1   Joseph M. Alioto (State Bar No 42680)
    Tatiana V. Wallace (SBN 233939)
2   **ALIOTO LAW FIRM**
    One Sansome Street, 35th Floor
3   San Francisco, CA  94104
    Telephone:      (415) 434-8900
4   Facsimile:      (415) 434-9200
    Email:          jmalioto@aliotolaw.com
5

6   Joseph R. Saveri (State Bar No. 130064)
    Steven N. Williams (State Bar No. 175489)
7   Cadio Zirpoli (State Bar No. 179108)
    Elissa Buchanan (State Bar No. 249996)
8   David H. Seidel (State Bar No. 307135)
    **JOSEPH SAVERI LAW FIRM, LLP**
9   601 California Street, Suite 1000
    San Francisco, California 94108
10  Telephone:      (415) 500-6800
    Facsimile:      (415) 395-9940
11  Email:          jsaveri@saverilawfirm.com
                    swilliams@saverilawfirm.com
12                  czirpoli@saverilawfirm.com
                    eabuchanan@saverilawfirm.com
13                  dseidel@saverilawfirm.com

14  Counsel for Plaintiffs

15

16              **UNITED STATES DISTRICT COURT**

17              **NORTHERN DISTRICT OF CALIFORNIA**

18

19  DANTE DEMARTINI, CURTIS BURNS JR.,          Case No.
    NICHOLAS ELDEN, JESSIE GALVAN,
20  CHRISTOPHER JOSEPH GIDDINGS-LAFAYE,         **COMPLAINT TO PROHIBIT THE**
    STEVE HERRERA, HUNTER JOSEPH               **ACQUISITION OF ACTIVISION**
21  JAKUPKO, DANIEL DERMOT ALFRED              **BLIZZARD BY MICROSOFT**
    LOFTUS, BEOWULF EDWARD OWEN, and           **CORPORATION IN VIOLATION OF**
22  IVAN CALVO-PÉREZ,                          **SECTION 7 OF THE CLAYTON**
                                               **ANTITRUST ACT, 15 U.S.C. § 18**
23              Plaintiffs,

24          v.

25
    MICROSOFT CORPORATION, a Washington
26  corporation,

27              Defendant.

28

1

## TABLE OF CONTENTS

2  INTRODUCTION ................................................................................................ 1

3  JURISDICTION AND VENUE ......................................................................... 3

4  DIVISIONAL ASSIGNMENT .......................................................................... 3

5  PARTIES ............................................................................................................ 3

6       Plaintiffs ...................................................................................................... 3

7       Microsoft Corporation ................................................................................ 5

8  BACKGROUND ................................................................................................ 7

9       Activision Blizzard ...................................................................................... 8

10      Video Game Platforms ............................................................................... 10

11              a)      Console Gaming ...................................................................... 10

12              b)      PC Gaming ............................................................................. 12

13              c)      Mobile Gaming ........................................................................13

14              d)      Cloud-Based Gaming Services ................................................ 14

15      Gaming Content ......................................................................................... 14

16              a)      Video Game Developers ..........................................................15

17              b)      Video Game Publishers ...........................................................15

18              c)      Video Game Distributors .........................................................15

19  RELEVANT PRODUCT MARKETS ................................................................ 16

20  GEOGRAPHIC MARKET ................................................................................ 24

21  The Merger May Substantially Lessen Competition or Tend to Create a Monopoly .................. 26

22  The Video Game Industry Is Characterized by Significant Network Effects and Barriers to
23      Entry ......................................................................................................... 29

24  Microsoft Directly Competes with Activision Blizzard in Game Development for the Console and
        PC Gaming Markets ....................................................................................31

25  Microsoft Directly Competes with Activision Blizzard in Game Publishing for the Console and
26      PC Gaming Markets ................................................................................... 32

27  Microsoft Directly Competes with Activision Blizzard in Game Distribution for the Console and
        PC Gaming Markets ................................................................................... 33

28  The Proposed Consolidation May Substantially Lessen Current Competition in the Video Game
        Development, Publishing, and Distribution Markets .................................... 33

ii

The Proposed Consolidation May Substantially Lessen Competition in the Labor Market ......... 34

The Proposed Consolidation May Give Microsoft Outsized Market Power and the Ability to Further Harm Competition by Foreclosing Inputs to Rivals in the Relevant Markets ..... 34

PRAYER FOR RELIEF ............................................................................................................. 40

# INTRODUCTION

1.     This is a private antitrust action seeking an order of the Court prohibiting the proposed acquisition of Activision Blizzard, Inc. by Microsoft Corporation as a violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18). The threatened loss or damage to the Plaintiffs and to the public at-large by the merging of two giants in the video game industry is extensive and broad.

2.     On January 18, 2022, Microsoft announced plans to acquire Activision Blizzard. Microsoft agreed to pay $68.7 billion ($68,700,000,000), or approximately $95 per share in an all-cash transaction. Under the proposed terms of the merger, Microsoft would acquire all the outstanding stock of Activision Blizzard. Upon completion of the deal, Activision Blizzard would be wholly owned by Microsoft.

3.     The proposed acquisition price of $68.7 billion in cash demonstrates the merger is significant and non-trivial. Indeed, if the acquisition is allowed to proceed, it would be the largest merger of technologies companies ever.

4.     Microsoft and Activision Blizzard are each significant rivals in the video game development, publishing, and distribution markets.

5.     Microsoft and Activision Blizzard both develop, publish, and distribute gaming content for purchase by consumers, and they directly compete in this market.

6.     Microsoft and Activision Blizzard are two of the largest gaming corporations in the United States with significant market share in the video game markets for developing, publishing and distributing video games.

7.     Microsoft owns and sells the Xbox gaming consoles and the Windows operating system, two of the primary platforms on which games are played.

8.     The development and publishing of video games for these and other platforms are critical inputs to the popularity and continued viability of gaming platforms.

9.     The development and publishing of video games are also critical inputs to new gaming platforms and distribution methods, such as multi-game subscription services and cloud-based gaming.

10.     In addition to the elimination of a significant rival, the proposed acquisition may give Microsoft far-outsized market power in the video game industry and may enable Microsoft to foreclose rivals to critical inputs and important markets.

11.     The current trend toward concentration, the lessening of competition, and the tendency to create a monopoly in the video game industry was already harming competition at an alarming rate before the proposed acquisition was announced. Both companies are the products of substantial campaigns to acquire, merge with, and consolidate numerous video game companies to achieve their current stature in the video game industry.

12.     If Microsoft's proposed acquisition of Activision Blizzard is allowed to proceed, the video game industry may lose substantial competition, and Microsoft may have far-outsized market power, with the ability to foreclose rivals, limit output, reduce consumer choice, raise prices, and further inhibit competition.

13.     The proposed acquisition is a violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18) in that the effect of the potential consolidation "may be substantially to lessen competition or tend to create a monopoly" in various markets in the video game industry.

14.     This private action is authorized under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26), which provides in relevant part that "any person…shall be entitled to sue and have injunctive relief …against threatened loss or damage by a violation of the antitrust laws." The remedy afforded to private plaintiffs includes injunctive relief prohibiting  any potential unlawful acquisition as well as divestiture.

15.     The Clayton Act codifies Congress' "intent to encourage vigorous private litigation against anticompetitive mergers" that may substantially lessen competition. *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990).

16.     Plaintiffs bring this action under the authority of Section 16 of the Clayton Antitrust Act and allege that the proposed acquisition of Activision Blizzard by Microsoft constitutes a substantial threat of injury to the Plaintiffs and the public because the acquisition

may have the effect of substantially lessening competition and may tend to create a monopoly in various markets in violation of Section 7 of the Clayton Antitrust Act.

17.     Competition rather than combination is the rule of trade in the United States so that these Plaintiffs, and the public at large, may enjoy the benefits and innovations that come from competition, including, among others, improved quality and increased choices at the lowest possible prices.

18.     Vigorous enforcement of the antitrust laws by private persons is an essential part of the congressional plan to ensure that competition rather than monopoly is, and remains, the rule of trade in the United States, including in the video game industry.

## JURISDICTION AND VENUE

19.     The proposed acquisition is in and substantially affects the interstate and foreign commerce of the United States in that video game consoles, personal computers, smartphones, and the video games that are played on those platforms, including cloud-gaming services, are sold throughout the United States.

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and Sections 7 and 16 of the Clayton Act (15 U.S.C. §§ 18 and 26).

21.     Jurisdiction and venue are proper in this judicial district pursuant to 15 U.S.C. §§15, 22, 26, and 28 U.S.C. § 1391.

## DIVISIONAL ASSIGNMENT

22.     Pursuant to Civil Local Rule 3-5.(b), assignment of this case to the San Francisco Division is proper because a substantial number of the Plaintiffs reside in and practice gaming in San Francisco.

## PARTIES

### Plaintiffs

23.     The Plaintiffs named below are individual citizens of the cities and states listed. Each Plaintiff is a consumer of video games, all with the express interest and intent in ensuring that the industry remains competitive, with the utmost innovation, output, choice, and price

constraints, now and in the future.  The potential acquisition of Activision Blizzard by Microsoft threatens loss and harm to the Plaintiffs, and to the public at large, of the salutary benefits of substantial competition within the video game industry.

24.     Dante DeMartini is a video gamer located in San Francisco, California. Mr. DeMartini plays video games on the PlayStation console and on his personal computer using Windows OS. Mr. DeMartini plays or has purchased titles from Activision Blizzard, including multiple versions of *Call of Duty*, *World of Warcraft*, *Overwatch*, *Overwatch 2*, *Starcraft II*, *Diablo III*, and *Hearthstone*.

25.     Curtis Burns Jr. is a video gamer located in San Francisco, California. Mr. Burns plays video games on the PlayStation console. Mr. Burns plays or has purchased titles from Activision Blizzard, including *Call of Duty*.

26.     Nicholas Elden is a video gamer located in Hoboken, New Jersey. Mr. Elden plays video games on Xbox, PlayStation, Nintendo Switch, and on mobile devices. Mr. Elden plays or has purchased titles from Activision Blizzard, including *Call of Duty*, *Diablo*, *Tony Hawk*, and others.

27.     Jessie Galvan is a video gamer located in San Francisco, California. Mr. Galvan plays video games on the PlayStation 5 console. Mr. Galvan plays or has purchased titles from Activision Blizzard, including *Call of Duty*.

28.     Christopher Joseph Giddings-LaFaye is a video gamer located in San Rafael, California. Mr. Giddings plays video games on his personal computer using Windows OS. Mr. Giddings plays or has purchased titles from Activision Blizzard, including *Call of Duty* and *Overwatch*.

29.     Steve Herrera is a video gamer located in Oakland, California. Mr. Herrera plays video games on PlayStation consoles and the Nintendo Switch. Mr. Herrera plays or has purchased titles from Activision Blizzard, including *Call of Duty* titles, *Overwatch*, *Overwatch 2*, *Crash Bandicoot*, and *Marvel Ultimate Alliance*.

30.     Hunter Joseph Jakupko is a video gamer located in Los Angeles, California. Hunter Joseph Jakupko plays video games on Xbox and PlayStation consoles as well as his personal computer using Apple OS. Mr. Jakupko plays or has purchased titles from Activision Blizzard, including *Call of Duty: Modern Warfare 2*, *Call of Duty: Warzone 2*, *World of Warcraft*, *and Overwatch 2*.

31.     Daniel Dermot Alfred Loftus is a video gamer located in San Rafael, California. Mr. Loftus plays video games on PlayStation consoles. Mr. Loftus plays or has purchased titles from Activision Blizzard, including *Call of Duty* and *Overwatch*.

32.     Beowulf Edward Owen is a video gamer located in Las Cruces, New Mexico. Mr. Owen plays video games on his personal computer using the Windows operating system and Xbox consoles. Mr. Owen plays or has purchased titles from Activision Blizzard including *Call of Duty* and *Overwatch*.

33.     Ivan Calvo-Perez is a video gamer located in San Francisco, California. Mr. Calvo-Perez plays video games on the PlayStation consoles and on his personal computer using Windows OS. Mr. Calvo-Perez plays or has purchased titles from Activision Blizzard, including *Call of Duty*, *Diablo*, *Starcraft*, and *Warcraft 3*.

**Microsoft Corporation**

34.     Defendant Microsoft Corporation is a corporation incorporated under the laws of the State of Washington with its principal place of business in Redmond, Washington. Microsoft is a global technology company.

35.     Microsoft manufactures and sells the Xbox gaming console, a gaming platform capable of processing video games developed for the platform and offers for sale related services.

36.     For the most recent generation of Xbox consoles Microsoft sold 7.47 million units by July 2022, nearly the same number as its closest competitor, the Sony PlayStation.

37.      Microsoft CEO Satya Nadella announced that the company was "the market leader in North America for three quarters in a row among next gen consoles," in a July 26, 2022 earnings call.

38.     Microsoft owns and develops the Windows operating system. Windows is the primary computer operating system for which computer video games are developed.

39.     Microsoft's Windows' market share of computer operating systems is roughly 70–80% worldwide. For computer gaming, that share is roughly 90%.

40.     This market share is also reflected in the number of games developed and available for the Microsoft Windows operating system compared to other operating systems.

41.     Microsoft is a developer, publisher, and distributor of video games for consoles, PCs, and mobile devices.

42.     Microsoft owns 23 different game development studios, including some of the largest. According to Microsoft, Microsoft is "responsible for developing and publishing some of the biggest video game franchises in history," including *Age of Empires*, *Forza*, *Gears of War*, *Halo*, *Minecraft*, *Fallout*, *Microsoft Flight Simulator*, *DOOM*, *The Elder Scrolls*, and many more.

43.     Microsoft is one of the only game developers and publishers that can afford to invest the time, funding, and human resources required to develop and sustain top game franchises like *Minecraft* or *Halo*.

44.     According to a report by the Congressional Research Service, Microsoft is the largest single video game publisher in the United States by market share.

45.     Microsoft distributes games through the Microsoft Store, which sells Xbox and Windows PC games.

46.     Microsoft also distributes games through its Game Pass subscription services that allow consumers to pay a monthly fee to have access to an entire library of games on either Xbox or Windows PC or both.

47.     In March of 2022, Game Pass accounted for about 60% of the video game subscription market already.

48.     Microsoft offers cloud gaming through its Xbox Cloud Gaming service.

49.     Cloud-based gaming is a new model of gaming in which users connect to remote gaming servers through the internet.

50.     Microsoft operates cloud-based gaming servers at data centers located throughout the world. Microsoft hosts games on these servers and streams them to a user's devices.

51.     The server runs the game and processes gamer inputs in real-time, replicating the experience of playing games natively.

52.     Since the video games are processed on the server and not the user's device, cloud-based gaming allows users to play video games on virtually any device, so long as it has a sufficiently fast internet connection.

53.     Microsoft also owns and runs its Azure cloud services.

54.     Azure is used primarily for enterprise and business server solutions, but it is also used as a backend platform for hosting and supporting live games, called Azure PlayFab, which supports live multiplayer games such as Microsoft's Minecraft. Microsoft also uses its Azure cloud services for cloud-based gaming.

55.     PlayFab is a complete server-side platform to create, manage and run real-time games. Microsoft launched this backend development solution in 2014.

## BACKGROUND

56.     The video game industry is a fast-evolving, and quickly growing modern industry.

57.     Revenue in the video game industry is projected to reach $197 billion this year, with an annual growth rate of 7.67%, reaching $285 billion by 2027.

58.     In 2021, there were an estimated 3.24 billion consumers of video games globally (roughly half the world's population), with 226.6 million gamers in the United States alone.

59.     That equates to roughly 68% of the U.S. population playing some form of video games, after a 30% increase during the Covid-19 pandemic in 2020.

60.     As with many other tech industries, the video game industry changes rapidly with technological advances and creative innovation. The industry has changed dramatically from its humble beginnings roughly 50 years ago, when *Pong* was released in 1972.

61.     In recent years, the trend towards concentration of power in the video game industry has increased dramatically.

62.     In 2021 alone, there were 1,159 mergers worth a total of $85.4 billion, the highest in history and over three times the deal value of mergers in the video game industry in 2020.

63.     That number was quickly surpassed just six months into 2022, which saw $107 billion spent on acquisitions across 651 transactions.

64.     The rapid concentration of the video game industry has not escaped notice by industry participants and consumers. Nathan Brown, a game consultant and industry author, suggested that the video game industry is "concentrating power overwhelmingly in the hands of . . . [a] small number of corporations."

65.     On January 18, 2022, Microsoft announced plans to acquire Activision Blizzard. Microsoft agreed to pay $68.7 billion ($68,700,000,000.00) in an all-cash transaction. Under the proposed terms of the merger, Microsoft would acquire all the outstanding stock of Activision Blizzard. Upon completion of the deal, Activision Blizzard would be wholly owned by Microsoft.

66.     The unlawful acquisition agreement requires Microsoft to pay Activision Blizzard a "reverse termination fee" if the merger is unable to proceed due to challenge under the antitrust laws. The agreement provides that Microsoft will pay Activision Blizzard a reverse termination fee of $2 billion if terminated prior to January 18, 2023, $2.5 billion if terminated after January 18, 2023, or $3 billion if terminated after April 18, 2023.

**Activision Blizzard**

67.     Activision Blizzard, Inc. is a corporation incorporated under the laws of the State of Delaware with its headquarters and principal place of business in Santa Monica, California.

68.     Activision Blizzard is a video game developer, publisher, and distributor. It creates, publishes, and sells video games across multiple platforms, including Xbox, PlayStation, Windows and Apple PCs, and mobile devices.

69.    Activision Blizzard has developed and published some of the most popular game franchises in history, such as *Call of Duty*, *World of Warcraft*, *StarCraft*, *Overwatch*, *Diablo*, and *Candy Crush*, among others.

70.    Activision's *Call of Duty* franchise is considered to be one of the most successful and important gaming franchises in the console gaming market.

71.    *Call of Duty* is currently one of the largest game franchises by user base and revenue.

72.    *Call of Duty* has ranked in the top games available on a console for many years and has a high level of awareness amongst gamers and draws a large and loyal user base to the platforms on which it is played. It has been consistently successful for nearly a decade.

73.    There exist very few franchises that can be considered alternatives to *Call of Duty* or match its level of success.

74.    Activision Blizzard is one of the few game developers and publishers that can afford to invest the time, funding, and human resources required to develop and sustain a game franchise like *Call of Duty* or *World of Warcraft*.

75.    Activision Blizzard is currently considered the second largest video game publisher in the United States, with a market share of 10%, behind only Microsoft.

76.    There are only several independent game publishers in the world that are capable of making the highest production quality and most graphics-intensive video games that can be mass marketed and are highly anticipated among gamers (generally referred to as "AAA" or "Triple-A" games), including Activision Blizzard, Electronic Arts, Take-Two, and Ubisoft. Microsoft and Sony are also Triple-A game publishers.

77.    Activision Blizzard is also a video game distributor, selling its gaming content through its digital store front, www.battle.net.

**Video Game Platforms**

78.     Video games are developed and published for specific platforms that run the gaming content. Video game platforms are generally any system—a combination of hardware and software—that plays video game programs, or what is often referred to as "gaming content."

79.     Video game platforms process and run the gaming content developed for the platform. Thus, all of the gaming content – the actual video games being played – come from the development of the gaming content, not from the platform. Without video games developed for a platform, a video game platform does not have any gaming content of its own.

80.     Video game platforms are generally divided into four major categories: console systems, personal computers, mobile devices, and cloud-based gaming services.

a)  **Console Gaming**

81.     Console systems are hardware devices that connect directly to a TV or monitor and allow users to play video games. The latest generation of consoles utilizing the latest technology are referred to as "next gen" consoles. Next gen consoles generally cost around $500.

82.     The console itself provides the processing function for game play.

83.     By using a console controller, a user plays games that are displayed typically on a television monitor.

84.     Only games specifically designed and engineered for that console will play on the console.

85.     Some large franchises offer cross-platform interoperability, where the game allows online play between players using different gaming consoles or platforms.

86.     Users must purchase the console system and must also purchase the gaming content designed for that console.

87.     For the past 20 years, there have only been three major manufacturers of gaming consoles. Microsoft makes Xbox consoles, including the most recent Xbox Series X and Series S. Sony Group Corporation ("Sony") makes PlayStation consoles, including the most recent

PlayStation 5. Nintendo Co. Ltd. ("Nintendo"), makes various console systems, including the most recent Nintendo Switch.

88.     Console manufacturers produce new generations of their consoles roughly every four to seven years. Each new generation of consoles generally features the latest technological advances in console gaming, and allows users to play ever more graphically and computationally advanced games.

89.     Game designers and engineers design games to make use of such increased processing power or new features.

90.     New games are ordinarily not backwards compatible with prior versions of consoles.

91.     Users must purchase the latest-generation consoles in order to play the newest and best games.

92.     Nintendo consoles, like the Nintendo Switch, are far less powerful than the Microsoft Xbox Series X or the Sony PS5. Thus, Microsoft and Sony are the only two producers of the high-performance segment of consoles that includes only the most technologically advanced consoles, which can run the most graphically and computationally complex games at the highest levels.

93.     Nintendo consoles and their games tend to cater to a younger and more casual gaming audience.

94.     As such, Xbox and PlayStation are much more similar and substitutable for one another, whereas Nintendo has largely carved out a niche that does not compete as heavily with Xbox or PlayStation.

95.     Most console games are developed in different versions to be played on different consoles. Individual games will often have both an Xbox version, compatible with an Xbox console, and a PlayStation version, compatible with a PlayStation console. Some games, however, are exclusive titles, only able to be played on an Xbox, PlayStation, PC, or Nintendo console and not the other systems.

**b) PC Gaming**

96.     Games can also be played on personal computers ("PC"),[1] which provide the processing of gaming content.

97.     Most personal computers may be used to play video games. All personal computers can run some video games in addition to their other uses, however, only computers with sufficiently advanced graphical processors and other specifications are able to process and run the most graphically advanced and latest gaming content.

98.     Players utilizing a PC generally use their keyboard and mouse as opposed to a specifically designed controller.

99.     As the computing and graphics processing power of PCs increase, game developers and publishers design games to make use of increased processing power.

100.     Each video game is programmed for a specific computer operating system, and users purchase video games specifically programmed for the operating system of their personal computer.

101.     PC games are generally programmed for either the Windows operating system or Apple's operating system, but gamers play on Windows PC much more than on Apple computers. Windows makes up roughly 90% of the PC gaming market.

102.     Just as with consoles, as PC technologies advance and more advanced video games are developed, users must occasionally upgrade the graphical and computational processing power of their PCs to play the most technologically advanced games.

103.     PCs are primarily used for personal and business functionality rather than playing video games.

104.     PCs are largely produced and marketed to consumers for use irrespective of their video-game-playing potential.

---

[1] Although the term "PC" means personal computer, the term "PC" is often used to mean specifically a Windows or non-Apple computer. This complaint uses the term PC to mean any computer, including Apple computers. However, given that roughly 90% of computer gaming occurs on Windows computers, the two meanings of the term are largely interchangeable with respect to PC-gaming

105.    Similarly, the operating systems of PCs are primarily designed for broad functionality, and not solely for gaming.

106.    However, because of the popularity of gaming on PCs, the ability of the operating system and the hardware specifications of a PC to be able to run games is an important factor in consumer choice.

107.    Another important factor is the quality and quantity of the games programed for that type of device.

108.    Most console games are also developed to be played on personal computers.

109.    Most popular games can be purchased for use on a console (Microsoft Xbox or Sony PlayStation) and for use on a Windows personal computer. Some games are also made for Apple computers as well.

110.    *Call of Duty* for example, made by Activision Blizzard, has been developed for the Xbox, the PlayStation, and for Windows PCs, and can be purchased for all three of those platforms.

111.    To play on any of these platforms a user would still need to buy the proper version designed for that platform.

c) **Mobile Gaming**

112.    Games can also be played on mobile devices, such as mobile smartphones or tablets. Smartphones allow users to install games through the smartphones' app stores.

113.    Mobile gaming, however, is largely targeted at a different user base than console or PC gaming, in part due to the different gaming experience.

114.    Players are able to play games directly on their phone, typically with touch-based control systems, without needing to use another device besides their phone or other mobile device.

115.    While consoles and PC games can provide very similar (if not identical) gaming experiences due to the similarities between hardware capabilities and complex user controls,

mobile gaming currently lacks the technical capabilities to play the majority of console and PC games.

116.    Thus, the majority of mobile gaming consumers use smartphones to play more casual games, such as *Candy Crush*, or *Words with Friends*.

117.    As such, mobile gaming is generally not substitutable with console and/or PC gaming and constitutes a separate market.

**d)  Cloud-Based Gaming Services**

118.    Cloud-based gaming services allow users to play video games on virtually any device, so long as they have a strong internet connection.

119.    In cloud-based gaming, the service provider runs the hardware to process the video game on servers and computer systems, and then streams the video game to the user's device remotely through the internet.

120.    The fundamental reason for cloud-based gaming is that the user does not need a device with the capabilities to process the intense graphics of many Triple-A games and can instead stream the video game to virtually any device with a fast internet connection, such as a smartphone, tablet, Smart TV, or lower-end PC.

121.    Numerous companies have begun to try to develop cloud-based gaming services, such as Google's Stadia, Amazon's Luna, Shadow, Microsoft's Xbox Cloud Gaming, and PlayStation Now.[2]

122.    Cloud-based gaming services are reliant on a pre-existing catalog of games, especially high-end titles, as the games are the critical input.

**Gaming Content**

123.    Video games (gaming content) are marketed and distributed to consumers through video game developers, publishers, and distributors.

---

[2] Google Stadia will be shutting down in January 2023 with Google now utilizing Nvidia GeForce Now to provide access to Xbox Cloud Gaming, Amazon Luna, and Google Play for new Chromebooks. Shadow has similarly transitioned to focusing on offering a suite of cloud-based computing solutions, with the company being purchased by OVHcloud to develop a European alternative to Office 365.

### a) **Video Game Developers**

124.   Video game developers, also referred to as "game studios," are the entities that create and design video games. Game developers generally are classified as either indie developers, large-scale developers, or third-party developers. Indie developers are small independent developers, usually employing up to 100 employees with generally limited funding, that create smaller and less marketed games.

125.   Large-scale developers are large organizations that work on many games across multiple platforms, have significantly more funding, and generally make larger games that are mass-marketed to a much broader consumer base. Large-scale developers often have control over extremely popular video game franchises, such as *World of Warcraft* and *Call of Duty* (owned by Activision Blizzard), or *Halo* and *Minecraft* (owned by Microsoft).

126.   Third-party developers are entities that contract with video game publishers to create and develop specific video games for their publisher clients.

127.   Indie developers are entities that create smaller games with less funding and marketing for the same video game platforms as other developers.

### b) **Video Game Publishers**

128.   Video game publishers are the entities that market, monetize, and produce video games for mass distribution. Sometimes, publishers fund video game developers to develop specific games for the publishers. Publishers are usually much larger and more heavily resourced than game developers, as publishers need the resources to ensure the finished game is properly placed in the market, compatible with various video game platforms, and adequately marketed to be profitable. Publishers may also ensure that game support and adequate server space is provided.

### c) **Video Game Distributors**

129.   Video game distributors are the entities that distribute gaming content to consumers. In the past, video game distributors sold video games on discs or cartridges in physical brick-and-mortar retail stores. By 2018, 83% of video game sales were in digital format

and sold to consumers through digital stores that allow consumers to download the video games

directly to the device on which they will be played (i.e., consoles, PCs, mobile smartphones).

## RELEVANT PRODUCT MARKETS

### Video Games Are a Relevant Product Market

130.    Video games are unique entertainment and competitive pursuits, without similar

or substitutable products. Video gamers (or just "gamers"—those who play video games) are

unlikely to substitute other types of games (e.g., board games, card games, puzzles) for video

games in response to a small but significant price increase.

131.    The video game industry recognizes this as shown by the different marketing

techniques used for video games and the different pricing structures, as opposed to other forms of

entertainment and competitive pursuits. Video games require additional hardware to be able to

play, and offer players online connectivity, downloadable content, and other benefits that other

entertainment products lack. The industry also recognizes this difference in the different manner

of producing video games, with specialized manufacturers, the different methods of marketing

video games, the distinct prices of video games with strong price sensitivity, and the

specialization of video game publishers when compared to other products.

132.    Video games constitute a line of commerce and a relevant product market within

the meaning of Section 7 of the Clayton Act.

133.    The video game market is subdivided into smaller relevant product markets, such

as video games for console systems, video games for PCs, video games for mobile devices, Triple-

A video games, and cloud-based gaming.

### Console Gaming Constitutes a Relevant Product Market

134.    Video games for consoles are unlikely to be substituted by gamers for other video

game platforms because a gamer would need to purchase an entirely new platform to play video

games designed for another platform, along with new video games developed for another

platform, and because the network effects associated with console gaming are sufficient to reduce

substitutability between console gaming and other types of platforms.

135.     Console gaming also uses a different user input device—the video game controller—from PC gaming, in which the user generally uses a keyboard and mouse.

136.     The user input device on console gaming is also significantly different from mobile gaming, in which the user uses the touchscreen of a phone or tablet to play the video game.

137.     With console gaming, gamers must purchase the console system (hardware device) used solely for the purpose of gaming, whereas PC gaming requires use of a PC, which many gamers already have access to irrespective of whether they play games on the PC or not. PC gaming is similar to mobile gaming, with most gamers already owning a PC and not requiring the purchase of a separate hardware device solely for gaming. However, for the best gaming experience, and to play the latest and most graphically demanding games, gamers generally must purchase either specific gaming computers or update their non-gaming computers with sufficient hardware upgrades.

138.     Console gaming has distinct customers compared to other gaming products, resulting in the term "console gamer" for those players who prefer to play on console as opposed to PC or otherwise.

139.     The industry recognizes console gaming as a unique product market, shown in the way console gaming is marketed to gamers, and through the distinct online communities that support and uphold console gaming as unique to other platforms.

140.     Some developers produce games solely for console systems and no other platforms.

141.     Console games have a distinct pricing structure.

142.     Mobile gaming's lack of the same quality of hardware and software, completely different user controls, as well as differing titles, different marketing techniques, and different gaming communities and types of games played, make mobile gaming also an unlikely substitute, recognized by the industry.

143.     Console gaming constitutes a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**PC Gaming Constitutes a Relevant Product Market**

144.   Video games for PCs are also unlikely to be substituted by gamers for video games on different platforms because a gamer would need to purchase an entirely new platform to play video games designed for another platform.

145.    Video games for PCs are also unlikely to be substituted by gamers because the network effects associated with PC gaming are sufficient to reduce substitutability between PC gaming and other types of platforms.

146.   PC gaming also uses a different user input device—most often the keyboard and mouse—from console gaming, in which the user uses a gaming controller. If PC gamers wish, some games allow for a controller to be connected to the PC to also allow for using a console controller as an input device.

147.   The user input device on PC gaming is also very different from mobile gaming, in which the user uses the touchscreen of a phone or tablet to play the video game.

148.   With PC gaming, gamers need only the use of a PC with sufficient specifications, which many gamers already have access to irrespective of whether they play games on the PC or not, as opposed to console gaming, in which users must purchase a separate hardware device designed solely for gaming. Similar to mobile gaming, PC gamers often already have the device needed to play games without having to buy an additional device. However, gamers will often have to pay for specific gaming computers, or hardware upgrades, to play the latest and most graphically intensive games.

149.   PC gaming has distinct customers compared to other gaming products, resulting in the term "PC gamer" for those players who prefer to play on PC as opposed to console or otherwise.

150.   The industry recognizes PC gaming as a unique product market, shown in the way PC gaming is marketed to gamers, and the distinct online communities that support and uphold PC gaming as unique to other platforms.

151.    PC games have a distinct pricing structure compared to console gaming and gaming on other platforms, such as mobile gaming.

152.    PC games must be specifically developed and programmed for PC operating systems and cannot operate on consoles or other platforms.

153.    Mobile gaming's lack of the same quality of hardware and software, completely different user controls, as well as differing titles, different marketing techniques, and different gaming communities and types of games played, makes mobile gaming also an unlikely substitute, recognized by the industry.

154.    PC gaming constitutes a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**Mobile Gaming Constitutes a Relevant Product Market**

155.    Video games for mobile devices such as smartphones and tablets are also unlikely to be substituted by gamers for video games on different platforms because a gamer would need to purchase an entirely new platform to play video games designed for another platform, and because the network effects associated with mobile gaming are sufficient to reduce substitutability between mobile gaming and other types of platforms.

156.    Mobile gaming also uses a different user input device—the touchscreen on a smartphone or tablet—from console gaming and PC gaming.

157.    With mobile gaming, gamers need only the use of a smartphone or tablet, which many gamers already have access to irrespective of whether they play games on it or not.

158.    Mobile gaming has distinct customers compared to other gaming products, resulting in the term "mobile gamer" for those players who prefer to play on mobile as opposed to console, PC, or otherwise.

159.    The industry recognizes mobile gaming as a unique product market, shown in the way mobile gaming is marketed to gamers, and the distinct online communities that support and uphold mobile gaming as unique to other platforms.

160.    Mobile games must be specifically developed and programmed for mobile device operating systems and cannot operate on consoles or other platforms.

161.    Mobile games have a distinct pricing structure compared to video games on other platforms.

162.    Mobile gaming's lack of the same quality of hardware and software, as well as the vastly different user input controls, means that mobile gaming is largely composed of different types of games than console or PC gaming, and the video games are also targeted at a different user base.

163.    Mobile gaming is thus an unlikely substitute to other gaming platforms.

164.    Mobile gaming constitutes a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**AAA Video Games Constitute a Relevant Product Market**

165.    Triple-A video games ("AAA games") are video games with the highest production values, the best graphical and visual experiences, are the most marketed and widely distributed, and are highly anticipated by industry participants.

166.    Triple-A video games are considered unique in the industry, with expectations of high unit sales and revenue, are much more heavily marketed, and are unlikely to be substituted for other video games.

167.    Triple-A video games have distinct customers due to their widespread appeal and marketing to the general public as opposed to more limited marketing for other non-Triple-A games.

168.    Triple-A video games' prominence and uniqueness in the industry is reflected in the ability of only a small number of companies being able to publish Triple-A games, including Microsoft, Sony, Activision Blizzard, Electronic Arts, Take-Two, and Ubisoft.

169.    Triple-A video games have a unique pricing structure compared to other games and command the highest prices. They also often offer additional editions of the game that command a higher price with additional cosmetics, physical goods, or other benefits.

170.    Triple-A video games constitute a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**Video Game Subscription Services Constitute a Relevant Product Market**

171.    Video game subscription services, such as Xbox Game Pass are also unlikely to be substituted by gamers for other rental game services due to the specific titles that the subscription offers, strong network effects, and the ease of obtaining a large catalog of games for a major discount.

172.    Video game subscription services typically cater to customers who are willing to pay for monthly access to a large game library as opposed to purchasing individual games that they will own forever.

173.    The industry recognizes video game subscription services as a unique product market as shown in marketing for game subscription services, the placing of titles by developers on game subscription services as opposed to other means of distribution, and the continued sale of games directly without a game subscription.

174.    Video game subscription services have a distinct price model that allow for multiple games to be available for significantly less cost than buying each game individually.

175.    Video game subscription services are thus unlikely to be substituted for other game discount services, like renting games or multigame bundles.

176.    Video game subscription services constitute a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**Game Console Systems Constitutes a Relevant Product Market**

177.    Game console systems are highly differentiated from other gaming platforms, such as PC operating systems or mobile devices, as they are devices made with the primary purpose of playing video games.

178.    The industry recognizes game console systems as a unique relevant product market as shown by how the industry markets games for specific consoles, designs game primarily for the use of console controller inputs, and markets games specifically for use on consoles.

179.    Game console systems constitute a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**High-Performance Console Systems Constitutes a Relevant Product Market**

180.    High-performance consoles systems are highly differentiated from other consoles, such as Nintendo's consoles, which do not incorporate the latest graphical advances and cannot play the most advanced games at the highest level.

181.    High-performance console systems constitute a unique relevant market that does not include Nintendo's most recent console, the Nintendo Switch.

182.    Microsoft's latest Xbox consoles and Sony's latest PlayStation console are both considered in the industry to be "next gen" consoles, but the Nintendo Switch is not.

183.    The Nintendo Switch was released in 2017, the latter half of what is considered the eighth generation of gaming consoles, which had begun in approximately 2013.

184.    The Nintendo Switch has lower computational performance, more in line with Microsoft's and Sony's eighth generation consoles than their current ninth generation consoles.

185.    The Nintendo Switch is instead focused on permitting portable, handheld use, sacrificing computing power which leaves the Nintendo Switch unable to play some of the more advanced games that require the Xbox Series X or PlayStation 5.

186.    The Nintendo Switch offers a different catalog of games, and focuses on casual and family gaming.

187.    The difference in computing power is reflected in a lower price for the Nintendo Switch, which retails at $299.99 as opposed to the Xbox Series X and PlayStation 5, which retail at $499.99.

188.    The industry recognizes high-performance console systems as a unique product market, shown in how the industry markets high-end console gaming and high-end consoles to gamers and the new exclusive gaming titles only available on high-end consoles. It is also reflected in use of the term "next-gen" consoles.

189.    High-performance console systems constitute a line of commerce and a unique product market within the meaning of Section 7 of the Clayton Act.

**Computer Operating Systems Constitute a Relevant Product Market**

190.    PC operating systems, such as Windows OS, are unlikely to be substituted by video gamers for other video game operating systems, due to the specific titles that the operating system offers, strong network effects, and non-gaming related benefits to an operating system, such as familiarity of use and use outside of gaming for PCs.

191.    PC operating systems appeal to a different customer base than those for other video game platforms due to their additional options beyond gaming and unique capabilities from gaming consoles.

192.    The industry recognizes the PC operating market as a unique product market as seen in their provision of games to specific operating systems, limitation of titles to only operating systems and not consoles, and individual distribution systems for different operating systems.

193.    PC operating systems are priced differently than consoles or other video game platforms due to their additional uses outside gaming and the customization options for heightened performance.

194.    PC operating systems are thus unlikely to be substituted for other video game platforms.

195.    PC operating systems constitute a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**Cloud-Based Gaming Constitutes a Relevant Product Market**

196.    Cloud-based gaming services are unique to all other traditional gaming platforms.

197.    Cloud-based gaming is unique in that the user does not need any particular hardware platform, because the video game is instead processed on the service provider's servers remotely and streamed to the user. The gamer can thus play cloud-based gaming on virtually any device so long as it has a screen, sufficient user input controls, and a fast internet connection.

198.   Cloud-based gaming appeals to a different set of consumers by allowing flexibility on which devices are used to play video games.

199.   However, the nature of playing through the "cloud" brings inherent issues unique to this platform of gaming, such as inherent latency, or "lag," between when the user presses input controls and when the video game responds. This latency is a product of internet speeds, as well as the proximity of the service provider's physical servers to the user.

200.    Moreover, a gamer that utilizes cloud-based gaming cannot substitute video games on other platforms because the gamer would need to purchase the alternate gaming platform before playing video games designed for other platforms.

201.   Cloud-based gaming, as it does not require an additional device to play video games, operates in a distinct pricing structure that offers the cloud-based gaming as a standalone product.

202.   The industry recognizes cloud-gaming as a unique product market, shown in the way that new cloud-based gaming services are marketed to gamers, and demonstrated by the fact that cloud-gaming does not have the same video games available to play as other platforms enjoy.

203.   Cloud-based gaming services constitute a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

## GEOGRAPHIC MARKET

204.   With respect to the challenged conduct in the above markets, the United States is the relevant geographic antitrust market.

205.   Prices of video games in the United States are generally not constrained by the prices of video games in other countries.

206.   Game publishers and distributors generally price video games at highly differentiated prices by country, and consumers are largely unable to purchase games in other countries to take advantage of lower prices.

207.    Consumers are unable to buy physical copies of games in retail stores in other countries and are prevented by digital game stores from purchasing another countries' version of the same game (a practice known as "region locking").

208.    In addition, regulations and competition dynamics are generally differentiated by country.

209.    Not all nations have access to Microsoft Xbox services or consoles. Other nations have access to all consoles and systems, but have differing market shares based on internal considerations, such as Japan being dominated by Sony's PlayStation despite Microsoft's near equivalent market share in nations like the United States.

210.    Language barriers also prevent consumers from purchasing video games designed for other countries and sold in storefronts designed for other countries.

211.    The United States constitutes a relevant geographic antitrust market in the video game industry.

**COUNT 1**

**Violation of Section 7 of the Clayton Act (15 U.S.C. § 18)**

212.    Plaintiffs allege and incorporate paragraphs 1–212 as if alleged herein.

213.    On January 18, 2022, Microsoft announced plans to acquire Activision Blizzard. Microsoft agreed to pay $68.7 billion ($68,700,000,000) in an all-cash transaction.

214.    Under the proposed terms of the merger, Microsoft would acquire all the outstanding stock of Activision Blizzard. Upon completion of the deal, Activision Blizzard would be wholly owned by Microsoft.

215.    As Microsoft states, the consolidation would make Microsoft the world's third-largest gaming company by revenue.

216.    Microsoft has stated it expects the acquisition to close sometime in 2023.

217.    The unlawful acquisition agreement further requires Microsoft to pay Activision Blizzard a "reverse termination fee" if the merger is unable to proceed due to challenge under the antitrust laws. The agreement provides that Microsoft will pay Activision Blizzard a reverse

termination fee of $2 billion if terminated prior to January 18, 2023, $2.5 billion if terminated after January 18, 2023, or $3 billion if terminated after April 18, 2023. As a material provision of the unlawful acquisition agreement, the "reverse termination fee" is void and unenforceable.

**The Merger May Substantially Lessen Competition or Tend to Create a Monopoly**

218. The effect of the proposed acquisition may be substantially to lessen competition, or tend to create a monopoly, in interstate trade and commerce in the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

219. The proposed acquisition of Activision Blizzard by Microsoft is part of a dramatic wave of consolidation and stands to further lessen competition and harm consumers. The merger follows a long history of concentration in the markets by both Microsoft and Activision Blizzard and may serve to further consolidate power in the gaming industry.

220. Microsoft has bolstered and cemented its large video game ecosystem through a series of mergers and acquisitions, currently owning 24 different gaming studios, including:

a. Mojang Studios, acquired on September 15, 2014, and known for games such as *Minecraft* and *Minecraft Dungeons*;

b. Ninja Theory Ltd., acquired on June 10, 2018, is known for games such as *Devil May Cry* and *Disney Infinity*;

c. Playground Games Ltd., acquired on June 10, 2018, is known for games such as the *Forza Horizon* and *Forza Motorsport*;

d. Undead Labs LLC, acquired on June 10, 2018, is known for games such as *State of Decay*;

e. Compulsion Games Inc., acquired on June 10, 2018, is known for games such as *We Happy Few*;

f. Obsidian Entertainment Inc., acquired on November 10, 2018, is known for games such as *Pillars of Eternity*, *Knights of the Old Republic*, *Knights of the Old Republic II: The Sith Lords*, *Neverwinter Nights 2*, and *South Park: The Stick of Truth*;

g.  InXile Entertainment, Inc., acquired on November 10, 2018, is known for games such as the *Wasteland* franchise and *Torment: Tides of Numenera*;

h.  Double Fine Productions Inc., acquired on June 9, 2019, is known for games such as *Psychonauts*, *Broken Age*, *Brütal Legend*, and *Grim Fandango Remastered*;

i.  ZeniMax Media Inc., acquired on September 21, 2020, which comprises game studios Bethesda Game Studios, ZeniMax Online Studios, id Software, Arkane Studios, Machine Games, Tango Gamesworks, Alpha Dog Games, and Roundhouse Studios. These studios are known for franchises like *The Elder Scrolls*, *Fallout*, *Wolfenstein*, *Doom*, and *Quake*; and

j.  Rare Ltd., acquired on September 24, 2022, is known for games an franchises such as *GoldenEye 007*, *Perfect Dark*, and *Banjo Kazooie*.

221.  Activision Blizzard owns, among others, *Call of Duty*, *World of Warcraft*, *StarCraft*, *Overwatch*, *Diablo*, and *Candy Crush*.

222.  Activision Blizzard is also the product of many significant mergers and acquisitions, including:

a.  Raven Software Corp., acquired in 1997, and known for its work on *Call of Duty*, *Heretic*, and *Hexen*: *Beyond Heretic*;

b.  Treyarch Invention LLC, acquired on October 1, 2001, and known for work on the *Call of Duty* series;

c.  Infinity Ward Inc., acquired on October 30, 2003, is known for its work on the *Call of Duty* series;

d.  High Moon Studios Inc., acquired on January 5, 2006 by Vivendi Studios and resultantly Activision Blizzard after acquisition, is known for its work on *Transformers* video games, *Call of Duty*, and *Destiny*;

e.  Vicarious Visions Inc., now known as Blizzard Albany, acquired in January of 2005, is known for work on *Tony Hawk's Pro Skater*;

f.   Radical Entertainment Inc., acquired by Vivendi Games in 2005 and later Activision Blizzard, is known for work on *The Simpsons: Hit & Run*, *Prototype*, *Prototype 2*, and entries in the *Crash Bandicoot* franchise;

g.   Toys for Bob Inc., acquired on May 3, 2005, is known for its work on *Star Control* and *Star Control II*;

h.   Beenox Inc., acquired on May 25, 2005, is known for its work on popular franchises such as *X-Men*, *Spider-Man*, and *Shrek*;

i.   Blizzard Entertainment, Inc., acquired on July 9, 2008 through acquisition of its parent Vivendi Games, which includes games and franchises such as *World of Warcraft*, *Starcraft*, and *Overwatch*;

j.   Sledgehammer Games Inc., acquired in 2009, is known for its work on the *Call of Duty* series; and

k.   King Digital Entertainment PLC, acquired on February 23, 2016, a mobile game conglomerate that has game studios in Stockholm, Malmö, London, Barcelona, Berlin, Singapore, and Seattle with offices in San Francisco, Malta, Seoul, Tokyo, Shanghai, and Bucharest. It is also known for owning the franchise *Candy Crush*, which is the most popular mobile game of all time.

223.   The proposed acquisition of Activision Blizzard by Microsoft poses a substantial threat to the Plaintiffs, and to the public at large, in that the proposed acquisition may substantially lessen competition in each of the relevant product markets, and may cause loss to the Plaintiffs, and the public at large, in the form of higher prices, less innovation, less creativity, less consumer choice, decreased output, and other potential anticompetitive effects, which deprive the Plaintiffs, and the public at large, of the salutary benefits of competition.

224.   The proposed acquisition of Activision Blizzard by Microsoft may also substantially reduce competition in the labor market for video game labor talent.

225.    Employees in the video game industry may have substantially less choice among employers, and Microsoft may have outsized market power in hiring and retaining employees in the e video gaming field, which requires specialized talent.

226.    This is particularly concerning given that Activision Blizzard is currently engulfed in lawsuits from employees and from the California Department of Fair Employment and Housing, alleging that it engaged in widespread gender discrimination and sexual harassment.

227.    Concentration in the market may further limit employees' negotiating power and ability to change employers for improved working environments and compensation.

228.    Activision Blizzard is one of Microsoft's primary competitors for top talent in the gaming content industry. The proposed acquisition of Activision Blizzard by Microsoft may reduce the competition for talent in this field.

229.    The merger of Microsoft and Activision Blizzard will irreparably harm competition because Microsoft is acquiring, and thereby eliminating one of only a few significant rivals of gaming content creation. The current and future competition between Microsoft and Activision Blizzard will be irretrievably lost.

230.    If Microsoft's acquisition of Activision Blizzard is allowed to commence, Microsoft may have far-outsized market power in several key gaming markets, including the labor market, which will allow Microsoft to further inhibit competition.

**The Video Game Industry Is Characterized by Significant Network Effects and Barriers to Entry**

231.    The video game industry is characterized by significant network effects and barriers to entry.

232.    Gaming consoles or other gaming platforms are only desirable to consumers if the platform offers significant and quality video games for use on that platform.

233.    The more innovative and engaging video games a platform offers, the more consumers are willing to purchase or adopt the platform.

234.    At the same time, video game developers are more willing to invest in and develop video games for platforms that have a high user base and thus have the potential to sell to a large market of consumers that have adopted the platform.

235.    This combination creates a positive feedback loop, where the largest platforms attract the most quality content, which in turn attracts more consumers to the platform, thereby attracting more quality content.

236.    This constitutes a substantial barrier to entry, preventing actual or potential competitors from successfully competing or creating new platforms.

237.    Microsoft's already substantial gaming ecosystem creates significant network effects that reduce competition and create significant barriers to entry.

238.    Video games themselves also have significant network effects. As the Competition and Markets Authority found, "gamers like to be on the same platforms [and games] as their friends to play multiplayer games." Online multiplayer games are more attractive to gamers by the very virtue of their being popular, so that a large online community can sustain quality multiplayer gaming.

239.    The most popular online multiplayer games attract even more users through their popularity and the online community that develops, entrenching network effects further.

240.    Video games are also critical inputs for gaming platforms to be successful.

241.    Gaming platforms allow a user to play video games, and thus, the quantity and quality of the video games that are developed for a given platform are critical to a platform's success, because consumers choose a gaming platform in large part (if not entirely) based on which video games it can play on that platform.

242.    Triple-A games play an outsized role for gaming platforms to be successful as they are the most important video games to incentivize players to play on specific platforms.

243.    In the video game console market, for example, most video games are currently developed for both Xbox and PlayStation, and thus a consumer who purchases Xbox or PlayStation will have access to play most video games developed for consoles.

244.    However, some games are exclusive to the Xbox, PlayStation, PC, or Nintendo systems. If a consumer wishes to play a video game that is exclusive to a given console system, the consumer must purchase the console system on which that game is exclusively developed, in order to play that game.

245.    Some video games offer cross-platform interoperability that allows developers to market their games to multiple platforms with the promise that players will be able to play the same game with friends who own different platforms.

246.    Video games must also be developed for a particular operating system on PCs.

247.    In the PC gaming market, game developers and publishers must choose whether to develop a video game for Windows, Apple, Linux, or other operating systems.

248.    For those consumers that wish to play video games on their PC, the quantity and quality of video games programmed for a given operating system is an important factor in deciding which PC and PC operating system to purchase.

249.    By making games exclusive to the Windows operating system, competition with respect to operating systems may be reduced.

250.    Whether video game developers and publishers choose to develop games for a particular platform or operating system is a critical input for the platform manufacturer.

251.    Without substantial and widespread video game development for a particular platform, the platform as a gaming option is unlikely to be successful.

**Microsoft Directly Competes with Activision Blizzard in Game Development for the Console and PC Gaming Markets**

252.    As horizontally competitive game developers, Microsoft and Activision Blizzard compete to design, create, promote, and sell the most innovative, enjoyable, and marketable games available to consumers.

253.    Microsoft and Activision Blizzard compete to produce games that will sustain gamers' attention and interest and become significantly popular so that they will enjoy the substantial network effects that arise when a critical mass of players plays the game.

254.    Few other game developers have comparable resources and game-development talent to create the most immersive and highly desirable game titles.

255.    Activision Blizzard owns some of the most iconic and popular game franchises in history, including *Call of Duty*, *World of Warcraft*, *StarCraft*, *Overwatch*, *Diablo*, and *Candy Crush*.

256.    Microsoft also owns some of the most iconic and popular game franchises in history, including *Age of Empires*, *Forza*, *Gears of War*, *Halo*, *Minecraft*, *Fallout*, *Microsoft Flight Simulator*, *DOOM*, *The Elder Scrolls*, among others.

257.    If the acquisition of Activision Blizzard by Microsoft were to be completed, Activision Blizzard, an exceptionally strong and important competitor in the game development market, and a significant rival of Microsoft would be eliminated, and competition would be substantially lessened.

**Microsoft Directly Competes with Activision Blizzard in Game Publishing for the Console and PC Gaming Markets**

258.    Microsoft and Activision Blizzard are both video game publishers that compete against each other to publish and market the most popular video games.

259.    Activision Blizzard owns some of the most iconic and popular game franchises in history, including *Call of Duty*, *World of Warcraft*, *StarCraft*, *Overwatch*, *Diablo*, and *Candy Crush*. Activision Blizzard is one of the "Big 4," independent Triple-A video game publishers.

260.    Microsoft also owns some of the most iconic and popular game franchises in history, including *Age of Empires*, *Forza*, *Gears of War*, *Halo*, *Minecraft*, *Fallout*, *Microsoft Flight Simulator*, *DOOM*, *The Elder Scrolls*, and more.

261.    If the acquisition of Activision Blizzard by Microsoft were to be completed, Activision Blizzard, one of only a few Triple-A publishers, and an exceptionally strong and important competitor in the game publishing market, and a significant rival of Microsoft, would be eliminated, and competition would be substantially lessened.

**Microsoft Directly Competes with Activision Blizzard in Game Distribution for the Console and PC Gaming Markets**

262.    Microsoft and Activision Blizzard directly compete in the game distribution market.

263.    Activision Blizzard owns "www.battle.net," where it sells PC games to consumers.

264.    Microsoft owns the Microsoft Store, where it also sells PC games to consumers.

265.    Microsoft also provides a game subscription service called Game Pass.

266.    If the acquisition of Activision Blizzard by Microsoft were to be completed, Activision Blizzard, an exceptionally strong and important competitor in the game distribution market, and a significant rival of Microsoft, would be eliminated, and competition would be substantially lessened.

**The Proposed Consolidation May Substantially Lessen Current Competition in the Video Game Development, Publishing, and Distribution Markets**

267.    Microsoft and Activision Blizzard vigorously compete against one another to develop, create, publish, and sell the most innovative, entertaining, and engaging video games to consumers across multiple genres and platforms.

268.    Microsoft is the largest game publisher in the United States, controlling the development, production, and marketing of some of the industry's most popular game franchises.

269.    Microsoft has approximately 23.9% of the market share of game publishing in the United States.

270.    Activision Blizzard is the second largest video game publisher in the United States, with approximately 10% of the market share.

271.    Activision Blizzard is one of only a few independent video game publishers considered capable of reliably publishing Triple-A video games.

272.    As the largest publisher in the United States, Microsoft owns numerous video game developers. Microsoft also controls many of the industry's most talented game developers and other key industry personnel.

273.     As the second largest publisher in the United States, Activision Blizzard owns numerous immensely popular game titles itself, and also controls a large roster of video game talent working on the next generation of video games.

274.     If either company were to fail to deliver adequate quality and experiences in a range of game genres at a competitive price, consumers will choose to purchase other video games that provide better content at a more competitive price.

275.     If Microsoft's acquisition of Activision Blizzard were to be completed, one of Microsoft's significant rivals would be eliminated, and competition would be significantly lessened.

**The Proposed Consolidation May Substantially Lessen Competition in the Labor Market**

276.     Consolidation may also substantially lessen competition in the market for labor.

277.     The talent necessary to develop, design, program, and produce video games is highly technical and specialized. Such employees are highly skilled and sought after. Further, there are only a limited number of large employers like Microsoft and Activision Blizzard in the United States that compete to employ such talent.

278.     On information and belief, Microsoft and Activision Blizzard actively compete to recruit talented labor in the video game industry labor market.

279.     By consolidating the employment power of these rivals, competition for labor in this industry may substantially lessen.

**The Proposed Consolidation May Give Microsoft Outsized Market Power and the Ability to Further Harm Competition by Foreclosing Inputs to Rivals in the Relevant Markets**

280.     The acquisition of Activation Blizzard by Microsoft may result in one of the industry's largest video game companies, with outsized market power and the ability to foreclose key inputs to rivals and further harm competition.

281.     Microsoft already controls one of the industry's most popular and largest video game ecosystems. As the largest video game publisher in the United States, Microsoft already has significant market power.

282.     Activision Blizzard controls several other of the most important video game franchises, including *Call of Duty*, among others.

283.     *Call of Duty* is one of the most important gaming franchises.

284.     Between 2010 to 2019, *Call of Duty* titles comprised 10 of the top 15 games sold.

285.     The latest installment, Modern *Warfare II*, amassed more than $1 billion in sales within ten days of release.

286.     Although *Call of Duty* is currently offered across multiple platforms, including Xbox, PlayStation, and Windows PC, Microsoft's acquisition of Activation Blizzard could change that.

287.     Activision Blizzard's games are critical to competition in high-end gaming, having no meaningful substitute.

288.     Owning Activision Blizzards' catalog of games would make a material difference in the industry, providing Microsoft's gaming platforms a significant competitive advantage.

289.     The proposed acquisition would give Microsoft an unrivalled position in the gaming industry, leaving it with the greatest number of must-have games and iconic franchises.

290.     Microsoft would have the ability to foreclose important inputs to rivals of console gaming by making some or all of Activision Blizzard's important catalog of games, including *Call of Duty*, exclusive to Microsoft platforms or partially exclusive.

291.     Exclusivity could take the form of "(i) making [Activision Blizzard] content unavailable on rival consoles (i.e. exclusive to Xbox), (ii) making [Activision Blizzard] content available for release on rival console gaming platforms at a later date compared to Xbox (i.e. timed exclusivity), (iii) degrading the quality of [Activision Blizzard] gaming content available to rival console gaming platforms, (iv) making features or upgrades of [Activision Blizzard] games unavailable to other console gaming platforms (i.e. content exclusivity), and/or (v) raising the wholesale price of [Activision Blizzard] content on rival consoles gaming platforms."

292.     Currently, Microsoft Xbox and Sony PlayStation systems compete vigorously with one another.

293.    Foreclosing Activision Blizzard titles from appearing on PlayStation would harm competition between Xbox and PlayStation.

294.    Studies show 46% of PlayStation and Nintendo users in the United States would consider subscribing to Microsoft's Game Pass subscription service with the inclusion of Activision Blizzard titles.

295.    Nearly a fifth of this demand is based on the inclusion of the *Call of Duty* Franchise alone.

296.    Given the significant network effects at both the video game and gaming platform levels set forth above, if Microsoft were to make *Call of Duty* and other titles exclusive or partially exclusive to the Xbox or another of Microsoft's gaming platforms or distribution channels, competition could significantly be harmed.

297.    By acquiring Activision Blizzard, Microsoft may have the ability and incentive to engage in strategies to foreclose Sony—Microsoft's closet rival in console gaming platforms—from Activision Blizzard games significantly harming competition.

298.    In addition to console gaming concerns, Microsoft could also foreclose Activision Blizzard's important content on rival PC operating systems, which would substantially harm competition and further cement and maintain Microsoft's monopoly position in the PC operating system gaming market.

299.    For example, Activision Blizzard's *World of Warcraft*, *Diablo*, *Hearthstone*, and *Starcraft,* among others, are currently all developed for Mac in addition to Windows.

300.    Once owned by Microsoft those games, and any other games developed by Microsoft or Activision Blizzard could be developed exclusively for Windows, reducing competition for operating systems.

301.    In fact, Microsoft has engaged in similar practices before, restricting access to games from studios they have acquired.

302.    In 2020, after acquiring ZeniMax Media, which contained the highly popular Bethesda publisher, Microsoft stated it would honor exclusivity commitments made by Bethesda

for one year, and after that determine exclusivity on a case by case basis. Microsoft also assured

the European Commission during its regulatory approval of the deal, that Microsoft would not

have the incentive to cease or limit making ZeniMax games available for purchase on rival

consoles.

303.    Bethesda's next title, *Starfield*, will be exclusive to the Xbox consoles and

Windows PC, despite prior franchises from that publisher developing games for compatibility

with other consoles as well.

304.    Microsoft also has made public plans to make other titles from ZeniMax Media,

such as the next entry in the popular *Elder Scrolls* franchise, *Elder Scrolls VI*, exclusive.

305.    Similar exclusivity decisions were reached after acquiring other studios, such as

Obsidian, inXile, and Ninja Theory.

306.    Microsoft has currently made public promises to keep Activision Blizzard's game

content, including *Call of Duty* available on platforms owned and developed by competitors, like

Sony's PlayStation console, but their past history implies these promises are illusory.

307.    There is currently intense competition in the nascent market for cloud-based

gaming services.

308.    Microsoft has launched a cloud-based gaming service, greatly aided, and

accelerated by its already existing Azure cloud-server infrastructure, which runs its cloud-gaming

services.

309.    Just as with any other gaming platform, the video games available on a provider's

cloud-gaming service are a critical input, further enhanced by the inherent network effects.

310.    For a cloud-gaming service to successfully enter the market, it must have access to

a wide range of video games, and in particular must be able to provide users with access to the

most popular Triple-A game franchises.

311.    Were the combination to proceed, it will provide Microsoft with one of, if not the

largest catalog of popular video games.

312. Microsoft would then be able to make those games exclusive to its own cloud-gaming service and foreclose rivals of cloud-based gaming to these critical inputs.

313. Given that cloud gaming is an emerging market that has not gained widespread mainstream adoption yet, and the inherently strong network effects, Microsoft's use of Activision Blizzard's important gaming catalog to foreclose rivals to these important inputs could wipeout competition in these emerging spaces, and create further barriers to entry, thereby further increasing its market power and tending to create a monopoly.

314. Microsoft could also make its gaming catalog, including Activision Blizzard's games, exclusive to its game subscription service, Game Pass, and foreclose rivals of game subscription services to these critical inputs. Game Pass already accounts for roughly 60% of the game subscription market.

315. Microsoft's ability to restrict Activision Blizzard's highly popular game catalog exclusively to Microsoft's cloud-gaming service and game subscription service would impair and foreclose the critical inputs to its competitors and lessen competition.

316. With multi-game subscription services and/or cloud game streaming services by acquiring Activision Blizzard Microsoft may foreclose access to Activision Blizzard games.

317. This would be detrimental to Microsoft's rival distributors of console and PC video games that offer such services, and to its own PC and console video games, which are key for the provision of the nascent services of multi-game subscription and cloud game streaming.

318. Such foreclosure strategies could reduce competition in the markets for the distribution of console and PC video games, leading to higher prices, lower quality, and less innovation for console gaming distributors, which may in turn be passed on to consumers.

319. The proposed acquisition may reduce competition in the market for PC operating systems. Microsoft may reduce the ability of rival providers of PC operating systems to compete with Microsoft's operating system Windows by combining Activision Blizzard's game catalog with Microsoft's cloud-based game streaming to Windows devices.

320. This would discourage video gamers to buy non-Windows PCs.

321.   In addition, Microsoft would receive the ability and incentive to engage in foreclosure strategies using Activision Blizzard's content.

322.   Combined with the rest of Microsoft's multi-product ecosystem, could strengthen network effects, and raise barriers to entry in the supply of cloud gaming services.

323.   Both Microsoft and Activision Blizzard are some of the largest and most influential entities in the video game industry.

324.   In addition to currently competing against one another in video game development, publishing, and distribution, they are both strong, vigorous and viable potential competitors in gaming markets in which they do not currently compete in.

325.   Both competitors have been ready, willing, and able to compete in new gaming markets.

326.   For example, in 2017, Activision Blizzard announced the launch of a new "Consumer Products division," hiring veteran Mattel and Disney executive Tim Kilpin to lead the new division.

327.   Activision Blizzard is thus a massive and vigorous competitor in the industry, already demonstrating its willingness to compete in new markets.

328.   That competition may be irreparably lost if the acquisition is allowed to proceed.

329.   The shape of the gaming industry—and its future—is forged through the competition of these behemoths in the gaming industry.

330.   The competition in the industry brought by Activision Blizzard must be preserved to ensure that the next generation of video game innovation and value are enhanced through competition, not stifled through consolidation.

331.   Unless enjoined, the proposed acquisition may, and most probably would, have the following potential effects in each of the relevant markets, among others:

a.   actual and potential competition between Microsoft and Activision Blizzard would be eliminated;

b.      competition within the video game development, publishing and
        distribution markets would be substantially lessened;

c.      competition to hire and retain talent within the specialized video game labor
        market would be substantially lessened;

d.      the merged entity would have outsized market power and the ability and incentive
        to foreclose critical inputs to rival platform producers, thereby harming rivals'
        ability to compete effectively;

e.      video game quality, innovation, and diversity may decrease;

f.      video game output may decrease;

g.      video game prices may increase; and

h.      Further effects of lessened competition may arise in numerous ways.

332.    By reason of this violation, the Plaintiffs are threatened with loss or damage in the
form of the ill effects of diminished competition that occurs with the consolidation of power,
including but not limited to, reduced quality, innovation and diversity of video games along with
increased prices; reduced wages, decreased mobility, and worse working conditions for video
game industry employees, the potential further elimination of favored competitors, as well as
additional irreparable harm for which damages may be inadequate to compensate Plaintiffs.

333.    Plaintiffs are entitled to bring suit under Section 16 of the Clayton Antitrust Act, 15
U.S.C. § 26, to obtain preliminary and permanent injunctive relief against this proposed
acquisition, and to recover their costs of suit, including a reasonable attorney's fee.

## PRAYER FOR RELIEF

A.      Declaring, finding, adjudging, and decreeing that the agreement to
consolidate Microsoft and Activision Blizzard violates Section 7 of the Clayton Antitrust
Act, 15 U.S.C. § 18.

B.      Preliminarily enjoining Defendants from consummating the merger, or, if
necessary, ordering divestiture, during the pendency of this action.

1    C.    Permanently enjoining Defendants from consummating the merger or

2  requiring divestiture.

3    D.    Declaring the contract between the Defendants to be null and void and

4  against the public policy of the United States which declares that competition rather than

5  combination is the rule of trade in the United States;

6    E.    Declaring the reverse termination fee agreement between Defendants to be

7  null and void and against the public policy of the United States; and

8    F.    Awarding to Plaintiffs their costs of suit, including a reasonable attorney's fee,

9  as provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

10    G.    Granting Plaintiffs such other and further relief to which they may be

11  entitled and which the Court finds to be just and proper.

Dated: December 20, 2022                    By:      /s/ Joseph M. Alioto
                                                    Joseph M. Alioto


                                           Joseph M. Alioto (SBN 42680)
                                           Tatiana V. Wallace (SBN 233939)
                                           **ALIOTO LAW FIRM**
                                           One Sansome Street, 35th Floor
                                           San Francisco, CA  94104
                                           Telephone:     (415) 434-8900
                                           Facsimile:     (415) 434-9200
                                           Email:         jmalioto@aliotolaw.com


Dated: December 20, 2022                    By:      /s/ Joseph R. Saveri
                                                    Joseph R. Saveri


                                           Joseph R. Saveri (State Bar No. 130064)
                                           Steven N. Williams (State Bar No. 175489)
                                           Cadio Zirpoli (State Bar No. 179108)
                                           Elissa Buchanan (State Bar No. 249996)
                                           David H. Seidel (State Bar No. 307135)
                                           **JOSEPH SAVERI LAW FIRM, LLP**
                                           601 California Street, Suite 1000
                                           San Francisco, California 94108
                                           Telephone:     (415) 500-6800
                                           Facsimile:     (415) 395-9940
                                           Email:         jsaveri@saverilawfirm.com
                                                          swilliams@saverilawfirm.com
                                                          czirpoli@saverilawfirm.com
                                                          eabuchanan@saverilawfirm.com
                                                          dseidel@saverilawfirm.com


                                           Joseph M. Alioto Jr. (SBN 215544)
                                           **ALIOTO LEGAL**
                                           100 Pine Street, Suite 1250
                                           San Francisco, California 94111
                                           Tel: (415) 398-3800
                                           Email:         joseph@aliotolegal.com


                                           *Counsel for Plaintiffs*