Joseph M. Alioto (State Bar No 42680)
Tatiana V. Wallace (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone:     (415) 434-8900
Facsimile:     (415) 434-9200
Email:          jmalioto@aliotolaw.com

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:     (415) 500-6800
Facsimile:     (415) 395-9940
Email:          jsaveri@saverilawfirm.com
                swilliams@saverilawfirm.com
                czirpoli@saverilawfirm.com
                eabuchanan@saverilawfirm.com
                dseidel@saverilawfirm.com

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANTE DEMARTINI, CURTIS BURNS JR., NICHOLAS ELDEN, JESSIE GALVAN, CHRISTOPHER JOSEPH GIDDINGS-LAFAYE, STEVE HERRERA, HUNTER JOSEPH JAKUPKO, DANIEL DERMOT ALFRED LOFTUS, BEOWULF EDWARD OWEN, and IVAN CALVO-PÉREZ,<br><br>                    Plaintiffs,<br><br>        v.<br><br>MICROSOFT CORPORATION, a Washington corporation,<br><br>                    Defendant. | Case No. 3:22-cv-08991<br><br>**MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE**<br><br>Date:       January 26, 2023<br>Time:       TBD |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**:

**PLEASE TAKE NOTICE** that on Thursday, January 26, 2022, or as soon thereafter as the Court finds it practical, Plaintiffs will and hereby do move the Court for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), against the proposed acquisition of Activision Blizzard, Inc. by Microsoft Corporation, under Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 18 and 26. The motion will be made based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declaration of David H. Seidel in support of this Motion and the exhibits attached thereto, the Declarations of Plaintiffs in support of this Motion, any evidence received on this Motion, and the file in this matter.

**REQUESTED RELIEF**

1.  Pursuant to Rule 65(a) and Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs seek an order from the Court preliminarily enjoining Defendant Microsoft Corporation from acquiring its significant rival Activision Blizzard, Inc., until a trial on the merits may be conducted by the Court to determine whether the combination is unlawful under Section 7 of the Clayton Act, 15 U.S.C. § 18.

2.  Plaintiffs request that the Court order Microsoft to show cause why the merger should not be preliminarily enjoined pending a bench trial on the merits.

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ...................................................................................................1

II. FACTUAL BACKGROUND ................................................................................ 2

III. LEGAL STANDARD ........................................................................................... 5

IV. ARGUMENT ......................................................................................................... 7

    A.    Plaintiffs Are Likely to Succeed on the Merits ........................................... 7

        1.    The Clayton Act Codifies Congress' Intent to Prohibit Mergers Through Direct Private Actions Such as This ................................ 8

        2.    Plaintiff's Burden Under Section 7 Is Exceptionally Low ............. 9

        3.    Plaintiff's Need Only Show a Reasonable Probability of Lessening of Competition in a Single Product Market; Defendants Must Establish There Will Be No Lessening of Competition in Any Market ...................................................................................... 11

        4.    The Merger May Substantially Lessen Competition in Numerous Markets......................................................................................12

    B.    Plaintiffs Are likely to Suffer Irreparable Harm Without Preliminary Relief ............................................................................................................... 23

    C.    The Balance of Equities Tips in Plaintiffs' Favor and Preliminary Relief Is in the Public Interest......................................................................... 23

    D.    A Bond Should Not be Required....................................................... 25

V. CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ................................................. 6, 7

*Barahona-Gomez v. Reno* 167 F.3d 1228 (9th Cir. 1999) ......................................................... 25

*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011 (9th Cir. 2016) ................................................ 23, 24

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ............................................................ *passim*

*California v. Am. Stores Co.*, 495 U.S. 271 (1990) .................................................................. *passim*

*F.T.C. v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) ......................................................... 9

*Hosp. Corp. of Am. v. F.T.C.*, 807 F.2d 1381 (7th Cir. 1986) ..................................................... 11

*Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171 (6th Cir. 1995) ......................................... 25

*Olin Corp. v. F.T.C.*, 986 F.2d 1295 (9th Cir. 1993) ............................................................. 11, 13

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775 (9th Cir. 2015) ............................................................................... 12

*United States v. Aluminum Co. of Am.*, 377 U.S. 271 (1964) .......................................... 9, 10, 11, 15

*United States v. Continental Can Co.*, 378 U.S. 441 (1964) ................................................ 10, 11, 15

*United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973) ...................................................... 22

*United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966) ................................................... 10, 15, 16

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ......................................................... 12, 16

*United States v. Swift & Co.*, 286 U.S. 106 (1932) ..................................................................... 20

*United States v. Topco*, 405 U.S. 596 (1972) ........................................................................... 24

*United States v. Trib. Publ'g Co.*, 2016 WL 2989488 (C.D. Cal. Mar. 18, 2016) ............................ 6

*United States v. Von's Grocery Co.*, 384 U.S. 270 (1966) ......................................................... *passim*

**Statutes**

15 U.S.C. § 18 (Clayton Act Section 7) ............................................................................... *passim*

15 U.S.C. § 18 (Clayton Act Section 16) ............................................................................. *passim*

**Rules of Civil Procedure**

Fed. R. Civ. P. 65 ............................................................................................ 1, 5, 6, 25

MOTION FOR PRELIMINARY INJUNCTION – CASE NO. 3:22-cv-08991

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiffs seek a preliminary injunction to temporarily stop the acquisition of Activision Blizzard by Microsoft Corporation, until the parties can have an accelerated trial on the merits. By stopping the merger until an accelerated trial, the Court will ensure that the status quo is maintained and prevent irreparable harm to competition and to the Plaintiffs before Plaintiffs can demonstrate that the acquisition is unlawful under Section 7 of the Clayton Act. 15 U.S.C. §18. Because Plaintiffs are likely to establish that the merger is unlawful and are threatened with irreparable harm if the merger proceeds, the Court should grant the motion. Microsoft is one of the dominant firms in the gaming industry. Activision Blizzard is one of Microsoft's chief rivals and a major firm in the creation and publishing of gaming content.  Microsoft's offer to pay $68.7 billion for Activision Blizzard would be the largest merger of technologies companies in history. The combination will eliminate an independent competitor, likely lessening competition.

Through Section 7 of the Clayton Act, Congress prohibited all mergers and acquisitions in which the effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The history of the Clayton Act, as explained by numerous Supreme Court cases, shows without question that Congress meant to vigorously clamp down on the trend towards market concentration through mergers and acquisitions.  The Supreme Court has repeatedly affirmed that Congress specifically intended the Act's broad language, requiring that a Plaintiff only show that a merger has a reasonable probability of lessening competition or tending to create a monopoly for it to be unlawful. *See, e.g.*, *Brown Shoe Co. v. United States,* 370 U.S. 294, 317 (1962). Under this standard, Congress meant to stop market concentration in its incipiency, based on a simple but powerful policy judgment: that in the United States, internal expansion through competition is inherently preferred over concentration through mergers and acquisitions, and that concentration must be stopped long before it reaches monopolistic levels.

As part of Congress' statutory plan to prevent market concentration in its incipiency, Congress enshrined the individual right of action as part of its enforcement scheme. Congress authorized private Plaintiffs threatened with loss or harm from the loss of competition, to seek and obtain injunctive relief. As the Supreme Court has explained, "[p]rivate enforcement of the [Clayton] Act was in no sense an afterthought; it was an integral part of the congressional plan for protecting competition." *California v. Am. Stores Co.*, 495 U.S. 271, 275 (1990). Section 16 and other provisions of the Clayton Act "manifest a clear intent to encourage vigorous private litigation against anti-competitive mergers," and "subject mergers to searching scrutiny." *Id*.

As this motion shows, Microsoft's acquisition of Activision Blizzard readily satisfies the Section 7 standard. Given Congress' clear mandate to prohibit all mergers and acquisition the effect of which "may be substantially to lessen competition, or to tend to create a monopoly," 15 U.S.C. § 18, the Supreme Court has repeatedly struck down mergers with far less risk of lessening competition than is the case here. Under the Supreme Court's controlling authority, Microsoft's proposed $68.7 billion acquisition of Activision Blizzard is without question unlawful and must be enjoined. To prevent the irreparable harm to competition and to Plaintiffs that will ensue if the merger is allowed to be consummated but then ultimately found to be unlawful, the Court should preliminarily enjoin the merger from consummating until after an accelerated trial on the merits.

## II.   FACTUAL BACKGROUND

The video game industry is a fast-evolving, and expanding modern industry. Revenue in the video game industry is projected to reach $197 billion this year and $285 billion by 2027. Pls' Compl. ¶ 57.[1]  This growth has been recently spurred, in part, by the Covid-19 pandemic, seeing a 30% increase in the U.S. population that plays video games. In 2021, a total estimated 3.24 billion consumers played video games globally (roughly half the world's population). That year, approximately 226.6 million people in the United States played video games (roughly 68% of the

---

[1] *Video Games - Worldwide*, Statista, available at https://www.statista.com/outlook/dmo/digital-media/video-games/worldwide (last visited Dec. 16, 2022).

U.S. population). *Id*. ¶¶ 58-59.[2] Video gaming is one of the largest entertainment sectors in the United States and the world. For example, the 2019 reboot of *Call of Duty*, *Call of Duty: Modern Warfare*, earned $600 million in three days.[3]

The marketing and distribution of video games to consumers requires game developers, publishers, and distributors. *Id*. ¶ 123. Video game developers are the persons and entities that create and design video games, referred to as "gaming content." *Id*. ¶ 124. Video game publishers are those that market, monetize, and produce gaming content for mass distribution. Developers and publishers are often combined in a single entity or work together in creating gaming content. *Id*. ¶ 128. Video game distributors occupy the final step of distributing gaming content to consumers. *Id*. ¶ 129. Distribution of gaming content was initially the province of brick and motor retail stores. By 2018, however, 83% of all video games were sold through digital stores, allowing consumers to directly download games to the device on which they play. *Id*.; Declaration of David H. Seidel ("Seidel Decl.") Ex. B at 4 [Congressional Research Service Report August 3, 2022]. A new form of distribution has also recently emerged in which companies offer multi-game subscription services, like Microsoft's immensely popular Game Pass, that allows consumers to have access to large libraries of video games for monthly subscription fees. *Id*. ¶ 46.[4] At all levels, there is substantial competition to provide consumers with the best video games at the lowest possible price.

Where and how people play video games has also expanded in recent years. Initially, during the days of *Pacman*, *Asteroids*, *Galaga*, and the original *Donkey Kong*, consumers played video games in arcades. Today, most gamers play video games on gaming consoles, like the Xbox

---

[2] *See* Emma Bliznovska, *How Many People Play Video Games?*, available at https://websitebuilder.org/blog/how-many-people-play-video-games/.

[3] Paul Tassi, Forbes, *Call of Duty: Modern Warfare Sales Top $600 Million in Three Days*, October 30, 2019, available at https://www.forbes.com/sites/paultassi/2019/10/30/call-of-duty-modern-warfare-sales-top-600-million-in-three-days/?sh=6d01a04d7956.

[4] *See* Ben Gilbert, *Microsoft is quietly bringing in billions from its Netflix-like Game Pass service as subscribers top 25 million*, BUSINESS INSIDER, Jan 18, 2022 (available at https://www.businessinsider.com/xbox-game-pass-to-make-billions-in-2022-2022-1).

or PlayStation they purchase, as well as on other personal devices like Personal Computers ("PCs"), smartphones, or other mobile devices. Recently the possibilities have been expanded through the development of a new market for cloud-based gaming, in which games are streamed directly to a user's device. *Id*. ¶¶ 81-122. Each of these platforms differ from each other, in method of control, specific games available, marketing, and ease of use. Gaming content is developed for these platforms specifically, taking advantage of differences among them. *Id*.

Microsoft and Activision Blizzard are two titans in the gaming industry. Microsoft is a massive game developer and publisher of gaming content in the United States. Microsoft has acquired numerous other prestigious game development and publishing studios, currently owning 23 different game development studios. *Id*. ¶ 42. Microsoft is the largest game publisher in the United States. Microsoft is also a leading game distributor through its online Microsoft store. *Id*. ¶¶ 44, 45. Microsoft owns some of the most successful game content franchises, including *Minecraft*, *Halo*, *Fallout*, *DOOM,* and others. *Id*. ¶ 42. Microsoft also sells its Xbox console system, which competes against Sony's PlayStation, the other high-end gaming console. Microsoft's Xbox also competes with the only other console system, Nintendo. *Id*. ¶¶ 87. Microsoft also develops and owns the ubiquitous Windows operating system, which is the operating system for 90% of the PC gaming market. *Id*. ¶ 101; Seidel Decl. Ex. A at ¶ 260 [Competition & Market's Authority Phase 1 Decision]. Microsoft also dominates the video games subscription market, with its massively successful Game Pass program. Game Pass accounts for about 60% of the multi-game subscription market. Pls' Compl. ¶ 47.[5] By establishing Game Pass, which includes cloud-based gaming, Microsoft hoped to establish another gaming platform, which operates in connection with other platforms Microsoft controls: Xbox (game consoles); Windows (operating system); and Azure (cloud). Microsoft therefore operates at all levels of the video game industry and possesses high market shares in each. These market actors interact with

---

[5] *See* Stephen Totilo, *Gaming's Netflix or Spotify Moment Is Still a Long Way Off*, Axios, March 28, 2022, at https://www.axios.com/2022/03/28/video-game-subscriptions-xbox-game-pass-netflix.

1    one another and are intrinsically interlinked. These connections form an ecosystem, a continuous

2    loop of interaction and commerce. Microsoft seeks to control and dominate that ecosystem.

3         Activision Blizzard is a gaming content developer, publisher, and distributor that is

4    responsible for several of the most popular game franchises in history, including *Call of Duty*,

5    *World of Warcraft*, *StarCraft*, *Overwatch*, *Diablo*, and *Candy Crush*. *Id*. ¶ 69. *Call of Duty*, in

6    particular, is considered one of the most important gaming franchises, and is the single largest

7    franchise measured by user base and revenue. *Id*. ¶¶ 70-71; Seidel Decl. Ex. A at ¶¶ 14-15, 148(c),

8    151[Competition & Market's Authority Phase 1 Decision]. After Microsoft, Activision Blizzard is

9    the second largest video game publisher in the United States. Activision is one of only a few

10   independent game publishers that are capable of making the highest production value, most-

11   graphically advanced, and most marketed and popular video games ("Triple-A" games). Pls'

12   Compl. ¶¶ 75-76.[6] Through their own distribution platform and digital store front,

13   www.battle.net, Activision Blizzard directly distributes its own gaming content to consumers,

14   competing with Microsoft in distribution. *Id*. ¶ 77. Absent the merger, Microsoft and Activision

15   Blizzard directly compete in the game development, publishing, and distribution markets.

16        On January 18, 2022, Microsoft announced plans to acquire Activision Blizzard. *Id*. ¶ 2.

17   Microsoft agreed to pay $68.7 billion ($68,700,000,000), in an all-cash transaction to acquire the

18   stock of Activision Blizzard. *Id*. According to the plan Activision Blizzard would be wholly owned

19   by Microsoft. *Id*. If the acquisition is allowed to proceed, it would be the largest merger of

20   technologies companies ever—and by far the largest in the video game industry—and is likely to

21   significantly harm competition across the entire gaming industry and its related markets.

22   **III.   LEGAL STANDARD**

23        The Court may grant a preliminary injunction under Federal Rule of Civil Procedure 65(a)

24   and under Section 16 of the Clayton Act, 15 U.S.C. §26. In deciding whether to grant a

25   preliminary injunction, courts must consider four factors: (1) the movant's likelihood of success

26

27   ───────────────

     [6] *See* T.C., *Why are video games so expensive to develop*, THE ECONOMIST, Sep 25, 2014 (available at
     https://www.economist.com/the-economist-explains/2014/09/24/why-video-games-are-so-

28   expensive-to-develop).

───────────────

on the merits; (2) the movant's likelihood of irreparable harm if the preliminary injunction is not issued; (3) a balancing of the equities; and (4) the public interest. *See, e.g.*, *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *United States v. Trib. Publ'g Co.*, 2016 WL 2989488, at *2 (C.D. Cal. Mar. 18, 2016). In the Ninth Circuit, courts engage in a sliding scale approach, in which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies*, 632 F.3d at 1131. One common iteration of this approach, the "serious questions" test, recognizes that a stronger showing of the balancing of hardships factor lessens the burden for likelihood of success on the merits. *Id.* Under the serious questions test, a preliminary injunction is proper upon a showing of "serious questions going to the merits," so long as the balance of hardships "tips sharply in [plaintiff's] favor." *Id.*

       In *All. For the Wild Rockies*, for example, the leading Ninth Circuit case addressing preliminary injunctions generally, an environmental group sought a preliminary injunction to stop the U.S. Forest Service from commencing a forestry project within a portion of a national forest in Montana. The group alleged that the grounds that the Forest Service's commencement of the project was in violation of certain statutes, and that its members would be irreparably harmed by losing the ability to "view, experience, and utilize the areas in their undisturbed state." *Id.* at 1135. The Ninth Circuit reversed the lower court's denial of plaintiff's motion for preliminary injunction because it found there were at least "serious questions" going to the merits, and the balance of hardships tipped sharply in the plaintiff's favor. Plaintiffs had shown they would permanently lose the ability to enjoy that portion of the forest in its unaltered state. In contrast, the Forest Service did not show it would lose the opportunity to perform the project's important work at a later date, if the plaintiff ultimately lost on the merits. Because the project could be undertaken in the future, the Ninth Circuit held the requirements of Rule 65 were satisfied and ordered the preliminary injunction should issue.

## IV.   ARGUMENT

### A.   Plaintiffs Are Likely to Succeed on the Merits

This lawsuit ultimately presents the Court with a singular issue. The Clayton Act outlaws all mergers and acquisitions where "the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly." 15 U.S.C. § 18. Under the Supreme Court's binding precedent, Congress' use of this expansive definition was meant to ensure that any growing trend towards concentration in markets was stopped in its incipiency, even before it was clear whether a merger would—or did in fact—lessen competition, reflecting a policy judgment that competition among numerous market participants is preferable to concentrating markets through mergers and acquisitions. *See, e.g.*, *Am. Stores*, 495 U.S. at 275; *United States v. Von's Grocery Co.*, 384 U.S. 270, 274 (1966); *Brown Shoe,* 370 U.S. at 317. Here, after years of unchecked concentration in the video game industry, Microsoft, as the largest publisher of gaming content in the United States, has announced it will eliminate a significant rival by acquiring Activision Blizzard, the second largest publisher of gaming content in the United States. Both companies are among only a handful of companies able to produce top-quality gaming content. Through the merger, the post-acquisition entity will have the ability and incentive to foreclose Activision Blizzard's significant portion of top gaming content to rival producers of gaming platforms and subscription services. Might this merger substantially lessen competition or tend to create a monopoly?

At the preliminary injunction stage, Plaintiffs need only show a likelihood of prevailing on the merits. And given that the balance of hardships tips sharply in Plaintiffs' favor here, *see infra* Section IV.C, Plaintiffs need only show that there are "serious questions" as to whether this acquisition might substantially lessen competition or tend to create a monopoly. *See All. For the Wild Rockies*, 632 F.3d at 1131. Given that the merger will eliminate the substantial and direct competition between Microsoft and Activision Blizzard, and has enormous potential for further anticompetitive effects, at trial, Plaintiffs will go far beyond their required burden and show that

the merger will lessen competition and will tend to create a monopoly. Even at this stage, it clear that this merger is unlawful.

### 1. The Clayton Act Codifies Congress' Intent to Prohibit Mergers Through Direct Private Actions Such as This

As part of Congress' statutory scheme to prohibit all mergers and acquisitions that may substantially lessen competition, Congress established a private right of action as an important means to stop anticompetitive mergers that, through incremental combinations and concentrations, slowly but surely destroy competition and tend to lead to monopolies and oligopolies. Section 16 of the Clayton Act provides in relevant part that "[a]ny person . . . shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage" from an unlawful merger or acquisition. 15 U.S.C. § 26. As explained in *California v. American Stores*, the Clayton Act's provisions "manifest a clear intent to encourage vigorous private litigation against anti-competitive mergers." 495 U.S. 271, 275 (1990). By encouraging vigorous private litigation to police unlawful mergers, Congress sought to "subject mergers to searching scrutiny" through private lawsuits such as this. *Id.* Indeed, "[p]rivate enforcement of the [Clayton] Act was in no sense an afterthought; it was an integral part of the congressional plan for protecting competition." *Id.*

Congress understood the broad and pervasive harms inherent in economic concentration through mergers and acquisitions. *See Brown Shoe,* 370 U.S. at 317 ("[A] keystone in the erection of a barrier to what Congress saw was the rising tide of economic concentration, was its provision of authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency."). Congress therefore "sought to assure . . . the courts the power to brake this force at its outset and before it gathered momentum." *Id.* at 317–18. Through these provisions, the Clayton Act codifies Congress' intent to arrest the trend of economic concentration by encouraging private litigants to sue for injunctive relief to prevent the merger or acquisition as Plaintiffs seek here. Through an injunction, Congress intended that illegal mergers be stopped before they happen.

### 2.    Plaintiff's Burden Under Section 7 Is Exceptionally Low

To effectuate the Clayton Act's statutory scheme to stop economic concentration through merger and thereby "preserve competition among many small businesses," Congress enshrined an expansive definition of unlawful acquisitions. *Von's Grocery*, 384 U.S. at 277. Section 7 makes unlawful all mergers and acquisitions, the effect of which "may be substantially to lessen competition or tend to create a monopoly." 15 U.S.C. § 18. Congress' use of the term "may" in Section 7 was meant to ensure that litigants would not need to prove anticompetitive effects but would merely need to show a "reasonable probability" that competition would be lessened. *See Brown Shoe*, 370 U.S. at 323. Outlawing all mergers with merely a reasonable probability of lessening competition was a "necessary element in any statute which seeks to arrest restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act." *Id* at 323 n.39. Indeed, requiring a Clayton Act Plaintiff of showing "certainty and actuality of injury to competition" would be "incompatible" with Section 7's aim to go beyond liability under the Sherman Act "by reaching incipient restraints." *Id*. That is why Section 7 ultimately requires merely a "prediction" as to whether competition may be lessened, and "doubts are to be resolved against the transaction." *F.T.C. v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989).

Congress's expansive definition of unlawful mergers was not made by chance. It was no linguistic accident. Congress meant to "clamp down with vigor on mergers." *Von's Grocery*, 384 U.S. at 276. The very objective of Section 7 of the Clayton Act was to "prevent accretions of power," even those "which 'are individually so minute as to make it difficult to use the Sherman Act test against them.'" *United States v. Aluminum Co. of Am.*, 377 U.S. 271, 280 (1964). That is why the Supreme Court has reiterated that a plaintiff's burden under Section 7 is particularly low. *See Am. Stores*, 495 U.S. at 275. It is also why Supreme Court case after Supreme Court case has prohibited mergers with far less potential harm to competition than here.

In *Brown Shoe*, for example, the Court prohibited a merger between the third and eighth-largest shoe sellers in the United States, where the eighth-largest manufactured less than 0.5% and

retailed less than 2% of shoes. 370 U.S. 294, 298 (1962). The Court held that it could not "avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency." *Id.* at 345. In *United States v. Cont'l Can Co.*, the Court prohibited an acquisition of the sixth-largest competitor by the second largest, where the acquisition would increase the acquiring entity's market share from 21.9% to 25%. 378 U.S. 441, 461 (1964). In *United States v. Aluminum Co. of Am.*, 377 U.S. 271, 280–81 (1964), the Court prohibited the acquisition of the ninth-largest producer of aluminum conductor, which held only 1.3% of the market, by the largest producer of aluminum conductor, which held 27.8% of the market. The Court held that "[p]reservation of [the ninth-largest producer], rather than its absorption by one of the giants, will keep it 'as an important competitive factor,'" and thus, the small aluminum conductor producer with only 1.3% market share "seems to us the prototype of the small independent that Congress aimed to preserve" through Section 7. *Aluminum Co. of Am.*, 377 U.S. at 281. In *Von's Grocery*, the Court prohibited the merger of two grocery store chains, each with less than 5% of the market. Based solely on the market shares of the merging grocery store chains and the growing trend toward concentration in the market, the Court held that "these facts alone are enough to cause us to conclude . . . that the [merger] did violate §7." *Von's Grocery*, 384 U.S. at 274. And in *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966), the Court held unlawful the acquisition of the eighteenth largest brewer by the 10th largest brewer, which when combined, became the fifth-largest brewer with a combined market share of only 4.49%.

This long line of Supreme Court cases is clear. Section 7 of the Clayton Act means exactly what Congress enacted—concentration in economic markets through mergers and acquisitions is precisely what Congress aimed to stop. All mergers and acquisitions that may substantially lessen competition or tend to create a monopoly are unlawful. The Clayton Act enshrined into law a policy that unilateral expansion through competition is inherently preferable to expansion through mergers and acquisitions. The Supreme Court held:

> "A company's history of expansion through mergers presents a different economic picture than a history of expansion through unilateral growth. Internal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to reduce

available consumer choice while providing no increase in industry capacity, jobs or output. It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small mergers that added to concentration in an industry." [citing congressional record].

*Brown Shoe*, 370 U.S. at 346 n.72 (1962).

Judge Posner, recognizing the very low threshold for unlawfulness, summarized the Supreme Court precedent interpreting Section 7 of the Clayton Act: "[T]aken as a group," the Supreme Court cases seemed "to establish the illegality of any nontrivial acquisition of a competitor, whether or not the acquisition was likely either to bring about or shore up collusive or oligopoly pricing." *Hosp. Corp. of Am. v. F.T.C.*, 807 F.2d 1381, 1385 (7th Cir. 1986). "The elimination of a significant rival was thought by itself to infringe the complex of social and economic values conceived by a majority of the Court to inform the statutory words 'may . . . substantially . . . lessen competition.'" *Id*. And "[n]one of these decisions has been overruled." *Id*.

### 3. Plaintiff's Need Only Show a Reasonable Probability of Lessening of Competition in a Single Product Market; Defendants Must Establish There Will Be No Lessening of Competition in Any Market

Section 7 of the Clayton Act requires merely the reasonable probability of lessening of competition "in any line of commerce" or "in any activity affecting commerce" anywhere in the country. 15 U.S.C. § 18. The Supreme Court has recognized that an unlawful merger or acquisition might affect multiple relevant markets. Courts must consider whether the merger might lessen competition **in any one of them**, and if so, "the merger is proscribed." *Brown Shoe*, 370 U.S. at 325–28 (assessing whether merger might lessen competition in men's, women's, and children's shoes); *see also Cont'l Can*, 378 U.S. at 457–58 ("That there may be a broader product market made up of metal, glass and other competing containers does not necessarily negative the existence of submarkets of cans, glass, plastic or cans and glass together, for 'within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes.'"); *Aluminum Co. of Am.*, 377 U.S. at 276 (recognizing submarkets for both aluminum conductor and copper conductor, and finding merger might substantially lessen competition in aluminum conductor market); *Olin Corp. v. F.T.C.*, 986 F.2d 1295, 1304 (9th Cir. 1993) ("Even accepting [Defendant's] argument that there is a relevant market comprised of all

pool sanitizers, this does not preclude identification of a relevant submarket comprised solely of dry sanitizers.").

Therefore, Microsoft may not defeat a showing that the merger may substantially lessen competition in one market, by showing a potential increase in competition in another market. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 370 (1963) (holding that "anticompetitive effects in one market" cannot be justified by "procompetitive consequences in another"). So long as Plaintiffs can identify a single product market in which competition might be substantially lessened, Plaintiffs must prevail. *Id*. Thus, Microsoft must establish that there is no reasonable probability that the merger might lessen competition in each of the relevant product markets.

### 4. The Merger May Substantially Lessen Competition in Numerous Markets

At the hearing on Plaintiffs' motion for preliminary injunction, Plaintiffs will establish that competition will be lessened in a number of relevant markets.

#### a. Relevant Geographic Market

As a threshold matter, the relevant geographic market for assessment in this case is the United States. "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Brown Shoe*, 370 U.S. at 336. The proper geographic market must "correspond to the commercial realties of the industry and be economically significant." *Id*. at 336-37 (citations omitted). The relevant geographic market is the "area of effective competition where buyers can turn for alternate sources of supply." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015). In other words, the relevant geography is where the group of sellers or producers "have the actual or potential ability to deprive each other of significant levels of business." *Id*.

Prices of video games in the United States are generally not constrained by the prices of video games in other countries. Pls' Compl. ¶ 205. Gamers are unable to take advantage of lower prices in different countries, instead bound by the prices in the United States. *Id*. Digital purchases, increasingly the primary form of game distribution, prevent consumers from purchasing another countries' version of the same game. *Id*. ¶ 207. Language barriers further

1    prevent consumers from purchasing video games from other countries. *Id*. ¶ 210. Thus, gamers

2    are confined to the United States to purchase games, and the actual or potential ability of

3    competitors to deprive each other of business occurs within the United States. The United States

4    thus constitutes a relevant geographic market for analyzing the proposed merger.

5    **b.    Relevant Product Markets**

6    In order to assess whether the merger might lessen competition in a product market, all

7    relevant product markets that may be affected must first be identified. The Clayton Act prohibits

8    mergers which may substantially lessen competition in "in any line of commerce." 15 U.S.C. § 18.

9    Thus, the effects of a merger are reviewed in each economically significant market or submarket

10   to determine if there is a reasonable possibility the merger will lessen competition. *See Brown*

11   *Shoe*, 370. U.S. at 325. "[I]f such a probability is found to exist, the merger is proscribed." *Id*. As

12   discussed in *Brown Shoe*, the "outer boundaries of a product market are determined by the

13   reasonable interchangeability of use . . . between the product itself and substitutes for it." *Id*. But

14   within a broad market, "well-defined submarkets may exist which, in themselves, constitute

15   product markets for antitrust purposes." *Id*. To determine whether a product market constitutes a

16   relevant product market for antitrust purposes, courts examine "such practical indicia as industry

17   or public recognition of the submarket as a separate economic entity, the product's peculiar

18   characteristics and uses, unique production facilities, distinct customers, distinct prices,

19   sensitivity to price changes, and specialized vendors." *Id*.; *see also Olin Corp.*, 986 F.2d at 1299.

20   Applying the practical indicia set forth in *Brown Shoe*, the relevant product markets that

21   may be affected by the Microsoft Acquisition merger are the following. Within the video game

22   content market, there are relevant markets for (1) console gaming (*see* Pls' Compl. ¶¶ 134-143);

23   (2) PC gaming (see Pls' Compl. ¶¶ 144-154); (3) Mobile gaming (see Pls' Compl. ¶¶ 155-164); (4)

24   Triple-A video games (*see* Pls' Compl. ¶¶ 165-170); and (5) multi-game library subscription

25   services (*see* Pls' Compl. ¶¶ 171-176). Within the gaming platform or systems market, there are

26   relevant product markets of (6) the sale of game console systems (*see* Pls' Compl. ¶¶ 177-179; (8)

27   the sale of high-end game console systems (*see* Pls' Compl. ¶¶ 180-189); (9) the sale of PC

28

operating systems (*see* Pls' Compl. ¶¶ 190-195); and (10) cloud-based gaming services (*see* Pls' Compl. ¶¶ 196-203).

### c.     The Merger May Substantially Lessen Competition in Each of the Relevant Product Markets

If this Court were to allow Microsoft to acquire and merge with Activision Blizzard, competition within numerous relevant product markets in the United States may substantially lessen. "[I]t is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition. If such a probability is found to exist, the merger is proscribed." *Brown Shoe*, 370 U.S. at 325. At the hearing on Plaintiffs' motion for preliminary injunction, Plaintiffs will show far beyond their minimal burden that competition will be lessened in the relevant markets.

### i.     The Markets for Gaming Content for Consoles and PCs

The electronic-gaming industry revolves around gaming content. It is the creation and sale of video game content that provides users with the gaming experience they seek. Gaming platforms merely provide the technology to run and deploy those games. Microsoft and Activision Blizzard are two of the largest game developers and publishes of gaming content in the industry, and they are horizontal competitors, directly competing against one another to develop, publish, and distribute gaming content to consumers in the console and PC gaming markets. Through Microsoft's acquisition of Activision Blizzard, the competition for the development, publishing, and sale of gaming content between these two market leaders will be eliminated. Under the Supreme Court's prior Section 7 cases, this alone is more than sufficient to show beyond a doubt that the merger will substantially lessen competition, let alone "may."

According to a report prepared by the Congressional Research Service, Microsoft is the largest publisher of gaming content in the United States, with a market share of 23.9%. *See* Seidel Decl. Ex. B at 4. Since 2014, Microsoft has been involved in numerous significant mergers and acquisitions of video game developers and publishers. *See* Pls' Compl. ¶ 220. Microsoft owns through acquisition former competitors such as ZeniMax Media Inc., the parent company of Bethesda, a popular Triple-A video game developer and publisher responsible for popular

franchises such as *The Elder Scrolls*, *Fallout*, *Wolfenstein*, and others. *Id.* Microsoft also owns other massive video game franchises, such as *Minecraft*, *Halo*, and *Gears of War*. Microsoft continues to develop and publish gaming content.

Activision Blizzard is the second largest publisher of gaming content in the United States with a market share of 10%. *See* Seidel Decl. Ex. B at 5. Since 1997 Activision Blizzard has been involved in several significant mergers and acquisitions of video game developers. Pls' Compl., at ¶ 222. Activision Blizzard now owns a number of former competitors such as Treyarch Invention LLC and Infinity Ward Inc., that work on the immensely popular *Call of Duty* franchise. *Id.*, ¶¶ 222(b)- (c). Activision Blizzard is responsible for developing or publishing some of the most successful video games of all time, such as *Call of Duty*, *World of Warcraft*, *StarCraft*, *Diablo*, *Overwatch*, and *Candy Crush*. Activision Blizzard continues to develop and publish gaming content.

These market share statistics alone are more than sufficient to conclude that the merger is unlawful under Section 7. Through the acquisition, Microsoft will add 10% of the market to its current control of roughly 24%, for a combined total of roughly 34% of the market. *See* Seidel Decl. Ex. B at 4–5. This is far in excess of market concentration the Supreme Court has previously held unlawful. *See, e.g.*, *Von's Grocery*, 384 U.S. at 272–74 (holding unlawful the merger of two grocery store chains, with a combined total of 7.5% of the market); *Cont'l Can*, 378 U.S. at 461 (holding unlawful an acquisition that would increase the acquiring entity's market share from 21.9% to 25%.); *Aluminum Co. of Am.*, 377 U.S. at 280–81 (holding unlawful an acquisition of an entity with 1.3% of the market share by a company with 27.8% of the market); *Pabst Brewing Co.*, 384 U.S. at 550 (holding unlawful the acquisition of two brewers with a combined market share of only 4.49%). Moreover, these cases did not turn on complicated econometric or statistical analyses. Instead, these cases turned simply on the market share statistics of the merging entities in combination with a trend towards concentration in the markets, and the elimination of a significant competitor through a non-trivial transaction. *See, e.g.*, *Von's Grocery*, 384 U.S. at 278 ("It is enough for us that Congress feared that a market marked at the same time by both a

continuous decline in the number of small businesses and a large number of mergers would slowly but inevitably gravitate from a market of many small competitors to one dominated by one or a few giants, and competition would thereby be destroyed.").

Indeed, in *Philadelphia National Bank*, 374 U.S. at 364, the Court held that any combination which would raise the post-merger entity to more than 30% was a clear *per se* prima facie showing of unlawfulness under Section 7. The Court held that "[w]ithout attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat," and therefore established "prima facie unlawfulness." 374 U.S. at 364 & n.41. Here, Microsoft's acquisition of Activision Blizzard will raise Microsoft's market share in the video game publishing market well beyond the small concentration rates already deemed unlawful by numerous Supreme Court cases, and beyond the 30% presumption declared under *Philadelphia National Bank*.

The significant concentration in the game development and publishing markets that will result from this acquisition is particularly pronounced, given the recent and steady trend towards concentration in the industry. As the Supreme Court has held, Section 7 was specifically intended to prevent a lessening of competition in its incipiency. Thus, whether a market is trending towards concentration is highly relevant in determining whether a particular merger might lessen competition or tend to create a monopoly. *In Von's Grocery*, the Court held: "Congress sought to preserve competition among many small businesses by arresting a trend toward concentration in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies. Thus, where concentration is gaining momentum in a market, we must be alert to carry out Congress' intent to protect competition against ever increasing concentration through mergers." 384 U.S. at 277*; see also Pabst Brewing Co.*, 384 U.S. at 552–53 ("We hold that a trend toward concentration in an industry, whatever its causes, is a highly relevant factor in deciding how substantial the anti-competitive effect of a merger may be."). Here, as alleged in the Complaint, and as Plaintiffs will establish at trial, both Microsoft and Activision Blizzard became the giants that they are through numerous mergers, in an industry characterized by substantial

and increasing concentration. Pls' Compl. ¶¶ 219-222. The trend towards consolidation in the game development and publishing markets further supports finding that Microsoft's proposed acquisition, which would eliminate one of Microsoft's significant horizontal competitors, is *per se* unlawful under Section 7.

The merger's elimination of a significant rival in the game development and publishing markets for console and PC gaming is even worse because both Microsoft and Activision Blizzard are two of only a handful of publishers capable of producing Triple-A games. As alleged in the complaint and recognized in the industry, Triple-A games are the most important gaming content, having the highest game production value, and generally employ the most cutting-edge graphics technologies. They are the most heavily marketed and are the most highly anticipated and popular games. Pls' Compl. ¶¶ 165-169. They thus command the highest prices. Pls' Compl. ¶ 166. Triple-A games constitute an even more concentrated relevant product market. There are only six or seven publishers capable of producing such high-production and heavily marketed games, and only four or five independent Triple-A publishers, not including Microsoft or Sony. *Id.* ¶¶ 76, 165. Microsoft and Activision Blizzard are two of the largest Triple-A publishers, along with Electronic Arts, Take-Two, Ubisoft, Sony, and in some cases Epic. *Id.* ¶ 76 Microsoft and Activision Blizzard directly compete with one another with respect to the development and publishing of these critically important Triple-A games, in an already highly concentrated market. The acquisition here, which would combine the largest and second-largest publishers and eliminate the competition between them is unlawful under Section 7.

   **ii.  The Markets for Gaming Platforms, such as Console and High-End Console Systems, PC Operating Systems, and Cloud-based gaming**

Microsoft has become a giant in the video game industry, controlling an integrated and interconnected gaming ecosystem. It competes in numerous gaming markets. Microsoft sells the Xbox, a high-end gaming console. Pls' Compl. ¶ 7. It sells games. Pls' Compl. ¶ 45-46. It owns and operates Azure, a cloud server infrastructure for numerous products and services, including gaming. Pls' Compl. ¶¶ 53-55. It sells the Windows operating system, which owns around 90% of

the PC gaming market. Pls' Compl. ¶¶ 39, 101; Seidel Decl. Ex. A at ¶ 260. It sells a multi-game subscription service for Xbox and PC, Game Pass, which controls roughly 60% of the game subscription market. Pls' Compl. ¶ 47; Seidel Decl. Ex. A. at ¶ 210. And it also sells a cloud-based gaming service. Pls' Compl. ¶¶ 50, 310.

The merger has the potential to and will likely substantially lessen competition in the markets for gaming platforms, including consoles, PC, and cloud-based gaming, because the merger will give Microsoft control over an outsized portion of top gaming content and Triple-A games. This top gaming content is a critical input to rival platform manufacturers, and Microsoft will be able to foreclose this gaming content to rival platform manufacturers, including consoles, PC operating systems, and cloud-based gaming, to harm competition.

As described in the complaint, the video game industry is characterized by high network effects and barriers to entry. *See* Pls' Compl. at ¶¶ 231-251; *see also* Seidel Decl. Ex. A at ¶¶ 130, 297. Gaming platforms are reliant on gaming content producers developing and publishing gaming content for the platform. Without adequate gaming content available for a given platform, the platform will not be successful. Consumers choose gaming platforms in large part on the quality and quantity of available games for the platform. Game developers seek to develop games for popular game platforms to reach as many consumers as possible, thereby reinforcing network effects and increasing barriers to entry.  Gamers are also incentivized to play popular games so that they can find other gamers online and play with friends.

If permitted, the merger will give Microsoft further control over Triple-A gaming content. The merger would provide Microsoft with the means and further incentive to foreclose Activision Blizzard's important gaming catalog and future releases from rival gaming platform providers. For example, in the console gaming market, Microsoft will be able to make Activision Blizzard's current and forthcoming game titles—along with Microsoft's own substantial gaming content—exclusive to its Xbox system, precluding Microsoft's Xbox rivals from access to this critical source of gaming content. The same is true with respect to PC gaming and cloud-based gaming services, as Microsoft could make Activision Blizzard's current and forthcoming game

content exclusive to the Windows operating system and Microsoft cloud-based gaming offerings, maintaining its monopoly position in the PC gaming market and foreclosing rivals. Indeed, Microsoft has already engaged in this anticompetitive practice when it has acquired game developers and publishers in the past. Pls' Compl. at ¶¶ 301-305; Seidel Decl. Ex. A at ¶ 192; Seidel Decl. Ex. B at 5.

As held in *Brown Shoe*, an arrangement, which "forces the customer to take a product or brand he does not necessarily want in order to secure one which he does desire," is "inherently anticompetitive." 370 U.S. at 330. *Brown Shoe* thus held that "its use by an established company is likely 'substantially to lessen competition" even if "only a relatively small amount of commerce is affected." *Id.* In *Brown Shoe*, the issue was whether a shoe company that owned both shoe manufacturing and retail shoe stores could lawfully acquire a shoe company with numerous shoe retail stores. The court noted that if the shoe manufacturer were to fill the newly acquired shoe stores with its own manufactured shoes, that action would foreclose those retail outlets to other shoe manufacturers. The Court analogized vertical acquisitions for the purpose of making one product exclusive to the other as an inherently anticompetitive tying arrangement. *Id.* at 329–32.

The same applies here. If Microsoft were to make Activision Blizzard's current or forthcoming gaming content exclusive or partially exclusive to Microsoft's Xbox, the Windows Operating system, or its cloud-gaming service, the merger would be inherently anticompetitive just as it was in *Brown Shoe*. *Id.* If Microsoft were to make Activision Blizzard's gaming content exclusive, it would further harm competition through "foreclosure of a share of the market otherwise open to competitors," *id.* at 328, by forcing consumers to purchase, for example, an Xbox—regardless of the merits of the Xbox system over the PlayStation system—if the consumer wished to play Activision Blizzard's particularly popular gaming content. The same for Microsoft's other gaming platforms.

Microsoft already owns numerous gaming franchises that it has made exclusive to the Xbox or the Windows operating system, and to its Game Pass game subscription service. And when Microsoft acquired the game developer and publisher ZeniMax Media, the parent company

to Triple-A game developer and publisher Bethesda Softworks LLC ("Bethesda"), in March 2021, Microsoft assured the European Commission it did not have the incentive to withhold gaming content from rival platforms. According to the European Commission, Microsoft submitted that post-transaction, "Microsoft would not have the incentive to cease or limit making ZeniMax games available for purchase on rival consoles." *See* Pls' Compl. ¶ 302. [7] Shortly after the merger was cleared by the European Commission, Microsoft made public its decision to make several of ZeniMax's games Microsoft-exclusive titles, including *Starfield, Redfall,* and *Elder Scrolls VI*. Pls' Compl. ¶¶ 303-305;[8] Seidel Decl. Ex. A ¶¶ 192–194; Seidel Decl. Ex. B at 5–6.

Acknowledging that exclusivity of Activision Blizzard's game is a real possibility, Microsoft has attempted to disclaim any intention or incentive to make Activision Blizzard's games exclusive to Microsoft's platforms. Pls' Compl. ¶ 306.[9] But regardless of what Microsoft may say to obtain approval of this massive acquisition, the merger would, as Microsoft admits, give Microsoft the ability to foreclose rivals from this important gaming content. Microsoft has already demonstrated it has the incentive, as well as the willingness to make games exclusive, as it did when it acquired ZeniMax games.[10]

### iii. The Markets for Game Distribution Channels, Including Multi-Game Library Subscription Services

Microsoft also operates game distribution channels, including its multi-game library subscription services product, Game Pass, and its online digital game store, the Microsoft Store.

---

[7] *See* European Commission Decision, Case M.10001, May 3, 2021, available at https://ec.europa.eu/competition/mergers/cases1/202124/m10001_438_3.pdf.

[8] *See* Sam White, *How Xbox Outgrew the Console: Inside Phil Spencer's Multi-Billion Dollar Gamble*, November 15, 2021, available at https://www.gq-magazine.co.uk/culture/article/xbox-phil-spencer-todd-howard-interview.

[9] *See, e.g.*, Matthew Humphries, *Phil Spencer Says Sony Is the Only "Major Opposer" to Activision Blizzard Deal*, PC Mag, December 12, 2022 available at https://www.pcmag.com/news/phil-spencer-says-sony-is-the-only-major-opposer-to-activision-blizzard.

[10] "[S]ize carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past." *United States v. Swift & Co.*, 286 U.S. 106, 116 (1932) (Cardozo, J.).

---

Under Game Pass, Microsoft offers players an entire library of games for the Xbox and Windows operating systems at a flat monthly fee. In this way, players can subscribe to an entire collection of games, rather than purchasing games individually. The multi-game library subscription service is a new game distribution market, and Microsoft is incentivized to make Activision Blizzard's game exclusive to Game Pass, thereby foreclosing rival and nascent game subscription services from Activision Blizzard's important gaming content and increasing barriers to entry. Just as with Microsoft's likely exclusion of gaming content with respect to rival gaming platforms, this court need only find a reasonable probability that Microsoft will make Activision Blizzard's gaming content exclusive to Game Pass to find the merger unlawful under Section 7.

### iv.     The Labor Market for Talented Game Content Creators

The merger is also reasonably likely to reduce competition among Triple-A game publishers and developers to hire and retain the labor talent needed to create and publish high-end gaming content. Microsoft and Activision Blizzard are both huge video game industry employers in the United States, and the merger stands to substantially lessen competition in the labor market. The talent necessary to develop, design, program, produce, and publish video games is highly technical and specialized. Pls' Compl. ¶ 277. There are already a limited number of large employers, such as Microsoft and Activision Blizzard, in the United States who hire the highly skilled, technical, and specialized employees in the gaming content fields. *Id.* ¶ 277. Given the limited number of large employers that hire and retain game content talent, Microsoft and Activision Blizzard actively recruit each other's employees. Pls' Compl. ¶ 278. The merger would lessen competition for labor by thinning the already sparse employment pool by combining two of the largest competitors in the space.

The loss of competition in the labor market has the potential to further limit employees' negotiating power and ability to change employers for improved working environments and compensation. *Id.* ¶¶ 224-229. The loss of competition in the labor market is especially concerning given that Activision Blizzard is currently a defendant in multiple lawsuits from employees and from the California Department of Fair Employment and Housing due to

allegations of widespread gender discrimination and sexual harassment. Fewer employment options available to employees necessarily limits employee's mobility, including leaving undesirable working conditions for better employers. The proposed merger would eliminate the competition between two of the largest employers in the market for video game content labor talent, reducing compensation, employee negotiating power, and the ability to change employers for improved working environments.

      **v.**   **Nascent Competition Will Be Substantially Lessened**

  In addition, Microsoft's acquisition of Activision Blizzard may, and is likely to, substantially lessen competition by eliminating Activision Blizzard as a nascent or potential competitor. In *United States. v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973), the Supreme Court reversed a lower court decision on the ground that it "failed to give separate consideration to whether" one of the merging parties "was a potential competitor in the sense that it was so positioned on the edge of the market that it exerted beneficial influence on competitive conditions in that market." *Id.* at 532–33. "The specific question . . . is not what [Defendant's] internal company decisions were but whether, given its financial capabilities and conditions in the [market], it would be reasonable to consider it a potential entrant into that market." *Id.* at 533.

  Here, Activision Blizzard is one of the most successful video game content producers of all time. It owns, and continues to develop and publish, numerous of the most successful and popular games across numerous platforms and gaming genres. Activision Blizzard has the financial capabilities and the incentive to enter new markets, including markets in which it would compete with Microsoft, such as multi-game subscription services, or cloud-based gaming. Indeed, Activision Blizzard has already demonstrated it has the incentive and means to enter new markets. In 2017, Activision Blizzard announced it was creating a new consumer products division, and hired veteran Mattel and Disney executive Tim Kilpin to lead the new division. Pl. Compl. ¶¶ 324–28. By acquiring Activision Blizzard, Microsoft will forever close the door to any competition from Activision Blizzard entering new markets in which Microsoft competes. This is yet another basis, sufficient alone under *Falstaff Brewing*, to hold the merger unlawful.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.    Plaintiffs Are likely to Suffer Irreparable Harm Without Preliminary Relief

Plaintiffs will suffer irreparable harm if the combination is allowed to proceed. Each of the ten Plaintiffs seeking to stop Microsoft's merger is a passionate video game player. Plaintiffs all rely on gaming as a significant source of entertainment, recreation, and socializing with friends. Indeed, the enjoyment and social connections they gain from this rapidly growing industry is a meaningful part of their identities, and they are invested in their gaming communities. *See generally* Pls' Declarations in Support. Given that the merger may, and most likely will, lessen competition in the gaming industry, Plaintiffs are threatened with the potential harm that comes from reduced competition, including their ability to experience the most innovative, entertaining, and highest-quality gaming content on the widest range of platforms, at competitive prices.

Under Section 16 of the Clayton Act, plaintiffs are entitled to injunctive relief to prevent "threatened loss or damage by a violation of the antitrust laws," including the possible lessening of competition in a relevant market under Section 7. The Supreme Court has held that the "lessening of competition 'is precisely the kind of irreparable injury that injunctive relief under Section 16 of the Clayton Act was intended to prevent.'" *Am. Stores*, 492 U.S. at 1304; *see also Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) ("A lessening of competition constitutes an irreparable injury under our case law."). Thus, because Microsoft's acquisition may substantially lessen competition in the relevant markets, Plaintiffs have shown threatened irreparable harm and are entitled to injunctive relief under Section 16.

### C.    The Balance of Equities Tips in Plaintiffs' Favor and Preliminary Relief Is in the Public Interest

The balance of equities tips sharply in Plaintiffs' favor because if a preliminary injunction is denied and the merger were allowed to proceed, yet Plaintiffs ultimately prevail at trial and divestiture must then be attempted, Plaintiffs will be irreparably harmed during the pendency of this case and competition within these important markets across the United States will be irretrievably lost.  Indeed, given Microsoft's demonstrated prior strategy of acquiring important gaming developers and publisher and then making their gaming content exclusive to Microsoft's own gaming platforms, the damage done to competition will likely be extensive, immediate, and

irreversible. Similarly, the loss in competition that currently exists between Microsoft and Activision Blizzard in the production of gaming content will necessarily be lost. On the other hand, if the Court issues a preliminary injunction merely until an accelerated trial on the merits is heard, yet the Plaintiffs ultimately lose on the merits, Microsoft will only face possible delay of its acquisition. It is much less disruptive of the industry and less harmful to competition to maintain the status quo and delay an acquisition, than to allow a merger to proceed only to later seek divestiture to undue the unlawful merger. *See, e.g.*, *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016). Breaking up a consummated merger is difficult if not impossible. Among other things, civil litigation seeking divestiture and damages from a consummated merger can take years to resolve, which makes efforts to "unscramble" the "eggs" impractical.[11]

Further, given Plaintiffs demonstration of likely success on the merits, a preliminary injunction is in the public interest. As the Ninth Circuit has held, "the central purpose of the antitrust laws, state and federal, is to preserve competition," which is "vital to the public interest." *Id.* at 1024. Indeed, the antitrust laws were established in part to ensure that no economic forces grew so large and so powerful that they could grossly tilt the economic playing field further in their favor. They recognized that allowing economic power to concentrate in the hands of too few corrupted all facets of society. Justice Thurgood Marshall captured this fundamental premise succinctly: "Antitrust laws . . . are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972).  Plaintiffs will show that Microsoft's $69 Billion acquisition of the second largest gaming publisher and content creator in the United States will lessen competition and give Microsoft outsized power to further harm competition, foreclose rivals, and

---

[11] *See generally*, William J. Baer, *Reflections on 20 Years of Merger Enforcement Under the Hart-Scott-Rodina Act*, October 31, 1996, available at https://www.ftc.gov/news-events/news/speeches/reflections-20-years-merger-enforcement-under-hart-scott-rodino-act (discussing how mergers cannot be "unscrambled" after they are consummated).

raise further barriers to entry. Prohibiting this merger from proceeding and maintaining the status quo until Plaintiffs can prevail on the merits is in the public interest.

### D.      A Bond Should Not be Required

A bond is not mandatory under Fed. R. Civ. P. 65(c) but is within the discretion of the District Court. *Barahona-Gomez v. Reno* 167 F.3d 1228 (9th Cir. 1999); *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (district court has discretion to require posting of security). In holding that no bond was required in *Reno*, the Court recognized the importance of the public interests underlying the suit and "the unremarkable financial means of the [Plaintiffs] as a whole." *Id*. The Sixth Circuit, cited to with approval in *Reno*, is in accord. In *Moltan v. Eagle-Picher*, the court held that the posting of security under Rule 65(c) was not required due to (1) the strength of the plaintiffs' case and (2) the strong public interests involved. 55 F.3d at 1176.

Just as in *Reno* and *Moltan*, the Court should waive the requirement of a bond. Plaintiffs do not have the financial means to post security, and thus the requirement of a bond could well foreclose Plaintiffs' ability to bring this important case. Moreover, Plaintiffs are likely to succeed in showing that this merger might substantially lessen competition in important markets, thus protecting the public interest in robust economic competition and preventing a trend towards concentration of economic power. All these factors weigh in favor of not requiring a bond here.

## V.      CONCLUSION

For all the foregoing reasons, the Court should issue a preliminary injunction to ensure the unlawful merger does not commence before Plaintiffs can prove the merits of their case at trial. Plaintiffs are likely to prevail on the merits, will suffer irreparable injury if the merger is allowed to commence during the pendency of Plaintiffs' claims, and the balance of hardships tips sharply in Plaintiffs'—and the public interest's—favor.

Dated: December 20, 2022

By: _____/s/ Joseph M. Alioto_____
Joseph M. Alioto

Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:     (415) 434-8900
Facsimile:     (415) 434-9200
Email:            jmalioto@aliotolaw.com

Dated: December 20, 2022

By: _____/s/ Joseph R. Saveri_____
Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:     (415) 500-6800
Facsimile:     (415) 395-9940
Email:            jsaveri@saverilawfirm.com
                     swilliams@saverilawfirm.com
                     czirpoli@saverilawfirm.com
                     eabuchanan@saverilawfirm.com
                     dseidel@saverilawfirm.com

Joseph M. Alioto Jr. (SBN 215544)
**ALIOTO LEGAL**
100 Pine Street, Suite 1250
San Francisco, California 94111
Tel: (415) 398-3800
Email:            joseph@aliotolegal.com

Plaintiffs' Counsel