# EXHIBIT A



# Anticipated acquisition by Microsoft Corporation of Activision Blizzard, Inc.

**CMA/15/2022**

# Decision on relevant merger situation and substantial lessening of competition

**ME/6983/22**

The CMA's decision on reference under section 33(1) of the Enterprise Act 2002 given on 1 September 2022. Full text of the decision published on 12 October 2022.

Please note that [✄] indicates figures or text which have been deleted or replaced in ranges at the request of the parties or third parties for reasons of commercial confidentiality.

## SUMMARY

### Overview of the decision

1.    The Competition and Markets Authority (**CMA**) conducted a phase 1 investigation into the anticipated acquisition of Activision Blizzard, Inc. (**ABK**) by Microsoft Corporation (**Microsoft**) (the **Merger**). After examining a range of evidence, the CMA believes that the Merger meets the threshold for reference to an in-depth phase 2 investigation, giving rise to a realistic prospect of a substantial lessening of competition (**SLC**) in gaming consoles, multi-game subscription services, and cloud gaming services.

2.    As a result of the initial concerns found in the phase 1 investigation, the CMA is therefore considering whether to accept undertakings under section 73 of the Enterprise Act 2002 (the **Act**). Microsoft and ABK have until 8 September 2022 to offer an undertaking that might be accepted by the CMA. If no such undertaking is offered, then the CMA will refer the Merger for an in-depth phase 2 investigation pursuant to sections 33(1) and 34ZA(2) of the Act. This would enable the CMA to investigate these concerns in more detail before reaching a final decision on whether or not the Merger gives rise to an SLC.

## About the gaming industry

### *The same three companies have been the only major suppliers in the console gaming market for the past 20 years*

3.  The gaming industry is the UK's largest revenue-generating form of entertainment. It is bigger than pay TV, home video (including streaming), cinema, music, or books. In 2021, it generated approximately £7 billion in revenue in the UK.

4.  For the past twenty years, the same three companies have been the only significant suppliers of console gaming – Microsoft (Xbox), Sony (PlayStation) and Nintendo (Switch being the current generation console), with little or no entry from new rivals. As part of its investigation, the CMA sought to ensure that the Merger would not substantially reduce either current or future potential competition.

5.  Part of the difficulty in entering and expanding in the console gaming market is the existence of strong network effects. Console providers such as Microsoft compete to attract users who want to play high-quality games, often with friends, as well as high-quality content from game developers, who want to make games for consoles with a large user base. Consoles with a lot of gamers attract better content, which in turn attracts more gamers to that console, which in turn attract better content, and so on. This self-reinforcing mechanism makes it more difficult for new entrants without a large user base or good pre-existing gaming content to enter and grow in the market.

6.  In addition to consoles, people play games on personal computers (**PCs**) and mobile devices. Consoles and PCs can usually process larger and more complex games (such as *Call of Duty*). Mobile devices currently lack the technical capabilities to play most console games, and most people use them to play more casual games (such as *Candy Crush*).

### *Subscription services and cloud gaming are growing*

7.  The CMA believes the gaming industry is in a transitional phase. Over the past several years, gamers have typically accessed games by paying an up-front fee and downloading the relevant games from a digital storefront (such as the Xbox Store) to their console or device (such as a PC or mobile). For consoles this 'buy-to-play' model, whereby the gamer pays for the game in full and then accesses the software locally on their device, remains the primary mode of delivering games.

8.  In recent years, two important and closely related disruptions have started to emerge in the gaming industry. The first is the development of cloud gaming services, a technology that allows complex games to be accessed on remote servers and streamed directly to a device. Since games are executed remotely, gamers can play using a range of devices that can be less powerful, and are often cheaper, than consoles (such as mobile phones or tablets). There have been

several recent entrants into the gaming industry using this disruptive technology, including Amazon Luna, Netflix, Google Stadia, Blacknut, NVIDIA GeForce Now, as well as publishers like Ubisoft. Many industry experts predict that cloud gaming will continue to grow significantly in the coming years.

9.   The second important development is the emergence of multi-game subscription services. Unlike the traditional buy-to-play model, these services allow gamers to access a catalogue of games for a fixed, often monthly, fee. Some subscription services currently offer games that must be downloaded and played on consoles, with a smaller selection of games that can be streamed from cloud infrastructure (such as Xbox Game Pass), and other subscription services offer gaming libraries that are entirely cloud-based (such as Amazon Luna and Google Stadia). While most of the revenue in the industry continues to be generated from the purchase of individual games, multi-game subscription services are rapidly growing and have attracted a range of new entrants, including Microsoft, Sony, Nintendo, Amazon, Apple, Electronic Arts, Ubisoft, NVIDIA, Netflix, Utomik, Blacknut, and Google.

10.  Although the console gaming market is highly concentrated, the CMA believes that the shift to cloud gaming services and multi-game subscription services is opening a window of opportunity for new entrants. To succeed, these new entrants will need to offer a strong gaming catalogue that will attract users. Cloud gaming service providers will also need access to cloud infrastructure and an operating system (**OS**) license (especially Windows OS, which is the operating system for which most PC games are designed).

## About the businesses and the transaction

### *Microsoft has a strong gaming ecosystem*

11.  Microsoft is a global technology company offering a wide range of products and services, with a global turnover of nearly £125 billion in FY2021. Since 2001, it has released several generations of Xbox gaming consoles. Xbox is one of the three major consoles in the market alongside Sony PlayStation and Nintendo Switch. Gamers typically download digital copies of the games they want to play on Xbox from Microsoft's Xbox Store. Microsoft also offers a multi-game subscription service, Xbox Game Pass, where gamers pay a monthly fee to gain access to a library of downloadable and cloud-based gaming content.

12.  Microsoft is also a game publisher and currently owns 24 game development studios, several of which it acquired in recent years. These studios make games such as *Minecraft*, *Forza*, *Elder Scrolls*, and *Halo* for Xbox and other consoles, PC, and mobile devices. Some of this content is available exclusively on Xbox and some is licensed to rival console providers.

13. Microsoft has other business areas that are relevant to gaming. One is Azure, a leading cloud platform (ie a network of data centres and cloud computing infrastructure) that offers a wide range of services across several industries, including gaming. Another is Windows, the leading PC operating system. Many people play games on a PC rather than a console, and the vast majority of them use Windows OS. Because of its popularity, game developers generally make games that are designed and optimised for Windows OS.

***ABK creates some of the most popular gaming content***

14. ABK is a game developer and publisher with global turnover of £6.3 billion in FY2021. It develops gaming content for consoles, PC, and mobile. ABK's three most popular franchises—*Call of Duty*, *World of Warcraft* and *Candy Crush*— account for most of its revenue.

15. *Call of Duty*, in particular, is widely regarded as one of the most successful gaming franchises of all time. For more than a decade, its releases have ranked in the top games available on console and are expected to continue to do so.

***Microsoft's acquisition of ABK is a significant transaction***

16. Microsoft announced in January 2022 that it has agreed to acquire ABK for a purchase price of USD 68.7 billion. The Merger is conditional on receiving merger control clearance from a number of global competition agencies, including the CMA.

## The CMA's assessment

***Why is the CMA looking at the merger?***

17. The CMA's primary duty is to seek to promote competition, both within and outside the UK, for the benefit of consumers. It has a duty to investigate mergers that could raise competition concerns in the UK, provided it has jurisdiction to do so.

18. The CMA believes that it has jurisdiction to review this Merger: the CMA believes it is or may be the case that each of Microsoft and ABK is an enterprise and that they will cease to be distinct as a result of the Merger, and that the turnover test is met given ABK generated more than £70 million turnover in the UK in FY2021. Accordingly, arrangements are in progress or contemplation which, if carried into effect, will result in the creation of a relevant merger situation.

***How did the CMA investigate the merger?***

19. At phase 1, the CMA needs to establish whether there is a *realistic prospect* of an SLC which merits a reference to an in-depth phase 2 investigation. This is a lower threshold than that used during a phase 2 investigation, which requires the CMA to conclude that a merger is *likely* to result in an SLC in order to prohibit a transaction.

20.    To understand the implications of the Merger on competition, the CMA gathered information from a wide variety of sources, including by using the CMA's statutory information gathering powers to ensure that the CMA has as complete a picture as possible under the constraints of the statutory timetable.

21.    As part of its phase 1 investigation, the CMA gathered data and reviewed over one thousand internal documents from Microsoft and ABK to understand their businesses, their future strategies, and the gaming industry as a whole. The CMA also gathered evidence from other market participants, such as game developers and competitors across console, cloud, PC, and mobile gaming, which included both written and oral submissions as well as their internal documents.

22.    This evidence shows that the Merger could impact competition in several ways. In investigating the Merger, and consistent with the CMA's strict legal time constraints at phase 1, the CMA focused on the most important ways in which the Merger could potentially harm competition, both now and in the future. These 'theories of harm' assess the harm to competition that could arise from:

(a)    Microsoft withholding or degrading ABK's content—including popular games such as *Call of Duty*—from other consoles or multi-game subscription services; and

(b)    Microsoft leveraging its broader ecosystem together with ABK's game catalogue to strengthen network effects, raise barriers to entry and ultimately foreclose rivals in cloud gaming services.

**A game-changing merger**

23.    Microsoft already holds a strong position in the gaming industry through its established Xbox console, which has a large user base and a strong catalogue of gaming content. Microsoft has been steadily strengthening its gaming ecosystem in line with the evolution of the gaming industry, including by acquiring independent gaming studios (such as Bethesda in 2021), expanding Game Pass (its market-leading multi-game subscription service), and developing its cloud infrastructure to better support its gaming activities.

24.    Acquiring ABK would significantly expand Microsoft's own gaming library, adding some of the world's best-selling and most recognisable franchises, including *Call of Duty*, *World of Warcraft*, and *Candy Crush*. The CMA is concerned that having full control over this powerful catalogue, especially in light of Microsoft's already strong position in gaming consoles, operating systems, and cloud infrastructure, could result in Microsoft harming consumers by impairing Sony's—Microsoft's closest gaming rival—ability to compete as well as that of other existing rivals and potential new entrants who could otherwise bring healthy competition through innovative multi-game subscriptions and cloud gaming services.

### *What could be the impact of the merger on gaming consoles and subscription services?*

25.    The CMA gathered substantial evidence from Microsoft, ABK, and third parties to assess the significance of ABK's gaming portfolio. This evidence consistently pointed towards ABK's content, especially *Call of Duty*, as being important and capable of making a material difference to the success of rivals' gaming platforms. ABK invests significant time and capital in creating regular *Call of Duty* releases, which consistently rank as some of the most popular games. These titles require thousands of game developers and several years to complete, and there are very few other games of similar calibre or popularity.

26.    The CMA believes the Merger could allow Microsoft to make ABK content, including *Call of Duty*, exclusive to Xbox or Game Pass, or otherwise degrade its rivals' access to ABK content, such as by delaying releases or imposing licensing price increases. This type of concern is known as 'input foreclosure', where a firm uses its control of an important input to harm its rivals.

27.    The CMA examined internal documents and economic analyses to assess whether Microsoft would have an incentive to use ABK's content to foreclose rivals. The CMA did not limit its analysis to an assessment of the short-term or 'static' costs and benefits to Microsoft of engaging in these strategies. Rather, the CMA considered Microsoft's broader strategies, as evidenced by its internal documents and historical course of dealing following similar transactions in the past. The CMA found that the potential strategic benefits to Microsoft of using ABK's content to foreclose rivals— such as expanding the Game Pass user base and strengthening network effects in its gaming ecosystem—could outweigh any immediate losses in terms of licensing revenues. The CMA notes that Microsoft has followed this approach in several past acquisitions of gaming studios, where it made future game releases from those studios exclusive in consoles to Xbox (such as the upcoming Starfield and, based on Microsoft's public statements, Elder Scrolls VI from Bethesda, a studio Microsoft acquired as part of its USD 7.5 billion acquisition of ZeniMax in 2021).

28.    The CMA believes that in the short- to medium-term, the main rival that could be affected by this conduct would be Sony. Evidence suggests that Microsoft and Sony compete closely with each other in terms of content, target audience, and console technology. Nintendo, on the other hand, competes less closely with either of Sony or Microsoft, generally offering games that focus more on 'family fun' and innovative ways of playing (eg the Wii Fit board) and does not currently offer any *Call of Duty* games on the Nintendo Switch.

29.    PlayStation currently has a larger share of the console gaming market than Xbox, but the CMA considers that *Call of Duty* is sufficiently important that losing access to it (or losing access on competitive terms) could significantly impact Sony's revenues and user base. This impact is likely to be felt especially at the launch of the next

generation of consoles, where gamers make fresh decisions about which console to buy. The CMA believes that the Merger could, therefore, significantly weaken Microsoft's closest rival, to the detriment of overall competition in console gaming.

30.   As the market for multi-game subscription gaming services grows, Microsoft could use its control over ABK content to foreclose rivals, including recent and future entrants into gaming as well as more established players such as Sony. Absent the Merger, ABK games would in principle be available to any multi-game subscription service. The CMA recognises that ABK's newest games are not currently available on any subscription service on the day of release but considers that this may change as subscription services continue to grow. After the Merger, Microsoft would gain control of this important input and could use it to harm the competitiveness of its rivals. As the multi-game subscription market is still in its infancy, the effect of the Merger could be to tip or significantly increase concentration in the market in Microsoft's favour before future rivals have a chance to develop. The CMA therefore believes that the Merger gives rise to significant competition concerns in multi-game subscription services (including cloud gaming services, to the extent these are distributed through multi-game subscription services).

### *What could be the impact of the merger on cloud gaming services?*

31.   In the longer term, many market participants expect cloud gaming to grow and for gamers to shift from console gaming to cloud gaming on a range of devices. This market is growing rapidly and has seen several new entrants that were previously not active in console gaming, including cloud platform providers, such as Google and Amazon, and game developers such as Ubisoft.

32.   Microsoft already has a combination of assets that is difficult for other cloud gaming service providers to match. By having a large and well-distributed cloud infrastructure, Microsoft will be able to host games on its servers on preferential terms and reach gamers throughout the world without having to pay a fee to third-party cloud platforms. By having Windows, the OS where the vast majority of PC games are played, Microsoft can stream games from Windows servers without having to pay an expensive Windows licensing fee and may be able to design and test games made for Windows more effectively than rivals. And by having an existing console ecosystem, Microsoft has an existing user base of gamers to which it can promote its cloud gaming services, as well as a range of popular games that it can offer.

33.   The Merger would, therefore, bring together the company in a uniquely strong position to offer cloud gaming services with one of the industry's strongest gaming catalogues. The CMA is concerned that, by leveraging ABK's content and Microsoft's wider ecosystem, Microsoft will have an unparalleled advantage over current and potential cloud gaming service providers. This could result in increased concentration in cloud gaming services or the market 'tipping' to Microsoft, and

ultimately deny consumers the benefits of competition between new and emerging providers vying to succeed in cloud gaming. The CMA recognises that, if Microsoft were to significantly increase its market power in cloud gaming services, this could have knock-on effects on independent game developers and publishers who compete against Microsoft's own gaming portfolio, and who could be disadvantaged in a number of ways, such as by having to pay higher fees or by being demoted on Microsoft's gaming ecosystem.

34.     The CMA therefore believes the Merger could substantially reduce competition in cloud gaming services.

## What happens next?

35.     As a result of these concerns, the CMA believes that the Merger gives rise to a realistic prospect of an SLC in gaming consoles (together with their digital storefronts), multi-game subscription services, and cloud gaming services. The CMA is therefore considering whether to accept undertakings under section 73 of the Act. Microsoft and ABK have until 8 September 2022 to offer an undertaking which might be accepted by the CMA. If no such undertaking is offered, or the CMA decides that any undertaking offered is insufficient to remedy its concerns to the phase 1 standard, then the CMA will refer the Merger for an in-depth phase 2 investigation pursuant to sections 33(1) and 34ZA(2) of the Act. Following such a further detailed investigation, the CMA would reach a final decision as to whether or not the Merger gives rise to an SLC.

# ASSESSMENT

## PARTIES

36.    Microsoft is a global technology company founded in 1975 and headquartered in
       Redmond, Washington, US.[1] Microsoft is publicly listed on Nasdaq. Microsoft's
       global turnover in the financial year 2021 was close to £125 billion, of which [✂]
       was generated in the UK.[2]

37.    Microsoft is organised into three operating segments: (i) Productivity and Business;
       (ii) Intelligent Cloud; and (iii) More Personalised Computing.[3] Microsoft offers a wide
       range of products and services including:

       (a)    Windows OS. Microsoft Windows is a computer OS that can be installed on a
              PC or server to provide a graphics-based interface between the user and the
              computer's hardware and software. Over the years, Microsoft has released
              various versions of Windows in an endeavour to improve on features like
              speed and user interface.[4] Microsoft offers two types of licences for Windows –
              Windows for desktop PCs (**Windows Client**) and Windows for servers
              (**Windows Server**) [✂].[5]

       (b)    Azure. Azure is Microsoft's public cloud platform and associated services.
              Azure offers over 200 Infrastructure-as-a-Service (**IaaS**) and Platform-as-a-
              Service (**PaaS**) solutions including computing, storage, networking, databases,
              operating systems, developer tools, and runtimes, to help enterprises build and
              run their systems, analytics, and applications in the cloud. Customers pay
              consumption-based fees for the services they use.[6] Within Azure, Microsoft
              offers Azure PlayFab, a backend platform for live games, providing managed
              game services, real-time analytics, and live operations, which enables game
              developers to build and operate games, analyse gaming data, and improve
              overall gaming experiences.[7] Examples of games that run on Azure PlayFab
              include first-party games such as *Minecraft, Forza Horizon 4, Doom Eternal*,
              and *Microsoft Flight Simulator*, as well as some third-party games including
              *Roblox, Astroneer* and *Wasteland 3*.[8]

       (c)    Xbox Cloud Gaming. Microsoft currently offers cloud-based game streaming
              through Xbox Cloud Gaming, which is composed of dedicated Xbox consoles

---

[1] Final Merger Notice dated 5 July 2022 (**FMN**), paragraph 3.1.
[2] FMN, paragraph 6.1.
[3] FMN, paragraph 3.2.
[4] 'From Windows 1 to Windows 10: 29 years of Windows evolution', dated 2 October 2014, accessed 4 August 2022.
[5] The Parties' response to question 5 of the CMA's RFI dated 19 July 2022.
[6] FMN, paragraph 12.82.
[7] FMN, paragraph 12.83.
[8] FMN, paragraph 12.83.

located in Microsoft data centres.[9] This is distinct from Azure. Microsoft has deployed around [✂] Xbox servers worldwide across its data centres to provide Xbox Cloud Gaming. It is [✂].[10]

(d)  <u>Xbox</u>. Xbox is Microsoft's gaming console. It connects to a television or other display and allows users to play games specifically developed for Xbox. Xbox first launched in 2001 and has since remained one of the three main gaming consoles in the market (along with Sony's and Nintendo's consoles).[11]

(e)  <u>Xbox Game Studios</u>. Microsoft is active as a developer, publisher, and distributor of games. Microsoft publishes games for PCs, consoles and mobile devices developed by Xbox Game Studios, a collection of 24 first party development studios, including the recently acquired ZeniMax studios. Examples include games in the *Minecraft, Forza, Elder Scrolls* and *Halo* game titles.[12]

(f)  <u>Digital distribution</u>. Microsoft distributes games in digital form.[13] Microsoft operates the Microsoft Store on Windows (the **Microsoft Store**), an app store on Windows PCs, through which it distributes its own first-party games and third-party games for PC, as well as an Xbox-branded storefront (the **Xbox Store**), which can be accessed via an Xbox console, web-browser, or the Xbox App for Windows.[14]

(g)  <u>Gaming Subscription Services</u>. Microsoft offers multi-game subscription services that include access to first- and third-party games (eg Xbox Live Gold and Xbox Game Pass), online multiplayer capabilities (eg Xbox Live and Xbox Live Gold) and cloud gaming functionality (Xbox Cloud Gaming, which is available as part of the Xbox Game Pass top-tier subscription and on a free-to-play basis with *Fortnite*).[15]

38.  ABK is a game developer and publisher founded in 2008 and headquartered in Santa Monica, California, US.[16] ABK is publicly listed on Nasdaq. ABK's global turnover in the financial year 2021 was over £6 billion, of which approximately £716 million was generated in the UK.[17]

39.  ABK is active in the following areas:

---

[9] FMN, paragraph 12.85.
[10] FMN, paragraph 12.85.
[11] FMN, paragraph 2.7.
[12] FMN, paragraph 6 of the Executive Summary.
[13] Microsoft also distributes games in physical form through third parties, but does not have 'bricks-and-mortar' retail outlets in the UK.
[14] FMN, paragraph 7 of the Executive Summary.
[15] FMN, paragraph 8 of the Executive Summary.
[16] FMN, paragraph 3.10.
[17] FMN, paragraph 6.1.

(a) <u>Game development and publishing</u>. ABK develops games for PCs, consoles, and mobile devices, and publishes them in most countries around the world through three business units: (i) Activision Publishing, Inc (**Activision**); (ii) Blizzard Entertainment, Inc (**Blizzard**); and King Digital Entertainment (**King**).[18]

(b) <u>Digital distribution</u>. In Europe, ABK provides warehousing, logistics, and sales distribution services to third-party publishers of interactive entertainment software and interactive entertainment hardware (as well as its own publishing operations). ABK also has an online gaming digital storefront for PC games, Battle.net, which facilitates digital distribution of Blizzard and select Activision content.[19]

(c) <u>Display advertising</u>. ABK operates digital display advertising within some of its game content, particularly within mobile games offered by King.[20]

40. Microsoft and ABK are together referred to as the **Parties**, or for statements referring to the future, the **Merged Entity**.

## TRANSACTION AND RATIONALE

41. On 18 January 2022, Microsoft entered into an agreement with ABK, via its direct wholly owned subsidiary Anchorage Merger Sub Inc., to acquire sole control of ABK (as defined above, the **Merger**).[21] Under the terms of this agreement, Microsoft agreed to pay USD 95 per share, representing a purchase price of approximately USD 68.7 billion.[22]

42. The Parties informed the CMA that the Merger is also the subject of review by competition authorities in a number of other jurisdictions, including Australia, Brazil, [✂], the EU, Japan, [✂], South Korea, and the US.[23]

43. The Parties told the CMA that Microsoft's rationale for the Merger is to:

(a) provide Microsoft with gaming content (including popular ABK franchises like *Call of Duty* (**CoD**), *World of Warcraft*, and *Candy Crush Saga*) which will help Microsoft to execute a cross-platform strategy (allowing gamers to play games on multiple devices);[24]

---

[18] FMN, paragraph 3.11.
[19] FMN, paragraph 3.13.
[20] FMN, paragraph 3.14.
[21] FMN, paragraphs 2.1, 2.3, and 2.5. See, here: <u>press release</u> issued by Microsoft.
[22] FMN, paragraph 2.2.
[23] FMN, paragraph 2.4.
[24] FMN, paragraph 2.21.

(b)     improve Microsoft's presence in the mobile segment, where ABK holds an established position (particularly through King);[25]

(c)     support Microsoft's investments in its multi-game subscription service, Xbox Game Pass[26] (**XGP**), and improve user engagement/adoption amongst Xbox and PC users;[27]

(d)     improve Microsoft's ability to create a 'Universal Store' (extending the Xbox digital storefront across non-Xbox platforms and devices);[28] and

(e)     increase the attractiveness of Microsoft's advertising business (**MSAN**).[29]

44.     Microsoft's internal documents broadly support the rationale stated above, with a particular focus on acquiring a broad range of differentiated gaming content to help scale XGP.[30]

## PROCEDURE

45.     As part of its Phase 1 investigation, the CMA gathered data and reviewed over one thousand internal documents from Microsoft and ABK to understand their businesses, their future strategies, and the gaming industry as a whole. The CMA also gathered evidence from other market participants, such as game developers and competitors across console, cloud, PC, and mobile gaming, which included both written and oral submissions as well as their internal documents. Where necessary, this evidence has been referred to within this Decision.

46.     The Merger was considered at a Case Review Meeting.[31]

## JURISDICTION

47.     The CMA believes that the Merger (as described in paragraph 41) is sufficient to constitute arrangements in progress or contemplation for the purposes of the Act.[32]

---

[25] FMN, paragraphs 2.16, 2.20, and 2.22.
[26] For completeness, the CMA notes that Microsoft offers a number of pricing options for its subscription services, for users on both PC and consoles, as well as a bundled subscription and cloud gaming offering (Xbox Game Pass Ultimate). Throughout this Decision, references to Xbox Game Pass refer to the various offerings as a collective, unless otherwise specified.
[27] FMN, paragraph 2.24.
[28] FMN, paragraph 2.25 and 2.26.
[29] FMN, paragraph 2.29.
[30] For example, see [✂].
[31] Mergers: Guidance on the CMA's jurisdiction and procedure (CMA2), December 2020, from page 46.
[32] Section 33(1)(a) of the Act.

48.    Each of Microsoft and ABK is an 'enterprise' under section 129 of the Act. As a result of the Merger, these enterprises will cease to be distinct for the purposes of sections 23(1)(a) and 26 of the Act.[33]

49.    The UK turnover of ABK in FY2021 exceeded £70 million, so the turnover test in section 23(1)(b) of the Act is satisfied.[34]

50.    The CMA therefore believes that it is or may be the case that arrangements are in progress or in contemplation which, if carried into effect, will result in the creation of a relevant merger situation.

## COUNTERFACTUAL

51.    The CMA assesses a merger's impact relative to the situation that would prevail absent the merger (ie the counterfactual). For anticipated mergers, the counterfactual may consist of the prevailing conditions of competition, or conditions of competition that involve stronger or weaker competition between the merger firms than under the prevailing conditions of competition.[35]

52.    In determining the appropriate counterfactual, the CMA will generally focus only on potential changes to the prevailing conditions of competition where there are reasons to believe that those changes would make a material difference to its competitive assessment.[36] The CMA also seeks to avoid predicting the precise details or circumstances that would have arisen absent the merger. For example, the CMA might assess the likelihood that one of the merger firms would have entered or significantly expanded, but not the precise characteristics of the product or service it would have introduced or the level of sales it would have achieved.[37]

53.    The Parties submitted that the relevant counterfactual against which to assess the Merger is the prevailing conditions of competition.[38] The CMA has not received any evidence that indicates it should base its assessment on a counterfactual other than the prevailing conditions of competition.

54.    The Parties also submitted that the CMA departs from this counterfactual at certain points in the competitive assessment, on the basis that the CMA speculates that certain changes may occur in ABK's product offerings.[39] However, the CMA's conclusion on the counterfactual does not seek to ossify the market at a particular point in time, and an assessment based on the prevailing conditions of competition

---

[33] FMN, paragraph 5.2.
[34] FMN, paragraph 5.3.
[35] Merger Assessment Guidelines, March 2021, paragraph 3.2.
[36] Merger Assessment Guidelines, March 2021, paragraph 3.9.
[37] Merger Assessment Guidelines, March 2021, paragraph 3.11.
[38] FMN, paragraph 11.1.
[39] The Parties' response to the CMA's Issues Letter dated 11 August 2022 (**Issues Letter response**), paragraph 3.1; and the Parties' response to the CMA's Supplementary Issues Letter (**Supplementary Issues Letter response**), paragraphs 1.6, 4.26, and 4.29.

can reflect that, absent the merger, a merger firm would have continued making investments in improvements, innovations or new products.[40] Therefore, the CMA considers that the prevailing conditions of competition in this case include strategies and innovations in the gaming industry (including the emergence of multi-game subscription and cloud gaming services, as discussed further below). The CMA considers the discussion around potential improvements, innovations or new products which might have occurred as part of the prevailing conditions of competition absent the Merger is most appropriately addressed within the competitive assessment.

55.   The CMA therefore considers that the relevant counterfactual is the prevailing conditions of competition. However, the CMA considers the dynamic nature of aspects of the gaming industry as part of its competitive assessment.

## BACKGROUND

56.   The Parties submitted that gaming is the fastest growing portion of the media and entertainment sector. Gaming is already larger in terms of revenue than pay TV, home video (including streaming), cinema, music, books, or newspapers & magazines.

57.   By revenue, the UK is the largest video game market in Europe and the sixth-largest gaming market worldwide. Having grown year-on-year for the past decade, the gaming industry is currently the UK's highest-grossing form of entertainment (generating overall revenues of approximately £7 billion in revenue in the UK).[41]

58.   The way in which games are distributed has changed over the past few years. Games were previously distributed on physical media (eg cartridges, Blu-ray discs or CD-ROM) in brick-and-mortar stores. In recent years, this has shifted towards digital distribution, with gamers downloading games directly to their PCs, consoles, or mobiles via online stores. Industry analysts report that physical sales accounted for 21% of gaming revenue in 2021, falling to 19% in 2022 (as compared to 55% in 2015).[42] The result of this shift has been to significantly increase the prominence of digital distribution channels, such as console storefronts (eg the Xbox Store or the PlayStation Store) and PC storefronts (eg Valve's Steam and Epic's Games Store).

59.   Today, the gaming industry is going through two important and closely related transitions. The first is a shift towards cloud gaming services. Historically, the gaming industry has been organised around a limited set of devices optimised for gaming—consoles and gaming PCs in particular—which are expensive and relatively infrequent purchases (console generations are released years apart). The

---

[40] Merger Assessment Guidelines, March 2021, paragraph 3.3.
[41] 'The UK video games market is worth a record £7.16bn', dated 31 March 2021, accessed 30 August 2022.
[42] 'Video game market in the United Kingdom – Statistics & Facts', dated 10 November 2021, accessed 27 July 2022.

emergence of cloud gaming technology provides an additional delivery mechanism that allows gamers to stream games running on hardware in a data centre to their choice of device. Rather than downloading the game, gamers access and play the games through a lightweight 'middleware' app on their device. Cloud gaming means that gamers can play more technologically complex games on less powerful devices, such as mobile devices, that would otherwise lack the computing power or storage to support those games. Although the evidence shows that cloud gaming continues to face challenges, such as slow internet speeds in some regions and latency issues during gameplay, experts consider that the industry is at an inflection point where cloud gaming technology will become feasible for most game titles in the foreseeable future.[43] The expectation is that cloud gaming will grow significantly and, in time, potentially become the primary delivery mechanism for gaming content.

60.    The second transition is a shift from 'buy-to-play' towards multi-game subscription services.[44] Games have traditionally been sold under the 'buy-to-play' model, whereby customers pay a one-time upfront fee for each individual game.[45] With the emergence of multi-game subscription services, gamers are now able to access a curated catalogue of games, which they can download to their device or stream from a cloud gaming services provider. While most of the revenue in the industry continues to be generated from the purchase of individual games, multi-game subscription services are growing rapidly, and the potential growth of this market has attracted several rivals to establish their own multi-game subscription service offering, including Sony, Amazon, Apple, and Google. Some of these multi-game subscription services offer a combination of downloads and streaming (eg XGP), while others focus on streaming only (eg Google Stadia). The number of games across all multi-game subscription services that are available to stream from cloud gaming services is rapidly increasing.

61.    The CMA considers that this shift towards cloud gaming and multi-game subscription services represents an opportunity to reshape the competitive landscape in the gaming industry. Microsoft submitted that it has lost the 'console wars' to Sony and Nintendo with each generation of consoles.[46] Microsoft explained that it launched XGP in large part as a response to Xbox's lack of success in the console wars.[47]

62.    The CMA considers that Microsoft is in a unique position to take advantage of the shift towards cloud gaming and multi-game subscription services. Gaming content attracts users to a platform, which, in turn, generate the revenues required to create more content and encourage third-party game developers to create games for that

---

[43] Third-party responses to question 6 of the CMA's Cloud Gaming questionnaire; and a third-party response to question 12 of the CMA's Developer/Publisher questionnaire.
[44] This is discussed in greater detail below from paragraph 236.
[45] Other existing payment models, including expansion packs, in-game purchases, and single game subscriptions are set out in the frame of reference section.
[46] FMN, paragraph 22.
[47] FMN, paragraphs 2.9 and 22.

platform. This self-reinforcing mechanism makes it harder for new entrants without a large user base or good pre-existing content to enter the market. The Merger would significantly expand Microsoft's gaming library, adding some of the world's best-selling and most recognisable franchises, such as CoD and *World of Warcraft*. This would leave Microsoft as the only supplier with (i) the leading PC operating system, (ii) one of the world's leading cloud services platforms, and (iii) one of the strongest gaming libraries and user bases.

## FRAME OF REFERENCE

63.   Market definition provides a framework for assessing the competitive effects of a merger. The assessment of the relevant market is an analytical tool that forms part the analysis of the competitive effects of the merger and should not be viewed as a separate exercise.[48] The boundaries of the market do not determine the outcome of the analysis of the competitive effects of the merger, as it is recognised that there can be constraints on merging parties from outside the relevant market, segmentation within the relevant market, or other ways in which some constraints are more important than others. The CMA will take these factors into account in its competitive assessment.[49]

64.   In this case, as in other digital markets, the relevant products are complex and include recent and future potential developments. Demand for gaming products can vary considerably between gamers, and there are complexities in how customers make decisions. The choices available to customers depend on whether they already own a gaming device or if they are planning on buying one. In addition, different customer characteristics mean that some customers may consider a broader range of choices than others. For example, some gamers may prefer complex games that require considerable time and skill (and have historically been played on consoles). Others may prefer simpler games that can be played casually for short periods of time on a range of devices, whilst another group may prefer a mix of both. Where possible, the CMA has accounted for these factors in the discussion of frame of reference which follows. However, the CMA notes that a single frame of reference may not always capture the true competitive interactions between different providers and, where this is the case, these are discussed in the competitive assessment.

65.   The potential issues under analysis in this case relate in various ways to how competition between the Parties and their rivals will dynamically evolve over time, in particular in relation to multi-game subscription and cloud gaming services. In these circumstances, the CMA will place more emphasis on the competitive assessment than on static market definition. In its assessment of the impact of the Merger on

---

[48] Merger Assessment Guidelines, March 2021, paragraph 9.1.
[49] Merger Assessment Guidelines, March 2021, paragraph 9.4.

competition, it will consider evidence on concentration measures alongside evidence of closeness of competition. This involves assessing the strength of the current and likely future constraints between the products of the Parties and their rivals. Evidence on concentration and on closeness of competition can be interpreted and taken into account without the need for a precise definition of the relevant markets.[50]

66.   Accordingly, the CMA's analysis does not seek to conclude on a bright-line definition of the relevant markets, but instead describes the competitive framework within which the Parties and their rivals operate.[51]

67.   In this case, the CMA found that gaming platforms are two-sided, with users on one side and content providers on the other. In its frame of reference, the CMA has assessed each side of the market separately, focusing primarily on the user side of the market, where the competitive concerns in this Merger arise. The CMA has considered both sides of the market in its competitive assessment, including the impact of direct and indirect network effects.[52]

## Product scope

### *PCs, consoles, and mobile devices*

68.   Microsoft manufactures and sells dedicated gaming consoles under its *Xbox* brand. Microsoft also sells PCs (such as its *Surface* series of computers) and mobile devices (such the Microsoft *Surface Duo*), which can also be used to play video games.

69.   ABK does not manufacture or sell PCs, consoles, or mobile devices.[53]

### *Parties' submissions*

70.   The Parties submitted that there are separate markets for the manufacture and supply of (i) PCs and consoles and (ii) mobile devices.[54] In particular, the Parties explained that mobile devices lack the technical capabilities to play most PC and console games, and only a small proportion of PC and console games are also available as native mobile apps.[55]

### *CMA assessment*

71.   The CMA acknowledges that a sub-group of gamers may consider a number of different devices suitable for their gaming requirements. However, it considers that,

---

[50] Merger Assessment Guidelines, March 2021, paragraph 9.3.
[51] Merger Assessment Guidelines, March 2021, paragraph 9.4-9.5.
[52] Merger Assessment Guidelines, March 2021, paragraph 4.22.
[53] FMN, paragraph 12.28.
[54] FMN, paragraph 13.30.
[55] FMN, paragraph 2.16.

for a large group of gamers, the unique experience offered by each device in terms of hardware capabilities and convenience, as well the difference in quality and range of content available is likely to mean that these devices would not be considered as substitutable. The CMA also notes the lack of substitutability on the supply side.

72.   In addition, the CMA notes that PCs, consoles, and mobile devices are generally considered separately in the Parties' internal documents (both in terms of revenues and the competitive landscape).[56] The CMA has also seen third-party reports that also consider PC, console, and mobile gaming separately.[57]

73.   Several third parties told the CMA that the dynamics of competition (including the competitor set) differ between consoles and PCs.[58] One third party told the CMA that different device categories (ie PC, console, and mobile) are suited to different types of game.[59]

74.   The CMA has considered whether the frame of reference should be further segmented by console type. Whilst it recognises that buying a gaming device such as a console is a high-cost investment, it considers that the most important aspect of competition for this case is that for the next generation consoles where customers would be making fresh choices about which console to buy. This is discussed further in the competitive assessment.

75.   Based on this evidence, the CMA considers that there are significant differences between PCs, consoles, and mobile devices, and that it is appropriate to distinguish between the manufacture and supply of each.

### *Cloud gaming services*

76.   Cloud-based game streaming services (**cloud gaming services**) are consumer-facing services which allow games to be streamed over the internet from gaming hardware in a data centre to a gamer's choice of supported device. This differs from gaming on PCs, mobile, and console, where customers are limited to playing games that have been downloaded to that specific piece of hardware. Although nascent, cloud gaming is developing rapidly, allowing even complex games to be placed across different (and less powerful) devices.

77.   Microsoft offers cloud gaming services through Xbox Cloud Gaming (**xCloud**). This is available to gamers as a bundled offering with its Xbox Game Pass Ultimate (**XGPU**) multi-game subscription service, as well as separately on a trial basis for

---

[56] [✂].
[57] [✂]; and [✂].
[58] For example, see note of a call with a third party, dated 19 July 2022, paragraph 21 and note of call with a third party, dated 14 July 2022, paragraph 15.
[59] Note of a call with a third party, dated 19 July 2022, paragraph 4.

one game, *Fortnite*.[60] ABK does not currently offer gamers a cloud gaming service.[61]

*Parties' submissions*

78.   The Parties told the CMA that they do not consider that there is a separate market for cloud gaming services (ie downloads vs streaming), including because gamers choose a gaming experience based on whether it provides enjoyment at an attractive price point, not based on the location of the content or means of delivery.[62]

79.   The Parties further explained that cloud gaming is an alternative way for gamers to access content that is not tied to a specific device and does not provide different content to what is available to download and play.[63]

*CMA assessment*

80.   The CMA notes that this is a dynamic area in which competition is still evolving, and that the precise boundaries of the market may change as the market continues to develop.

81.   The CMA considers that the Parties' submissions fail to recognise the impact of cloud gaming services on demand for consoles, PCs, and games. As the Parties recognise, cloud gaming allows gamers to stream games from a server on any device.[64] This means that gamers can access games that were previously available only on console through a wider range of less powerful devices (eg smart TVs, mobiles). The Parties acknowledged that cloud gaming services could be attractive to a different pool of customers who do not have access to the current hardware required for playing more complicated games and will lower the barriers for certain gamers to access titles.[65] The CMA notes that, as hardware technology develops and cloud gaming services grow, hardware distinctions may become less important in future. As such, the CMA considers that cloud gaming services can be seen as an alternative for gamers to owning a console or PC.

82.   From a supply-side perspective, cloud gaming services are very different from console gaming. To offer cloud gaming services, a provider needs access to cloud infrastructure that is close enough to gamers to operate within acceptable levels of latency. It also requires access to the operating system that supports the games on the user's device. Console gaming, by contrast, requires the manufacture, distribution, and ongoing support of physical devices.

---

[60] The Parties' response to question 6 of the CMA's RFI dated 12 July 2022.
[61] The Parties' response to question 6 of the CMA's RFI dated 12 July 2022.
[62] FMN, paragraph 13.49.
[63] Issues Letter response, paragraph 4.8.
[64] Issues Letter response, paragraph 4.8.
[65] Submission made during the Issues Meeting.

83.   The evidence that the CMA received is generally consistent with cloud gaming services being a separate market. The Parties' internal documents, for example, regularly consider cloud gaming service providers separately, suggesting that they operate in a separate competitive landscape.[66]

84.   The CMA notes that several providers offer cloud gaming services as part of a multi-game subscription service, including Microsoft, Sony, Google, Ubisoft and Amazon.[67] The CMA considers, however, that this is not a necessary feature of cloud gaming services, and that it is technically possible to provide cloud gaming services as part of a different product offering (such as on a buy-to-play basis). The CMA considers the market for multi-game subscription services separately below.

85.   Based on this evidence, the CMA has considered a separate frame of reference for cloud gaming services.

### Computer operating systems

86.   Gaming hardware, especially PCs and mobile devices, is typically provided with an OS. A computer OS provides a graphics-based interface between the user and the computer's hardware and software.[68]

87.   Microsoft is active in the design and supply of computer OS under the *Windows* brand for desktop PCs (Windows Client) and for servers (Windows Server), [✂].[69] Microsoft also historically designed and supplied mobile OS under the *Windows Mobile* brand but ceased these activities in December 2019.[70]

88.   Activision Blizzard is not active in the design or supply of OSs.[71]

### Parties' submissions

89.   The Parties told the CMA that OSs compete at the device level, ie between different PC devices. The Parties submitted that, as demand moves away from traditional laptops and desktops to mobile computing devices, PC OSs also face increasing competition from mobile OSs.[72]

90.   Microsoft submitted that it licenses its Windows Server, but not Windows Client, to other cloud gaming services providers for use as an input in the cloud services they

---

[66] For example, see [✂].
[67] FMN, paragraph 12.51.
[68] The Parties' response to question 1 of the CMA's RFI dated 12 July 2022.
[69] The Parties' response to question 5(b) of the CMA's RFI dated 19 July 2022.
[70] For completeness, Microsoft continues to produce a limited range of mobile devices but these utilise a third-party operating system. See, 'Windows 10 Mobile End of Support: FAQ', accessed 4 August 2022.
[71] The Parties' response to question 1 of the CMA's RFI dated 12 July 2022.
[72] The Parties' response to question 2 of the CMA's RFI dated 12 July 2022.

provide to their end users. Microsoft explained that it has never licensed Windows Client to cloud gaming services providers, and that [✂].[73]

91.   The Parties submitted there are various computer OSs available, as well as software that can convert games designed for use on one OS to enable use on another OS (eg to play games made or use on Windows OS on devices that run Linux OS).[74]

*CMA assessment*

92.   The CMA considers that PC and mobile OSs are different frames of reference. No third party contacted by the CMA considered that the two are substitutes.

93.   As for the distinction between Windows Server and Windows Client, the evidence is mixed on whether they should form part of the same frame of reference. The CMA notes the Parties' submissions that Windows Client and Windows Server license OS products [✂] and that each are optimised for their specific use. One cloud gaming service provider, however, told the CMA that Windows Client is superior for cloud gaming services because (i) Microsoft often deploys gaming-related updates to the Windows Client version some time before deploying the same updates to the Windows Server version; and (ii) games are compiled and tested for the desktop version, and gaming-related updates are often included earlier in the desktop version than in the server version.[75]

94.   Based on this evidence, the CMA has assessed the Merger based on separate frames of reference for PC and mobile OSs. The CMA did not have to conclude on whether there are separate frames of reference for client and server OSs (including in relation to cloud gaming services), since these features of the market can be adequately taken into account in the competitive assessment.

**Game publishing**

95.   Game development refers to the creation of a game (including the design, art, programming and testing), using software development tools (including software development kits (**SDKs**) and 'game engines'). Game publishing refers to the subsequent making available to the public, for sale or free of charge, a game. For the purposes of this Decision, and in line with the Parties' submissions, the CMA has considered development and publishing activities jointly (under the single term, **publishing**).[76]

---

[73] The Parties' response to question 5(d) of the CMA's RFI dated 19 July 2022.
[74] The Parties' response to question 1 of the CMA's RFI dated 12 July 2022; the Parties' response to question 5 of the CMA's RFI dated 19 July 2022; and the Supplementary Issues Letter response, paragraph 5.26.
[75] Third-party response to question 11 of the CMA's Cloud Gaming questionnaire.
[76] FMN, paragraph 13.3.

96.   The Parties are both active in the publishing of games for PCs, consoles, and mobile devices.[77]

*Parties' submissions*

97.   The Parties submitted that the CMA should consider an overall market for game publishing. They also submitted, however, that technical differences between mobile and PCs/consoles lead to the development of different gaming content in each. The Parties explained that PC/console games tend to be more complex and narrative-driven than native mobile games and, therefore, cater to different audiences.[78]

98.   The Parties submitted that, whilst games are sometimes categorised by reference to their genre (eg role-playing games, shooters, puzzle games, etc), there is no need to further segment on that basis as many games combine aspects of multiple genres, and gamers generally just play whatever game they like best, irrespective of what genre that game may be.[79]

*CMA assessment*

99.   The CMA has seen evidence to support a market segmentation by device type:

(a)   Microsoft's stated rationale for the Merger is in part to improve its presence and expertise in mobile gaming.

(b)   The Parties' shares of supply vary between publishing games for each of PCs, consoles, and mobile devices, with the competitor sets varying between category of gaming hardware too.[80]

(c)   The Parties' games are often published on only one form of hardware (for example, ABK's World of Warcraft games are only playable online on PCs, and have not been released on the latest generation consoles).[81]

100.  Third parties support the view that there are material differences between publishing games for each of PC, console, and mobile devices:

(a)   One third party stated that mobile devices have physical limitations in terms of power, battery life, screen size, etc. As such, mobile games are generally lower quality, simple in design and concept, and frequently played to kill time, eg while commuting. The third party explained that mobile games tend to be free-to-play, with revenues driven almost exclusively by in-app purchases.[82]

---

[77] FMN, paragraph 15.1.
[78] FMN, paragraphs 13.7 and 13.8.
[79] FMN, paragraph 13.16.
[80] FMN, Tables 9 - 15.
[81] FMN, paragraph 3.12 and footnote 76.
[82] Third-party response to question 3 of the CMA's RFI dated 25 May 2022.

(b)   A number of third parties told the CMA that they require SDKs from console original equipment manufacturers (**OEMs**) to publish games on console, which is not required for publishing PC games.[83]

(c)   One third party explained that certain consoles have hardware limitations that PCs do not, which limits their ability to publish PC games on consoles.[84]

101.   The CMA received mixed evidence on whether the market for game publishing should be segmented by genre. Several of the Parties' internal documents indicate that the Parties categorise, distinguish, and compare games from different publishers according to genre.[85] The Parties also advertise games by genre in their digital storefronts.[86] Some third parties explained that certain game genres (such as shooter games) compete more closely with each other than with games from different genres.[87]

102.   On the other hand, the CMA received evidence suggesting that the importance of genre as a means of segmenting games has decreased in recent years. One third party told the CMA that many popular games have adopted elements of multiple genres, and games often compete across genre for the attention of gamers.[88] Other third parties told the CMA that factors beyond genre may lead to titles competing closely, such as the release date or overall popularity of the gaming franchise.[89]

103.   Based on this evidence, the CMA has assessed the Merger based on separate frames of reference for game publishing on mobile, console, and PC. The CMA notes that, as hardware technology develops and cloud gaming services grow, hardware distinctions may become less important in future. As for game genre, the CMA did not have to reach a conclusion on the precise product frame of reference, as it found that its competitive assessment would not change regardless of whether the market for game publishing is segmented by genre.

### *Game distribution*

104.   Games are predominantly distributed (i) individually from physical retail stores or digital storefronts in either physical form or as digital downloads (ie on a buy-to-play basis); and/or (ii) as a collection of games via multi-game subscription services, which allow gamers to access a game catalogue for a fixed period for a fee, typically recurring monthly.

---

[83] For example, see note of a call with a third party, dated 19 July 2022, paragraph 6; and a third-party response to question 6(c) of the CMA's Publisher and Developer questionnaire.
[84] Note of a call with a third party, dated 19 July 2022, paragraph 5.
[85] For example, see [✂].
[86] See 'Xbox Games Catalog', accessed 24 August 2022; and 'Battle.net', accessed 24 August 2022.
[87] For example, see submission from a third party, submitted on 26 July, pages 31 and 32; and note of a call with a third party, dated 17 May 2022, paragraph 7.
[88] Note of a call with a third party, dated 19 July 2022, paragraph 9.
[89] Note of a call with a third party, dated 5 May 2022, paragraph 8; and note of a call with a third party, dated 17 May 2022, paragraph 10.

105.  The Parties are both active in game distribution on digital storefronts. Microsoft operates the Microsoft Store on PC and the Xbox Store on Xbox, distributing both games developed by Microsoft as well as by third parties. ABK is active through Battle.net, although it does not currently distribute third-party games.[90] Microsoft also offers a multi-game subscription service, XGP, which allows gamers access to hundreds of titles for a monthly fee.[91]

*Parties' submissions*

106.  The Parties told the CMA that individual game distribution and multi-game subscription services form part of a single distribution market for video games.[92]

107.  In relation to multi-game subscription services, the Parties told the CMA that:

   (a) multi-game subscription services are not an alternative channel of distribution for gaming content, rather that they are an alternative pricing model;

   (b) gamers on Microsoft's multi-game subscription service can interact with gamers playing games on the same platform (eg Xbox) even if they are accessing the game outside of the multi-game subscription service;

   (c) there is direct competitive interaction between buy-to-play games and multi-game subscription services; and

   (d) gamer behaviour suggests that multi-game subscription services are part of the same market. For example, internal Microsoft analysis shows [✂] in gamers' base game purchases 12 months following subscription to Microsoft's multi-game service.[93]

*CMA assessment*

108.  The CMA considers that multi-game subscription services are a different product proposition to traditional digital single-game purchases. Under a multi-game subscription service, gamers can access a bundle of games during a period of time for a fixed fee. The drivers of demand in that context are the price of the bundle, the range of content, and the quality of individual titles. By contrast, when accessing games through digital storefronts, gamers typically pay a higher up-front price for a single game. Although stores can monetise games using a range of methods (eg in-app purchases), gamers typically have unlimited access to the game after the

---

[90] FMN, paragraph 12.59.
[91] One of ABK's titles, *World of Warcraft*, requires gamers to pay a monthly subscription to play the game. The subscription only covers access to this title, and so is not a multi-game subscription service. FMN, paragraph 22 of the Executive Summary and paragraph 2.9.
[92] FMN, paragraph 13.46.
[93] Issues Letter response, paragraphs 4.2 to 4.4.

purchase. The drivers of demand in that context are the price and quality of the individual game.

109.   On the supply side, several of the Parties' internal documents suggest that, whilst there is some overlap, the competitor set for multi-game subscription services is different from that of digital storefronts.[94]

110.   Third parties told the CMA that:

(a)   the business model for multi-game subscription services is very different from storefronts;[95]

(b)   there are certain groups of customers who will only purchase individual games, as they wish to own the titles (and would therefore not consider a multi-game subscription to be a substitute to buy-to-play purchases); and[96]

(c)   each mode of distribution will likely suit different types of games/gamers.[97]

111.   Multi-game subscriptions are a nascent but rapidly growing area. Whilst the CMA acknowledges the Parties' submissions that there is a degree of diversion from buy-to-play purchases towards multi-game subscription services, the evidence shows that, at least at present, there is insufficient demand- or supply-side substitution between the two for it to be appropriate to assess them as a single frame of reference. As such, and on a cautious basis, the CMA considers that it is appropriate to assess the impact of the Merger on video game distribution via digital storefronts and multi-game subscription services separately.[98]

112.   The CMA also considered whether to segment multi-game subscription services by each type of device and cloud gaming. The CMA found that almost every multi-game subscription service already allows gamers to access some proportion of their gaming catalogue across different devices. This includes services like XGP or PlayStation Plus, which include a console and a cloud gaming services element, services like Apple Arcade, which allows users to download gaming content to a variety of devices, and services like Amazon Luna or Google Stadia, which allows gamers to stream their games directly to a range of devices. The CMA considers

---

[94] For example, see [✂], and [✂].
[95] For example, see note of a call with a third party, dated 16 May 2022, paragraphs 4 - 6; and note of a call with a third party dated 26 May 2022, paragraph 15.
[96] For example, see note of a call with a third party, dated 17 May 2022, paragraph 24; and note of a call with a third party dated 19 July 2022, paragraph 20.
[97] For example, see third-party response to question 4 of the CMA's PC Storefront questionnaire; and note of a call with a third party, dated 14 June 2022, paragraphs 14 and 17.
[98] The CMA notes that the Parties have submitted analysis indicating that gamers switch their gameplay between XGP and buy-to-play [✂] (see Appendix A and B of the IL response). However, the CMA does not consider that this analysis is sufficient to demonstrate that buy-to-play and subscription services are part of the same frame of reference because (i) the analysis considers a sample of users that are already on XGP and, therefore, doesn't address the behaviour of users that never had XGP; (ii) the diversion observed is in user attention rather than actual users and is not wholly indicative of customer switching; and (iii) the diversion is driven by the availability of content, rather than changes in price or quality of the service.

that multi-game subscription services are continuing to evolve and may appeal more strongly to gamers who are device agnostic than to gamers who have a strong preference for console gaming. As such, the CMA considers that it is appropriate to use a single frame of reference for multi-game subscription services without segmenting further by device type.

113.   Given that the 'buy-to-play' market is not experiencing the same dynamics as the multi-game subscriptions market, the CMA considered it appropriate to assess game distribution of 'buy-to-play' titles via digital storefronts for each of consoles, PCs, and mobile separately.

## Geographic scope

114.   The Parties submitted that their products and services are available on a global basis, including in the UK.[99] For each of the product frames of reference considered above, the Parties submitted the following:

(a)   In respect of PCs and consoles, the geographic market is at least wider than the UK (including the EEA) if not worldwide, as consoles supplied across the UK/EEA are technically equivalent and there are no impediments to cross-border sales of PCs/consoles within the UK and EEA.[100]

(b)   The market for cloud gaming services is worldwide.[101]

(c)   In relation to game publishing, the relevant markets are worldwide, for example because many publishers typically produce one version of a video game for distribution worldwide without significant price differences.[102]

(d)   For the digital distribution of games, the geographic market is worldwide, as the same digital distribution channels are available anywhere in the world without cross-border restrictions and the same game publishers compete across all major regions.[103]

115.   The Parties did not make any submissions on the geographic frame of reference for the design and supply of computer OSs.

116.   For each of the product frames of reference under consideration, the Parties generally provided shares of supply on both a worldwide and UK basis. The CMA notes that, in each of the product frames of reference under consideration, the suppliers present in the area are generally active across a broader geographic region than the UK, and are often active globally. The Parties' internal documents

---

[99] FMN, paragraph 13.23.
[100] FMN, paragraph 13.31.
[101] FMN, paragraph 13.70.
[102] FMN, paragraph 13.23.
[103] FMN, paragraph 13.51.

suggest that these markets are often considered on a worldwide basis, but are sometimes also considered at a regional (eg Europe or North America) or national level.[104]

117.   The CMA also found evidence suggesting that these markets may have a national dimension. The market shares provided by the Parties show material differences between the UK and global shares, suggesting differences in the competitive landscape by geography. In particular, the Merged Entity generally has higher shares of supply in the UK as compared to worldwide. For example, in 2021, the Parties estimate Microsoft's share of supply of console hardware by sales volume to be [10-20]% globally but [20-30]% in the UK.[105] Similarly, in 2021, the Parties estimate the Merged Entity's combined share of supply for console game publishing was around [10-20]% globally and [10-20]% in the UK. In addition, the CMA has seen some evidence of differential availability of services in local markets, including of Microsoft's XGP offering.[106] Further, in relation to Xbox Live Gold, for example, Microsoft's website explains that '[t]o ensure that pricing for the Xbox Live Gold subscription service reflects the local market economies, Xbox Live Gold subscription cards are only redeemable in the country purchased and cannot be redeemed in any other country'.[107]

118.   As such, while recognising that there are multi-national aspects to competition in each of these product frames of references, there is also evidence of regional and national variations in supply and demand. The CMA therefore considers it is appropriate, on a cautious basis, to assess the impact of the Merger in these product frames of reference in the UK. However, where relevant, it has taken account of the broader global context and evidence that is not specific to the UK in the competitive assessment.

## CMA preliminary conclusion on frame of reference

119.   For the reasons set out above, the CMA has considered the impact of the Merger in the following frames of reference in the UK:

(a)   the manufacture and supply of each of:

(i)   PCs;

(ii)   consoles; and

(iii)   mobile devices;

---

[104] For example, see [✂] and [✂].
[105] FMN, Tables 25 and 27.
[106] For example, see 'Xbox Supported Countries/Regions', accessed 30 August 2022.
[107] 'Making sure your Xbox digital subscription is valid for your country | Xbox Support', accessed 4 August 2022.

(b)     the supply of cloud gaming services;

(c)     the design and supply of computer OSs;

(d)     the publishing of games on each of:

      (i)     PCs;

      (ii)    consoles; and

      (iii)   mobile devices;

(e)     the distribution of games through digital storefronts in each of:

      (i)     PC;

      (ii)    consoles; and

      (iii)   mobile devices; and

(f)     the distribution of games through multi-game subscription services.

## COMPETITIVE ASSESSMENT

120.   In formulating theories of harm (**TOH**), the CMA will consider how a merger might affect rivalry between firms seeking to win customers' business over time by offering them a better deal. The theories of harm will depend on the levels of the supply chain at which the merger firms operate; the links between the merger firms and with their rivals; the nature of competition and how firms go about winning customers from each other; and any long-run dynamics in the relevant sectors.[108] For some mergers, the CMA may consider several theories, sometimes affecting the same market.[109] The CMA will generally take a forward-looking approach to the assessment of any theories of harm, considering the effects of the merger both now, and in the future.[110]

121.   In this case, the CMA has assessed a number of theories of harm. In doing so, taking into account the nature of competition and market dynamics identified, the CMA has considered not only each individual theory of harm separately but, as will be outlined further below, also their interaction so as to assess the potential impact of the Merger in the round. The CMA notes that, whilst discussed as part of its assessment of input foreclosure, the importance of (i) network effects and (ii) ABK's

---

[108] Merger Assessment Guidelines, March 2021, paragraph 2.12.
[109] Merger Assessment Guidelines, March 2021, paragraph 2.16.
[110] Merger Assessment Guidelines, March 2021, paragraph 2.14.

content (and CoD in particular) to gaming platforms is a common element across all theories of harm in this decision.

## Input foreclosure of rivals using ABK content

122. The concern with an input foreclosure theory of harm is that the merged entity may use its control of an important input to harm its downstream rivals' competitiveness, for example by refusing to supply the input (total foreclosure) or by increasing the price or worsening the quality of the input supplied to them (partial foreclosure). This might then harm overall competition in the downstream market, to the detriment of customers.[111]

123. The Merger would combine Microsoft—one of only three console gaming platform providers and a leading multi-game subscription service provider—with ABK's strong and diversified catalogue of game content, including CoD, one of the world's largest game franchises.

124. The Merged Entity's games would include some of the biggest and highest selling franchises across various genres, such as shooters (eg CoD, *Halo*, *Gears of War, Doom*, *Overwatch*), role playing games (eg *World of Warcraft*, *Elder Scrolls*, *Fallout*, *Diablo*), racing and flying games (eg *Forza*), action and adventure games (eg *Minecraft*), and others.[112] According to one of the Parties' competitors, the only category where Microsoft would not have a leading position would be in sports games, where Electronic Arts (**EA**), a game producer and publisher, has the strongest position.[113]

125. The CMA has assessed whether adding ABK's portfolio of games to Microsoft's broad and integrated offering would enhance Microsoft's ability to engage in total or partial foreclosure strategies.

126. The CMA has considered whether the Merger may lead to foreclosure in the following target markets:[114]

   (a) Console gaming platforms (**TOH1a**). The CMA uses this term to refer to gaming consoles and their respective digital storefronts.[115]

---

[111] Merger Assessment Guidelines, March 2021, paragraph 7.9.
[112] The Parties overlap in game publishing within certain genres, such as shooter games for console and role-playing games for PC. The CMA did not have to conclude whether the Merger gives rise to competition concerns arising from horizontal unilateral effects in game publishing split by genre because any such concerns would be captured by the concerns found in the remaining theories of harm set out in this decision.
[113] Note of a call with a third party, dated 23 May 2022, paragraph 15.
[114] The CMA has not considered foreclosure in mobile markets as part of the Decision, given Microsoft's limited activities in mobile gaming.
[115] This theory of harm is therefore relevant to two of the frames of references identified above: the manufacture and supply of consoles and the distribution of games through digital storefronts for consoles. However, the CMA notes that Microsoft and Sony each have an exclusive digital storefront for their console games so, in their case, these two potential frames of reference are inherently linked.

(b)   Multi-game subscription services (**TOH1b**). Multi-game subscription services are available across consoles, PC, mobile, and cloud gaming services, with cloud gaming services generally being device agnostic. Considering Microsoft's activities, this theory of harm focuses on the impact of the Merger on PC, console, and cloud multi-game subscription services (and the term 'multi-game subscription services' will be used in that context).

127.   The importance of network effects and ABK's content (and CoD in particular) to gaming platforms are discussed below.

*Network effects*

128.   Gaming platforms are two-sided, with users on one side and content providers on the other. Two-sided markets are often characterised by network effects, where the value of the product for customers on one side of the platform depends on the volume of users either on the same side (direct network effects) or on the other side (indirect network effects).[116]

129.   The CMA found that console gaming platforms, cloud gaming services, and multi-game subscription services are characterised by strong direct and indirect network effects:

(a)   In terms of indirect network effects, the Parties explained that game publishers are more likely to develop content for a platform with a significant user base and, in turn, a strong content library attracts more users to a platform.[117] One Microsoft internal document, for example, explains [✂].[118] Another Microsoft internal document explains that Microsoft's gaming ecosystem creates '[✂]'. The document goes on to illustrate a flywheel that shows [✂].[119]

(b)   In relation to direct network effects, the Parties explained that gamers like to be on the same platform as their friends to play multiplayer games.[120] One Microsoft internal document explains that [✂].[121] Likewise, one ABK internal document shows that [✂].[122] The document explains that [✂].[123] One third party submitted that leading AAA games have multiplayer functionality and have become social media platforms and that, as a result, established AAA video games benefit from significant network effects, which raise barriers to entry for new games and new developers.[124]

---

[116] Merger Assessment Guidelines, March 2021, paragraph 4.22.
[117] Issues Letter response, paragraphs 6.32 and 6.39.
[118] [✂].
[119] [✂].
[120] Issues Letter response, paragraphs 6.32 and 6.35.
[121] [✂].
[122] [✂].
[123] [✂].
[124] Third-party response to question 2 of the CMA's Cloud Gaming questionnaire.

(c)   The CMA found that multi-game subscription services, which is the most common pricing structure for cloud gaming services, also require considerable scale to be successful, which increases barriers to entry into this market. One of Microsoft's internal documents, for example, explains that [✂]¹²⁵ ¹²⁶ The document concludes that [✂].¹²⁷

130.   The CMA's Merger Assessment Guidelines state that network effects generally mean that mergers are more likely to induce a tipping effect or accelerate the market towards tipping, whereas customers would have benefited from a longer period of competition.¹²⁸ These Guidelines also state that the presence of network effects means that barriers to entry are likely to be high and that incumbent platform operators that have market power derived from network effects may be able to amplify their effect.¹²⁹

131.   The CMA considers the evidence above to suggest that there are strong network effects present in gaming and that they are particularly important for competition in the context of nascent markets like multi-game subscription services and cloud gaming.

***Importance of ABK's catalogue of games***

*Parties' submissions*

132.   The Parties submitted that (i) ABK content lacks market power upstream, as demonstrated by ABK's low shares of supply in game publishing (both on the basis of revenues and monthly active users (**TOH1**)); (ii) that the publishing market is fragmented; (iii) a number of other publishers will continue to supply a wide range of content; and (iv) that CoD is not an important input (and that observed gamer behaviour is consistent with this).

133.   The Parties told the CMA that, in upstream game publishing, ABK had a share by value across PC, console, and mobile in 2021 of just [5-10]% globally and [5-10]% in the UK.¹³⁰ The Parties noted that focusing on console only, ABK's share remains at just [5-10]% by value globally and [10-20]% in the UK.¹³¹ Combined console shares would be [10-20]% globally and [10-20]% in the UK,¹³² which the Parties consider to be below the level at which market power can typically be considered to

---

¹²⁵ '[✂].
¹²⁶ '[✂].
¹²⁷ '[✂].
¹²⁸ Merger Assessment Guidelines, March 2021, paragraph 4.25(a).
¹²⁹ Merger Assessment Guidelines, March 2021, paragraph 4.25(d).
¹³⁰ FMN, Tables 10 and 11.
¹³¹ FMN, Tables 14 and 15.
¹³² FMN, Tables 14 and 15; and Issues Letter response, paragraph 5.15.

arise, in particular given the wide range of competitors with greater or equivalent share.[133]

134. According to the Parties, ABK's lack of market power upstream can be seen from its share of console based on MAU. Based on 2021 data, the Parties estimate that ABK has a share of MAU of only [10-20]% globally, whilst other publishers are of equal or comparable scale, including EA (eg *FIFA*, *Apex Legends*, *Star Wars*) at [10-20]% globally, Epic Games (eg *Fortnite*), with a share of [5-10]% globally and Take-Two (eg *Grand Theft Auto*, *Red Dead Redemption*) with a share of [5-10]% globally.[134]

135. The Parties submitted that other rivals in game publishing have a greater or equivalent share of the upstream publishing segment across all gaming platforms.[135] These include EA, Nintendo, Take-Two, Ubisoft, Sony, Embracer, Square Enix, and Epic Games, together with a long-tail of smaller publishers. The Parties submitted that these publishers would continue to offer some of the most well-known and highly regarded console franchises as competitive alternatives to CoD.[136] The Parties consider that, in the context of this abundance of content, some of which is exclusive to Sony and Nintendo, it is not realistic to conclude that CoD has upstream market power.

136. The Parties submitted that gamer behaviour is consistent with ABK's lack of market power upstream. According to the Parties, an analysis of CoD's presence on Xbox shows that, whilst *Fortnite* and CoD account for a significant proportion of game-time played on Xbox ([10-20]% and [10-20]% in 2021, respectively), gamers also play popular franchises such as *Grand Theft Auto*, *FIFA*, *Minecraft*, *NBA2K*, *Tom Clancy*, *ROBLOX*, *Apex Legends*, and *Rocket League*, which account for a significant proportion of the remaining game-time.[137]

137. The Parties additionally submitted that more than [✂]% of gamers on Xbox played at least three games during 2021, with only [✂]% of total game time accounted for by gamers that played two or fewer games throughout the year. The Parties consider that this demonstrates that gamers clearly engage with more than one

---

[133] Issues Letter response, paragraph 5.15.
[134] The Parties' submission in relation to vertical merger analysis, submitted on 28 July 2022, paragraph 2.14, in response to the CMA's RFI dated 26 May 2022.
[135] Issues Letter response, paragraph 5.15.
[136] These include, for example, *FIFA, Apex Legends, Player Unknown Battlegrounds, Madden, Battlefield, Need For Speed, Elden Ring, Star Wars, The Legend of Zelda, Super Mario, Pokémon, Animal Crossing, Grand Theft Auto, NBA2K, Red Dead Redemption, Mafia, Assassin's Creed, Far Cry, The Tom Clancy Series, Gran Turismo, Uncharted, The Last of Us, Ghost of Tsushima, Spider-Man, Days Gone, Final Fantasy, Kingdom Hearts* and *Fortnite*. See FMN, paragraph 15.19.
[137] The Parties' submission in relation to vertical merger analysis, submitted on 28 July 2022, paragraph 2.18, in response to the CMA's RFI dated 26 May 2022.

game and that no one game can impact the downstream competitiveness of a console.[138]

138.   The Parties submitted that Xbox gamer data shows that [✂]% of Xbox gamers did not play CoD in a specific year. According to the Parties, amongst those gamers that do play CoD, the majority only do so for a short period of time. In particular, among gamers who played at least one hour of CoD in 2021, more than [✂]% played it for less than 5% of their total gaming time and [✂]% of CoD gamers spent less than 50% of their gaming time on the game. The Parties consider that this illustrates that the gaming industry is extremely competitive and, for the vast majority of gamers, CoD is a small component of overall gaming consumption.[139]

139.   The Parties further submitted that CoD's popularity varies over time and does not equate to market power. The Parties cite the example of *CoD: Vanguard* (**Vanguard**), which they said was not generally well-received and showed drops in purchases and player engagement compared to previous CoD titles. The Parties submitted that, compared to the revenues of previous CoD titles such as *Modern Warfare* and *Black Ops Cold War* four months after their release, Vanguard achieved revenues that were [✂] previous titles by its fourth month.[140]

*Internal documents*

140.   The CMA believes that the Parties' internal documents show that ABK has one of the most important gaming franchises.

<u>ABK's catalogue</u>

141.   One ABK internal document shows that ABK has six franchises generating revenues greater than [✂] based on owned IP across platforms and demos, including CoD, *Candy Crush*, *World of Warcraft*, *HearthStone*, *Overwatch*, and *Diablo*.[141] Of these, CoD was the number one console franchise globally for [✂] years. The document states that there is unprecedented demand for ABK content across new distribution outlets and devices.[142]

<u>CoD</u>

142.   The Parties' internal documents consistently highlight the size and importance of CoD across platforms. For example, one ABK internal document shows that CoD

---

[138] The Parties' submission, 'Assessing the risk of input foreclosure in console gaming', submitted on 27 July 2022, paragraph 4.4.1, in response to the CMA's RFI dated 9 June 2022. A gamer is defined to have played a game if they played more than 1 hour of that game during the course of 2021.
[139] The Parties' submission in relation to vertical merger analysis, submitted on 28 July 2022, paragraph 2.19, in response to the CMA's RFI dated 26 May 2022.
[140] Issues Letter response, paragraph 5.28.
[141] [✂].
[142] [✂].

generated [✂] on Battle.net in 2020.[143] Several of the third-party consultancy reports submitted by the Parties show that *CoD: Modern Warfare* ranked [✂].[144]

143. ABK's internal documents also highlight the importance of CoD to Sony's PlayStation, in particular:

    (a)    One ABK internal document shows that [✂]. The document also shows that CoD remains the [✂].[145]

    (b)    Another ABK internal document shows that ABK's content played a pivotal role in the success of PlayStation and would continue to do so. The document explains that a six-year CoD partnership between Sony and ABK helped to increase PlayStation 4's console share from [✂], and ABK's content drove around [✂] PlayStation Plus engagement since the launch of PlayStation 4.[146] The document concludes that ABK can have a large impact on Sony's gaming business in the next generation.[147]

144. The Parties' internal documents also highlight [✂]. One Microsoft internal document explains that [✂].[148] Microsoft believes that [✂].[149]

*Third-party views*

145. The CMA has received third-party evidence to suggest that ABK's gaming catalogue, in particular CoD, is important and could make a material difference to gaming platforms.

<u>ABK's catalogue</u>

146. Several of the third parties that the CMA contacted during its investigation confirmed that ABK's content is important and would give Microsoft's gaming platforms a significant advantage. For example, some of Microsoft's competitors explained that ABK games are critical to competition in high-end gaming; that they have no meaningful substitute; and that the acquisition would give Microsoft an unrivalled position in the gaming industry, leaving it with the greatest number of must-have games/iconic franchises.[150] Another competitor explained that ABK games constitute a significant share of overall spend and gameplay time on its platform.

---

[143] [✂].

[144] For example, see [✂]; and [✂].

[145] [✂].

[146] [✂].

[147] [✂].

[148] As submitted by the Parties, AAA games are developed by large development studios, requiring significant budget and time (up to several years), usually for consumption on multiple gaming devices and platforms. See FMN, paragraph 12.12.

[149] [✂].

[150] Submission by a third party, submitted on 26 July 2022, page 5; and third-party response to question 11 of the CMA's Cloud Gaming questionnaire dated 28 July 2022.

This competitor also stated that having ABK games on its platform attracted gamers who then played against other gamers on the platform.[151]

147.   The CMA also saw an independent survey report by YouGov, which polled 1,200 British adults and 1,200 US adults in January 2022 (the **YouGov Report**). It showed that 29% of PlayStation gamers in the UK (46% in the US) indicated that the inclusion of ABK games in XGP would make them consider subscribing to the service. [152] The same was true for 26% of Nintendo gamers (46% in the US), 26% of PC gamers (42% in the US), and 20% of smartphone gamers (27% in the US) in the UK.[153] Overall, the YouGov Report suggested that 48% of Xbox gamers in the UK would consider signing up for XGP if it included ABK games. While the CMA cannot comment on the robustness of this survey, the results are consistent with the other evidence that the CMA has seen.

<u>CoD</u>

148.   The CMA received evidence indicating that CoD is a particularly important game:

   (a)   Sony Interaction Entertainment (**SIE**) submitted to the CMA that CoD has a large number of users on PlayStation, and a significant portion of these gamers spent a majority of their time playing CoD. CoD is a particularly important revenue stream for PlayStation, with the game having the highest awareness and ownership of all third-party franchises.[154] The CMA understood from SIE that CoD's fan base is very loyal towards the franchise, and that having access to the CoD franchise is likely to be a priority for a large number of players. SIE submitted to the CMA that if CoD were exclusively available on Xbox and/or XGP, this could severely adversely impact their ability to compete effectively.[155]

   (b)   Another competitor explained that CoD had an indirect impact on its revenues, as it attracted a larger gamer base, who then purchased other games on their platform. This, in turn, impacted the attractiveness of their platform to other publishers. This competitor explained that successful games, such as CoD, create network effects that draw awareness and traffic to smaller games.[156]

   (c)   The CMA reviewed an independent 2019 report submitted by a competitor stating that CoD had the most 'passionate' fan base among top gaming brands that year. It explained that 'Call of Duty's significance to entertainment at large

---

[151] Third-party response to the CMA's RFI dated 25 May 2022.
[152] 'How many users could the Microsoft/Activision deal bring to Xbox Game Pass?', dated 21 January 2022, accessed 11 April 2022. The survey polled 1200 US adults and 1200 UK adults, with a margin of error of 2.8% by virtue of the sample size.
[153] 'How many users could the Microsoft/Activision deal bring to Xbox Game Pass?', dated January 2022, accessed 11 April 2022.
[154] SIE's response to questions 1 and 24 of the CMA's RFI dated 25 May 2022.
[155] SIE's response to question 24 of the CMA's RFI dated 25 May 2022; and Submission from SIE, submitted on 3 August 2022.
[156] Note of a call with third party, dated 17 May 2022, paragraph 9.

cannot be overstated. The brand was the only video game IP to make it into the top 10 of all entertainment brands among fanatics, joining powerhouses like Star Wars, Game of Thrones, Harry Potter, and Lord of the Rings.' The report goes on to explain that *CoD: Modern Warfare* had the biggest launch of 2019, earning over USD 600 million in just three days, marking the twelfth year in a row that a CoD game ranked as the best-selling game in its launch month.[157]

149.   Competitors also noted that very few game franchises can (or could ever) match CoD's success. [✁] noted that no other game publisher has come close to replicating the success of CoD, particularly in shooters. [✁] also submitted that no other publisher can commit the same level of resources and expertise to game development; and even if they could, CoD is too entrenched for any rival to catch-up.[158] Another competitor explained that no game could substitute CoD, and that it would be difficult to pinpoint a game that would be a close alternative.[159]

*CMA views*

150.   Based on this evidence, the CMA believes that ABK content is important to the current and future success of console gaming platforms and multi-game subscription services.

151.   The CMA considers that overall publisher shares do not present a complete picture of the importance of ABK content. As discussed below (and in the assessment of individual input foreclosure theories of harm), some ABK games, and CoD in particular, are especially important for attracting gamers to a platform. These gamers go on to play other games available on that platform, increasing that platform's overall revenue. This aspect of competition cannot be captured in market shares solely. In particular, the CMA considers that:

(a)   **CoD is currently one of the largest game franchises** by user base and revenue. CoD has ranked in the top games available on console for many years and is expected to continue to do so. A substantial share of PlayStation gamers' spend a significant amount of their time playing CoD. New entrants (eg in cloud gaming services) have also noted the importance of having CoD on their platform. CoD's importance is also evidenced by [✁].[160]

(b)   **CoD has a high level of awareness amongst gamers**, and is responsible for drawing a large, diverse, and loyal user base to a platform as noted above.

---

[157] ['Report: Call of Duty has the most passionate fan base among 2019's top gaming brands'](#), dated 12 December 2019, accessed 3 August 2022.
[158] [✁].
[159] Note of a call with a third party, dated 17 May 2022, paragraph 10.
[160] The Parties' response to question 12 of the CMA's RFI dated 12 July 2022, Tables 12.1 and 12.2.

The presence of these gamers, who then spend money on other games on the platform, also attracts other game publishers to choose that platform.

(c) **CoD has been consistently successful for nearly a decade.** Whilst the Parties submit that CoD's year-on-year success is not guaranteed based on the poorer reception of Vanguard,[161] the CMA notes that the performance of a single CoD title does not determine the importance of the franchise. The persistent high revenues and player engagement across all CoD titles, even after the release of Vanguard, indicates that gamers who did not like Vanguard most likely continued to play older CoD titles rather than switch away to a different game.[162]

(d) **There exist very few franchises that can be considered alternatives to CoD or match CoD's level of success**. For example, in the shooter genre, there is only one competitor of a similar size (Epic Games' *Fortnite* franchise), which in any case differs significantly from CoD in terms of its gameplay functionalities and target audience.[163] Other competitors such as EA and Ubisoft are markedly smaller.[164] The remaining long tail of publishers that supply games are relatively small and do not command a large user base.

(e) **There also exist few publishers that can afford to invest the time and capital required to develop a game franchise like CoD in the future.** The CMA understands that each CoD game takes about [✂] years to develop.[165] ABK has multiple studios with a combined total of [✂] game developers working on different versions of CoD at any one time to maintain yearly releases.[166] The CMA understands that this is difficult for other publishers to match.[167] Moreover, other large publishers—such as EA—focus on specific genres like sports, which means that they may not compete as closely with CoD.

(f) **The Merger would result in CoD being part of a catalogue of games that includes some of the best-selling franchises in particular genres**, such as in shooters (eg *Call of Duty, Halo, Gears of War, Doom, Overwatch*), role-playing games (eg *World of Warcraft, Elder Scrolls, Fallout, Diablo*), racing and

---

[161] Issues Letter response, paragraphs 5.27 - 5.28.
[162] For example, CoD telemetry data submitted by the Parties indicates that [✂] for each of PlayStation, Xbox and PC, including after the release of Vanguard.
[163] For example, *Fortnite* is largely free-to play, with a single title that gets regularly updated. It supports cross-play across devices and have different modes that are not also first-person shooter. The overall theme of the game is more casual, with fewer elements of serious combat as in CoD.
[164] For example, EA's Battlefield, despite being similar to CoD in terms of gameplay and story settings, had sold less than a quarter of CoD copies as of August 2021. See, 'Stealth Optional, Call of Duty vs Battlefield sales: Which FPS game has sold more units?', dated 9 August 2021, accessed 26 August 2022.
[165] SIE's response to question 6 of the CMA's RFI dated 25 May 2022.
[166] The Parties' response to question 1 of the CMA's RFI dated 25 July 2022, Annex 028.1.
[167] For example, see [✂].

flying games (eg *Forza*), action and adventure games (eg *Minecraft*), and others.

## TOH1a Input foreclosure of rival console gaming platforms (excluding multi-game subscription services)

152.   There are currently three main console gaming platform providers in the market – Microsoft, Sony, and Nintendo. The CMA has investigated whether the Merged Entity could harm Microsoft's rivals and thus lessen current and future competition in console gaming platforms through strategies such as (i) making ABK content unavailable on rival consoles (ie exclusive to Xbox), (ii) making ABK content available for release on rival console gaming platforms at a later date compared to Xbox (ie timed exclusivity), (iii) degrading the quality of ABK gaming content available to rival console gaming platforms, (iv) making features or upgrades of ABK games unavailable to other console gaming platforms (ie content exclusivity), and/or (v) raising the wholesale price of ABK content on rival consoles gaming platforms.

153.   The CMA considers that any foreclosure of Microsoft's console rivals would affect console hardware and the related storefronts. This is because console platforms are integrated in terms of their offer of hardware and digital storefronts.

154.   As noted further below, the CMA considers that Nintendo competes less closely with Xbox as compared to PlayStation, by virtue of its differentiated content, target audience, and differential technical capabilities. This theory of harm therefore focuses on Sony. The CMA has considered (i) the ability of the Merged Entity to harm Sony through total or partial foreclosure of ABK games, (ii) its incentive to do so, and (iii) the effect of such strategies on competition.

*Ability*

*Parties' submissions*

155.   As noted above, the Parties submitted that the Merged Entity would lack market power in game publishing. The Parties also submitted that any foreclosure strategy could not induce significant enough switching of gamers from rival platforms because (i) ABK content is not a critical input to rival consoles, (ii) gamers multi-home across gaming consoles (ie they simultaneously own more than one gaming console), (iii) even if exclusive games were to play an important role in a gamer's decision regarding which console to purchase, players tend to remain loyal to their preferred console(s), and (iv) players are likely to face switching costs that may deter them from switching away from the Parties' rival consoles.[168]

156.   As set out in further detail below, the Parties additionally submitted that CoD is not an important input to rival consoles because (i) Nintendo is successful without CoD;

---

[168] FMN, paragraph 19.14.

(ii) Sony has existing contractual protections (which ensure access to CoD on PlayStation), and the Merged Entity would make CoD available on PlayStation beyond these until the end of 2027; and (iii) evidence from past partial exclusivity strategies shows that they are ineffective.

157.   The Parties submitted that Nintendo has built a successful console business without a single version of CoD being available on Nintendo Switch. The Parties stated that the overall quality and appeal of a platform are more important than any game. The Parties submitted that Nintendo cannot be dismissed as competing less closely with Xbox than PlayStation on the basis that it offers different types of games that are marketed to a different audience (ie family friendly games) because (i) there are several paths that a console platform can take without relying on a particular game franchise or genre; and (ii) Nintendo offers games across genres.[169]

158.   The Parties submitted that (i) CoD represents only [✂]% of Sony's digital sales worldwide; (ii) only a small proportion of gamers (<[✂]% of PlayStation's MAU) played CoD in 2021; (iii) even if all of PlayStation's MAU that play CoD were to leave PlayStation, it would still have more MAU than Xbox today; and (iv) the success of PlayStation is due to the technical superiority of its console rather than CoD's attractiveness.[170]

159.   In relation to Sony, the Parties further submitted that they would not be able to engage in a hypothetical input foreclosure strategy because ABK has existing contracts with Sony that pre-date the Merger and limit the extent to which the Merged Entity would be able to withhold CoD from the PlayStation platform. The Parties explained that a number of existing agreements between ABK and Sony, which provide for certain ABK content to be distributed on PlayStation, expire in 2024. The Parties further explained that they have proposed to Sony that the Merged Entity would make CoD available on PlayStation beyond the existing agreement till the end of 2027.[171]

160.   In relation to partial foreclosure strategies, the Parties submitted that CoD has provided exclusive or timed-exclusive downloadable content for either Sony or Microsoft since 2005, and that these arrangements have not led to either Sony or Microsoft being foreclosed. The Parties also submitted that including 'extra content' on the Xbox platform would benefit consumers and would not harm PlayStation gamers.[172]

---

[169] Issues Letter response, paragraphs 5.16 - 5.21.
[170] Issues Letter response, paragraphs 5.23 - 5.25.
[171] The Parties' submission in relation to vertical merger analysis, submitted on 28 July 2022, paragraph 2.2, in response to the CMA's RFI 2 dated 26 May 2022.
[172] Supplementary Issues Letter response, paragraphs 4.17 - 4.21.

*Internal documents*

161.  As described above, the CMA found that ABK's content, especially CoD, is important for rival gaming platforms, including console gaming platforms.

162.  The CMA considered the Parties' submissions in relation to Nintendo being a successful platform that does not offer CoD and believes that this is because Nintendo generally offers a differentiated gaming experience to Xbox and PlayStation.

163.  In general, Microsoft's internal documents track PlayStation more closely than Nintendo, with Nintendo often being absent from any internal competitive assessment.[173] One Microsoft internal document assesses [✂].[174]

164.  Another Microsoft internal document points to the differences in the technical strategies of Xbox/PlayStation and Nintendo consoles [✂].[175] This internal document considers [✂].[176]

165.  The CMA has also received evidence from the Parties showing that [✂].[177] This suggests that Xbox and PlayStation are closer substitutes to each other than to Nintendo Switch.

*Third-party views*

166.  As described above, the CMA found that ABK's content, especially CoD, is important to rival gaming platforms, in particular Sony's PlayStation.

167.  Regarding the Merged Entity's ability to foreclose Nintendo, third parties confirmed that Microsoft and Sony compete closely in gaming consoles, and that Nintendo is not as close a competitor.

168.  One third party explained that Nintendo's business model differs from that of Sony's and Microsoft's, and that Nintendo competes more closely with companies outside of the gaming industry. For example, Nintendo has products such as Wii Fit, which are not traditional games and may compete with fitness apps and other non-game apps.[178] This third party also explained that Nintendo's audience differs from other consoles, as its games are marketed as family-friendly with less focus on heavy violence or shooting games (eg *Mario Kart* and *Super Mario*).[179]

---

[173] For example, see [✂].
[174] [✂].
[175] [✂].
[176] [✂].
[177] 'Assessing the risk of input foreclosure in console gaming', section A.2.5, submitted by the Parties on 27 July 2022 in response to the CMA's RFI dated 9 June 2022.
[178] Third-party response to question 3 of the CMA's RFI dated 27 May 2022.
[179] Note of a call with a third party, dated 16 May 2022, paragraph 8.

169. Another third-party publisher commented on the technical differences of Nintendo's consoles, noting that they had encountered difficulties when bringing a game to Nintendo Switch but no difficulty in bringing the same game to Xbox or PlayStation. This third party explained that this was because of the different type of hardware that Nintendo offers relative to Xbox and PlayStation.[180]

170. As for the Merged Entity's ability to foreclose Sony, consistent with ABK's internal documents discussed above, the CMA has received evidence that CoD has higher levels of user engagement and revenue spend on PlayStation than the Parties estimated. SIE submitted that it has the highest awareness and ownership levels of all third-party franchises.[181] In addition, CoD plays an important role in attracting high-value gamers to the platform.[182] These CoD gamers spend considerable amounts of money on other PlayStation games and hardware, which substantially increases the revenue impact of having CoD on the platform.[183]

171. The CMA notes that the network effects in gaming mean that having players on a platform attracts content to that platform, and if a sufficient number of high-end gamers were to leave PlayStation, that could impact the level of investment that independent publishers devote to making or adapting games for PlayStation. As noted above, third parties further told the CMA that there currently exist very few game franchises that can match CoD's success.

172. Third-party views also covered the Merged Entity's ability to engage in partial foreclosure strategies. SIE told the CMA that, even if CoD games remained available on PlayStation following the Merger, the Merged Entity would still be able to engage in partial foreclosure by increasing the differentiation between the versions of CoD available on Xbox and on PlayStation. According to SIE, gamers may expect that CoD on Xbox will include extra content and enhanced interoperability with the console hardware, in addition to any benefits from membership in XGP. SIE submitted that these factors are likely to influence gamers' choice of console.[184]

*CMA assessment of ability*

173. Based on the above evidence, the CMA has found that:

   (a) The Merged Entity would have significant upstream market power in publishing of games for consoles, with a share of [10-20]% by revenue and [30-40]% by minutes played on console in the UK.[185] ABK has a particularly high share in shooter games ([30-40]% in the UK), with CoD being one of the largest game

---

[180] Note of a call with a third party, dated 19 July 2022, paragraph 5.
[181] SIE's response to question 24 of the CMA's RFI dated 25 May 2022.
[182] SIE's response to question 24 of the CMA's RFI dated 25 May 2022.
[183] SIE's response to question 24 of the CMA's RFI dated 25 May 2022.
[184] SIE's response to question 18 of the CMA's RFI dated 25 May 2022.
[185] Parties' response to the CMA's RFI dated 26 May 2022, Annex 14.

franchises available to distribution platforms. In any event, the CMA considers that market shares are not completely indicative of upstream market power in such a market, which is characterised by network effects. The franchise's market power is enhanced by its high level of awareness and the presence of very few games that can match its level of success.

(b)   ABK's content is an important input for Sony, such that Microsoft may have the ability to foreclose Sony's PlayStation console gaming platform. Along with the evidence mentioned above on the importance of CoD, the CMA notes that:

(i)   CoD has higher levels of revenue and user engagement on PlayStation than was estimated by the Parties. Sony also generates significant revenues from CoD users spending on other PlayStation games.[186]

(ii)   PlayStation's success is not driven primarily by its technical superiority (as the Parties suggest). Gaming content is an important driver of demand, and PlayStation's competitive position could be materially harmed if CoD were not available (or not available on equal terms) on its console post-Merger.[187]

(iii)   Although PlayStation currently has a substantial number of non-CoD MAU, the CMA believes that some of these non-CoD gamers may also switch away from PlayStation following any total or partial foreclosure strategies. This is because the presence of strong direct network effects imply that some of these non-CoD gamers would want to continue to play other games with their friends who are CoD gamers, who in turn switch as a result of the foreclosure strategies.

(c)   There are few, if any, alternative franchises with CoD's level of brand awareness and popularity amongst gamers. Whilst the Parties submitted that PlayStation itself has some exclusive franchises, such as *Marvel's Spiderman*, the CMA believes that these do not come close to having CoD's level of success.

174.   In relation to the Parties submissions that Nintendo is successful without offering CoD titles on its console, the CMA considers that this is likely due to its differentiated hardware and content that is generally targeted at a 'family-friendly audience.' The CMA believes that the availability of a few games exhibiting violence (such as *Postal Redux*) does not undermine its conclusion that most of Nintendo's content appeals to a different customer segment. In addition, the CMA notes that one of the reasons for the lack of CoD's availability on Nintendo suggested by the Parties is because the Nintendo Switch is not technically capable of supporting the

---

[186] SIE's responses to the CMA's RFIs dated 8 June 2022 and 25 July 2022.
[187] Several Microsoft internal documents state [✂]. For example, see [✂]; and [✂].

latest version of CoD, which the CMA considers is further evidence that Nintendo is not as close a rival to PlayStation or Xbox.[188] As such, the CMA does not consider that Nintendo's current success is sufficient evidence to show that Sony does not require access on competitive terms to ABK's content in order to compete against Microsoft.

175.   In relation to the Parties' submissions on Sony's contractual protections, the CMA notes that the proposal to extend ABK's agreement with Sony beyond 2024 is yet to be formally agreed (with the terms of the proposed agreement under continuing discussions).[189] In any event, consistent with the CMA's Merger Assessment Guidelines, while the CMA acknowledges that this contract may provide Sony with some protection at least in the short term, the CMA is not minded to place material weight on contractual protections when considering the ability of the merged entity to foreclose its rivals through, for example, denying access to current or future versions of the input (ABK content in this case).[190] This is because, for example, such contractual protections (i) may not account for all the possible foreclosure mechanisms that could be available to the Merged Entity, (ii) may be renegotiated or terminated early, or (iii) may not be enforced depending on the respective parties' respective bargaining positions.

176.   The CMA considers that the above conclusions also hold in relation to the Parties' ability to foreclose rival console platforms using partial foreclosure strategies. Whilst the CMA recognises that strategies such as timed exclusivity or marketing exclusivity may not have foreclosed rivals in the past, the Merged entity could engage in additional partial foreclosure strategies that remain untested (such as degrading quality of ABK content or increasing prices on rival platforms). When combined, these strategies could significantly impact the ability of Sony to compete.

177.   Based on the above evidence, in particular the market power of the Merged Entity in relation to game publishing for consoles and the importance of ABK's content as an input, the CMA believes that the Merged Entity may have the ability to engage in total and partial foreclosure of rival console platforms, in particular Sony who is currently Microsoft's main and closest competitor in this area.

*Incentive*

178.   The CMA notes that gaming is a complex and dynamic market, where firms' current positions and profit margins may not be a good guide to the future, and where strategic considerations may play a greater role.[191] As such, the CMA considers it is appropriate for it to place greater weight on qualitative rather than quantitative

---

[188] Statement made during the Issues Meeting.
[189] The Parties' submission in relation to vertical merger analysis, paragraph 2.5, submitted on 27 July 2022 in response to the CMA's RFI dated 9 June 2022.
[190] Merger Assessment Guidelines, March 2021, paragraph 7.15.
[191] Merger Assessment Guidelines, March 2021, paragraph 7.18.

evidence when assessing the incentives of the Merged Entity to foreclose rivals. In terms of its quantitative assessment, the CMA's focus is on the relative magnitude of the costs and benefits of foreclosure, not on predicting the exact size of each element.[192] As such, the CMA has not performed a quantitative analysis of incentives but has assessed the Parties' submissions on this point.

*Financial modelling*

179.    The Parties submitted that ABK games, particularly CoD, generate large revenues on PlayStation so it would not be in the interest of the Merged Entity to withdraw them from PlayStation. The Parties submitted that PlayStation accounts for approximately [✂] of CoD MAU, and a correspondingly large proportion of ABK's revenues from CoD.[193]

180.    To illustrate this point, the Parties submitted an economic analysis to show that the Merged Entity would not have an incentive to withhold the CoD franchise from Sony's console gaming platform between 2024 and 2028. The Parties submitted that, for such a strategy to be profitable, over [✂]% of CoD players on PlayStation would need to purchase a new Xbox, a figure they consider to be implausibly high.[194]

181.    The Parties submitted that their analysis of incentives represents an accurate view of the decisions facing the Merged Entity, as it was prepared using Microsoft's ordinary course of business data. Sony separately submitted a similar analysis relying on its own data, which suggested that a lower proportion of CoD players on PlayStation would need to switch to Xbox for such a strategy to be profitable. The Parties consider Microsoft's ordinary course of business data be superior to any data available to Sony for this analysis.[195]

182.    The CMA believes, however, that the methodology underlying the Parties' incentives analysis, and the data inputs on which it is based, may be flawed or incomplete, and that the approach to estimating the critical diversion ratio is not likely to be accurate. In addition, the CMA considers that the number of gamers that would switch to Xbox if Microsoft made ABK's content exclusive could be significantly higher than the Parties predict, given the importance of ABK's content to gamers, which again would make the model inaccurate.

183.    First, the Parties' model is likely to understate the benefits to the Merged Entity of withholding CoD from PlayStation:

---

[192] Merger Assessment Guidelines, March 2021, paragraph 7.18.
[193] Issues Letter response, paragraph 5.37.
[194] Submission by the Parties, 'Assessing the risk of input foreclosure in console gaming', dated 27 July 2022, paragraphs 7 – 8.
[195] Issues Letter response, paragraph 5.52.

(a)    The model does not capture the impact of network effects in gaming, and the corresponding increase in revenues that these could bring to Microsoft. An increase in its user base would boost the attractiveness of Xbox to developers, thereby attracting more users and content in future (in line with the network effects in gaming discussed above), which would increase the return to Microsoft from engaging in such a strategy.

(b)    The Parties assume that the value to Microsoft of acquiring a new Xbox user [✂]. In other words, [✂], which the CMA considers is not credible and suggests that the model understates the benefit of an acquired user.[196] For comparison, one ABK document estimates that the lifetime value of a PlayStation user is approximately [✂].[197] Under the Parties' analysis, the average lifetime value of an Xbox user over the five years of the analysis is [✂].[198] The CMA further notes that [✂] [199] and lacks explanation of how they were constructed.

(c)    The model assumes a very limited value to Microsoft [✂], despite the evidence that this is a key driver of Microsoft's strategy. More specifically, the model estimates this based on [✂].

(d)    The model assumes that [✂].

184.    Second, the CMA considers that the model may overstate the costs to the Merged Entity of withholding CoD from PlayStation:

(a)    The CMA believes that the model overestimates the revenue that is made from each CoD gamer on PlayStation. This has been calculated by dividing total expected CoD revenues on PlayStation by an estimate of the annual number of users worldwide of [✂]. However, the CMA understands that in fact a substantially larger number of PlayStation users play CoD within a year, implying that, all else being equal, the true revenue per user may be substantially smaller than the model assumes.[200]

(b)    The analysis assumes that the Merged Entity would [✂] on PlayStation. Specifically, it assumes Microsoft will receive [✂]% of these revenues, based on historical commission rates and partnerships. The analysis [✂].[201]

---

[196] The Parties submitted that the value to Microsoft of selling a console [✂]. The Parties submitted that [✂]. The CMA does not consider this credible, as it implies that [✂]. See Issues Letter response, Annex ILR002, paragraphs 1.9 – 1.10.
[197] Issues Letter response Annex, 'Annex ILR 005 - CONFIDENTIAL TO ABK', dated 1 April 2021, page 1.
[198] FMN Annex 026.2, 'Microsoft's incentive to withhold ABK content from Sony - Appendix A1 derivations'.
[199] Submission by the Parties, 'Assessing the risk of input foreclosure in console gaming', dated 27 July 2022, paragraph 67.
[200] Submission from SIE, submitted on 31 July 2022, slide 5.
[201] The Parties' response to question 12 of the CMA's RFI dated 12 July 2022.

185. Third, the CMA considers that the methodology chosen by the Parties to conduct their analysis does not represent a standard approach to estimating a critical diversion ratio. The complex methodology used by the Parties appears to depend heavily on the assumptions listed above rather than to reflect the relative profits which would be gained in the downstream market and lost in the upstream market from foreclosure.

186. The CMA considers that these flawed assumptions, combined with the Parties' choice of a non-standard methodology to calculate critical diversion ratios, limit the evidential weight which may be placed on the findings of the analysis. Robustness tests by the Parties allow for small changes in these parameters, but the CMA believes that these sensitivities do not address the limitations identified in this analysis. In these tests, the Parties estimate that small parameter changes lead to large changes in the critical diversion ratio.[202]

187. The CMA notes that this analysis is also limited only to the CoD franchises. As discussed above, the CMA considers that ABK's other gaming franchises, across both its back catalogue and new releases, are also highly appealing to gamers, including those who play them on rival consoles. As such, a foreclosure strategy which included these additional ABK games alongside CoD may decrease the critical diversion ratio.

188. SIE submitted to the CMA its own analysis of the Merged Entity's incentive to make the CoD franchise exclusive to the Xbox console.[203] This analysis estimates the critical diversion ratio, using data from Sony, as being [1 to 10%] of PlayStation gamers.[204] SIE states that, given the levels of engagement with CoD observed among PlayStation gamers, actual switching as a result of an exclusivity strategy will be higher than the critical diversion ratio.[205]

189. The CMA considers that this illustrates that there is a range of results that can be achieved by making reasonable changes to certain assumptions. While the CMA has placed limited evidentiary weight on SIE's analysis, the CMA considers that even the Merged Entity's static incentive to foreclose Sony may be considerably stronger than suggested by the Parties.

190. In any event, the CMA considers that a static analysis of vertical arithmetic is of only limited value in assessing the Merged Entity's incentive to foreclose, as the Merged Entity may be pursuing objectives other than the maximisation of short-term

---

[202] For example, the Parties submit [✂]. See Issues Letter Response, Annex ILR002, paragraph 1.11.
[203] Submission from SIE, submitted on 3 August 2022.
[204] The average profits per PlayStation user to the Merged Entity from the CoD games are estimated to be [USD 5 to 10] per year. The estimated profits to the Merged Entity from acquiring a new Xbox user are based on Sony's revenues and margins for a new PlayStation user, and is [USD 100 to 200] per year. The critical diversion ratio is then calculated by dividing the first profits figure by the second.
[205] Submission from SIE, submitted on 3 August 2022, page 2.

profits.[206] [The CMS considers] Microsoft's strategy for its gaming division is long-term, well-financed, and focused on user acquisition. The evidence suggests that Microsoft has shown itself to be willing to make losses in the short term in order to build scale and increase its user base.[207] The future growth of the gaming industry increases Microsoft's incentive to prioritise increasing its size in the short run, as does the presence of strong direct and indirect network effects.

*Microsoft's past business practices*

191.   In assessing Microsoft's incentives to engage in foreclosure strategies post-Merger, the CMA has considered Microsoft's past conduct following the acquisition of other gaming studios. The CMA believes that this is informative as to Microsoft's broader strategic objectives, its costs and benefits of engaging in foreclosure using gaming content, and ultimately its incentive to engage in foreclosure following this Merger.[208]

192.   The CMA found a pattern of Microsoft acquiring development studios and making their upcoming games exclusive to Xbox. All of these studios developed games for other gaming consoles before being acquired by Microsoft. These include:

(a)   **ZeniMax Media**: Microsoft chose to make several of ZeniMax's major gaming franchises exclusive in consoles to Xbox, including the upcoming games *Starfield* and, based on Microsoft's public statements,[209] *The Elder Scrolls VI*, following its 2021 acquisition.[210]

(b)   **Obsidian**: Microsoft chose to make *The Outer Worlds 2* and the upcoming *Avowed* exclusive to Xbox consoles following its 2018 acquisition.[211]

(c)   **inXile**: This developer is now developing an Xbox exclusive game following its acquisition by Microsoft in 2018.[212]

(d)   **Ninja Theory**: This developer, acquired by Microsoft in 2018, released an Xbox exclusive game, *Bleeding Edge*, in 2020 and its upcoming *Hellblade 2*, is planned to be released as an Xbox console exclusive.[213]

---

[206] Merger Assessment Guidelines, March 2021, paragraph 7.19(e).
[207] For example, see 'Microsoft confirms it's never turned a profit on sale of Xbox consoles', dated 6 May 2021, accessed 3 August 2022.
[208] Merger Assessment Guidelines, March 2021, paragraph 7.19(a).
[209] For example, see 'How Xbox outgrew the console: inside Phil Spencer's multi-billion dollar gamble', dated 15 November 2021, accessed 15 August 2022.
[210] For example, see 'Peter Hines on Starfield frustrations: "I'm not apologizing for exclusivity" but rather "expressing empathy"', dated 22 June 2021, accessed 29 July 2022.
[211] For example, see 'Everything we know about Avowed, the new Obsidian RPG for Xbox Series X', dated 27 July 2022, accessed 29 July 2022.
[212] For example, see 'Next-gen inXile Xbox exclusive RPG will be powered by Unreal Engine 5', dated 20 May 2020, accessed 29 July 2022.
[213] For example, see 'Hellblade 2: everything we know about the Xbox Series X game', dated 14 July 2022, accessed 29 July 2022.

(e) **Compulsion**: The developed upcoming game *Midnight* will be exclusively on Xbox following its 2018 acquisition by Microsoft.[214]

193. The Parties submitted that there are examples of Microsoft having released games on PlayStation following past acquisitions of publishers.[215] In particular:

(a) **Double Fine**: *Psychonauts 2* was released on multiple consoles following the publisher's acquisition by Microsoft.

(b) **inXile**: *Wasteland 3* was released on multiple consoles following the publisher's acquisition by Microsoft.

(c) **Compulsion**: The CMA notes that *We Happy Few* was released on multiple consoles following the publisher's acquisition by Microsoft.

(d) **ZeniMax Media**: Two games with pre-existing contractual obligations to be timed exclusives on PlayStation, *Deathloop* and *Ghostwire: Tokyo*, were released as such following the acquisition by Microsoft, and two multiplayer games which were released prior to the acquisition, *Elder Scrolls Online* and *Fallout 76*, have continued to receive support and updates following the acquisition.

(e) **Mojang**: The main *Minecraft* game (released in 2014) remains available on rival consoles, and the more recent releases in the Minecraft franchise, *Minecraft Dungeons* and the upcoming *Minecraft Legends*, are multi-console.

194. The CMA does not consider it necessary to assess Microsoft's incentives in every previous acquisition. Rather, the CMA considers that Microsoft's course of conduct is sufficiently strong evidence of its broad incentives that it may have an incentive to acquire valuable content and make it exclusive. This is because (i) Microsoft has often pursued a strategy of acquiring publishers and making their upcoming games exclusive to Xbox, even when those publishers previously made their content available to all consoles, and (ii) Microsoft has pursued this strategy when acquiring content that is far less valuable than ABK's games, and hence far less likely to divert customers to its console. As such, the CMA considers that Microsoft may have an even stronger incentive to make ABK's content exclusive to Xbox post-Merger.

*Partial foreclosure*

195. While the above examples of Microsoft's exclusivity strategies following past acquisitions of publishers relate primarily to full exclusivity (total foreclosure), the

---

[214] For example, see ['New upcoming Xbox exclusives revealed: Project 'Midnight' from Compulsion and 'Pentiment' from Obsidian'](#), dated 11 November 2021, accessed 29 July 2022.
[215] Issues Letter response, paragraph 5.46.

CMA believes that the Merged Entity could have the incentive to use partial foreclosure strategies with respect to ABK games.

196.   The Parties submitted that cross-platform play is an important feature of CoD that would be threatened by the Merged Entity pursuing a strategy of partial foreclosure.[216] Cross-platform play creates a large pool of players, which allows for improved matchmaking between players of similar ability and allows gamers to play with their friends across different consoles.[217]

197.   The CMA considers that, given the high number of CoD players, high-quality matchmaking would continue to be possible even if cross-play were compromised. Cross-play would also be less important if a foreclosure strategy succeeded in attracting more gamers to Xbox (an effect that would be strengthened by the existence of strong direct network effects). In any event, the CMA considers that there are mechanisms of partial foreclosure that are compatible with cross-platform play, such as exclusive in-game items or price differences.

198.   The CMA considers that partial foreclosure strategies could allow Microsoft to increase its user base while minimizing revenue losses from CoD players in PlayStation. In particular, the CMA notes that PlayStation gamers have varying degrees of attachment to CoD – some would switch to Xbox in response to a total foreclosure strategy and others would not. A partial foreclosure strategy would allow Microsoft to capture the most dedicated gamers—those who would switch to Xbox to benefit from enhanced content, interoperability or earlier releases —whilst continuing to generate revenues from less dedicated PlayStation CoD gamers who may not have switched to Xbox in response to a total foreclosure strategy.

*Reputational damage*

199.   The Parties submitted that they would not engage in partial foreclosure strategies because this would damage the reputation of both Xbox and CoD.[218] The Parties submitted two examples to illustrate that reputations can be damaged by any such strategies: the Xbox timed exclusivity of Square Enix's 2015 *Rise of the Tomb Raider*,[219] and the PC port of Warner Brothers' 2015 *Batman: Arkham Knight*.[220]

200.   The Parties did not, however, explain how any such reputational damage would remove their incentive to engage in a partial foreclosure strategy. This would require showing that a sufficient number of users would refuse to purchase CoD on Xbox, which the CMA considers to be unlikely given the popularity of the franchise. The CMA considers that the two examples that the Parties provided are not directly relevant to the Merged Entity's incentive to make ABK games exclusive, especially

---

[216] Supplementary Issues Letter response, paragraphs 4.41 - 4.44.
[217] Issues Letter response, paragraphs 5.39 - 5.40.
[218] Issues Letter response, paragraph 5.38.
[219] Issues Letter response, footnote 73.
[220] Supplementary Issues Letter response, paragraph 4.45.

since one example relates to a game published by a third-party publisher (and the Parties did not provide evidence that it performed poorly as a result of reputational damage), and the other is unrelated to any form of exclusivity. Moreover, the CMA notes that many games are exclusive to certain consoles without any reputational or financial damage to the games or the consoles.[221]

*CMA assessment of incentives*

201. For the reasons set out above, the CMA believes that the Merged Entity may have the incentive to engage in total or partial foreclosure strategies using ABK's content in order to expand its user base and grow its gaming platform. The CMA believes that the benefits to the Merged Entity could outweigh the costs associated with either total or partial foreclosure.

**Effect**

202. The Parties submitted that Sony will not be marginalised as a console platform if it loses access to CoD. The Parties submitted that Sony is superior to Xbox in various metrics, such as installed console base and MAU, and [✂]. The Parties also submitted that Sony has a large portfolio of exclusive content that accounted for [✂]% of consumer spend on PlayStation. The Parties provided the example of *Marvel's Spiderman: Miles Morales*, which outsold all Xbox titles combined in the week that PlayStation 5 launched.[222]

203. The CMA acknowledges that PlayStation is currently outperforming Xbox in terms of metrics such as installed console base and MAU. However, the CMA also notes that:

   (a) Given the importance of CoD to PlayStation, and the existence of strong direct and indirect network effects, any foreclosure strategy could have a significant impact on Sony's revenues and user base. As noted above, very few other titles on PlayStation, including Sony's exclusive titles, are currently able to replicate CoD's success.

   (b) The impact of any foreclosure strategy, total or partial, on Sony may be particularly strong at the launch of the next generation of consoles, when both new and existing users decide which console to buy. If CoD is made exclusive to Xbox at that point (either permanently or for a period of time after the launch of the new consoles), a significant number of current PlayStation users could switch to Xbox, rendering Sony's current market-leading position immaterial.

---

[221] One third party told the CMA that they do view the possibility of retaliation by consumers in response to unfair behaviour as a constraint on Microsoft. See, note of a call with a third party, dated 19 July 2022, paragraph 26.
[222] Issues Letter response, paragraphs 5.5 - 5.8 and 5.23.

(c)    The CMA notes with respect to the example submitted by the Parties that enhanced versions of games that are launched alongside a new console, such as *Marvel's Spiderman: Miles Morales,* would be expected to have particularly high sales the week that the console launches as consumers will purchase games together with the new consoles. The CMA further understands that in the second week following the launch of PlayStation 5, the top selling game for the system was *CoD: Black Ops Cold War*.[223]

204.    When it has been established that there will be harm to competitors this will often directly imply that there will be harm to overall competition, where the foreclosed firms play a sufficiently important role in the competitive process on the downstream market.[224] Based on the evidence above, the CMA believes that PlayStation is Xbox's closest competitor in a highly concentrated market for gaming consoles and, therefore, plays a very important role in the competitive process. The CMA believes that the Merged Entity may have the ability and incentive to engage in total and/or partial foreclosure strategies using ABK's content, and that this could materially affect Sony's ability to compete. The CMA therefore believes that a material impact on Sony's ability to compete would have a detrimental impact on overall competition in the market and ultimately harm consumers.

### Conclusion on TOH1a

205.    For the reasons set out above, the CMA believes that the Merged Entity may have the ability and incentive to engage in strategies to foreclose Sony—Microsoft's closet rival in console gaming platforms—and that this could significantly harm competition. Accordingly, the CMA found that the Merger raises significant competition concerns as a result of vertical effects in relation to the manufacture and supply of consoles (together with their digital storefronts) in the UK.

## TOH1b Input foreclosure of rival multi-game subscription services

206.    The Parties' rivals in multi-game subscription services include providers that, for a regular subscription payment, offer access to a catalogue of games that can be downloaded to a user's PC or console, or otherwise streamed to different devices via cloud. Some providers offer a combination of downloads and streaming (eg, Sony PlayStation Plus, Nintendo Switch Online and Ubisoft+), and others offer only streaming (eg Google Stadia, Amazon Luna and NVIDIA GeForce Now). As noted above, this theory of harm focuses on the impact of the Merger on PC, console, and cloud multi-game subscription services based on Microsoft's current offering.

207.    The CMA investigated whether the Merged Entity could harm Microsoft's rivals and lessen current and future competition in multi-game subscription services through

---

[223] ['Spider-Man: Miles Morales was the best selling game physical PS5 launch game'](#), dated 23 November 2020, accessed 29 August 2022.
[224] [Merger Assessment Guidelines](#), March 2021, paragraph 7.21.

strategies such as (i) making ABK content unavailable on rival multi-game subscription services (ie exclusive to XGP), (ii) making ABK content available for release on rivals multi-game subscription services at a later date compared to Microsoft's subscription services (ie timed exclusivity), (iii) degrading the quality of ABK gaming content available to rival multi-game subscription services, (iv) making features or upgrades of ABK games unavailable to other multi-game subscription services (ie content exclusivity), and/or (v) raising the wholesale price of ABK content on rival multi-game subscription services.

208.   By way of background, the CMA notes that:

(a)   The gaming content available in multi-game subscription services is currently more limited than the gaming content available on a buy-to-play basis. If a significantly expanded range of content (including day one releases) were exclusive to XGP in future, this could significantly impede the ability of other subscription services to compete.

(b)   Microsoft has stated its intention to [✂], which would be consistent with its prior course of conduct after acquiring certain gaming studios, as discussed in TOH1a above. The CMA has considered whether a significantly expanded range of content (including new releases) were exclusive to XGP in future, this could significantly impede the ability of other subscription services to compete.

(c)   As submitted by the Parties, the multi-game subscription services market is still nascent with a range of competitors vying for market share. The CMA considers that, given the presence of strong direct and indirect network effects in multi-game subscription services, there is a heightened risk that the Merger could significantly increase Microsoft's market power, or even tip the market in its favour (as a strong incumbent with its XGP offer), before future rivals have a chance to develop.

209.   The CMA has assessed (i) the ability of the Merged Entity to harm Microsoft's rivals in multi-game subscription services through total or partial foreclosure, (ii) its incentive to do so, and (iii) the effect of such strategies on competition.

### *Ability*

*Parties' submissions*

210.   The Parties submitted that Microsoft's share of supply in multi-game subscription services across all platforms in the UK was [50-60]% in 2021, with the share on console being [50-60]% and PC being [60-70]%. The Parties submitted that ABK

does not currently offer and has no current plans to offer a multi-game subscription service similar to XGP.[225]

211.   The Parties submitted that it is possible that Microsoft may differentiate XGP by including ABK games in the multi-game subscription service, whilst [✂] other multi-game subscription services.[226]

212.   According to the Parties, this would not raise foreclosure concerns because:

(a)   Multi-game subscription services represent a nascent monetisation strategy and will continue to co-exist with other payment models such as traditional buy-to-play and freemium models. By 2030, Microsoft anticipates that the value of multi-game subscription services will be USD [✂], whereas transactional revenue (including upfront game purchases) will be around USD [✂].[227] The Parties also estimate that multi-game subscription services will account for [✂]% of total gaming revenue by 2025 (or [✂]% excluding hardware sales).[228]

(b)   XGP represents a small share of gaming distribution revenue and cannot be considered a strong incumbent in multi-game subscription services. XGP has grown gradually since its launch in 2017, and XGP MAU represented [✂]% of Xbox total MAU in 2021 – primarily due to a shift of Xbox Live Gold subscribers.[229]

(c)   XGP subscribers will [✂] as a result of the Merger. By 2025 Microsoft estimates that [✂] as a result of the Merger – a [✂]% increase in the number of subscribers forecast absent the Merger.[230]

(d)   Gamers will continue to have access to ABK games, including CoD, via traditional buy-to-play channels. This will reduce any incentive to switch to XGP, as gamers could easily remain with their preferred subscription service and purchase a copy of CoD separately.[231]

(e)   ABK content is not currently an important input for multi-game subscription services, nor is there any realistic prospect of it becoming so. ABK currently only makes limited back-catalogue titles available on subscription, and only on a limited time-period basis.[232]

---

[225] FMN, paragraph 12.60.
[226] FMN, paragraph 19.21.
[227] FMN, paragraph 13.44.
[228] Issues Letter response, paragraph 6.8(a).
[229] Issues Letter response, paragraphs 6.12 - 6.14.
[230] Issues Letter response, paragraph 6.15(a).
[231] FMN, paragraph 19.24.
[232] Issues Letter response, paragraph 6.18.

(f)   While XGP has pioneered the multi-game subscription payment model, it is a dynamic space with many services offering a similar monetisation model at a variety of price points (eg Sony, Nintendo, EA, Ubisoft, Apple, Amazon, Google, Facebook, and Netflix). Each of these entrants has access to various assets (eg in terms of user base, capital, and existing content) that they can leverage to compete with XGP.[233]

*Importance of multi-game subscription services*

213.   The CMA notes that, in line with the Parties' submissions, the number of ABK games available on multi-game subscription services is currently limited. However, the CMA considers that this would likely change as the market for multi-game subscription services develops absent the Merger. In particular:

(a)   As set out below, subscription services are growing in popularity. Although they may continue to coexist with traditional payment models for some time, the evidence shows that subscription services may soon be sufficiently important to attract more and better content from game publishers (including ABK).[234]

(b)   Rival publishers such as Ubisoft are already offering a selected portfolio of their games as part of their own subscription service, and Ubisoft has also made its content available on Amazon Luna and Google Stadia subscription services.[235]

(c)   ABK has offered titles to platforms on subscription in the past. Some of its older titles (including CoD) used to be included in multi-game subscription services in support of larger [✄], such as with [✄] and as part of Sony's subscription offerings for limited periods (ie 1 to 2 months).[236]

214.   The CMA has already set out the importance of ABK's content, and in particular CoD, to rival game distribution platforms. The CMA believes that, as the market for multi-game subscription services grows, ABK would be likely to start making more of its content available on a range of multi-game subscription services absent the Merger. The CMA believes that ABK's content will be equally important to those multi-game subscription services as it currently is to consoles on a buy-to-play basis.

---

[233] FMN, paragraph 19.22.
[234] The CMA considers that the Parties' estimates of the split between transactional revenue and subscription revenue above likely understates the revenue from subscriptions. For example, in-game purchases can also be a feature of subscription services, and it is unclear whether the analysis considers this.
[235] FMN, Table 5.
[236] Activision internal documents also show that [✄].

215.   The CMA sets out below the evidence that it has gathered on the growth and future importance of multi-game subscription services, and its assessment of this evidence.

*Internal documents*

216.   Several of the Parties' internal documents show that, along with the traditional buy-to-play model, the importance of multi-game subscription services as an alternative payment model in the gaming industry is increasing. For example:

(a)   One ABK internal document states that multi-game subscription services gained traction as Microsoft continues to invest in XGP. The document added that multi-game subscription services are increasing on console and mobile.[237] Additionally, a third-party report held by ABK and shared with the CMA states that the expansion of new business models has boosted monetisation in the gaming industry, one of those models being multi-game subscription services.[238]

(b)   A third-party report provided to the CMA by ABK states that multi-game subscription services are one 'key theme' for the gaming industry in 2022. The document explained that the gaming industry is going through a transition towards digital services, particularly multi-game subscription services. Gamers will be attracted to these services because they have a lower cost access point and a large game library.[239]

(c)   Microsoft internal documents, including third-party reports held by Microsoft and shared with the CMA, state that that [✂]. [240] [241] [242] Another Microsoft document explains that [✂].[243]

*Third-party views*

217.   The CMA received third-party evidence showing that gaming is expected rapidly to shift towards a subscription-based payment model:

(a)   One competitor considers that the gaming sector has already seen a recent shift from purchasing individual games (either digitally or physically) towards multi-game subscription services, and this competitor considers that this is as a result of consumers' desire to access a wide variety of content.[244]

---

[237] [✂].
[238] [✂].
[239] [✂].
[240] [✂].
[241] [✂].
[242] [✂].
[243] [✂].
[244] Note of a call with a third party, dated 16 May 2022, paragraph 4.

(b)   One third-party publisher told the CMA that multi-game subscription services will be an increasingly important way that consumer access content.[245]

(c)   One competitor explained that the gaming industry is gradually moving towards multi-game subscription service business models.[246]

(d)   One competitor anticipates that multi-game subscription services will become a sizeable part of the gaming industry within three to five years and wants to be present in this segment.[247]

218.   One multi-game subscription provider also submitted that the Merged Entity would be able to foreclose rivals by degrading the quality of ABK's content on rival multi-game subscription services.[248]

*CMA assessment of ability*

219.   The CMA found that multi-game subscription services are becoming increasingly important. As set out above, the CMA believes that ABK's content would likely be available on those platforms in future, in which case it would be expected to be as important as it is to consoles today on a buy-to-play basis. As such, the evidence set out in TOH1a in relation to the importance of ABK's content (including CoD) applies equally to the assessment of the Merged Entity's ability to foreclose rivals in multi-game subscription services using ABK's content.

220.   The CMA notes that its assessment does not rest on multi-game subscription services representing the 'only future model for game distribution', or for there to be a 'seismic shift' to subscription services, as submitted by the Parties.[249] It only requires multi-game subscription services to grow to the point that game publishers find it sufficiently attractive to make their best content available on them, which is something that is already starting to happen (as with Ubisoft).

221.   As for XGP, the CMA found that it is already the strongest provider of multi-game subscription services. It offers a catalogue of popular games (with over 400 games) and accounts for over [50-60]% of the UK market.[250] The Parties estimate that, by 2030, it will grow to [✂] subscribers absent the transaction.[251]

222.   The CMA is concerned that, especially given that multi-game subscription services is a nascent area with strong direct and indirect network effects and has created an opportunity for potential disruption in the gaming market, combining ABK's content with XGP could raise barriers to entry, entrench Microsoft's position as the leading

---

[245] Note of a call with a third party, dated 5 May 2022, paragraph 21.
[246] Note of a call with a third party, dated 23 May 2022, paragraphs 4 - 5.
[247] Note of a call with a third party, dated 17 May 2022, paragraph 12.
[248] Submission from a third party, submitted on 26 July 2022, page 13.
[249] Issues Letter response, paragraphs 6.7 - 6.9.
[250] FMN, Table 33.
[251] Issues Letter response, paragraph 6.15.

provider of multi-game subscription services, and substantially reduce existing and potential competition.

223.   As such, based on the above evidence, the CMA believes that the Merged Entity may have the ability to engage in partial and/or total foreclosure of Microsoft's multi-game subscription rivals and lessen existing and potential competition in this market.

*Incentive*

224.   As set out above, the CMA does not consider that a static quantitative analysis of incentives would be particularly informative in a dynamic market that exhibits direct and indirect network effects. This type of analysis is even less informative in the nascent and rapidly developing market of multi-game subscription services.

225.   The CMA believes that the Merged Entity may have an incentive to make ABK's content exclusive to XGP, or to engage in the partial foreclosure of rival subscription services, on the basis of (i) Microsoft's own statements and course of dealing, (ii) internal documents, and (iii) third-party evidence.

*Microsoft's statements and past business practices*

226.   Microsoft's statements suggest that one of the most important reasons behind the Merger is adding ABK's games to XGP to differentiate XGP from other multi-game subscription services. Microsoft's announcement of the Merger stated:

> 'The acquisition also bolsters Microsoft's Game Pass portfolio with plans to launch Activision Blizzard games into Game Pass, which has reached a new milestone of over 25 million subscribers. With Activision Blizzard's nearly 400 million monthly active players in 190 countries and three billion-dollar franchises, this acquisition will make Game Pass one of the most compelling and diverse lineups of gaming content in the industry. Upon close, Microsoft will have 30 internal game development studios, along with additional publishing and esports production capabilities.'[252]

227.   The CMA notes that none of Microsoft's first-party titles are available on multi-game subscription services other than XGP, even where those titles are available for purchase on rival consoles.

*Microsoft's internal documents*

228.   A number of internal documents confirm [✂], further highlighting incentives to foreclose competitors:

---

[252] ['Microsoft to acquire Activision Blizzard to bring the joy and community of gaming to everyone, across every device'](#), dated 18 January 2022, accessed 1 August 2022.

(a)   One Microsoft internal document explained that [✂].[253]

(b)   Another Microsoft internal document explained that [✂].[254]

(c)   One Microsoft internal document discussed [✂].[255]

(d)   One Microsoft internal document explained [✂].[256]

(e)   Another Microsoft internal document explained that [✂].[257] [258]

(f)   Microsoft also recognises the value of ABK's content specifically to grow its XGP platform. For example, a Microsoft internal document shows that [✂].[259]

229.   The Parties' internal documents also show the importance of [✂], demonstrating an incentive to engage in partial foreclosure strategies such as timed exclusivity. Microsoft recognises, in particular, the value of new releases for attracting users to XGP. One Microsoft internal document explains, for example, that [✂].[260]

*Third-party views*

230.   Several competitors who spoke to the CMA referred to Microsoft's behaviour in relation to past acquisitions, including that of ZeniMax Media, where Microsoft did not uphold its promise to continue making Bethesda content available on multiple stores and platforms.[261]

231.   One of these competitors explained that, in relation to this Merger, Microsoft would have the incentive to withhold ABK games from rival multi-game subscription services, as it would allow Microsoft to drive game distribution through its own services and secure the leading position in multi-game subscription services.[262] This competitor believes that many gamers will switch to Microsoft from other multi-game subscription services, which will generate direct and indirect profits for Microsoft in a variety of ways.[263] In the competitor's view, the incentives to draw users to the Microsoft console gaming platform will far outweigh any downside from reduced sales of individual games on rival platforms.[264]

---

[253] [✂].
[254] [✂].
[255] [✂].
[256] [✂].
[257] [✂].
[258] [✂].
[259] [✂].
[260] [✂].
[261] Submission from a third party, submitted on 26 July 2022, pages 18 and 19; note of a call with a third party, dated 23 May 2022, paragraph 12; note of a call with a third party, dated 6 May 2022, paragraph 22; and third-party response to the CMA's Cloud Gaming questionnaire dated 28 July 2022, page 29.
[262] Submission from a third party, submitted on 26 July 2022, page 16.
[263] Submission from a third party, submitted on 26 July 2022, page 17.
[264] Submission from a third party, submitted on 26 July 2022, page 18.

*Conclusion on incentives*

232.  Based on this evidence, the CMA believes that the Merged Entity may have the incentive to engage in total or partial foreclosure of rival multi-game subscription services using ABK's content.

**Effect**

233.  Competition concerns may be particularly likely to arise if one of the merger firms has a degree of pre-existing market power in the downstream market, and already faced limited competitive constraints pre-merger.[265] The CMA believes that Microsoft's XGP holds a strong position in multi-game subscription services pre-Merger, and that most of its competitors are significantly smaller in terms of user base and revenues.[266] Most XGP rivals lack the popularity and range of content that XGP would own post-Merger. Given the importance of ABK's content, the CMA considers that current and future rivals could be affected by any foreclosure strategies using that content.

234.  The CMA also notes that multi-game subscription services is a nascent market that exhibits both direct and indirect network effects. The CMA believes that combining XGP, as the strongest incumbent, with ABK's important gaming catalogue could substantially reduce competition as a result of total or partial foreclosure or a combination of both. The CMA believes this could raise barriers to entry, reduce the number of competitors to one or only a few providers, and significantly increase Microsoft's market power. The CMA believes that the Merger may cause this effect, or at least accelerate this process, thereby depriving consumers of a longer period of competition between platforms.

**Conclusion on TOH1b**

235.  For the reasons set out above, the CMA believes that the Merged Entity may have the ability and incentive to engage in strategies to foreclose rival multi-game subscription service providers, which includes cloud gaming services to the extent they are also multi-game subscription services, and that this may significantly harm competition. Accordingly, the CMA found that the Merger raises significant competition concerns as a result of vertical effects in relation to:

(a)  Multi-game subscription services (including cloud gaming services, to the extent these are distributed through multi-game subscription services).

---

[265] Merger Assessment Guidelines, March 2021, paragraph 7.21.
[266] Based on the shares of supply in multi-game subscription services submitted by the Parties, Microsoft's share of supply in 2021 was [30-40]% worldwide, and more than [50-60]% in the UK across all platforms. This is a highly concentrated market both globally and in the UK, with only Sony having a share of supply similar to Microsoft worldwide.

**TOH2 Foreclosure of cloud-gaming service providers through leveraging Microsoft's ecosystem**

236.   Cloud gaming technology allows gamers to stream games running on gaming hardware in a data centre to their choice of supported device.[267] Cloud gaming is a nascent and rapidly developing market that is expected to grow significantly in the future. Some of the Parties' internal documents suggest that [✂].[268]

237.   Over the past few years, there have been several new entrants into cloud gaming services. These include Amazon Luna, Google Stadia, and NVIDIA GeForce Now, as well as publishers (eg Ubisoft+). The Parties submitted that each of these competitors is leveraging its own strengths, which are diverse and diversified from Microsoft's, and as such would continue to compete effectively against Microsoft following the Merger.[269]

238.   The CMA considers, however, that Microsoft's multi-product ecosystem already places it in a much stronger position than rivals in cloud gaming services. In particular, the combination of an existing gaming console (Xbox) and a strong portfolio of content, a dominant PC OS (Windows), and a strong cloud platform[270] (Azure), gives Microsoft an advantage that is difficult for rivals to replicate.

239.   This theory of harm considers whether the Merged Entity could leverage its gaming content and broader ecosystem to harm competition in cloud gaming services. TOH1 set out the importance of ABK's content and focused on how Microsoft could use that content to foreclose rivals in gaming console platforms and multi-game subscription services. By contrast, this theory does not rely on any single element of Microsoft's ecosystem post-Merger—including ABK's content—to explain how Microsoft could foreclose rivals. Rather, it considers that (i) Microsoft already has an advantage over rivals by having a broad multi-product ecosystem, including a leading cloud platform and PC OS, and (ii) Microsoft could leverage this ecosystem together with ABK's gaming content to strengthen network effects, raise barriers to entry, and hence foreclose rivals in cloud gaming services.[271]

240.   For the avoidance of doubt, and as set out in TOH1, the CMA believes that ABK's content alone could give Microsoft the ability to foreclose rivals in gaming consoles and multi-game subscription services (including cloud gaming services). What this theory of harm captures is that Microsoft also has a broader ecosystem that it could

---

[267] FMN, paragraph 22 of the Executive Summary.
[268] For example, see [✂]. See further internal documents and evidence referred to in paragraph 244 below.
[269] Issues Letter response, paragraph 7.55.
[270] For the purposes of this Decision, the CMA considers a cloud platform to be a network of data centres and cloud computing infrastructure.
[271] The Merger Assessment Guidelines state that 'the CMA will consider whether the harm to competitors it has identified will result in substantial harm to overall competition in the downstream market. This will include through raising barriers to entry for potential entrants, where the negative impact on customers may take some time to materialise'. According to the Guidelines, 'competition concerns may be particularly likely to arise if one of the merger firms has a degree of pre-existing market power in the downstream market, and already faced limited competitive constraints pre-merger.' See Merger Assessment Guidelines, March 2021, paragraphs 7.20 - 7.21.

leverage post-Merger to gain market power in cloud gaming services. It considers that Microsoft could use ABK's content in combination with other elements of its multi-product ecosystem to reduce competition in cloud gaming services.

241. This theory of harm is non-horizontal, but also involves consideration of network effects. The CMA therefore considers the ability, incentive, and effect framework to be appropriate to assess the effects of this Merger,[272] whilst adapting this framework to the particular circumstances of the case.

242. This theory of harm first sets out the evidence for the growing importance of cloud gaming services. It then sets out Microsoft's pre-Merger advantages over current and potential rivals as a provider of cloud gaming services. Finally, this theory of harm sets out how the Merger will increase Microsoft's ability and incentive to foreclose cloud gaming service rivals and harm competition using ABK's content in combination with its broader multi-product ecosystem, and the effect this could have on competition.

### *Shift to cloud gaming services*

243. The Parties submitted that there remain technical challenges before streaming will deliver the most sophisticated games with a user experience matching that of today's PCs and consoles.[273] The Parties submitted that (i) consumer spend on cloud gaming is relatively minor, (i) that Microsoft [✄], (i) and that industry reports and some internal documents suggest that it will take a long time before cloud gaming overtakes consoles.[274]

244. The CMA found that several of the Parties' internal documents suggest that the gaming industry is expected to shift from device-based gaming to cloud-based game streaming. For example:

    (a) A third-party report provided to the CMA by Microsoft states that cloud gaming services and multi-game subscription services will become an increasingly important part of the games market.[275]

    (b) One Microsoft internal document explains that [✄]. [276] [277] The document also notes [✄].[278]

    (c) A third-party report provided to the CMA by ABK states that the 'recurring theme' surrounding game streaming over the last decade is that 'it will eventually become ubiquitous, replace consoles, and be the primary means of

---

[272] As set out in Chapter 7 of the Merger Assessment Guidelines, March 2021.
[273] FMN, paragraph 2.14.
[274] Issues Letter response, paragraphs 7.44 - 7.48.
[275] [✄].
[276] [✄].
[277] [✄].
[278] [✄].

accessing game libraries on multiple devices'.[279] Whilst this document suggests, as the Parties highlighted,[280] that in the shorter term game streaming though subscription services will be an important but mostly complementary way of providing multiplatform access and cross-play, and that the 'inevitable transition' to streamed gaming faces expensive technical hurdles, the CMA considers this document overall supports the notion that the gaming industry is expected to shift to cloud-based streaming.

(d)     One ABK internal document states that '[✂]'.[281] The document notes that game streaming has been well received by the gaming community and is expected to grow from [✂] in 2019 to [✂] in 2023.[282]

(e)     An independent report shows that cloud gaming will become an increasingly important part of the games market. The document states that in 2022 more countries will have access to major cloud gaming services, and that cloud gaming will appeal to both hardcore and casual gamers.[283]

245.   The CMA also received third-party evidence suggesting that gaming is expected to move towards cloud gaming services. For example:

(a)     One competitor told the CMA that cloud gaming services have gained momentum in the past few years and, if fair and effective competition is available, could be poised for significant, rapid growth, with great benefits.[284] The competitor added that technological barriers to streaming games over the internet are quickly dropping, including the global expansion of high-speed, high-bandwidth, low-latency, highly reliable internet, 5G rollouts, and improved cloud technology.[285]

(b)     Another competitor told the CMA that current cloud technology can support a significant transition to cloud gaming services, and that this shift is already happening.[286] This competitor sees a long-term shift from gaming on physical devices to cloud gaming services, and thinks cloud gaming services will be popular amongst most gamers.[287]

(c)     One third-party publisher estimated that cloud gaming will be a viable alternative to native devices in major markets within five years.[288]

---

[279] [✂].
[280] Issues Letter response, paragraph 7.47.
[281] [✂].
[282] [✂].
[283] [✂].
[284] Third-party response to question 6 of the CMA's Cloud Gaming questionnaire.
[285] Third-party response to question 6 of the CMA's Cloud Gaming questionnaire.
[286] Third-party response to question 6 of the CMA's Cloud Gaming questionnaire.
[287] Third-party response to question 6 of the CMA's Cloud Gaming questionnaire.
[288] Third-party response to question 12 of the CMA's Publisher and Developer questionnaire.

246. On the basis of this evidence, while the CMA acknowledges the Parties' submissions that cloud gaming is at an early stage and faces some technical challenges, the evidence suggests that it will grow significantly over the coming years and become an increasingly important means of accessing gaming content.

***Microsoft's current ecosystem advantages***

247. For the reasons set out below, the CMA found that, as well as quality content, building a successful cloud gaming service offering requires (i) access to a cloud platform that is sufficiently large and distributed to reach customers in different countries and provide a gaming experience with minimum latency, and (ii) access to the OSs that customers use to play games on their devices.

248. The CMA considers that pre-Merger Microsoft is already in a uniquely strong position to offer cloud gaming services because it is the only provider with a strong position across console, OS, and cloud platform. The importance of each of these products for the supply of cloud gaming services is explained below.

*Users and content – Xbox*

249. As set out in TOH1, Microsoft is one of only three global gaming console providers. The Parties estimate that, in 2021, Microsoft's share of UK console hardware by yearly sales value was approximately [30-40]%.[289] The two other console providers are Sony (PlayStation) and Nintendo (Switch and 3DS).[290]

250. The CMA considers that having an existing console ecosystem gives Microsoft two important advantages over most other existing and potential cloud gaming service providers. First, Microsoft already has a large user base to which it can promote its cloud gaming services. The Parties estimate that, in 2021, Xbox had approximately [✂] MAU.[291] The Parties submitted that XGP alone has approximately 25 million subscribers worldwide and that Microsoft estimates that XGP will grow to nearly [✂] subscribers by 2030.[292]

251. Second, Microsoft already has a large gaming library. Microsoft's Xbox Game Studios includes a collection of 24 first-party development studios, including the recently acquired ZeniMax studios. Examples include games in the *Minecraft*, *Forza*, *Elder Scrolls* and *Halo* game titles.[293] Microsoft also has existing relationships with a range of third-party studios who develop games for Xbox.[294]

---

[289] FMN, Table 26.
[290] FMN, Table 26.
[291] Slide deck accompanying the Issues Letter response, slide 14.
[292] FMN, paragraph 2.13.
[293] FMN, paragraph 6 of the Executive Summary.
[294] FMN, paragraph 41 of the Executive Summary.

252. Microsoft's internal documents suggest that rival non-console cloud gaming service providers looking to enter and expand in this market lack [✂]:

   (a) One third-party report shared with the CMA by Microsoft suggests that Microsoft is uniquely placed to take advantage of game streaming because rival cloud providers entering cloud gaming services will be at a disadvantage if they do not already have a substantial original content library.[295] The document explains that unlike the costs of technology (ie compute and bandwidth), which increase more linearly with user growth, the marginal cost of content can drop significantly if more subscribers join the platform.[296] The CMA notes that this document pre-dates the agreement of the Merger.

   (b) Another Microsoft internal document shows that [✂].[297] The CMA notes that this document pre-dates the agreement of the Merger.

   (c) One Microsoft email to the CEO of Microsoft Gaming explains that [✂].[298] [299] [300]

253. On this basis, and in light of the strong network effects described in TOH1, the CMA believes that having an existing gaming console, together with the existing content portfolio and developer/publisher relationships that Microsoft has built over time to support that gaming console, may give Microsoft a significant advantage over cloud gaming services rivals without one.

*Cloud platform - Azure*

254. Microsoft explained that it offers a public cloud platform and associated services called Azure. Azure offers over 200 services, including computing, storage, networking, databases, OSs, developer tools, and runtimes, to help enterprises build and run their systems, analytics, and applications in the cloud.[301]

255. Microsoft submitted that, in 2020, it had a share of approximately [20-30]% of cloud services in the UK and [10-20]% worldwide.[302] The CMA has also seen one public source that suggests that Microsoft's global share of supply was [20-30]% in the second quarter of 2022[303] – [5-10]% higher than the 2020 estimate submitted by the

---

[295] [✂].
[296] [✂].
[297] [✂].
[298] [✂].
[299] [✂].
[300] [✂].
[301] FMN, paragraph 12.82.
[302] FMN, paragraph 13.71.
[303] See ['Amazon Leads $200-Billion Cloud Market'](#), dated 2 August 2022, accessed 16 August 2022. The Parties submitted that this source explains that Amazon's market share still exceeds the combined market share of its two largest competitors, Microsoft Azure and Google, with Amazon being shown to have 34% worldwide market share in Q2 2022 (Supplementary Issues Letter response, paragraph 6.5). The CMA acknowledges Amazon's currently higher global share of cloud services, but simply notes that this source indicates that the Parties' own market share estimates may understate Microsoft's position.

Parties (this also suggests that the UK share may be higher than the Parties' 2020 estimate of [20-30]%). The CMA notes that the two other major cloud platform suppliers are Amazon and Google.

256. Microsoft submitted that having Azure does not give it a material advantage that it can leverage to improve its gaming offering because [✂] xCloud is provided on [✂] Xbox consoles [✂] economies of scale [✂] does not expect to be in a position to implement this in the next five years.[304]

257. Microsoft's internal documents suggest, [✂]. For example:

   (a)  One internal email [✂]. [305] [306]

   (b)  One Microsoft internal document explains [✂].[307]

258. The CMA also received third-party evidence suggesting that only firms with strong cloud infrastructures will be able to compete effectively in cloud gaming services:

   (a)  One Microsoft internal document prepared by a [✂].[308]

   (b)  One independent report submitted by Microsoft notes that compute cost per hour (ie the cost per hour of cloud usage) is [✂] expense item for a cloud gaming platform ([✂]%), [✂] first party content costs and bandwidth costs.[309] [✂]. [310] [311]

   (c)  Sony submitted that cloud infrastructure is a critical input into game streaming, and that Microsoft's strong position in cloud gives it a substantial advantage over rivals. Sony explained that, because Microsoft is vertically integrated in cloud services, Microsoft will not incur licensing and use fees that its rivals have to pay in order to offer cloud games. By contrast, Microsoft is in a position to charge fees that may make it untenable for developers to host their games on a cloud platform.[312]

   (d)  One cloud service provider explained that Microsoft already has a 'massive cloud presence', and can leverage its existing infrastructure to enjoy a significant cost advantage over new entrants. [313] The competitor also noted that Microsoft has advantages in hardware, power, space, bandwidth, and

---

[304] FMN, paragraph 19.45.
[305] [✂].
[306] Issues Letter response, paragraph 7.51.
[307] [✂].
[308] [✂].
[309] [✂].
[310] [✂].
[311] [✂].
[312] SIE's response to question 32 of the CMA's RFI dated 25 May 2022.
[313] Third-party response to question 7 of the CMA's Cloud Gaming questionnaire.

many other key features of cloud infrastructure, because it contracts at much higher volumes than others.[314]

259. On this basis, the CMA considers that the Merged Entity may have a significant advantage over rivals without a cloud platform. This will allow Microsoft to attract more users to its cloud gaming services, further strengthening network effects in this market.

*Operating system - Windows*

260. Microsoft owns Windows OS, which is the market leader in the supply of PC OSs. According to the Parties, Microsoft had a share of supply of OSs of approximately [70-80]% worldwide and [60-70]% in the UK in 2022.[315] The CMA has seen evidence that Microsoft's hypothetical market share of OS software for personal computers used for gaming is even higher than this, upwards of 95%.[316] Microsoft's rivals include Mac OS, Chrome OS, and other Linux OSs.

261. The CMA understands that OS software provides the interface between videogame applications and the gaming hardware and software, and cloud gaming platforms require both (i) access to cloud infrastructure; and (ii) an OS licence to allow the cloud infrastructure where their games are hosted to run the relevant OS.[317]

262. As set out above, Microsoft told the CMA that it offers two types of licences for Windows OS: Windows Client (for PCs) and Windows Server (for servers). Microsoft explained that it has a policy of licensing (i) Windows Client and Windows Server to end-users for their own internal use; and (ii) Windows Server to cloud-computing providers as an input for purposes of hosting cloud services.[318] Microsoft does not license Windows Client to cloud-computing providers for use as an input in the hosting of cloud services. [✂] the vast majority of Windows applications (including games) run equally well on both Windows Client and Windows Server.[319]

263. The CMA believes that, as a result of having Windows OS, Microsoft is in a strong position relative to other cloud gaming service providers. First, it has a significant cost advantage. For example, one cloud gaming service provider explained that the cost of a Windows Server licence is a significant proportion of overall costs and ensures that Microsoft will always have a competitive advantage.[320] Second, Microsoft has unrestricted access to Windows OS. Although the Parties submitted that most Windows applications (including games) run equally well on Windows Client and Windows Server, one cloud gaming service provider explained that the

---

[314] Third-party response to question 7 of the CMA's Cloud Gaming questionnaire.
[315] The Parties' response to question 1 of the CMA's RFI dated 12 July 2022.
[316] 'Steam Hardware & Software Survey: July 2022', dated July 2022, accessed 15 August 2022.
[317] Third-party response to question 2 of the CMA's Cloud Gaming questionnaire.
[318] Supplementary Issues Letter response, paragraph 5.13.
[319] Supplementary Issues Letter response, paragraph 5.20.
[320] Third-party response to question 7 of the CMA's Cloud Gaming questionnaire.

Windows Client version of OS is superior to the Windows Server version for gaming, since games are compiled and tested for the desktop version, and gaming-related updates are often included earlier in the desktop version than in the server version.[321]

Windows Promotions

264.  Microsoft submitted that it has adopted two broad strategies to make use of Windows to increase awareness and adoption of XGP by PC gamers:[322]

(a)  Microsoft has entered into partnerships with several PC OEMs for the provision of a month's free subscription to XGPU for customers purchasing a new PC.

(b)  Microsoft has used [✕].

265.  The Parties submitted that Microsoft [✕] promotional strategies using Windows aimed at converting PC users to XGP, despite concerted efforts to do so[323] and that Windows is [✕] to drive customer uptake of XGP.[324]

266.  In relation to Microsoft's free trial programme with OEM partners, Microsoft provided conversion rate estimates since the launch of the programme in July 2020 up to May 2022. According to Microsoft, [✕] PC units were sold and activated with a XGP free trial offer in that time, and just over [✕] trials were redeemed by PC users (ie [✕]%), of which approximately [✕] were new XGP members (ie [✕]%). Of these new to XGP users, around [✕] converted their free trial to a paid XGP membership worldwide. As such, approximately [✕]% of PC users to whom a free trial of XGP was made available through the OEM programme became incremental paying XGP members.[325] The CMA notes that a [✕]% conversion does not, by itself, show that these promotional strategies are unimportant. This could, for example, represent a high proportion of purchasers of PC units who are also potential customers for multi-game subscription services.

267.  In respect of the other tools that Microsoft uses to increase awareness of XGP among PC users, Microsoft [✕].[326]

268.  One of Microsoft's internal documents shows that [✕].[327]

269.  On the basis in particular of the importance to game developers of accessing the Windows OS, and also of the role the Windows OS may play in promoting gaming content, the CMA considers that the Merged Entity may have a significant

---

[321] Third-party response to question 11 of the CMA's Cloud Gaming questionnaire.
[322] The Parties' response to question 4 of the CMA's RFI dated 19 July 2022.
[323] Issues Letter response, paragraph 7.35.
[324] Issues Letter response, paragraph 7.36.
[325] The Parties' response to question 4 of the CMA's RFI dated 19 July 2022.
[326] The Parties explained that it [✕]. See the Parties' response to question 4 of the CMA's RFI dated 19 July 2022.
[327] [✕].

advantage over rivals without a leading OS. This could allow Microsoft to attract more users to its cloud gaming services, further strengthening network effects in this market.

***Microsoft's rivals***

270.   The CMA notes that several industry participants are trying to enter or expand in the cloud gaming services space. These include large tech companies (eg Google, Amazon, and Meta), current console providers (eg Sony and Nintendo), game publishers (eg Ubisoft and EA) and others (eg NVIDIA and Vortex). The Parties submitted that several of these rivals have a collection of assets that they can use to compete in cloud gaming services – for example, Google has Android, YouTube, Chrome, and Play Store; Apple has iOS, Apple Store, and Apple Arcade; Amazon has Twitch, Prime Gaming, and Luna; Valve has Steam, Steam OS, and Steam Deck.[328]

271.   The CMA has seen evidence that Microsoft is the only cloud gaming services provider to have the full set of capabilities—including relevant technology and content—required to compete effectively in cloud gaming. For example, one Microsoft internal document [✂].[329]

[✂]

272.   The CMA considers that Microsoft's internal assessment of the competitive landscape is consistent with the CMA's view that no rival currently matches Microsoft's ecosystem advantages for providing cloud gaming services.

***Impact of the Merger on Microsoft's ability to foreclose rivals***

273.   As set out above, Microsoft already has a multi-product ecosystem that places it in a uniquely strong position to provide cloud gaming services. To some extent, therefore, Microsoft can already offer a cost-competitive cloud gaming service that is difficult for rivals to match, and it can use different elements of its ecosystem to weaken its rivals (for example, by charging expensive licensing fees for Windows Server OS).

274.   The CMA believes, however, that the Merger could nonetheless harm competition by significantly strengthening Microsoft's integrated offering. Absent the Merger, rivals could still hope to compete against Microsoft by offering a different value proposition that is stronger than Microsoft's offering on at least some parameters of competition (for example, by offering a better gaming catalogue at a lower price). Following the Merger, it may be significantly more difficult for rivals to compete against Microsoft on any parameter of competition, as Microsoft would have by far

---

[328] Issues Letter response, paragraph 7.58.
[329] [✂].

the strongest integrated offering across cloud, computer OSs, and gaming content. The CMA believes that the investment required by a competitor to develop an offering that could compete effectively with that of Microsoft could be significantly increased following the Merger.

275. The CMA believes that further strengthening of its cloud gaming services offering post-Merger could also change Microsoft's ability and incentive to foreclose rivals using different parts of its multi-product ecosystem. Strategies that may not have succeeded absent the Merger could succeed after the Merger, especially when deployed in combination. These include:

(a) **Gaming content.** Engaging in total or partial foreclosure strategies using the Merged Entity's gaming content (as set out in TOH1);

(b) **Azure.** Denying access to Microsoft's cloud platform to rival cloud gaming services providers (or offering it on worse terms, including price, location, and/or processing power);[330] and

(c) **Windows.** Denying access to a Windows OS licence (or offering it on worse terms, including price).

276. In relation to gaming content, the CMA has set out in TOH1 the total and partial foreclosure strategies that Microsoft could engage in post-Merger.

277. In relation to cloud platforms, Microsoft submitted that it is a smaller provider of traditional cloud services to the gaming industry than Amazon (ie AWS) and Google (ie GCP), both of which have built their own cloud-based game streaming services. According to Microsoft, Amazon's strategy is to integrate its cloud-based game streaming service with AWS, promoting Luna as the world's most comprehensive and broadly adopted cloud platform.[331] The Parties submitted that Google also promotes its Stadia offering as a 'cloud-native developer platform purpose-built for the 21st century and powered by the best of Google'.[332] Microsoft also submitted that there are a number of other rivals launching cloud-based streaming services which build on their competitive strength in cloud computing, including Meta, NVIDIA, Tencent, and Sony.[333]

278. The CMA notes, however, that:

(a) Microsoft is the second largest cloud platform provider in a market where there are three main players and a long tail of smaller players.

---

[330] Including intermediary companies, such as Ubitus, who provide B2B cloud gaming software and services that enable their enterprise customers to create their own consumer-facing cloud gaming offerings.
[331] FMN, paragraph 19.47. See, Introducing Amazon Luna (developer.amazon.com).
[332] FMN, paragraph 19.47. See, Welcome to Stadia (stadia.dev).
[333] FMN, paragraph 12.51.

(b)   The CMA does not consider that the presence of Microsoft's main cloud platform rivals—Amazon (AWS) and Google (GCP)—is sufficient to suggest that if Microsoft chose to foreclose its other rivals there would not be an impact on their ability to access cloud server space or the terms on which they are able to do so.

(c)   Moreover, in relation to cloud gaming services, market shares may be less informative of market power because cloud gaming services require a large and well-distributed cloud platform to minimise latency across different locations, and smaller cloud platform providers may not be sufficiently well placed to offer this.

279.   In relation to OSs, the Parties submitted that cloud gaming service providers have alternatives to Windows, such as Linux.[334] The Parties submitted that Google Stadia uses servers running on Linux, and that this has not limited its growth.[335] The Parties also submitted that Amazon is planning to move away from Windows following the successful launch of the Valve Steam Deck, which plays Windows PC games on Linux without using Windows at all by using Linux-based software, *Proton*.[336]

280.   However, the CMA understands that running its servers on Linux OS has been one of the factors that has limited the growth of Google Stadia. This is supported by third-party evidence and public sources as well as Microsoft's own internal documents, one of which states the following:

[✄].[337]

281.   Another ABK internal document compares various cloud gaming services (namely, Google's Stadia, Microsoft's xCloud, and Amazon's Luna), and states that the Windows-based solutions are easier to port games to than the Linux-based solution.[338] One Microsoft internal document [✄].[339]

282.   The CMA considers that the existence of strong network effects in this market also means that Windows is likely to have a lasting advantage over other OSs. The popularity and installed base of gamers that use Windows OS means that publishers write video games for Windows OS and often not for other OSs. This includes the most popular and complex games, such as CoD, which the Parties told the CMA has only been available on Windows OS for the past few years, and not on any other OS. One cloud gaming service competitor told the CMA that cloud gaming

---

[334] Supplementary Issues Letter response, paragraph 5.22.
[335] Supplementary Issues Letter response, paragraph 5.23.
[336] Supplementary Issues Letter response, paragraphs 5.26 - 5.27.
[337] [✄].
[338] [✄].
[339] [✄].

service providers are also likely to choose the OS used by most gamers.[340] The CMA considers that the possibility of Amazon using *Proton* on its Luna service to avoid using Windows is speculative at this point in time, and that the technology is untested in a cloud gaming context.

283. The CMA considers that the Merged Entity would control an important portfolio of gaming content, a leading cloud platform that could be used for delivering cloud gaming services, and the main PC OS used by gamers. The Merged Entity may have the ability to foreclose cloud gaming services rivals by refusing them access to one or more of these (or offering access on worse terms).

*Impact of the Merger on Microsoft's incentives to leverage its ecosystem*

284. Where the CMA considers several possible ways in which the Merged Entity may foreclose its rivals, it may either undertake one common assessment of incentives or several related assessments.[341] In this case, the CMA considers that Microsoft's ability to foreclose rivals may derive from leveraging all three elements of its ecosystem in combination (users and content, cloud, and OS). The CMA therefore considers that a common assessment of incentives is also appropriate across all three elements.

285. The CMA believes that acquiring ABK's content could change Microsoft's incentive to engage in foreclosure strategies using its ecosystem. For the reasons set out in ToH1, the CMA believes that ABK's content is important to gamers, and Microsoft could use it to attract more users to its cloud gaming services platform. This would make a foreclosure strategy using Microsoft's broader ecosystem more effective, which could incentivise Microsoft to engage in the foreclosure strategies described above, in circumstances where it may not have had the incentive to do so absent the Merger.

286. Moreover, the CMA considers that the existence of strong network effects (as described earlier in this Decision) also increase Microsoft's incentive to engage in the foreclosure strategies described above post-Merger. In markets with strong network effects and high barriers to entry, there is an increased risk of the market 'tipping' towards one platform. As a platform accumulates users and content, it becomes difficult for other platforms to attract the user base, acquire the content, and ultimately reach the scale necessary to provide a competitive offering. The Parties submitted that the CMA has not explained how and why Microsoft's incentives would change post-merger as a result of the existence of network effects.[342] However, the CMA believes that, by leveraging ABK's content and its

---

[340] Third-party response to question 2 of the CMA's Cloud Gaming questionnaire.
[341] Merger Assessment Guidelines, March 2021, paragraph 7.17.
[342] Supplementary Issues Letter response, paragraph 5.30.

wider ecosystem, Microsoft could strengthen network effects and raise barriers to entry for current and potential cloud gaming services rivals.

287. This strategy is consistent with Microsoft's own internal documents. For example:

   (a)   One Microsoft internal document shows that [✂].[343]

   (b)   The same internal document explains that, [✂]. [344] According to that document, [✂].[345]

288. On this basis, the CMA believes that the Merger may result in Microsoft having the incentive to leverage its ecosystem to strengthen network effects, increase barriers to entry, and foreclose rivals in cloud gaming services.

*Effects*

289. The CMA considers that the market for cloud gaming services is at an early stage of development. There are several recent and potential new entrants that may be able to compete by offering different value propositions and disrupt the highly concentrated gaming console market. As a result, the current competitive landscape could change significantly over the coming years.

290. The CMA is concerned that this Merger could strengthen Microsoft's already strong cloud gaming services offering. As set out above, Microsoft's broader ecosystem already gives it a unique set of advantages over rivals in cloud gaming services. The Merger would significantly improve its first-party content library, which Microsoft could use in combination with the rest of its ecosystem to tip the market in its favour and gain market power. This could have the effect of further strengthening network effects and raising barriers to entry and expansion for other rivals or potential rivals.

291. The CMA considers that strengthening network effects and raising barriers to entry as described in this theory of harm could affect all current and potential rivals in cloud gaming services. In particular, it could make it very difficult for new and recent entrants without the required technological capabilities and gaming content to compete effectively against Microsoft.

292. The CMA believes that, in the absence of the Merger, either these competition concerns would not materialise, or customers would at least benefit from a longer period of competition between platforms vying to be the 'winning platform' in these markets prior to any tipping occurring.[346]

---

343 [✂].
344 [✂].
345 [✂].
346 Merger Assessment Guidelines, March 2021, paragraph 4.25.

293.   In addition, the CMA recognises that the competition concerns identified in this theory of harm could also have consequences for the game publishing market. If Microsoft were to acquire significant market power in cloud gaming services, it could become a *de facto* gatekeeper[347] between game publishers and gamers. This could have knock-on effects on independent game developers and publishers who compete against Microsoft's own gaming portfolio, ultimately giving it the ability to control access to gamers, charge high fees for game distribution, and manipulate game rankings. The CMA therefore also recognises that the effects of this theory of harm could impact competition in other markets, such as game publishing.

***Conclusion***

294.   For the reasons set out above, the CMA believes that the Merged Entity may have the ability and incentive to engage in foreclosure strategies using ABK's content which, when combined with the rest of its multi-product ecosystem, could strengthen network effects and raise barriers to entry in the supply of cloud gaming services. Accordingly, the CMA found that the Merger raises significant competition concerns as a result of non-horizontal effects in relation to cloud gaming services.

## COUNTERVAILING CONSTRAINTS

### Barriers to entry and expansion

295.   Entry, or expansion of existing firms, can mitigate the initial effect of the acquisition on competition, and in some cases may mean that there is no SLC. In assessing whether entry or expansion might prevent a substantial lessening of competition, the CMA considers whether such entry or expansion would be timely, likely and sufficient.[348] In terms of timeliness, the CMA's guidelines indicate that the CMA will look for entry to occur within two years; the CMA has discretion however to consider a longer timeframe, and typically will do so where the theories of harm under consideration are 'dynamic'.[349]

296.   The evidence received by the CMA from the Parties and third parties in the investigation does not indicate that entry or expansion will be timely, likely or sufficient to mitigate any SLC arising, in any of the markets in which the CMA has identified competition concerns.

297.   For example, internal documents of both Microsoft and ABK show that the development and marketing costs of console and PC games (particularly those characterised as AAA) are high, and rely on scarce resources such as software development skills. One ABK internal document explains that the investments

---

[347] See ['Unlocking digital competition, Report of the Digital Competition Expert Panel'](the Furman Report), dated 13 March 2019, page 41, accessed 04 August 2022.
[348] [Merger Assessment Guidelines](), March 2021, paragraph 8.31.
[349] [Merger Assessment Guidelines](), March 2021, paragraph 8.33.

required to make a great game are substantially above [✂], in addition to marketing budgets of a similar scale, and that budgets for backend infrastructure and customer service have 'exploded'. The document estimates that launching new IP such as *Skylanders* requires an all-in upfront investment in the range of [✂]. The document notes there are very few publishers who have the financial resources to compete at this scale.[350]

298.  One competitor told the CMA that the cost of creating a brand new game is greater than USD 100 million, and that doing so is particularly difficult and expensive for independent developers and publishers.[351] The high costs of game development and publishing have also been noted in the media.[352]

299.  In relation to subscription services, the Parties' internal documents show [✂].[353]

300.  The CMA has also set out in detail evidence of strong direct and indirect network effects across the gaming industry (including in console gaming platforms, subscription services, and cloud gaming services). That evidence is indicative of high barriers to entry and is not repeated here.

301.  The CMA notes that there has not been a successful major entrant into console gaming ecosystems since Microsoft's own entry in 2001.

302.  As such, the CMA believes that barriers to entry and expansion into the publishing of high-quality gaming content are high, meaning the possibility of entry or expansion replacing ABK's content does not alleviate the CMA's concerns around input foreclosure.

## THIRD-PARTY VIEWS

303.  The CMA contacted customers and competitors of the Parties, as well as academics and trade associations in the gaming industry.

304.  Most competitors raised concerns regarding (i) Microsoft making ABK games exclusive to its own platform; and/or (ii) degrading the quality of ABK games on other platforms; and/or potential self-preferencing behaviour by Microsoft. These concerns have been taken into account where appropriate in the competitive assessment above.

305.  In addition to the theories of harm outlined above, third-party concerns were also raised in relation to the potential foreclosure of rival PC storefronts and PC OSs

---

[350] [✂].
[351] Note of call with third party, dated 23 May 2022, paragraph 18.
[352] For example, see 'Why video games are so expensive to develop', dated 25 September 2014, accessed 1 August 2022.
[353] [✂].

using ABK's content.[354] The most substantive submissions and evidence on these concerns were provided to the CMA relatively late within the phase 1 timetable, limiting the CMA's ability to investigate. Some third-party game publishers also raised concerns that the Merger could foreclose game publishers.[355] The CMA found mixed evidence on this but considered that any potential harm to game publishers would be captured already by the theories of harm investigated in this decision.

## CONCLUSION ON SUBSTANTIAL LESSENING OF COMPETITION

306.   Based on the evidence set out above, the CMA believes that it is or may be the case that the Merger may be expected to result in an SLC as a result of non-horizontal effects in relation to the following frames of reference in the UK:

(a)   the manufacture and supply of gaming consoles (together with their digital storefronts);

(b)   the distribution of games through multi-game subscription services; and

(c)   the supply of cloud gaming services.

---

[354] Note of a call with a third party, dated 9 June 2022, paragraph 25; note of a call with a third party, dated 27 June 2022, paragraph 11; and submission by a third party, submitted to the CMA on 26 July 2022, page 28.
[355] Third-party responses to question 13 of the CMA's Publisher Developer questionnaire; and note of a call with a third party, dated 17 May 2022, paragraph 20.

# DECISION

307.   Consequently, the CMA believes that it is or may be the case that (i) arrangements are in progress or in contemplation which, if carried into effect, will result in the creation of a relevant merger situation; and (ii) the creation of that situation may be expected to result in an SLC within a market or markets in the United Kingdom.

308.   The CMA therefore believes that it is under a duty to refer under section 33(1) of the Act. However, the duty to refer is not exercised whilst the CMA is considering whether to accept undertakings under section 73 of the Act instead of making such a reference.[356] The Parties have until 8 September 2022[357] to offer an undertaking to the CMA.[358] The CMA will refer the Merger for a phase 2 investigation[359] if the Parties do not offer an undertaking by this date; if the Parties indicate before this date that they do not wish to offer an undertaking; or if the CMA decides[360] by 15 September 2022 that there are no reasonable grounds for believing that it might accept the undertaking offered by the Parties, or a modified version of it.

**Sorcha O'Carroll**
**Senior Director, Mergers**
**Competition and Markets Authority**
**1 September 2022**

---

[356] Section 33(3)(b) of the Act.
[357] Section 73A(1) of the Act.
[358] Section 73(2) of the Act.
[359] Sections 33(1) and 34ZA(2) of the Act.
[360] Section 73A(2) of the Act.

# EXHIBIT B



# Microsoft's Proposed Acquisition of Activision Blizzard: In Brief

August 3, 2022

Congressional Research Service

https://crsreports.congress.gov

R47203

# Contents

Introduction ............................................................................................................................. 1

The Video Game Industry ....................................................................................................... 1

    Microsoft and Activision Blizzard in the Video Game Industry ...................................... 4

Potential Concerns Regarding Microsoft's Proposed Acquisition of Activision Blizzard ............. 5

    Foreclosure ............................................................................................................... 5

    Market Dominance ...................................................................................................... 6

        Distributors .......................................................................................................... 6

        Publishers and Developers .................................................................................... 7

        Potential Markets ................................................................................................. 7

    Labor Market Monopsony ........................................................................................... 8

Potential Action from Antitrust Enforcers .............................................................................. 9

Considerations for Congress ................................................................................................. 11

# Figures

Figure 1. Percentage of Internet Users in the United States Ages 16 to 64  Playing Video
    Games, by Device .......................................................................................................... 2

# Contacts

Author Information ............................................................................................................... 12

# Introduction

On January 18, 2022, Microsoft Corp. announced plans to acquire Activision Blizzard Inc., a video game company, for $68.7 billion.[1] The Federal Trade Commission (FTC) is reviewing the acquisition,[2] as provided under the Hart-Scott-Rodino Act (HSR),[3] to determine whether its effect might be "substantially to lessen competition"—a violation of Section 7 of the Clayton Act.[4] Competition authorities in other countries are reviewing Microsoft's proposed acquisition as well.[5] The companies have said they expect to complete the acquisition before June 30, 2023.[6]

In recent decades, enforcement of antitrust laws has typically focused on how a proposed merger or acquisition might affect consumers, such as by reducing price competition in relevant product markets. Some of the FTC's actions and statements over the last two years suggest that in its review of Microsoft's proposed acquisition, the FTC may be considering other factors that are discussed in this report.[7]

This report discusses Microsoft's proposed acquisition of Activision Blizzard, including some of the potential effects on existing product markets, labor markets, and on product markets that do not currently exist but may develop in the future. The report also provides some considerations for Congress, discussing some bills that may affect Microsoft's proposed acquisition or Microsoft's future behavior if the acquisition is completed.

# The Video Game Industry

The video game industry can be separated into three components:

- developers or gaming studios that create and design video games;
- publishers who market and monetize the video games; and

---

[1] Microsoft News Center, "Microsoft to Acquire Activision Blizzard to Bring the Joy and Community of Gaming to Everyone, Across Every Device," Microsoft, January 18, 2022, at https://news.microsoft.com/2022/01/18/microsoft-to-acquire-activision-blizzard-to-bring-the-joy-and-community-of-gaming-to-everyone-across-every-device/.

[2] First disclosed by Activision Blizzard (Activision Blizzard, Inc., SEC Form Schedule 14A, March 21, 2022, pp. 69-70, at https://www.sec.gov/Archives/edgar/data/0000718877/000110465922036155/tm225196-4_defm14a.htm#tREAP). Confirmed by FTC Chair Lina Khan's letter to Senator Elizabeth Warren, June 9, 2022, at https://www.warren.senate.gov/imo/media/doc/Response%20Letter%20to%20FTC%20Chair%20Lina%20M.%20Khan%20to%20Sen.%20Warren%20re%20Microsoft%20Activision.pdf.

[3] Federal Trade Commission (FTC), "Hart-Scott-Rodino Antitrust Improvements Act of 1976," accessed on April 28, 2022, at https://www.ftc.gov/legal-library/browse/statutes/hart-scott-rodino-antitrust-improvements-act-1976.

[4] 15 U.S.C. §18. For a brief summary of §7 of the Clayton Act, see CRS In Focus IF11234, *Antitrust Law: An Introduction*, by Jay B. Sykes.

[5] For example, the United Kingdom's Competition and Markets Authority and Australian Competition and Consumer Commission are reviewing the acquisition; for more information, see https://www.gov.uk/cma-cases/microsoft-slash-activision-blizzard-merger-inquiry and https://www.accc.gov.au/public-registers/mergers-registers/public-informal-merger-reviews/microsoft-corporation-activision-blizzard-inc.

[6] Activision Blizzard, Inc., SEC Form Schedule 14A, March 21, 2022, pp. 69-70, at https://www.sec.gov/Archives/edgar/data/0000718877/000110465922036155/tm225196-4_defm14a.htm#tREAP.

[7] Examples of recent actions and statements include the FTC and Department of Justice (DOJ) reviewing guidelines that outline standards used by both agencies to review mergers, a recent lawsuit filed by the FTC, and the FTC Chair Lina Khan's response to a letter from some Senators. These are discussed in greater detail in "Potential Action from Antitrust Enforcers."

- distributors who provide the video games to consumers.[8]

Video games are most commonly played on game consoles, personal computers (PCs), and mobile devices (**Figure 1**). Although some retailers sell physical copies of video games for consoles and PCs, the majority of video games are sold in digital format;[9] games for mobile devices are sold only in digital format.

**Figure 1. Percentage of Internet Users in the United States Ages 16 to 64 Playing Video Games, by Device**



**Source:** CRS using Global Web Index data (2021 Q3) from DataReportal, "Digital 2022: The United States of America," February 9, 2022, p. 44, at https://datareportal.com/reports/digital-2022-united-states-of-america.

The extent of competition among distributors depends on the format and device used to play the game. The digital format of video games played on a console generally can only be downloaded from a digital store operated by the producer of the console. Games for PCs can be purchased from a selection of digital stores that are operated by various firms,[10] including publishers and developers.[11] Some of these firms also provide their games as apps on certain mobile devices;[12] these are distributed through app stores, such as Google Play and Apple's App Store.

---

[8] Gaming Street Staff, "Intro to the Industry: The Difference Between Game Developers and Publishers," *Gaming Street*, September 18, 2019, at https://gamingstreet.com/intro-to-the-industry-the-difference-between-game-developers-and-publishers/.

[9] The Entertainment Software Association estimates that in 2018, 83% of video game sales were in digital format, and 17% were sold in a physical format. Entertainment Software Association, "2019 Essential Facts About the Video Game Industry," 2019, p. 20, at https://www.theesa.com/resource/essential-facts-about-the-computer-and-video-game-industry-2019/.

[10] Examples include Valve Corp.'s Steam (only allows individual games to be purchased) and Google's Stadia (subscription service).

[11] Examples include Epic Games Store and Electronic Arts (EA) Play.

[12] Some of these video games require a minimum level of hardware specifications, such as a certain amount of random-access memory (RAM). For example, *Call of Duty: Mobile* is compatible with Android and iOS devices with at least 2

Consoles are typically sold at a loss; the manufacturers then profit from sales of games and subscription services.[13] This can incentivize console producers to acquire developers and publishers and offer exclusive content.[14] Technological developments have allowed some PCs and other devices, depending on their hardware capabilities, to compete with game consoles.[15] For example, early in 2022, Valve Corp. released a handheld PC—Steam Deck—that resembles the Nintendo Switch console but provides features that are typically available on PCs, such as a web browser, and allows users to download third-party software, including other operating systems.[16]

Some firms have started offering video game subscription services that provide access to multiple games for a monthly fee, meaning users do not need to purchase each individual game.[17] Some firms offer cloud gaming, which allows users to play video games using remote servers in data centers, reducing the hardware requirements needed to play the games and expanding the variety of devices that can be used.[18] Cloud gaming, however, requires a high-speed internet connection and is not feasible for potential users who do not have access to sufficiently high broadband speeds.[19] Subscription services reportedly provide 4% of total revenue in the North American and European video game markets.[20]

Some firms backed by venture capitalists and large firms that are primarily known for providing other online services have shown interest in entering the video game industry.[21] For example,

---

GB of RAM. Activision Support, "Call of Duty: Mobile," Activision Blizzard, February 8, 2021, at https://support.activision.com/cod-mobile/articles/call-of-duty-mobile.

[13] MarketLine, *MarketLine Industry Profile: Game Consoles in the United States*, December 2021; and Nick Statt, "Microsoft VP Confirms Xbox Hardware Business Loses Money," *Protocol*, May 5, 2021, at https://www.protocol.com/microsoft-confirms-the-xbox-hardware-business-loses-money.

[14] Console producers have been offering exclusive games for decades. For example, *Super Mario* games are offered only on Nintendo's consoles (https://mario.nintendo.com/), *Marvel's Spider-Man: Miles Morales* is offered only on Sony's consoles (https://www.playstation.com/en-us/games/marvels-spider-man-miles-morales/), and *Halo Infinite* is offered only on Microsoft's consoles and PCs with a Windows operating system (https://www.halowaypoint.com/halo-infinite).

[15] Chris Plante, "Console or PC? This Fall, the Choice is Simple," *Polygon*, November 5, 2020, at https://www.polygon.com/2020/11/5/21551308/should-i-buy-xbox-ps5-or-pc.

[16] Steam, "Steam Deck Launching February 25th," January 26, 2022, at https://store.steampowered.com/news/app/1675180/view/3117055056380003048; and Jacob Ridley, "Steam Deck: Everything you need to know about Valve's handheld gaming PC," *PC Gamer*, February 25, 2022, at https://www.pcgamer.com/steam-deck-price-release-date-specs/.

[17] Some games, such as *World of Warcraft*, require a subscription to access the entire game (https://worldofwarcraft.com/en-us/start). Examples of streaming and cloud gaming services are available at Dan Ackerman, "Best Game Subscription Services," *CNET*, June 13, 2022, at https://www.cnet.com/tech/gaming/best-game-subscription-services/.

[18] Jacob Roach and Kevin Parrish, "What Is Cloud Gaming?," *DigitalTrends*, March 29, 2021, at https://www.digitaltrends.com/gaming/what-is-cloud-gaming-explained/; and Michael Kriech, "The Rise of Cloud Gaming," *DataCenters*, April 26, 2022, at https://www.datacenters.com/news/the-rise-of-cloud-gaming.

[19] Taylor Clogston, "The 10 Worst Things About Cloud Gaming, Ranked," *CBR*, February 13, 2022, at https://www.cbr.com/the-worst-things-about-cloud-gaming-ranked/; and Sam Naji and Damian Abrahams, "Cloud Gaming Is Being Sold As the Next Stage of Video Game Innovation, but Consumers Will Have the Last Word," *GamesIndustry.biz*, March 14, 2022, at https://www.gamesindustry.biz/articles/2022-03-14-cloud-gaming-is-being-sold-as-the-next-stage-of-video-game-innovation-but-consumers-will-have-the-last-word-opinion. For more information on broadband speeds, see CRS In Focus IF11875, *Raising the Minimum Fixed Broadband Speed Benchmark: Background and Selected Issues*, by Colby Leigh Rachfal.

[20] The estimate of total revenue includes physical copies and digital downloads of games and game add-ons. Stephen Totilo, "Gaming's Netflix or Spotify Moment Is Still a Long Way Off," *Axios*, March 28, 2022, at https://www.axios.com/2022/03/28/video-game-subscriptions-xbox-game-pass-netflix.

[21] Nick Statt, "Andreessen Horowitz Launches a $600 Million Gaming Fund," *Protocol*, May 18, 2022, at

Netflix started offering games on mobile devices on November 2, 2021, and has acquired video game developers.[22] These firms may be able to further expand the selection of distributors available for certain devices and potentially increase competition in the industry.[23]

## Microsoft and Activision Blizzard in the Video Game Industry

Microsoft distributes video games using Microsoft Store, its subscription service Game Pass,[24] and its cloud gaming service Xbox Cloud Gaming (Beta);[25] publishes games, including the franchises *Halo* and *Minecraft*;[26] and owns 23 gaming studios.[27] In 2021, Microsoft had the second-highest share in the U.S. market for game consoles at 34.8%, according to a report from MarketLine, an industry research firm; estimates for Sony and Nintendo were 40.7% and 24.5%, respectively.[28] In January 2022, Microsoft stated that it had more than 25 million Game Pass subscribers.[29] In April 2022, Microsoft reported that more than 10 million people have streamed games over Xbox Cloud Gaming,[30] although it is unclear how long or how many times users accessed the service. Estimates from Ampere Analysis reportedly indicate that Game Pass makes up about 60% of the video game subscription market.[31] Among video game publishers in the United States, Microsoft had the highest market share at 23.9%, according to IBISWorld.[32]

Activision Blizzard is a video game publisher and developer primarily known for its franchise games, which include *World of Warcraft*, *Call of Duty*, *Diablo*, and *Candy Crush*.[33] The company can be separated into three segments—Activision, Blizzard, and King—that each contain their own gaming studios. Among video game publishers in the United States, Activision Blizzard had

---

https://www.protocol.com/bulletins/andreessen-horowitz-gaming-fund-launch.

[22] Mike Verdu, "Let the Games Begin: A New Way to Experience Entertainment on Mobile," Netflix, November 2, 2021, at https://about.netflix.com/en/news/let-the-games-begin-a-new-way-to-experience-entertainment-on-mobile; Amir Rahimi, "Game Developer Boss Fight Entertainment Joins Netflix," Netflix, March 24, 2022, at https://about.netflix.com/en/news/game-developer-boss-fight-entertainment-joins-netflix.

[23] Aisha Malik, "Netflix Buys Independent Game Developer Boss Fight in Latest Gaming Acquisition," *TechCrunch*, March 25, 2022, at https://techcrunch.com/2022/03/25/netflix-buys-game-developer-boss-fight/; and Kellen Browning, "Netflix Buys Another Video Game Studio As It Builds Out Its Gaming Business," *New York Times*, March 24, 2022, at https://www.nytimes.com/2022/03/24/business/netflix-game-studio.html.

[24] Microsoft, "Xbox Game Pass," accessed on June 15, 2022, at https://www.xbox.com/en-US/xbox-game-pass.

[25] Microsoft, "Xbox Cloud Gaming (Beta) with Xbox Game Pass," accessed on June 15, 2022, at https://www.xbox.com/en-US/xbox-game-pass/cloud-gaming; and Microsoft Xbox, "How to Use Cloud Gaming," accessed on June 15, 2022, at https://support.xbox.com/en-US/help/games-apps/cloud-gaming/about-cloud-gaming.

[26] Franchises or franchise video games are multiple games released under the same main title (e.g., *Halo Infinite*, *Halo Recruit*).

[27] Microsoft, "Welcome to Xbox Game Studios," accessed on July 22, 2022, at https://www.xbox.com/en-US/xbox-game-studios.

[28] MarketLine, *MarketLine Industry Profile: Game Consoles in the United States*, December 2021.

[29] Phil Spencer, "Welcoming the Incredible Teams and Legendary Franchises of Activision Blizzard to Microsoft Gaming," Microsoft, January 18, 2022, at https://news.xbox.com/en-us/2022/01/18/welcoming-activision-blizzard-to-microsoft-gaming/.

[30] Microsoft, Earnings Release FY 22 Q3, Earnings Call Transcript, p. 10, at https://www.microsoft.com/en-us/Investor/earnings/FY-2022-Q3/productivity-and-business-processes-performance.

[31] Stephen Totilo, "Gaming's Netflix or Spotify Moment Is Still a Long Way Off," *Axios*, March 28, 2022, at https://www.axios.com/2022/03/28/video-game-subscriptions-xbox-game-pass-netflix.

[32] Sean Egan, *Video Game Software Publishing in the U.S.*, IBISWorld, September 2021.

[33] Activision Blizzard, "Who We Are," accessed on July 8, 2022, at https://www.activisionblizzard.com/who-we-are.

the second highest market share at 10%, according to IBISWorld.[34] Activision also distributes video games for PCs through its digital store—Battle.net.[35]

# Potential Concerns Regarding Microsoft's Proposed Acquisition of Activision Blizzard

Microsoft's proposed acquisition may be considered both a vertical merger, in which one firm is the supplier and the other is a customer in the supply chain, and a horizontal merger, in which the merging firms are direct competitors, offering similar products or services that are considered substitutes. One concern with vertical mergers is that they may lead to foreclosure, a situation in which a supplier that competes with the merged firm loses access to a potential customer or a buyer that competes with the merged firm is denied access to a supplier. A concern with horizontal mergers is that they may significantly increase the market share of the merged firm, increasing concentration in the market and reducing competition, thereby enabling the remaining firms to raise prices. Microsoft's proposed acquisition may also raise other concerns that typically have not been raised in merger challenges in recent decades, such as dominance in markets that may develop in the future and labor market monopsony.[36]

## Foreclosure

A key question about Microsoft's proposed acquisition may be the extent to which Microsoft might restrict the availability of Activision Blizzard's video games to its consoles and its streaming and cloud gaming services. Such a restriction would mean that other companies' consoles or streaming or cloud gaming services would not be able to offer Activision Blizzard's games to consumers. Microsoft has stated that if the merger is approved, it would continue to make *Call of Duty* and other popular Activision games available on other gaming consoles in addition to its Xbox.[37] The statement specifies that Activision's popular content would be "available on competing platforms like Sony's PlayStation." It is unclear, however, if this commitment pertains only to Sony's consoles or also applies to PlayStation Plus,[38] Sony's version of Game Pass. Additionally, it is unclear whether Activision Blizzard's games would be available on other streaming or cloud gaming services.

Microsoft could also limit the availability of other games that are or will be under development. In 2020, after acquiring ZeniMax Media, parent company of the video game developer Bethesda Softworks,[39] Microsoft stated that it would honor the exclusivity commitments Bethesda made

---

[34] Sean Egan, *Video Game Software Publishing in the U.S.*, IBISWorld, September 2021.

[35] Blizzard, "Battle.net Desktop App," accessed on June 15, 2022, at https://www.blizzard.com/en-us/apps/battle.net/ desktop.

[36] A monopsony exists when a single buyer dominates a market. In labor markets, an employer with monopsony power dominates demand for workers able to perform certain jobs, enabling it to pay lower compensation than might be required to attract workers in a competitive market.

[37] Brad Smith, "Adapting Ahead of Regulation: A Principled Approach to App Stores," Microsoft Blogs, February 9, 2022, at https://blogs.microsoft.com/on-the-issues/2022/02/09/open-app-store-principles-activision-blizzard/.

[38] Sony incorporated its cloud gaming service (formerly PlayStation Now) into its subscription service—PlayStation Plus—on June 13, 2022. PlayStation, "Introducing the All-New PlayStation Plus," accessed on June 16, 2022, at https://www.playstation.com/en-us/ps-plus.

[39] Microsoft News, "Microsoft Finalizes Acquisition of ZeniMax Media," Microsoft, accessed on May 26, 2022, at https://news.microsoft.com/features/microsoft-finalizes-acquisition-of-zenimax-media/; and Tom Warren, "Microsoft Completes Bethesda Acquisition, Promises Some Xbox and PC Exclusives," *Verge*, March 9, 2021, at

with Sony for certain games for one year,[40] but that future Bethesda games would be made available for "other consoles on a case by case basis."[41] The game *Starfield*, officially introduced by Bethesda in 2018,[42] is scheduled to be released in November 2022 exclusively on Microsoft's Xbox Series X and S consoles and Windows PCs; it will not be available on other consoles.[43]

## Market Dominance

### Distributors

One potential concern may be how Microsoft's acquisition might affect competition among digital stores selling video games for PCs, a market in which both Microsoft and Activision Blizzard compete. Following the acquisition, Microsoft could operate both Microsoft Store and Battle.net. This may not have a significant effect on competition, however, because Valve Corp.'s Steam is considered to be the dominant market player among PC digital stores. In a 2021 lawsuit alleging anticompetitive practices by Valve, video game developer Wolfire Games estimated that Valve controlled at least 75% of PC desktop game distribution.[44]

With respect to subscription or cloud gaming services, Microsoft may be able to increase its market share with the acquisition by offering more content than other providers. In addition to developing its own games, Microsoft has entered partnerships with various developers and publishers. For example, some Game Pass subscribers can access games on Electronic Arts (EA) Play for no additional cost,[45] and *Fortnite* is available for free on Xbox Cloud Gaming without a Game Pass membership, although users must have a Microsoft account.[46] If Microsoft allows other subscription or cloud gaming services to distribute Activision Blizzard's video games, it may charge these providers a fee to do so, meaning potential competitors could face an additional cost that Microsoft would not.

Consumers would arguably benefit from having a greater selection of video games offered through Microsoft's subscription and cloud gaming services. However, if other subscription and cloud gaming service providers are unable to increase their market shares, Microsoft may be able to dominate the market, potentially allowing Microsoft to increase prices in the future. The salience of this concern may reflect opinions on whether antitrust enforcement should consider

---

https://www.theverge.com/2021/3/9/22319124/microsoft-bethesda-acquisition-complete-finalized.

[40] Nick Pino, "Microsoft-Owned Deathloop Will Remain a PS5 Timed-Exclusive Until September 14, 2022," *TechRadar*, July 8, 2021, at https://www.techradar.com/news/deathloop-ps5-timed-exclusive-date; and Owen Good, "Ghostwire: Tokyo Launch Date, Preview Showcase Announced," *Polygon*, February 2, 2022, at https://www.polygon.com/22914664/ghostwire-tokyo-release-date-ps5-timed-exclusive.

[41] Jay Peters, "Microsoft Will Honor Bethesda's PS5 Exclusives, but Future Console Releases Will be a 'Case-by-Case,'" *Verge*, September 21, 2020, at https://www.theverge.com/2020/9/21/21449121/microsoft-bethesda-ps5-playstation-5-xbox-series-x-s-consoles-exclusives.

[42] Chris Plante, "Starfield Is Bethesda's Big, New Game – Here's Your First Look," *Polygon*, June 10, 2018, at https://www.polygon.com/e3/2018/6/10/17434018/starfield-trailer-bethesda-e3-2018-pc-xbox-ps4.

[43] Jamel Smith, "Starfield Really Is Still an Xbox Exclusive – No, Seriously," *TechRadar*, last updated September 1, 2021, at https://www.techradar.com/news/starfield-really-is-an-xbox-exclusive-no-seriously.

[44] Wolfire Games, LLC, William Herbert, and Daniel Escobar v. Valve Corp., case no. 2:21-cv-00563, April 27, 2021.

[45] EA Play, "EA Play Coming to Microsoft Game Pass Members," accessed on June 15, 2022, at https://www.ea.com/ea-play/news/ea-play-coming-to-xbox-game-pass.

[46] Catherine Gluckstein, "Play Fortnite on iOS, iPadOS, Android Phones and Tablets, and Windows PC with Xbox Cloud Gaming for Free," Microsoft Xbox News, May 5, 2022, at https://news.xbox.com/en-us/2022/05/05/play-fortnite-with-xbox-cloud-gaming-for-free/.

potential effects on the industry that may affect competition in the future or focus exclusively on consumer welfare.

## Publishers and Developers

Among video game publishers in the United States, Microsoft and Activision Blizzard are estimated to have the largest market shares.[47] IBISWorld reports, however, that competition among publishers and developers is high, even though the success of new entrants, particularly among developers, is fairly low.[48] Publishers and developers can face high levels of uncertainty and risk.[49] Furthermore, measuring the market share of Microsoft and Activision Blizzard within the United States may not accurately reflect competition in these markets, given that these companies compete at a global level. Some industry analysts list Tencent, which is headquartered in China, as the largest video game publisher worldwide based on revenue;[50] Microsoft and Activision Blizzard are listed among the top 10, along with Sony, Nintendo, EA, and Take-Two Interactive.[51] Microsoft stated that after its acquisition of Activision Blizzard, it would "become the world's third-largest gaming company by revenue, behind Tencent and Sony."[52]

## Potential Markets

Microsoft's proposed acquisition could provide it with a competitive advantage in markets that may develop. In its initial announcement, Microsoft stated that its acquisition "will provide building blocks for the metaverse."[53] The metaverse currently does not exist; it is a concept of a single, unified virtual system on the internet where users can purchase items, play games, learn, and socialize, shifting how we interact with technology.[54] Key components often include virtual reality (VR) and augmented reality (AR) technologies. Games such as *Fortnite* and *Roblox* have sought to develop the metaverse concept by offering virtual spaces for users to socialize when they are not playing games, such as "hang-out" spaces and virtual concerts.[55]

---

[47] Sean Egan, *Video Game Software Publishing in the U.S.*, IBISWorld, September 2021.

[48] Ibid; and Dan Cook, *Video Game Software Developers*, IBISWorld, May 2021.

[49] Ibid; and Jeff Grubb, "Xbox's Bethesda Acquisition Is Evidence of Blockbuster Gaming's Volatility," *VentureBeat*, September 22, 2020, at https://venturebeat.com/2020/09/22/xboxs-bethesda-acquisition-is-evidence-of-blockbuster-gamings-volatility/.

[50] Khee Hoon Chan, "A Closer Look at Tencent, the World's Biggest Game Company," *Polygon*, March 2, 2022, at https://www.polygon.com/22949530/tencent-the-worlds-biggest-video-game-company; Newzoo, *Global Games Market Report: The VR & Metaverse Edition*, 2021; and Game Dev Insider, "10 Biggest Game Companies of All Time," accessed on June 24, 2022, at https://gamedevinsider.com/10-biggest-game-companies-of-all-time/.

[51] Ibid.

[52] Microsoft News Center, "Microsoft to Acquire Activision Blizzard to Bring the Joy and Community of Gaming to Everyone, Across Every Device," Microsoft, January 18, 2022, at https://news.microsoft.com/2022/01/18/microsoft-to-acquire-activision-blizzard-to-bring-the-joy-and-community-of-gaming-to-everyone-across-every-device/.

[53] Ibid.

[54] Eric Ravenscraft, "What Is the Metaverse, Exactly?," *Wired*, April 25, 2022, at https://www.wired.com/story/what-is-the-metaverse/.

[55] Paul Tassi, "Fortnite's Vision of the Metaverse Feels Like It Has Stalled," *Forbes*, January 21, 2022, at https://www.forbes.com/sites/paultassi/2022/01/21/fortnites-vision-of-the-metaverse-feels-like-it-has-stalled/; Dean Takahashi, "Roblox's Year-End Data Reveals Its Metaverse Advantage," *VentureBeat*, January 26, 2022, at https://venturebeat.com/2022/01/26/roblox-year-end-data-reveals-its-metaverse-advantage/; and Steve Kovach, "Next for the Metaverse: Convincing You It's Not Just for Kids," *CNBC*, December 22, 2021, at https://www.cnbc.com/2021/12/22/here-are-the-companies-building-the-metaverse-meta-roblox-epic.html.

It is unclear whether Microsoft would obtain a significant advantage in developing the metaverse through its proposed acquisition. Although Microsoft has been investing in AR and VR technologies,[56] other firms have been investing in these technologies as well, including Meta Platforms and Alphabet.[57] Activision Blizzard does not offer an interactive game that has led users to socialize in a manner similar to *Fortnite* and *Roblox*, although its studios may be able to develop similar games. It remains uncertain whether companies will be able to successfully develop technologies needed to create the metaverse and how consumers will respond.

## Labor Market Monopsony

Microsoft's acquisition could reduce the number of potential employers in the video game industry. At an FTC forum, an Activision Blizzard employee raised concern that consolidation in the industry could enable firms to hire employees at lower wages than in a competitive market.[58] During its acquisition of ZeniMax, Microsoft reportedly stated that it did not plan on making changes to ZeniMax and that ZeniMax would operate independently following the acquisition.[59] One industry analyst viewed the acquisition as a means to support gaming studios under ZeniMax, which had been struggling financially; according to the analyst, without the acquisition, ZeniMax would have likely faced layoffs and released fewer games.[60] If Microsoft were to utilize a similar approach with Activision Blizzard, allowing it to essentially operate as a separate entity within Microsoft, the acquisition might not significantly affect the labor market for developers. Furthermore, some employees may have skills that would be easily transferrable to firms outside of the video game industry, which could limit Microsoft's ability to control wages. Nevertheless, Microsoft's acquisition would reduce the number of large, established firms in the video game industry, which could provide it with greater negotiating power.

Another concern may be that Microsoft's proposed acquisition could affect ongoing efforts to reach a collective bargaining agreement for Activision Blizzard employees. This concern was raised by an Activision Blizzard employee at an FTC forum and by some Senators in a March 2022 letter to the FTC,[61] which cited Microsoft's dismissal of temporary quality assurance

---

[56] Jennifer Langston, "'You Can Actually Feel Like You're in the Same Place': Microsoft Mesh Powers Shared Experiences in Mixed Reality," Microsoft Innovation Stories, March 2, 2021, at https://news.microsoft.com/innovation-stories/microsoft-mesh/; Nishant Thacker, "Microsoft Mesh – A Technical Overview," Microsoft Mixed Reality Blog, March 2, 2021, at https://techcommunity.microsoft.com/t5/mixed-reality-blog/microsoft-mesh-a-technical-overview/ba-p/2176004.

[57] Casey Newton, "Is Facebook Cornering the VR Market?," *Verge*, June 16, 2021, at https://www.theverge.com/2021/6/16/22537795/is-facebook-cornering-the-vr-market; and Brian X. Chen, "What's All the Hype About the Metaverse?," *New York Times*, January 18, 2022, at https://www.nytimes.com/2022/01/18/technology/personaltech/metaverse-gaming-definition.html.

[58] FTC, "FTC-DOJ Merger Guidelines Listening Forum – Technology," May 12, 2022, at https://www.ftc.gov/media/ftc-doj-merger-guidelines-listening-forum-technology-may-12-2022.

[59] Ryan Browne, "Microsoft Buys Bethesda, Maker of Hit Fallout and The Elder Scrolls Games, in $7.5 Billion Deal," *CNBC*, September 21, 2020, at https://www.cnbc.com/2020/09/21/microsoft-to-buy-zenimax-owner-of-fallout-elder-scrolls-franchises.html.

[60] Jeff Grubb, "Xbox's Bethesda Acquisition Is Evidence of Blockbuster Gaming's Volatility," *VentureBeat*, September 22, 2020, at https://venturebeat.com/2020/09/22/xboxs-bethesda-acquisition-is-evidence-of-blockbuster-gamings-volatility/.

[61] FTC, "FTC-DOJ Merger Guidelines Listening Forum – Technology," May 12, 2022, at https://www.ftc.gov/media/ftc-doj-merger-guidelines-listening-forum-technology-may-12-2022; Rhiannon Bevan, "Activision Blizzard Dev Warns that Microsoft Merger Will Give Bosses 'Even More Power,'" *The Gamer*, May 13, 2022, at https://www.thegamer.com/activision-blizzard-dev-merger-microsoft-ftc-doj-testimony/; and Aaron Mak, "Fun* and Games," *Slate*, February 7, 2022, at https://slate.com/technology/2022/02/activision-raven-union-video-games-testers-

workers two years after they formed a union in 2014.[62] However, on June 13, 2022, Microsoft and the Communications Workers of America—the union that has been assisting Activision Blizzard employees—announced that they had entered a labor neutrality agreement enabling workers "to freely and fairly make a choice about union representation," which would apply beginning 60 days after Microsoft's acquisition is completed.[63] Furthermore, it is unclear whether working conditions would improve if Activision Blizzard were to remain an independent company rather than being acquired by Microsoft.

# Potential Action from Antitrust Enforcers

Some antitrust enforcers are reportedly considering some of the concerns discussed in the previous section, including the potential effect of Microsoft's proposed acquisition on competing gaming subscription services and the market for game developers.[64] In response to the March 2022 letter from some Senators asking the FTC to consider whether the transaction might exacerbate anticompetitive conduct in the labor market,[65] FTC Chair Lina Khan stated that she shares those Senators' concerns about monopsony power in labor markets.[66]

After reviewing the transaction, the FTC may choose to

- allow the acquisition to proceed unchallenged;
- enter a negotiated consent agreement with Microsoft that includes provisions to maintain competition; or
- seek to stop the acquisition by filing suit in federal court.[67]

The FTC and DOJ jointly publish guidelines to outline the principal analytic techniques, practices, and enforcement policies used by the agencies to review mergers;[68] the FTC voted to

---

qa.html.

[62] Letter from Senators Elizabeth Warren, Bernie Sanders, Sheldon Whitehouse, and Cory Booker to FTC Chair Lina Khan, March 31, 2022, at https://www.warren.senate.gov/imo/media/doc/ 2022.03.31%20Letter%20to%20FTC%20re%20Activision%20Microsoft%20Deal.pdf; Josh Eidelson and Hassan Kanu, "Microsoft Bug Testers Unionized. Then They Were Dismissed," *Bloomberg*, August 23, 2018, at https://www.bloomberg.com/news/articles/2018-08-23/microsoft-bug-testers-unionized-then-they-were-dismissed; and Andrew Limbong, "Will Activision Blizzard Workers Unionize? Microsoft's Deal Complicates Things," *NPR*, February 17, 2022, at https://www.npr.org/2022/02/17/1079253973/activision-blizzard-raven-union-microsoft.

[63] Microsoft News Center, "CWA, Microsoft Announce Labor Neutrality Agreement," Microsoft, June 13, 2022, at https://news.microsoft.com/2022/06/13/cwa-microsoft-announce-labor-neutrality-agreement/.

[64] John Sisco and Samuel Stolton, "EU Quizzes Rivals Over Microsoft-Activision Access," *Politico*, July 22, 2022, at https://www.politico.eu/article/eu-regulator-scrutinizing-microsoft-activision-hear-competition-concern/.

[65] Letter from Senators Elizabeth Warren, Bernie Sanders, Sheldon Whitehouse, and Cory Booker to FTC Chair Lina Khan, March 31, 2022.

[66] Letter from FTC Chair Lina Khan to Senator Elizabeth Warren, June 9, 2022.

[67] FTC, "Premerger Notification and the Merger Review Process," accessed on April 29, 2022, at https://www.ftc.gov/ advice-guidance/competition-guidance/guide-antitrust-laws/mergers/premerger-notification-merger-review-process.

[68] The horizontal merger guidelines were published in 2010, available at https://www.ftc.gov/system/files/documents/ public_statements/804291/100819hmg.pdf. The vertical merger guidelines were published in 2020 (available at https://www.ftc.gov/system/files/documents/reports/us-department-justice-federal-trade-commission-vertical-merger-guidelines/vertical_merger_guidelines_6-30-20.pdf), but the FTC voted to withdraw its approval in September 2021 (FTC, "Federal Trade Commission Withdraws Vertical Merger Guidelines and Commentary," September 15, 2021, at https://www.ftc.gov/news-events/news/press-releases/2021/09/federal-trade-commission-withdraws-vertical-merger-guidelines-commentary). For a brief overview of the 2020 vertical merger guidelines, see CRS Legal Sidebar LSB10521, *Antitrust Regulators Release New Vertical Merger Guidelines*, by Jay B. Sykes.

withdraw its approval of the vertical merger guidelines in September 2021.[69] DOJ and the FTC have announced that they are reviewing the horizontal and vertical merger guidelines; their list of specific areas of inquiry include the use of market definition in analyzing competitive effects, threats to potential and nascent competition, and the impact of monopsony power, including in labor markets.[70] The agencies have sought public input, including information on the "unique characteristics of digital markets" and "whether alternative metrics or qualitative factors should also trigger presumptions of competitive harm."[71] Until the updated merger guidelines are released, the standards used by the agencies to examine the potential competitive effects of mergers may be unclear, including the standards used to review Microsoft's proposed acquisition.

In its review of Microsoft's proposed acquisition of Activision Blizzard, the FTC may be considering product markets that currently do not exist but may develop in the future, such as the metaverse. On July 27, 2022, the FTC filed a complaint in federal court to block Meta Platforms' acquisition of Within Unlimited, a software company that develops apps for VR devices. In its complaint, the FTC states that the acquisition "poses a reasonable probability of eliminating both present and future competition ... [a]nd Meta would be one step closer to its ultimate goal of owning the entire 'Metaverse'"[72] While the complaint lists the VR dedicated fitness app and VR fitness app as the relevant antitrust markets, references to the metaverse in the complaint suggest that the FTC may have concerns that Meta Platforms could foreclose competition in the metaverse. The FTC may have similar concerns regarding Microsoft's proposed acquisition.

Over the last two decades, DOJ and the FTC have not contested most proposed mergers and acquisitions.[73] After conducting an investigation, the agencies often enter a consent decree with the merging firms, which typically requires a divestiture to address competition concerns. Some merging parties abandon the transaction when either agency opens an investigation or challenges the merger by filing a complaint in federal court. Recently, for example, Nvidia Corp. abandoned its proposed acquisition of Arm Ltd. after the FTC filed a complaint to challenge it;[74] the FTC Bureau of Competition director stated that the "result is particularly significant because it represents the first abandonment of a litigated vertical merger in many years."[75] Nevertheless, the outcome of a challenged merger may ultimately be decided in the federal courts.[76]

[69] FTC, "Federal Trade Commission Withdraws Vertical Merger Guidelines and Commentary," September 15, 2021, at https://www.ftc.gov/news-events/news/press-releases/2021/09/federal-trade-commission-withdraws-vertical-merger-guidelines-commentary.

[70] FTC, "Federal Trade Commission and Justice Department Seek to Strengthen Enforcement Against Illegal Mergers," January 18, 2022, at https://www.ftc.gov/news-events/news/press-releases/2022/01/federal-trade-commission-justice-department-seek-strengthen-enforcement-against-illegal-mergers; U.S. Department of Justice (DOJ), "Justice Department Issues Statement on the Vertical Merger Guidelines," September 15, 2021, at https://www.justice.gov/opa/pr/justice-department-issues-statement-vertical-merger-guidelines.

[71] Ibid.

[72] FTC v. Meta Platforms Inc., Mark Zuckerberg, and Within Unlimited Inc., case no. 3:22-cv-04325, July 27, 2022.

[73] Since FY2000, more than 1,000 mergers and acquisitions that meet HSR thresholds have been proposed each year except FY2009. In-depth investigations of these transactions, indicated by a second request for additional information, occurred for less than 5% of the transactions. Only a portion of these in-depth investigations resulted in one of the agencies contesting the transaction. See FTC, *Hart-Scott-Rodino Annual Reports*, at https://www.ftc.gov/policy/reports/annual-competition-reports.

[74] FTC, "Statement Regarding Termination of Nvidia Corp.'s Attempted Acquisition of Arm Ltd.," February 14, 2022, at https://www.ftc.gov/news-events/news/press-releases/2022/02/statement-regarding-termination-nvidia-corps-attempted-acquisition-arm-ltd.

[75] Ibid.

[76] For example, in 2017, the DOJ filed a complaint to challenge AT&T's acquisition of Time Warner. The U.S. District Court judge ruled in favor of the merging parties, allowing the merger to be consummated. U.S. v. AT&T Inc.,

# Considerations for Congress

Microsoft's proposed acquisition would be the largest technology industry acquisition to date.[77] Antitrust enforcers may be considering potential harms to competition that could result from the proposed acquisition, in addition to potential benefits to consumers. The FTC may be considering issues that typically have not been raised in merger reviews in recent decades.

Some bills introduced in the 117th Congress are related to mergers and acquisitions. For example, S. 225 and S. 3267 would amend antitrust laws to explicitly prohibit monopsony, requiring antitrust enforcers and courts to consider the effect of proposed mergers on labor markets. H.R. 7101, S. 3847, and S. 1074 would amend antitrust laws to prevent firms of a certain size or share of a defined market from making any acquisitions. If these bills are passed into law, they could affect Microsoft's proposed acquisition if it meets other requirements in the bills, such as the threshold for market share.

Some bills would prohibit specific conduct by certain firms that do not focus on mergers and acquisitions. For example, H.R. 3816 and S. 2992 would prohibit large firms from engaging in specified forms of discriminatory conduct.[78] S. 4201 and H.R. 7858 would create a new federal commission to regulate digital platforms, with additional requirements for systemically important digital platforms. If these bills are passed into law, they likely would not affect Microsoft's proposed acquisition. They may, however, affect Microsoft's future behavior if the acquisition is completed and Microsoft meets the thresholds specified in the bills.

---

DirecTV Group Holdings, LLC, and Time Warner Inc., case no. 1:17-cv-02511, November 20, 2017, at https://www.justice.gov/atr/case-document/file/1012916/download; U.S. v. AT&T Inc., et al., civil case 17-2511 (RJL), June 12, 2018, at https://www.dcd.uscourts.gov/sites/dcd/files/17-2511opinion.pdf.

[77] Ari Levy, "Microsoft sets record for biggest tech deal ever, topping Dell-EMC merger in 2016," *CNBC*, January 18, 2022, at https://www.cnbc.com/2022/01/18/biggest-tech-deal-ever-microsoft-activision-set-69-billion-record.html.

[78] For an overview of this bill and others targeting large online platforms, see CRS Report R46875, *The Big Tech Antitrust Bills*, by Jay B. Sykes.

# Author Information

Clare Y. Cho
Analyst in Industrial Organization and Business

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.