Joseph M. Alioto (State Bar No 42680)
Tatiana V. Wallace (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:      (415) 434-8900
Facsimile:      (415) 434-9200
Email:          jmalioto@aliotolaw.com

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:      (415) 500-6800
Facsimile:      (415) 395-9940
Email:          jsaveri@saverilawfirm.com
                swilliams@saverilawfirm.com
                czirpoli@saverilawfirm.com
                eabuchanan@saverilawfirm.com
                dseidel@saverilawfirm.com

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANTE DEMARTINI, et al., | Case No. 3:22-cv-08991-JSC |
| Plaintiffs, | |
| v. | **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |
| MICROSOFT CORPORATION, a Washington corporation, | |
| Defendant. | |

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ................................................................................1

II.    ARGUMENT ...................................................................................5

     A.    Microsoft's Motion is Premised on a Mischaracterization of the Clayton Act and Ignores Binding Supreme Court Authority ....................................5

     B.    Plaintiffs Have Adequately Alleged That the Merger May Substantially Lessen Competition ..................................................................11

     C.    Plaintiffs' Claim is Ripe ..........................................................16

     D.    Plaintiffs Have Standing ..........................................................20

     E.    Plaintiffs are Entitled to Injunctive Relief ...................................23

III.   CONCLUSION.....................................................................24

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................................................12

5

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ....................................................... *passim*

6

*California v. Am. Stores Co.*, 492 U.S. 1301 (1989) .........................................................21, 22, 24

7

*California v. Am. Stores Co.*, 495 U.S. 271 (1990) ............................................................... *passim*

8

*Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979)..........................................................................6

9

*Cassen Enterprises, Inc. v. Avis Budget Grp., Inc.*, No. 2:10-cv-01934-JCC (W.D.
    Wash. Mar. 11, 2011), Dkt. 39 ...........................................................................................22

10

*City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983))................................................................22

11

*Clapper v. Amnesty Int'l USA*, 568 U. S. 398 (2013) ...................................................................21

12

*Clemens v. ExecuPharm Inc.*, 48 F.4th 146 (3d Cir. 2022) .........................................................20

13

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962) ...................................12

14

*Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992 (9th Cir. 2010) ...........................................11, 14

15

*DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018)....................................15

16

*Erickson v. Pardus*, 551 U.S. 89 (2007) ......................................................................................12

17

*Eurotec Vertical Flight Sols., LLC. v. Safran Helicopter Engines S.A.A.*, No. 3:15-
    CV-3454-S, 2019 WL 3503240 (N.D. Tex. Aug. 1, 2019) ....................................................10

18

*Fed. Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1 ......................................................9, 10

19

*Ford Motor Co. v. United States*, 405 U.S. 562 (1972)...................................................8, 9, 10, 16

20

*Hosp. Corp. of Am. v. F.T.C.*, 807 F.2d 1381 (7th Cir. 1986) ......................................................13

21

*In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420-YGR, 2014 WL
    309192 (N.D. Cal. Jan. 21, 2014) ........................................................................................11

22

*In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009) .............................11

23

*Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 447 (2015) ("Where, ..................................................6

24

*Korea Kumbo Petrochemical v. Flexsys Am. LP*, No. C07-01057 MJJ, 2008 WL
    686834 (N.D. Cal. Mar. 11, 2008) .......................................................................................10

25

26

27

28

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ...................................................................23

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, No. 1:21-cv-00540-AWI-EPG,
    2022 WL 2791201 (E.D. Cal. July 15, 2022) ......................................6, 7, 8, 10

*Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366 (9th Cir. 1988) ...................8

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,* No. 5:16-CV-06370-EJD, 2017
    WL 4310767 (N.D. Cal. Sept. 28, 2017) ............................................................11

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 663 F. Supp. 1360 (D. ...............9

*Rebel Oil, Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421 (9th Cir. 1995)...........8, 11

*S. Austin Coal. Cmty. Council v. SBC Commc'ns Inc.*, 191 F.3d 842 (7th Cir.
    1999) .............................................................................................................18, 19

*Saint Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d
    775, 788 (9th Cir. 2015)...................................................................................8, 12

*Sherwin-Williams Co. v. Dynamic Auto Images, Inc.,* No. SACV 16-1792
    JVS(SSx), 2017 WL 3081822 (C.D. Cal. Mar. 10, 2017) .......................................11

*Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013) ..................................................11

*Spokeo, Inc. v. Robins*, 578 U.S. 330, (2016) ...........................................................21

*Susan B. Anthony List v. Driehaus*, 573 U.S.149 (2014)............................................20

*TransUnion LLC v. Ramirez,* 141 S. Ct. 2190 (2021) ................................................22

*United States v. Aluminum Co. of Am.*, 377 U.S. 271 (1964).......................................7

*United States v. Borden Co.*, 347 U.S. 514 (1954)........................................17, 18, 19

*United States. v. Falstaff Brewing*, 410 U.S. 526 (1973)...........................................16

*United States v. Phil. Nat'l Bank*, 374 U.S. 321 (1963) .........................................8, 13

*United States v. Radio Corp. of Am.*, 358 U.S. 334 (1959) ........................................19

*United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ................................8, 11

*United States v. Von's Grocery Co.*, 384 U.S. 270 (1966) ...............................1, 2, 5, 13

*Zenith Radio Corp., v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969)..................20, 24

**Statutes**

Celler-Kefauver Anti-Merger Act.............................................................2, 6, 9, 13

15 U.S.C. § 18 ............................................................................................... *passim*

15 U.S.C. § 26 ............................................................................................... *passim*

47 U.S.C. § 310 ............................................................................................................. 19

**Other Authorities**

Daniel A. Crane, *Fascism and Monopoly* .................................................................. 2, 3

Tim Wu, *The Curse of Bigness: Antitrust in the New Gilded Age* (2018) ....................................... 3

Timothy Muris, Prepared Remarks, June 10, 2022, available at
   https://www.ftc.gov/news-events/news/speeches/prepared-remarks-0 ..................................... 3

## I.      INTRODUCTION

Plaintiffs allege a single claim under Section 7, seeking to prohibit the proposed acquisition of Activision Blizzard by Microsoft, which if consummated, would be one of the largest technology mergers of all time. Section 7 of the Clayton Act prohibits all mergers that might substantially lessen competition or tend to create a monopoly. 15 U.S.C. § 18. Congress passed Section 7 in 1914, and then strengthened it in 1950, for the express purpose of clamping down on mergers with vigor, and stopping trends in concentration before any lessening of competition or anticompetitive harm occurred. Understanding the unique and powerful mandate that Section 7 provides, Congress also passed Section 16, which provides a private right of action, co-equal with federal regulatory authority, to bring suits just like this one to stop concentration of industry through mergers in its incipiency. 15 U.S.C. § 26. "Private enforcement of the [Clayton] Act was in no sense an afterthought; it was an integral part of the congressional plan for protecting competition." *California v. Am. Stores Co.*, 495 U.S. 271, 275 (1990). Through Section 16, in combination with Section 7's mandate to stop mergers before they are consummated, Congress has provided private plaintiffs, just like the Plaintiffs in this case, with standing to bring these claims, a mandate that such claims are ripe *before* the merger is consummated, and specific authorization to seek injunctive relief—the only form of relief adequate to stop the trend in concentration in is incipiency.

The language of Section 7 is exceptionally broad. It "prohibit[s] corporations under most circumstances from merging." *United States. v. Von's Grocery Co.*, 384 U.S. 270, 275 (1966). This was no accident. The goal of the Clayton Act, and what differentiated it from the Sherman Act, was to prevent the trend in concentration in industries in its incipiency, and prior to any anticompetitive harm. *Id.* 277 ("Congress sought to preserve competition among many small businesses by arresting a trend toward concentration in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies."). The Clayton Act therefore mandates that competition, not combination, is the rule of trade in the United States. It

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

is a policy judgment. And it requires companies to expand through competition, not through merger. As explained in *Brown Shoe*:

> A company's history of expansion through mergers presents a different economic picture than a history of expansion through internal growth. Internal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output. It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small mergers that added to concentration in an industry.

*Brown Shoe Co. v. United States*, 370 U.S. 294, 346 n.72 (1962).

Prior to the adoption of the Clayton Act, Congress was concerned with a wave of concentration throughout the American economy. *See Von's Grocery*, 384 U.S. 270 at 274-75. Congress passed the Clayton Act in order to prohibit mergers that concentrated industry well before it ran afoul of the Sherman Act.[1] After passing the Clayton Act in 1914, Congress again grew concerned as mergers continued to be approved. *Id*. at 275 ("Ingenious businessmen, however, soon found a way to avoid Section 7 . . . and mergers continued to concentrate economic power into fewer and fewer hands until 1950 when congress passed the Celler-Kefauver Anti-Merger Act."). Following World War II, Congress was also keenly aware of the influence that large consolidated economic entities had in the establishment and preservation of foreign autocratic regimes. *See* Daniel A. Crane, *Fascism and Monopoly*, 118 MILR 1315, 1324 (2020). Thus, Congress passed the Celler-Kefauver Anti-Merger Act, amending and strengthening Section 7 of the Clayton Act by "(1) closing the asset "loophole," which had

---

[1] *See* S.Rep. No. 698, 63d Cong., 2d Sess., p. 1: ("Broadly stated, the [Clayton Act], in its treatment of unlawful restraints and monopolies seeks to prohibit and make unlawful certain trade practices which, as a rule, singly and in themselves, are not covered by the act of July 2, 1890 (the Sherman Act), or other existing antitrust acts, and thus, by making these practices illegal, to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation.")

allowed merging firms to escape Section 7's coverage through asset, rather than stock, acquisitions; (2) deleting "acquiring-acquired" language in the original text of Section 7 that could be read to limit Section 7 to horizontal mergers and exclude coverage of vertical and conglomerate mergers; and (3) clarifying that Section 7 reached "incipient" trends toward increasing concentration levels that might threaten competition." *See id.* at 1323–24; *see also Brown Shoe*, 370 U.S. at 314–315.

Yet despite Congress's clear intent, the Executive branch has strayed from the law through adoption of its own merger guidelines.[2] The merger guidelines were adopted by regulatory agencies, dramatically curtailing their ability to stop mergers as Congress intended. The merger guidelines did not "clamp down with vigor on mergers," they clamped down with vigor on the government's power to stop them by self-imposing higher legal and evidentiary burdens. As one prominent antitrust scholar has noted: "Merger control has wandered so far from Congress's expressed intent in 1950 as to make a mockery of the democratic process." Tim Wu, *The Curse of Bigness: Antitrust in the New Gilded Age* (2018). The merger guidelines are in fact agency guidelines without the force of law. In the face of binding Supreme Court authority, they have no relevance to the sufficiency of Plaintiffs' allegations.[3]

Indeed, Microsoft's arguments are at odds with the binding precedent on point. Microsoft asks this court to ignore Supreme Court authority interpreting Section 7. Microsoft asks the Court to apply the wrong standard, relying on cases addressing conspiracy and monopolization claims under Sections 1 and 2 of the *Sherman Act*, and other inapposite caselaw, including those

---

[2] The guidelines reflect the laissez-faire view of Robert Bork, and others. *See* generally Tim Wu, *The Curse of Bigness: Antitrust in the New Gilded Age* (2018) at 88–92, 102–109.

[3] *See, e.g.*, Timothy Muris, Prepared Remarks, June 10, 2022, available at https://www.ftc.gov/news-events/news/speeches/prepared-remarks-0 ("The Guidelines lack the force of law. They formally bind no one—not the courts, not other countries, not even the Department of Justice.").

1  applying the merger guidelines. With respect to Microsoft's standing and ripeness arguments,

2  Microsoft largely repurposes the same arguments it already made when it moved to stay this

3  case. The Court already denied those same arguments. Those arguments are just as misplaced

4  now as they were then. And injunctive relief is not only allowed, but is the only adequate

5  remedy.

6        Plaintiffs' complaint is more than adequate to state a claim under Section 7. Plaintiffs'

7  complaint alleges in detail that Microsoft is one of the largest video game companies in the

8  world, and directly competes with Activision Blizzard, another of the largest game developers

9  and publishers. The two companies compete against each other in the development and

10 publishing of high-end video games, which are played across various gaming platforms.

11 Microsoft and Activision Blizzard, already large video game companies, have both had their own

12 history of mergers and acquisitions—part of a significant trend in consolidation in the video

13 game industry. Plaintiffs' complaint further specifically alleges that Microsoft has a dominant or

14 substantial position across numerous gaming platforms. Microsoft owns the Windows operating

15 system, which accounts for roughly 90% of the PC gaming market. Microsoft is one of only

16 three manufacturers of gaming consoles. And Microsoft also has significant market share in

17 multi-game library subscription services. Microsoft is also in the emerging market of cloud-

18 based gaming, having a significant advantage with its Azure cloud-based services. Plaintiffs

19 allege that Microsoft's merger with Activision Blizzard would allow and incentivize Microsoft to

20 withhold key gaming content from rival game platforms, foreclosing those rivals as well as

21 nascent competitors, from important content, which is the lifeblood of any gaming platform.

22 Plaintiffs' complaint further details how the market already operates under significant network

23 effects and barriers to entry. It also alleges that Microsoft and Activision Blizzard are each one of

24 the largest employers of top game development talent, who directly compete to hire and retain

25 top video game labor talent. Plaintiffs plead with particularity and sufficiency that the proposed

26 merger might substantially lessen competition or tend to create a monopoly. These allegations are

27 more than sufficient. Microsoft's Motion should be denied.

28

## II.    ARGUMENT

The Court should deny Microsoft's motion to dismiss for the following reasons.

### A.    Microsoft's Motion is Premised on a Mischaracterization of the Clayton Act and Ignores Binding Supreme Court Authority

In asking the Court to dismiss Plaintiffs' Section 7 claim, Microsoft ignores almost the entirety of Supreme Court caselaw on Section 7. The only Section 7 Supreme Court case Microsoft cites is *California v. Am. Stores Co.*, 495 U.S. 271 (1990), which, despite Microsoft's arguments otherwise, affirms Plaintiffs' standing and ability to seek injunctive relief, as discussed in Sections D & E below.

Microsoft's omission of all other Supreme Court cases addressing Section 7 is not an accident. The Supreme Court cases interpreting and applying Section 7 all demonstrate that the motion to dismiss should be denied. The Clayton Act is aimed at stopping the trend towards future anticompetitive effects of mergers. In *United States v. Von's Grocery Co.* the court stated:

> The dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic concentration in the American economy. To arrest this 'rising tide' toward concentration into too few hands and to halt the gradual demise of the small businessman, Congress decided to clamp down with vigor on mergers. It both revitalized § 7 of the Clayton Act by 'plugging its loophole' and broadened its scope so as not only to prohibit mergers between competitors, the effect of which 'may be substantially to lessen competition, or to tend to create a monopoly' but to prohibit all mergers having that effect. By using these terms in § 7 which look not merely to the actual present effect of a merger but instead to its effect upon future competition, Congress sought to preserve competition among many small businesses by arresting a trend toward concentration in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies. Thus, where concentration is gaining momentum in a market, [courts] must be alert to carry out Congress' intent to protect competition against ever increasing concentration through mergers.'

384 U.S. 270, 277 (1966). The statutory language is intentionally broad. It prohibits mergers "in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

Microsoft attempts to sweep away the entire corpus of Section 7 Supreme Court caselaw by arguing that they are "decades old." Def's Mot. at 6. Microsoft's argument has no basis in

law. Plaintiffs believe a more appropriate term is "long settled." Moreover, that the Supreme Court cases interpreting Section 7 are from the 1950s, 1960s, and 1970s, in the years after the Celler-Kaufaver Anti-Merger Act was established in 1950, only strengthens the doctrine of *stare decisis* because they (1) were decided shortly after the laws were enacted; (2) Congress did not act to undercut any of the decisions; and (3) they have remained good law. Congress has not amended or modified Section 7 to address any of the intervening Supreme Court cases interpreting the Act. Congress has left Section 7 intact and unchanged just as it was passed in 1950. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 696–97 (1979) ("It is always appropriate to assume that our elected representatives, like other citizens, know the law."). The Supreme Court cases control the decision in this case. *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 447 (2015) ("Where, as here, the precedent interprets a statute, stare decisis carries enhanced force, since critics are free to take their objections to Congress.").

In ignoring Supreme Court authority, Microsoft asks the Court to apply the wrong legal standard. Microsoft's motion mischaracterizes the Clayton Act, confusing Section 7 with the Sherman Act and the horizontal merger guidelines.

Microsoft asserts that for Plaintiffs to plead a claim under Section 7, they must "plead factual allegations showing that 'the defendant owns a dominant share of that market,'" and that "there are significant barriers to entry and that existing competitors lack the capacity to increase their output in the short run." Def's Mot. at 5. This is incorrect. It mistakenly seeks to apply the Sherman Act standards to a Section 7 case. In support, Microsoft cites *Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, No. 1:21-cv-00540-AWI-EPG, 2022 WL 2791201 (E.D. Cal. July 15, 2022). But that case addressed both a Sherman Act Section 1 claim, and a Clayton Act Section 7 claim stemming from anticompetitive conduct including a prior, already consummated merger. The *Netafim* court expressly stated that it was applying the Sherman Act standards to both claims,

because the plaintiff did not oppose that approach. *Id.* at *4 n.6.[4]

But that approach is wrong, and directly contradicted by the Supreme Court cases Microsoft asks this Court to ignore. Applying the Sherman Act standards to a Section 7 Clayton Act case like this one would undo the very purpose of Section 7. Section 7 was expressly amended in 1950 to reach mergers **that did not meet the standards for unlawful conduct set forth in the Sherman Act.** *See, e.g.*, *Brown Shoe*, 370 U.S. at 328–29 ("[T]the legislative history of [Section] 7 indicates clearly that the tests for measuring the legality of any particular economic arrangement under the Clayton Act are to be less stringent than those used in applying the Sherman Act."); *id.* at 323 n.39 (holding the Clayton Act sought to "arrest restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act."); *id.* at 318 ("Congress rejected, as inappropriate to the problem it sought to remedy, the application to [Section] 7 cases of the standards for judging the legality of business combinations adopted by the courts in dealing with cases arising under the Sherman Act."). Congress amended Section 7 to "prevent accretions of power," even those "which 'are individually so minute as to make it difficult to use the Sherman Act test against them.'" *United States v. Aluminum Co. of Am.*, 377 U.S. 271, 280 (1964).

But despite this, Microsoft cites numerous Sherman Act cases in its Motion, and attempts to require Plaintiffs to plead a Sherman Act violation to move forward with their Section 7 claim. That approach fails. Section 7 was expressly amended to ensure that Plaintiffs *would not* have to prove a Sherman Act violation.

Microsoft incorrectly asserts that "Plaintiffs must sufficiently allege barriers to market entry and expansion in each of their product markets." Def's Mot. at 8. Microsoft mistakenly

---

[4] The Court also in footnote 6, on its own without opposition from plaintiff, cited cases purportedly in support of the position that Clayton Act Section 7 claims are analyzed under the identical standards as Sherman Act Sections 1 and 2 claims. But a careful review of the cases cited does not support that proposition because the cited cases, like *Netafim Irrigation* itself, generally concerned cases alleging both Sherman Act and Clayton Act claims against already consummated mergers. The posture—and arguments of plaintiffs—in *Netafim* and its cited cases are thus entirely different than Plaintiffs here. Moreover, the assertion that Section 7 claims are analyzed under the Sherman Act standards is contrary to law.

relies on *United States v. Syufy Enters.*, 903 F.2d 659, 662 n.3 (9th Cir. 1990). *Syufy* was a case brought under Section 2 of the Sherman Act and Section 7 of the Clayton Act.[5]  The portion of the decision that Microsoft relies on involves the standards applicable under Section 2 Microsoft misleadingly quotes from *Syufy*'s discussion of "the ability to exclude competition," a factor applicable to Section 2 of the Sherman Act. *Id* at 664. In fact, the text Microsoft cites is a quotation from *Oahu Gas*, which was a case addressing Section 2 claims only. *See Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 366 (9th Cir. 1988). Microsoft omits the citation to *Oahu Gas*. *See* Def's Mot. at 8.

Microsoft also claims that Plaintiffs' complaint should be dismissed because "Plaintiffs have failed to plead that other competitors in the relevant product markets could not check the alleged anticompetitive consequences . . . after the merger." Def's Mot. at 9 (again citing three Sherman Act cases, *Netafim Irrigation*, *Syufy*, and *Rebel Oil, Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995)). There is no such pleading requirement. This is not an element of Plaintiffs' Section 7 claim. There is no support for this contention in the statute and none is implied by the appliable Supreme Court authority, which requires only that plaintiffs plead facts showing the combination would likely reduce competition. *See, e.g.*, *Brown Shoe,* 370 U.S. at 325; *Ford Motor Co. v. United States*, 405 U.S. 562, 566–67 & n.4 (1972). Consistent with basic pleading principles, Plaintiffs need only plead facts setting forth a prima facie case. *See, e.g.*, *United States v. Phil. Nat'l Bank*, 374 U.S. 321, 363–364 & n.41 (1963) (citing *Brown Shoe*, 370 U.S., at 315). Upon a showing of such facts, the burden will then shift to Defendants to prove the merger will not substantially lessen competition. *Saint Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir. 2015)*.* Whether competitors may or may not fill the competitive void left by this merger is not an element of Plaintiffs' claim.

Microsoft also cites to *Fed. Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C. 2021), for the proposition that Plaintiffs must allege market power. *See* Def's Mot. at 7 ("This

---

[5] *Syufy* was a case that challenged the post consummation effects of a merger. *United States v. Syufy Enters.*, 903 F.2d at 662 n.3).

1    Complaint's claim of market power is much more ill-defined than the complaint in *Facebook*.").

2    But *Facebook* was a Sherman Act section 2 claim. ("[T]he FTC's challenges to Facebook's

3    acquisitions here arise under Section 2 of the Sherman Act, not Section 7 of the Clayton Act."). It

4    was also brought by the FTC and was thus analyzed under the merger guidelines. *Id.* at 18.

5         Microsoft repeats its error. It asserts that "Plaintiffs must make a fact-specific showing

6    that 'the merger will result in a foreclosure of access to sources of supply, a significant increase

7    in concentration in a relevant market, or heightened barriers to entry in either market." Def's

8    Mot. at 10 (quoting *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 663 F. Supp. 1360, 1489

9    (D. Kan. 1987)). First, this is not an accurate statement of the law. The Court in *Reazin* cited

10   generally to *Ford Motor Company v. United States* for this highly specific proposition. *See*

11   *Reazin*, 663 F. Supp. at 1489. But *Ford* imposes no such requirement. *See Ford,* at 562, 566–67.

12        In *Ford*, the Supreme Court addressed a vertical merger between the Ford Motor

13   Company and Electric Autolite, a spark plug manufacturer. The main dispute concerned whether

14   the injunctive relief ordered by the trial court was appropriate, and addressed the nature of the

15   proof of the violation established at the district court. The Court affirmed the trial court's

16   conclusion that the merger's effect "may be substantially to lessen competition." *Id.* First,

17   because Ford had acted as a restraint on the market for spark plugs simply by being "outside"

18   and "near the edge" of the spark plug market. *Id.* at 567. Second, because the merger foreclosed

19   Ford's ability to purchase spark plugs from other manufacturers, which was roughly 10% of the

20   market, and also added barriers to entry. *Id.* The Supreme Court concluded these facts were

21   sufficient to establish a violation. Indeed, as the Supreme Court found, there could be no other

22   interpretation "if the letter and spirit of the Celler-Kefauver Antimerger Act are to be honored."

23   *See Ford*, 405 U.S. at 569 (citing *Phila. Nat'l Bank*, 374 U.S. at 362–63; *United States v. Penn-*

24   *Olin Chemical Co.*, 378 U.S., at 170–71; *Brown Shoe*, 370 U.S. at 311–23). The Court did not

25   conclude the theories of harm were necessary. They were merely sufficient. Nothing in *Ford*

26   made any specific pronouncements about the pleading requirements of Section 7, much less any

27   requirement that Plaintiff must plead effects on supply, market definition or barriers to entry.

28

1    Indeed, consideration of whether the merger may substantially lessen competition is a

2    highly fact specific inquiry, unsuited for resolution on the pleadings. *Brown Shoe* is instructive.

3    As *Brown Shoe* explained, "[t]he primary vice of a vertical merger . . . is that, by foreclosing the

4    competitors of either party from a segment of the market otherwise open to them, the

5    arrangement may act as a 'clog on competition,' . . . which 'deprive(s) rivals of a fair opportunity

6    to compete." *Brown Shoe*, 370 U.S. at 323–24 (citations omitted). Such effects depend on the

7    facts of the particular case. In cases in which "the foreclosure is neither of monopoly nor de

8    minimis proportions, the percentage of the market foreclosed by the vertical arrangement cannot

9    itself be decisive." *Id*. at 329. In these cases, "it becomes necessary to undertake an examination

10   of various economic and historical factors in order to determine whether the arrangement under

11   review is of the type Congress sought to proscribe." *Id*. "A most important such factor to

12   examine is the very nature and purpose of the arrangement." *Id*.

13   Microsoft makes the puzzling assertion that Plaintiffs' allegations regarding the likely

14   effect of the merger run afoul of Rule 12 because they are "speculative." *See* Def's Mot. at 10–

15   11. This makes no sense. Section 7 outlaws mergers that "may" substantially lessen competition.

16   "[T]he very wording of [Section 7] requires a prognosis of the probable future effect of the

17   merger." *Brown Shoe*, 370 U.S. at 332. Section 7 aims to prohibit mergers *before* they occur, and

18   before the trend in concentration raises antitrust concerns.[6] *See Brown Shoe*, 370 U.S. at 323

19   ("Congress used the words 'may be substantially to lessen competition' . . . to indicate that its

20

21   [6]Microsoft's citations include numerous cases that either did not concern Section 7 at all, or
     concerned situations in which the merger had already occurred—thus providing for direct

22   evidence of the effects of the merger, and usually Sherman Act claims too. For example, in
     Section A of Defendant's Motion, Defendants cite to the following cases, which either did not

23   concern Section 7 at all, or concerned claims addressing already consummated mergers: *Netafim*

24   *Irrigation*, 2022 WL 2791201; *Korea Kumbo Petrochemical v. Flexsys Am. LP*, 2008 WL 686834
     (N.D. Cal. Mar. 11, 2008); *Fed. Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1 (D.D.C.

25   2021); *Eurotec Vertical Flight Sols., LLC. v. Safran Helicopter Engines S.A.A.*, 2019 WL
     3503240 (N.D. Tex. Aug. 1, 2019); *Sherwin-Williams Co. v. Dynamic Auto Images, Inc*., 2017

26   WL 3081822 (C.D. Cal. Mar. 10, 2017); *Syufy Enters.*, 903 F.2d 659; *Optronic Techs., Inc. v.*

27   *Ningbo Sunny Elec. Co.,* 2017 WL 4310767 (N.D. Cal. Sept. 28, 2017); *Rebel Oil Co. v. Atl.*
     *Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995).

28

1  concern was with probabilities, not certainties."). By definition, Section 7 addresses "ephemeral

2  possibilities." *Id.*

3       Nonetheless, Plaintiffs' complaint is replete with well pleaded assertions of fact which

4  describe the market structure, market conditions, and the likely, if not certain effects of the

5  merger, were it allowed to proceed. *See* Section B below. Even at trial on the merits, Plaintiffs

6  only need to establish a "reasonable probability" that the merger would, if consummated, lessen

7  competition in any relevant market. *Brown Shoe*, 370 U.S. at 325 ("[I]f there is a reasonable

8  probability that the merger will substantially lessen competition . . . the merger is proscribed.").

9       **B.     Plaintiffs Have Adequately Alleged That the Merger May Substantially
                  Lessen Competition**

10

11       To survive a motion to dismiss, a "complaint must contain sufficient factual material,

12  accepted as true, to 'state a claim to relief that is plausible on its face.'" *In re Lithium Ion*

13  *Batteries Antitrust Litig.*, No. 13-MD-2420-YGR, 2014 WL 309192, at *9 (N.D. Cal. Jan. 21,

14  2014) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The statements alleged in

15  the complaint must provide "the defendant[s] fair notice of what . . . the claim is and the grounds

16  upon which it rests." *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1141 (N.D. Cal.

17  2009) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). Dismissal under Rule 12(b)(6) is

18  appropriate only "when the complaint either (1) lacks a cognizable legal theory or (2) fails to

19  allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953,

20  959 (9th Cir. 2013). All of a plaintiff's well-pleaded allegations of material fact are taken as true

21  and construed in the light most favorable to the plaintiff. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629

22  F.3d 992, 998 (9th Cir. 2010).

23       Microsoft's attacks on particular aspects of Plaintiffs' complaint fail. Even under the

24  Sherman Act, a higher bar than Section 7, Rule 12(b)(6) only requires that Plaintiffs make out a

25  plausible claim that defendants conspired to restrain trade—*i.e.*, enough facts "to raise a

26  reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550

27  U.S. at 556. Plaintiffs are not required to demonstrate that their claim is probable. *Id.*; *see also*

28  *Erickson*, 551 U.S. at 93 (a complaint "need only give the defendant fair notice of what the . . .

1    claim is and the grounds upon which it rests") (internal quotation marks and citations omitted).

2    The allegations should be evaluated holistically, not piecemeal. *See Cont'l Ore Co. v. Union*

3    *Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("[T]he character and effect of a conspiracy

4    are not to be judged by dismembering it and viewing its separate parts, but only by looking at it

5    as a whole.").

6          Plaintiffs allege a single Section 7 claim. Compl. at ¶¶ 212–333. The Complaint alleges

7    more than sufficient particularized facts, which, when taken as true, state a plausible claim that

8    the merger "may substantially lessen competition, or tend to create a monopoly." 15 U.S.C. 18.

9    That is all that is required. *Saint Alphonsus*, 778 F.3d 775, at 788; *see Twombly*, 550 U.S. 544,

10   570 (2007). So long as Plaintiffs have made out a plausible claim under Section 7, Plaintiffs'

11   singular cause of action must survive the motion to dismiss.[7]

12         Plaintiffs' complaint adequately alleges a plausible Section 7 claim in numerous ways.

13   Plaintiffs complaint alleges that Microsoft and Activision are direct horizontal competitors with

14   respect to video games. As Plaintiffs specifically allege, they are major competitors with respect

15   to game development, game publishing, and game distribution. Compl. at ¶¶ 252, 258, 262, 267.

16   Thus, Microsoft's acquisition of Activision may substantially lessen competition because it will

17   eliminate the direct competition between Activision and Microsoft. *See* Compl. at ¶¶ 257, 261,

18   266, 275; Pls' Mot. for Prelim. Inj. (ECF No. 4) at 5. Under Section 7, the elimination of a rival

19   is enough. *See Hosp. Corp. of Am. v. F.T.C.*, 807 F.2d 1381, 1385 (7th Cir. 1986) (the Supreme

20   Court cases interpreting Section 7 "establish the illegality of any nontrivial acquisition of a

21   competitor, whether or not the acquisition was likely either to bring about or shore up collusive

22   or oligopoly pricing. . . . None of these decisions has been overruled."). "The elimination of a

23   significant rival was thought by itself to infringe the complex of social and economic values

24   conceived by a majority of the Court to inform the statutory words 'may . . . substantially . . .

25

26   [7] Here, more than in other cases, the evidence that will support Plaintiffs' claims is almost
     entirely in the hands of Microsoft and Activision and is not publicly available. Microsoft has
     asserted that much of the relevant discovery in this case, including the documents it produced to
27   the FTC, "is among the most competitively and commercially sensitive information in
     Microsoft's possession." ECF No. 53 at 3. It is therefore not publicly available.

28

1  lessen competition.'" *Id*. As Plaintiffs allege, Activision is a significant rival of Microsoft. *See*

2  Compl. at ¶¶ 257, 261, 266, 275.

3         Further, Plaintiffs allege specific market shares of the two rivals. Plaintiffs allege that

4  Microsoft has roughly 24% of the video game publishing market, and Activision has roughly

5  10%. Compl. at ¶¶ 269-70; Pls' Mot. for Prelim. Inj. (ECF No. 4) at 14–15. The merger of firms

6  with such market shares is also sufficient, without more, to show that the merger may result in

7  market concentration and substantially lessen competition. *See Phil. Nat'l Bank*, 374 U.S. at 364

8  & n.41 ("Without attempting to specify the smallest market share which would still be

9  considered to threaten undue concentration, we are clear that 30% presents that threat. . . ").

10  Indeed, such facts are sufficient to show "prima facie unlawfulness" under Section 7. *Id.* In

11  addition, Plaintiffs allege that the video game industry has experienced a substantial trend in

12  concentration. Compl. at ¶¶ 61–64, 219-223. This is precisely what Congress wished to prevent.

13  The Cellar-Kefauver Anti-Merger Act sought to "clamp down with vigor on mergers" and to stop

14  any "trend toward concentration in its incipiency *before* that trend developed to the point that a

15  market was left in the grip of a few big companies." *Von's Grocery*, 384 U.S. at 276–77

16  (emphasis added).

17         Further, the complaint sets forth in copious detail the various product markets on which

18  video game content is played. Compl. at ¶¶ 134–143 (Consoles); Compl. at ¶¶ 144–154 (PC);

19  Compl. at ¶¶ 196–203 (cloud-based). The complaint describes in detail the high network effects

20  and barriers to entry. Compl. at ¶¶ 231–251. Plaintiffs further allege that Microsoft has a

21  substantial market share of multi-game library subscription services. Compl. at ¶¶ 46–47.

22  Plaintiffs allege that Microsoft's control over a significant portion of Triple-A games or gaming

23  content generally, will allow Microsoft to harm competition by foreclosing competitors and

24  competition by making its gaming content exclusive or partially exclusive to its own platforms.

25  Compl. at ¶¶ 280-331; Pls' Mot. for Prelim. Inj. (ECF No. 4) at 18. These facts are sufficient to

26  infer—indeed to show—foreclosure from several aspects of the video gaming market. *See Brown*

27  *Shoe*, 370 U.S. at 323–24 (Noting the anticompetitive effects of mergers which foreclose

28

1    "competitors of either party from a segment of the market otherwise open to them, the

2    arrangement may act as a 'clog on competition,' . . . which 'deprive(s) rivals of a fair opportunity

3    to compete."). These well pleaded allegations are also more than sufficient to withstand a motion

4    to dismiss.

5         Microsoft has no real answer to these allegations. Microsoft largely attempts to dispute

6    several of the allegations factually, but these efforts fail. Microsoft argues that "Plaintiffs have

7    alleged no facts beyond conclusory and speculative assertions that Microsoft could disrupt

8    current market practices—and go back on its word—to stop games from being available across

9    multiple platforms." Def's Mot. at 10. For starters, under 12(b)(6), the allegations in the

10   complaint are taken as true, and all inferences are made in Plaintiffs' favor. *Daniels-Hall*, 629

11   F.3d at 998. Microsoft's argument boils down to its assertion that Microsoft would never "go

12   back on its word," and therefore, Plaintiffs' claims are factually impossible. Def's Mot. at 10.

13   Such an argument is impermissible at this stage. Moreover, Plaintiffs have alleged factual

14   contentions that specifically cut against Microsoft's "we-promise-not-to" argument. Plaintiffs'

15   complaint specifically alleges that in March, 2021, when Microsoft purchased ZeniMax Media,

16   owner of numerous game development and publishing studios, including Bethesda Softworks,

17   Microsoft assured the European Commission that "Microsoft would not have the incentive to

18   cease or limit making ZeniMax games available for purchase on rival consoles." Compl. at ¶

19   302; Pls' Mot. for Prelim. Inj. (ECF No. 4) at 20 & n.7 at ¶¶ (107), (114). Microsoft then

20   discarded that representation, and has since confirmed that certain highly anticipated games

21   being developed by ZeniMax and Bethesda will be Microsoft exclusives. *See* Compl. at ¶ 303–

22   04; Pls' Mot. for Prelim. Inj. (ECF No. 4) at 20 & n.8.

23        Microsoft cites to *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018),

24   arguing that any allegations based on "post-transaction business practices," are "classic

25   speculative conclusion" and warrant dismissal. Def's Mot. at 10–11. But *DeHoog* is

26   distinguishable. In Dehoog, Plaintiffs challenged Anheuser-Busch InBev, SA/NV ("ABI") from

27   acquiring SABMiller, plc ("SAB"). As a condition of approving the transaction, the DOJ

28

1   required SAB to divest entirely its MillerCoors domestic beer business. Another company,

2   Molson, purchased MillerCoors. Plaintiffs claimed nonetheless that Molson was likely to act

3   anticompetitively itself, based on the actions of different companies, even though it was not party

4   to the merger. *See DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 761–62 (9th Cir.

5   2018). But here, plaintiffs are not challenging the conduct—now or in the future—of any market

6   participants not party to the deal. Plaintiffs' allegations focus directly on the role of Microsoft

7   and Activision, their conduct to date, and the competition that will likely be reduced if the two

8   combine, rather than compete, as they now do. *See Brown Shoe*, 370 U.S. at 332–33 ("[B]ecause

9   these trends are not the product of accident but are rather the result of deliberate policies of [the

10  Defendant] and other leading shoe manufacturers, account must be taken of these facts in order

11  to predict the probable future consequences of this merger.").

12      Also, Plaintiffs allege facts plausibly suggesting that the merger may substantially lessen

13  competition in the labor market for game content creators and publishers. *See, e.g.*, Pls' Mot. for

14  Prelim. Inj. at 21–22. Plaintiffs allege that the labor talent to design, develop, and publish video

15  games is highly technical and specialized. Compl. at ¶¶ 225, 277. Plaintiffs allege that there are a

16  limited number of large employers, including Microsoft and Activision, that hire this labor talent.

17  Compl. ¶¶ 225, 228–29. Plaintiffs allege that Microsoft and Activision horizontally compete for

18  the same labor talent. Compl. at ¶¶ 228, 278. The loss of competition in the labor market has the

19  potential to further limit employees' negotiating power and ability to change employers for

20  improved working environments and compensation. Compl. at ¶¶ 224–229.

21      Plaintiffs further allege that the merger may harm competition by eliminating Activision

22  Blizzard as a nascent competitor.  As Plaintiffs allege, Activision is a likely viable entrant into

23  video game markets in which it currently does not compete, such as in gaming platforms or

24  subscription services. *See* Compl. at ¶¶ 307, 317. This is also sufficient to state a claim under

25  Section 7. *See United States. v. Falstaff Brewing*, 410 U.S. 526, 532–33 (1973) (reversing lower

26  court decision on the ground that it "failed to give separate consideration to whether" one of the

27  merging parties "was a potential competitor in the sense that it was so positioned on the edge of

28

1   the market that it exerted beneficial influence on competitive conditions in that market."); *Ford*,

2   405 U.S. at 569 (upholding decision that merger might substantially lessen competition because

3   merger eliminated Ford's position as a "deterrent to current competitors" while it remained

4   outside and on the edge of the market).

5        **C.**    **Plaintiffs' Claim is Ripe**

6        Having failed to stay the case, Microsoft now asks the Court to throw it out for the same

7   reasons. Microsoft's argument that Plaintiffs' claims are not ripe rehashes almost verbatim the

8   argument it made when it sought a stay, ECF No. 26. *Compare* Def's Mot at 12 (quoting *South*

9   *Austin*, 191 F.3d 842 (7th Cir. 1999)) *with* ECF No. 26 at 9 (same). Now, however, Microsoft

10   seeks an even more draconian remedy, asking the Court to dismiss Plaintiffs' claims entirely.

11        Just as it does now, Microsoft argued in its motion to stay that (1) Plaintiffs would not be

12   harmed by a stay (now dismissal) because Microsoft allegedly cannot immediately consummate

13   the merger pending regulatory action; and (2) that Microsoft would be harmed by burdensome

14   discovery without a stay (now dismissal). *Compare* Def's Mot. at 14 *with* ECF No. 26 at 5–8.

15   The Court found that argument wanting then. Nothing has changed.[8]

16        Microsoft's argument continues to suffer from basic logical and legal flaws. First, there is

17   no dispute that Section 7 provides Plaintiffs the right to challenge this merger *before it goes into*

18   *effect*. There is likewise no dispute that the civil remedies afforded under Section 7 may proceed

19   autonomously from regulatory proceedings. *United States v. Borden Co.*, 347 U.S. 514, 519

20   (1954). It is beyond dispute that Microsoft has executed a binding agreement to acquire

21   Activision. It maintains its intention to consummate the merger and has only recently

22   confirmed—by stipulation in this case—that it will delay closing until May 1, allowing this

23   action to proceed without the need for immediate injunctive relief and with the benefit of a more

24

25   ────────────────────

26   [8] Microsoft's identical argument on ripeness should be summarily denied on law of the case grounds. *Arizona v. California*, 460 U.S. 605, 618 (1983) ("[T]he [law of the case] doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the

27   same issues in subsequent stages in the same case.").

28

1   well-developed factual record.

2       Microsoft's tenuous argument that Plaintiffs claims are not ripe until the exact moment

3   that Microsoft is able to close its merger is absurd. It turns the statutory scheme on its head.

4   Section 7 is specifically aimed at stopping mergers *before they occur*. *See, e.g.*, *du Pont de*

5   *Nemours & Co.*, 353 U.S., at 597 (Section 7 seeks "to arrest the creation of trusts, conspiracies,

6   and monopolies in their incipiency and before consummation). Under Section 7, mergers that

7   "might" substantially lessen competition are unlawful, not just mergers shown to have already

8   lessened competition. 15 U.S.C. § 18. Similarly, Section 16 provides for a right of action to any

9   Plaintiffs threatened with loss or damage, not just Plaintiffs that have already suffered harm. 15

10  U.S.C. § 26. Section 7 curbs trends in concentration in their incipiency. *Brown Shoe*, 370 U.S. at

11  346. As the Supreme Court has held: "'Incipiency' in this context denotes not the time the stock

12  was acquired, but any time when the acquisition threatens to ripen into a prohibited effect. . . . To

13  accomplish the congressional aim, the Government may proceed at any time that an acquisition

14  may be said with reasonable probability to contain a threat that it may lead to a restraint of

15  commerce or tend to create a monopoly of a line of commerce." *du Pont*, 353 U.S. at 597. And,

16  as Plaintiffs have pointed out, there is considerable merit to addressing mergers before they are

17  consummated, rather than trying to "unscramble the egg," after irreparable harm is done.

18      Second, Microsoft's assertion that it cannot consummate the merger until it "obtain[s]

19  approvals to close the transaction" is not supported by the record. Def's Mot. at 12; *see also* ECF

20  No. 26 at 2–3 (seeking stay pending completion of regulatory review that allegedly prevents

21  Microsoft from closing transaction). When Microsoft made this same argument before, Plaintiffs

22  pointed out that Microsoft provided no basis (or even citation) to support the assertion that the

23  regulatory proceedings in fact precluded Microsoft from closing the merger. *See* ECF No. 30 at

24  13–14. The only statutory limitation, the Hart-Scott-Rodino Act's statutory waiting period, has

25  passed. *See* 15 U.S.C. §18a (e). There is no dispute that the pendency of the FTC action does not

26  preclude Microsoft from merging. In order to do so, the FTC would have had to seek—and

27  obtain—injunctive relief. It has not done so. Likewise, Microsoft presents the Court with no

28

PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

1   legal basis (or even citation) for the novel assertion that the foreign regulatory proceedings

2   prohibit Microsoft from merging.[9] Plaintiffs demonstrated the paucity of these arguments before.

3   Microsoft has no answer to them now, merely repeating the same failed arguments from before,

4   and yet again failing to support them.

5          Third, Microsoft's primary authority for its position that these claims are not ripe is the

6   same Seventh Circuit case Microsoft previously cited in its motion to stay. *See* Def's Mot at 12

7   (citing *South Austin*, 191 F.3d 842). But that case is both distinguishable and mistaken. *South*

8   *Austin*'s conclusion that private plaintiffs' claims could not proceed until after all regulatory

9   review and proceedings were concluded failed to reconcile or even acknowledge the Supreme

10  Court's pronouncements that private actions are an integral and co-equal part of the

11  Congressional scheme to enforce the antitrust laws, *California v. Am. Stores,* 495 U.S. at 275, or

12  that private and government actions "may proceed simultaneously or in disregard of each other."

13  *Borden*, 347 U.S. at 519. *South Austin* further failed to consider the practical reality that by

14  holding the claims unripe until the merging parties could consummate the merger, the plaintiffs

15  would be unable to stop the merger before its consummation—the very premise of Section 7.

16  *South Austin* is also readily distinguishable, because (a) the plaintiffs in that case essentially

17  acquiesced to dismissal so long as they would not be subsequently barred by laches; and (b) the

18  merger concerned utilities companies under the jurisdiction of the Federal Communications

19  Commission (FCC), among companies already under a consent decree. *South Austin*, 191 F.3d

20  842. There are significantly more statutory restrictions and FCC authority over

21  telecommunications utilities than the FTC has over general corporate mergers. *See, e.g.*, *United*

22  *States v. Radio Corp. of Am.*, 358 U.S. 334, 336 (1959); 47 U.S.C. § 310.

23         Fourth, Microsoft argues that the "final terms of this transaction are [not] known." Def's

24  Mot. at 14. This assertion is puzzling. The agreement is final. Both the Plaintiffs here and the FTC

25  challenge the identical executed merger agreement. Microsoft has filed with this Court the

26

27  ───────────────────────

28  [9] Nor is there any authority for the proposition that Section 7 is preempted by regulatory
    proceedings outside the United States.

1    executed agreement, signed by both Microsoft and Activision. *See* Decl. of R. Kilaru, ECF No.

2    26-1 ("Attached as Exhibit H is a true and correct copy of the Executed Agreement."). This is the

3    same agreement requiring HSR disclosure and the reason for the FTC proceedings. Indeed the

4    fact of the agreement gives rise to the regulatory proceedings in the first place. Moreover, the

5    agreement by its terms specifically allows the parties to close the transaction anytime they wish.

6    *See id.* at 21 ("The consummation of the Merger will take place at a closing (the "Closing") to

7    occur at . . . . such other time, location and date as Parent, Merger Sub and the Company

8    mutually agree in writing."). Plaintiffs' civil action is no less ripe than the FTC's action.

9         Fifth, as addressed in Plaintiffs' opposition to Microsoft's motion to stay, the Supreme

10   Court has already ruled that private plaintiffs' actions and governmental actions challenging the

11   identical merger and seeking the identical relief "may proceed simultaneously or in disregard of

12   each other." *Borden*, 347 U.S. at 519. That makes sense because Congress enshrined coequal

13   enforcement between private plaintiffs and governmental action. Congress could have made the

14   federal regulatory interest preeminent, occupying the field, or so dominant that it leaves no room

15   for private enforcement. It did not do so, and in fact, did the contrary. *See California v. Am.*

16   *Stores Co.*, 495 U.S. 271, 275 (1990) ("Private enforcement of the [Clayton] Act was in no sense

17   an afterthought; it was an integral part of the congressional plan for protecting competition.").

18   That the FTC is proceeding simultaneously with Plaintiffs here is no basis to hold the claims are

19   not ripe. *Borden*, 347 U.S. at 519; *see also* ECF No. 30 at 7–8.

20        Sixth, Microsoft further argues that Plaintiffs' claims should be dismissed on ripeness

21   grounds because Microsoft will have to engage in discovery. Def's Mot. at 14. This too has

22   already been briefed and ruled on by the Court. *See* ECF 30 at 16–18. Defendant's discovery

23   burdens are no basis to hold a claim is unripe. Microsoft's alleged discovery burdens are also

24   greatly exaggerated. *See* ECF 30 at 12–18. The Court has the power to manage discovery

25   consistent with the Federal Rules of Civil Procedure and sound principles of case management,

26   and has already exercised its power to do so.

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**D.      Plaintiffs Have Standing**

Microsoft asserts Plaintiffs have no standing to assert claims under Section 7. Microsoft first argues that Plaintiffs' threat of injury is too "hypothetical," because the merger is "pending regulatory approval. . . ." Def's Mot. at 15. This is the same argument that the claims are not ripe (*supra* Section C), and that Section 7 affords no remedy because the merger has not yet closed (*infra* Section E). It fares no better as a standing argument.

None of Defendants' cited cases on standing addressed Section 16 of the Clayton Act. The Supreme Court directly addressed this issue in *Zenith Radio Corp., v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969). Under *Zenith*, a Section 16 plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws" in order to establish Article III standing. *Id.* ("[Section] 16 of the Clayton Act, 15 U.S.C. s 26, which was enacted by the Congress to make available equitable remedies previously denied private parties, invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of 'threatened injury . . . . That remedy is characteristically available even though the plaintiffs has not yet suffered actual injury, he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws.")(citations omitted); *see also Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 153 (3d Cir. 2022) (rejecting a rule that "would require plaintiffs to wait until they had sustained an actual injury to bring suit" as "[t]his would directly contravene the Supreme Court's holding in *Susan B. Anthony List*, which authorizes suits based on a 'substantial risk' that the harm will occur.") (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S.149, 158 (2014)).

The threat to Plaintiffs is significant and impending. The merger agreement is executed, and other than Microsoft's stipulation in this case, there does not appear to be any legal impediment to closing the merger. *See supra* Section C. Nor would it matter if there were, because Plaintiffs must be entitled to bring their Section 7 claims *before* the merger is consummated. *See du Pont*, 353 U.S. at 597; *see supra* Section C. If Plaintiffs lacked standing until the point at which Microsoft could close the merger, Microsoft would as a practical matter

be free to do so before Plaintiffs' claims were heard. Moreover, Plaintiffs have standing now because they are threatened with the loss or damage from reduced competition that might arise if the merger is allowed to proceed and may pursue injunctive relief to prevent that harm. 15 U.S.C. § 26; *California v. Am. Stores Co.*, 492 U.S. 1301, 1304 (1989) (lessening of competition "is precisely the kind of irreparable injury that injunctive relief under section 16 of the Clayton Act was intended to prevent"). It is a bedrock principal that a plaintiff threatened with irreparable harm must be able to bring suit in time to prevent the irreparable harm from occurring.

Plaintiffs have sufficiently alleged facts to establish standing under Article III because they are threatened with concrete impending injury if the merger is not enjoined. Plaintiffs risk substantial harm because the merger may likely substantially reduce competition in the video game industry. As the Supreme Court noted in *Spokeo*, "the risk of real harm" (or as the Court otherwise stated, a "material risk of harm") is sufficient to "satisfy the requirement of concreteness." 578 U. S. at 341–342 (citing *Clapper v. Amnesty Int'l USA*, 568 U. S. 398 (2013)).[10] Here, as noted above, the merger, one of the largest in history, and effecting wide swaths of commerce in the United States, is set to close soon.

Microsoft's reliance on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) is misplaced. Although Microsoft contends that *Clapper* requires "[p]rivate plaintiffs under the Clayton Antitrust Act" to show a threat of injury that is "certainly impending," Def's Mot. at 15, *Clapper* did not address the Clayton Act at all. It addressed a private plaintiffs' claim that Section 702 of the Foreign Intelligence Surveillance Act of 1978, 50 U. S.C. §1881a, which permitted surveillance of persons outside the United States, was unconstitutional. In that case, the plaintiffs alleged they had standing because their communications might, at some point in the future, be surveilled. *Id.* The Court held they lacked standing because their threatened harm was too hypothetical and there was no evidence plaintiffs had in fact been surveilled. *Id.* Here on the other hand, Microsoft has executed a merger agreement and is either able to close right now

---

[10] Plaintiffs seek claims for injunctive relief under Section 16 of the Clayton Act. They do not seek damages under Section 4 of the Clayton Act.

1  (other than the stipulation it agreed to in this case), or as soon as the regulatory actions are

2  concluded, which could come anytime. *See* ECF No. 30 at 14 ("As stated in Exhibit G, the CMA

3  "aims to complete [its] inquiry as soon as possible and in advance of [April 26, 2023].").

4  Moreover, as the Supreme Court recently confirmed in *TransUnion LLC v. Ramirez*, "a person

5  exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the

6  harm from occurring, at least so long as the risk of harm is sufficiently imminent and

7  substantial." 141 S. Ct. 2190, 2210 (2021) (citing *Clapper*, 568 U. S. at 414, n. 5; City of *Los*

8  *Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).

9          Defendants' citation to *Cassen Enters.* is equally off-base. That case concerned a situation

10  where private plaintiffs challenged a merger during the pendency of the Hart-Scott-Rodino-Act

11  waiting period, during which the merger was statutorily prohibited from closing. *See Cassen*

12  *Enterprises, Inc. v. Avis Budget Grp., Inc.*, No. 2:10-cv-01934-JCC (W.D. Wash. Mar. 11, 2011),

13  Dkt. 39. In contrast here, the HSR waiting period has expired. *See supra* Section C. Microsoft's

14  agreement in this case to postpone the merger's close until at least May 1 cannot render the harm

15  insufficiently imminent or unsubstantial to eliminate Plaintiffs' standing. Had Plaintiffs not

16  brought this suit and achieved the stipulation, Microsoft may have already closed the merger.

17  Plaintiffs are certainly threatened with irreparable harm sufficient to confer standing here.

18          Microsoft next argues that Plaintiffs lack the standing required to argue that Microsoft's

19  merger may substantially lessen competition in the labor market. As discussed above, Plaintiffs

20  have standing to assert their Section 7 claim. Thus, they may pursue the theories and evidence in

21  support of that claim. Microsoft cites no case for the proposition that a Plaintiff must have

22  independent standing or exposure to each aspect of commerce or competition likely reduced as a

23  result of the merger. The only case Microsoft cites, *Kowalski v. Tesmer*, 543 U.S. 125 (2004), is

24  inapplicable here. It addressed whether attorneys had standing to pursue claims on behalf of

25  hypothetical future clients. That issue is not present here. Plaintiffs are pursuing a single Section

26  7 claim on behalf of themselves. One of their arguments in support of their claim is that the

27  merger may lessen competition in the labor market.

28

1    When Section 7 was amended in 1950, part of the amendment was to ensure that the Act

2    applied not only to mergers between competitors, "but also to vertical and conglomerate mergers

3    whose effect may tend to lessen competition in any line of commerce in any section of the

4    country." *Brown*, 370 U.S. at 317. Massive mergers like this one may impact competition across

5    numerous markets, products, and emerging technologies. Nothing in the Act suggests that a

6    plaintiff suing to stop the merger must have a direct connection to each of the numerous products

7    or markets that may be impacted. As stated under Section 16 of the Act, any person "shall be

8    entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation

9    of the antitrust laws." 15 U.S.C. § 26.

10    Moreover, even if Plaintiffs are not video game developers, that does not mean they are

11    not threatened by reduced competition in the labor market in the video game industry. Lessening

12    of competition within the labor market impacts the video game industry and video game

13    consumers.

14    **E.     Plaintiffs are Entitled to Injunctive Relief**

15    Microsoft's last ditch effort to deny Plaintiffs the relief afforded them by Section 7 is to

16    argue that the availability of monetary relief precludes injunctive relief. This assertion is at odds

17    with Section 7 and 16. No court has so held. Section 16 of the Clayton Act specifically permits

18    and allows for injunctive relief. *See* 15 U.S.C.A. § 26; *see also California v. Am. Stores*. 495 U.S.

19    at 275 ("the literal text of § 16 is plainly sufficient to authorize injunctive relief, including an

20    order of divestiture, that will prohibit the conduct from causing that harm."). The statute nowhere

21    provides this as an alternative as a substitute for monetary relief or in its absence.

22    Microsoft falls back on "traditional principles of equity," for the proposition that

23    Plaintiffs cannot pursue injunctive relief because seeking "monetary damages," is an "adequate

24    remedy of law." Def's Mot. at 16. This is incorrect both in fact and as a matter of law. The

25    Clayton Act specifically authorizes that injunctive relief is available for threatened antitrust

26    injury. *See* 15 U.S.C. 26, *see, e.g*., *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100,

27    130 (1969) ("[Section 16] was enacted by the Congress to make available equitable remedies

28

previously denied private parties, [and] invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of 'threatened' injury. That remedy is characteristically available even though the plaintiff has not yet suffered actual injury."). Further, the Clayton Act was designed to allow for both damages and injunctive relief so as to further the enforcement of the antitrust laws. *Id*. at 130 ("the purpose of granting private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws.") (citing *Borden*, 347 U.S. at 518). Moreover, as shown above, there are strong reasons to prefer injunctive relief to prevent the merger instead of damages or other post-merger relief. In addition, Plaintiffs are not seeking damages under Section 4 of the Clayton Act.

Moreover, Plaintiffs have alleged they would be irreparably harmed by the lessening of competition from the merger. *See* Pls' Mot. for Prelim. Inj. (ECF No. 4). Irreparable harm means damages would not suffice. *California v. Am. Stores Co.*, 492 U.S. at 1304 (lessening of competition "is precisely the kind of irreparable injury that injunctive relief under section 16 of the Clayton Act was intended to prevent"). Nor would monetary damages be adequate or even make sense here. The lessening of competition would continue to perpetuate into perpetuity.

## III.   CONCLUSION

For the foregoing reasons, Microsoft's motion to dismiss should be denied. If this Court grants the motion to dismiss, Plaintiffs respectfully request leave to amend.

1    Dated: February 17, 2023                    By:    _/s/ Joseph M. Alioto_
2                                                      Joseph M. Alioto

3                                                Joseph M. Alioto (SBN 42680)
                                                 Tatiana V. Wallace (SBN 233939)
4                                                **ALIOTO LAW FIRM**
                                                 One Sansome Street, 35th Floor
5                                                San Francisco, CA  94104
                                                 Telephone:     (415) 434-8900
6                                                Facsimile:     (415) 434-9200
                                                 Email:         jmalioto@aliotolaw.com
7

8

9    Dated:  February 17, 2023                   By:    _/s/ Joseph R. Saveri_
10                                                     Joseph R. Saveri

11                                               Joseph R. Saveri (State Bar No. 130064)
                                                 Steven N. Williams (State Bar No. 175489)
12                                               Cadio Zirpoli (State Bar No. 179108)
                                                 Elissa Buchanan (State Bar No. 249996)
13                                               David H. Seidel (State Bar No. 307135)
                                                 **JOSEPH SAVERI LAW FIRM, LLP**
14                                               601 California Street, Suite 1000
                                                 San Francisco, California 94108
15                                               Telephone:     (415) 500-6800
                                                 Facsimile:     (415) 395-9940
16                                               Email:         jsaveri@saverilawfirm.com
                                                                swilliams@saverilawfirm.com
17                                                              czirpoli@saverilawfirm.com
                                                                eabuchanan@saverilawfirm.com
18                                                              dseidel@saverilawfirm.com
19

20                                               Joseph M. Alioto Jr. (SBN 215544)
                                                 **ALIOTO LEGAL**
21                                               100 Pine Street, Suite 1250
                                                 San Francisco, California 94111
22                                               Tel: (415) 398-3800
                                                 Email:         joseph@aliotolegal.com
23

24

25                                               Plaintiffs' Counsel

26

27

28