Valarie C. Williams (Bar No. 335347)
Tania Rice (Bar No. 294387)
Tyler Blake (Bar No. 316623)
Alston & Bird LLP
560 Mission Street, Suite 2100
San Francisco, CA 94105
Telephone: (415) 243-1000
valarie.williams@alston.com
tania.rice@alston.com
tyler.blake@alston.com

B. Parker Miller (*pro hac vice*)
Alston & Bird LLP
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309
Telephone: (404) 881-7000
parker.miller@alston.com

Rakesh N. Kilaru (*pro hac vice*)
Anastasia M. Pastan (*pro hac vice*)
Jenna Pavelec (*pro hac vice*)
Wilkinson Stekloff LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
rkilaru@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
jpavelec@wilkinsonstekloff.com

*Counsel for Defendant Microsoft Corporation*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANTE DEMARTINI, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | Case No. 3:22-cv-08991-JSC<br><br>**DEFENDANT MICROSOFT CORPORATION'S REPLY IN SUPPORT OF MOTION TO DISMISS**<br><br>Hon. Jacqueline Scott Corley<br><br>Date: March 16, 2023<br>Time: 10:00 a.m.<br>Courtroom: 8 – 19th Floor |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................................................... 1

II.     PLAINTIFFS APPLY THE WRONG LAW ....................................................................... 2

III.    PLAINTIFFS FAILED TO ALLEGE FACTS TO STATE A PLAUSIBLE CLAIM ............ 4

        A.      Plaintiffs Did Not Adequately Allege Their Horizontal Theory of Harm .................... 5

        B.      Plaintiffs Did Not Adequately Allege Their Vertical/Foreclosure Theory of
                Harm .......................................................................................................................... 6

        C.      Plaintiffs Did Not Adequately Allege Their Labor Market and "Nascent
                Competitor" Theories of Harm ................................................................................... 8

IV.     PLAINTIFFS' CLAIM IS NOT RIPE ................................................................................. 9

V.      PLAINTIFFS LACK STANDING ....................................................................................... 10

VI.     PLAINTIFFS HAVE FAILED TO ALLEGE IRREPARABLE HARM ............................... 11

VII.    CONCLUSION ..................................................................................................................... 12

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)..................................................................................................4, 6

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007)..................................................................................................4, 6

*Bradt v. T-Mobile US, Inc.,*
   No. 19-cv-07752-BLF, 2020 U.S. Dist. LEXIS 44141 (N.D. Cal. Mar. 13, 2020)..............4, 5

*Bradt v. T-Mobile US, Inc.,*
   No. 5:19-cv-07752-BLF (N.D. Cal. Mar. 5, 2020), ECF No. 63 .............................4

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962)..................................................................................................3, 8

*California v. Am. Stores Co.,*
   495 U.S. 271 (1990)..................................................................................................11

*Dehoog v. Anheuser-Busch InBev SA/NV,*
   899 F.3d 758 (9th Cir. 2018) ............................................................... *passim*

*Fabbrini v. City of Dunsmuir,*
   544 F. Supp. 2d 1044 (E.D. Cal. 2008).....................................................................8

*Ford Motor Co. v. United States,*
   405 U.S. 562 (1972)..................................................................................................2

*Fruehauf Corp. v. FTC,*
   603 F.2d 345 (2d Cir. 1979)......................................................................................7

*FTC v. Lab'y Corp. of Am.,*
   No. SACV 10-1873 AG, 2011 U.S. Dist. LEXIS 20354 (C.D. Cal. Feb 22, 2011)..................8

*FTC v. Procter & Gamble Co.,*
   386 U.S. 568 (1967)..................................................................................................4

*FTC v. Qualcomm Inc.,*
   969 F.3d 974 (9th Cir. 2020) ....................................................................................5

*Hosp. Corp. of Am. v. FTC,*
   807 F.2d 1381 (7th Cir. 1986) (Posner, J.) .............................................................2, 5

*Malaney v. UAL Corp.,*
   No. 3:10-CV-02858, 2010 U.S. Dist. LEXIS 106049 (N.D. Cal. Sept. 27, 2010)...................4

ii

*Med Vets, Inc. v. VIP Petcare Holdings, Inc.*,
    811 F. App'x 422 (9th Cir. 2020) ...................................................................1, 3, 6

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) .....................................................................................2

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*,
    No. 1:21-cv-00540, 2022 U.S. Dist. LEXIS 126239 (E.D. Cal. July 15, 2022)..................3, 5

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018).................................................................................................3

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    20 F.4th 466 (9th Cir. 2021) .....................................................................................5

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)..................................................................................................10

*St. Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys.*,
    778 F.3d 775 (9th Cir. 2015) .................................................................................5, 6

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)............................................................................................11

*Trump v. New York*,
    141 S. Ct. 530 (2021)..............................................................................................10

*United States v. AT&T Inc.*,
    310 F. Supp. 3d 161 (D.D.C. 2018) .....................................................................6, 9

*United States v. Baker Hughes, Inc.*,
    908 F.2d 981 (D.C. Cir. 1990) (Thomas, J.) ...........................................................2

*United States v. Gen. Dynamics Corp.*,
    415 U.S. 486 (1974)...................................................................................................2

*United States v. Marine Bancorporation, Inc.*,
    418 U.S. 602 (1974)............................................................................................3, 8, 9

*United States v. Syufy Enters.*,
    903 F.2d 659 & 663-64 (9th Cir. 1990) ...............................................................3, 6

**Statutes**

Enterprise Act 2002
    (UK); 2004 O.J. (L 24) 1–22 ..................................................................................10

**Other Authorities**

https://twitter.com/BradSmi/status/1629180356359495680 ...........................................9

Microsoft, *Microsoft and NVIDIA Announce Expansive New Gaming Deal* (Feb. 21, 2023), https://news.microsoft.com/2023/02/21/microsoft-and-nvidia-announce-expansive-new-gaming-deal/ ................................................................................9

*Notice of possible remedies under Rule 12 of the CMA's rules of procedure for merger, market and special reference groups* (2023), https://assets.publishing.service.gov.uk/media/63e376bdd3bf7f173ad1cee4/Notice _of_possible_remedies_2.0.pdf ................................................................................9

1    I.      INTRODUCTION

2          Microsoft moved to dismiss Plaintiffs' Complaint because it fails to properly plead a Section

3    7 claim for relief under governing Ninth Circuit precedent.  Plaintiffs' Complaint does not establish a

4    controversy that should be adjudicated at this time nor any relevant facts to support a claim.  Plaintiffs'

5    Opposition does not meaningfully argue about any of that.  Rather, Plaintiffs advocate for a radical

6    antitrust legal regime that neither Congress nor the Supreme Court has approved.  Misstating cases

7    from the 1960s, and ignoring every case since then, they posit that any nontrivial merger between

8    competitors must be enjoined—a *per se* bar on almost every merger.  They contend that an individual

9    plaintiff need not plead anything beyond the prospect of a merger between two significant competitors

10   to plausibly state a claim, proceed to expensive and expansive discovery, and stop any prospective

11   merger in its infancy, even before the final terms are known.

12         Of course, that is not the law.  Binding Ninth Circuit Section 7 decisions issued within the past

13   five years reaffirm that Plaintiffs have the burden to allege facts showing a "reasonable probability"

14   that the merger will result in anticompetitive effects.  *Dehoog v. Anheuser-Busch InBev SA/NV*, 899

15   F.3d 758, 763 (9th Cir. 2018).  To plausibly plead that "reasonable probability" for a Section 7 case,

16   Plaintiffs were required to define the relevant market, set forth sufficiently detailed facts showing

17   market power in that market, and set forth sufficiently detailed facts showing barriers to market entry.

18   *See, e.g.*, *Med Vets, Inc. v. VIP Petcare Holdings, Inc.*, 811 F. App'x 422, 423 (9th Cir. 2020).

19   Plaintiffs cannot avoid the requirement of alleging well-pleaded and non-conclusory facts.  Nor are

20   they immune to the constitutional requirements of a concrete, imminent harm to the Plaintiffs in the

21   lawsuit.

22         Plaintiffs fell far short of meeting these standards.  Their Opposition avoids addressing those

23   problems, instead reducing the issues to a single legal question of whether this Court should

24   fundamentally rewrite antitrust law.  Plaintiffs' counsel pursued this inaccurate view of Section 7 twice

25   before in this District.  In each case, that position was rejected.  This Court should also reject Plaintiffs'

26   inaccurate statements of the law and should grant Microsoft's Motion to Dismiss.

27

28

## II.     PLAINTIFFS APPLY THE WRONG LAW

Plaintiffs' Opposition justifies their failure to adequately plead a Section 7 claim under controlling Ninth Circuit law by exclusively relying on, and blatantly distorting, cases that are over 50 years old.  Plaintiffs assert that Section 7 "prohibit[s] most corporations under most circumstances from merging" and that they only needed to allege a nontrivial merger between competitors.  (Opp. at 1:19-21 (citing *United States v. Von's Grocery Co.*, 384 U.S. 270, 275 (1966)); Opp. at 12:18-22.) That is wrong and has been wrong for a long time.

Plaintiffs ignore 50 years of evolution in antitrust law.  Plaintiffs end their review in 1972, with a Supreme Court case that began to establish that courts must scrutinize a merger by considering facts such as market share and barriers to entry in the relevant market.  (*See* Opp. at 9:12-27); *Ford Motor Co. v. United States*, 405 U.S. 562, 568 (1972) (finding that merger would have "the result of transmitting" the "virtually insurmountable" barriers to entry from the auto manufacturing market into the spark plug market).  Landmark Supreme Court Section 7 decisions in the 1970s—which shifted the focus to economic demonstrations of consumer harm—are the basis of modern antitrust analysis. *See, e.g.*, *United States v. Gen. Dynamics Corp.*, 415 U.S. 486 (1974) (rejecting challenge to the merger of two of the largest firms in the increasingly concentrated coal industry, emphasizing the importance of evaluating not only "statistics concerning market share and concentration" but also the structure of the particular market).  Since then, federal courts have recognized that while the Supreme Court has not directly overruled its 1960s decisions, "it has cut them back sharply."  *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 990 (D.C. Cir. 1990) (Thomas, J.); *see also, e.g.*, *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1386 (7th Cir. 1986) (Posner, J.) ("important developments" have "cast doubt on the continued vitality" of "the very strict merger decisions of the 1960s").

Under current, binding Section 7 case law, Plaintiffs have the burden of proving that a merger has a "reasonable probability" of resulting in anticompetitive effects.  *E.g.*, *Dehoog*, 899 F.3d at 763. Market power (the ability to raise "price above the competitive level without losing so many sales so rapidly that the price increase is unprofitable"[1]) and barriers to market entry (that competitors will not be lured into the market to sell the products at lower prices) are two crucial elements for making that

---

[1] *Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 274 (8th Cir. 2004) (citation omitted).

showing.  *See Med Vets*, 811 F. App'x at 423 (plaintiffs are required to show market power in the relevant market); *United States v. Syufy Enters.*, 903 F.2d 659, 662 n.3 & 663-64 (9th Cir. 1990) (antitrust cases "must make economic sense"; firms cannot injure competition without "significant barriers to [market] entry"); *see also Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2291 (2018) (Breyer, J., dissenting) (indicating that a market power inquiry is necessary in Section 7 cases).  Plaintiffs attempt to distinguish modern case law by arguing that the courts in several of the recent cases addressed claims under *both* the Sherman Act and Section 7 of the Clayton Act.  (Opp. at 6:16-8:8.)  Plaintiffs never explain how this supposed distinction could possibly matter.  Microsoft did not "misleadingly" quote those decisions; it quoted law that governs Plaintiffs' Section 7 claim.  *See Syufy*, 903 F.2d at 662 n.3, 664, 671 (finding that both claims "stand[] or fall" with the "essential" element of market power; the defendant "did not possess the power to set prices or to exclude competition," so the government could "make out a violation of neither the Sherman nor Clayton Acts" and "its lawsuit collapse[d] like a house of cards"); *Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, No. 1:21-cv-00540, 2022 U.S. Dist. LEXIS 126239, at *8 n.6, *15–25 (E.D. Cal. July 15, 2022) (addressing simultaneously and dismissing both of plaintiffs Sherman Act and Section 7 of the Clayton Act antitrust claims).

Not only do Plaintiffs ignore decades of antitrust jurisprudence, but they blatantly misstate the holdings in the 1960s cases on which they rely.  For example, they misquote *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962), arguing that it holds that plaintiffs may make "speculative" allegations because "[b]y definition, Section 7 addresses 'ephemeral possibilities.'"  (Opp. at 10:13-11:2.)  But the *Brown Shoe* opinion stated the opposite: "[N]o statute was sought for dealing with ephemeral possibilities.  Mergers with a probable anticompetitive effect were to be proscribed by [the Clayton] Act."  370 U.S. at 323.  The Supreme Court has reaffirmed that plaintiffs may not pursue Section 7 claims based on the mere possibility of post-merger anticompetitive harm.  *See United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 622–23 (1974) ("[I]t is to be remembered that [Section] 7 deals in 'probabilities,' not 'ephemeral possibilities.'").  Plaintiffs also argue that they need not allege facts showing market power in a particular defined market (Opp. at 8:24-25), but not even the anti-merger caselaw of the 1960s had such a low bar.  *See, e.g., Brown Shoe*, 370 U.S. at 322 n.38

3

1  (stating that market share is "the primary index of market power; but only a further examination of the

2  particular market—its structure, history and probable future—can provide the appropriate setting for

3  judging the probable anticompetitive effect of the merger"); *FTC v. Procter & Gamble Co.*, 386 U.S.

4  568, 577 (1967) ("Section 7 of the Clayton Act was intended to arrest the anticompetitive effects of

5  *market power* in their incipiency.") (emphasis added).

6  　　　　Plaintiffs' arguments have been soundly rejected before in cases brought by the same plaintiffs'

7  counsel.  In *Malaney v. UAL Corp.*, No. 3:10-CV-02858, 2010 U.S. Dist. LEXIS 106049, at *3 (N.D.

8  Cal. Sept. 27, 2010), the plaintiffs argued, as they do here, that "they need only demonstrate that the

9  merger between [two airlines] is a non-trivial acquisition of a significant competitor."  *Id.* at *23.

10  Judge Seeborg held that this approach "is wrong."  *Id.* at *25.  A decade later, counsel's argument was

11  rejected again when representing customers seeking to enjoin T-Mobile's merger with Sprint.  *Bradt*

12  *v. T-Mobile US, Inc.*, No. 19-cv-07752-BLF, 2020 U.S. Dist. LEXIS 44141, at *2 (N.D. Cal. Mar. 13,

13  2020).  Judge Labson-Freeman noted that counsel's argument, which asserted the illegality of "any

14  nontrivial acquisition of a competitor," was "tantamount to a *per se* rule whenever a merger is

15  proposed" and was unsupported.  *Id.* at *12.  The court noted that "one cannot read the Supreme

16  Court's antitrust jurisprudence as if each case remained frozen in time unless it's reversed;" rather, a

17  court must "consider antitrust law today in light of the Supreme Court and the Ninth Circuit's current

18  rulings on it."  *Bradt v. T-Mobile US, Inc.*, No. 5:19-cv-07752-BLF (N.D. Cal. Mar. 5, 2020), ECF

19  No. 63 at 17.  The outcomes in *Mulaney* and *Bradt* make sense given the governing law.  While

20  Plaintiffs advocate for the nearly limitless power of Section 7 (and liberal standing and ripeness

21  standards, for that matter), they have not pointed to any case where the court enjoined a prospective

22  merger by applying their interpretation of Section 7 to a complaint with nothing more than conclusory

23  and speculative allegations like those found in this Complaint.  If Plaintiffs' theory of the law were

24  correct, this Court should expect to see numerous cases where that has happened.

25  **III.   PLAINTIFFS FAILED TO ALLEGE FACTS TO STATE A PLAUSIBLE CLAIM**

26  　　　　Plaintiffs were required to plead (1) facts (2) that plausibly state their claim (3) that there is a

27  "reasonable probability" of substantially lessened competition.  *Dehoog*, 899 F.3d at 763 (applying

28  *Twombly* and *Iqbal* to a Section 7 claim).  They failed to do so.

4

### A.      Plaintiffs Did Not Adequately Allege Their Horizontal Theory of Harm

Plaintiffs argue that "[u]nder Section 7, elimination of a rival is enough" to allege a claim. (Opp. at 12:18-19.) But that is not the law. Plaintiffs' support for their invalid interpretation of Section 7's scope is a misquoted opinion by Judge Posner. (*Id.* at 12:20–21 (quoting *Hosp. Corp.*, 807 F.2d at 1385).) But the Seventh Circuit rejected Plaintiffs' view of Section 7 two paragraphs later because "important developments" have "cast doubt on the continued vitality" of "the very strict merger decisions of the 1960s:" "the Supreme Court . . . has said repeatedly that the economic concept of competition, *rather than any desire to preserve rivals as such*, is the lodestar that shall guide the contemporary application of . . . the Clayton Act." *Hosp. Corp.*, 807 F.2d at 1386 (emphasis added).[2]

Under binding Ninth Circuit authority, Plaintiffs must allege facts establishing the relevant market, market power in that market, and barriers to entry of new competitors in that market—in other words, factual detail plausibly showing how the merger has a reasonable probability of substantially lessening competition. *See Dehoog*, 899 F.3d at 763; *St. Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 783–85 (9th Cir. 2015); *Netafirm Irrigation,* 2022 U.S. Dist. LEXIS 126239, at *15-16.

Under the correct legal standard, Plaintiffs plainly fail to state a claim. Plaintiffs point to their only two specifically pleaded factual allegations—that Microsoft and Activision Blizzard respectively have 24% and 10% market share in what Plaintiffs call the video game *publishing* market. (Opp. at 13:3-7.) Plaintiffs' insurmountable problem is that they have *not raised any claims about that alleged market*, but rather ten other separate alleged product markets. Plaintiffs had the burden and opportunity to define the relevant market. *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 485 (9th Cir. 2021). They have done nothing to allege facts related to market share or impact to competition in the markets they actually pled. And they cannot rely on market share statistics that are outside of the markets alleged. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 992-93 (9th Cir. 2020) (reversing grant of injunction where the district court had considered anticompetitive effects from Qualcomm's licensing practices as "interrelated" with the defined modem chip market; "actual or

---

[2] Judge Labson-Freeman also noted Plaintiffs' counsel's "selective reliance" on Judge Posner's decision. *Bradt*, 2020 U.S. Dist. LEXIS 44141, at *12.

alleged harms to customers and consumers outside the relevant markets are beyond the scope of antitrust law"); *St. Alphonsus*, 778 F.3d at 785 ("[A] prima facie case is established if the plaintiff proves that the merger will probably lead to anticompetitive effects *in that market*.") (emphasis added). Accordingly, they have not come close to stating a plausible claim. *See, e.g.*, *Med Vets*, 811 F. App'x at 423 (affirming dismissal of Section 7 claim where plaintiff failed to plausibly allege market power in the relevant market). Further, even if Plaintiffs had properly pled a game publishing market and relevant market shares, those allegations alone would be insufficient to plead a Section 7 claim, without factual allegations concerning the number of competitors and barriers to market entry. *See Syufy*, 903 F.2d at 664.

Plaintiffs' remaining conclusory assertions—that the companies are "major competitors" and that there is a "substantial trend in concentration" in the video game industry—are insufficient to plausibly allege a Section 7 claim. (*See* Opp. at 12:13-22, 13:10-16.) Efforts to invoke magic language are not enough, and Plaintiffs provide no authority suggesting otherwise. Under antitrust law and basic pleading requirements, Plaintiffs were required to allege factual detail concerning market power in the relevant markets, the structure of the market (such as number of competitors), and barriers to entry. (Mot. at 8:1–9:23.) They did not. Their "labels and conclusions"—that this is a large merger that will harm competition—constitute the exact type of bare complaint that *Iqbal* and *Twombly* prohibit.[3] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.    Plaintiffs Did Not Adequately Allege Their Vertical/Foreclosure Theory of Harm

Plaintiffs allege that Microsoft's post-merger share of "[AAA] games or gaming content generally" could allow it to "foreclos[e]" competitors by making Activision Blizzard games exclusive to Microsoft platforms. (Opp. at 13:20-25; Compl. ¶¶ 280-331.) This speculative and conclusory allegation is insufficient, by itself, to state a plausible claim. (Mot. at 9:26–10:9.) And Plaintiffs' *own allegations* show that their foreclosure theory is implausible.

First, a rival's inability to effectively compete without access to the games (*i.e.*, that they are a critical input) is a necessary element of Plaintiffs' claim. *See United States v. AT&T Inc.*, 310 F. Supp.

---

[3] That Plaintiffs have not seen most of the evidence is not an excuse for failing to meet the basic pleading standard, and Plaintiffs fail to cite any support for this notion. (Opp. at 12 n.7.)

3d 161, 202-04 (D.D.C. 2018) (rejecting vertical foreclosure theory where, although programming content was important and valuable, it was not "must have" and the evidence was not persuasive in showing that its foreclosure would materially impact competition), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019); *Fruehauf Corp. v. FTC*, 603 F.2d 345, 360 (2d Cir. 1979) (rejecting foreclosure theory because "some market foreclosure may ensue from the merger, but not one that deprives rivals from major channels of distribution, much less one that excludes them from the market altogether") (footnotes omitted).  Plaintiffs simply conclude that Activision Blizzard games are "key inputs," (Compl. ¶ 280), because they are "some of the most iconic and popular game franchises in history."  But they have not alleged facts (such as Activision Blizzard's market share and number of game developers) showing that the competitors cannot compete using an alternative input.  And indeed, Plaintiffs go on to list nine non-Activision Blizzard franchises that are also "some of the most iconic and popular game franchises in history."  (*Id.* ¶¶ 255-56.)  They also list at least four other companies that publish what Plaintiffs term "Triple-A" games.  (*Id.* ¶ 168.)   Accordingly, their own allegations confirm the existence of a competitive industry with numerous game developers and publishers, directly rebutting their suggestion that Sony and Nintendo will be foreclosed from competing in the markets for consoles, subscription services, and cloud-based gaming using other games.  (*Id.* ¶¶ 124-27.)

Second, Plaintiffs allege that Activision Blizzard's games are currently available on "multiple platforms" and that Microsoft has made "public promises" to keep the content available on competitors' platforms.  (Compl. ¶¶ 286, 306.)  Those allegations refute Plaintiff's claim.  Plaintiffs' assertions that these promises are "illusory" are insufficient to pull Plaintiffs' allegations over the plausibility line.  Contrary to Plaintiffs' contention, Microsoft's argument is not an improper factual dispute; what matters is whether Plaintiffs have alleged facts that make their foreclosure theory plausible. (Mot. at 10:22–11:2).  Where they concede that Microsoft has promised to continue making the games available (and do not allege facts showing an incentive to reverse its representations under current market circumstances), they have not alleged a plausible claim.

Plaintiffs' attempt to distinguish *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018), in which the court affirmed a dismissal of Section 7 claim because it relied on speculative allegations about future behavior, by arguing that the speculation in that case was about a third party

instead of a party to the case.  (Opp. at 14:23-15:11.)  Plaintiffs' argument is unavailing.  Speculation about any party's future conduct does not constitute a well-pleaded allegation.  *DeHoog* simply relies on the basic tenet that allegations must be plausible and not speculative or conclusory.  899 F.3d at 765 (citing *Iqbal*, 556 U.S. at 678 and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).  Plaintiffs also rely on their incorrect theory that Section 7 reaches "ephemeral possibilities," (Opp. at 11:1–2), but that is not so.  *Brown Shoe*, 370 U.S. at 323; *Marine Bancorporation*, 418 U.S. at 622–23.  Instead, well-pleaded Section 7 claims require plaintiffs to allege "*facts* that an acquisition creates 'an appreciable danger' or 'a reasonable probability' of anticompetitive effects in the relevant market."  *DeHoog*, 899 F.3d at 763 (emphasis added).  Plaintiffs have not done so.

C.   ***Plaintiffs Did Not Adequately Allege Their Labor Market and "Nascent Competitor" Theories of Harm***

Plaintiffs do not address the issues with their "labor market" allegations beyond repeating their bare allegations.  (Opp. at 15:12-20.)  Plaintiffs do not allege any factual detail, such as market shares or numbers of employees.  Any allegations related to the market for video game publishing or sales are irrelevant.  *See FTC v. Lab'y Corp. of Am.*, No. SACV 10-1873 AG, 2011 U.S. Dist. LEXIS 20354, at *50 (C.D. Cal. Feb. 22, 2011) ("Market shares must be measured in a proper relevant product and geographic market; alleging market shares in some other market is inadequate.").

In their Opposition, Plaintiffs belatedly attempt to add a new theory of liability, which is that the "merger may harm competition by eliminating Activision Blizzard as a nascent competitor."  (Opp. at 15:21-25.)  They refer only to vague and conclusory allegations that concerned their vertical foreclosure theory, addressed above.  (*Id.* (citing Compl. ¶¶ 307, 317).)  Plaintiffs cannot add new allegations via their Opposition brief.  *See Fabbrini v. City of Dunsmuir*, 544 F. Supp. 2d 1044, 1050 (E.D. Cal. 2008).  Moreover, Plaintiffs fail to allege any of the necessary elements for their new theory.  To plead a nascent or potential competitor theory, Plaintiffs must factually plead, among other things: (1) the specific markets Activision Blizzard would enter, (2) that those markets are highly concentrated, and (3) either that Activision Blizzard is a potential market entrant with feasible means of entering the market other than the merger or that Activision Blizzard was perceived by others as a potential market entrant and its position on the edge of the market restrained oligopolistic, coordinated

8

behavior.  *See Marine Bancorporation, Inc.*, 418 U.S. at 623-25.  Plaintiffs fail to allege any such factual detail.

## IV.    PLAINTIFFS' CLAIM IS NOT RIPE

Plaintiffs' Opposition ignores the two chief reasons that this case is unripe: (1) the prospective merger is undergoing review by the U.K., European, and other worldwide regulators (not just the FTC proceeding, which is the only piece that Plaintiffs acknowledge); and (2) those reviews could cause the prospective transaction to change in a way that would eviscerate one of Plaintiffs' primary theories of liability (the vertical foreclosure theory).  (*See* Mot. at 3:20-4:4, 12:23-13:12.)  Indeed, on February 8, the U.K.'s Competition and Markets Authority issued its provisional findings and requested views on possible remedies, including structural remedies to the transaction (such as a partial divestiture of the segment of Activision Blizzard associated with *Call of Duty*) or behavior remedies (including contractual arrangements with third-party platforms relating to access to *Call of Duty*).  *See* Competition & Markets Authority, *Notice of possible remedies under Rule 12 of the CMA's rules of procedure for merger, market and special reference groups* (2023)*,* https://assets.publishing.service.gov.uk/media/63e376bdd3bf7f173ad1cee4/Notice_of_possible_rem edies_2.0.pdf.  Courts have found that remedies imposed by regulators are relevant to the assessment of anticompetitive effects.  *See AT&T Inc.*, 310 F. Supp. 3d at 217.

Nintendo and Microsoft have also recently announced that they have signed a 10-year binding contract to make *Call of Duty* available to Nintendo players, "the same day as Xbox, with full feature and content parity."  *See* https://twitter.com/BradSmi/status/1629180356359495680.  Microsoft and NVIDIA have also reached a 10-year agreement, which includes a commitment to make *Call of Duty* and other Activision Blizzard games available on NVIDIA's cloud gaming service.  *See* Microsoft, *Microsoft and NVIDIA Announce Expansive New Gaming Deal* (Feb. 21, 2023), https://news.microsoft.com/2023/02/21/microsoft-and-nvidia-announce-expansive-new-gaming-deal/.  These updates not only highlight the prematurity of this lawsuit, but also how the companies view themselves as competitors in the market.

Plaintiffs mischaracterize Microsoft's argument as asserting that they must wait until "the exact moment that Microsoft is able to close its merger."  (Opp. at 17:2-3.)  That is not Microsoft's

argument.  Rather, Plaintiffs must meet the constitutional requirements of ripeness and standing that are baked into every lawsuit filed in federal court.  *Trump v. New York*, 141 S. Ct. 530, 535 (2021). Plaintiffs' other arguments similarly avoid the main issues: they assert that the transaction can close but ignore that the U.K. and E.U.'s regulators are empowered to seek modifications to the transaction as part of their approval process[4]; they assert that the agreement is "final" because there is a written document but ignore that it may change prior to closing[5]; they assert that private enforcement is coequal to the FTC proceeding but ignore that Microsoft is still working with worldwide regulators and that the Constitution bars private plaintiffs from bringing unripe claims; and they provide no meaningful way to distinguish the cases finding that similar claims must be dismissed as unripe, other than to complain that those courts got it wrong.

Plaintiffs attempt to wave away the seriousness of the constitutional bar on their unripe claim by arguing that this issue has already been litigated on Microsoft's motion to stay.  The motion to stay involved the Court's discretionary authority to control the proceedings.  (*See* Dkt. 26.)  Conversely, finding that Plaintiffs' claim is unripe would constitutionally mandate dismissal.  Plaintiffs fail to even address the legal test for determining whether their claim is unripe.  (Mot. at 13:13-14.)  They offer no response to the proposition that the issues are not fit for judicial decision (because the Court cannot evaluate a future transaction that is subject to change) and that they will face no hardship by simply refiling this case at a more appropriate time.

## V.    PLAINTIFFS LACK STANDING

Standing—the requirement that Plaintiffs face a concrete, particularized, and imminent injury—is a baseline constitutional requirement that cannot be reduced or eliminated.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  Contrary to what Plaintiffs' Opposition tries to imply, there

---

[4] *See* Enterprise Act 2002 (as amended) (UK); 2004 O.J. (L 24) 1–22.

[5] The "final" agreement itself contemplates that "if and to the extent necessary to obtain clearance of the Merger pursuant to the HSR Act and any other Antitrust Laws  or Foreign Investment Laws . . . the Company and its Affiliates will: (i) offer, negotiate, commit to and effect, by consent decree, hold separate order, or otherwise, (A) the sale, divestiture, license or other disposition of assets . . . ."  (Dkt. 26-1, Kilaru Decl., Ex. H, at 67.)

1   is no special or lessened standing requirement for plaintiffs bringing claims under Section 16 of the
2   Clayton Act.

3          Plaintiffs concede that they must "demonstrate a significant threat of injury from an impending
4   violation of the antitrust laws" to establish standing.  (Opp. at 20:9-11 (quoting *Zenith Radio Corp. v.*
5   *Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969)).)  Taking this standard as a given, Plaintiffs fail
6   to meet it.  As discussed in the opening brief, Plaintiffs' alleged harm is not "certainly impending."
7   Plaintiffs' attempt to distinguish *Cassan Enterprises, Inc. v. Avis Budget Group, Inc.* (another action
8   brought by Plaintiffs' counsel), relies on a distinction without a difference.  No. 2:10-cv-01934-JCC
9   (W.D. Wash. Mar. 11, 2011), ECF No. 39.  There and here, the transactions faced additional regulatory
10  hurdles before closing (differences in the precise stage of the regulatory approval process are
11  immaterial).  There and here, aspects of the transaction were subject to change.  There and here, the
12  plaintiffs lack standing.

13         Plaintiffs' argument that they have standing to assert their labor market claim because they
14  otherwise have standing to assert an overall Section 7 claim is legally wrong.  (Opp. at 22:19-23.)
15  Plaintiffs cite no legal authority in support of their position.  But "standing is not dispensed in gross;
16  rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief
17  that they seek."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).

18  **VI.     PLAINTIFFS HAVE FAILED TO ALLEGE IRREPARABLE HARM**

19         Plaintiffs claim that they do not have to plead the traditional standards for an injunction because
20  the Clayton Act authorizes injunctive relief.  Supreme Court case law directly on point (including
21  cases upon which Plaintiffs rely) precludes this argument.  *See California v. Am. Stores Co.*, 495 U.S.
22  271, 281-82 (1990) ("[T]he statutory language [of Section 16] indicates Congress' intention that
23  traditional principles of equity govern the grant of injunctive relief.").

24         With respect to their failure to plead irreparable harm specifically, Plaintiffs, again, claim to
25  meet this requirement merely by stating that they would be "irreparably harmed" without providing
26  any factual basis in support.  (Opp. at 24.)  This argument flies in the face of all post-*Twombly* case
27  law on pleading standards.  As discussed above, Plaintiffs have offered virtually no factual predicate
28

for their claims of antitrust harm. Therefore, they have failed to allege irreparable harm and their claim for injunctive relief must be dismissed.

**VII.     CONCLUSION**

      Microsoft requests that the Court dismiss Plaintiffs' action in its entirety.


Dated: February 24, 2023                                   Respectfully submitted,


                                                       By:   */s/ Valarie C. Williams*

                                                        Valarie C. Williams
                                                        B. Parker Miller
                                                        Tania Rice
                                                        Tyler Blake
                                                        Alston & Bird LLP

                                                        Rakesh N. Kilaru
                                                        Anastasia M. Pastan
                                                        Jenna Pavelec
                                                        Wilkinson Stekloff LLP

                                                        *Counsel for Defendant Microsoft Corporation*