Valarie C. Williams (Bar No. 335347)
Tania Rice (Bar No. 294387)
Tyler Blake (Bar No. 316623)
Alston & Bird LLP
560 Mission Street, Suite 2100
San Francisco, CA 94105
Telephone: (415) 243-1000
valarie.williams@alston.com
tania.rice@alston.com
tyler.blake@alston.com

B. Parker Miller (*pro hac vice*)
Alston & Bird LLP
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309
Telephone: (404) 881-7000
parker.miller@alston.com

Rakesh N. Kilaru (*pro hac vice*)
Anastasia M. Pastan (*pro hac vice*)
Jenna Pavelec (*pro hac vice*)
Wilkinson Stekloff LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
rkilaru@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
jpavelec@wilkinsonstekloff.com

*Counsel for Defendant Microsoft Corporation*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANTE DEMARTINI, *et al.*,<br><br>               Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>               Defendant. | Case No. 3:22-cv-08991-JSC<br><br>**DEFENDANT MICROSOFT CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>Hon. Jacqueline Scott Corley<br><br>Date: April 12, 2023<br>Time: 1:00 p.m.<br>Courtroom: 8 – 19th Floor |

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................................ 1

II.     ISSUES TO BE DECIDED ...................................................................................... 1

III.    FACTUAL BACKGROUND ..................................................................................... 2

IV.     PLAINTIFFS' FUNDAMENTAL LEGAL ERRORS AND THE CORRECT
        LEGAL FRAMEWORK ............................................................................................ 3

        A.      Plaintiffs Carry the Burden of Proving Entitlement to a Preliminary
                Injunction—an Extraordinary and Drastic Remedy .................................... 3

        B.      Plaintiffs Will Need to Show a "Reasonable Probability" of Anticompetitive
                Harm ............................................................................................................ 4

        C.      Plaintiffs Have the Burden of Proof ............................................................ 6

V.      ARGUMENT ............................................................................................................ 7

        A.      Plaintiffs Are Not Likely to Succeed on Their Horizontal Challenge to the
                Merger .......................................................................................................... 7

                1.      Plaintiffs Did Not Establish a Relevant Product or Geographic Market .......... 7

                2.      Plaintiffs Did Not Show Unduly High Market Concentration ........................ 9

                3.      Plaintiffs Did Not Show Barriers to Market Entry ................................. 12

        B.      Plaintiffs Are Not Likely to Succeed on Their Vertical Challenge to the
                Merger .......................................................................................................... 14

                1.      There Is No Reasonable Probability that Microsoft Will Foreclose
                        Competition by Limiting Access to Activision Blizzard Games ..................... 15

                2.      Microsoft's Larger Rivals Have Access to Innumerable Alternative
                        Games .......................................................................................................... 18

        C.      Plaintiffs Are Not Likely to Succeed in Their Miscellaneous Theories ..................... 19

                1.      Plaintiffs' Labor Market Theory Fails ............................................... 19

                2.      Plaintiffs' Nascent Competition Theory Fails ..................................... 20

                3.      The Merger's Procompetitive Benefits Outweigh Any (Speculative)
                        Adverse Competitive Effects ...................................................................... 21

        D.      Plaintiffs Have Not Shown a Likelihood of Irreparable Harm .................................. 22

        E.      The Balance of the Equities Disfavors an Injunction .............................................. 23

VI.     CONCLUSION ........................................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alberta Gas Chems., Ltd. v. E. I. Du Pont de Nemours & Co.*,
    826 F.2d 1235 (3d Cir. 1987)................................................................14

*Alliance for the Wild Rockies v. Cottrell*,
    632 F.3d 1127 (9th Cir. 2011) ..............................................................4

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*,
    190 F.3d 1051 (9th Cir. 1999) ..............................................................19

*Boardman v. Pacific Seafood Group*,
    822 F.3d 1011 (9th Cir. 2016) ..............................................................24

*Bradt v. T-Mobile US, Inc.*,
    No. 5:19-cv-07752-BLF, 2020 U.S. Dist. LEXIS 44141 (N.D. Cal. Mar. 5, 2020)..................5

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)................................................................15, 16, 18

*California v. Sutter Health Sys.*,
    84 F. Supp. 2d 1057 (N.D. Cal. 2000) .................................................8, 9

*Cohlmia v. St. John Med. Ctr.*,
    693 F.3d 1269 (10th Cir. 2012) ............................................................10

*Comcast Cable Comm'ns, LLC v. FCC*,
    717 F.3d 982 (D.C. Cir. 2013) ..............................................................14

*Dehoog v. Anheuser-Busch InBev SA/NV*,
    899 F.3d 758 (9th Cir. 2018) ..............................................................5, 21

*Doe v. Univ. of Wash.*,
    695 F. App'x 265 (9th Cir. 2017) ..........................................................3

*In re Dynamic Random Access Memory Antitrust Litig.*,
    516 F. Supp. 2d 1072 (N.D. Cal. 2007) .................................................19

*Epic Games, Inc. v. Apple Inc.*,
    559 F. Supp. 3d 898 (N.D. Cal. 2021) .................................................7, 8, 9, 13

*ET Trading, Ltd. v. ClearPlex Direct, LLC*,
    No. 15-CV-00426-LHK, 2015 U.S. Dist. LEXIS 25894 (N.D. Cal. Mar. 2, 2015)...............22

*Fruehauf Corp. v. FTC*,
    603 F.2d 345 (2d Cir. 1979)................................................................14, 18

ii

*FTC v. Arch Coal, Inc.*,
    329 F. Supp. 2d 109 (D.D.C. 2004) ........................................................................5, 6, 7

*FTC v. Exxon Corp.*,
    636 F.2d 1336 (D.C. Cir. 1980) ...................................................................................23

*FTC v. Great Lakes Chem. Corp.*,
    528 F. Supp. 84 (N.D. Ill. 1981) .............................................................................23, 24

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ................................................................................4, 11

*FTC v. Lab. Corp. of Am.*,
    No. SACV 10-1873 .................................................................................................23, 24

*FTC v. Meta Platforms, Inc.*,
    No. 5:22-cv-04325, 2023 U.S. Dist. LEXIS 29832 (N.D. Cal. Jan. 31, 2023)..............4, 20, 21

*FTC v. Occidental Petroleum Corp.*,
    No. 86-900, 1986 U.S. Dist. LEXIS 26138 (D.D.C. Apr. 29, 1986) ...................................3, 23

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) .......................................................................................9

*FTC v. RAG-Stiftung*,
    436 F. Supp. 3d 278 (D.D.C. 2002) .............................................................................16

*FTC v. Tenet Health Care Corp.*,
    186 F.3d 1045 (8th Cir. 1999) ...................................................................................8, 9

*FTC v. Thomas Jefferson Univ.*,
    505 F. Supp. 3d 522 (E.D. Pa. 2020) ............................................................................8

*Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*,
    No 3:09-cv-03854, 2009 U.S. Dist. LEXIS 133999 (N.D. Cal. Oct. 22, 2009) ......................22

*Hairston v. Pac. 10 Conf.*,
    101 F.3d 1315 (9th Cir. 1996) .....................................................................................19

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ......................................................................................7

*Hosp. Corp. of Am. v. FTC*,
    807 F.2d 1381 (7th Cir. 1986) ......................................................................................5

*Malaney v. UAL Corp.*,
    No. 3:10-CV-02858-RS, 2010 U.S. Dist. LEXIS 106049 (N.D. Cal. Sep. 27,
    2010), *aff'd*, 434 Fed. Appx. 620 (9th Cir. 2011)...................................................4, 5, 22, 23

*Med. Vets, Inc. v. VIP Petcare Holdings, Inc.*,
    811 F. App'x 422 (9th Cir. 2020) ...................................................................................7

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*,
 No. 1:21-cv-00540-AWI-EPG, 2022 U.S. Dist. LEXIS 126239 (E.D. Cal. July 15,
 2022) ........................................................................................................................................14

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
 20 F.4th 466 (9th Cir. 2021) ...................................................................................6, 11, 12

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
 414 F. Supp. 3d 1256 (N.D. Cal. 2019) .................................................................................12

*Payment Logistics Ltd. v. Lighthouse Network LLC*,
 No. 18-cv-00786, 2019 U.S. Dist. LEXIS 44075 (S.D. Cal. Mar. 18, 2019) ....................8, 15

*Physician Specialty Pharm., LLC v. Prime Therapeutics, LLC*,
 No. 18-cv-1044, 2019 U.S. Dist. LEXIS 159853 (D. Minn. Aug. 8, 2019) ..........................14

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
 507 F.3d 117 (2d Cir. 2007)...................................................................................................14

*Rebel Oil Co. v. Atl. Richfield Co.*,
 51 F.3d 1421 (9th Cir. 1995) ..................................................................................................14

*Republic of Philippines v. Marcos*,
 862 F.2d 1355 (9th Cir. 1988) ..................................................................................................4

*St. Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys.*,
 778 F.3d 775 (9th Cir. 2015) ........................................................................................ *passim*

*United States v. AT&T Inc.*,
 310 F. Supp. 3d 161 (D.D.C. 2018) .............................................................................. *passim*

*United States v. AT&T, Inc.*,
 916 F.3d 1029 (D.C. Cir. 2019) .............................................................................................14

*United States v. Baker Hughes, Inc.*,
 908 F.2d 981 (D.C. Cir. 1990) .....................................................................................5, 11, 13

*United States v. Calmar, Inc.*,
 612 F. Supp. 1298 (D.N.J. 1985) ...........................................................................................13

*United States v. Falstaff Brewing Corporation*,
 410 U.S. 526 (1973). ...............................................................................................................21

*United States v. Gen. Dynamics Corp.*,
 415 U.S. 486 (1974)...................................................................................................................5

*United States v. Marine Bancorporation, Inc.*,
 418 U.S. 602 (1974)............................................................................................................7, 20

*United States v. Oracle Corp.*,
 331 F. Supp. 2d 1098 (N.D. Cal. 2004) ..................................................................................11

iv

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) .......................................................................5, 6, 7, 19

*United States v. UnitedHealth Grp. Inc.*,
    No. 1:22-cv-0481 (CJN), 2022 U.S. Dist. LEXIS 170934 (D.D.C. Sept. 21, 2022).....5, 16, 17

*Where Do We Go Berkeley v. Cal. Dep't of Transp.*,
    32 F.4th 852 (9th Cir. 2022) .......................................................................4

**Other Authorities**

U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* § 5.3 (2010) ...................................12

U.S. Department of Justice, HERFINDAHL-HIRSCHMAN INDEX (Jul. 31, 2018),
    https://www.justice.gov/atr/herfindahl-hirschman-index .......................................................12

## I.      INTRODUCTION

Roughly eleven months after Microsoft announced the acquisition of Activision Blizzard, Plaintiffs lodged a bare bones, speculative, and conclusory Complaint and Motion for Preliminary Injunction, claiming that Supreme Court precedent demands that almost all mergers and acquisitions should be stopped.  That is not the law.  When the correct governing law is applied, Plaintiffs' Motion fails.  Plaintiffs do not explain, much less prove, how or why competitive harms like higher prices or lower quality would actually happen.  They do not explain, much less prove, why the gaming industry would not continue to be dynamic, innovative, and competitive.  More specifically, Plaintiffs have not shown that they are likely to prevail on the critical issue of whether this acquisition would have anticompetitive effects.  Plaintiffs have failed to define the markets that would be affected by this transaction.  They provide no evidence that the markets they allege are actually concentrated, difficult for competitors to enter, or that competitors would be denied key inputs.  What little evidence they provide is wrong (and irrelevant).  They fail to meet the legal requirements to show that this drastic remedy is necessary to prevent harm that could not otherwise be remedied.  They certainly do not demonstrate that their interests in stopping the merger outweigh Microsoft's interest in completing the transaction.

The facts show why this transaction makes gaming more competitive.  Microsoft has made commitments, and signed binding contracts, that will bring Activision Blizzard's games to *more* gamers.  After the transaction, Microsoft will be more competitive with dominant market participants like Sony in console gaming, and Apple and Google in mobile gaming.  The law does not require Microsoft to prove that the transaction will enhance competition or broaden access where, as here, Plaintiffs have not met their burden to show that the transaction is likely to cause anticompetitive harm.  But the brief record before the Court demonstrates that this transaction will do exactly that.  Microsoft requests that this Court deny the Motion for Preliminary Injunction.

## II.      ISSUES TO BE DECIDED

Whether Plaintiffs have met their burden of proof to preliminarily enjoin Microsoft's acquisition of Activision Blizzard.

III.   **FACTUAL BACKGROUND**

   **Microsoft**

   Microsoft has been transparent about its motives for the merger with Activision Blizzard.  It is trying to become more competitive in gaming by gaining Activision Blizzard content and offering it to more consumers across more devices and with more ways to pay.  (*See* Williams Decl., Ex. A; Kilaru Decl., Ex. C.)

   After all, Microsoft is one of many companies in the gaming space, and nowhere near the largest.  There are thousands of game developers and publishers, who compete by providing different types of games on different platforms at different prices, ranging all the way down to $0.  (*See* Kilaru Decl., Ex. F.)  Microsoft trails behind rivals like Tencent, Nintendo, EA, and Take Two.  (*See infra* at 11 (combining all forms of game development).)  Microsoft has approximately a ▮% global market share and ▮% market share in the U.S.  (*Id.*)

   Microsoft also offers a gaming platform on which consumers can play video games through its Xbox console.  Microsoft trails behind Sony's PlayStation and the Nintendo Switch in the console space.  (Kilaru Decl., Exs. J, K.)  While Microsoft developed the Windows operating system, it has a minor presence in PC gaming (a ▮% global and ▮% U.S. market share) due to Windows' open nature, which fostered vibrant competition in PC game publishing and distribution.  (*See* Kilaru Decl., Exs. H, I.)  Microsoft has almost no presence in mobile gaming, the fastest-growing segment of gaming and a place where ▮% of gamers spend their time today.  (Kilaru Decl., Exs. F, L, M.)

   Unlike Sony and Nintendo, which have several game titles that are exclusive to their consoles, Microsoft's Xbox games are also available on PCs.  (*See* Williams Decl., Ex. M.)  In a rare step for console manufacturers, Microsoft has made many of its most popular first-party games, such as *Minecraft*, available on other platforms.  (*See* Kilaru Decl., Ex. C.)

   **Activision Blizzard**

   Activision Blizzard has created some popular game titles, including *Call of Duty* and *World of Warcraft*.  Activision Blizzard has several popular mobile games as well, including *Candy Crush*, and production experience in mobile games.  This acquisition would give Microsoft a presence in that space, potentially bringing competition to a market dominated by Apple and Google.  (*See* Williams

Decl., Ex. B; Kilaru Decl., Ex. C.)  Activision Blizzard is far from the only creator of popular gaming content.  Numerous rivals also have popular and highly ranked games.  (*See* Williams Decl., Ex. M; Kilaru Decl., Ex. F.)  Currently, Activision Blizzard's games can be played in limited ways.  Many (including *Call of Duty*) are not available on Nintendo; they are not available in subscription services that allow consumers to access a library of games for one low fee; and they are not available to be streamed.  Microsoft will open up access to Activision Blizzard content if this acquisition is allowed to move forward.

### **The Transaction**

Microsoft has agreed to acquire Activision Blizzard.  In addition, Microsoft has executed a contract with Nintendo that requires Microsoft to make *Call of Duty* available on Nintendo platforms for the next 10 years, with releases to occur on the same day as Xbox, with full feature and content parity.  (Kilaru Decl., Ex. A; Williams Decl., Ex. N.)  It has similarly executed a contract with NVIDIA to make Activision Blizzard games (as well Xbox games) available for 10 years on NVIDIA's cloud service, which is a service designed to "expand the addressable market" by offering high-performance gaming at a lower price and providing access to customers who "do not own, or cannot afford, the latest gaming systems."  (Kilaru Decl., Ex. B; Williams Decl., Ex. C.)  Microsoft has also tried to persuade Sony to agree to a contract extending its contractual access to *Call of Duty*.  (Kilaru Decl., Exs. C, D, E.)  Plaintiffs have asserted no facts and presented no evidence contradicting the rationale for the transaction, which directly undermines all their theories of the case.

## IV.   PLAINTIFFS' FUNDAMENTAL LEGAL ERRORS AND THE CORRECT LEGAL FRAMEWORK

### A.    Plaintiffs Carry the Burden of Proving Entitlement to a Preliminary Injunction— an Extraordinary and Drastic Remedy

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Doe v. Univ. of Wash.*, 695 F. App'x 265, 266 (9th Cir. 2017) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).  This is particularly true in the merger context since a preliminary injunction is "likely to spell the doom of an agreed merger."  *FTC v. Occidental Petroleum Corp.*, No. 86-900, 1986 U.S. Dist. LEXIS 26138, at *33 (D.D.C. Apr. 29, 1986).  Plaintiffs have the burden of making a clear showing

1  that (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the

2  absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in

3  the public interest.  *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir.

4  2022).   Alternatively, an injunction may issue if Plaintiffs clearly establish that "the balance of

5  hardships tips sharply in their favor" and that there are "serious questions" on the merits—provided

6  Plaintiffs have demonstrated the other two factors.  *Id.*

7      Plaintiffs argue for the application of the "serious questions" test.  But the equities do not favor

8  (let alone sharply favor) Plaintiffs.  (*See infra* Section V.E.)  This case is easily distinguished from

9  cases like *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137-38 (9th Cir. 2011), where the

10 plaintiffs' ability to enjoy a national forest would be irreparably lost, whereas the defendant would

11 only lose a small amount in revenue by delaying the project.  Conversely, here, Plaintiffs have not set

12 forth any particular harm that they will suffer, whereas issuing a preliminary injunction to stop a

13 merger has the potential to permanently impact the merger and would impose severe consequences.

14 *See, e.g.*, *Malaney v. UAL Corp.*, No. 3:10-CV-02858-RS, 2010 U.S. Dist. LEXIS 106049, at *49-50

15 (N.D. Cal. Sep. 27, 2010), *aff'd*, 434 F. App'x. 620 (9th Cir. 2011).  Therefore, Plaintiffs must show

16 a likelihood of success, in addition to the other factors.  Regardless, under either test, Plaintiffs face a

17 heavy burden that they have not met.  (*See infra* Section V.A-C.)  Establishing "serious questions"

18 requires a "substantial" showing; courts may not "enter an injunction on a merely plausible claim."

19 *Cal. Dep't of Transp.*, 32 F.4th at 863; *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th

20 Cir. 1988).[1]

21     **B.     Plaintiffs Will Need to Show a "Reasonable Probability" of Anticompetitive Harm**

22     Plaintiffs fundamentally misstate what they must do to show a likelihood of success on the

23 merits.  Plaintiffs have proffered almost no facts and evidence, arguing instead that their burden for

24 enjoining a merger under Section 7 is "[e]xceptionally [l]ow" because any "nontrivial acquisition of a

25

26 ─────────────────
   [1] Unlike private merger challenges, FTC motions for preliminary injunctions against mergers are
27 always evaluated under the serious questions test.  *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714–15 (D.C.
   Cir. 2001).  Yet, as demonstrated by the cases cited throughout this brief, FTC merger challenges are
28 regularly denied for failing to meet that test.  *See, e.g.*, *FTC v. Meta Platforms, Inc.*, No. 5:22-cv-
   04325, 2023 U.S. Dist. LEXIS 29832 (N.D. Cal. Jan. 31, 2023).

1   competitor" is illegal.  (Mot. at 9-11.)  That is not the law.

2          Plaintiffs' radical view of antitrust law relies on select cases from the 1960s.  Even those cases

3   do not support Plaintiffs' proposed legal regime, which would stop almost every merger.  Plaintiffs'

4   "nontrivial acquisition" language comes from their misunderstanding of a Seventh Circuit opinion in

5   which Judge Posner was merely commenting about how the 1960s cases "seemed" to view mergers.

6   *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1385 (7th Cir. 1986).  Importantly, Judge Posner rejected

7   that overly broad view of the law and noted the modern consensus in federal courts: that "important

8   developments" have "cast doubt on the continued vitality" of "the very strict merger decisions of the

9   1960s."  *Id.* at 1386; *see also, e.g.*, *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 990 (D.C. Cir.

10  1990) (Thomas, J.) (the Supreme Court has "cut [the 1960s cases] back sharply").  Modern antitrust

11  analysis is rooted in landmark cases from the 1970s, which shifted the focus to economic showings of

12  consumer harm.  *See, e.g.*, *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974) (rejecting

13  challenge to the merger of two of the largest firms in the increasingly concentrated coal industry,

14  emphasizing the importance of evaluating not only "statistics concerning market share and

15  concentration" but also the structure of the particular market); *Hosp. Corp.*, 807 F.2d at 1386 ("the

16  economic concept of competition . . . guide[s] the contemporary application of . . . the Clayton Act").

17  Courts in this district have rejected Plaintiffs' view of Section 7 in cases brought by the same plaintiffs'

18  counsel.  *See Bradt v. T-Mobile US, Inc.*, No. 5:19-cv-07752-BLF, 2020 U.S. Dist. LEXIS 44141, at

19  *12 (N.D. Cal. Mar. 5, 2020); *Malaney*, 2010 U.S. Dist. LEXIS 106049, at *25.

20         Today, a Section 7 plaintiff must show a "reasonable probability" that the merger will

21  substantially lessen competition.  *Dehoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th

22  Cir. 2018).  Plaintiffs must accomplish this with economic facts about the particular market at issue.

23  *See United States v. Syufy Enters.*, 903 F.2d 659, 663 (9th Cir. 1990) (antitrust cases "must make

24  economic sense"); *United States v. UnitedHealth Grp. Inc.*, No. 1:22-cv-0481 (CJN), 2022 U.S. Dist.

25  LEXIS 170934, at *20–21 (D.D.C. Sept. 21, 2022) (Section 7 requires courts to make "predictive

26  judgment[s]" about likely competitive effects, "informed by real-world evidence"); *FTC v. Arch Coal,*

27  *Inc.*, 329 F. Supp. 2d 109, 116–17 (D.D.C. 2004) ("[A]ntitrust theory and speculation cannot trump

28  facts, and even [merger challenges] must be resolved on the basis of the record evidence relating to

the market and its probable future."). The particular economic elements that plaintiffs must show depends on which theory of antitrust harm they invoke. Here, Plaintiffs primarily invoke "horizontal" and "vertical foreclosure" challenges to the merger:

1) <u>Horizontal Theory</u>: This theory posits that there will be anticompetitive harm if firms consolidate such that there are too few rivals in the market, because the remaining competitors are likely to increase prices to anticompetitive levels or coordinate behavior to restrict output. *Arch Coal*, 329 F. Supp. 2d at 123. Plaintiffs must show that the challenged merger will result in an undue concentration in the market—typically shown using the Herfindahl–Hirschman Index for market concentration. *Id.* at 123–24; *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 485 (9th Cir. 2021). They must also show that there are significant barriers to market entry, such that new competitors cannot enter the market and reduce the firms' ability to exercise market power by controlling prices and output. *Syufy*, 903 F.2d at 664.

2) <u>Vertical Foreclosure Theory</u>: This theory applies where a firm in the relevant market acquires a necessary upstream or downstream input to that market, and posits that the firm is likely to eliminate competitors' ability to meaningfully compete by foreclosing competitors from accessing that input, allowing the firm to raise prices to supracompetitive levels or restrict output. *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 193 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). Accordingly, Plaintiffs must show that the firm is likely to foreclose access to a critical input, that has no reasonable alternatives, from its competitors. *Id.* at 202-04.

**C.    Plaintiffs Have the Burden of Proof**

Plaintiffs have the burden of proof for every element of their Section 7 claim. *Arch Coal*, 329 F. Supp. 2d at 116. Plaintiffs' suggestion that the burden is on Microsoft to "establish that there is no reasonable probability that the merger might lessen competition" is wrong. (Mot. at 17.) Instead, Plaintiffs must "first establish a prima facie case that a merger is anticompetitive," generally by showing high market share, market concentration, and additional facts about the market structure, such as barriers to entry. *St. Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 783, 785-86, 788 (9th Cir. 2015). Microsoft may then rebut that prima facie case by "cast[ing] doubt on the accuracy of the [Plaintiffs'] evidence as predictive of future anti-competitive effects." *Id.* at

788.  Finally, the "burden of production shifts back to the [Plaintiffs] and merges with the ultimate burden of persuasion, which is incumbent on the [Plaintiffs] at all times."  *Id.* at 783.  Ultimately, "plaintiffs have the burden on every element of their Section 7 challenge, and a failure of proof in any respect will mean the transaction should not be enjoined."  *Arch Coal*, 329 F. Supp. 2d at 116.

## V.   ARGUMENT

### A.   Plaintiffs Are Not Likely to Succeed on Their Horizontal Challenge to the Merger

Plaintiffs assert that Microsoft and Activision Blizzard are horizontal competitors and that their merger will harm competition through a consolidation of market share.[2]  (Mot. at 14-17.)  They argue that Microsoft and Activision Blizzard currently compete against each other, and that the combined entity will have the ability and incentive to increase prices, decrease output, and create lower quality, less innovative games.  To prevail on this theory, Plaintiffs will be required to show, at a minimum: (1) a relevant product and geographic market; (2) an unduly high market concentration and market share in the relevant market; and (3) barriers to market entry.  *See Med. Vets, Inc. v. VIP Petcare Holdings, Inc.*, 811 F. App'x 422, 423 (9th Cir. 2020); *Syufy*, 903 F.2d at 662 n.3 & 663-64.  Plaintiffs have done none of this.

### 1.   Plaintiffs Did Not Establish a Relevant Product or Geographic Market

First, defining the relevant product and geographic market is a "necessary predicate" to Plaintiffs' claim.  *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974).  Properly defining a relevant market requires more than naming it.  The relevant product market "must encompass the product at issue as well as all economic substitutes for the product"—which are all products that are reasonably interchangeable or cross-elastic in demand with the product at issue. *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018).  Plaintiffs must justify their proposed product markets with "specific evidence supporting the proposed market definition;" they cannot "ignore economic reality and 'arbitrarily choose the product market relevant to [their] claims.'"  *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1015 (N.D. Cal. 2021) (quoting *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017)).  In "limited settings," a market can be narrowed to submarkets, but they must be "economically distinct from the general

---

[2] Regulators have narrowed their concerns to only a vertical theory of harm.

1  product market." *Id.* at 1017 (quoting *Newcal Indus., Inc. v. Ikon Office Sols.*, 513 F.3d 1038, 1045

2  (9th Cir. 2008)).  Plaintiffs must set forth economic evidence to show the outer bounds of any market,

3  with courts considering matters such as the product's peculiar characteristics and uses, distinct

4  customers, distinct prices, sensitivity to price changes, unique production facilities, and specialized

5  vendors. *Id.*

6       Plaintiffs have rummaged for a viable market, starting with what they call a "video game"

7  market and then gerrymandering four proposed submarkets: console games, PC games, mobile games,

8  and "Triple-A" games.   But they have not offered any evidence of the required economic

9  considerations, such as economic substitutes or distinct customers and prices.  Plaintiffs' own

10 allegations show problems with their submarkets.  For example, they allege that they play similar

11 games across multiple devices, calling into question whether console games, PC games, and mobile

12 games are distinct.  (Compl. ¶¶ 24, 26, 28, 30, 32, 33.)  Plaintiffs' narrowest "Triple-A" market is a

13 particularly vague and subjective group of what they call the best and "most important" games.  (Mot.

14 at 17:7-11.)  But Plaintiffs provide no concrete definition of what a "Triple-A" game is (nor specify

15 whether this includes console, PC, and/or mobile games), much less economic evidence of the

16 contours of that market.

17      Accordingly, Plaintiffs' motion for a preliminary injunction must be denied.  *See, e.g.*, *Payment*

18 *Logistics Ltd. v. Lighthouse Network LLC*, No. 18-cv-00786, 2019 U.S. Dist. LEXIS 44075 (S.D. Cal.

19 Mar. 18, 2019) (denying motion for preliminary injunction of vertical merger, finding that product

20 markets for two specific types of payment interfaces were not economically distinct, because the same

21 category of customers had used various types of systems); *FTC v. Thomas Jefferson Univ.*, 505 F.

22 Supp. 3d 522, 528, 557 (E.D. Pa. 2020) (denying motion to preliminarily enjoin merger because

23 plaintiff did not "put forth enough evidence to prove" its relevant market); *FTC v. Tenet Health Care*

24 *Corp.*, 186 F.3d 1045, 1051-54 (8th Cir. 1999) (reversing order preliminarily enjoining merger, where

25 plaintiff's evidence "falls short" of supporting its "contrived market area").

26      Plaintiffs also "bear[] the burden of proving the proper geographic market," which they must

27 show is the area in "which consumers can practically turn for alternative sources of the product and in

28 which the antitrust defendants face competition." *California v. Sutter Health Sys.*, 84 F. Supp. 2d

1057, 1068 (N.D. Cal. 2000) (quoting *FTC v. Freeman Hosp.*, 69 F.3d 260, 268 (8th Cir. 1995)). Plaintiffs assert a national market without providing any evidence to carry their burden of proof that pricing in each of the alleged submarkets is unaffected by global competition. In fact, Plaintiffs' own exhibits undermine their geographic market. They cite a 2022 Congressional Research Service report, (Mot. at 14-15), which states that "measuring the market share of Microsoft and Activision Blizzard within the United States may not accurately reflect competition in these markets, given that these companies compete at a global level." (Mot., Ex. B at 74.) Another court in this district has found the geographic market for gaming transactions is global. *See Epic Games*, 559 F. Supp. 3d at 991. Because Plaintiffs have provided no evidence justifying a national, as opposed to global, market, the Court should deny Plaintiffs' motion on that basis alone. *See Sutter Health*, 84 F. Supp. 2d at 1085–86 (denying injunction because plaintiff "failed to prove a well-defined geographic market and thereby has failed to prove its prima facie [Section 7] case"); *accord Tenet Health*, 186 F.3d at 1053-54.

## 2. *Plaintiffs Did Not Show Unduly High Market Concentration*

If Plaintiffs can establish a market where Microsoft and Activision Blizzard compete, they must then prove that a merger of the two will create a dominant player in a market that is concentrated, such that the combined firm will have enough market power to raise prices, reduce output, or have diminished incentive to innovate. Plaintiffs have not shown that any of their proposed markets are unduly concentrated or that Microsoft has an unduly high market share. The only figures that Plaintiffs provide are allegations that Microsoft and Activision Blizzard respectively have market shares of 23.9% and 10% in a "video game publishing" market. None of Plaintiffs' alleged markets are for "video game publishing" and they do not explain how these figures relate to their proposed markets. Market share statistics that are not for the particular market at issue are irrelevant and should not be considered. *See, e.g.*, *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992-93 (9th Cir. 2020).

Moreover, the purported market share figures are not accurate. Plaintiffs fail to attach the 2021 IBISWorld Inc. report that underlies the exhibit containing their market share figures. But there are clear facial errors in the 2023 version of the report, which contains similar numbers.

1

2

3

4

5

6

7

8

9

10

11          (Williams Decl., Ex. D.)

12          Accordingly, Plaintiffs' unsupported and inaccurate market share statistics in "game

13   publishing"—a purported market that does not match any of Plaintiffs' alleged markets—do not satisfy

14   their burden of showing that they are likely to succeed, or even raise serious questions, on the merits.

15   While Microsoft is under no burden to provide the relevant and accurate market share and market

16   concentration figures, those figures confirm that Plaintiffs' claim cannot succeed.  Assuming, solely

17   for sake of argument, that Plaintiffs' alleged "video game" market is a cognizable conglomeration of

18   their alleged submarkets for console, PC, and mobile games (a level of definition they have not

19   themselves provided), Microsoft's market share is ▮% globally and ▮% in the U.S.  (Kilaru Decl., ¶¶

20   5-6, Exs. H-M.)  These shares come nowhere close to establishing a probability that Microsoft would

21   gain enough market power to raise prices to anticompetitive levels.  *See Cohlmia v. St. John Med. Ctr.*,

22   693 F.3d 1269, 1283 (10th Cir. 2012) ("a market share of less than 20% is woefully short under any

23

24

25

26

27

28   [3] ▮

1   metric from which to infer market power").

(Kilaru Decl., ¶ 6.)

More importantly, Plaintiffs have failed to show concentration in any of their proposed markets. Plaintiffs' failure to establish market concentration for any of their asserted markets means that they have not made a showing of undue market power and their motion should be denied. *See H.J. Heinz Co.*, 246 F.3d at 715 (to carry their burden of establishing a Section 7 violation, plaintiffs "must show that the merger would produce a firm controlling an undue percentage share of the relevant market, and would result in a significant increase in the concentration of firms in that market" (cleaned up)). Plaintiffs' reliance on a case from 1963 to argue that market shares alone establish a purported *per se* Section 7 claim is wrong under modern antitrust law. *Baker Hughes*, 908 F.2d at 989-91 (more recent cases "discarded *Philadelphia Bank*'s" formulation and carefully analyze evidence of market concentration); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1111 (N.D. Cal. 2004) ("A finding of market shares and consideration of the *Philadelphia Nat'l Bank* presumptions should not end the court's inquiry.").

Courts typically look at the degree of concentration in the relevant market and compare it with the degree to which the merger would increase concentration. *See Optronic Techs*, 20 F.4th at 485; *St. Alphonsus*, 778 F.3d at 783. The Herfindahl–Hirschman Index ("HHI") is a "widely accepted

MICROSOFT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:22-cv-08991-JSC

measure of market concentration."[4]  *Optronic Techs*, 20 F.4th at 485.  The HHI values show that what appear to be the comprehensible markets Plaintiffs are alleging are unconcentrated and highly competitive, both before and after the merger.   HHI values lower than 1,500 points show unconcentrated markets, and "[m]ergers resulting in unconcentrated markets are unlikely to have adverse competitive effects and ordinarily require no further analysis."  U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* § 5.3 (2010)[5]; *see also Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 414 F. Supp. 3d 1256, 1263 (N.D. Cal. 2019).   The following table shows HHI figures related to Plaintiffs' proposed video games, PC games, console games, and mobile games markets.



(Kilaru Decl., ¶¶ 5-6.)

### 3.   *Plaintiffs Did Not Show Barriers to Market Entry*

Even if Plaintiffs could properly establish a relevant market where Microsoft and Activision

---

[4] HHI "is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers."   U.S. Department of Justice, HERFINDAHL-HIRSCHMAN INDEX (Jul. 31, 2018), https://www.justice.gov/atr/herfindahl-hirschman-index.

[5] *St. Alphonsus*, 778 F.3d at 783, 786 (the Merger Guidelines are "often used as persuasive authority").

[6] Plaintiffs do not set forth the bounds of their proposed "video games" market.  They do not specify whether they claim that market to be a combination of their proposed PC, console, and mobile games markets, or whether it could include other types of video games and other economic substitutes. Microsoft does not provide these HHI numbers as an endorsement of this proposed market.  But for the sake of argument, it has calculated HHI figures for a purported "video game" market using the combined data for Plaintiffs' proposed PC, console, and mobile games markets.

  HHI numbers related to Plaintiffs' "Triple-A" market have not been provided, nor has Microsoft provided market share figures for that alleged "market" to the FTC.  Plaintiffs have not set forth the bounds of that market in a way that would allow Microsoft to estimate what might be included in it (nor have Plaintiffs set forth any of their own figures that could relate to that market).

1   Blizzard compete, and show that the combined firm would have the market power to raise prices or

2   restrain output in that market, Plaintiff would also need to demonstrate that other companies could not

3   easily enter to discipline the combined firm's ability to do so.  Plaintiffs have provided no evidence to

4   show that new competitors would not likely enter any of their alleged markets and correct any

5   supracompetitive prices or restricted output.  *See Baker Hughes*, 908 F.2d at 987 ("In the absence of

6   significant barriers [to entry], a company probably cannot maintain supracompetitive pricing for any

7   length of time."); *United States v. Calmar, Inc.*, 612 F. Supp. 1298, 1307 (D.N.J. 1985) (denying

8   injunction where "the potential entry by new or existing firms into the [relevant] market . . . will

9   prevent sustained unjustified price increases by the merged firm").  Plaintiffs' own allegations concede

10  that there are numerous video game developers.  (Compl. ¶¶ 62, 124-127.)  Having failed to set forth

11  any evidence of barriers to entry in any alleged market, Plaintiffs have not met their burden.[7]

12      The evidence confirms that the "video game market appears dynamic, innovative, and

13  competitive."  *Epic Games*, 559 F. Supp. 3d at 975.  In 2021 alone, there were approximately 1,700

14  unique titles launched on Nintendo Switch, 980 on Sony PlayStation, and 725 on Microsoft Xbox.

15  (Williams Decl., Ex. E.)  New games are created by developers small and large.[8]  There are numerous

16  success stories of new games that became popular within months.[9]  Plaintiffs' own exhibits

17  acknowledge the reality that an ecosystem of venture capitalists and other sources of funding have

18  sprung up, potentially increasing competition.[10]

19      Existing gaming companies could also increase output of gaming content to temper any

20

21  ───────────────

    [7] To be clear, barriers to entry is largely irrelevant because there is no evidence that Microsoft would
    have the ability to raise prices or reduce output after the merger.

22  [8] For example, large firms such as Amazon and Netflix are game developing studios.  (*See* Williams

23  Decl., Exs. F, G.)  Smaller "indie" developers are also plentiful.  (*See* Compl. ¶ 124.)  In fact, both
    Sony and Microsoft have made concerted efforts to grant indie developers access to their stores and

24  consoles.  (*See* Williams Decl., Exs. H, I.)

25  [9] As just one example, the immensely popular game title *PUBG: Battlegrounds* began as a developer's
    inexpensive creation for a type of gameplay, which has spurred innovation.  Major competitors like

26  Epic, EA, and Activision Blizzard have since developed their own take on that idea.  (*See* Williams
    Decl., Ex. J.)

27  [10] (Dkt. 4-2 at 83–84 (noting that "firms backed by venture capitalists and large firms that are primarily
    known for providing other online services have shown interest in entering the video game industry"

28  and that these firms may be able to "potentially increase competition in the industry").  (*See also*
    Williams Decl., Exs. K, L.)

13

potential anticompetitive effects.  *See Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, No. 1:21-cv-00540-AWI-EPG, 2022 U.S. Dist. LEXIS 126239, at *22 (E.D. Cal. July 15, 2022); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995).  Even a cursory glance of the video game industry shows a slew of developers and publishers creating hit games.  These include Sony, Nintendo, Riot Games, EA, Epic Games, Konami, Rockstar Games, Ubisoft, Sega Games, Square Enix, Capcom, Bandai Namco, Deep Silver, Warner Bros. Interactive, Koei Tecmo, CD Projekt RED, Remedy Entertainment, and Valve Corporation, to name a few.  (*See* Williams Decl., Ex. M.)  New titles often garner massive popularity and often outperform Activision Blizzard's *Call of Duty* both in sales and in critical acclaim.  (*See id.*)

## B.     Plaintiffs Are Not Likely to Succeed on Their Vertical Challenge to the Merger

Plaintiffs' theory of harm to competition in the "markets for gaming platforms" rests on the contention that Microsoft will be able to foreclose competition by withholding the availability of critical gaming content from rivals' platforms—other consoles, other PC operating systems, other cloud-based platforms, and other subscription services.  (Mot. at 17-21.)  This is known as a vertical foreclosure theory.  Section 7 claims for vertical mergers are "substantially more difficult than challenging a horizontal merger."  *See Physician Specialty Pharm., LLC v. Prime Therapeutics, LLC*, No. 18-cv-1044, 2019 U.S. Dist. LEXIS 159853, at *31 (D. Minn. Aug. 8, 2019).  There has not been a single case in the past 50 years in which the government or a private litigant has successfully enjoined a merger under this theory.  *See United States v. AT&T, Inc.*, 916 F.3d 1029, 1037 (D.C. Cir. 2019) ("There is a dearth of modern judicial precedent on vertical mergers . . . .").

Vertical mergers are typically *procompetitive*—they "encourage product innovation, lower costs for businesses, and create efficiencies—and thus reduce prices and lead to better goods and services for consumers."  *Comcast Cable Comm'ns, LLC v. FCC*, 717 F.3d 982, 990 (D.C. Cir. 2013) (Kavanaugh, J., concurring); *see also, e.g.*, *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007); *Alberta Gas Chems., Ltd. v. E. I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1244-45 (3d Cir. 1987).  Thus, it is not *per se* unlawful for a company to acquire a downstream product that is also used by its competitors.  *Fruehauf Corp. v. FTC*, 603 F.2d 345, 352 (2d Cir. 1979).  Vertical mergers only cause competitive harm in "certain circumstances."  *AT&T*, 310 F. Supp. 3d at 194

(quoting Non-Horizontal Merger Guidelines §§ 4, 4.2).

To challenge a vertical merger, Plaintiffs must use "case-specific evidence" to prove that (1) the vertical merger is likely to result in Microsoft foreclosing competitors' access to a downstream input _and_ (2) that the downstream input is critical, with no reasonable alternatives available, such that rivals will be deprived of a fair opportunity to compete.  *See AT&T*, 310 F. Supp. 3d at 202-04; *Brown Shoe Co. v. United States*, 370 U.S. 294, 323-24 (1962) (the "primary vice of a vertical merger" is that by foreclosing competitors' access to "a segment of the market otherwise open to them," rivals will be deprived "of a fair opportunity to compete").

Plaintiffs have not met their burden of establishing that they are likely to succeed, or have even raised serious questions, on these issues.  Microsoft's conduct—agreeing to make Activision Blizzard's games available on Nintendo and NVIDIA, and offering a legally enforceable contract to Sony—directly rebuts Plaintiffs' theory.  Even if, against all of the evidence, Microsoft made the games exclusive, Plaintiffs cannot prove that would substantially lessen competition, because competitors can still compete using numerous alternative games as their downstream inputs.

Defining a relevant market is also essential for Section 7 challenges to vertical mergers.  *Payment Logistics*, 2019 U.S. Dist. LEXIS 44075.  Plaintiffs assert the existence of markets for video game subscription services, game consoles, high-performance game consoles, computer operating systems, and cloud-based gaming without any evidentiary support grounded in economic realities.  For example, they do not address whether these platforms are economically distinct or whether they are reasonable alternatives.  Accordingly, Plaintiffs fail to meet their burden.

### 1.  *There Is No Reasonable Probability that Microsoft Will Foreclose Competition by Limiting Access to Activision Blizzard Games*

Plaintiffs' claim relies on the speculation that Microsoft will have the "means" and "incentive" to make Activision Blizzard's games exclusive to Xbox, Windows, or its cloud-gaming service.  (Mot. at 18, 19.)  Recent developments preclude this theory.  Microsoft has executed a contract with Nintendo that requires it to make *Call of Duty* available on the Nintendo Switch for the next 10 years, with releases to occur on the same day as Xbox, with full feature and content parity.  (Kilaru Decl., Ex. A; Williams Decl., Ex. N.)  It has similarly executed a contract with NVIDIA to make Activision

Blizzard and Xbox games available for 10 years on NVIDIA's cloud service, which is a service designed to "expand the addressable market" by offering high-performance gaming at a lower price and providing access to customers who "do not own, or cannot afford, the latest gaming systems." (Kilaru Decl., Ex. B; Williams Decl., Ex. C.)  It would inherit a contract that makes Activision Blizzard games available on Sony's platform through 2024.  (*See* Williams Decl., Ex. W; Kilaru Decl., Ex. E.) It has also made an offer of a binding contract to extend Sony's access to *Call of Duty*.  (Kilaru Decl., Exs. C, D, E; Williams Decl., Ex. O.)  Accordingly, Microsoft does not have the "means" to withhold competitors' access to the downstream content because such withholding is contractually impossible. *See FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 290 (D.D.C. 2002) ("[A] plaintiff must show that the substantial lessening of competition will be 'sufficiently probable and imminent.'") (quoting *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 623 n.22 (1974)).

Existing case law does not address a foreclosure theory in such circumstances where it is so clear that foreclosure of competitors cannot happen.  But in more uncertain circumstances, courts turn to examining the defendant's "incentive" to foreclose competitors' access to the downstream input. *See United States v. UnitedHealth Grp. Inc.*, No. 1:22-cv-0481 (CJN), 2022 U.S. Dist. LEXIS 170934, at *90 (D.D.C. Sept. 19, 2022); *AT&T*, 310 F. Supp. 3d at 210, 244-45.  Microsoft has no such incentive.  To the contrary, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  (*Id.*)  Microsoft's executed contracts demonstrate that Microsoft will *expand* consumers' access to the games.  That Microsoft has taken every step to guarantee competitors' access to Activision Blizzard games refutes any possible argument that it is incentivized to foreclose access.

Indeed, as the undisputed evidence shows, the primary strategic rationale for the deal is to give Microsoft a foothold on mobile to make games more accessible to consumers.  Right now, Apple and Google maintain a duopoly in mobile game distribution.  Microsoft hopes that acquiring Activision will allow it to challenge this duopoly, to the benefit of consumers.  (Kilaru Decl., Ex. C; Williams Decl., Ex. B.)  But the relevant point for present purposes is that this strategic rationale is consistent with the overall objective and commitment of expanding rather than contracting access to games.  *See Brown Shoe*, 370 U.S. at 329 & n.48 ("evidence indicating the purpose of the merging parties, where

available, is an aid in predicting the probable future conduct of the parties and thus the probable effects of the merger"). No public or private statement from Microsoft shows an intent to make Activision Blizzard's portfolio exclusive. Rather, private and public statements show that Microsoft's plan is to expand its mobile presence while maintaining and expanding Activision Blizzard's existing revenue streams from its hit franchises such as *Call of Duty*. (*See, e.g.*, Kilaru Decl., Ex. C; Williams Decl., Ex. P.)

Courts have rejected vertical foreclosure theories where the incentives would weigh against the acquiring company restricting competitors' access to downstream inputs. In *UnitedHealth Group*, the court evaluated a challenge to UnitedHealth's acquisition of a market-leading claim processing company (with a 70% market share in claims editing), which sold technological innovations that the government contended were "critical inputs to commercial health insurance." 2022 U.S. Dist. LEXIS 170934, at *4-9, *14. The government asserted a foreclosure theory that UnitedHealth would have the ability and incentive to raise rival payers' costs by withholding or delaying the claims processing innovations. *Id.* at *84. But the court found that the market structure incentivized UnitedHealth to continue selling the claims processing technology to rivals—otherwise, it "would risk sales to over 80 percent of the market" and "risk forgoing up to 40 percent of its total revenue." *Id.* at *90. The court held that the government failed to meet its *prima facie* burden. *Id.* at *91.

In *AT&T*, the court similarly found that the government's evidence on its foreclosure theory was "fatally anemic," where AT&T was incentivized to continue providing Time Warner's programming content to its rivals. 310 F. Supp. 3d at 210, 244-45, *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). AT&T executives stated their intent to continue to offer the content broadly. *Id.* at 210. Moreover, "wide distribution" would drive AT&T's revenue and there was no explanation as to why it would discard the profits associated with increased consumption. *Id.* at 244. Documents showing that AT&T recognized that "one possibility" was to "withhold or otherwise limit content from other distributors in an attempt to benefit AT&T's distribution platforms" were insufficient for the government to meet its burden, because that evidence was "a far cry from evidence that the merged company is likely to do so." *Id.* at 210. "Section 7 involves *probabilities*, not certainties or possibilities." *Id.* (quoting *Baker Hughes*, 908 F.2d at 984). Likewise, here, Plaintiffs cannot show a

probability that Microsoft will discard the profits associated with a wider distribution of gaming content sales.

Plaintiffs' only argument is that Microsoft has previously acquired another game developer, ZeniMax Media, and made certain of ZeniMax's games exclusive after stating that it would not have an incentive to do so.  The suggestion that Microsoft reversed course on ZeniMax games is untrue.  Microsoft only discussed its plans regarding content that was already available on rival platforms, not brand new future content.  (Williams Decl., Ex. V.)  Future ZeniMax titles not yet available for any platform would be treated on a case-by-case basis, and Microsoft has decided to keep two future releases exclusive to compete with Sony's catalog of well-established exclusive games.  (*See id.*)  Microsoft did not reverse any contractual (or other) promise to continue making the games available to rivals.  Its contractual guarantees here eclipse any speculation that Microsoft may make *Call of Duty* exclusive.  Further, Microsoft's intent is to treat *Call of Duty* like its past acquisition of *Minecraft*—a popular multi-player game for which Microsoft also expanded, rather than restricted, competitors' access after acquiring it.  (Kilaru Decl., Exs. C, E; Williams Decl., Ex. P.)  *Minecraft* and *Call of Duty* are both successful games with a broad multi-platform community of engaged players.  (Williams Decl., Ex. P.)  Accordingly, Plaintiffs have not shown a "'reasonable probability' of a substantial impairment of competition"; a "'mere possibility' will not suffice."  *Fruehauf*, 603 F.2d at 351.

**2.**  ***Microsoft's Larger Rivals Have Access to Innumerable Alternative Games***

Even if Plaintiffs could prove a likelihood that Microsoft will withhold rivals' access to the games, that is not enough.  They must further establish that Activision Blizzard's gaming content is a critical input in the market, such that rivals would be deprived of a fair opportunity to compete without access to it.  *See Brown Shoe*, 370 U.S. at 323-24; *AT&T*, 310 F. Supp. 3d at 202-04 (rejecting foreclosure theory where, although programming content was important and valuable, it was not "must have" and the evidence was not persuasive in showing that its foreclosure would materially impact competition); *Fruehauf*, 603 F.2d at 360 (rejecting foreclosure theory because "some market foreclosure may ensue from the merger, but not one that deprives rivals from major channels of distribution, much less one that excludes them from the market altogether").  If rivals can simply compete using alternative games, Plaintiffs' claim of a reasonable probability of substantial

competitive harm would not make economic sense.  *See Syufy*, 903 F.2d at 662 n.3 & 663-64.

Plaintiffs make the unsupported assertions that Activision Blizzard's "top gaming content is a critical input to rival platform manufacturers" and that "[w]ithout adequate gaming content available for a given platform, the platform will not be successful."  (Mot. at 18:8, 18:14-15.)  These claims are belied by the fact that there are numerous games available for console play, including other high-ranking and critically acclaimed games.  (Williams Decl., Ex. M.)  Nintendo is a larger competitor than Microsoft even though it currently does not have access to Activision Blizzard games (it would gain access post-merger)—conclusively proving that Microsoft's larger rivals can compete using other games.  (*See* Kilaru Decl., Exs. A, F.)  Sony also competes with other games, including those exclusive to Sony PlayStation, such as the popular game *God of War: Ragnarok*.  (Williams Decl., Ex. M.)  Activision Blizzard's market share of console game publishing revenues is only ██% globally and ██% in the U.S.  (Kilaru Decl., Exs. J, K.)

Plaintiffs have failed to provide *any evidence* that Activision Blizzard games are critical inputs.  They have not met their burden of showing a likelihood of success or even serious questions on the merits.  The evidence shows that they could not: with so many alternative downstream inputs, Plaintiffs' foreclosure theory fails.

### C.    Plaintiffs Are Not Likely to Succeed in Their Miscellaneous Theories

#### 1.    *Plaintiffs' Labor Market Theory Fails*

Plaintiffs cannot establish a likelihood of success on the merits of a Section 7 claim for a video game labor market because they lack standing to assert this theory.  The burden is on Plaintiffs to prove antitrust standing, which requires a showing of antitrust injury and that Plaintiffs are "appropriate antitrust plaintiff[s]."  *Hairston v. Pac. 10 Conf.*, 101 F.3d 1315, 1321 (9th Cir. 1996).  "Antitrust injury requires the plaintiff to have suffered its injury *in the market where competition is being restrained*.  Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1057 (9th Cir. 1999) (emphasis added).  Plaintiffs are not participants "in the labor market for video game labor talent."  (Compl. ¶ 224.)  Accordingly, Plaintiffs cannot pursue a preliminary injunction based on that theory.  *See In re Dynamic Random Access*

1   *Memory Antitrust Litig.*, 516 F. Supp. 2d 1072, 1090 (N.D. Cal. 2007) ("[A]ntitrust standing is granted

2   only where the plaintiff is a participant in the relevant market - e.g., a consumer or competitor in the

3   relevant market alleged.").

4       Additionally, Plaintiffs' own exhibit undermines its theory of anticompetitive harm in the labor

5   market for video game developers.  (*See* Dkt. 4-2 at 88 (stating that Microsoft's acquisition of ZeniMax

6   allowed it to "operate independently" and that "without the acquisition, ZeniMax would have likely

7   faced layoffs and released fewer games"); *id.* at 89 (noting Microsoft's labor neutrality agreement with

8   the Communications Workers of America and that "it is unclear whether working conditions would

9   improve if" the merger did not occur).)  Far from meeting their burden of providing evidence to support

10  this theory, the only evidence Plaintiffs have provided cuts against it.  Plaintiffs fail to provide any of

11  the required evidence to support their claim.  They do not show the contours of a relevant labor pool

12  or geographic market.  They cite no market share statistics or market concentration for the labor pool.

13        **2.**    ***Plaintiffs' Nascent Competition Theory Fails***

14      Plaintiffs also request a preliminary injunction due to Activision Blizzard's potential ability

15  and incentive to enter unknown "nascent or potential" markets, citing *United States v. Falstaff Brewing*

16  *Corporation*, 410 U.S. 526 (1973). (Mot. at 22.)  But Plaintiffs provide no evidence to support these

17  vague and conclusory allegations.  The Supreme Court last commented on the potential competition

18  doctrine in *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 623 (1974), where it made

19  clear that a plaintiff must first identify the target market *and* show that it is highly concentrated with

20  "dominant participants in the target market engaging in interdependent or parallel behavior *and* with

21  the capacity effectively to determine price and total output of goods or services."  *Id.* at 630 (emphasis

22  added).  Only then can the plaintiff attempt to prove anticompetitive harm within the target market by

23  showing either that the defendant is an actual potential entrant or a perceived potential entrant to the

24  market.  *Id.*  Each entrant theory requires specific evidentiary findings.[11]

---

25  [11] In *FTC v. Meta Platforms, Inc.*, Judge Davila conducted an extensive analysis of the FTC's claim
26  that Meta's acquisition of Within should be blocked because Meta was an actual or perceived
    competitor.  No. 5:22-cv-04325, 2023 U.S. Dist. LEXIS 29832 (N.D. Cal. Jan. 31, 2023).  He noted
27  that the Ninth Circuit has not established the standard of proof for this claim, but that other courts had
28  demanded a range of proof from "strict proof" (Fourth Circuit) to "reasonable probability" (Eighth

1    Plaintiffs fail entirely to engage in the exacting test for establishing Activision Blizzard as a

2    potential competitor.  Plaintiffs quote *Falstaff* but fail to support the case's legal propositions with

3    facts.  *See Dehoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 764 (9th Cir. 2018) ("The claim is

4    doomed from the start because the potential competitor theory lacks factual allegations in the

5    complaint.").  Here, there is no evidence as to what "potential" markets Activision Blizzard has the

6    intent—not to mention the feasible ability—to enter.  Instead, Plaintiffs speculate in a single sentence

7    about Activision Blizzard's ability to enter the markets for multi-game subscription services or cloud-

8    based gaming.  (Mot. at 22.)  Plaintiffs make no effort to show that these markets are currently highly

9    concentrated, or that Activision Blizzard fulfills the actual or perceived potential entrant tests.  The

10   Court should accordingly deny Plaintiffs' one sentence request for a preliminary injunction on the

11   basis of protecting nascent or potential competition.

### 3.  *The Merger's Procompetitive Benefits Outweigh Any (Speculative) Adverse Competitive Effects*

Microsoft's acquisition of Activision Blizzard will expand the output and accessibility of its

gaming content in many ways, including:

- Activision Blizzard presently does not offer its gaming content on any subscription service, but Microsoft will offer Activision Blizzard's existing portfolio and new releases on Game Pass, expanding consumers' choice and ability to access this content (at lower prices).  (Williams Decl., Ex. Q.)

- Activision Blizzard's portfolio, including the *Call of Duty* franchise, has not been available to Nintendo console owners since 2014, but, on February 22, 2023, Microsoft announced a 10-year agreement to bring Activision Blizzard's gaming content to over 100 million Nintendo Switch users if the transaction closes.  (Kilaru Decl., Ex. A; Williams Decl., Ex. R, S.)

- Activision Blizzard's portfolio is presently not available on any cloud-streaming service, but Microsoft has also announced a 10-year licensing agreement with NVIDIA

27

28   Circuit).  *Id.* at *67–68.  Regardless of the standard of proof, the court denied the motion for preliminary injunction examining the extensive factual evidence presented on the actual and perceived competitor theory.  *Id.* at *69–88.  Plaintiffs have presented no such evidence here.

for Activision Blizzard's games.  (Kilaru Decl., Ex. B; Williams Decl., Ex. T.)
Notably, NVIDIA is a third-party cloud-streaming service, which shows that
Microsoft has no incentive to make access to Activision Blizzard's games exclusive to
its cloud-streaming service.

Beyond these immediate and concrete procompetitive benefits, the merger would also enable
Microsoft to leverage Activision Blizzard's mobile presence to compete with Apple and Google's
duopoly in the mobile app store space.  (Williams Decl., Ex. B.)  Foreign regulators already recognize
the existence of this duopoly and enjoining the merger now would only further cement Apple and
Google's dominance.  (Williams Decl., Ex. U.)  The merger will expand access to millions of gamers,
whereas blocking the merger maintains a situation where Sony has a dominant share and blocks
innovation.  Given these procompetitive benefits, Plaintiffs cannot show, as they must for any of their
theories, that the merger may "substantially" lessen competition.  *St. Alphonsus*, 778 F.3d at 790.

### D.   Plaintiffs Have Not Shown a Likelihood of Irreparable Harm

A *sine qua non* of injunctive relief is a showing that the conduct at issue, if not enjoined, would
cause irreparable harm to the party requesting the injunction.  Harm compensable by monetary
damages is not "irreparable."  *See ET Trading, Ltd. v. ClearPlex Direct, LLC*, No. 15-CV-00426-
LHK, 2015 U.S. Dist. LEXIS 25894, at *8 (N.D. Cal. Mar. 2, 2015).  Plaintiffs' case primarily
concerns a monetary issue.  Plaintiffs allege that Microsoft will gain outsized market power that allows
it to charge anticompetitive prices for Activision Blizzard games.  *See Golden Gate Pharm. Servs.,
Inc. v. Pfizer, Inc.*, No 3:09-cv-03854, 2009 U.S. Dist. LEXIS 133999, at *3 (N.D. Cal. Oct. 22, 2009)
("injuries resulting from higher prices would appear to be injuries fully compensable by an award of
monetary damages").

Plaintiffs speculate about the potential for a reduction in "their ability to experience the most
innovative, entertaining, and highest-quality gaming content on the widest range of platforms, at
competitive prices."  (Mot. at 23.)  Such speculation is insufficient to carry their burden.  Plaintiffs
have not shown how they, specifically, will be irreparably harmed.  Absent any such showing,
Plaintiffs' motion for a preliminary injunction must be denied.  This case is like *Malaney v. UAL
Corp.*, No. 3:10-CV-02858-RS, 2010 U.S. Dist. LEXIS 106049, at *47-48 (N.D. Cal. Sept. 27, 2010),

in which each plaintiff submitted a declaration "stating an unformed hope of future air travel," but did not declare set plans to travel on the routes at issue.  Failing to prove imminent harm that would be "personal to them," the plaintiffs failed to establish irreparable harm.  *Id.*  Likewise, here, Plaintiffs submitted declarations vaguely noting their enjoyment of games and their concerns about the merger, but they have not established that the merger would result in an imminent impact on products that they have a set plan to purchase.

Moreover, Plaintiffs will be able to continue playing their Activision Blizzard games wherever they currently play them.  Activision Blizzard games will continue to be available on Sony consoles at least until 2024 (pursuant to Activision Blizzard's contract with Sony, which Microsoft would inherit).  They can continue to play the games on their PCs.  They would not need to purchase any new products to continue playing.  The merger would allow them to play the games on even more platforms, due to Microsoft's contracts with Nintendo and NVIDIA.

### E.    The Balance of the Equities Disfavors an Injunction

Plaintiffs fail to demonstrate that the balance of the equities weighs in their favor, let alone sharply in their favor.  Plaintiffs must "present evidence" to prove that "the harm to the parties and to the public that would flow from a preliminary injunction is outweighed by the harm to competition, if any, that would occur in the period between denial of a preliminary injunction and the final adjudication of the merits of the Section 7 claim."  *FTC v. Lab. Corp. of Am.*, No. SACV 10-1873 AG (MLGx), 2011 U.S. Dist. LEXIS 20354, at *55 (C.D. Cal. Feb. 22, 2011) (internal quotation marks omitted).

The private equities between the parties weigh against an injunction.  As discussed above, Plaintiffs have failed to show any irreparable injury specific to themselves if the merger is consummated.  Given this failure, the Court does not need to go further to deny the injunction. *Malaney*, 2010 U.S. Dist. LEXIS 106049, at *48.  But the harm to Microsoft and Activision Blizzard that could arise from a preliminary injunction is steep, because "[e]xperience seems to demonstrate that" a preliminary injunction is "likely to spell the doom of an agreed merger."  *FTC v. Occidental Petroleum Corp.*, No. 86-900, 1986 U.S. Dist. LEXIS 26138, at *33 (D.D.C. Apr. 29, 1986); *accord FTC v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980); *FTC v. Great Lakes Chem. Corp.*, 528 F.

Supp. 84, 99 (N.D. Ill. 1981).  Plaintiffs acknowledge that enjoining this transaction would have material adverse financial consequences to Microsoft.  (Compl. ¶ 66 (noting a $3 billion reverse termination fee if the merger fails).)  Accordingly, the balance of equities tips in Microsoft's favor, and certainly does not tip sharply in Plaintiffs' favor so as to justify application of the serious questions test.

The public equities also disfavor an injunction because the procompetitive effects of the merger are likely to outweigh the conclusory harms that Plaintiffs assert.  *See Great Lakes Chem. Corp.*, 528 F. Supp. at 98 (denying preliminary injunction after considering procompetitive effects of merger). Additionally, "[b]ecause of courts' preferences for narrow rather than broad remedies," a preliminary injunction is not appropriate where Plaintiffs could later bring a post-merger Section 7 claim.  *Lab. Corp.*, 2011 U.S. Dist. LEXIS 20354, at *61-62 (concluding "that the balancing of the equities strongly favors Defendants").  Rather than blocking a transaction based on guesses about future behavior in a competitive and ever-changing market, it would be prudent for the Court to wait to consider what actions worldwide regulators have taken, new developments like contractual agreements with competitors, and whether any cognizable, post-merger anticompetitive effects materialize.  Plaintiffs misrepresent the holding in *Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1023 (9th Cir. 2016). In *Boardman*, the defendant did not establish how it would be harmed by the preliminary injunction, tipping the balance to the Plaintiffs.  *Id.*  Here, the balance of the equities lands firmly and only in favor of Microsoft.

## VI.   CONCLUSION

Microsoft requests that the Court deny Plaintiffs' Motion for a Preliminary Injunction.

Dated: March 2, 2023                    Respectfully submitted,


By:   _/s/ Valarie C. Williams_

Valarie C. Williams
B. Parker Miller
Tania Rice
Tyler Blake
Alston & Bird LLP

Rakesh N. Kilaru
Anastasia M. Pastan
Jenna Pavelec
Wilkinson Stekloff LLP

*Counsel for Defendant Microsoft Corporation*

MICROSOFT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:22-cv-08991-JSC