UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANTE DEMARTINI, et al.,<br><br>   Plaintiffs,<br><br>   v.<br><br>MICROSOFT CORPORATION,<br><br>   Defendant. | Case No. 22-cv-08991-JSC<br><br>**ORDER GRANTING MOTION TO DISMISS** |

Plaintiff video gamers sue under the Clayton Act, Sections 7 and 16, to enjoin the merger of Microsoft Corporation and video game developer and publisher Activision Blizzard. Pending before the Court is Microsoft's motion to dismiss. (Dkt. No. 42.[1]) After carefully considering the complaint, the parties' submissions, and having had the benefit of oral argument on March 16, 2023, the Court GRANTS the motion with leave to amend. The Complaint does not plausibly allege the merger creates a reasonable probability of anticompetitive effects in any relevant market.

## BACKGROUND

On January 18, 2022, Microsoft announced plans to acquire Activision Blizzard for approximately $70 billion. (Dkt. No. 1 ¶ 2.) The acquisition "would be the largest merger of technologies companies ever." (*Id.* ¶ 3.) Microsoft and Activision are "each significant rivals in the video game development, publishing, and distribution markets." (*Id.* ¶ 4.) If the merger proceeds, "Microsoft may have far-outsized market power, with the ability to foreclose rivals, limit output, reduce consumer choice, raise prices, and further inhibit competition." (*Id.* ¶ 12.)

---

[1] Record Citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

On December 20, 2022, Plaintiff consumers of video games sued under Sections 7 and 16 of the Clayton Act to stop the merger. (Dkt. No. 1.) At the same time, they filed a motion for preliminary injunction. Microsoft initially moved to stay this case pending resolution of a Federal Trade Commission (FTC) administrative action initiated on December 8, 2022 seeking similar remedies. (Dkt. No. 26.) The Court denied the motion, but Microsoft stipulated the merger would not occur before May 1, 2023. (Dkt. Nos. 33, 48.) The Court accordingly scheduled the motion for preliminary injunction to be heard on April 13, 2023, and directed Microsoft to produce certain discovery. (Dkt. No. 48.) In the meantime, Microsoft moved to dismiss the complaint on ripeness and standing grounds, and for failure to state a claim. (Dkt. No. 42.) The Court heard oral argument on March 16, 2023.

**DISCUSSION**

"Section 7 of the Clayton Act generally prohibits business acquisitions whose effect 'may be substantially to lessen competition, or tend to create a monopoly' in a relevant market." *Dehoog v. Anheuser-Busch Inbev SA/NV*, 899 F.3d 758, 762 (9th Cir. 2018) (quoting 15 U.S.C. § 18.) Section 16 of the Clayton Act permits a private plaintiff to obtain injunctive relief for a Section 7 violation upon showing "threatened loss or damage." 15 U.S.C. § 26. The threatened loss or damage must be personal to the private plaintiff. *See Cal. v. Am. Stores Co.*, 495 U.S. 271, 296 (1990); *United States v. Borden Co.*, 347 U.S. 514, 518 (1954).

**I.     Article III Jurisdiction**

The Court first addresses Microsoft's Rule 12(b)(1) motion arguing lack of ripeness and lack of standing. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94 (1998).

**A.     Ripeness**

Microsoft argues the Section 7 claim is not ripe because the merger is under regulatory review and may look different or not happen at all. For the Article III case or controversy requirement to be satisfied, "the case must be 'ripe'—not dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 141 S. Ct. 530, 535 (2020). In *Trump*, for example, the plaintiffs challenged as unlawful the President's stated intent to exclude undocumented aliens from apportionment for congressional representation

2

and federal funding. The Supreme Court held the case was not ripe because there was so much uncertainty about whether such a policy would ever be enacted. *Id*. at 535-36. But here, in contrast, the merger agreement has been executed and Microsoft does not dispute the merger could occur any time on or after May 22, 2023 (and only not until then because Microsoft stipulated not to merge before then). That the contours of the contracted-for merger may later change does not mean Plaintiffs' challenge is not currently ripe.

Microsoft's reliance on *S. Austin Coal. Cmty. Council v. SBC Commc'ns Inc.*, 191 F.3d 842 (7th Cir. 1999), fails to persuade the Court otherwise. First, the court did not hold a Section 7 challenge is not ripe for jurisdictional purposes until all of the regulatory approvals have been completed. To the contrary, the court observed that "[w]hether the district judge should have equated lack of ripeness to lack of subject-matter jurisdiction is debatable; sometimes prematurely filed suits are retained on the docket until it is time to proceed." *Id*. at 844. It ultimately upheld the district court's dismissal because the plaintiff's lone claim of prejudice—a potential laches defense—was ameliorated by a stipulation from the defendants that they would not raise a laches defense. *Id*. at 845. Thus, *S. Austin Cmty. Council* it is best read as affirming the district court's case management decision rather than holding the district court lacked subject matter jurisdiction. Further, while Microsoft repeats its mantra that it cannot consummate the merger until the European authorities approve the merger, it does not offer any evidence to support that assertion.

In sum, to accept Microsoft's ripeness argument would mean in practice a Section 7 merger challenge is not ripe until the merger has happened. But that argument contradicts Section 16's language which permits a private plaintiff to sue against "*threatened* conduct." 15 U.S.C. § 26 (emphasis added); *see also Malaney v. UAL Corp*., No. 3:10-CV-02858-RS, 2010 WL 3790296, at *5 (N.D. Cal. Sept. 27, 2010), aff'd, 434 F. App'x 620 (9th Cir. 2011). Further, as the Supreme Court has observed, "the Senate declared the objective of the Clayton Act to be as follows:

> *** Broadly stated, the bill, in its treatment of unlawful restraints and monopolies, seeks to prohibit and make unlawful certain trade practices which, as a rule, singly and in themselves, are not covered by the [Sherman] Act . . ., or other existing anti-trust acts, and thus, by making these practices illegal, to arrest the creation of trusts,

3

conspiracies, and monopolies *in their incipiency and before consummation*.

*United States v. E. I. du Pont de Nemours & Co.,* 353 U.S. 586, 597 (1957) (emphasis added). Incipiency in this context means "any time when the acquisition threatens to ripen into a prohibited effect." *Id.*; *see also John Lenore & Co. v. Olympia Brewing Co.,* 550 F.2d 495, 498 (9th Cir. 1977) (Section 7 of the Clayton Act "is primarily a prophylactic measure intended to stop anti-competitive corporate mergers and acquisitions before those events could cause harm").

### B. Standing

Next, Microsoft argues Plaintiffs do not have standing to pursue their Section 7 claim.

#### 1. No standing because transaction has not been approved

First, Microsoft argues the named plaintiffs have not sufficiently alleged standing because "the merger has not closed and is pending regulatory approval." (Dkt. No. 42 at 21.) It thus contends Plaintiffs cannot show the necessary threat of injury that is "certainly impending." *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *see also TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210 (2021) ("a person exposed to a risk of future harm may pursue forward-looking, injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial"). But this argument repeats its ripeness argument and, in any event, Microsoft cites no evidence to support its attorney argument the transaction cannot close pending European regulatory examination. Further, the district court case upon which it relies, *Cassan Enterprises, Inc. v. Avis Budget Grp., Inc*., 10-cv-1934-JCC (W.D. Wash. March 11, 2011), involved a challenge to a merger during the waiting period when the parties were statutorily barred from merging. It is undisputed that statutory bar is not in effect here.

#### 2. No standing based on competition for labor

Next, Microsoft argues Plaintiffs do not have standing to pursue a Section 7 claim based upon anticompetitive effects in the labor market. Plaintiffs do not contend the alleged anticompetitive effects in the labor market will damage them (Dkt. No. 61 at 27); thus, they do not have standing to pursue such claim. *See California v. Am. Stores Co*., 495 U.S. 271, 296 (1990) (Under the Clayton Act "[a] private litigant, . . . must have standing—in the words of § 16, he

4

1   must prove 'threatened loss or damage' to his own interests in order to obtain relief"); *United*
2   *States v. Borden Co.*, 347 U.S. 514, 518 (1954) (holding that a private plaintiff may obtain
3   injunctive relief under Section 16 only when he establishes the antitrust injuries are personal).
4         Plaintiffs insist that because they allege threatened loss or damage from other alleged
5   merger anticompetitive effects, for example, foreclosing access to certain videogames, they have
6   standing to pursue a claim based on the alleged harm to competition for labor. Unsurprisingly,
7   they cite nothing to support that argument. The law is to the contrary. *See TransUnion,* 141 S. Ct.
8   at 2208 ("standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each
9   claim that they press and for each form of relief that they seek"). To the extent Plaintiffs' claim is
10  premised on reduced competition in the labor market, it is dismissed without prejudice for lack of
11  standing.

12  **II.     Failure to State a Claim**

13        Microsoft argues Plaintiffs have not plausibly alleged a Section 7 violation. "Section 7 of
14  the Clayton Act requires Consumers to first establish a prima facie case that a merger is
15  anticompetitive." *Dehoog v. Anheuser-Busch Inbev SA/NA*, 899 F.3d 758, 763 (9th Cir. 2018)
16  (quoting *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd*., 778 F.3d 775, 783
17  (9th Cir. 2015)). "In practical terms, this means adequately alleging facts that an acquisition
18  creates 'an appreciable danger' or a 'reasonable probability' of anticompetitive effects in the
19  relevant market." *DeHoog*, 899 F.3d at 763. So, "[d]etermination of the relevant product and
20  geographic markets is a necessary predicate to deciding whether a merger contravenes the Clayton
21  Act." *Saint Alphonsus Med. Ctr.-Nampa*, 778 F.3d at 788; *see also U.S. v. Marine*
22  *Bancorporation, Inc.*, 418 U.S. 602, 618 (1974); *Fount-Wip, Inc. v. Reddi-Wip, Inc*., 568 F.2d
23  1296, 1301 (9th Cir. 1978) (in Section 7 case, holding the plaintiffs failed to meet their burden
24  because "of their failure adequately to define and to prove the relevant market, which is a
25  necessary predicate for evaluating claims under these provisions of the antitrust laws"). "Section
26  7 does not require proof that a merger or other acquisition [will] cause[] higher prices in the
27  affected market. All that is necessary is that the merger create an appreciable danger of such
28  consequences in the future." *St. Alphonsus Med. Ctr.-Nampa*, 778 F.3d at 788.

United States District Court
Northern District of California

Plaintiffs allege 10 different product markets and sub-markets:

- Video Games
- Console Gaming
- PC Gaming
- Mobile Gaming
- AAA Video Games
- Video Game Subscription Services
- Game Console Systems
- High-Performance Console Systems
- Computer Operating Systems
- Cloud-Based Gaming

(Dkt. No. 1 ¶¶ 130-203.)  They also allege the United States is the relevant geographic market. (*Id.* ¶ 204.)  Microsoft does not challenge the adequacy of the alleged markets; instead, it argues Plaintiffs have not alleged facts that plausibly support an inference the merger creates an appreciable danger of anticompetitive effects in any one of, or any combination of, these markets. *See Dehoog*, 899 F.3d at 763.  The Court agrees.

**A.  Horizontal Merger Theory**

Plaintiffs allege Microsoft and Activision are direct competitors in (1) game development for the console and PC gaming markets, (2) game publishing for the console and PC gaming markets, and (3) game distribution for the console and PC gaming markets.  (Dkt. No. 1 ¶¶ 257-275.)  For each of these combination of markets, Plaintiffs baldly conclude that by eliminating a rival, "competition would be substantially lessened."  (*Id.* ¶¶ 257, 261, 266, 275.)  The Complaint lacks allegations that support a plausible inference of a reasonable probability of anticompetitive effects in those markets.

The allegations as to competition in game distribution for the console and PC gaming markets are illustrative.  Plaintiffs allege:

> Microsoft and Activision Blizzard directly compete in the game distribution market.

> Activision owns www.battle.net, where it sells PC games to consumers.
>
> Microsoft owns the Microsoft Store, where is also sells PC games to consumers.
>
> Microsoft also provides a game subscription service called Game Pass.
>
> If the acquisition of Activision Blizzard by Microsoft were to be completed, Activision Blizzard, an exceptionally strong and important competitor in the game distribution market, and a significant rival of Microsoft, would be eliminated and competition would be substantially lessened.

(*Id*. ¶¶ 262-266.) That's it. No factual allegations as to market share, other competitors, or even what anticompetitive conduct is at risk of occurring in these markets that may injure the plaintiffs and why it is reasonably probable to happen. Plaintiffs' general allegation that the merger may cause "higher prices, less innovation, less creativity, less consumer choice, decreased output, and other potential anticompetitive effects" (*id.* ¶ 223) is insufficient. Why? How? *See In re Century Aluminum Co. Sec. Litig*., 729 F.3d 1104, 1107 (9th Cir. 2013) ("the complaint's allegations must . . . suggest that the claim has at least a plausible chance of success"). Elsewhere the Complaint alleges that in 2022 Game Pass accounted for 60% of the video game subscription market (*id*. ¶ 47), but there is nothing in the Complaint that tethers that number to a plausible reasonable probability the merger will cause anticompetitive effects in game distribution for the console and PC gaming markets. In sum, Plaintiffs do not allege facts sufficient to plausibly state a Section 7 claim under their horizontal merger theory.

### B.  Vertical Merger Theory

Plaintiffs also claim a reasonable probability of harm from anticompetitive effects of the vertical aspects of the merger; in particular, that Microsoft will make Activision's games only available on Microsoft platforms, for example, Xbox, Windows, or Microsoft's game subscription service. (Dkt. No. 1 ¶¶ 280-291) In particular, they allege Activision's *Call of Duty* is one of the most important gaming franchises, and that although it is currently offered across multiple gaming platforms, including Sony PlayStation (*id.* ¶ 286), following the merger Microsoft would have the ability to make "some or all of Activision Blizzard's important catalog of games, including *Call of*

7

*Duty*, exclusive to Microsoft platforms or partially exclusive." (*Id.* ¶¶ 290-91.) This exclusivity ability creates an appreciable danger of harm to competition between Xbox and PlayStation and between Microsoft and rival PC operating systems, including Mac. (*Id.* ¶¶ 293, 296-99.)

These allegations do not plausibly support a reasonable probability of anticompetitive effects in a particular market that would harm Plaintiffs. While Plaintiffs allege Microsoft might obtain the ability to make Activision's games exclusive, and they assert Microsoft would have an incentive to do so, they do not make any factual allegations that support the conclusory incentive assertion. Why would Microsoft make *Call of Duty* exclusive to its platforms thus resulting in fewer games sold? What is it about the console market or PC games market and Microsoft's position in those markets that makes it plausible there is a reasonable probability Microsoft would take such steps. Plaintiffs fail to meet their pleading burden because the complaint does not allege facts that suggest answers to these questions. *See United States v. Syufy Enterprises*, 903 F.2d 659, 663 (9th Cir. 1990) (stating all antitrust cases must make economic sense).

At best, Plaintiffs describe past behavior where Microsoft has failed to keep its promises to regulators. For example, Plaintiffs emphasize their allegations that when in 2020 Microsoft acquired ZeniMax Media, which contained the "highly popular" Bethesda publisher, it stated it would "honor exclusivity commitments made by Bethesda for one year, and after that determine exclusivity on a case by case basis. Microsoft also assured the European Commission during its regulatory approval of the deal, that Microsoft would not have the incentive to cease or limit making ZeniMax games available for purchase on rival consoles." (Dkt. No. 1 ¶ 302.) Yet, Microsoft has announced it will make future ZeniMax editions exclusive to Microsoft platforms. (*Id.* ¶¶ 303-304.) "Similar exclusivity decisions were reached after acquiring other studios, such as Obsidian, inXile, and Ninja Theory." (*Id.* ¶ 305.). So, while Microsoft has made "public promises" to keep *Call of Duty* available on competitors' platforms, Plaintiffs allege this promise is illusory. (*Id.* ¶ 306.)

These allegations come closer to stating a prima facie Section 7 claim than the horizontal theory allegations, but still fall short of plausibility. Again, as there are no allegations as to the size of the other acquired studios for which Microsoft made "[s]imilar exclusivity decisions," the

8

place of ZeniMax games in the relevant markets, whether Microsoft or Sony currently have exclusive titles on their platforms, the place of those titles in the market, or similar factual allegations, Plaintiffs' allegations do not cross the line to plausible probability. *See Med Vets, Inc. v. VIP Petcare Holdings, Inc.,* 811 F. App'x 422, 423–24 (9th Cir. 2020); *see also United States v. Gen. Dynamics Corp*., 415 U.S. 486, 498 (1974) (To evaluate "the probable anticompetitive effect of a merger," courts "examin[e] the particular market—its structure, history and probable future[.]"). While the allegations support an inference Microsoft is willing to break its public promises, why would it do so as to *Call of Duty*? The Complaint does not allege facts that support a plausible inference it is reasonably probable it will do so. *See In re Century Aluminum Co. Sec. Litig*., 729 at 1107 ("the complaint must allege factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged") (cleaned up).

Is it possible Microsoft will make Activision's game catalog fully or partially exclusive? Yes. Have Plaintiffs alleged facts that make it plausible Microsoft is reasonably likely to do so? Without more factual context, no. Plaintiffs' allegations, including that *Call of Duty* "has been developed for the Xbox, the PlayStation, and for Windows PCs, and can be purchased for all three of those platforms" (*id.* ¶ 110), and in that market context "is currently one of the largest game franchises by user base and revenue" (*id.* ¶ 71), with the latest installment amassing "more than $1 billion in sales within ten days of release" (*id.* ¶ 285), are equally consistent with there being no appreciable danger Microsoft will make Activision's games exclusive to Microsoft's platforms, at least not games amassing $1 billion within ten days of release across several platforms. Such equality of possibility is insufficient. *See In re Century Aluminum Co. Sec. Litig*., 729 at 1108. What are missing are allegations that plausibly suggest it is reasonably probable to make economic sense for Microsoft to make the successful Activision gaming franchises exclusive. *See Syufy Enterprises*, 903 F.2d at 663 (stating all antitrust cases must make economic sense).

Plaintiffs' assertion that they need only show "ephemeral possibilities" (Dkt. No. 61 at 16) ignores their pleading burden and Supreme Court law. *See United States v. Marine Bancorporation, Inc*., 418 U.S. 602, 622-23 (1974) ("But it is to be remembered that s[ection] 7 deals in 'probabilities,' not 'ephemeral possibilities.'") (quoting *Brown Shoe Co. v. United States*,

9

370 U.S. 294, 323 (1962)).  Plaintiffs must allege facts tethered to the relevant market(s) to plausibly suggest a reasonable probability of anticompetitive effects and accompanying harm to Plaintiffs in those markets.

### C. Plaintiffs' Arguments are Unpersuasive

Plaintiffs insist that to meet their prima facie burden they need only allege an appreciable danger "of elimination of a rival."  (Dkt. No. 61 at 17.)  So, because they have alleged Microsoft and Activision are non-trivial competitors in game development, game publishing, and game distribution (Dkt. No. 1 ¶¶ 252, 257, 258, 261, 262, 266, 267, 275), they have met their prima face burden and the motion to dismiss must be denied.  But this argument ignores binding Ninth Circuit precedent.  To meet its prima facie burden, a plaintiff must allege facts that plausibly show it is reasonably probable a merger will be anticompetitive  *Dehoog v. Anheuser-Busch Inbev SA/NA*, 899 F.3d 758, 763 (9th Cir. 2018).  "In practical terms, this means adequately alleging facts that an acquisition creates 'an appreciable danger' or a 'reasonable probability' of anticompetitive effects in the relevant market."  *Id.*; *see also Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 785 (9th Cir. 2015) (to meet its prima facie burden, the plaintiff must establish "that the merger will probably lead to anticompetitive effects in that market").  Merely alleging the elimination of a rival does not plausibly support an inference of an appreciable danger of anticompetitive effects in a relevant market.  *See Malaney v. UAL Corp.*, No. 3:10-CV-02858-RS, 2010 WL 3790296, at *7 n.11 (N.D. Cal. Sept. 27, 2010), aff'd, 434 F. App'x 620 (9th Cir. 2011) ("Simply put, there is no support for the notion that, merely by removing one competitor, any horizontal merger in the airline industry will be anticompetitive and thereby violate Section 7").

At oral argument, Plaintiffs urged the Court not to follow Ninth Circuit precedent regarding what is required to plead a prima facie Section 7 claim because, in their view, the Ninth Circuit law conflicts with the United States Supreme Court merger cases from the 1960's.  Disregarding Ninth Circuit precedent is not this Court's prerogative.  *See Zuniga* v. *United Can Co.*, 812 F.2d 443, 450 (9th Cir. 1987).  The only circumstance in which a district court can decline to follow binding circuit precedent is when an intervening Supreme Court decision is

clearly irreconcilable with the prior circuit opinion. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003). Not here.

In any event, the Seventh Circuit case upon which Plaintiffs rely does not support their legal proposition for the reasons stated in *Malaney*, 2010 WL 3790296, at *6-7. *Malaney* illustrates the fallacy of Plaintiffs' legal assertion. There the consumer plaintiffs challenged the proposed, but not yet consummated, merger of United Airlines and Continental Airlines. A non-trivial merger resulting in the elimination of a rival if there is one. Yet, the district court held the plaintiffs had not met their prima facie burden of showing anticompetitive effects in the relevant market and denied the preliminary injunction. *Id*. at *12. The Ninth Circuit affirmed. 434 F. App'x 620 (9th Cir. May 23, 2011). At oral argument Plaintiffs tried to explain *Malaney* away by emphasizing the district court held the non-trivial acquisition of a rival is not *conclusive* of a Section 7 violation. True. But the district court did not deny the preliminary injunction because the defendants had rebutted the plaintiffs' prima facie showing; instead, it held the plaintiffs had not met their initial burden.

Plaintiffs also correctly argue a prima face case can sometimes be shown by a high combined market share. *See Saint Alphonsus Medical Center-Nampa*, 778 F.3d at 785. But the only market share Plaintiffs allege is in the video game publishing market. (Dkt. No. 1 ¶¶ 75, 269-270.). The video game publishing market, however, is not one of the 10 markets pled in the Complaint. (Dkt. No. 1 ¶¶ 130-203.) If market share alone can satisfy a prima facie burden, it at least has to be market share in a relevant market. *See Med Vets*, 811 F. App'x at 423–24.

**CONCLUSION**

The Complaint's allegations are consistent with Plaintiffs' theory that to satisfy their prima facie burden they need only plausibly plead a reasonable probability the merger will eliminate a Microsoft rival. For the reasons explained above, the Court disagrees. Microsoft's motion to dismiss is GRANTED with 20 days leave to amend. To the extent Plaintiffs' Section 7 claim is premised on a reduction in competition in the labor market, it is dismissed without prejudice for lack of standing.

The preliminary injunction hearing is VACATED in light of this Order. The Court will

hold a status conference in person on April 12, 2023 at 1:30 p.m. in Courtroom 8, 19th Floor, 450 Golden Gate Avenue, San Francisco.  An updated joint case management conference statement is due April 7, 2023.

This Order disposes of Docket No. 42.

**IT IS SO ORDERED.**

Dated: March 20, 2023

_____
JACQUELINE SCOTT CORLEY
United States District Judge