Valarie C. Williams (Bar No. 335347)
Tania Rice (Bar No. 294387)
Alston & Bird LLP
560 Mission Street, Suite 2100
San Francisco, CA 94105
Telephone: (415) 243-1000
valarie.williams@alston.com
tania.rice@alston.com

B. Parker Miller (*pro hac vice*)
Alston & Bird LLP
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309
Telephone: (404) 881-7000
parker.miller@alston.com

Beth A. Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
Kieran Gostin (*pro hac vice*)
Anastasia M. Pastan (*pro hac vice*)
Jenna Pavelec (*pro hac vice*)
Wilkinson Stekloff LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
kgostin@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
jpavelec@wilkinsonstekloff.com

*Counsel for Defendant Microsoft Corporation*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANTE DEMARTINI, *et al.*,<br><br>    Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>    Defendant. | Case No. 3:22-cv-08991-JSC<br><br>**DEFENDANT MICROSOFT CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hon. Jacqueline Scott Corley<br>Date: May 12, 2023<br>Time: 10:00 a.m.<br>Courtroom: 8 – 19th Floor |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on May 12, 2023, at 10:00 a.m., or as soon thereafter as the matter may be heard by the Court, located in Courtroom 8 – 19th Floor, 450 Golden Gate Ave., San Francisco, CA 94102, Defendant Microsoft Corporation will and hereby does move the Court, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss this action for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

Microsoft moves to dismiss the action on the ground that the Court lacks subject matter jurisdiction, because Plaintiffs lack standing.  Microsoft also moves to dismiss Plaintiffs' First Amended Complaint on the ground that it does not allege sufficient facts to state a plausible claim for relief.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the accompanying Declaration of Rakesh Kilaru, all pleadings and papers on file in this action, and upon such other matters that the Court may rely on or as may be presented to the Court at the time of the hearing.

Dated: April 19, 2023

Respectfully submitted,

By:   *Valarie C. Williams*

Valarie C. Williams
B. Parker Miller
Tania Rice
Alston & Bird LLP

Beth A. Wilkinson
Rakesh N. Kilaru
Kieran Gostin
Anastasia M. Pastan
Jenna Pavelec
Wilkinson Stekloff LLP

*Counsel for Defendant Microsoft Corporation*

# <u>TABLE OF CONTENTS</u>

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

I.      Introduction ..................................................................................................................... 1

II.     Issues to Be Decided ...................................................................................................... 2

III.    Factual Background ........................................................................................................ 2

        A.      Plaintiffs' Theories ............................................................................................. 2

        B.      Facts Relevant to Plaintiffs' Lack of Standing ................................................. 5

IV.     Legal Standard ................................................................................................................ 6

V.      Argument ........................................................................................................................ 6

        A.      This Case Should Be Dismissed for Lack of Subject Matter Jurisdiction
                Because Plaintiffs Cannot Demonstrate Article III Standing ........................... 6

        B.      Plaintiffs Have Not Plausibly Alleged That They Will Suffer Irreparable
                Harm .................................................................................................................... 9

        C.      Plaintiffs Have Not Plausibly Alleged a Reasonable Probability of
                Substantially Lessened Competition in Any Relevant Market ....................... 12

                1.      Plaintiffs' Sole Horizontal Theory of Harm, Involving "Triple-
                        A" Games, Fails ................................................................................... 13

                        i.      Plaintiffs Have Not Defined a Relevant Market .................... 13

                        ii.     Plaintiffs' Market Share Figures Are Not Tethered to
                                Their Market ........................................................................... 15

                2.      Plaintiffs' Vertical Theories Fail ........................................................ 16

                        i.      Plaintiffs Have Not Alleged Incentive or Ability to Make
                                Call of Duty Exclusive ............................................................ 16

                        ii.     Plaintiffs Have Not Alleged a Reasonable Probability of
                                Foreclosure of Competition .................................................... 17

                        iii.    Plaintiffs Have Not Plausibly Alleged a Resulting
                                Antitrust Harm ........................................................................ 19

VI.     Conclusion .................................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altes v. Bulletproof 360, Inc.*,
  No. 2:19-cv-04409-ODW, 2020 U.S. Dist. LEXIS 32716 (C.D. Cal. Feb. 25, 2020) ...........................................................................................................................10

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*,
  190 F.3d 1051 (9th Cir. 1999) ...................................................................................20

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)......................................................................................................6

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................................7

*Cable & Comput. Tech., Inc. v. Lockheed Sanders, Inc.*,
  214 F.3d 1030 (9th Cir. 2000) ...................................................................................17

*Cargill, Inc. v. Monfort of Colo., Inc.*,
  479 U.S. 104 (1986)....................................................................................................19

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013) ...................................................................................19

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013)......................................................................................................6

*In re Coca-Cola Prods. Mktg. & Sales Practices Litig. (No. II)*,
  No. 20-15742, 2021 U.S. App. LEXIS 26239 (9th Cir. Aug. 31, 2021) ....................6

*Comcast Cable Comm'ns, LLC v. FCC*,
  717 F.3d 982 (D.C. Cir. 2013) ...................................................................................12

*Coronavirus Reporter v. Apple Inc.*,
  No. 21-cv-05567-EMC, 2021 U.S. Dist. LEXIS 249564 (N.D. Cal. Nov. 30, 2021) ...................................................................................................................14, 15

*Coto Settlement v. Eisenberg*,
  593 F.3d 1031 (9th Cir. 2010) ...................................................................................16

*Crouse-Hinds Co. v. Internorth, Inc.*,
  518 F. Supp. 416 (N.D.N.Y. 1980) ............................................................................18

*DeHoog v. Anheuser-Busch InBev SA/NV*,
  899 F.3d 758 (9th Cir. 2018) .....................................................................................13

*DeHoog v. Anheuser-Busch InBev, SA/NV*,
   No. 1:15-cv-02250-CL, 2016 U.S. Dist. LEXIS 137407 (D. Or. Oct. 3, 2016),
   *aff'd*, 899 F.3d 758 (9th Cir. 2018)................................................................................21

*Edstrom v. Anheuser-Busch Inbev SA/NV*,
   647 F. App'x 733 (9th Cir. 2016) ................................................................................13

*Elias v. Connett*,
   908 F.2d 521 (9th Cir. 1990) ......................................................................................10

*Fitz v. Rosenblum*,
   No. 3:22-cv-01859-IM, 2022 U.S. Dist. LEXIS 219385 (D. Or. Dec. 6, 2022).........8

*Foster v. Essex Prop., Inc.*,
   No. 5:14-cv-05531-EJD, 2017 U.S. Dist. LEXIS 8373 (N.D. Cal. Jan. 20, 2017) ...................7

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ......................................................................................15

*Hassell v. Uber Techs., Inc.*,
   No. 20-cv-04062-PJH, 2020 U.S. Dist. LEXIS 229310 (N.D. Cal. Dec. 7, 2020).................10

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) .........................................................................13, 14, 15

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005) ....................................................................................16

*Lanovaz v. Twinings N. Am., Inc.*,
   726 F. App'x 590 (9th Cir. 2018) ..................................................................................7

*Malaney v. UAL Corp.*,
   No. 3:10-CV-02858-RS, 2010 U.S. Dist. LEXIS 106049 (N.D. Cal. Sep. 27,
   2010) ...........................................................................................................................11

*Marder v. Lopez*,
   450 F.3d 445 (9th Cir. 2006) ......................................................................................16

*Marion Healthcare, LLC v. S. Ill. Hosp. Servs.*,
   No. 21-cv-00873, 2022 U.S. Dist. LEXIS 114392 (S.D. Ill. June 28, 2022) ...................20

*Med. Diagnostic Labs., LLC v. Independence Blue Cross*,
   No. 16-5855, 2017 U.S. Dist. LEXIS 140256 (E.D. Pa. Aug. 30, 2017) ...................11

*Med. Vets, Inc. v. VIP Petcare Holdings, Inc.*,
   811 F. App'x 422 (9th Cir. 2020) ................................................................................16

*Med Vets, Inc. v. Vip Petcare Holdings, Inc.*,
   No. 18-cv-02054-MMC, 2019 U.S. Dist. LEXIS 68099 (N.D. Cal. Apr. 22, 2019),
   *aff'd*, 811 F. App'x 422 (9th Cir. 2020)......................................................................14

*O'Neill v. Coca-Cola Co.*,
  669 F. Supp. 217 (N.D. Ill. 1987) .............................................................................20

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
  507 F.3d 117 (2d Cir. 2007)......................................................................................12

*Safe Air For Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004) ................................................................................6, 7

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016).....................................................................................................7

*Sprint Nextel Corp. v. AT&T Inc.*,
  821 F. Supp. 2d 308 (D.D.C. 2011) ..........................................................................20

*St. Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys.*,
  778 F.3d 775 (9th Cir. 2015) ...............................................................................13, 16

*Taleff v. Sw. Airlines Co.*,
  828 F. Supp. 2d 1118 (N.D. Cal. 2011) .........................................................10, 12, 21

*Tamboura v. Singer*,
  No. 5:19-cv-03411-EJD, 2020 U.S. Dist. LEXIS 94566 (N.D. Cal. May 29, 2020) .........7, 10

*TransUnion LLC v. Ramirez*,
  141 S. Ct. 2190 (2021).................................................................................................6

*United States v. AT&T Inc.*,
  310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019)....................13, 18

*United States v. Borden Co.*,
  347 U.S. 514 (1954).....................................................................................................8

*United States v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990) ...............................................................................18, 19

*ZF Meritor, LLC v. Eaton Corp.*,
  696 F.3d 254 (3d Cir. 2012)........................................................................................8

**Statutes**

15 U.S.C. § 18...........................................................................................................2, 13

15 U.S.C. § 26.........................................................................................................10, 12

**Other Authorities**

Fed. R. Civ. Proc. 65(c) .................................................................................................12

https://assets.publishing.service.gov.uk/media/641d6b7e32a8e0000cfa9381/Updated_
  version_-_Microsoft_Activision_Addendum_PFs__For_Publication_230324_.pdf..............17

iv

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3      Plaintiffs' Amended Complaint fails to fix the defects that resulted in the dismissal of their

4    first complaint.  The additional detail does not solve their critical failure to plead facts, as opposed to

5    conclusions, on the key points necessary for these ten Plaintiffs to move forward with their

6    unprecedented effort to enjoin the merger.  Specifically, Plaintiffs have not plausibly pled (1) standing,

7    (2) irreparable non-monetary loss, and (3) a reasonable probability of substantial harm to competition.

8    Plaintiffs do not allege any concrete, imminent, personal harm.  This defect is fatal for two independent

9    reasons.  First, it means plaintiffs have not, and cannot, plead the injury-in-fact necessary to establish

10    Article III standing.  Second, it means they have not and cannot plausibly plead irreparable, non-

11    monetary loss or damage—which is required to state a claim for injunctive relief under the Clayton

12    Act.  Plaintiffs rest on conjectural assertions that they are "likely" to purchase yet-to-be-released future

13    games and gaming platforms, but those speculative allegations are insufficient.  Plaintiffs simply

14    cannot plead around the fact that no plaintiff would lose access to the video games they play, while

15    some would actually gain access and benefit from the acquisition.  Moreover, any alleged harm

16    associated with buying a new platform and new game releases is compensable by monetary damages,

17    so Plaintiffs' claim for injunctive relief fails.

18      Plaintiffs' theories of competitive harm are equally deficient, providing a third, independent

19    basis for dismissal.  Plaintiffs allege that Microsoft Corporation and Activision Blizzard are horizontal

20    competitors in a "Triple-A" video game market, but they admit that there is "no precise definition" for

21    such a market.  They help themselves to the most artificially favorable market shares possible, taking

22    just the top competitors in the *overall* video game space and measuring them in relation to one another.

23    But critically, Plaintiffs allege no market shares that are based specifically on their alleged market for

24    "Triple-A" games.  As to harm, Plaintiffs vaguely allege that they will be harmed by future higher

25    prices and decreased innovation in future "Triple-A" game releases, but do not allege when or how

26    those effects would occur.  They also allege only that they are "likely" to purchase unspecified future

27    games (while also alleging that new games in a series can take six to ten years to develop).  These

28    alleged harms are distant conjecture.

Plaintiffs allege a vertical theory of harm by speculating that Microsoft will make Activision games exclusive to its platforms.  But they acknowledge that Microsoft has executed several ten-year contracts to make Activision games available on more platforms than they currently are.  Plaintiffs search for loopholes that would allow Microsoft to avoid these contractual obligations, but they have not plausibly shown that Microsoft will evade its contractual agreements and make Activision games exclusive.  Next, Plaintiffs' allegations of harm to competition focus on incentives for consumers to switch from Sony platforms (the market leader in consoles) to Microsoft platforms.  But even if Microsoft were to make the games exclusive, Plaintiffs do not allege how this would result in lessened competition in the market—they have not plausibly alleged why Sony would not continue to compete using alternative games and platforms, as Nintendo and others now do.  Plaintiffs have not met their pleading burden, and their conclusory allegations and speculative assumptions about future behaviors doom their Amended Complaint.

## II.   ISSUES TO BE DECIDED

Whether Plaintiffs' claim alleging violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18), seeking to enjoin Microsoft's acquisition of Activision Blizzard, should be dismissed because: (1) Plaintiffs lack standing, or (2) Plaintiffs have failed to allege irreparable harm to themselves, or (3) Plaintiffs have failed to allege a plausible claim of harm to competition.

## III.   FACTUAL BACKGROUND

### A.   Plaintiffs' Theories

Plaintiffs are ten video gamers who seek to stop a prospective transaction in which Microsoft would acquire Activision Blizzard.  (Am. Compl. ¶ 1.)  They acknowledge that they currently have access to Activision games, including *Call of Duty*, on various platforms, including Sony PlayStation, Microsoft's Xbox, and their personal computers.  (*Id.* at ¶¶ 113-122.)  They do not allege that the transaction will cause them to lose access to any of the games they are currently playing, including the latest version of *Call of Duty*.  Instead, they offer speculative theories that the transaction will lead to harms in the future, at some unspecified point in time.

First, Plaintiffs allege a horizontal theory that the acquisition will harm competition in the market for "Triple-A" video games.  (*Id.* at ¶ 3.)  But they concede that "there is no precise definition

of Triple-A games." (*Id.* at ¶ 166.)   Indeed, throughout their complaint they use various, non-overlapping terms to describe this category of games, such as games that are "blockbusters," have the "highest production values," have "expectations of high unit sales and revenue," are "heavily marketed," and are "highly anticipated." (*Id.* at ¶¶ 165, 166, 169, 182.)   Plaintiffs then allege that Microsoft and Activision are both publishers of "Triple-A" games—though they do not specify which games made by these or other companies meet that definition. (*Id.* at ¶ 167.)   They also inexplicably exclude certain games (*e.g.*, *Fortnight*) that are "Triple-A" even by Plaintiffs' own definition. (*Id.*)

Notwithstanding this Court's prior ruling, Plaintiffs still do not provide market shares properly tied to their "Triple-A" market.   They provide market shares for a selected subset of top video game publishing companies (excluding Epic Games and other publishers), in relation to one another and excluding all other competitors. (*Id.* at ¶¶ 167-168.)   They use data for all games sold in North America rather than data for "Triple-A" games sold in the United States. (*Id.*)   Plaintiffs do not specify what games are in or out of their loosely defined market, nor account for the fact that publishers can also offer non-"Triple-A" games.

Plaintiffs allege that they will be harmed if two of the six identified "Triple-A" publishers merge,[1] because Microsoft would be less incentivized to compete on price and quality for future game releases. (*Id.* at ¶¶ 248-250, 253-260.)   But they offer little explanation as to why that would be the case, what those harms actually are, or when and how they will occur.   Indeed, they allege a lengthy six- to ten-year development cycle for new games, so claimed quality harms are a distant conjecture. (*Id.* at ¶ 257.)   They do not specify any particular plans to purchase certain new titles. (*See id.* at ¶¶ 125-126.)

Second, Plaintiffs allege a vertical theory that Microsoft's acquisition of a downstream game developer will harm competition in markets for gaming platforms: high-performance consoles, multi-game content library subscriptions, cloud-based gaming, and computer operating systems. (*Id.* at ¶ 261.)   Plaintiffs fail to allege facts showing the competitive landscape in those markets, for example,

---

[1] Plaintiffs allege that in a different way of delineating the market (*i.e.*, third-party Triple-A game publishers), Microsoft is not a direct competitor to Activision. (Am. Compl. ¶¶ 168, 250-251.)   With this delineation, Microsoft is also not one of the "Big Four" "Triple-A" publishers recognized in the industry, (*id.* at 173), and Plaintiffs' horizontal theory would not apply.

by failing to describe the competitors and market concentration in the library subscription and cloud-based gaming markets.

In terms of harm, Plaintiffs allege that it is reasonably likely that Microsoft will make those games exclusive or partially exclusive to its platform.  (*Id.* at ¶¶ 321-341.)  But as Plaintiffs themselves acknowledge, since announcing the transaction, Microsoft has signed contractual agreements to make *Call of Duty* and other Activision games available on more competitors' platforms than before.  (*Id.* at ¶ 329.)  While Plaintiffs attempt to poke holes into the commitments Microsoft has made, they offer no reason to conclude that the post-transaction status quo is worse for gamers than the current status quo, in which Activision games are available on none of these new platforms.

Plaintiffs also fail to explain why any such decisions would irreparably harm competition as a whole, and them personally, as opposed to merely impacting one of Microsoft's competitors.  Plaintiffs allege that the transaction will harm competition in various platform markets because some consumers will switch from Sony PlayStation—the current market leader (which has its own exclusive games)—to Microsoft Xbox.  (*Id.* at ¶¶ 206-207, 316.)  But the only potential harms they describe are speculative, financial harms.  Specifically, they allege that "some of the Plaintiffs" may buy an Xbox console if *Call of Duty* becomes exclusive to Microsoft platforms, or that the current Xbox users might face higher prices for unspecified future releases of new generations of Xbox consoles.  (*Id.* at ¶ 350-351.)  They also allege that "some of the Plaintiffs" may purchase Microsoft's library subscription service and cloud gaming service—even though none of the Plaintiffs allege that they currently use multi-game subscription or cloud services nor allege that Activision content is available on competing services today.  (*Id.* at ¶¶ 113-122, 361, 372.)  All of these harms, to the extent they may occur, are fully addressable by money damages.  Further, they do not allege any personalized harm *at all* related to their operating systems market.  (*See id.* at ¶¶ 378-385.)

Plaintiffs also make vague allegations about a reduced incentive for Microsoft to compete if it has the most popular game, without explaining why this would be the case or why overall competition in the market would be substantially lessened (*i.e.*, why Sony and others would not compete harder with improved offerings or more favorable pricing).  (*Id.* at ¶ 269.)

**B.      Facts Relevant to Plaintiffs' Lack of Standing**

Plaintiffs currently play video games on various combinations of platforms: Microsoft Xbox, Sony PlayStation, Nintendo Switch, Windows OS computers, Mac computers, and mobile devices. (Am. Compl. ¶¶ 113-122.)   Their allegations depend on the assertion that Microsoft will make Activision games (primarily, *Call of Duty*) exclusive to Microsoft platforms.  Plaintiffs do not allege that they will lose access to any existing Activision games on any of their current platforms upon the closing of the transaction.

Plaintiffs' claim that they will lose access to new releases of Activision games in the *future* lacks factual detail.  On the contrary, their own complaint suggests the opposite will happen.  Microsoft Xbox and Windows users would continue to have access to current and new game releases, like before. And as Plaintiffs acknowledge, Microsoft has entered into several contracts that would become effective following the acquisition and would expand Plaintiffs' access to *Call of Duty* and other Activision games:

- Activision and Sony have current agreements that guarantee that newly released games in the *Call of Duty* series will be available on Sony PlayStation through the end of 2024.  (Kilaru Decl., Ex. A at 472:2-22, 476:7-477:13.)  Post-acquisition, those agreements would remain in force. (Kilaru Decl., Ex. B at 195:21-196:10.)  Microsoft has further made an offer to Sony to make *Call of Duty* titles available on Sony *PlayStation* for ten years.  (Am. Compl., ¶ 335.)

- *Call of Duty* is not currently available on Nintendo's platform.  (Kilaru Decl., Ex. B at 108:22-109:6, 139:4-16.)  Microsoft and Nintendo entered into an agreement to make *Call of Duty* titles available on Nintendo platforms for ten years.  (Kilaru Decl., Ex. B at 136:22-137:19, 141:10-17, Ex. C.)

- Activision games are not currently available through multi-game subscription or cloud streaming services.  (*See* Am. Compl. ¶¶ 63, 149.)  Microsoft and NVIDIA entered into an agreement to make Activision games available on NVIDIA's cloud gaming service, which can in turn be accessed on numerous devices, as a lower cost way for consumers to access the games even if they do not have the latest gaming systems.  (Kilaru Decl., Ex. B at 156:24-157:10, Ex. D.)

- Microsoft and Boosteroid entered into an agreement to make Activision games available on Boosteroid's cloud gaming service.  (Kilaru Decl., Ex. E at 144:6-145:13.)

- Microsoft and Ubitus entered into an agreement to make Activision games available on Ubitus's cloud gaming service.  (Kilaru Decl., Ex. E at 161:24-163:16, 166:14-20.)

As a result of the acquisition, Plaintiffs and other gamers would either have the same access to Activision games as before, or in the case of Nintendo, Mac, and multi-game subscription and cloud streaming service users, they would *gain* access.

## IV.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a court must dismiss an action for lack of subject matter jurisdiction if the plaintiff lacks standing.  To have standing, a plaintiff must have suffered a redressable injury in fact that is concrete, particularized, and actual or imminent. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  "A Rule 12(b)(1) jurisdictional attack may be facial or factual."  *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

Pursuant to Rule 12(b)(6), a court must dismiss the plaintiff's complaint if it fails to state a claim for relief.  To survive a motion to dismiss, the plaintiff must have alleged facts establishing a plausible claim for relief that exceeds a speculative level.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[L]abels and conclusions" or "'naked assertion[s]' devoid of 'further factual enhancement'" do not constitute well-pleaded facts that are entitled to the presumption of truth.  *Id.*

## V.   ARGUMENT

### A.   This Case Should Be Dismissed for Lack of Subject Matter Jurisdiction Because Plaintiffs Cannot Demonstrate Article III Standing

Plaintiffs lack standing because they have not pled and cannot establish an injury-in-fact.  They will not personally suffer any injury that is concrete (not abstract), particularized (personal to Plaintiffs), and imminent ("*certainly impending*" and not conjectural).  *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203-05 (2021); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  "[A]llegations of *possible* future injury are not sufficient."  *In re Coca-Cola Prods. Mktg. & Sales Practices Litig. (No. II)*, No. 20-15742, 2021 U.S. App. LEXIS 26239, at *5 (9th Cir. Aug. 31, 2021) (quoting *Clapper*, 568 U.S. 398 at 409).  "When '[s]peculative inferences' are necessary . . . standing will not be found."  *Tamboura v. Singer*, No. 5:19-cv-03411-EJD, 2020 U.S. Dist. LEXIS 94566, at *11 (N.D. Cal. May 29, 2020) (quoting *Johnson v. Weinberger*, 851 F.2d 233, 235 (9th Cir. 1988)).

Plaintiffs are required to "clearly . . . allege facts demonstrating" their standing.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339-41 (2016).  Additionally, in "resolving a factual attack on jurisdiction,

the district court may review evidence beyond the complaint" and the court "need not presume the truthfulness of the plaintiff's allegations." *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Plaintiffs bear the burden of proof, requiring them to establish each element of standing. *Foster v. Essex Prop., Inc.*, No. 5:14-cv-05531-EJD, 2017 U.S. Dist. LEXIS 8373, at *4 (N.D. Cal. Jan. 20, 2017) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006); *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004)).

First, Plaintiffs have not pled and cannot show concrete injury. They have only alleged abstract future possibilities of harm. Their allegations are insufficient. Plaintiffs' alleged harms are that (1) prices will increase, (2) output, innovation, and quality will decrease, and/or (3) Microsoft will make Activision games exclusive such that Plaintiffs are "reasonably likely" to purchase Microsoft platforms in the future. (Am. Compl. ¶¶ 125-128.) However, since Plaintiffs allege that they already own the relevant games and devices, (*id.* at ¶¶ 113-122), any changes in price, output, innovation, quality, and exclusivity could necessarily impact only hypothetical future purchases of yet-to-be released games and gaming platforms. Plaintiffs do not say when those changes would occur or describe them with any concreteness. A plaintiff cannot proceed past the pleading stage simply by reciting the elements of a cause of action and saying these elements will manifest at some point in the future. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Second, Plaintiffs fail to show any personalized, imminent harm. They make only vague and conclusory allegations that they "are likely to purchase Activision Blizzard games [or Triple-A games] in the future" and are "reasonably likely to purchase Microsoft's various gaming platforms in the future." (Am. Compl. ¶¶ 125-128.) Those allegations are insufficient. In *Lanovaz v. Twinings N. Am., Inc.*, 726 F. App'x 590, 591 (9th Cir. 2018), the Ninth Circuit found that a plaintiff's statement that she would "consider buying" a product again was insufficient to confer standing, because a "'profession of an inten[t] . . . is simply not enough' to satisfy Article III." (Quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992).) A "some day" intention, "without any description of concrete plans" or "specification of when the some day will be," is insufficient. *Id.*; *see also Fitz v. Rosenblum*, No. 3:22-cv-01859-IM, 2022 U.S. Dist. LEXIS 219385, at *6-7 (D. Or. Dec. 6, 2022) ("Plaintiffs' conclusory statements that they wish to purchase large-capacity magazines at some point in the future

1   are speculative and insufficient to support a finding of irreparable harm."); *ZF Meritor, LLC v. Eaton*

2   *Corp.*, 696 F.3d 254, 302 (3d Cir. 2012) (plaintiff lacked standing to bring antitrust claims where it

3   could show no more than a mere possibility of reentering the market).

4         Likewise, here, Plaintiffs have only made a conclusory allegation that they are "likely" or

5   "reasonably likely" to purchase unspecified products, at some unspecified time in the future.  Such

6   "some day" professions are not sufficient to confer standing.  They do not allege any concrete plans,

7   such as which games and platforms they plan to buy and when.  Nor do they allege when they last

8   purchased Activision games (only vaguely alleging that they "play[] or ha[ve] purchased" them).  (Am.

9   Compl. ¶¶ 113-122.)  With respect to their "cloud gaming services" and "multi-game content library

10  subscription services" markets, Plaintiffs do not allege that they have ever used any such services

11  before, let alone any concrete plans to do so.  (*Id.*)  Overall, Plaintiffs' allegations only speak to

12  possibilities and have not alleged any harm that is personal to them.  *See United States v. Borden Co.*,

13  347 U.S. 514, 518 (1954) (a private plaintiff may only pursue relief under Section 16 when "when his

14  personal interest will be served").

15        Third, Plaintiffs lack standing to bring their vertical theory for an additional reason.  That

16  theory relies on the assertion that Microsoft will make Activision games (particularly, *Call of Duty*)

17  exclusive or partially exclusive to its platforms, forcing "some of the Plaintiffs" to buy Microsoft

18  platforms (like an Xbox) or pay higher prices for future purchases of those platforms.  (Am. Compl.

19  ¶¶ 350-351, 361-362, 372-373.)  But Plaintiffs' own allegations undercut their theory.  They admit

20  that Microsoft has entered into ten-year contractual agreements to make the games available on more

21  platforms than before.  (*Id.* at ¶ 329.)

22        Plaintiffs do not allege the personal injury required for standing for a simple reason: they

23  cannot.  In fact, for many of the Plaintiffs, this transaction will increase access to games.  Plaintiffs

24  currently play their games on various platforms—Sony PlayStation, Microsoft Xbox, Nintendo

25  Switch, personal computers, and mobile devices.  (*Id.* at ¶¶ 113-122.)  Plaintiffs do not allege that any

26  of the games they currently own and play will stop working after the transaction.  To be clear, after

27  the transaction closes, all Plaintiffs will still be able to play the games they currently own, just as they

28  do now.  Further, their access to future game releases would be the same or better.  For the five

8

Plaintiffs who already play their games on a Microsoft Xbox or Windows operating system, they do not allege any imminent and non-conjectural harm, because they assert that Microsoft will make future game releases available on its platforms.  For the Plaintiffs who own a Sony PlayStation, they currently have access to *Call of Duty* and other Activision console games on their PlayStation, under existing contracts between Sony and Activision that will ensure access to new game releases through at least the end of 2024.  (Kilaru Decl., Ex. A at 472:2-22, 476:7-477:13, Ex. B at 195:21-196:10.)  Microsoft has also made an offer to Sony to extend the contractual access to *Call of Duty* on Sony's platform, for a term of ten years.  (Am. Compl. ¶ 335.)  For the Plaintiffs who have a Nintendo Switch or a Mac computer, they cannot currently play *Call of Duty* on those devices, so those Plaintiffs could not lose anything.  (Kilaru Decl., Ex. B at 108:22-109:6, 139:4-16.)  But Microsoft has entered into a ten-year contract with Nintendo to make *Call of Duty* available on the Nintendo Switch.  (Kilaru Decl., Ex. B at 136:22-137:19, 141:10-17, Ex. C.)  Microsoft has also entered into contracts with multiple cloud gaming service providers to make *Call of Duty* and other Activision games available on Mac computers and other devices.  (Kilaru Decl., Ex. B at 156:24-157:10, Ex. D, Ex. E at 144:6-145:13, 161:24-163:16, 166:14-20.)  Accordingly, none of the Plaintiffs will imminently lose access to the games on any of their platforms, and some will have increased access to those games.

Plaintiffs who stand to benefit from the activity they are attempting to enjoin do not have standing.  "'A plaintiff who would have been *no better off* had the defendant refrained from the unlawful acts of which the plaintiff is complaining does not have standing . . . .'"  *Tamboura*, 2020 U.S. Dist. LEXIS 94566, at *12 (quoting *McNamara v. City of Chi.*, 138 F.3d 1219, 1221 (7th Cir. 1998)).  Plaintiffs cannot meet their burden to show a concrete, particularized, and "certainly impending" injury.  Without Article III standing, this court lacks jurisdiction.  The case should be dismissed with prejudice for this reason alone.

## B.    Plaintiffs Have Not Plausibly Alleged That They Will Suffer Irreparable Harm

For reasons akin to their failure to establish the injury-in-fact necessary for Article III standing, Plaintiffs do not and cannot allege that they will suffer irreparable harm upon the closing of the transaction.  Plaintiffs seek to enjoin Microsoft's acquisition of Activision under Section 16 of the Clayton Act, which allows private plaintiffs to seek injunctive relief under the "same conditions and

principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity." 15 U.S.C. § 26.  To plead their claim, Plaintiffs must plausibly allege facts sufficient to demonstrate that they are entitled to injunctive relief.  *Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118, 1122 (N.D. Cal. 2011).  Accordingly, they must plausibly allege that: (1) that they will suffer an irreparable injury, (2) that they have no adequate remedy at law, (3) that considering the balance of hardships, an equitable remedy is warranted, and (4) that the public interest would not be disserved by a permanent injunction.  *Id.* (quoting *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007)); *Hassell v. Uber Techs., Inc.*, No. 20-cv-04062-PJH, 2020 U.S. Dist. LEXIS 229310, at *24 (N.D. Cal. Dec. 7, 2020) (noting the "longstanding" requirement that plaintiffs must lack an adequate legal remedy and plausibly allege irreparable harm).[2]

Plaintiffs have not adequately alleged any irreparable harm necessitating an injunction.  They assert that there will be "increased prices" for future games and gaming platforms, and that some of them might buy a new gaming platform if the games become exclusive to Microsoft's platforms.  (Am. Compl. ¶¶ 125, 128, 184, 202, 217, 229, 350, 351.)  These alleged harms are squarely compensable through monetary damages.  *See, e.g.*, *Elias v. Connett*, 908 F.2d 521, 526 (9th Cir. 1990) (plaintiff failed to allege irreparable harm where he "failed to show that he will suffer more than mere monetary harm or financial hardship if denied relief"); *Altes v. Bulletproof 360, Inc.*, No. 2:19-cv-04409-ODW (SKx), 2020 U.S. Dist. LEXIS 32716, at *7 (C.D. Cal. Feb. 25, 2020) (induced purchases are redressable by monetary damages, and thus not irreparable).

Plaintiffs make conclusory allegations about the potential for reduced innovation and quality of future games and platforms.  (Am. Compl. ¶¶ 125-127, 248.)  But those allegations are unsupported by factual allegations that make them plausible.  *See Med. Diagnostic Labs., LLC v. Independence Blue Cross*, No. 16-5855, 2017 U.S. Dist. LEXIS 140256, at *11-12 (E.D. Pa. Aug. 30, 2017) (a complaint cannot "offer a bare conclusion that quality has fallen"; it "must allege facts to support a reduction in quality across the relevant market").  Plaintiffs have not fixed this fatal pleading flaw

---

[2] To obtain a preliminary injunction, Plaintiffs will need to make additional showings, including an "immediate" danger of irreparable loss or damage, and the execution of a "proper bond against damages for an injunction improvidently granted." 15 U.S.C. § 26.  Microsoft will address these issues in its opposition to Plaintiffs' motion for preliminary injunction.

from their prior complaint.  They still cannot explain in any concrete way why, how, or when this reduced innovation or quality would occur.  If anything, their allegations suggest that the transaction will motivate Sony and others to compete more aggressively.

Plaintiffs also offer no clarity about when these harms will take place, nor how they would be affected personally.  Here, any of the effects Plaintiffs claim would not be felt until long into the future, particularly given the lengthy production timeframe for new game titles, which can take six to ten years.  (Am. Compl. ¶ 257.)  The same is true for next generation consoles, which are "released approximately every five to ten years." (*Id.* ¶ 50.)  Plaintiffs' vague allegations about potential future purchases are too speculative to establish that they will be irreparably harmed.  *See Malaney v. UAL Corp.*, No. 3:10-CV-02858-RS, 2010 U.S. Dist. LEXIS 106049, at *48 (N.D. Cal. Sep. 27, 2010) (allegations of impacts on "an unformed hope of future air travel" were too "speculative" and "*de minimus*" to constitute irreparable harm).[3]

In an analogous case where the plaintiffs sought to enjoin an airline merger on the theory that it would result in higher ticket prices and diminished service, the court found that the plaintiffs had failed to allege irreparable harm because they had "not demonstrated that the remedies available at law, such as monetary damages, would be inadequate." *Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118, 1123, n.7 (N.D. Cal. 2011).  Here, too, Plaintiffs allege higher prices and a vague notion of reduced quality.  They have not demonstrated that the remedies available at law would be inadequate.

Finally, Plaintiffs make no allegations concerning the hardships to Microsoft if an injunction is entered, why their harm outweighs that hardship, and how the public would be impacted.  In terms of the public interest, vertical mergers are typically procompetitive—they "encourage product innovation, lower costs for businesses, and create efficiencies—and thus reduce prices and lead to better goods and services for consumers." *Comcast Cable Comm'ns, LLC v. FCC*, 717 F.3d 982, 990 (D.C. Cir. 2013) (Kavanaugh, J., concurring); *see also, e.g.*, *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 124 (2d Cir. 2007).  That is so here, given that this acquisition promises to

---

[3] The *Malaney* holding related to the plaintiffs' motion for a preliminary injunction.  No motion to dismiss was filed in that action, so the court did not have opportunity to address these issues at the pleading stage.  But under similar circumstances here, Plaintiffs' allegations of unformed plans for future purchases are insufficient to allege irreparable harm.

bring the Activision games to more platforms than before, and Plaintiffs concede that Microsoft has contractual commitments to do so.  (Am. Compl. ¶ 329.)  Plaintiffs also acknowledge that stopping the transaction would be harmful to Microsoft, because it would require Microsoft to pay a substantial break fee, at minimum.  (*Id.* at ¶ 163.)  Ultimately, Plaintiffs have stacked up *no* plausible allegations of irreparable harm against *their own allegations* that the transaction would benefit others by making Activision's games more broadly available.  Accordingly, Plaintiffs have not come close to alleging that the balance of equities cut in their favor.

In sum, Plaintiffs have not and cannot plausibly plead facts setting forth an entitlement to injunctive relief.  For this independent reason, the Amended Complaint should be dismissed with prejudice.[4]

## C.       Plaintiffs Have Not Plausibly Alleged a Reasonable Probability of Substantially Lessened Competition in Any Relevant Market

Section 7 of the Clayton Antitrust Act concerns mergers and acquisitions whose effect "may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.  To plausibly allege their claim at the pleading stage, Plaintiffs must "adequately alleg[e] facts that an acquisition creates 'an appreciable danger' or 'a reasonable probability' of anticompetitive effects in the relevant market."  *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018) (quoting *St. Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 788 (9th Cir. 2015)).

To meet that threshold, Plaintiffs are required to allege at least a plausible relevant market and a reasonable probability of anticompetitive effects in that market—at a minimum by showing a substantial increase in market share/concentration or a reasonable probability of foreclosure of competition.  *See Edstrom v. Anheuser-Busch Inbev SA/NV*, 647 F. App'x 733, 735 (9th Cir. 2016); *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 193 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019).

---

[4] Because the Amended Complaint fails to adequately plead both the standing and facts needed to establish irreparable harm, this is a gating issue and this action should be dismissed pursuant to both Rule 12(b)(1) and 12(b)(6).  Separately, Microsoft anticipates that there will be additional deficiencies related to irreparable harm in Plaintiffs' forthcoming Motion for Preliminary Injunction that will be addressed in the opposition to that motion.

1.    **Plaintiffs' Sole Horizontal Theory of Harm, Involving "Triple-A" Games, Fails**

  *i.*    ***Plaintiffs Have Not Defined a Relevant Market***

  As a "necessary predicate" to any antitrust case, Plaintiffs must properly define a relevant market, or the complaint must be dismissed.  *St. Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 783 (9th Cir. 2015); *see also Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1123 (9th Cir. 2018) (affirming dismissal for failure to sufficiently allege a relevant product market). Plaintiffs' original complaint contained allegations related to five different alleged horizontal markets, beginning with a video games market and narrowing to more limited markets.  In prior briefing, Microsoft pointed out that it did not have sizeable enough market shares and concentrations in any of those markets that would support an antitrust claim.  Plaintiffs' Amended Complaint narrows its alleged horizontal claim to just the alleged market for "Triple-A video games."  But this is not a properly pled relevant market.

  First, Plaintiffs must clearly define the outer bounds of a market by specifying "all economic substitutes for the product"—all products that are reasonably interchangeable or cross-elastic in demand with the product at issue, which must be included in the market.  *Hicks*, 897 F.3d at 1120. Failure to identify and discuss the reasonably interchangeable products is grounds for dismissal, because a court cannot analyze the market if cannot "discern what is included and what is not." *Coronavirus Reporter v. Apple Inc.*, No. 21-cv-05567-EMC, 2021 U.S. Dist. LEXIS 249564, at *21- 22 (N.D. Cal. Nov. 30, 2021) (dismissing claims where plaintiffs failed to allege clear market definitions, including allegations specifying what products are included in each market and why the boundaries of the market are proper); *see also Med Vets, Inc. v. Vip Petcare Holdings, Inc.*, No. 18- cv-02054-MMC, 2019 U.S. Dist. LEXIS 68099 (N.D. Cal. Apr. 22, 2019) (dismissing claim where the product market description was too vague to determine which products would be included), *aff'd*, 811 F. App'x 422 (9th Cir. 2020).

  Here, Plaintiffs have not discussed potentially interchangeable and cross-elastic products, nor clarified which products are within the bounds of their market definition.  Instead, Plaintiffs admit that "there is no precise definition of Triple-A games."  (Am. Compl. ¶ 166.)  If Plaintiffs cannot define their market, the Court cannot be expected to evaluate what is included in it.  Plaintiffs provide various

descriptors of "Triple-A" games, all of which are inherently subjective: "highly anticipated," "blockbusters," "high development costs, superior graphical quality, and expectations of high unit sales and revenue, typically from a studio with large development and publishing teams, supported by extensive marketing and promotion."  (Am. Compl. ¶¶ 165, 182.)  They nowhere specify which of these descriptions they are using in determining which games fall in their market—nor do they anywhere list what games actually do fall in this alleged market.  Offering a conclusory allegation that a market exists, without actually pointing to the products that are in it or any of the facts to assess it, does not satisfy Rule 12(b)(6).

Second, Plaintiffs' alleged market boundaries must be plausible.  *Hicks*, 897 F.3d at 1121. Drawing on "judicial experience and common sense," a court should reject a defined market that fails to include reasonably interchangeable products.  *Id.* at 1121, 1123 (citation omitted).  For example, in *Hicks*, the Ninth Circuit dismissed an action asserting that advertisements to golf fans or during golf tournaments constituted a unique market, because there were other economic substitutes (advertising on television programs, radio broadcasts, podcasts, websites, and social media pages).  *Id.* at 1121. The court found that such markets were "artificial" and "contorted to meet their litigation needs."  *Id.*

Here, Plaintiffs do not specify how many games are in their "Triple-A" market, nor why the games on the bubble of that supposed market would not be reasonably interchangeable or cross-elastic. For example, if Plaintiffs' market contains the fifteen games with the highest development costs or most extensive marketing—a fact that remains unclear based on the deficiencies of their pleadings— they do not explain why a sixteenth would not be included.  Indeed, there are substitutes that Plaintiffs do not include or explain, referenced within their own pleading.  For example, Plaintiffs acknowledge that they are excluding *Fortnite* (which is widely viewed in the industry and by Plaintiffs as a "Triple-A" game) and its publisher Epic, without explaining why *Fortnite*'s use of a "free-to-play" model (which charges for in-game purchases) would preclude it from being reasonably interchangeable with the included games.  (Am. Compl. ¶¶ 75, 167, 250.)

Third, a plaintiff cannot "arbitrarily choose the product market relevant to its claims." *Coronavirus Reporter*, 2021 U.S. Dist. LEXIS 249564, at *17-18 (quoting *Buccaneer Energy (USA) v. Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017)).  And a fundamental principle is

that it must be a market for products or services.  *Id.* at \*33 (quoting *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)).

Here, Plaintiffs' market is arbitrary and self-serving.  They have artificially narrowed a market by starting at the end—selecting a small subset of competitors and removing all other competitors' products.  Plaintiffs' attempt to define the market based on the top competitors runs afoul of the principle that the market must be defined based on the product.  Moreover, by selecting only the "blockbuster" competitors, Plaintiffs arbitrarily drove up their market share figures.  But even as to those publishers, Plaintiffs do not identify whether all of those publishers' games are automatically assigned to the "Triple-A" market, or if not, which ones.  Ultimately, Plaintiffs' figures do not provide a picture of an entire product market, but rather a picture of a few top competitors in relation to one another.  (Am. Compl. ¶¶ 167-168, 249.)

### ii.   *Plaintiffs' Market Share Figures Are Not Tethered to Their Market*

Plaintiffs were required to plausibly allege substantially increased market power in their relevant market, through the use of figures showing market shares and concentration.  *St. Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 783-85 (9th Cir. 2015).  The market shares must be tied to the market alleged; otherwise, they are irrelevant.  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992-93 (9th Cir. 2020).

Here, Plaintiffs do nothing to show market shares and concentration regarding the product constituting their relevant market.  They provide market share figures for four or six of the top *publishers* out of an entire video game market (and manipulate the data by removing all but those top competitors).  (Am. Compl. ¶¶ 167-168, 249.)  But publishers make many games.  Plaintiffs fail to allege any market shares in a "Triple-A" *games* product market.  Their figures were not based on a determination of the sales of all "Triple-A" games.  Additionally, Plaintiffs' allegations concern market share of Triple-A publishers in North America—not the United States, which is their alleged geographic market.  (*Id.* at ¶¶ 239, 249.)  Further, Plaintiffs do not specify what year their (irrelevant) figures relate to.

The Ninth Circuit has made clear that where a plaintiff only asserts market shares that are not tied to the alleged product market, a claim under Section 7 of the Clayton Act must be dismissed.

15

*Med. Vets, Inc. v. VIP Petcare Holdings, Inc.*, 811 F. App'x 422, 423 (9th Cir. 2020) (alleging a 95% share of "Rx in Retail" did not show market power in the relevant market, which was defined to include wholesale distribution of prescription and non-prescription "wellness and medication products"); *Qualcomm*, 969 F.3d at 992-93 (finding that it was error to consider anticompetitive effects from Qualcomm's licensing practices as "interrelated" with the defined modem chip market; "actual or alleged harms to customers and consumers outside the relevant markets are beyond the scope of antitrust law"). Plaintiffs have alleged no relevant market shares and their claim must be dismissed.

## 2.      Plaintiffs' Vertical Theories Fail

Plaintiffs' vertical theories of harm rest on the allegation that post-acquisition, Microsoft will make Activision games exclusive or partially exclusive to its platforms, forcing "some of the Plaintiffs" to buy Microsoft platforms (and potentially at higher prices). (Am. Compl. ¶¶ 342-385.) Plaintiffs' theory is not plausible. Plaintiffs' attenuated theory of harm rests on multiple variables, none of which are reasonably probable: (i) Microsoft will make Activision games exclusive, (ii) that exclusivity would prevent Sony (the admitted leader in consoles) and competitors in other alleged markets from competing effectively, (iii) as a result, competition in the markets will be substantially lessened, and (iv) that would result in a legally recognized harm to Plaintiffs. Each link relies on conjecture that falls well short of producing the required degree of probability.

### i.      *Plaintiffs Have Not Alleged Incentive or Ability to Make Call of Duty Exclusive*

Plaintiffs acknowledge that Microsoft has entered into contracts to provide competitors with access to *Call of Duty* and other Activision games.[5] (Am. Compl. ¶¶ 321-341.) They establish that Microsoft will make *Call of Duty* more available than ever before. (*See id.* at ¶ 329.) The mere

---

[5] While Plaintiffs' allegations are insufficient to find that Plaintiffs have alleged a claim for relief, under the incorporation by reference doctrine, the Court may also consider the agreements themselves (Exhibits C and D to the Kilaru Declaration) in ruling on Microsoft's Rule 12(b)(6) motion to dismiss. The contents of these agreements are alleged in the Amended Complaint (Am. Compl. ¶¶ 329-341), their authenticity is not in question, and there are no disputed issues as to their relevance. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010)*; Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). Accordingly, the court may treat the agreements as part of the complaint and may assume that their contents are true for purposes of this motion. *Marder v. Lopez*, 450 F.3d 445, 448–49 (9th Cir. 2006).

existence of these legally enforceable agreements demonstrates two key facts: (1) Microsoft believes that it is incentivized to expand access, the opposite of taking *Call of Duty* exclusive; and (2) Microsoft will not have the ability to make *Call of Duty* and other Activision content exclusive.[6]

Plaintiffs attempt to wave away these agreements on the grounds that the contractual terms are too ambiguous to be enforceable.  Plaintiffs take issue with a term requiring Microsoft to use its "best efforts" to make future *Call of Duty* titles compatible with Nintendo's platform.  (Am. Compl. ¶ 333.) But "best efforts" clauses are common and do not render contracts unenforceable.  *Cable & Comput. Tech., Inc. v. Lockheed Sanders, Inc.*, 214 F.3d 1030, 1035 (9th Cir. 2000).  Plaintiffs have not alleged why it is reasonably probable that Microsoft would breach its agreement to use its "best efforts" (nor that Microsoft has failed to comply with such terms in the past) or that those efforts would not succeed. Similarly, Plaintiffs take issue with the terms of Microsoft's offer to provide *Call of Duty* on Sony platforms after 2024, but the relevant point is that Microsoft has offered a 10-year commitment to provide access on PlayStation and the PlayStation subscription service.  (Am. Compl. ¶¶ 335-336). These contractual commitments and the offer to Sony render implausible Plaintiffs' assertion that Microsoft will make *Call of Duty* exclusive.  Plaintiffs also acknowledge that Microsoft would earn significant profits by continuing to sell the games on Sony's platform.  (*See* Am. Compl. ¶¶ 308-313.) Plaintiffs' allegations demonstrate that it is more likely—or at least equally possible—that Plaintiffs will have continued access to new releases of Activision games on their preferred platform.  *See In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1105 (9th Cir. 2013) (plaintiffs must do more than allege facts that are consistent with two competing possibilities).

### ii.     *Plaintiffs Have Not Alleged a Reasonable Probability of Foreclosure of Competition*

Plaintiffs' allegations fail to state a claim even if the Court accepted Plaintiffs' theory that

---

[6] Plaintiffs spend several paragraphs discussing selected portions of the provisional findings by the U.K.'s Competition and Markets Authority related to content being an important factor in choice of gaming platform.  (Am. Compl. ¶¶ 274-279.)  But they omit the most relevant CMA conclusions: (1) that the merged entity would not have an incentive to fully foreclose PlayStation using *Call of Duty*; (2) a partial foreclosure strategy would not provide the ability to foreclose PlayStation; and therefore (3) the acquisition will not result in a substantial lessening of competition in console gaming. (*See*  https://assets.publishing.service.gov.uk/media/641d6b7e32a8e0000cfa9381/Updated_version_-_Microsoft_Activision_Addendum_PFs__For_Publication_230324_.pdf.)

Microsoft could and would make Activision games exclusive to Xbox and PCs. Plaintiffs must further allege how making Activision content exclusive to Xbox and PCs would result in "a significant percentage of market foreclosure" in a relevant market—*i.e.*, that competing platforms would lose the ability to effectively compete. *Crouse-Hinds Co. v. Internorth, Inc.*, 518 F. Supp. 416, 431 (N.D.N.Y. 1980). The product input must be "critical," with no reasonable alternatives available, such that rivals will be deprived of a fair opportunity to compete. *See United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 202-04 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). If there are alternatives, then Plaintiffs' case runs afoul of the rule that antitrust cases "must make economic sense." *United States v. Syufy Enters.*, 903 F.2d 659, 663 (9th Cir. 1990). Plaintiffs' foreclosure theory makes no sense here, where the input is far from essential and competitors will still be able to compete with alternative products.

First, with respect to the alleged multi-game subscription and cloud gaming markets, Plaintiffs do not allege that *Call of Duty* or other Activision games are currently available on those platforms, so they are, by definition, not critical inputs. (Am. Compl. ¶¶ 63, 70.) Plaintiffs' allegations that Microsoft would expand access to Plaintiffs and other gamers by offering Activision content on these additional platforms cannot constitute competitive harm. And Plaintiffs do not make factual allegations regarding the competitors and market concentrations in those markets. With respect to Plaintiffs' "computer operating systems" market, Plaintiffs conflate this with their cloud gaming market and allege that there will be harm to a "computer operating systems" market if Microsoft makes Activision games exclusive to its cloud gaming service. (Am. Compl. ¶¶ 380-381.) Again, since the games are not currently available on any cloud gaming service, Plaintiffs do not explain how this would harm competition. They also do not allege how this would move the needle on Microsoft's market share in "computer operating systems." There are no allegations tying game exclusivity to consumers switching operating systems.

With respect to consoles, what Plaintiffs have actually alleged is that making Activision content exclusive could force Sony to compete harder with Xbox for consumers' gaming dollars. For instance, if Xbox became more attractive to some Sony PlayStation gamers post-acquisition, it is *at least* equally likely that Sony would respond with improved content, better hardware, lower prices, or

18

otherwise make PlayStation more attractive, all of which would inure to the benefit of Plaintiffs.  As the Court noted when comparing the potential future outcomes from the transaction, "[E]quality of possibility is insufficient."  (Order Granting Motion to Dismiss, Dkt. 74, at 9 (citing *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1105 (9th Cir. 2013)).)  Plaintiffs have not alleged any facts that would transform this undeniable increase in competition with the console leader, Sony, into harm to competition.  Allegations that some Sony customers would switch to Microsoft products is not enough.

Plaintiffs make several allegations about the success of *Call of Duty* and the potential that consumers will make gaming platform purchases based on where *Call of Duty* is available.  But they also allege that there are competing games—ten to twenty every year even using Plaintiffs' artificial "Triple-A" class—and that many of those are exclusive to certain platforms (such as Sony's).  (Am. Compl. ¶¶ 72, 177.)  Plaintiffs' Amended Complaint does not explain how Sony's extensive use of exclusivity provisions, marketing agreements, and acquisitions are part and parcel of a competitive market, but Microsoft's hypothetical future exclusivity for Activision content is not.  Further, while Plaintiffs describe Nintendo Switch's allegedly less desirable characteristics, they acknowledge that the Switch has been one of the three main gaming consoles for years.  (Am. Compl. ¶¶ 51, 188.)  The success of the Switch, despite its current and historical lack of access to *Call of Duty* (*id.* at ¶¶ 58-60), makes it implausible that Activision games are essential inputs.  Finally, Plaintiffs do not plausibly show how the potential for Microsoft to take some of Sony's customers harms the market overall, as opposed to just decreasing Sony's revenue.  "[T]he antitrust laws protect competition, *not* competitors."  *Syufy Enterprises*, 903 F.2d at 668.  Microsoft, Sony, and their other competitors will continue to compete to consumers' benefit, despite shifts in game availability.

### iii.   Plaintiffs Have Not Plausibly Alleged a Resulting Antitrust Harm

To seek injunctive relief under Section 16 of the Clayton Act, private plaintiffs must allege threatened loss that is "of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful."  *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986).  This is known as "antitrust standing."  Plaintiffs' status as consumers does not automatically "confer[] antitrust standing"; rather, the Court must examine "the relationship between the defendant's

1    alleged unlawful conduct and the resulting harm to the plaintiff." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*,

2    190 F.3d 1051, 1058 (9th Cir. 1999). A key factor for antitrust standing is "the directness of the

3    injury." *Id.* at 1054. Antitrust standing is assessed "according to the Rule 12(b)(6) standard," which

4    means that Plaintiffs were required to allege well-pleaded, factual, and nonspeculative allegations to

5    link the alleged violation to their alleged injury. *See Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp.

6    2d 308, 312 n.1, 316-17 (D.D.C. 2011).

7           Here, the relationship between the acquisition and Plaintiffs alleged harms—having to switch

8    from rival gaming platforms to Microsoft platforms and facing higher prices or lower quality—is too

9    attenuated to confer antitrust standing. In *O'Neill v. Coca-Cola Co.*, 669 F. Supp. 217, 219-20 (N.D.

10   Ill. 1987), a private plaintiff brought a Section 7 claim challenging Coca-Cola and Pepsi's vertical

11   mergers with independent bottling facilities. The plaintiff alleged that the mergers would increase

12   barriers to entry in the soft drink market, increase interdependent pricing and reduce competition

13   between Coca-Cola and Pepsi, and, ultimately, increase prices for consumers. *Id.* at 222. The court

14   dismissed the action because the plaintiff did not "provide the causal links" between these allegations

15   and higher prices to consumers. *Id.* at 222-23. While the mergers would have "serious ramifications

16   for other independent bottlers," the "causal links between the allegedly illegal acquisitions and

17   [plaintiff's] pocketbook injury" was "vaguely defined" and speculative. *Id.* at 223-24; *see also Marion*

18   *Healthcare, LLC v. S. Ill. Hosp. Servs.*, No. 21-cv-00873, 2022 U.S. Dist. LEXIS 114392, at *8–15

19   (S.D. Ill. June 28, 2022).

20          The same is true here. For the console, subscription, and cloud-gaming markets, Plaintiffs

21   assert that they may at some point in the future be "forced" to buy Microsoft's gaming platforms,

22   which "may" have higher prices and lower quality than competitor platforms. (Am. Compl. ¶¶ 350-

23   351, 361-362, 372-373).[7] But their only basis for these conclusory allegations is speculation that

24   Microsoft will have "less incentive to compete with rival[s]." (*Id.* ¶¶ 351, 362, 373). This conclusory

25   chain of causation is insufficient to state an antitrust injury necessary for a Section 16 claim.

26          Further, as addressed above, this speculation only lands Plaintiffs at a hypothetical monetary

27

28   ───────────────
[7] Notably, Plaintiffs do not even attempt to allege a personal harm (*e.g.*, higher prices) in the computer
operating systems market. (Am. Compl. ¶¶ 378-385).

injury—an eventual potential of higher prices for lower quality—that is not irreparable or imminent. *See Taleff*, 828 F. Supp. 2d at 1123, n.7 (dismissing complaint because allegations of harm in the form of higher ticket prices for diminished service did not set forth an irreparable harm).  Plaintiffs' claim of harm fundamentally fails.

## VI.   CONCLUSION

Microsoft requests that the Court dismiss Plaintiffs' action with prejudice and without leave to amend.  Plaintiffs have tried and failed for a second time to establish their standing and allege a plausible claim under the Clayton Act, including irreparable non-monetary harm to themselves. Dismissal with prejudice is appropriate where, as here, Plaintiffs cannot remedy the Amended Complaint's deficiencies.  *See, e.g.*, *DeHoog v. Anheuser-Busch InBev, SA/NV*, No. 1:15-cv-02250-CL, 2016 U.S. Dist. LEXIS 137407, at *4 (D. Or. Oct. 3, 2016), *aff'd*, 899 F.3d 758 (9th Cir. 2018).

Dated: April 19, 2023

Respectfully submitted,

By:   *Valarie c. Williams*

Valarie C. Williams
B. Parker Miller
Tania Rice
Alston & Bird LLP

Beth A. Wilkinson
Rakesh N. Kilaru
Kieran Gostin
Anastasia M. Pastan
Jenna Pavelec
Wilkinson Stekloff LLP

*Counsel for Defendant Microsoft Corporation*