# EXHIBIT 2

Caroline Van Ness (SBN 281675)
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570
Email: caroline.vanness@skadden.com

Steven C. Sunshine (*pro hac vice*
forthcoming)
Julia K. York (*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
Email: steven.sunshine@skadden.com
Email: julia.york@skadden.com

*Attorneys for Activision Blizzard, Inc.*

Joseph R. Saveri (SBN 130064)
Steven N. Williams (SBN 175489)
Cadio R. Zirpoli (SBN 179108)
Elissa Buchanan (SBN 249996)
David H. Seidel (SBN 307135)
JOSEPH SAVERI LAW FIRM, LLP
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com
Email: swilliams@saverilawfirm.com
Email: czirpoli@saverilawfirm.com
Email: eabuchanan@saverilawfirm.com
Email: dseidel@saverilawfirm.com

*(additional counsel listed on signature
page)*

*Attorneys for Dante DeMartini, et al.*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION BLIZZARD, INC.,<br><br>Moving Party,<br><br>v.<br><br>DANTE DEMARTINI, CURTIS BURNS JR., NICHOLAS ELDEN, JESSIE GALVAN, CHRISTOPHER JOSEPH GIDDINGS-LAFAYE, STEVE HERRERA, HUNTER JOSEPH JAKUPKO, DANIEL DERMOT ALFRED LOFTUS, BEOWULF EDWARD OWEN, and IVAN CALVO-PEREZ,<br><br>Responding Parties. | Misc. Case No.<br><br>Underlying action in United States District Court for the Northern District of California, No. 3:22-cv-08991-JSC<br><br>**JOINT STIPULATION REGARDING ACTIVISION BLIZZARD, INC.'S MOTION TO QUASH THIRD-PARTY SUBPOENAS**<br><br>Fact Discovery Cutoff: TBD<br>Expert Discovery Cutoff: TBD<br>Pretrial Conference and Trial Date: TBD<br>Hearing Date: TBD |

# TABLE OF CONTENTS

Page

I. PRELIMINARY STATEMENTS ...................................................1

    A. Activision's Preliminary Statement .....................................1

    B. *DeMartini* Plaintiffs' Preliminary Statement ........................2

II. BACKGROUND ...........................................................................5

    A. Activision's Summary of Factual and Procedural Background .............5

        1. *The DeMartini* Plaintiffs' Allegations in the Underlying Antitrust Action ........................................................5

        2. The Proposed Transaction ...........................................6

        3. Procedural History of the Underlying Antitrust Action ...............7

        4. *The DeMartini* Plaintiffs' Subpoenas to Non-Party Activision and the Meet and Confer Process ....................8

    B. *DeMartini* Plaintiffs' Summary of Factual and Procedural Background..........................................................11

III. ARGUMENT .............................................................................13

    A. Activision's Argument ..................................................13

        1. Legal Standard ........................................................13

        2. This Court Should Quash Both of Plaintiffs' Subpoenas Because the Issuing Court Lacks Subject-Matter Jurisdiction Over the Underlying Action. ...............15

        3. This Court Should Quash Plaintiffs' Deposition Requests on the Merits.....................................................18

            (a) This Court Should at a Minimum Defer Plaintiffs' Deposition Requests Because the Issuing Court has Deferred First-Party Depositions. ...............18

            (b) This Court Should Quash Plaintiffs' Deposition Requests Because Plaintiffs Have Failed to Articulate a Substantial Need for the Confidential Commercial Information they Seek to Elicit.....................20

            (c) This Court Should Quash Plaintiffs' Request to Depose Activision's CEO Because that Request Runs Afoul of the Apex Deposition Doctrine. ................21

4.     This Court Should Quash Plaintiffs' Document Requests. .........24

        (a)   Request for Production No. 1 .............................24

        (b)   Request for Production No. 2.............................26

        (c)   Request for Production No. 3.................................27

        (d)   Request for Production No. 4.................................27

        (e)   Request for Production Nos. 5 and 6.....................28

B.    *DeMartini* Plaintiffs' Argument ..........................................30

    1.    Legal Standard ..................................................................31

    2.    Activision's Argument That the Issuing Court Lacks Subject-Matter Jurisdiction Over the Underlying Action Borders on Frivolous...............................................................32

    3.    The Court Should Not Quash Plaintiffs' Deposition Requests on the Merits...........................................................33

        (a)   This Court Should Not Defer Plaintiffs' Deposition Requests Because the Court Where the Action is Pending Has Thus Far Declined to Do So.................................................................33

        (b)   The Court Should Not Quash Plaintiffs' Deposition Requests Because Plaintiffs Seek a Limited Amount of Testimony – Two Depositions – Directly Related to the Issues in Dispute Arising from Microsoft's Acquisition of Activision .........................................................33

        (c)   The Court Should Not Quash Plaintiffs' Request to Depose Activision's CEO Because the Apex Doctrine does Not Apply and Mr. Kotick is Directly Involved in the Challenged Transaction .......................................................34

    4.    The Court Should Not Quash Plaintiffs' Document Requests...............................................................................35

        (a)   Request for Production No. 1 .............................35

        (b)   Request for Production No. 2.............................36

        (c)   Request for Production No. 3.................................36

        (d)   Request for Production No. 4.................................37

        (e)   Request for Production Nos. 5 and 6.....................37

IV.    CONCLUSION ..........................................................................38

A.     Activision's Conclusion ..................................................... 38

B.     *DeMartini* Plaintiffs' Conclusion ....................................... 38

# I.  PRELIMINARY STATEMENTS

## A.  Activision's Preliminary Statement

Ten individual gamers (the "*DeMartini* Plaintiffs" or "Plaintiffs") filed an action in the Northern District of California against Microsoft Corp. ("Microsoft") seeking to stop Microsoft from acquiring Activision Blizzard, Inc. ("Activision") (the "Proposed Transaction"), represented by counsel with a long history of unsuccessful challenges to high-profile mergers just like this one.[1]  Plaintiffs have served non-party Activision with two burdensome third-party subpoenas that seek overbroad swaths of information.

Plaintiffs' onerous third-party discovery requests include the deposition of Activision's CEO, a corporate deposition, and millions of pages of Activision's sensitive internal documents, untethered to the parties' claims and defenses.  Plaintiffs have refused to reconsider their improper discovery tactics, despite the facts that: (i) the issuing court in the underlying action has stayed first-party depositions until it has resolved a Motion for a Preliminary Injunction in April, such that Plaintiffs attempt to put non-party Activision in a worse position than the actual parties to the case; (ii)

---

[1]  In recent and past years, Plaintiffs' counsel has filed a series of unsuccessful, eleventh-hour challenges to high-profile mergers that either had closed or were about to close.  *See, e.g.*, *Bradt v. T-Mobile US, Inc.*, 2020 WL 1233939, at *1 (N.D. Cal. Mar. 13, 2020) (denying motion to enjoin merger pending appeal after plaintiffs lost motion for temporary restraining order); *Dehoog v. Inbev*, 2016 WL 5858663, at *1 (D. Or. Oct. 3, 2016) (dismissing antitrust challenge to merger of Anheuser-Busch InBev and SAB Miller), *aff'd sub nom. DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758 (9th Cir. 2018); *Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118, 1125 (N.D. Cal. 2011) (dismissing antitrust challenge to merger of Southwest Airlines and AirTran); *Cassan Enters., Inc. v. Avis Budget Grp., Inc.*, No. C10-1934-JCC, slip. op. at 6 (W.D. Wash. Mar. 11, 2011) (dismissing antitrust challenge to Avis's proposed acquisition of Dollar Thrifty); *Malaney v. UAL Corp.*, 2010 WL 3790296, at *15 (N.D. Cal. Sept. 27, 2010) (denying motion to enjoin merger of United Air Lines and Continental Airlines), *aff'd*, 434 F. App'x 620 (9th Cir. 2011), *cert. denied*, 132 S. Ct. 855 (2011); *Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, 2009 WL 3320272, at *2 (N.D. Cal. Oct. 14, 2009) (dismissing antitrust challenge to merger of Pfizer and Wyeth); *Ginsburg v. InBev NV/SA*, 649 F. Supp. 2d 943, 952 (E.D. Mo. 2009) (dismissing antitrust challenge to InBev's acquisition of Anheuser-Busch), *aff'd*, 623 F.3d 1229 (8th Cir. 2010); *Madani v. Shell Oil Co.*, 2008 WL 7856015, at *4 (C.D. Cal. July 11, 2008) (dismissing antitrust challenge to joint ventures between Shell and Texaco), *aff'd*, 357 F. App'x 158 (9th Cir. 2009); *Am. Channel, LLC v. Time Warner Cable, Inc.*, 2007 WL 1892227, at *7 (D. Minn. June 28, 2007) (dismissing antitrust challenge to Time Warner's acquisition of Adelphia).

Microsoft has filed a meritorious motion to dismiss, which will be heard in March; (iii) Microsoft has already offered to produce millions of pages of documents to Plaintiffs; and (iv) the Proposed Transaction is the subject of an administrative action commenced by the United States Federal Trade Commission (the "FTC") before its Administrative Law Judge and remains the subject of antitrust review by regulators around the world.  Plaintiffs' subpoenas are improper, particularly in view of the fact that first-party depositions have been stayed and Plaintiffs have (at best) only just *begun* to review any first-party discovery.

Activision respectfully requests that the Court enter an order quashing Plaintiffs' third-party subpoenas or, at a minimum, deferring Plaintiffs' third-party discovery of Activision until after the issuing court has resolved Plaintiffs' Motion for a Preliminary Injunction.

## B.  *DeMartini* **Plaintiffs' Preliminary Statement**

This brief violates Rule 1 of the Federal Rules of Civil Procedure, as Activision has already agreed to transfer this motion to the Northern District of California. Under Rule 45, this court should transfer adjudication over Activision's Motion to Quash to the Northern District of California because Activision has consented to transfer, and because there are "exceptional circumstances" to do so. Fed. R. Civ. P. 45; *see also E4 Strategic Sols., Inc. v. Pebble Ltd. P'ship*, No. SAMC1500022DOCDFMX, 2015 WL 12746706, at *2 (C.D. Cal. Oct. 23, 2015).

First, counsel for Activision has consented both orally and in writing. Activision has stated that "we remain amenable to transferring consideration of Activision's Motion to Quash in the Northern District of California (and to Judge Corley, specifically) once this motion has been appropriately filed in the Central District of California." *See* Declaration of Steve Williams ("Williams Decl.") (filed herewith) at ¶¶ 5–6 and Ex A [Email from Michael A. Lanci, Feb. 10, 2023 7:05 p.m.]

Second, this case presents the prototypical circumstances to transfer. Under the Advisory Committee notes, exceptional circumstances exist "in order to avoid

disrupting the issuing court's management of the underlying litigation, as when that court has already ruled on issues presented by the motion." *See E4 Strategic Sols.,* 2015 WL 12746706, at *2 (quoting the advisory committee notes to Rule 45). Here, Judge Corley has already denied Microsoft's motion to stay document discovery and has already ordered production of most of the same categories of documents Activision now seeks to quash. *See* York Decl. Ex. 9, Tr. of Proceedings Held on February 2, 2023, *DeMartini*, No. 3:22-cv-08991-JSC (N.D. Cal. Feb. 4, 2023) ("Feb. 2, 2023 Tr.").) at 8:18–9:21. There are also exceptional circumstances because Activision Blizzard asks this Court to essentially adjudicate Microsoft's pending motion to dismiss, by asking this Court to quash the subpoena on the grounds that Plaintiffs lack standing, and that their complaint will be dismissed, citing to Microsoft's pending motion to dismiss. Plaintiffs' opposition to Microsoft's motion to dismiss pending in the Northern District adequately addresses why Microsoft's—and now Activision's— arguments are groundless.

The procedure for presenting discovery disputes to the Court is substantially different before Judge Corley where the action is pending.[2]

The underlying action involves a challenge pursuant to Section 7 of the Clayton Act, 15 U.S.C. § 18, to Microsoft's proposed acquisition of Activision ("the Action"). The Action is pending before the Hon. Jacqueline Scott Corley in the Northern District of California. Judge Corley has ordered that discovery proceed in the Action, and Microsoft has already made productions of documents to the Plaintiffs with further productions ongoing.

Activision's brief fails to mention that the issuing Court has *already denied a motion to stay* filed by Microsoft and ordered that document discovery proceed. Activision also fails to mention that Plaintiffs' limited set of document requests Activision seeks to quash are essentially the identical document requests Plaintiffs

---

[2] www.cand.uscourts.gov/wp-content/uploads/judges/corley-jsc/JSC-Standing-Order-Feb-17-2023 (Judge Corley's Standing Order, which provides procedures for discovery disputes involving non-parties like Activision.).

JOINT STIPULATION REGARDING ACTIVISION BLIZZARD, INC.'S MOTION TO QUASH

issued to Microsoft, which the issuing Court has allowed to proceed and largely already ordered production.

Furthermore, Plaintiffs offered to moot this entire dispute by agreeing to reissue the subpoena for compliance in the Northern District of California and proposing a narrowed scope of document discovery, staging of document productions and depositions, and narrowed, targeted custodial searches. Activision appeared to be unable to even respond to this proposal, despite three separate phone calls discussing it with undersigned Plaintiff counsel. Instead, Activision appears adamant on filing a brief that no judicial officer is ever likely to read.

Moreover, there is no doubt that Activision, as one of the parties to the challenged merger, is not a typical non-party needing special protection. Indeed, Plaintiffs seek from Activision documents it has already gathered, reviewed, and produced to others, as well as a limited amount of deposition testimony. This is appropriate discovery from one of the two parties to the acquisition. Activision's arguments to the contrary ignore the facts and misstate the law. Indeed, none of the cases cited by Activision in support of its arguments about supposed burdens to non-parties involved a "non-party" who was a party to a challenged merger. Even outside the unique merger context, Activision's representations on the protections afforded to non-parties is overstated. *See, e.g.*, *Mount Hope Church v. Bash Back!*, 705 F.3d 418, 429 (9th Cir. 2012) ("[W]e will not read 'undue burden' differently just because a non-party was subpoenaed.").

Plaintiffs will not respond to the ad hominin attacks in footnote 1 above, other than to note that citations to different cases that one of Plaintiffs' counsel previously worked on adds nothing relevant to the analysis before the Court.

JOINT STIPULATION REGARDING ACTIVISION BLIZZARD, INC.'S MOTION TO QUASH

## II.    BACKGROUND

### A.    Activision's Summary of Factual and Procedural Background

#### 1.    *The DeMartini* Plaintiffs' Allegations in the Underlying Antitrust Action

Plaintiffs seek to stop a proposed transaction by Microsoft to acquire Activision, which Microsoft announced on January 18, 2022.  (*See* Declaration of Julia K. York ("York Decl.") (filed herewith) Ex. 6, Compl., *DeMartini v. Microsoft Corp.*, No. 3:22-cv-08991-JSC (N.D. Cal. Dec. 20, 2022) ¶¶ 1–2, Dkt. No. 1 ("Compl.").)  Microsoft owns and sells Xbox, one of three major video game consoles, and Windows, one of the primary operating systems for personal computers ("PCs").  (*Id.* ¶¶ 7, 87.)  Both Microsoft and Activision are among the many companies that develop and publish video games.  (*Id.* ¶¶ 5, 76, 124–29.)

Plaintiffs are ten individuals who play video games and claim to have purchased Activision titles, which they play on a variety of platforms,[3] including Microsoft's Xbox video game console, Sony's PlayStation video game console, and the Nintendo Switch video game console.  (*Id.* ¶¶ 23–33.)  Plaintiffs assert a single claim under Section 7 of the Clayton Antitrust Act alleging that the effect of the Proposed Transaction "may be substantially to lessen competition, or tend to create a monopoly" (*id.* ¶ 218) under three distinct, but equally unavailing, theories of relief: *First*, Plaintiffs allege that the Proposed Transaction may substantially lessen competition because Microsoft and Activision are horizontal competitors in various inadequately defined markets related to the development, publishing, and sale of video games.  (*Id.* ¶¶ 252–75.)  *Second*, Plaintiffs allege that the Proposed Transaction may lessen competition because Microsoft could make Activision's games exclusive or partially exclusive to Microsoft's platforms (*id.* ¶¶ 280–333), though Plaintiffs admit that Microsoft has made public promises that it will continue to keep Activision's games

---

[3] Video games can generally be played on numerous different platforms, including video game consoles, PCs, mobile devices, and cloud-based systems.  (*See* York Decl. Ex. 6, Compl. ¶¶ 78–122, 286.)

available on other platforms (*id.* ¶ 306). And ***third***, Plaintiffs allege that the Proposed Transaction could lessen competition for labor between video game developers, publishers, and distributors (*id.* ¶¶ 276–79), although they do not allege that they work in the video game industry or that they otherwise somehow participate in the video game labor market. (*See id.* ¶¶ 23–33; *see also* York Decl. Ex. 8, Defendant Microsoft Corp.'s Mot. to Dismiss 2–3, *DeMartini*, No. 3:22-cv-08991-JSC (N.D. Cal. Jan. 31, 2023), Dkt. No. 42 ("Mot. to Dismiss").)

## 2. The Proposed Transaction

Microsoft announced the Proposed Transaction on January 18, 2022. (*See* York Decl. Ex. 6, Compl. ¶ 2.) The Proposed Transaction has not yet closed, and it is currently under review by the FTC and multiple foreign regulators. (York Decl. Ex. 8, Mot. to Dismiss 3.) The FTC began reviewing the Proposed Transaction when it was announced and conducted a lengthy investigation. (York Decl. ¶ 11.) On December 8, 2022, the FTC filed an administrative complaint against Microsoft and Activision before its Administrative Law Judge, alleging that the Proposed Transaction violates federal antitrust laws. (*Id.*; *see also* Compl., *In re Microsoft/Activision Blizzard*, FTC No. 9412 (Dec. 8, 2022).) Fact discovery is scheduled to close on April 7, 2023, and an administrative trial is currently scheduled for August 2, 2023. (*See* York Decl. ¶ 11; *see also* Scheduling Order, *In re Microsoft/Activision Blizzard*, FTC No. 9412 (Jan. 4, 2023).)

In addition, Microsoft and Activision have for over a year been working cooperatively with regulators around the world—including the European Commission (the "EC") and the United Kingdom's Competition and Markets Authority (the "CMA")—to secure the necessary approvals to close the Proposed Transaction. (York Decl. Ex. 8, Mot. to Dismiss 3.) Microsoft has publicly acknowledged that it cannot close the Proposed Transaction while these and certain other foreign regulatory reviews remain open. (*See* York Decl. Ex. 7, Def.'s Mot. to Stay 4, *DeMartini*, No. 3:22-cv-08991-JSC (N.D. Cal. Jan. 11, 2023), Dkt. No. 26.) Microsoft is engaging

with each of the above-mentioned regulators, which could lead to remedies that may alter the transaction, such as a provision requiring Microsoft to continue making Activision games available on competitors' consoles.  (*See* York Decl. Ex. 8, Mot. to Dismiss 4.)

### 3. Procedural History of the Underlying Antitrust Action

Against this regulatory backdrop, Plaintiffs commenced the underlying action on December 20, 2022 by filing a Complaint that named Microsoft as sole defendant and a Motion for Preliminary Injunction that seeks to enjoin the Proposed Transaction.  (*See* York Decl. ¶ 2; York Decl. Ex. 6, Compl. ¶ 1; *see also* Pl.'s Mot. for Preliminary Injunction 1, *DeMartini*, No. 3:22-cv-08991-JSC (N.D. Cal. Dec. 20, 2022), Dkt. No. 4.)  On January 31, 2023, Microsoft filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), which raises numerous arguments in favor of dismissal.  (*See* York Decl. Ex. 8, Mot. to Dismiss at 1.)  As relevant to the instant Motion, Microsoft argues that Plaintiffs' Complaint must be dismissed because the issuing court lacks subject-matter jurisdiction over the action, explaining: (1) that the action is unripe in light of various pending regulatory approvals by government regulators; and (2) that Plaintiffs do not have Article III standing to pursue their claim.  (*Id.* at 11–16.)  Microsoft's Motion to Dismiss is scheduled to be heard on March 16.

The issuing court (Corley, J.) held a status conference in the underlying action on February 2, 2023.  (York Decl. Ex. 9, Tr. of Proceedings Held on February 2, 2023 *DeMartini*, No. 3:22-cv-08991-JSC (N.D. Cal. Feb. 4, 2023), Dkt. No. 54 ("Feb. 2, 2023 Tr.").)  At that status conference, the parties stipulated that Microsoft would not close the Proposed Transaction before May 1, 2023, and Judge Corley entered that stipulation as the order of the Court.  (*Id.* at 3:6–3:14.)  In light of that stipulation, Judge Corley rescheduled the hearing on Plaintiffs' Motion for a Preliminary Injunction to April 12, 2023.  (*Id.* at 5:7–5:18.)

At the conference, Microsoft reported that it had received various first-party document discovery requests from Plaintiffs.  Pursuant to those requests, Microsoft

stated it would be prepared to provide Plaintiffs with: (1) the "9 or 10 million pages of documents" it produced to the FTC in connection with the FTC's investigation into the Proposed Transaction; (2) "additional productions" related to the FTC investigation; and (3) any Microsoft deposition transcripts from the FTC action as they become available. (*Id.* at 8:18–9:22.) Given a request by Microsoft to defer depositions until after the preliminary injunction hearing and Plaintiffs' "representation [that Plaintiffs] don't need them for the preliminary injunction," Judge Corley further held that any first-party depositions—including first-party depositions of Microsoft's executives that Plaintiffs had already noticed—would be deferred until the parties "resolve the preliminary injunction" and "the case moves forward." (*Id.* at 10:6–10:11.) At the end of the conference, Plaintiffs inquired with Judge Corley as to whether she would defer third-party depositions, and she responded that she would "not make any ruling on" third-party discovery at that juncture because no third parties were yet before her. (*Id.* at 19:7–20:11.)

### 4. *The DeMartini* Plaintiffs' Subpoenas to Non-Party Activision and the Meet and Confer Process

Plaintiffs have served non-party Activision with two subpoenas pursuant to Federal Rule of Civil Procedure 45. (York Decl. ¶¶ 3–5.) ***First***, on January 30, 2023, Plaintiffs served Activision's registered agent, CSC Lawyers Incorporating Service, with a subpoena return-dated for February 14, 2023, encompassing: (1) a demand for a Federal Rule of Civil Procedure 30(b)(6) corporate deposition; and (2) a series of facially overbroad document requests. (*See* York Decl. Ex. 2.) ***Second***, on January 31, 2023, Plaintiffs served counsel for Activision with a deposition subpoena for Activision's CEO, Robert A. Kotick, that purports to require Mr. Kotick to appear for a deposition on February 27, 2023. (*See* York Decl. Ex. 1.) Counsel for Activision voluntarily accepted service of that subpoena, reserving all objections and the right to move to quash under Rule 45. (*See* York Decl. Ex. 3.)

On February 3, 2023, Activision participated in a meet and confer with Plaintiffs regarding both the deposition and document requests.  (York Decl. ¶¶ 6–8.)  Plaintiffs began the meet and confer by suggesting that "all" they seek from Activision is Mr. Kotick's deposition and the documents that Activision has produced to the FTC in connection with the Proposed Transaction.  (*Id.* ¶ 6.)  Notwithstanding the subpoena return dates of February 14 for the requested corporate deposition and February 27 for the requested deposition of Mr. Kotick, Plaintiffs suggested that they would seek to take the corporate deposition only if they were to need additional testimony *after* deposing Mr. Kotick.  (*Id.*)

Activision then set out its position.  With respect to Plaintiffs' deposition requests, Activision explained that it does not intend to produce its CEO for a deposition on February 27, nor does it intend to produce a corporate witness for a deposition on February 14.  (*Id.* ¶ 7.)  Activision explained that any depositions concerning its personnel should, at a minimum, be deferred until after the preliminary injunction hearing in the underlying action, particularly given: (1) that such an approach would be consistent with the stay that Judge Corley put in place for first-party depositions; and (2) Plaintiffs' explanation that they may not even need a corporate deposition.  (*Id.*)  With respect to Plaintiffs' document requests, Activision explained that Plaintiffs' request for Activision to produce any and all documents it has produced to the FTC is unwarranted, particularly given: (1) that Plaintiffs will be receiving 9 million pages of documents from defendant Microsoft (the acquiring party); (2) that Microsoft filed a meritorious motion to dismiss this action that will be argued on March 16; and (3) that a protective order was not yet in place at the time.  (*Id.*)  Nevertheless, Activision emphasized that it would be willing to consider a more reasonable, narrowed proposal from Plaintiffs.  (*Id.*)

Plaintiffs offered no such proposal.  (*See id.* ¶ 8.)  Instead, Plaintiffs responded that the "state of affairs" on the discovery they seek is reflected in the subpoenas they served and that their request for "just the FTC file" *was* their reasonable proposal.  (*Id.*)

Contradicting their earlier position that they do not need a corporate deposition, Plaintiffs then noted that if Activision does not intend to produce Mr. Kotick as a deponent on February 27, they would intend to proceed with a corporate deposition on February 14. (*Id.*) Plaintiffs added that they sought testimony from Mr. Kotick specifically because they believe it would be "important to talk to the person who is selling his business" and because they also seek information regarding what agreements Activision has with Microsoft, whether and why Activision may have any revenue sharing agreements with Microsoft, and how Activision determined the transaction price it would accept from Microsoft. (*Id.*) Activision responded that it would be back in touch to confirm its position on Plaintiffs' various discovery requests. (*Id.*)

On February 8, 2023, in accordance with the requirements of Central District of California Local Rule 37-1 and 45-1, Activision sent a letter to Plaintiffs setting out its position in full and providing the numerous reasons described herein as to why Plaintiffs' deposition and document requests should be quashed. (*See* York Decl. Ex. 4.) Activision thereafter participated in a further meet and confer with Plaintiffs on February 10, 2023, during which they were unable to resolve the issues presented in Activision's letter and herein. (York Decl. ¶ 10.) Activision then initiated the joint stipulation process required by Central District of California Local Rules 37-2 and 45-1 by timely serving Plaintiffs with its portion of the instant joint stipulation on February 10, 2023. (*Id.*) That same day, Activision also timely served Plaintiffs with its Responses & Objections to Plaintiffs' document requests. (York Decl. Ex. 5.)

**B.** *DeMartini* **Plaintiffs' Summary of Factual and Procedural Background**

As acknowledged by Defendants, the proposed acquisition of Activision by Microsoft is huge. It is subject to extraordinary scrutiny by the United States Federal Trade Commission and by the European Union.[4]

Plaintiffs' complaint seeks to prohibit the merger between Microsoft and Activision under Section 7 of the Clayton Act, 15 U.S.C. § 18. Section 7 makes unlawful all mergers, the effect of which "may be substantially to lessen competition, or to tend to create a monopoly." *Id.* Congress understood the broad and pervasive harms inherent in economic concentration through mergers and acquisitions. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 317–18 (1962) ("[A] keystone in the erection of a barrier to what Congress saw was the rising tide of economic concentration, was its provision of authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency."). "Congress saw the process of concentration in American business as a dynamic force; it sought to assure . . . the courts the power to brake this force at its outset and before it gathered momentum." *Id.* Thus, the law is intended to clamp down on mergers with "vigor" and stop trends in concentration before any lessening of competition or anticompetitive harm has occurred. *See, e.g.*, *United States v. Von's Grocery Co.*, 384 U.S. 270, 276-77 (1966) ("To arrest this 'rising tide' toward concentration into too few hands and to halt the gradual demise of the small businessman, Congress decided to clamp down with vigor on mergers."). Section 7 therefore "prohibit[s] corporations under most circumstances from merging by purchasing the stock of their competitors." *Id.* at 275.

---

[4] *See, e.g.*, Andrew Edgecliffe-Johnson & Patrick Temple-West, Activision Blizzard chief says UK will lose out if it blocks Microsoft deal, FINANCIAL TIMES, (Feb. 7, 2023) https://www.ft.com/content/3e128560-b400-471a-bc87-fd010794ee64; *see also* Stephanie Bodnoi & Jillian Deutsch, Microsoft says no to Activision merger without 'Call of Duty', LOS ANGELES TIMES, (Feb. 21, 2023, 1:59 PM PST), https://www.latimes.com/business/technology/story/2023-02-21/microsoft-says-no-to-activision-merger-without-call-of-duty.

In order to show that the proposed merger might lessen competition, Plaintiffs are entitled to discovery from the merging parties, Microsoft and Activision. Microsoft and Activision are the two halves of the evidentiary record regarding the merger and its possible effects on competition. Plaintiffs' discovery primarily focuses on the following: (1) the current competition between Microsoft and Activision Blizzard across gaming markets, including labor markets; (2) the potential for Microsoft to use Activision Blizzards' highly popular gaming content to foreclose rivals and lessen competition in various gaming markets; (3) the potential for Activision Blizzard to enter new gaming markets in which it currently does not compete; (4) Activision Blizzard's intentions and rationale for the merger; (5) Activision Blizzard's analysis and understanding of the state of competition pre and post-merger; (6) Activision Blizzards' communications with other competitors in the industry concerning the availability of Activision Blizzards' highly popular gaming content post-merger. All of these topics, and others, are relevant to whether the merger might lessen competition if it is allowed to proceed.

Judge Corley has already denied a motion by Microsoft to stay the proceedings pending various countries' regulatory review, including the FTC's action to stop the merger. Judge Corley has also ordered Microsoft produce to Plaintiffs everything they have produced to the FTC, as well as deposition transcripts from the FTC's HSR and administrative action. Microsoft has agreed to produce other targeted discovery as well. And, as noted above, Judge Corley has declined to stay non-party discovery.

Plaintiffs' counsel participated in three separate meet-and-confer sessions with counsel for Activision in efforts to narrow the disputes. The parties agreed that Judge Corley should decide any disputes, and Plaintiffs proposed staging productions by permitting Activision to produce certain documents prior to producing its HSR production. Plaintiffs also proposed deferring any depositions until after the hearing on Plaintiff's Motion for a Preliminary Injunction, as well as offering to request

narrowed and targeted document discovery. Despite their best efforts, Plaintiffs were unable to reach agreement with Activision.

## III. **ARGUMENT**

### A. **Activision's Argument**

This Court should quash both of Plaintiffs' subpoenas for numerous reasons. *First*, the Court should quash both of Plaintiffs' subpoenas because, as Microsoft persuasively argues in its Motion to Dismiss, the issuing court lacks subject-matter jurisdiction over the underlying action.  At a minimum, the Court should defer Plaintiffs' discovery requests until after the issuing court resolves the question of its jurisdiction.[5] *Second*, the Court should quash, or at a minimum defer, Plaintiffs' deposition requests because: (1) the issuing court has already deferred all first-party depositions until after the preliminary injunction hearing in the underlying action; (2) Plaintiffs lack a substantial need for the confidential commercial information they will seek to elicit from the depositions; and (3) Plaintiffs' subpoena to depose Mr. Kotick plainly runs afoul of the apex deposition doctrine. *Third*, the Court should quash each of Plaintiffs' document requests because Plaintiffs lack a substantial need for the confidential commercial information they seek and because they are facially overbroad and would impose an undue burden on Activision.

#### 1. **Legal Standard**

"[T]he Ninth Circuit has long held that nonparties subject to discovery requests deserve extra protection from the courts." *E.g.*, *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 161 F.R.D. 86, 88 (N.D. Cal. 1995) (citing *United States v. C.B.S.*, 666 F.2d 364, 371–72 (9th Cir. 1982)).  In accordance with that general principle, where, as here, a third-party subpoena seeks confidential "commercial information" from a non-party, discovery is permissible only if the requesting party "shows a substantial need for" such information "that cannot be otherwise met without

---

[5] For the avoidance of doubt, Activision reserves its right to move to quash Plaintiffs' discovery requests, including any deposition subpoenas pertaining to its personnel, even if Activision's discovery obligations are only deferred at this juncture.

undue hardship." Fed. R. Civ. P. 45(d)(3)(B)–(C). To make that showing, a party seeking discovery must demonstrate that the discovery is not only relevant but also "essential to a judicial determination of its case." *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 685 (N.D. Cal. 2006). For the protection of third parties, this is necessarily a high bar; a party seeking third-party confidential commercial information must establish that the claims or defenses in the underlying case "virtually rise[] or fall[] with the admission or exclusion" of that information. *See Edwards v. Cal. Dairies, Inc.*, 2014 WL 2465934, at *5 (E.D. Cal. June 2, 2014) (citation omitted).[6]

Rule 45 further provides that a court "must quash or modify a subpoena that . . . subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A). An evaluation of "undue burden" under Rule 45 requires a court to consider, *inter alia*, factors such as "relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described[,] and the burden imposed." *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005) (citation omitted); *see also Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 814 (9th Cir. 2003) (affirming a district court's decision to quash as unduly burdensome a subpoena that was "abusively drawn," not tailored to the needs of the case, and served for the improper "purpose of annoying and harassment" (citations and quotation marks omitted)). In a similar vein, "[t]he limitations set forth in Rule 26(b)(2)(C) apply to discovery served on non-parties" under Rule 45. *Briggs v. Cnty. of Maricopa*, 2021 WL 1192819, at *3 (D. Ariz. Mar. 30, 2021) (citation omitted); *see also Exxon Shipping Co. v. U.S. Dep't of Interior,* 34 F.3d 774, 779 (9th Cir. 1994) (explaining that non-parties may avail themselves of both Rule 26 and the

---

[6] Notably, "[t]he fact that a protective order is in place in the underlying action does not resolve the issue of whether the non-party is required to produce information that is claimed to be confidential commercial information." *Edwards*, 2014 WL 2465934, at *5. On the contrary, "Rule 45 does not require [a] court to permit the disclosure of competitively sensitive information even under such a protective order." *In re eBay Seller Antitrust Litig.*, 2009 WL 10677051, at *4 (W.D. Wash. Aug. 17, 2009); *see also, e.g.*, *Micro Motion, Inc. v. Kane Steel Co.*, 894 F.2d 1318, 1325 (Fed. Cir. 1990) ("The protective order is not a substitute for establishing relevance or need.").

"special protection[]" of Rule 45 "against the time and expense of complying with subpoenas"). Consequently, "[o]verbroad subpoenas seeking irrelevant information may be quashed or modified." *Gonzales*, 234 F.R.D. at 680.

> 2. **This Court Should Quash Both of Plaintiffs' Subpoenas Because the Issuing Court Lacks Subject-Matter Jurisdiction Over the Underlying Action.**

At the start, as Microsoft persuasively advances in its meritorious Motion to Dismiss, the issuing court lacks subject-matter jurisdiction over this action, thus rendering Plaintiffs' subpoenas void and any compliance with those subpoenas both improper and an undue burden. As the Supreme Court has explained, "the subpoena power of a court cannot be more extensive than its jurisdiction." *U.S. Cath. Conf. v. Abortion Rts. Mobilization, Inc.*, 487 U.S. 72, 76 (1988). For this reason, while Rule 45 "grants [district courts] the power to issue subpoenas" to third parties, "if a district court does not have subject-matter jurisdiction over the underlying action, and the process was not issued in aid of determining that jurisdiction, then the process is void." *Id.* Where a "litigant lacks standing," for example, "a federal court lacks authority to adjudicate the case, including issuing deposition subpoenas or other process." *In re Perez by Allen*, 2020 WL 7056024, at *3 (N.D. Cal. Dec. 2, 2020). Microsoft has put forth two persuasive arguments as to why the issuing court lacks subject-matter jurisdiction over Plaintiffs' claim—that Plaintiffs' claim is unripe and that Plaintiffs lack Article III standing. Plaintiffs' subpoenas are thus void and must be quashed.

*First*, as Microsoft argues, Plaintiffs' claim is not ripe. For a court to exercise subject-matter jurisdiction over a case, the "case must be 'ripe'—not dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). Courts consider two factors when determining whether a case is ripe: (1) "the fitness of the issues for judicial decision"; and (2) "the hardship to the parties of withholding court consideration." *Addington v. US Airline Pilots Ass'n,* 606 F.3d 1174, 1179 (9th Cir. 2010) (citation omitted). Courts have

dismissed cases as premature where, as here, regulatory reviews were ongoing, and the potential terms of the transaction were subject to change.  *See S. Austin Coal. Cmty. Council v. SBC Commc'ns Inc.*, 191 F.3d 842, 844 (7th Cir. 1999) ("Courts often wait for agencies, even when the agencies' views are not legally conclusive—not only because the agencies may have something helpful to say, but also because what the agencies *do* may shape the litigation."); *AT&T Mobility LLC v. Bernardi*, 2011 WL 5079549, at \*12 (N.D. Cal. Oct. 26, 2011) (holding that arbitration proceedings to challenge a merger were premature and reasoning that such challenges are unripe "until all required state and federal approvals have been obtained," given that "the agencies might insist on changes that would substantially alter the merger's competitive effects" (citation omitted)).

Here, Plaintiffs' claim is wholly premature, speculative, and unfit for judicial decision.  Plaintiffs seek to enjoin a proposed transaction that is undergoing multiple regulatory reviews, which may impact the final terms of the transaction and, thus, the ultimate disposition of this case, particularly given Microsoft's acknowledgement that it cannot close the Proposed Transaction while these reviews remain ongoing.  *See, e.g.*, *Dehoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 760 (9th Cir. 2018) (affirming dismissal of a Section 7 claim because the DOJ conditioned approval of the merger on one defendant "divest[ing] entirely its domestic beer business," so the plaintiffs "could not plausibly allege" the merger "would substantially lessen competition in that market").  Proposed remedies stemming from these regulatory reviews may completely moot Plaintiffs' theories of harm, and Microsoft has publicly stated that it remains open to such remedies, which may include terms to continue to make Activision games available on other platforms.  (*See* York Decl. Ex. 8, Mot. to Dismiss 12–13.)  In these circumstances, it would be premature for the issuing court to evaluate the Proposed Transaction because it will be unable to determine the potential anticompetitive effects of the Proposed Transaction.  In addition, Plaintiffs will not face hardship and will have their day in court (if it remains appropriate and

1   necessary).  *See Bernardi*, 2011 WL 5079549, at *12 (explaining that the "delay[ed]

2   pursuit of claims that are likely not ripe cannot cause any hardship").

3       ***Second***, as Microsoft further argues, Plaintiffs lack Article III standing to pursue

4   their claim, likewise because the merger is pending regulatory approvals.  Article III

5   standing requires an injury in fact that is (1) "concrete and particularized" and (2)

6   "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S.

7   330, 339 (2016) (citation omitted).  To meet Article III standing requirements, private

8   plaintiffs pursuing claims under Section 7 of the Clayton Antitrust Act, like any

9   plaintiffs asserting claims of future injury, must show that the threat of injury is

10  "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

11      Here, Plaintiffs cannot demonstrate that the threat of injury is "certainly

12  impending" given that regulatory reviews remain ongoing by competition authorities

13  around the world, which Microsoft has acknowledged must be completed for the

14  transaction to close, and that "aspects of the acquisition may change as a result of the

15  [those] reviews." *See Cassan Enters., Inc. v. Avis Budget Grp., Inc.*, No. 10-cv-01934-

16  JCC, W.D. Wash. (Mar. 11, 2011), Dkt. 39, at *5 (dismissing Section 7 claim for lack

17  of Article III standing where injuries described in the complaint were "far from

18  certain" in light of ongoing review by the FTC).  On the contrary, Plaintiffs' claim of

19  threatened injury here is both highly speculative and hypothetical, as it relies on a

20  chain of speculative inferences, including conjecture about the transaction's final

21  terms and about Microsoft's behavior afterward.  Such hypothetical "perceived"

22  threats are insufficient to confer Article III standing. *See SureShot Golf Ventures, Inc.*

23  *v. Topgolf Int'l, Inc.*, 2017 WL 3658948, at *4 (S.D. Tex. Aug. 24, 2017).

24      Because Plaintiffs' claim is unripe and Plaintiffs lack Article III standing, the

25  issuing court lacks subject-matter jurisdiction, and the subpoenas it issued are void and

26  must be quashed. *See USA Techs., Inc. v. Doe*, 713 F. Supp. 2d 901, 908 (N.D. Cal.

27  2010) (quashing a third-party subpoena given the "apparent deficiency of [a] claim,

28  which [was] the sole basis for federal jurisdiction," even though "the ultimate question

-17-

of federal jurisdiction" was to be decided by the issuing court).  At a bare minimum, Plaintiffs' discovery should be deferred until the question of the issuing court's jurisdiction is resolved.  *In re Verifone, Inc.*, 2018 WL 3532761, at *6 (N.D. Cal. July 23, 2018) (staying non-party's compliance with a deposition subpoena "pending a decision on the question of subject matter jurisdiction in the underlying action").

### 3. This Court Should Quash Plaintiffs' Deposition Requests on the Merits.

With respect to Plaintiffs' deposition requests, the Court should quash, or at a minimum defer, them for at least three independent reasons: (1) the issuing court has already deferred all first-party depositions until after the preliminary injunction hearing in the underlying action; (2) Plaintiffs lack a substantial need for the confidential commercial information they seek from the depositions; and (3) Plaintiffs' subpoena to depose Mr. Kotick runs afoul of the apex deposition doctrine.

#### (a) This Court Should at a Minimum Defer Plaintiffs' Deposition Requests Because the Issuing Court has Deferred First-Party Depositions.

The Court should at a minimum defer Plaintiffs' deposition requests because the issuing court has already deferred all first-party depositions until after resolution of Plaintiffs' Motion for a Preliminary Injunction in the underlying action.  As highlighted above, non-parties like Activision should not be subject to a higher burden than any first parties to an underlying litigation.  *See, e.g.*, *High Tech Med. Instrumentation*, 161 F.R.D. at 88.  Under Rule 45, a party typically must secure discovery from another party to the litigation before pressing a non-party like Activision for additional, potentially duplicative discovery and accordingly subjecting them to undue burden.  *See AECOM Tech. Servs., Inc. v. Zachry Constr. Corp.*, 2020 WL 1934973, at *4 (C.D. Cal. Feb. 3, 2020) ("[A] non-party[] should not have to provide discovery that can be produced by a party.").  Indeed, "[c]ourts are particularly reluctant to require a non-party to provide discovery that can be produced by a party."

*Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 300 F.R.D. 406, 410 (C.D. Cal. 2014).

Here, Plaintiffs seek two depositions of non-party Activision's employees despite the fact that the issuing court has halted all depositions of *defendant* Microsoft's employees until after resolution of Plaintiffs' Motion for a Preliminary Injunction. This is backwards. Non-parties should not be subject to greater discovery burdens than first parties—particularly given the possibility that the disposition of Plaintiffs' Motion for a Preliminary Injunction or Microsoft's Motion to Dismiss may obviate the need for depositions at all. *See Thomas Land & Dev., LLC v. Vratsinas Constr. Co.*, 2019 WL 126859, at \*2 (S.D. Cal. Jan. 8, 2019) (holding that was "an undue burden to force a non-party to comply with a voluminous discovery request" where there was not yet an "opportunity to pursue party discovery").

Plaintiffs must secure whatever discovery they need from Microsoft first—before pressing a non-party like Activision for additional, duplicative discovery and, accordingly, subjecting Activision to undue burden. *See id.* ("[T]here is a preference for parties to obtain discovery from one another before burdening non-parties with discovery requests." (citation omitted)). As just one example of Plaintiffs' duplicative discovery requests, Plaintiffs seek to depose Activision's corporate witness about the identities of Activision "employees or agents who communicated with Microsoft [] regarding the" Proposed Transaction. (York Decl. Ex. 2.) Such information is plainly discoverable from Microsoft itself. Plaintiffs should be able to evaluate what (if any) testimony they truly need from non-party Activision, and thus to avoid any potentially duplicative discovery, after they have had the opportunity to review Microsoft's voluminous document productions and deposed Microsoft's employees. *See Amini Innovation*, 300 F.R.D. at 412 & n.6 (C.D. Cal. 2014) (quashing a Rule 45 subpoena where the requesting party "ha[d] not shown that it could not have obtained the requested information from party witnesses"). Consequently, the Court should at a

minimum defer Plaintiffs' deposition requests until after the issuing court has resolved Plaintiffs' Motion for a Preliminary Injunction in the underlying action.

> **(b)** **This Court Should Quash Plaintiffs' Deposition Requests Because Plaintiffs Have Failed to Articulate a Substantial Need for the Confidential Commercial Information they Seek to Elicit.**

The Court should quash Plaintiffs' deposition requests for the independent reason that Plaintiffs have not articulated a substantial need for the confidential commercial information they seek. As an initial matter, the information Plaintiffs seek qualifies as confidential "commercial information" that is entitled to the heightened protections of the "substantial need" standard. Activision's internal information underlying the reasons for its sale and concerning its negotiations and agreements with Nintendo, Sony, and Microsoft is "plainly the sort of information [Activision] would not disclose to competitors." *In re Apple iPhone Antitrust Litig.*, 2020 WL 5993223, at \*9 (N.D. Cal. Oct. 9, 2020) (citation omitted); *see also In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 2012 WL 629225, at \*5 (N.D. Cal. Feb. 27, 2012) (holding that requests to non-parties that sought licensing agreements called for "highly confidential commercial information" for which the plaintiffs failed to establish a substantial need); *cf. Monterey Bay Mil. Hous., LLC v. Pinnacle Monterey LLC*, 2015 WL 2229229, at \*3 (N.D. Cal. May 12, 2015) (concluding that the "terms and pricing" of a non-party's insurance program constituted "confidential commercial information" where it was "based on numerous factors and extensive negotiations"). So, too, is Activision's internal information regarding its profits and losses. *See Edwards*, 2014 WL 2465934, at \*4 (noting that "sales and revenue information qualif[ies] as confidential commercial information"); *cf. Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*, 2021 WL 1821376, at \*3 (S.D. Cal. Mar. 15, 2021) (holding that a party's "information regarding [its] profits, expenditures, and losses" was confidential commercial information for purposes of a sealing motion because its

disclosure "might allow competitors to use that information to their advantage in their own contract negotiations, resulting in harm to" that party).

Plaintiffs have not established a substantial need for this information, as they cannot show that it is "essential to a judicial determination of [their] case." *Gonzales*, 234 F.R.D. at 685. Far from essential, Plaintiffs represented in their meet and confers with Activision that a corporate deposition may not even be necessary. (York Decl. ¶ 7.) Moreover, information concerning Activision's communications and negotiations with Microsoft is likely duplicative of information within defendant Microsoft's voluminous productions and—to the extent it is not—it would be more appropriately sought from defendant Microsoft's deponents. *See* Fed. R. Civ. P. 45(d)(3)(C)(i) (requiring a party to demonstrate a substantial need for testimony "*that cannot be otherwise met* without undue hardship" (emphasis added)). Similarly, information concerning whether Activision has communicated with Sony or Nintendo about the availability of Activision game content after Activision's merger with Microsoft is unnecessary given that it is Microsoft that will determine its own plans for Activision's content in a post-merger world in the first instance. *Cf. New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 245 (S.D.N.Y. 2020) (concluding that an acquiring company was unlikely to increase prices or lower service quality in part based on testimony by the acquiring company). Moreover, Plaintiffs have not even attempted to articulate why Activision's profit and loss information is "essential" to their case as opposed to any information they may obtain from Microsoft's productions. (*See* York Decl. ¶¶ 6–8.) The Court should accordingly quash Plaintiffs' deposition requests.

(c) **This Court Should Quash Plaintiffs' Request to Depose Activision's CEO Because that Request Runs Afoul of the Apex Deposition Doctrine.**

This Court should quash Plaintiffs' request to depose Mr. Kotick—the CEO of Activision—as particularly improper because it plainly runs afoul of the apex deposition doctrine. "Virtually every court that has addressed deposition notices

-21-

directed at an official at the highest level or 'apex' of corporate management has observed that such discovery creates a tremendous potential for abuse or harassment." *Celerity, Inc. v. Ultra Clean Holding, Inc.*, 2007 WL 205067, at \*3 (N.D. Cal. Jan. 25, 2007). Thus, "[w]hen a party seeks the deposition of a high-level executive (a so-called 'apex' deposition), the court may exercise its discretion under the federal rules to limit discovery." *Affinity Labs of Tex. v. Apple, Inc.*, 2011 WL 1753982, at \*15 (N.D. Cal. May 9, 2011). Under the apex deposition doctrine, "parties seeking to depose a high ranking corporate officer must first establish" two key requirements. *Id.* First, the party must establish "that other less intrusive means of discovery . . . have been exhausted without success." *Id.* And second, the party must establish that the executive "has unique, non-repetitive, firsthand knowledge of the facts at issue in the case." *Id.* Plaintiffs fail to meet either of these requirements here.

**First**, Plaintiffs have failed to establish that they have exhausted other less intrusive means of discovery without success before pursuing Mr. Kotick's deposition. For one thing, Plaintiffs had yet to engage in first-party discovery with Microsoft before seeking Mr. Kotick's deposition. At the time Plaintiffs served Mr. Kotick's deposition subpoena Plaintiffs, had not even *received* the nine to ten million pages of documents Microsoft has represented it is prepared to provide (York Decl. Ex. 9, Feb. 2, 2023 Tr. 8:18–9:22). *See Affinity Labs*, 2011 WL 1753982, at \*15 (denying motion to compel deposition where the plaintiffs "attempt to learn any of [the] facts [at issue] through written discovery" before seeking an apex deposition, "*as the rule requires*" (emphasis added)). For another, even if Microsoft's nine to ten million pages of documents were not sufficient, Plaintiffs have yet to exhaust less intrusive methods of discovery of Activision. Indeed, Plaintiffs served Activision with their facially overbroad document requests a mere day before they served Activision with their deposition subpoena to Mr. Kotick. (*See* York Decl. ¶¶ 3–5.) Plaintiffs' demand instead to *start* with discovery from Mr. Kotick is misguided, and Plaintiffs' deposition subpoena to Mr. Kotick can be quashed on this basis alone. *See Celerity*, 2007 WL

205067, at *5 (holding that the defendant could pursue an apex deposition only "after either interrogatories or the depositions of lower-level employees ha[d] failed to provide the discovery" it sought).

***Second***, Plaintiffs also have made no attempt to establish that Mr. Kotick has *unique, non-repetitive* knowledge of the information they seek. *See Klungvedt v. Unum Grp.*, 2013 WL 551473, at *3 (D. Ariz. Feb. 13, 2013) (precluding an apex deposition in part because the party seeking the deposition had "not filed any supplement to suggest that some evidence [had] been discovered to support his argument that [the executive had] unique knowledge related to the issues at hand"). As previously stated, Plaintiffs apparently seek to depose Mr. Kotick because they believe it would be "important to talk to the person who is selling his business" and because they seek information regarding what agreements Activision has with Microsoft, whether and why Activision may have any revenue sharing agreements with Microsoft, and how Activision determined the transaction price it would accept from Microsoft. (*See* York Decl. ¶ 8.) Yet high-level information about Activision's rationale for the sale and transaction price—even assuming that Plaintiffs needed that information for purposes of resolving their claim, which itself is questionable—is information that may be available from other employees or from documentary sources and that would not be unique to Mr. Kotick. *See Cabrera v. Serv. Emps. Int'l Union*, 2019 WL 6251451, at *2 (D. Nev. Nov. 22, 2019). ("Knowledge is unique if it is unavailable from less intrusive discovery."); *Celerity*, 2007 WL 205067, at *4–5 (refusing to permit a deposition to go forward based on the plaintiffs' claims that executives "participated" in relevant events, where knowledge was not unique to those executives).

Because Plaintiffs cannot satisfy either requirement of the apex deposition doctrine at this early juncture, this Court should quash its deposition subpoena to Mr. Kotick. Plaintiffs' approach to starting discovery with the deposition of Activision's

1   CEO signifies Plaintiffs' true intention to harass and unduly burden Activision and its
2   employees.

3        **4.    This Court Should Quash Plaintiffs' Document Requests.**

4        This Court should also quash each of Plaintiffs' document requests because
5   Plaintiffs cannot show a substantial need for the confidential commercial information
6   reflected in the documents they seek.  In addition, Plaintiffs' six document requests
7   are facially overbroad, would impose an undue burden on Activision, and go well
8   beyond the scope of reasonable discovery for a non-party in this action.

9        **(a)    Request for Production No. 1**

10       Request for Production No. 1 seeks "[a]ll documents [Activision] produced or
11  submitted to the United States Federal Trade Commission, the Department of Justice,
12  or any other United States regulatory agency related to [Activision's] proposed merger
13  with Microsoft Corporation."

14       ***Substantial Need.***  Activision has produced to the FTC hundreds of thousands
15  of records and millions of pages from the files of dozens of document custodians and
16  predecessors, as well as multiple (and substantial) volumes of highly detailed data.
17  (York Decl. ¶ 12.)   Among those records are scores of documents and data that
18  constitute confidential commercial information, for which Plaintiffs must establish a
19  substantial need under Rule 45—including, but not limited to, "customer lists" and
20  "sales and revenue information," *Edwards*, 2014 WL 2465934, at *4, competitive
21  analyses that strike at "the heart of [Activision's] confidential strategic thinking," *In
22  re eBay*, 2009 WL 10677051, at *6, and "marketing plans," *In Re Apple iPhone*, 2020
23  WL 5993223, at *9.   Moreover, Activision's productions to the FTC contain
24  information that is subject to non-disclosure agreements with third parties.  Despite all
25  this, Plaintiffs have put forth no argument as to why the entirety of Activision's
26  voluminous production to the FTC is "essential to a judicial determination of [their]
27  case," *Gonzales*, 234 F.R.D. at 685, or how their case "virtually rises or falls with the
28  admission or exclusion" of the full scope of this information.  *Edwards*, 2014 WL

2465934, at *5 (citation omitted).  At the same time, Microsoft, a party to this action and the acquiring entity, has agreed to produce nine to ten million pages of documents to Plaintiffs.  This material will suffice at this stage of the litigation.

**_Overbreadth and Undue Burden._**  For similar reasons, Plaintiffs' request for Activision's full productions to the FTC is overbroad and would impose an undue burden on Activision.  Indeed, because Plaintiffs make no attempt to distinguish those items from Activision's FTC productions that may be relevant to their claims from those items from those productions that are wholly irrelevant, this request is patently overbroad.  *See, e.g.*, *Briggs v. Cnty. of Maricopa*, 2021 WL 1192819, at *4 (D. Ariz. Mar. 30, 2021) ("[W]here only some of the information contained in a file is relevant to the action, the court may find that the subpoena is overly broad."); *VLSI Tech. LLC v. Kirkland & Ellis LLP*, 2018 WL 6930769, at *3 (C.D. Cal. June 19, 2018) (holding that a subpoena's "demand for blanket production . . . from [another] litigation [was] overly broad" because it was "not limited to only those documents that relate to the claims at issue in the pending action").  It is likewise overbroad to the extent that it could conceivably "encompass nearly *any* material plaintiff believed was relevant to his claims." *See Beltran v. Baker*, 2022 WL 16963921, at *3 (E.D. Cal. Nov. 16, 2022) (emphasis added) (holding that a "catchall" request seeking all potentially relevant materials was "unquestionably overbroad").[7]  Moreover, this request would impose an undue burden on Activision to the extent that it encompasses any documents that Plaintiffs can plainly procure from Microsoft, such as joint submissions to the agencies, any communications or other materials exchanged between Activision and Microsoft pertaining to the Proposed Transaction, and ordinary-course materials exchanged between Microsoft and Activision.  *Amini Innovation*, 300 F.R.D. at 410.  And it would also impose additional burden to notify the third-party partners whose confidential information may be implicated and provide an opportunity for those third

---

[7] For these reasons, Activision has objected to RFP Nos. 2, 3, 4, 5, and 6 to the extent that they would encompass any documents that are duplicative of the documents Plaintiffs seek in connection with RFP No. 1.

1  parties to object—particularly where no showing of substantial need for all of the

2  information has been made.

### (b)    Request for Production No. 2

4  Request for Production No. 2 seeks Activision's "profit and loss statements,

5  including for [its] gaming division(s), and i[ts] gaming studios."

6  ***Substantial Need.***  Profit and loss statements encompass precisely the kind of

7  information that qualifies as confidential commercial information under Rule 45.  *See*

8  *Edwards*, 2014 WL 2465934, at *4 (noting that "sales and revenue information

9  qualif[ies] as confidential commercial information").  Yet Plaintiffs cannot establish

10  that they have a substantial need for this information because they cannot establish

11  that it is "essential to a judicial determination of [their] case."  *Gonzales*, 234 F.R.D.

12  at 685.  On the contrary, Plaintiffs have not articulated to Activision why they need

13  Activision's profit and loss statements or why the voluminous documents they will

14  obtain from Microsoft would not satisfy the purpose they hope to achieve.  (*See* York

15  Decl. ¶¶ 6–8.)

16  ***Overbreadth and Undue Burden.***  This request is also overbroad and would

17  impose an undue burden on Activision because it demands that Activision search for

18  and produce all "profit and loss statements" without providing any meaningful

19  limitations by date, business unit, product, or anything else that would ensure targeted

20  discovery of relevant information.  While the request seeks profit and loss statements

21  for Activision's "gaming division(s)" and "gaming studios," that suggestion provides

22  no guidance whatsoever: Given that Activision is a *video game* publisher, a request

23  regarding Activision's "gaming division(s)" and "gaming studios" would span

24  Activision's entire business.  Courts regularly quash similar requests, and this Court

25  should do the same.  *See, e.g.*, *Moon*, 232 F.R.D. at 637 (concluding that requests

26  seeking "any and all documents over a ten year or greater period" were "overbroad on

27  their face and exceed[ed] the bounds of fair discovery" (citation and alterations

28  omitted)).

### (c)   Request for Production No. 3

Request for Production No. 3 seeks "[t]ranscripts of all depositions and interviews of [Activision] and [Activision] employees or agents by the FTC related to [Activision's] merger with Microsoft Corporation."

***Substantial Need.***  Like the documents in Activision's productions to the FTC, Activision's FTC transcripts encompass testimony describing or otherwise reflecting confidential commercial information such as, among many other things, competitive assessments and strategic plans.  *See In re eBay*, 2009 WL 10677051, at *6.  Again, Plaintiffs have put forth no argument as to why all of these transcripts are "essential to a judicial determination of [their] case." *Gonzales*, 234 F.R.D. at 685.  Nor can they at this juncture, given the likelihood that much of the information they require to facilitate their claim will be found in first-party Microsoft's FTC productions and Microsoft's FTC deposition transcripts, which Microsoft has already offered to produce to Plaintiffs.  (*See* York Decl. Ex. 9, Feb. 2, 2023 Tr. 8:18–9:22.)

***Overbreadth and Undue Burden.***  As with Plaintiffs' request for all documents that Activision has produced to the FTC in connection with the Proposed Transaction, this request is overbroad to the extent that Activision's FTC transcripts may encompass information that is irrelevant to Plaintiffs' claim.  *See VLSI Tech.*, 2018 WL 6930769, at *3 (holding that a subpoena's "demand for blanket production . . . from [another] litigation [was] overly broad" because it was "not limited to only those documents that relate to the claims at issue in the pending action").  In addition, this request will impose an undue burden on Activision to the extent that the transcripts encompass information that Plaintiffs can procure from Microsoft's FTC productions and Microsoft's FTC deposition transcripts.  *Amini Innovation*, 300 F.R.D. at 410.

### (d)   Request for Production No. 4

Request for Production No. 4 seeks "[a]ll [c]ommunications between or among [Activision's] Board of Directors and negotiators of the merger agreement regarding [Activision's] merger with Microsoft Corporation."

**Substantial Need.**  Courts have held that documents, such as those sought by this request, that are "created by or provided to [company] executives . . . definitely count[] as 'confidential research, development, or commercial information'" under Rule 45, for which a party must establish a substantial need.  *In re Apple iPhone*, 2020 WL 5993223, at *9.  But as with their other requests, Plaintiffs cannot do so here. Plaintiffs' case concerns *Microsoft's* rationale for the transaction and *Microsoft's* post-acquisition plans—not Activision's.  *Cf. Deutsche Telekom AG*, 439 F. Supp. 3d at 245 (concluding that an acquiring company was unlikely to increase prices or lower service quality in part based on testimony by the acquiring company).  Plaintiffs can obtain information from Microsoft regarding its rationale for the transaction and future plans.

**Overbreadth and Undue Burden.**  In addition, this request is overbroad and would impose an undue burden on Activision to the extent that it encompasses all communications with Microsoft (*i.e.*, communications between "the negotiators of the merger agreement") pertaining to the Proposed Transaction, which is properly discoverable from first-party Microsoft, not from non-party Activision.  *See Amini Innovation*, 300 F.R.D. at 410; *see also AECOM Tech. Servs.*, 2020 WL 1934973, at *4 ("[A] non-party[] should not have to provide discovery that can be produced by a party.").

### (e)    Request for Production Nos. 5 and 6

Request for Production No. 5 seeks "[a]ll [c]ommunications between [Activision] and Sony Corporation or any of its subsidiaries or affiliated entities or agents, concerning any of Activision Blizzard's video games or its video game content generally from January 1, 2022 to the present."

Request for Production No. 6 similarly seeks "[a]ll [c]ommunications between [Activision] and Nintendo Co., Ltd. or any of its subsidiaries or affiliated entities or agents, concerning any of Activision Blizzard's video games or its video game content generally from January 1, 2022 to the present."

-28-

***Substantial Need.*** As explained above, Activision's internal information concerning its negotiations and agreements with Nintendo and Sony is "the sort of information [Activision] would not disclose to competitors" and thus constitutes confidential commercial information under Rule 45 for which Plaintiffs must establish a substantial need. *In re Apple iPhone Antitrust Litig.*, 2020 WL 5993223, at *9; *see also In re NCAA Student-Athlete*, 2012 WL 629225, at *5 (holding that document requests to non-parties that sought certain licensing agreements called for "highly confidential commercial information," for which the plaintiffs had failed to establish a substantial need). Indeed, Activision's relationships with Sony and with Nintendo are covered by non-disclosure agreements, which tightly circumscribe the information that Activision can disclose to any third party.[8]

And again, Plaintiffs cannot establish that this information is "essential to a judicial determination of [their] case." *Gonzales*, 234 F.R.D. at 685. Plaintiffs' case concerns *Microsoft's* post-acquisition plans for Activision's content. Given that this request seeks information from January 1, 2022, to the present—a period beginning only 17 days prior to when Microsoft announced the Proposed Transaction—Plaintiffs are best served by reviewing Microsoft's productions for communications between Microsoft and Sony or Microsoft and Nintendo about Microsoft's plans regarding the availability of Activision's content across platforms in a post-merger world.[9]

---

[8] Activision notes that the issuing court entered a Protective Order in the underlying action on February 7, 2023 that includes protections for non-parties. (Protective Order, *Demartini v. Microsoft Corp.*, No. 3:22-cv-8991-JSC (N.D. Cal. Feb. 7, 2023), Dkt. No. 60.) Activision reserves its right under Federal Rule of Civil Procedure 26 to seek a modification of that Protective Order to ensure the adequate protection of its confidential information. *See Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 2019 WL 3069009, at *6 (C.D. Cal. Apr. 29, 2019). Activision further reserves its right under Federal Rule of Civil Procedure 45 to seek further protections for its confidential commercial information—*i.e.*, to request that productions be made only "under specified conditions." Fed. R. Civ. P. 45(d)(3)(C).

[9] Plaintiffs concede in their Complaint, and Microsoft notes in its Motion to Dismiss, that Microsoft has made public promises that it will continue to keep Activision's games available on other platforms. (York Decl. Ex. 6, Compl. ¶ 306; York Decl. Ex. 11, Mot. to Dismiss 3–4.)

***Overbreadth and Undue Burden.*** These requests are also vastly overbroad and, as written, would encompass virtually every communication between any Activision employee and any Sony employee and between any Activision employee and any Nintendo employee, including communications that are wholly irrelevant to Plaintiffs' claims. While Plaintiffs purport to limit their requests for these communications to communications related to Activision's "video games or its video game content," such a "limitation" is no limitation at all, given the obvious fact noted above that Activision is a *video game* publisher. "By requesting all [] communications" between these entities, "regardless of their content or subject matter, Plaintiff[s] ignore[] [their] responsibility to 'avoid imposing undue burden or expense on a person subject to the subpoena.'" *Hosseinzadeh v. Bellevue Park Homeowners Ass'n*, 2020 WL 3271769, at *3 (W.D. Wash. June 17, 2020) (quoting Fed. R. Civ. P. 45(d)(1)) (denying motion to compel responses to a document request seeking "all written communications"); *see also, e.g.*, *L.S. v. Oliver*, 2019 WL 4857990, at *2–6 (S.D. Cal. Oct. 1, 2019) (denying motion to compel responses to various discovery requests "seeking 'all communications' regardless of subject matter"). The Court should accordingly quash these requests.

## B. *DeMartini* Plaintiffs' Argument

Activision appears to misapprehend its role in a two-party merger, or at least it would have this Court do so. In reality, none of the cases cited by Activision support its arguments because none of the cases arose in the context of a two-party merger in which the merging parties had already gathered and produced millions of pages to various government agencies around the world, all of whom required those documents as a condition of determining whether the proposed acquisition might lessen competition. Activision further appears to misapprehend the standing that Congress granted to Plaintiffs under the Clayton Act to bring this action, and as a result, variously cites incorrect law on standing and disparages Plaintiffs and their counsel. However, Activision is quite wrong. Congress intended for actions like this to be

1  brought, and gave special powers to Plaintiffs to bring actions like this and to recover

2  attorneys' fees and costs if they are successful. "Private enforcement of the [Clayton]

3  Act was in no sense an afterthought; it was an integral part of the congressional plan

4  for protecting competition." *California v. Am. Stores Co.*, 495 U.S. 271, 275 (1990).

5      Activision asserts that it is a non-party and therefore entitled to heightened

6  protection. However, none of the cases cited by Activision in support of this position

7  involved a challenge to a corporate acquisition under Section 7 of the Clayton Act.

8  They are therefore of limited applicability here. In a section 7 merger case, the claim

9  is that the merger is unlawful in that it might lessen competition. Discovery into the

10  merging parties is therefore critical, constituting the two halves of the merger,

11  regardless of whether one or both are named as Defendants. Activision also argues

12  that Plaintiffs should be able to satisfy all of their discovery needs through discovery

13  of Defendant Microsoft. That is incorrect.

14              **1.**      **Legal Standard**

15      Under Rule 26(b)(1) of the Federal Rules of Civil Procedure, Plaintiffs are

16  permitted to "obtain discovery regarding any nonprivileged matter that is relevant to

17  any party's claim or defense and proportional to the needs of the case." The scope of

18  Rule 26 is broad, allowing discovery not only "for use at the trial," but also allowing

19  "inquiry into matters in themselves inadmissible as evidence but which will lead to the

20  discovery of such evidence." Advisory Committee Notes, Fed. R. Civ. P. 26. "The

21  purpose of discovery is to allow a broad search for facts, the names of witnesses, or

22  any other matters which may aid a party in the preparation or presentation of his case."

23  *Id.*

24      Discovery includes non-parties who possess relevant information and

25  documents. While under Rule 45, a court must quash a subpoena when it "subjects a

26  person to undue burden," Fed. R. Civ. P. 45(d)(3)(A)(iv), "[w]hat constitutes an

27  'undue burden' is the same when a nonparty is subpoenaed under Rule 45 as when a

28  party receives a request for production under Rule 34." *St. Jude Med. S.C., Inc. v.*

*Janssen-Counotte*, 305 F.R.D. 630, 637 (D. Or. 2015). *See also, Mount Hope Church v. Bash Back!*, 705 F.3d 418, 429 (9th Cir. 2012) ("[W]e will not read 'undue burden' differently just because a non-party was subpoenaed.").

Moreover, as the party resisting discovery, Activision Blizzard has the burden to demonstrate that the requested discovery is unduly burdensome. "[T]he party who moves to quash a subpoena has the 'burden of persuasion' under Rule 45(c)(3)." *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005). The moving party "must show that disclosure will cause it a clearly defined and serious injury. This burden is particularly heavy to support a motion to quash as contrasted to some more limited protection such as a protective order." *In re Domestic Drywall Antitrust Litig.*, 300 F.R.D. 234, 239 (E.D. Pa. 2014) (citations and quotations omitted).

Although the complaint only names Microsoft as a defendant, both Microsoft and Activision, as the two merging entities, are equally important to the claims and defenses. Microsoft only has its own documents, concerning competition and the merger's likely effects from Microsoft's side of the merger. Activision Blizzard has the other half. They are not duplicative and they are equally important. Both Microsoft's and Activision's relevant documents are necessary here.

### 2. Activision's Argument That the Issuing Court Lacks Subject-Matter Jurisdiction Over the Underlying Action Borders on Frivolous.

Plaintiffs are allowed to bring their claims on behalf of private citizens under Section 16 of the Clayton Act, which provides a private right of action against mergers before they occur. 15 U.S.C. § 26. "Private enforcement of the [Clayton] Act was in no sense an afterthought; it was an integral part of the congressional plan for protecting competition." *California v. Am. Stores Co.*, 495 U.S. 271, 275 (1990). Under Section 7, a plaintiff need only show that there is a reasonable probability that the proposed merger will substantially lessen competition in any line of commerce in the country.

*See Brown Shoe*, 370 U.S. at 325 ("[I]f there is a reasonable probability that the merger will substantially lessen competition . . . the merger is proscribed.").

Judge Corley will decide this issue, and it is not an excuse for Activision to evade legitimate discovery. One might assume that if this argument truly had merit, Judge Corley would not have ordered, and Microsoft would have objected more strenuously, to the opening of discovery. But instead, fulsome discovery is proceeding as to Microsoft, one party to the merger, and it should proceed as to Activision, the other party to the merger.

### 3. The Court Should Not Quash Plaintiffs' Deposition Requests on the Merits.

#### (a) This Court Should Not Defer Plaintiffs' Deposition Requests Because the Court Where the Action is Pending Has Thus Far Declined to Do So.

The argument that Activision's and Mr. Kotick's depositions should be delayed because depositions of Microsoft will be delayed is a non-sequitur. Judge Corley heard argument with respect to Microsoft depositions and made what was the right call at that time. Plaintiffs would get immediate production of all FTC documents and interview and deposition transcripts from Microsoft. That has happened and discovery is proceeding.

Activision is situated differently. Weeks have passed since the last hearing before Judge Corley. Plaintiffs are prepared to take these depositions now. There is no need to wait. In an effort to resolve this dispute, Plaintiffs had proposed awaiting scheduling the depositions until after the Preliminary Injunction hearing but agreement could not be reached. Absent that agreement, these depositions should proceed.

#### (b) The Court Should Not Quash Plaintiffs' Deposition Requests Because Plaintiffs Seek a Limited Amount of Testimony – Two Depositions – Directly Related to the

**Issues in Dispute Arising from Microsoft's Acquisition of Activision**

Activision's argument fails because Activision pretends it is a non-party. However, it is a party—one of only two—to the challenged merger. And that makes it subject to reasonable discovery, like that proposed by Plaintiffs. All of Activision's authorities in support of its argument involved true non-parties, not parties to the challenged merger. And none of those cases involved "non-parties" who had already reviewed and produced millions of relevant pages to various governments around the world involving the same challenged transaction. Activision has further failed to show how any legitimate privacy interest that it has would not be protected by the protective order which is in place in the Action. Indeed, Activision has already produced the majority of documents to various governments around the world.

(c) **The Court Should Not Quash Plaintiffs' Request to Depose Activision's CEO Because the Apex Doctrine does Not Apply and Mr. Kotick is Directly Involved in the Challenged Transaction**

The Apex Doctrine does not apply here because Plaintiffs only seek two depositions. They have no need to work their way up the corporate ladder. Nor, given the time constraints at issue in this case, do Plaintiffs have time. Mr. Kotick was and is directly involved in the negotiation of the transaction at issue here. There is no one at Activision who is more responsible for this proposed transaction and he is thus an appropriate deponent. Indeed, Mr. Kotick has spoken out publicly in favor of the merger on numerous occasions, providing his analysis on why he believes the merger is good for competition.[10] Plaintiffs have already identified numerous documents demonstrating Mr. Kotick's critical role in the challenged transaction.

---

[10] *See, e.g.*, Kotaku, "Bobby Kotick Is Stoking Chinese Fear To Champion The Microsoft Acquisition," Feb. 8, 2023, available at https://kotaku.com/bobby-kotick-activision-blizzard-microsoft-china-1850089106; *see also*

## 4. The Court Should Not Quash Plaintiffs' Document Requests.

### (a) Request for Production No. 1

Request for Production No. 1 seeks "[a]ll documents [Activision] produced or submitted to the United States Federal Trade Commission, the Department of Justice, or any other United States regulatory agency related to [Activision's] proposed merger with Microsoft Corporation."

Judge Corley has ordered Microsoft to produce to Plaintiffs the same request for documents that Microsoft produced to the FTC, and it has done so. Activision offers no reason why it should not do the same. Activision's suggestion that it produce something less than what it gave the FTC, whether by eliminating things that Microsoft has already produced or otherwise, necessarily entails more work and more burden that is not necessary. All Activision has to do is copy and produce what it produced before. Any effort to reanalyze that data for production is unnecessary and wasteful, as Judge Corley recognized when she ordered Microsoft to produce the entirety of its FTC production to Plaintiffs.

Further, Activision's argument that it is unfair or burdensome or oppressive for Plaintiffs to seek the production of the FTC files again relies on cases that did not involve mergers and are therefore of no guidance. The suggestion that there are irrelevant things in the FTC production is belied by the language of the request: "[a]ll documents [Activision] produced or submitted to the United States Federal Trade Commission, the Department of Justice, or any other United States regulatory agency related to [Activision's] proposed merger with Microsoft Corporation." The request limits the documents to those produced to the FTC in relation to the proposed merger. There is no reason to suspect that Activision produced to the FTC documents unrelated to the proposed merger with Microsoft, and Activision has not suggested that it has done so.

Further, it makes no sense to say that Activision should be excused from production because Microsoft produced documents that may be within Activision's

1  production. Plaintiffs are entitled to the entirety of the production, and existence of

2  some overlap does not excuse production when it would be more expensive and

3  burdensome to seek to exclude overlaps. Rather, wholesale production of the FTC

4  production is most consistent with Rule 1 of the Federal Rules of Civil Procedure.

5  **(b)     Request for Production No. 2**

6  Request for Production No. 2 seeks Activision's "profit and loss statements,

7  including for [its] gaming division(s), and i[ts] gaming studios." With respect to profit

8  and loss statements specifically, this information is relevant and important to analyzing

9  whether the merger might lessen competition because the profit and loss statements

10  will (1) help plaintiffs understand market share statistics by revenue; (2) will help

11  plaintiffs understand and compare the relative importance and popularity of gaming

12  content between Microsoft and Activision Blizzard, an area in which Microsoft and

13  Activision Blizzard directly compete; (3) will assist in understanding the rationales for

14  the merger; and (4) profit margins and revenues provide inferences and context in

15  competition analysis. *See, e.g., Le Baron's Est. v. Rohm & Haas Co.*, 441 F.2d 575,

16  578 (9th Cir. 1971). In *Rohm & Haas*, a case concerning an alleged antitrust price-

17  fixing conspiracy, the Ninth Circuit held that the "refusal to permit discovery of

18  appellees' profit margins constituted reversible error." *Id.*

19  **(c)     Request for Production No. 3**

20  Request for Production No. 3 seeks "[t]ranscripts of all depositions and

21  interviews of [Activision] and [Activision] employees or agents by the FTC related to

22  [Activision's] merger with Microsoft Corporation." Judge Corley ordered Microsoft

23  to produce these to Plaintiffs, *See* York Decl. Ex. 9, Feb. 2, 2023 Tr., at 9:17–21.

24  Activision offers no reason why it should not have to do the same. Activision argues

25  that some of the information may be irrelevant, but that makes no sense given that the

26  subject matter of the request is limited to the merger. Further, it makes no sense to say

27  that Activision should be excused from production because Microsoft produced

28  transcripts of depositions and interviews with Microsoft employees and agents.

Microsoft's production does not excuse Activision from production, it rather makes Plaintiffs' right to these materials more compelling as Activision is the counterparty to Microsoft and transcripts of depositions and interviews of Activision's employees and agents by the FTC would complement the same types of materials that Microsoft has already produced to Plaintiffs.

### (d)  Request for Production No. 4

Request for Production No. 4 seeks "[a]ll [c]ommunications between or among [Activision's] Board of Directors and negotiators of the merger agreement regarding [Activision's] merger with Microsoft Corporation."

This request, like the others, is limited to documents about the merger. It is intended, among other things, to ascertain the extent to which Activision and its negotiators have evaluated or considered impacts to competition from the merger and what those discussions and documents addressed. It is also aimed at understanding the rationales for the merger. These documents are central to the issues to be proven in the case. While privileged documents should of course be excluded, any non-privileged responsive documents are likely to be highly relevant to the claims that Plaintiffs seek to prove.

### (e)  Request for Production Nos. 5 and 6

Request for Production No. 5 seeks "[a]ll [c]ommunications between [Activision] and Sony Corporation or any of its subsidiaries or affiliated entities or agents, concerning any of Activision Blizzard's video games or its video game content generally from January 1, 2022 to the present."

Request for Production No. 6 seeks "[a]ll [c]ommunications between [Activision] and Nintendo Co., Ltd. or any of its subsidiaries or affiliated entities or agents, concerning any of Activision Blizzard's video games or its video game content generally from January 1, 2022 to the present."

These two requests involve the other two primary competitors in the console gaming space. Virtually every day's business news has involved some example of how

1   Sony and Nintendo do or do not fit into a competitive world post-merger. Sony is
2   rumored to have been offered incentives to go along with the deal, which it has
3   reportedly rejected. Sony is now believed to oppose the merger.

4     Nintendo, on the other hand, just became party to an agreement involving the
5   game Call of Duty, one of the most lucrative video game titles. How that deal came
6   about and the reasons for it is a legitimate and relevant topic of discovery.

7   **IV. <u>CONCLUSION</u>**

8     **A. <u>Activision's Conclusion</u>**

9     For these reasons, the Court should grant Activision's Motion to Quash and (i)
10  quash all of Plaintiffs' deposition and document requests or (ii) at a minimum, defer
11  Plaintiffs' third-party discovery of Activision until after the issuing court has resolved
12  Plaintiffs' Motion for a Preliminary Injunction.

13    **B. <u>*DeMartini* Plaintiffs' Conclusion</u>**

14    Activision's motion to quash should be transferred to the issuing court in the
15  Northern District of California. However, to the extent that a judicial officer in the
16  Central District of California renders a decision on this motion, the motion should be
17  denied in its entirety because the documents sought are directly relevant to the issue
18  which will be decided in the Action, the documents have already been collected and
19  can be produced pursuant to protective order with minimal expense and burden, and
20  Activision has failed to show that its objections should be sustained.

21
22
23
24
25
26
27
28

| | |
|---|---|
| DATED: February 23, 2023 | By: /s/ *Caroline Van Ness* |

Caroline Van Ness (SBN 281675)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570
Email: caroline.vanness@skadden.com

Steven C. Sunshine (*pro hac vice* forthcoming)
Julia K. York (*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
Email: steven.sunshine@skadden.com
Email: julia.york@skadden.com

*Attorneys for Activision Blizzard, Inc.*

| | |
|---|---|
| DATED: February 23, 2023 | By: /s/ *Steven N. Williams* |

Joseph R. Saveri
Cadio R. Zirpoli
Steven Noel Williams
Elissa Amlin Buchanan
David H. Seidel
JOSEPH SAVERI LAW FIRM, LLP
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com
Email: czirpoli@saverilawfirm.com
Email: swilliams@saverilawfirm.com
Email: eabuchanan@saverilawfirm.com
Email: dseidel@saverilawfirm.com

Joseph M. Alioto, Sr.
Tatiana V. Wallace
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-5029
Email: jmalioto@aliotolaw.com
Email: twallace@aliotolaw.com

1

Joseph Michelangelo Alioto, Jr.
2  ALIOTO LEGAL
100 Pine Street, Suite 1250
3  San Francisco, CA 94111
Telephone: (415) 398-3800
4  Email: joseph@aliotolegal.com

5  Lingel Hart Winters
LAW OFFICES OF LINGEL H. WINTERS
6  388 Market Street, Suite 900
San Francisco, CA 94111
7  Telephone: (415) 398-2941
Facsimile: (415) 393-9887
8  Email: sawmill2@aol.com

9  Lawrence Genaro Papale
LAW OFFICES OF LAWRENCE G.
10  PAPALE
The Cornerstone Building
11  1308 Main Street, Suite 117
St. Helena, CA 94574
12  Telephone: (707) 963-1704
Email: lgpapale@papalelaw.com

13
*Attorneys for Dante DeMartini, et al.*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JOINT STIPULATION REGARDING ACTIVISION BLIZZARD, INC.'S MOTION TO QUASH**

**ECF ATTESTATION**

I, Caroline Van Ness, am the ECF user whose identification and password are being used to file this Joint Stipulation. I hereby attest that I have obtained the concurrence in the filing of this document from all the signatories for whom a signature is indicated by a "conformed" signature (/s/) within this e-filed document, and I have on file records to support this concurrence for subsequent production for the Court if so ordered or for inspection upon request.

DATED: February 23, 2023          By: /s/ *Caroline Van Ness* ................................