# EXHIBIT 3

Caroline Van Ness (SBN 281675)
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570
Email: caroline.vanness@skadden.com

Steven C. Sunshine (*pro hac vice*
forthcoming)
Julia K. York (*pro hac vice* forthcoming)
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
Email: steven.sunshine@skadden.com
Email: julia.york@skadden.com

*Attorneys for Activision Blizzard, Inc.*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ACTIVISION BLIZZARD, INC., | Misc. Case No. |
| Moving Party, | Underlying action in United States District Court for the Northern District of California, No. 3:22-cv-08991-JSC |
| v. | |
| DANTE DEMARTINI, CURTIS BURNS JR., NICHOLAS ELDEN, JESSIE GALVAN, CHRISTOPHER JOSEPH GIDDINGS-LAFAYE, STEVE HERRERA, HUNTER JOSEPH JAKUPKO, DANIEL DERMOT ALFRED LOFTUS, BEOWULF EDWARD OWEN, and IVAN CALVO-PEREZ, | **DECLARATION OF JULIA K. YORK IN SUPPORT OF ACTIVISION BLIZZARD, INC.'S MOTION TO QUASH THIRD-PARTY SUBPOENAS** |
| Responding Parties. | Fact Discovery Cutoff: TBD<br>Expert Discovery Cutoff: TBD<br>Pretrial Conference and Trial Date: TBD<br>Hearing Date: TBD |

## DECLARATION OF JULIA K. YORK

I, Julia K. York, hereby declare as follows:

1. I am an attorney duly licensed to practice law in the District of Columbia. I am a partner in the law firm of Skadden, Arps, Slate, Meagher & Flom LLP, counsel for Activision Blizzard, Inc. ("Activision") in connection with the above-captioned miscellaneous action and the underlying action, *DeMartini v. Microsoft Corp.*, No. 3:22-cv-08991-JSC (N.D. Cal.). I submit this declaration in support of Activision's Motion to Quash Plaintiffs' Third-Party Subpoenas pursuant to Federal Rule of Civil Procedure 45. Unless otherwise stated, the matters set forth below are based on my personal knowledge and, if called as a witness, I could and would testify competently thereto.

2. On December 20, 2023, Plaintiffs Dante DeMartini, Curtis Burns, Jr., Nicholas Elden, Jessie Galvan, Christopher Joseph Giddings-Lafaye, Steve Herrera, Hunter Joseph Jakupko, Daniel Dermot Alfred Loftus, Beowulf Edward Owen, and Ivan Calvo-Pérez ("Plaintiffs") filed a Complaint and a Motion for a Preliminary Injunction in the action captioned *DeMartini v. Microsoft Corp.*, No. 3:22-cv-08991-JSC (N.D. Cal.) (the "*DeMartini* Action") seeking to enjoin a proposed acquisition by Microsoft Corp. ("Microsoft") of Activision (the "Proposed Transaction").

3. Plaintiffs have served non-party Activision with two subpoenas pursuant to Federal Rule of Civil Procedure 45 in connection with the *DeMartini* Action.

4. On January 30, 2023, Plaintiffs served Activision's registered agent, CSC Lawyers Incorporating Service, with a subpoena return-dated for February 14, 2023, encompassing: (1) a demand for a Federal Rule of Civil Procedure 30(b)(6) deposition of Activision Blizzard, Inc.; and (2) a series of requests for production of documents.

5. On January 31, 2023, Plaintiffs served non-party Activision with a deposition subpoena for Activision's CEO, Robert A. Kotick, that purports to require Mr. Kotick to appear for a deposition on February 27, 2023. Counsel for Activision

1  voluntarily accepted service of that subpoena on behalf of Activision, reserving all
2  objections and the right to move to quash under Federal Rule of Civil Procedure 45.

3      6.    On February 3, 2023, I participated in a meet and confer with Plaintiffs'
4  counsel regarding Plaintiffs' deposition and document requests. At the beginning of
5  the meet and confer, Plaintiffs' counsel suggested that "all" Plaintiffs seek from
6  Activision is Mr. Kotick's deposition and any documents that Activision has produced
7  to the United States Federal Trade Commission (the "FTC") in connection with the
8  Proposed Transaction. Plaintiffs' counsel further suggested that they would seek to
9  take the Rule 30(b)(6) corporate deposition only if they were to need additional
10 testimony after deposing Mr. Kotick.

11     7.    In response, I explained that Activision does not intend to produce its
12 CEO for a deposition on February 27, nor to produce a corporate witness for a Rule
13 30(b)(6) deposition on February 14. I further explained Activision's position that any
14 depositions concerning its personnel should, at a minimum, be deferred until after the
15 preliminary injunction hearing in the *DeMartini* Action, particularly given: (1) that
16 such an approach would be consistent with the stay that the issuing court put in place
17 for first-party depositions and (2) Plaintiffs' representation that they may not even
18 need a corporate deposition. I also stated that Activision would be willing to consider
19 a more reasonable, narrowed proposal from Plaintiffs.

20     8.    Plaintiffs' counsel responded that the "state of affairs" on the discovery
21 they seek is reflected in the subpoenas they served and that their request for "just the
22 FTC file" was their reasonable proposal. Plaintiffs' counsel further noted that if
23 Activision does not intend to produce Mr. Kotick as a deponent on February 27, then
24 Plaintiffs would proceed with the corporate deposition on February 14. Plaintiffs'
25 counsel stated that Plaintiffs seek testimony from Mr. Kotick specifically because
26 Plaintiffs believe it would be "important to talk to the person who is selling his
27 business" and because they also seek information regarding what agreements
28 Activision has with Microsoft, whether and why Activision may have any revenue

sharing agreements with Microsoft, and how Activision determined the transaction price it would accept from Microsoft. I indicated that Activision would be back in touch to confirm its position on Plaintiffs' discovery requests.

9. On February 8, 2023, counsel for Activision sent to Plaintiffs' counsel a letter setting out Activision's position on Plaintiffs' discovery requests pursuant to the procedures outlined in Central District of California Local Rules 37-1 and 45-1.

10. I participated in a further meet and confer with Plaintiffs' counsel on February 10, 2023 pursuant to Central District of California Local Rule 37-1. During that meet and confer, the parties were unable to resolve the issues set out in the February 8, 2023 letter. That same day, counsel for Activision sent to Plaintiffs' counsel (i) Activision's portion of a joint stipulation setting out the instant discovery dispute pursuant to Central District of California Local Rule 37-2 and (ii) the instant declaration and all accompanying exhibits.

11. The FTC began reviewing the Proposed Transaction when it was announced and conducted a lengthy investigation. On December 8, 2022, the FTC filed an administrative complaint against Microsoft and Activision before its Administrative Law Judge, which alleges that the Proposed Transaction violates federal antitrust laws. Fact discovery is scheduled to close in that action on April 7, 2023, and the evidentiary hearing before the Administrative Law Judge is scheduled to commence on August 2, 2023.

12. Activision has produced to the FTC, in connection with the FTC's investigation into the Proposed Transaction, hundreds of thousands of records and millions of pages from the files of dozens of dozens of document custodians and predecessors. Activision has also produced to the FTC multiple (and substantial) volumes of highly detailed data.

13. Attached as **Exhibit 1** is a true and correct copy of Plaintiffs' Rule 45 deposition subpoena to Activision CEO Robert A. Kotick, which Plaintiffs served on Activision's counsel on January 31, 2023.

14.     Attached as **Exhibit 2** is a true and correct copy of Plaintiffs' Rule 45 deposition and document subpoena to Activision Blizzard, Inc., which Plaintiffs served on Activision's registered agent, CSC Incorporating Service, on January 30, 2023.

15.     Attached as **Exhibit 3** is a true and correct copy of an email exchange between Plaintiffs' counsel and counsel for Activision in which counsel for Activision accepted service of Plaintiffs' Rule 45 deposition subpoena to Activision CEO Robert A. Kotick on January 31, 2023, without waiver of Activision's objections to that subpoena and reserving the right to move to quash the subpoena under Rule 45.

16.     Attached as **Exhibit 4** is a true and correct copy of a letter counsel for Activision sent to Plaintiffs' counsel on February 8, 2023 pursuant to the procedures outlined in Central District of California Local Rules 37-1 and 45-1.

17.     Attached as **Exhibit 5** is a true and correct copy of Activision Blizzard Inc.'s Responses and Objections to Plaintiffs' Subpoena to Produce Documents, which Activision served to Plaintiffs on February 10, 2023.

18.     Attached as **Exhibit 6** is a true and correct copy of the Complaint Plaintiffs filed on December 20, 2022 in the action captioned *DeMartini v. Microsoft Corp.*, No. 3:22-cv-08991-JSC (N.D. Cal.).

19.     Attached as **Exhibit 7** is a true and correct copy of the Motion to Stay Microsoft Corp. filed on January 11, 2023 in the action captioned *DeMartini v. Microsoft Corp.*, No. 3:22-cv-08991-JSC (N.D. Cal.).

20.     Attached as **Exhibit 8** is a true and correct copy of the Motion to Dismiss Microsoft Corp. filed on January 31, 2023 in the action captioned *DeMartini v. Microsoft Corp.*, No. 3:22-cv-08991-JSC (N.D. Cal.).

21.     Attached as **Exhibit 9** is a true and correct copy of a transcript of the February 2, 2023 status conference in the action captioned *DeMartini v. Microsoft Corp.*, No. 3:22-cv-08991-JSC (N.D. Cal.).

YORK DECL. IN SUPPORT OF ACTIVISION BLIZZARD, INC.'S MOTION TO QUASH

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on February 10, 2023 in Washington, D.C.

DATED:  February 10, 2023

By: /s/ *Julia K. York*

Julia K. York (*pro hac vice* pending)
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, DC 20005-2111
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
Email: julia.york@skadden.com

# Exhibit 1

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### Northern District of California

| | |
|---|---|
| DANTE DEMARTINI, et al., | ) |
| _Plaintiff_ | ) |
| v. | )    Civil Action No.    3:22-cv-08991-JSC |
| MICROSOFT CORPORATION, a Washington corporation, | ) |
| _Defendant_ | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:            Robert A. Kotick, CEO, Activision Blizzard, Inc.

_____

_(Name of person to whom this subpoena is directed)_

☑ Testimony: YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Veritext Legal Solutions<br>2049 Century Park E, Suite 2480<br>Century City, CA 90067 | Date and Time:<br>02/27/2023 9:00 am |
|---|---|

The deposition will be recorded by this method:    video and stenographic

❒ _Production:_ You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

 

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    01/30/2023

         _CLERK OF COURT_

                                 OR

_____      /s/ Joseph R. Saveri
_Signature of Clerk or Deputy Clerk_           _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_   Plaintiffs
_____ , who issues or requests this subpoena, are:

Joseph R. Saveri (SBN 130064), jsaveri@saverilawfirm.com/David H. Seidel (SBN 307135), dseidel@saverilawfirm.com
Joseph Saveri Law Firm, 601 California St., Ste. 1000, San Francisco, CA 94108, Telephone: (415) 500-6800

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   3:22-cv-08991-JSC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)*  Robert A. Kotick, CEO _____

on *(date)*  _____01/30/2023_____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
 **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
 **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
  **(i)** is a party or a party's officer; or
  **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
 **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
 **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
 **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
 **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
  **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
  **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**

 **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
  **(i)** fails to allow a reasonable time to comply;
  **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
  **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
  **(iv)** subjects a person to undue burden.
 **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

  **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
  **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
 **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
  **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
  **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
 **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
 **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
 **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
 **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
  **(i)** expressly make the claim; and
  **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# Exhibit 2

43390

**Class Action Research & Litigation**
P O Box 740
Penryn, CA 95663
916-663-2562

**U.S. Bank National Association**
2360 Grass Valley Highway
Auburn, CA 95603
90-2267/1211
90-2267/1211

1-30-23

PAY TO THE
ORDER OF  Activision Blizzard, Inc  $ 40.00

Forty and 00/100  DOLLARS

MEMO  243684

VALID VALID
VALID VALID
VALID VALID
VALID VALID

AUTHORIZED SIGNATURE

⑈043390⑈ ⑈121122676⑈ 157524124052⑈

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Northern District of California

| | |
|---|---|
| DANTE DEMARTINI, et al., | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  3:22-cv-08991-JSC |
| MICROSOFT CORPORATION, a Washington | ) |
| corporation, | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  ACTIVISION BLIZZARD, INC.
c/o CSC Lawyers Incorporating Service, 2710, Gateway Oaks Dr., Ste. 150N, Sacramento, CA  95833

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:  See Attachment A.

| Place: Veritext Legal Solutions 2049 Century Park E, Suite 2480 Century City, CA 90067 | Date and Time: 02/14/2023 10:00 am |
|---|---|

The deposition will be recorded by this method:  video and stenographic

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  See Attachment B.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  01/27/2023

| *CLERK OF COURT* | OR | |
|---|---|---|
| | | /s/ David H. Seidel |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Plaintiffs
, who issues or requests this subpoena, are:

Joseph R. Saveri (SBN 130064) / David H. Seidel (SBN 307135)
Joseph Saveri Law Firm, 601 California St., San Francisco, CA  94108

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 3:22-cv-08991-JSC

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* Activision Blizzard, Inc.

on *(date)*      01/27/2023      .

❑ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____   on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $      0.00      .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
   **(i)** is a party or a party's officer; or
   **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
   **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
   **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
   **(i)** fails to allow a reasonable time to comply;
   **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
   **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
   **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

   **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
   **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
   **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
   **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
   **(i)** expressly make the claim; and
   **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A
## DEPOSITION TOPICS

Pursuant to the provisions of Rule 30(b)(6) of the Federal Rules of Civil Procedure, Activision Blizzard, Inc. is hereby directed to designate one or more officers, directors, managing agents, or other persons who consent to testify on Activision Blizzard, Inc.'s behalf. Pursuant to Rule 30(b)(6), Activision Blizzard, Inc. has a duty to confer with Plaintiffs regarding the matters for examination and to designate each person who will testify on the matters set forth below:

1. Your compliance with the FTC's or Department of Justice's investigation into the merger between Activision Blizzard, Inc. and Microsoft Corporation, including, the documents produced by Activision Blizzard, Inc. during the Hart-Scott-Rodino Act investigation and subsequent FTC proceeding, and the witnesses of Activision Blizzard, Inc. that have been interviewed or deposed by the FTC or Department of Justice.

2. Profit and loss statements of Activision Blizzard, Inc. and its game division(s) and game studios.

3. The identities of all Activision Blizzard, Inc. employees or agents who communicated with Microsoft Corporation regarding the proposed merger between Microsoft Corporation and Activision Blizzard, Inc., including, the scope of the communications and who the communications were with.

4. The identities and job titles of all Activision Blizzard, Inc. employees or agents who have communicated with Sony regarding the future development and availability of Activision Blizzard game content for PlayStation consoles after the merger with Microsoft, including, the scope of the communications and who the communications were with.

5. The identities and job titles of all Activision Blizzard, Inc. employees or agents who have communicated with Nintendo regarding the future development and availability of Activision Blizzard game content for Nintendo consoles after the merger with Microsoft, including, the scope of the communications and who the communications were with.

## **ATTACHMENT B**
## **REQUEST FOR PRODUCTION OF DOCUMENTS**

### **DEFINITIONS**

As used herein, the following terms are defined as indicated:

1.     "Communication" means without limitation, oral or written communications of any kind, such as electronic communications, e-mails, facsimiles, telephone communications, correspondence, exchange of written or recorded information, or face-to-face meetings. The phrase "communication between" is defined to include instances where one party addresses the other party, but the other party does not necessarily respond.

2.     "Document" means the original and all non-identical copies of all items subject to discovery under Rule 34 of the Federal Rules of Civil Procedure. This definition includes, without limitation, electronically stored information, letters, correspondence, memoranda, legal pleadings, calendars, diaries, travel records, summaries, records of telephone conversations, telegrams, notes, reports, compilations, notebooks, work papers, graphs, sketches, photographs, videotapes, audiotapes, film and sound reproductions, emails, presentations, slide decks, internal or external web sites, audio or video discs (e.g., CD, DVD, Blu-ray and DVDHD), computer files, discs and drives, sales, advertising and promotional literature, agreements, stored recordings, minutes or other records of meetings, all written or graphic records of representations of any kind, and all mechanical or electronic data, records of representations of any kind.

3.     "Microsoft Corp," or "Microsoft" mean the responding Defendant, its predecessors, successors, subsidiaries, departments, divisions, and/or affiliates, including without limitation any organization or entity which the responding Defendant manages or controls, together with all present and former directors, officers, employees, agents, representatives, or any persons acting or purporting to act on behalf of the responding Defendant.

4.     "You," "Your," or "Your company" mean Activision Blizzard, Inc, its predecessors, successors, subsidiaries, departments, divisions, and/or affiliates, including without limitation any organization or entity which Activision Blizzard, Inc. manages or controls,

together with all present and former directors, officers, employees, agents, representatives, or any persons acting or purporting to act on behalf of Activision Blizzard, Inc.

## INSTRUCTIONS

1.     Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these Requests for Production shall be deemed to be continuing in nature so that, if You, Your directors, officers, employees, agents, representatives, or any person acting on Your behalf, subsequently discover or obtain possession, custody, or control of any Document or ESI previously requested or required to be produced, You shall make such Documents or ESI available within seven (7) days of discovery or possession.

2.     In producing Documents, You are requested to produce the original of each Document requested, together with all non-identical copies and drafts of such Document. If the original of any Document cannot be located, a copy shall be produced in lieu thereof, and shall be legible and bound or stapled in the same manner as the original.

3.     Documents attached to each other should not be separated, including, but not limited to, hard-copy versions of Documents attached to hard-copy printouts of e-mails produced pursuant to these Document Requests.

4.     Each set of documents produced in response to each Request for Production should be separated by Request so that it is clear which Request a set of documents is responsive to.

5.     If a Document once existed and has subsequently been lost, destroyed, or is otherwise missing, please provide sufficient information to identify the Document and state the details concerning its loss.

## DOCUMENT REQUESTS

### REQUEST FOR PRODUCTION NO. 1

All Documents You produced or submitted to the United States Federal Trade Commission, the Department of Justice, or any other United States regulatory agency related to Your proposed merger with Microsoft Corporation.

**REQUEST FOR PRODUCTION NO. 2**

Your profit and loss statements, including for You gaming division(s), and Your gaming studios.

**REQUEST FOR PRODUCTION NO. 3**

 Transcripts of all depositions and interviews of You and Your employees or agents by the FTC related to Your merger with Microsoft Corporation.

**REQUEST FOR PRODUCTION NO. 4**

 All Communications between or among Your Board of Directors and negotiators of the merger agreement regarding Your merger with Microsoft Corporation.

**REQUEST FOR PRODUCTION NO. 5**

 All Communications between You and Sony Corporation or any of its subsidiaries or affiliated entities or agents, concerning any of Activision Blizzard's video games or its video game content generally from January 1, 2022 to the present.

**REQUEST FOR PRODUCTION NO. 6**

 All Communications between You and Nintendo Co., Ltd. or any of its subsidiaries or affiliated entities or agents, concerning any of Activision Blizzard's video games or its video game content generally from January 1, 2022 to the present.

# Exhibit 3

## York, Julia K (WAS)

| | |
|---|---|
| **From:** | Kreiner, Evan R (NYC) |
| **Sent:** | Tuesday, January 31, 2023 11:31 AM |
| **To:** | 'David Seidel'; York, Julia K (WAS); Sunshine, Steven C (WAS); Raptis, Maria (NYC); Sheerin, Michael J (NYC) |
| **Cc:** | Joseph Saveri; Cadio Zirpoli; Steve Williams |
| **Subject:** | RE: [Ext] RE: DeMartini v. Microsoft, 22-cv-08991 |

Hi David,

We can accept service of this subpoena.  Activision reserves all objections and the right to move to quash under Rule 45.

Thanks,
Evan

**Evan Kreiner**
**Skadden, Arps, Slate, Meagher & Flom LLP**
One Manhattan West | New York | New York | 10001
T: +1.212.735.2491 | F: +1.917.777.2491
evan.kreiner@skadden.com

---

**From:** David Seidel <dseidel@saverilawfirm.com>
**Sent:** Tuesday, January 31, 2023 11:25 AM
**To:** York, Julia K (WAS) <Julia.York@skadden.com>; Sunshine, Steven C (WAS) <Steve.Sunshine@skadden.com>; Raptis, Maria (NYC) <Maria.Raptis@skadden.com>; Sheerin, Michael J (NYC) <Michael.Sheerin@skadden.com>; Kreiner, Evan R (NYC) <Evan.Kreiner@skadden.com>
**Cc:** Joseph Saveri <jsaveri@saverilawfirm.com>; Cadio Zirpoli <czirpoli@saverilawfirm.com>; Steve Williams <SWilliams@saverilawfirm.com>
**Subject:** [Ext] RE: DeMartini v. Microsoft, 22-cv-08991

Hello Ms. York,

Attached is the subpoena we are going to serve on Mr. Kotick. I'm generally available today if you would like to discuss.

Best,
David

---

**From:** David Seidel
**Sent:** Monday, January 30, 2023 10:51 AM
**To:** York, Julia K <Julia.York@skadden.com>; Sunshine, Steven C <Steve.Sunshine@skadden.com>; Raptis, Maria <Maria.Raptis@skadden.com>; Sheerin, Michael J <Michael.Sheerin@skadden.com>; Kreiner, Evan R <Evan.Kreiner@skadden.com>
**Cc:** Joseph Saveri <jsaveri@saverilawfirm.com>; Cadio Zirpoli <czirpoli@saverilawfirm.com>; Steve Williams <SWilliams@saverilawfirm.com>
**Subject:** RE: DeMartini v. Microsoft, 22-cv-08991

Hi Ms. York,

Thank you. Please also let us know whether you will accept service on behalf of Mr. Bobby Kotick. Please let us know by tomorrow morning, because we have a joint status report due tomorrow, and we need to report on third-party discovery issues.

Thank you,
David

**David Seidel**
Associate

_____

[                                    ]

601 California Street, Suite 1000
San Francisco, CA 94108
**T** 415.500.6800 x906
**F** 415.395.9940

---

**From:** York, Julia K <Julia.York@skadden.com>
**Sent:** Monday, January 30, 2023 6:04 AM
**To:** David Seidel <dseidel@saverilawfirm.com>; Sunshine, Steven C <Steve.Sunshine@skadden.com>; Raptis, Maria <Maria.Raptis@skadden.com>; Sheerin, Michael J <Michael.Sheerin@skadden.com>; Kreiner, Evan R <Evan.Kreiner@skadden.com>
**Cc:** Joseph Saveri <jsaveri@saverilawfirm.com>; Cadio Zirpoli <czirpoli@saverilawfirm.com>; Steve Williams <SWilliams@saverilawfirm.com>
**Subject:** RE: DeMartini v. Microsoft, 22-cv-08991


David,

Thank you for your e-mail.  We are not yet retained on the DeMartini matter but are checking with Activision and will get back to you on your question about whether we can accept service.

Kind regards,
Julia York

**Julia K. York**
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue, N.W. | Washington | D.C. | 20005-2111
**T: +1.202.371.7146** | **F: +1.202.661.9126** | **M: +1.202.361.2404**
**julia.york@skadden.com**

Skadden

---

**From:** David Seidel <dseidel@saverilawfirm.com>
**Sent:** Friday, January 27, 2023 1:11 PM
**To:** Sunshine, Steven C (WAS) <Steve.Sunshine@skadden.com>; York, Julia K (WAS) <Julia.York@skadden.com>; Raptis, Maria (NYC) <Maria.Raptis@skadden.com>; Sheerin, Michael J (NYC) <Michael.Sheerin@skadden.com>
**Cc:** Joseph Saveri <jsaveri@saverilawfirm.com>; Cadio Zirpoli <czirpoli@saverilawfirm.com>; Steve Williams <SWilliams@saverilawfirm.com>
**Subject:** [Ext] DeMartini v. Microsoft, 22-cv-08991

Hello counsel,

We represent the plaintiffs in the action seeking to enjoin the Microsoft-Activision merger, currently pending in the Northern District of California before Judge Corley (DeMartini v. Microsoft, 22-cv-08991). During a recent hearing, the Court directed us to proceed with discovery. We understand you represent Activision Blizzard before the FTC action. We are reaching out to ask if you will accept service of a subpoena on behalf of Activision Blizzard, and if you would like to set up a call to discuss.

I'm available most of the day today to discuss the subpoena we are going to serve. We can also set up a time to discuss the matter next week if you would like.

Best,
David

**David Seidel**
Associate

_____

601 California Street, Suite 1000
San Francisco, CA 94108
**T** 415.500.6800 x906
**F** 415.395.9940

----------------------------------------------------------------------------

This email (and any attachments thereto) is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this email, you are hereby notified that any dissemination, distribution or copying of this email (and any attachments thereto) is strictly prohibited. If you receive this email in error please immediately notify me at (212) 735-3000 and permanently delete the original email (and any copy of any email) and any printout thereof.

Further information about the firm, a list of the Partners and their professional qualifications will be provided upon request.

================================================================================

# Exhibit 4

## SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

1440 NEW YORK AVENUE, N.W.

WASHINGTON, D.C. 20005-2111

———

TEL: (202) 371-7000

FAX: (202) 393-5760

www.skadden.com

DIRECT DIAL
202-371-7146
DIRECT FAX
202-661-9126
EMAIL ADDRESS
Julia.York@SKADDEN.COM

FIRM/AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEW YORK
PALO ALTO
WILMINGTON

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

February 8, 2023

VIA EMAIL

Joseph M. Alioto
Alioto Law Firm
One Sansome Street, 35th Floor
San Francisco, CA 94104
jmalioto@aliotolaw.com

Cadio Zirpoli
Joseph Saveri Law Firm
601 California Street, Suite 1000
San Francisco, CA 94108
czirpoli@saverilawfirm.com

RE: *DeMartini, et al. v. Microsoft Corp.*, No. 3:22-cv-08991-JSC
(N.D. Cal.)

Dear Joe and Cadio:

On behalf of non-party Activision Blizzard, Inc. ("Activision"), we write to memorialize our meet and confer of February 3, 2023 in connection with Plaintiffs' third-party subpoenas to Activision in the above-captioned action, and to request a further meet and confer pursuant to Central District of California Local Rules 37-1 and 45-1. In short, as we previewed for you on our call last week, (1) no depositions of Activision Blizzard's personnel should proceed while depositions of party witnesses are stayed in the above-captioned action, and (2) Plaintiffs' request for the entirety of Activision's submissions to the Federal Trade Commission ("FTC") is unwarranted. Activision will not make its CEO or a corporate representative available for the noticed deposition dates or produce documents from its submissions to the FTC and intends to seek to quash both subpoenas.

February 8, 2022
Page 2

## I. *Background.*

On January 30, 2023, Plaintiffs served non-party Activision with two subpoenas pursuant to Federal Rule of Civil Procedure 45. *First*, Plaintiffs served counsel for Activision with a deposition subpoena for Activision's CEO, Robert A. Kotick, that purports to require Mr. Kotick to appear for a deposition on February 27, 2023. Counsel for Activision voluntarily accepted service of that subpoena, reserving all objections and the right to move to quash under Rule 45. *Second*, Plaintiffs served Activision's registered agent, CSC Lawyers Incorporating Service, with a subpoena return dated February 14, 2023, encompassing: (1) a demand for a Federal Rule of Civil Procedure 30(b)(6) corporate deposition; and (2) a series of facially overbroad document requests.

We participated in a meet and confer with you on February 3, 2023, regarding both the deposition and document requests. You began the meet and confer by suggesting that "all" Plaintiffs seek from Activision is Mr. Kotick's deposition and the documents that Activision has produced to the Federal Trade Commission (the "FTC") in connection with Microsoft Corp.'s ("Microsoft") proposed acquisition of Activision (the "Proposed Transaction"). Notwithstanding the subpoena return dates of February 14 for the requested corporate deposition and February 27 for the requested deposition of Mr. Kotick, you suggested that Plaintiffs would seek to take the corporate deposition only if they were to need additional testimony *after* deposing Mr. Kotick.

We explained to you Activision's position that any depositions concerning Activision, a non-party, should at a minimum be deferred until after the preliminary injunction hearing in the above-captioned action.[1] Such an approach would be consistent with the stay that Judge Corley put in place for first-party depositions. We explained that Activision does not intend to produce its CEO on February 27, nor does Activision intend to produce a corporate witness on February 14, particularly in light of Plaintiffs' representation that they may not even need a corporate deposition. As for Plaintiffs' document requests, we explained that the request that Activision produce any and all documents it has produced to the FTC is unwarranted, given that Plaintiffs will be receiving over nine million pages of documents from defendant Microsoft (the acquiring party), that Microsoft filed a meritorious motion to dismiss this action in its entirety that will be argued on March 16, and that a protective order was not yet in place. *See* Fed. R. Civ. P. 45(d)(3)(B)(i) (recognizing disclosure of "a trade secret or other confidential research, development, or commercial information"

---

[1] For the avoidance of doubt, Activision reserves its right to resist the taking of depositions of its personnel even if the deposition dates are merely stayed until after a decision on Plaintiffs' preliminary injunction motion.

February 8, 2022
Page 3

as a basis for quashing or limiting a subpoena). Nevertheless, we emphasized that Activision would be willing to consider a more reasonable, narrowed proposal from Plaintiffs.

You offered no such proposal. Instead, you responded that the "state of affairs" on the discovery Plaintiffs seek is reflected in the subpoenas they served and that Plaintiffs' request for "just the FTC file" *was* your reasonable proposal. Contradicting your earlier position that Plaintiffs do not need a corporate deposition, you then noted that if Activision does not intend to produce Mr. Kotick as a deponent on February 27, Plaintiffs would intend to proceed with a corporate deposition on February 14. We responded that we would be back in touch to confirm Activision's position on Plaintiffs' various discovery requests.

## II. *Plaintiffs' Subpoenas Should be Quashed.*

In short, (1) both of the subpoenas should be quashed because the issuing court lacks subject matter jurisdiction in this action, as Microsoft persuasively argues in its Motion to Dismiss; (2) neither of the depositions that Plaintiffs seek is warranted, and while it is Activision's position that both deposition subpoenas should promptly be withdrawn, at a bare minimum the deposition subpoena return dates should be deferred until after the preliminary injunction hearing in this action; and (3) the document requests that Plaintiffs have issued are vastly overbroad and should be quashed.

### a. Subject Matter Jurisdiction

At the start, both of the subpoenas that Plaintiffs served upon Activision are void because the issuing court lacks subject matter jurisdiction over this action, rendering any compliance with those subpoenas both improper and an undue burden. As Microsoft persuasively advances in its motion to dismiss, the issuing court lacks subject matter jurisdiction over this action because Plaintiffs' claims are unripe and because Plaintiffs lack Article III standing. Plaintiffs' subpoenas are thus void and must be withdrawn. *U.S. Cath. Conf. v. Abortion Rts. Mobilization, Inc.*, 487 U.S. 72, 76 (1988) ("[I]f a district court does not have subject-matter jurisdiction over the underlying action, and the process [in question] was not issued in aid of determining that jurisdiction, then the process is void . . . ."); *see also, e.g.*, *In re Perez by Allen*, 2020 WL 7056024, at *3 (N.D. Cal. Dec. 2, 2020) ("[I]f a litigant lacks standing, a federal court lacks authority to adjudicate the case, including issuing deposition subpoenas or other process.") At a bare minimum, Plaintiffs' third-party discovery of Activision should be deferred until the question of the issuing court's jurisdiction is resolved. *In re Verifone, Inc.*, 2018 WL 3532761, at *6 (N.D. Cal. July 23, 2018)

February 8, 2022
Page 4

(staying non-party's compliance with a deposition subpoena "pending a decision on the question of subject-matter jurisdiction in the underlying action").

###### b. Deposition Subpoenas

Plaintiffs' deposition subpoenas should be quashed for at least four additional, independent reasons.

*First*, Judge Corley has already deferred all first-party depositions in this action until after the preliminary injunction hearing. It necessarily follows that all non-party depositions should be deferred as well. Non-parties like Activision should not be subject to a higher burden than the parties themselves. *See, e.g.*, *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 161 F.R.D. 86, 88 (N.D. Cal. 1995) ("[T]he Ninth Circuit has long held that nonparties subject to discovery requests deserve extra protection from the courts." (citing *United States v. C.B.S.*, 666 F.2d 364, 371–72 (9th Cir.1982)). What is more, under Rule 45, Plaintiffs must secure whatever discovery they need from Microsoft first—before pressing non-parties like Activision for additional, potentially duplicative discovery and, accordingly, subjecting them to undue burden. *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 300 F.R.D. 406, 410 (C.D. Cal. 2014) ("Courts are particularly reluctant to require a non-party to provide discovery that can be produced by a party."). Consequently, Plaintiffs' deposition requests are premature, at best, under Rule 45.

*Second*, the depositions that Plaintiffs seek are improper under Rule 45 because Plaintiffs have not demonstrated a substantial need for the confidential commercial information they clearly seek to elicit (given the sensitivity of the confidential commercial information in Activision's productions to the FTC). Where, as here, a subpoena seeks confidential "commercial information" from a nonparty, discovery is permissible only if the requesting party "show[s] a substantial need for" such information "that cannot be otherwise met without undue hardship." Fed. R. Civ. P. 45(d)(3)(B)–(C). To make that showing, Plaintiffs must demonstrate that the discovery is not only relevant but also "essential to a judicial determination of its case." *Gonzales v. Google, Inc.*, 234 F.R.D. 674, 685 (N.D. Cal. 2006). Yet Plaintiffs have wholly failed to explain how their claims will "virtually rise[] or fall[] with the admission or exclusion" of the confidential commercial information they seek in connection with the two Activision depositions. *See Edwards v. Cal. Dairies, Inc.*, 2014 WL 2465934, at *5 (E.D. Cal. June 2, 2014). Nor could they, given the voluminous discovery they will obtain from Microsoft.

*Third*, Plaintiffs' request to depose Mr. Kotick—the CEO of Activision—is particularly improper, as it plainly runs afoul of the apex deposition doctrine. Under

February 8, 2022
Page 5

that doctrine, Plaintiffs must establish that: (1) "other less intrusive means of discovery . . . have been exhausted without success"; and (2) the executive they seek to depose "has unique, non-repetitive, firsthand knowledge of the facts at issue in the case." *Affinity Labs of Texas v. Apple, Inc.*, 2011 WL 1753982, at *15 (N.D. Cal. May 9, 2011). Yet Plaintiffs have not exhausted narrower means of discovery, and they have not even attempted to establish in these discussions that Mr. Kotick has unique, *non-repetitive* knowledge of the facts at issue in the case. Plaintiffs' hurried approach to starting discovery with the deposition of Activision's CEO signifies Plaintiffs' intention to harass and unduly burden Activision and its employees.

*Fourth*, Plaintiffs' request for a corporate deposition is likewise improper. Plaintiffs represented in our meet and confer that a corporate deposition may not even be necessary, so Plaintiffs cannot establish that they have a "substantial need" for the confidential commercial information they seek in connection with that deposition. Plaintiffs' Rule 30(b)(6) topics bear out that lack of necessity, particularly insofar as they encompass irrelevant information, information that could be procured from defendant Microsoft, duplicative information, and information that goes beyond the scope of what would be reasonable for a Rule 30(b)(6) deposition. For example, Plaintiffs' Rule 30(b)(6) topics indicate that they would like to ask Activision about, among other things, the identities of Activision "employees or agents who communicated with Microsoft [] regarding the" Proposed Transaction, including "the scope of the communications and who the communications were with." But such information is plainly discoverable from first-party Microsoft.

### c. Document Subpoena

Plaintiffs' six document requests should be withdrawn (or quashed) because they are facially overbroad, impose an undue burden, and go well beyond the scope of reasonable discovery for a non-party in this action. In addition, Plaintiffs cannot show a substantial need for the confidential commercial information they have requested.

**RFP No. 1** seeks "[a]ll documents [Activision] produced or submitted to the United States Federal Trade Commission, the Department of Justice, or any other United States regulatory agency related to [Activision's] proposed merger with Microsoft Corporation." Microsoft, a party to this action and the acquiring entity in the underlying proposed transaction, has agreed to produce nine to ten million pages of documents to Plaintiffs. This material will more than suffice at this stage of the litigation, and Plaintiffs have put forth no argument why Activision's voluminous production to the FTC is "essential to a judicial determination of [their] case," *Gonzales*, 234 F.R.D. at 685, or how their case "virtually rises or falls with the admission or exclusion" of this information. *Edwards*, 2014 WL 2465934, at *5.

February 8, 2022
Page 6

Plaintiffs thus do not have a substantial need for the material sought in this Request, as required to compel a third party to produce the types of business secrets included in Activision's productions to the FTC. Moreover, a document subpoena is overbroad and would impose an undue burden where, as here, "only some of the information contained in a file is relevant to the action." *Briggs v. Cnty. Of Maricopa*, 2021 WL 1192819, at *4 (D. Ariz. Mar. 30, 2021); *see also Beltran v. Baker*, 2022 WL 16963921, at *3 (E.D. Cal. Nov. 16, 2022) (holding that a "catchall request" seeking all potentially relevant materials was "unquestionably overbroad").[2]

**RFP No. 2** seeks Activision's "profit and loss statements, including for [its] gaming division(s), and i[ts] gaming studios." As with RFP No. 1, Plaintiffs lack a substantial need for Activision's profit and loss statements because such statements are confidential commercial information and are not essential for prosecution of Plaintiffs' claims. Moreover, this request is overbroad and would impose an undue burden on Activision, particularly to the extent that it purports to require Activision to produce all "profit and loss statements" without providing any date limitations or any other limitations (*e.g.*, by game). *See, e.g.*, *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005) (concluding that requests seeking "any and all documents over a ten year or greater period" were "overbroad on their face and exceed[ed] the bounds of fair discovery" (internal quotation marks and alterations omitted)).

**RFP No. 3** seeks "[t]ranscripts of all depositions and interviews of [Activision] and [Activision] employees or agents by the FTC related to [Activision's] merger with Microsoft Corporation." Activision's FTC transcripts reflect confidential commercial information, for which Plaintiffs cannot articulate a substantial need, let alone explain why all of these deposition and interview transcripts are "essential to a judicial determination of [their] case," *Gonzales*, 234 F.R.D. at 685, or how their case "virtually rises or falls with the admission or exclusion" of this information. *Edwards*, 2014 WL 2465934, at *5. Moreover, as with RFP No. 1, Plaintiffs' request for Activision's FTC transcripts are overbroad to the extent that the transcripts encompass information that may be irrelevant to Plaintiffs' claims. And the request will impose an undue burden on Activision to the extent that the transcripts encompass information that is reflected in the voluminous party production that Microsoft has already agreed to provide (which include investigational hearing transcripts of Microsoft personnel).

**RFP No. 4** seeks "[a]ll [c]ommunications between or among [Activision's] Board of Directors and negotiators of the merger agreement regarding [Activision's]

---

[2] For these reasons, Activision objects to RFP Nos. 2, 3, 4, 5, and 6 to the extent that they would encompass any documents that are duplicative of the documents Plaintiffs seek in connection with Request for Production No. 1.

February 8, 2022
Page 7

merger with Microsoft Corporation." Because "documents created by or provided to [company] executives . . . definitely count[] as 'confidential research, development, or commercial information'" under Rule 45, Plaintiffs must establish a substantial need for these communications. *In re Apple iPhone Antitrust Litig.*, 2020 WL 5993223, at *9 (N.D. Cal. Oct. 9, 2020). But they cannot. Plaintiffs' case concerns *Microsoft's* rationale for the transaction and *Microsoft's* post-acquisition plans—not Activision's.

**RFP No. 5** seeks "[a]ll [c]ommunications between [Activision] and Sony Corporation or any of its subsidiaries or affiliated entities or agents, concerning any of Activision Blizzard's video games or its video game content generally from January 1, 2022 to the present." Communications reflecting Activision's negotiations with Sony constitute sensitive confidential commercial information, which may be subject to non-disclosure obligations and the disclosure of which would do considerable harm to Activision's negotiations with other platform providers. Plaintiffs cannot establish a substantial need under Rule 45 for this information, as Plaintiffs cannot establish that their claim "virtually rises or falls with [its] admission or exclusion." *Edwards*, 2014 WL 2465934, at *5. In addition, this request is vastly overbroad and, as written, would encompass virtually every communication between any Activision employee and any Sony employee, including communications that are wholly irrelevant to Plaintiffs' claims.

**RFP No. 6** seeks "[a]ll [c]ommunications between [Activision] and Nintendo Co., Ltd. or any of its subsidiaries or affiliated entities or agents, concerning any of Activision Blizzard's video games or its video game content generally from January 1, 2022 to the present." Similar to RFP No. 5, communications reflecting Activision's negotiations with Nintendo are confidential commercial information, which may be subject to non-disclosure obligations and the disclosure of which would do considerable harm to Activision's negotiations with other platform providers. Plaintiffs cannot establish a substantial need for this information under Rule 45, again given that they cannot establish that their claim "virtually rises or falls with the admission or exclusion" of this information. *Edwards*, 2014 WL 2465934, at *5. Likewise, this request is vastly overbroad to the extent that it would encompass virtually every communication between any Activision employee and any Nintendo employee, including communications that are wholly irrelevant to Plaintiffs' claims.

Activision will timely serve its Responses and Objections to Plaintiffs' document requests on February 10, 2023.[3]

---

[3] As a final matter, Activision notes that the Court entered a Protective Order in this action on February 7, 2023 that includes protections for non-parties. *Demartini et al v. Microsoft Corp.*, No. 3:22-cv-8991-JSC (N.D. Cal.), Dkt. No. 60. Activision reserves its right under Federal Rule of Civil Procedure 26 to

February 8, 2022
Page 8

* * *

For these reasons, neither of the depositions Plaintiffs seek are warranted, and Plaintiffs should promptly withdraw both deposition subpoenas, or at minimum postpone their return date until after the preliminary injunction hearing in this action, at which point the parties can further evaluate their positions. Activision does not intend to produce its witnesses on either February 14 or February 27. Similarly, Plaintiffs' document requests are patently overbroad, would impose an undue burden on Activision, and do not meet the "substantial need" standard under Rule 45 and thus should be quashed.

Pursuant to Central District of California Local Rule 37-1 and 45-1, please let us know when Plaintiffs are available for a meet and confer to discuss the above on either (1) tomorrow, February 9 at a time between 2:30 pm ET and 6:00 pm ET or (2) Friday, February 10 at a time between 2:00 pm ET and 4:30 pm ET. We would appreciate Plaintiffs' prompt response to this letter so that, to the extent necessary, we may present any dispute arising from Plaintiffs' deposition subpoenas to the Court in a timely fashion.

Sincerely,

/s/ *Julia K. York*

Julia K. York

Cc: Tatiana V. Wallace (twallace@aliotolaw.com)
Joseph R. Saveri (jsaveri@saverilawfirm.com)
Elissa Amlin Buchanan (eabuchanan@saverilawfirm.com)
Steven Noel Williams (swilliams@saverilawfirm.com)
David H. Seidel (dseidel@saverilawfirm.com)
Joseph Michelangelo Alioto, Jr. (joseph@aliotolegal.com)
Lingel Hart Winters (sawmill2@aol.com)
Lawrence Genaro Papale (lgpapale@papalelaw.com)

---

seek a modification of that Protective Order to ensure the adequate protection of its confidential information. *See Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 2019 WL 3069009, at *6 (C.D. Cal. Apr. 29, 2019) (granting non-party's motion to modify a protective order to "preclude disclosure of [non-party's] documents to in-house attorneys of any market competitor"). Activision further reserves its right under Federal Rule of Civil Procedure 45 to seek further protections for its confidential commercial information—*i.e.*, to request that productions to be made only "under specified conditions." Fed. R. Civ. P. 45(d)(3)(C).

# Exhibit 5

1  Caroline Van Ness
   SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
2  525 University Avenue
   Palo Alto, CA 94301-1908
3  Telephone: (650) 470-4500
   Facsimile:  (650) 470-4570
4  Email: caroline.vanness@skadden.com

5  Steven C. Sunshine
   Julia K. York
6  SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
   1440 New York Avenue, N.W.
7  Washington, D.C. 20005
   Telephone: (202) 271-7860
8  Email: steve.sunshine@skadden.com
   Email: julia.york@skadden.com
9
   *Counsel for Non-Party ACTIVISION
10 BLIZZARD, INC.*

11

12  **UNITED STATES DISTRICT COURT
    NORTHERN DISTRICT OF CALIFORNIA**

13

14  Dante DeMartini,  et al.,

                    Plaintiffs,
15
16          v.

17  Microsoft Corp.,

18                  Defendant.

19

20

21

22

23

24

25

26

27

| | |
|---|---|
| **Case No. 22-cv-08991-JSC** | |
| **RESPONSES & OBJECTIONS OF NON-PARTY ACTIVISION BLIZZARD, INC. TO PLAINTIFFS' SUBPOENA TO PRODUCE DOCUMENTS, SERVED ON JANUARY 30, 2023** | |
| **Hon. Jacqueline Scott Corley** | |

28

**RESPONSES & OBJECTIONS OF ACTIVISION BLIZZARD, INC. TO PLAINTIFFS' SUBPOENA TO PRODUCE DOCUMENTS SERVED ON JANUARY 30, 2023**

Pursuant to Rule 45 of the Federal Rules of Civil Procedure and all other applicable laws and rules, non-party Activision Blizzard, Inc. ("Activision") submits the following Responses and Objections to the Subpoena to Produce Documents, Information, or Objects, dated January 27, 2023 and served on January 30, 2023 (the "Subpoena"), issued by Plaintiffs Dante DeMartini, et al. ("Plaintiffs") in the litigation captioned *DeMartini v. Microsoft Corp.*, Case No. 22-cv-08991-JSC (N.D. Cal.).

**GENERAL RESPONSES**

1.      Each of the responses to Plaintiffs' Requests herein (the "Responses") is made without waiving or intending to waive, but, on the contrary, expressly reserving: (a) the right to object, on the grounds of admissibility, competency, privilege, relevancy, or materiality, or any other proper grounds, to the use of the Response, for any purpose in whole or in part, in any subsequent proceeding in this action or any other action; (b) the right to object on any and all grounds, at any time, to other subpoenas *duces tecum* or other discovery procedures in this action; and (c) the right at any time to revise, correct, add to, or clarify any of the Responses set forth herein.

2.      The Responses reflect only the present state of Activision's investigation and understanding regarding the requested information, and Activision therefore reserves the right to amend or supplement its Responses.

3.      Except where expressly stated, Activision does not admit, adopt, or acquiesce in any factual or legal contention, assertion, or characterization contained in the Requests, or any definition therein, even where Activision has not otherwise objected to a particular Request, or has agreed (or in the future will agree) to provide information responsive to a particular Request. No incidental or implied admissions are intended by these Responses.

4.      Activision expressly reserves the right under all applicable laws and rules, including Fed. R. Civ. P. 45(d)(1), to seek compensation for the costs and fees associated with responding to the Subpoena.

## **GENERAL OBJECTIONS**

The following General Objections apply to and are incorporated into each specific Response and Objection below, whether or not they are expressly incorporated by reference in such Response. Any agreements to produce are limited by the following General Objections.  Activision's failure to specify any General Objection or Specific Objection, or any present or future agreement to produce responsive documents or data, is not a representation that any such documents or data exist or are within Activision's possession, custody, or control.  Any future production pursuant to the Requests or otherwise is not to be construed as an admission that any Request is proper.  Not listing an Objection herein does not constitute a waiver of that Objection or otherwise preclude Activision from raising that Objection later.

1.      Activision objects to the Requests on the grounds that they are improper and unduly burdensome because the issuing court lacks subject matter jurisdiction over this action, rendering the Subpoena void.  As Microsoft has argued in its Motion to Dismiss, the issuing court lacks subject matter jurisdiction over the *DeMartini* action because Plaintiffs' claims are unripe and Plaintiffs lack Article III standing.

2.      Activision objects to the Requests on the grounds that they are duplicative, overbroad, unduly burdensome, and disproportionate to the needs of this litigation.  Activision's productions in response to the United States Federal Trade Commission's (the "FTC") Second Request comprise multiple (and substantial) volumes of highly detailed data, in addition to hundreds of thousands of records and millions of pages from the files of dozens of document custodians and predecessors. Plaintiffs' request for *all* of these documents and data, without limitation and without regard to the relevance of such information, is patently overbroad and goes well beyond the scope of reasonable discovery for a non-party in this action.

Responses & Objections of Activision Blizzard, Inc. to Plaintiffs' Subpoena                    22-cv-08991-JSC
To Produce Documents, Served on January 30, 2023

3.    Activision objects to the Requests to the extent that they are vague, ambiguous, overbroad, unduly burdensome, and disproportionate to the needs of the *DeMartini* action.   In particular, Activision objects to the Requests to the extent that they seek discovery of "all" documents, communications, and/or data referring to, relating to, or regarding overbroad or vaguely defined topics, and particularly to the extent that they seek discovery of "all" such information relating to, in relation to, referring to, and/or concerning an overbroad topic and/or a topic that is of no (or marginal) relevance to the claims or defenses in the *DeMartini* action.   Insofar as any responsive materials may have some relevance to a party's claim or defense in the *DeMartini* action, producing "all" documents, communications, and/or data would be unduly burdensome and not proportional to the needs of the case.

4.    Activision objects to the Requests to the extent that they seek documents that are not relevant to the claims and defenses at issue in the *DeMartini* action or not designed to seek discovery that is proportional to the needs of this case.

5.    Activision objects to the Requests to the extent that they require Activision to produce documents or data outside of its possession, custody, or control, or to the extent that they seek documents or data in the possession of, or that are more readily available from, another entity. Activision further objects to the Requests to the extent that they purport to require Activision to speculate about the identity of persons who might have responsive documents or data or otherwise anticipate that Activision will collect documents or data from third parties.   For the avoidance of doubt, Activision will not speculate about the identity of persons who might have responsive documents nor collect documents from third parties for purposes of these requests.

6.    Activision objects to the Requests to the extent that they call for the production of documents or data protected by the attorney-client privilege, the work-product doctrine, the common interest privilege, or any other applicable privilege, doctrine, immunity, or exemption from or prohibition against disclosure of private information in discovery.   Nothing contained in these Responses is intended to be or may be construed as a waiver of the attorney-client privilege, the

Responses & Objections of Activision Blizzard, Inc. to Plaintiffs' Subpoena
To Produce Documents, Served on January 30, 2023

22-cv-08991-JSC

work-product doctrine, or any other applicable privilege, doctrine, or immunity. Any disclosure or production of work product, attorney-client privileged material, or any material subject to any immunity from disclosure is not intended to be a waiver of any applicable privilege or protection and shall be deemed inadvertent. Any document subject to a privilege, doctrine, or protection, if inadvertently produced, should be returned by Plaintiffs immediately. Plaintiffs should not use in any manner whatsoever any information derived from any inadvertently produced privileged or protected document.

7. Activision objects to the Requests to the extent that they seek the production of materials subject to non-disclosure or confidentiality agreements with third parties, or materials that, if disclosed, would violate the privacy interests of others. To the extent Activision produces such materials, it will do so only after providing required notice to third parties and an opportunity for them to object to the production of the materials.

8. Activision objects to the Requests to the extent that they seek to impose obligations upon Activision other than the obligations imposed under the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, Central District of California, or any other court, those Courts' orders, and/or applicable law.

9. Activision objects to the Requests to the extent that they: (i) are duplicative, overlapping, or repetitive of one or more of the other Requests; (ii) seek information, documents, or data that are equally obtainable through some other means that is more convenient, less burdensome, or less expensive; or (iii) require Activision to produce documents or data that are publicly available, are a matter of public record, or reflect documents or data that are otherwise equally available to Plaintiffs as they are to Activision. Where a document is responsive to more than one Request, and Activision has agreed to produce that document, Activision will produce that document only once.

10. Activision objects to the Requests to the extent that they purport to impose a duty on Activision to undertake a search for documents or data and information beyond a diligent, good-faith search of the files where Activision would reasonably expect to find documents, data, or information

4

Responses & Objections of Activision Blizzard, Inc. to Plaintiffs' Subpoena                22-cv-08991-JSC
To Produce Documents, Served on January 30, 2023

responsive to each individual Request. Activision objects to the Requests to the extent that they purport to require Activision to produce electronically stored information that is currently inaccessible, not reasonably accessible, stored in a form in which it is not ordinarily maintained or reasonably usable, unreasonably voluminous, or would be otherwise unduly burdensome to search or review. Activision further objects to the Requests to the extent that identifying and producing the requested information would impose an undue burden on Activision.

11. Activision objects to the Requests on the grounds that they are overbroad and unduly burdensome to the extent that they request documents and/or data that Activision does not maintain in the ordinary course of business. For the avoidance of doubt, Activision will not produce documents or data that it does not maintain in the ordinary course of business.

12. Activision objects to the Requests to the extent that they seek information regarding confidential, trade secret, commercially sensitive, and/or other proprietary or competitively sensitive information concerning Activision and its business, activities (including litigation), or operations, the disclosure or dissemination of which could cause Activision harm or prejudice. Such information is specifically protected by Federal Rule of Civil Procedure 45(d)(3)(B)(i). Activision reserves the right to redact from any document it produces any non-responsive matter, any matter that it has objected to disclosing, any personal information, and/or any material that could expose it or any other person to annoyance or embarrassment. To the extent any confidential, trade secret, and other proprietary or competitively sensitive information is produced, Activision will provide such information pursuant to the Protective Order Governing Confidential Material, entered by Judge Corley on February 7, 2023. Activision reserves the right to move to amend the Protective Order and seek additional protections for the most highly competitive and/or commercially sensitive information sought by Plaintiffs.

13. Activision objects to the Requests on the grounds that they are unduly burdensome because they purport to require compliance by February 14, 2023, which is an unreasonable time for compliance.

Responses & Objections of Activision Blizzard, Inc. to Plaintiffs' Subpoena
To Produce Documents, Served on January 30, 2023

22-cv-08991-JSC

14. Activision incorporates by reference each General Objection set forth into each specific Response. From time to time, a specific Response may repeat a General Objection for emphasis or some other reason. The failure to include any General Objection in any specific Response shall not be interpreted as a waiver of any General Objection to that Response.

## **OBJECTIONS TO INSTRUCTIONS**

1. Activision objects to the Requests, including the section entitled "Instructions" to the extent that they seek to impose obligations upon Activision other than the obligations imposed under the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, Central District of California, or any other court, those Courts' orders, and/or applicable law.

2. Activision objects to Instruction 1 on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome to the extent that it purports to require Activision to adhere to obligations that are "continuing in nature" and purports to require Activision to supplement its Responses with productions of documents dated through the end of fact discovery in this action and within seven days of discovery of such documents.

3. Activision objects to Instruction 2 on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, and unreasonable, including to the extent that it seeks all "non-identical copies" of documents and things described without regard to their responsiveness.

4. Activision objects to Instruction 4 on the grounds that it is unduly burdensome and unreasonable to the extent that it purports to require Activision to list each response to which a document is responsive when making a production.

5. Activision objects to Instruction 5 on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, and unreasonable, including to the extent that: (i) it seeks information describing why a document is missing and not able to be to produced; and (ii) it purports to require Activision to search for and/or produce information that is currently inaccessible, not reasonably accessible, stored in a form in which it is not ordinarily maintained or reasonably usable, unreasonably voluminous, or would be otherwise unduly burdensome to search or review.

## OBJECTIONS TO DEFINITIONS

1.     Activision objects to the Requests, including the section entitled "Definitions" (including, but not limited to, the definitions of "Document" and "Communication"), to the extent that they seek to impose obligations upon Activision other than the obligations imposed under the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, Central District of California, or any other court, those Courts' orders, and/or applicable law.

2.     Activision objects to the definition of the term "Communication" as overbroad and unduly burdensome to the extent that it includes any communications other than written communications.  Activision further objects to the definition because calling for all "communications" relating to the subject matter of a particular request without limitation renders each request in which it is used overbroad and unduly burdensome.  Further, "communications" should expressly exclude communications protected by the attorney-client privilege, the work product doctrine, the joint defense doctrine, or any other applicable protection, privilege, or immunity.

3.     Activision objects to the definition of the term "Document" as overbroad and unduly burdensome to the extent that it seeks to impose obligations upon Activision other than the obligations imposed under the Federal Rules of Civil Procedure, the Local Rules of the Northern District of California, Central District of California, or any other court, those Courts' orders, and/or applicable law, including because calling for all "documents" relating to the subject matter of a particular request without limitation renders each request in which it is used overbroad and unduly burdensome.  Activision will interpret "Document" to mean original documents themselves and not any draft or identical copies of those original documents.

4.     Activision objects to the definition of the term "Microsoft" on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome, including because it encompasses, without limitation, any "foreign parents, predecessors, successors, divisions, subsidiaries, affiliates, partnerships, and joint ventures; and all directors, officers, employees, agents, and representatives of

the foregoing." Unless otherwise stated, Activision will interpret "Microsoft" to refer only to Microsoft Corp.

5. Activision objects to the definition of the terms "You," "Your," and "Your Company" on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome, including because it encompasses, without limitation, any "predecessors, successors, subsidiaries, departments, divisions, and/or affiliates, including, without limitation, any organization or entity which Activision Blizzard, Inc. manages or controls, together with all present and former directors, officers, employees, agents, representatives, or any persons acting or purporting to act on behalf of Activision Blizzard, Inc." Unless otherwise stated, Activision will interpret "the Company," "You," "Your," and "Your Company" to refer only to Activision Blizzard, Inc.

**RESPONSES AND OBJECTIONS**
**TO SPECIFIC REQUESTS FOR PRODUCTION**

Subject to the General Responses and Objections above, which Activision incorporates into each specific response below, Activision responds and objects to the Requests as follows:

**REQUEST FOR PRODUCTION NO. 1:**

All Documents You produced or submitted to the United States Federal Trade Commission, the Department of Justice, or any other United States regulatory agency related to Your proposed merger with Microsoft Corporation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

Activision objects to Request No. 1 on the grounds that it is overbroad, unduly burdensome, not proportionate to the needs of this action, and not relevant to any party's claims or defenses, including because it purports to require Activision to produce "all documents" related to an overbroad topic and without any regard for whether such documents are relevant to any party's claims or defenses. Activision further objects to Request No. 1 on the grounds that it is duplicative, overbroad, unduly burdensome, and disproportionate to the needs of this action to the extent that: (i) it seeks documents that are sought by another Request; (ii) it seeks documents or other information

8

available by other means of discovery or from a named party in this action; and (iii) it seeks confidential commercial information for which Plaintiffs cannot establish a substantial need.

Subject to and without waiving the foregoing objections, Activision states that it is willing to meet and confer regarding this Request.

**REQUEST FOR PRODUCTION NO. 2:**

Your profit and loss statements, including for You [sic] gaming division(s), and Your gaming studios.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**

Activision objects to Request No. 2 on the grounds that it is overbroad, unduly burdensome, not proportionate to the needs of this action, and not relevant to any claims or defenses in this action including because: (i) it purports to seek all profit and loss statements relating to an overbroad topic, encompassing all gaming divisions and studios; (ii) it seeks documents or other information available by other means of discovery or from a named party in this action; and (iii) it seeks documents without a designated timeframe. Activision further objects to Request No. 2 on the grounds that it is duplicative, overbroad, unduly burdensome, and disproportionate to the needs of this action to the extent that: (i) it seeks documents that are sought by another Request; and (ii) it seeks confidential commercial information for which Plaintiffs cannot establish a substantial need. Activision further objects to Request No. 2 on the grounds that is irrelevant to Plaintiffs' allegations in the operative complaint.

Subject to and without waiving the foregoing objections, Activision states that it is willing to meet and confer regarding this Request.

**REQUEST FOR PRODUCTION NO. 3:**

Transcripts of all depositions and interviews of You and Your employees or agents by the FTC related to Your merger with Microsoft Corporation.

Responses & Objections of Activision Blizzard, Inc. to Plaintiffs' Subpoena
To Produce Documents, Served on January 30, 2023

22-cv-08991-JSC

**RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

Activision objects to Request No. 3 on the grounds that it is overbroad, duplicative, unduly burdensome, and not proportionate to the needs of this action, including because it purports to require Activision to produce transcripts of "all depositions and interviews" related to an overbroad topic and without any regard for whether such transcripts are relevant to any party's claims or defenses. Activision further objects to Request No. 3 on the grounds that it is duplicative, overbroad, unduly burdensome, and disproportionate to the needs of this action to the extent that: (i) it seeks documents sought by another Request; and (ii) it seeks confidential commercial information for which Plaintiffs cannot establish a substantial need.

Subject to and without waiving the foregoing objections, Activision states that it is willing to meet and confer regarding this Request.

**REQUEST FOR PRODUCTION NO. 4:**

All Communications between or among Your Board of Directors and negotiators of the merger agreement regarding Your merger with Microsoft Corporation.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

Activision objects to Request No. 4 on the grounds that it is overbroad, duplicative, unduly burdensome, not proportionate to the needs of this action, and not relevant to any claims or defenses in this action including because: (i) it purports to require Activision to search for and produce "[a]ll [c]ommunications," even those tangentially related to the subject matter of the Request, related to an overbroad topic; (ii) it seeks documents sought by another Request; and (iii) the term "negotiators" is overbroad, undefined, and open to interpretation. Activision further objects to Request No. 4 to the extent that: (i) it seeks documents that may be protected by the attorney-client privilege, the work product doctrine, the joint defense doctrine, or any other applicable protection, privilege, or immunity; (ii) it seeks documents or other information available by other means of discovery or from a named party in this action; and (iii) it seeks confidential commercial information for which Plaintiffs cannot establish a substantial need.

1    Subject to and without waiving the foregoing objections, Activision states that it is willing to

2    meet and confer regarding this Request.

3    **REQUEST FOR PRODUCTION NO. 5:**

4    All Communications between You and Sony Corporation or any of its subsidiaries or
     affiliated entities or agents, concerning any of Activision Blizzard's video games or its video game

5    content generally from January 1, 2022 to the present.

6    **RESPONSE TO REQUEST FOR PRODUCTION NO. 5:**

7    Activision objects to Request No. 5 on the grounds that it is duplicative, overbroad, unduly

8    burdensome, and disproportionate to the needs of this action because the Request purports to require

9    Activision to search for and produce "all communications," even those tangentially related to the

10   subject matter of the Request, related to an overbroad topic concerning virtually all communications

11   between Activision and Sony Corporation for the last thirteen months.  Activision further objects to

12   Request No. 5 on the grounds that it is duplicative, vague, ambiguous, overbroad, unduly

13   burdensome, and disproportionate to the needs of this action to the extent that: (i) it seeks information

14   sought by another Request; (ii) complying with the Request would cause Activision to violate

15   contractual obligations with a third party; (iii) it seeks communications between Activision and "any"

16   of Sony's "subsidiaries or affiliated entities or agents"; and (iv) it seeks confidential commercial

17   information for which Plaintiffs cannot establish a substantial need.

18   Subject to and without waiving the foregoing objections, Activision states that it is willing

19   to meet and confer regarding this Request.

20   **REQUEST FOR PRODUCTION NO. 6:**

21   All Communications between You and Nintendo Co., Ltd. or any of its subsidiaries or

22   affiliated entities or agents, concerning any of Activision Blizzard's video games or its video game

23   content generally from January 1, 2022 to the present.

24   **RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**

25   Activision objects to Request No. 6 on the grounds that it is duplicative, overbroad, unduly

26   burdensome, and disproportionate to the needs of this action because the Request purports to require

27

28

11

1  Activision to search for and produce "all communications," even those tangentially related to the

2  subject matter of the Request, related to an overbroad topic concerning virtually all communications

3  between Activision and Nintendo Co., Ltd. for the last thirteen months.  Activision further objects to

4  Request No. 5 on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, and

5  disproportionate to the needs of this action to the extent that: (i) it seeks information sought by

6  another Request; (ii) complying with the Request would cause Activision to violate contractual

7  obligations with a third party; (iii) it seeks communications between Activision and "any" of

8  Nintendo's "subsidiaries or affiliated entities or agents"; and (iv) it seeks confidential commercial

9  information for which Plaintiffs cannot establish a substantial need.

10       Subject to and without waiving the foregoing objections, Activision states that it is willing to

11  meet and confer regarding this Request.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED: February 10, 2023

/s/ Caroline Van Ness

Caroline Van Ness
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, CA 94301-1908
Telephone: (650) 470-4500
Facsimile:   (650) 470-4570
Email: caroline.vanness@skadden.com

Steven C. Sunshine
Julia K. York
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
Telephone: (202) 271-7860
Email: steve.sunshine@skadden.com
Email: julia.york@skadden.com

*Counsel for Non-Party ACTIVISION BLIZZARD, INC.*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 10, 2023, the foregoing document was served via electronic mail on the following counsel of record:

Joseph M Alioto (jmalioto@aliotolaw.com)
Tatiana V. Wallace (twallace@aliotolaw.com)
Joseph R. Saveri (jsaveri@saverilawfirm.com)
Cadio Zirpoli (czirpoli@saverilawfirm.com)
Steven Noel Williams (swilliams@saverilawfirm.com)
Elissa Amlin Buchanan (eabuchanan@saverilawfirm.com)
David H. Seidel (dseidel@saverilawfirm.com)
Joseph Michelangelo Alioto, Jr. (joseph@aliotolegal.com)
Lingel Hart Winters (sawmill2@aol.com)
Lawrence Genaro Papale (lgpapale@papalelaw.com)

*/s/ Julia K. York*

Responses & Objections of Activision Blizzard, Inc. to Plaintiffs' Subpoena          22-cv-08991-JSC
To Produce Documents, Served on January 30, 2023

# Exhibit 6

Joseph M. Alioto (State Bar No 42680)
Tatiana V. Wallace (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:      (415) 434-8900
Facsimile:      (415) 434-9200
Email:          jmalioto@aliotolaw.com

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:      (415) 500-6800
Facsimile:      (415) 395-9940
Email:          jsaveri@saverilawfirm.com
                swilliams@saverilawfirm.com
                czirpoli@saverilawfirm.com
                eabuchanan@saverilawfirm.com
                dseidel@saverilawfirm.com

Counsel for Plaintiffs

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DANTE DEMARTINI, CURTIS BURNS JR., NICHOLAS ELDEN, JESSIE GALVAN, CHRISTOPHER JOSEPH GIDDINGS-LAFAYE, STEVE HERRERA, HUNTER JOSEPH JAKUPKO, DANIEL DERMOT ALFRED LOFTUS, BEOWULF EDWARD OWEN, and IVAN CALVO-PÉREZ,<br><br>                    Plaintiffs,<br><br>        v.<br><br>MICROSOFT CORPORATION, a Washington corporation,<br><br>                    Defendant. | Case No.<br><br>**COMPLAINT TO PROHIBIT THE ACQUISITION OF ACTIVISION BLIZZARD BY MICROSOFT CORPORATION IN VIOLATION OF SECTION 7 OF THE CLAYTON ANTITRUST ACT, 15 U.S.C. § 18** |

TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

JURISDICTION AND VENUE ........................................................................................... 3

DIVISIONAL ASSIGNMENT ............................................................................................ 3

PARTIES ............................................................................................................................. 3

    Plaintiffs ......................................................................................................................... 3

    Microsoft Corporation .................................................................................................. 5

BACKGROUND .................................................................................................................. 7

    Activision Blizzard ....................................................................................................... 8

    Video Game Platforms ................................................................................................. 10

        a)      Console Gaming ............................................................................ 10

        b)      PC Gaming .................................................................................... 12

        c)      Mobile Gaming .............................................................................13

        d)      Cloud-Based Gaming Services ..................................................... 14

    Gaming Content ............................................................................................................ 14

        a)      Video Game Developers ................................................................15

        b)      Video Game Publishers .................................................................15

        c)      Video Game Distributors ...............................................................15

RELEVANT PRODUCT MARKETS ................................................................................ 16

GEOGRAPHIC MARKET ................................................................................................ 24

The Merger May Substantially Lessen Competition or Tend to Create a Monopoly .................. 26

The Video Game Industry Is Characterized by Significant Network Effects and Barriers to
    Entry ............................................................................................................................. 29

Microsoft Directly Competes with Activision Blizzard in Game Development for the Console and
    PC Gaming Markets .....................................................................................................31

Microsoft Directly Competes with Activision Blizzard in Game Publishing for the Console and
    PC Gaming Markets .................................................................................................... 32

Microsoft Directly Competes with Activision Blizzard in Game Distribution for the Console and
    PC Gaming Markets .................................................................................................... 33

The Proposed Consolidation May Substantially Lessen Current Competition in the Video Game
    Development, Publishing, and Distribution Markets ................................................... 33

ii

The Proposed Consolidation May Substantially Lessen Competition in the Labor Market ......... 34

The Proposed Consolidation May Give Microsoft Outsized Market Power and the Ability to Further Harm Competition by Foreclosing Inputs to Rivals in the Relevant Markets ..... 34

PRAYER FOR RELIEF ............................................................................................................ 40

**INTRODUCTION**

1.	This is a private antitrust action seeking an order of the Court prohibiting the proposed acquisition of Activision Blizzard, Inc. by Microsoft Corporation as a violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18). The threatened loss or damage to the Plaintiffs and to the public at-large by the merging of two giants in the video game industry is extensive and broad.

2.	On January 18, 2022, Microsoft announced plans to acquire Activision Blizzard. Microsoft agreed to pay $68.7 billion ($68,700,000,000), or approximately $95 per share in an all-cash transaction. Under the proposed terms of the merger, Microsoft would acquire all the outstanding stock of Activision Blizzard. Upon completion of the deal, Activision Blizzard would be wholly owned by Microsoft.

3.	The proposed acquisition price of $68.7 billion in cash demonstrates the merger is significant and non-trivial. Indeed, if the acquisition is allowed to proceed, it would be the largest merger of technologies companies ever.

4.	Microsoft and Activision Blizzard are each significant rivals in the video game development, publishing, and distribution markets.

5.	Microsoft and Activision Blizzard both develop, publish, and distribute gaming content for purchase by consumers, and they directly compete in this market.

6.	Microsoft and Activision Blizzard are two of the largest gaming corporations in the United States with significant market share in the video game markets for developing, publishing and distributing video games.

7.	Microsoft owns and sells the Xbox gaming consoles and the Windows operating system, two of the primary platforms on which games are played.

8.	The development and publishing of video games for these and other platforms are critical inputs to the popularity and continued viability of gaming platforms.

9.	The development and publishing of video games are also critical inputs to new gaming platforms and distribution methods, such as multi-game subscription services and cloud-based gaming.

COMPLAINT

10.     In addition to the elimination of a significant rival, the proposed acquisition may give Microsoft far-outsized market power in the video game industry and may enable Microsoft to foreclose rivals to critical inputs and important markets.

11.     The current trend toward concentration, the lessening of competition, and the tendency to create a monopoly in the video game industry was already harming competition at an alarming rate before the proposed acquisition was announced. Both companies are the products of substantial campaigns to acquire, merge with, and consolidate numerous video game companies to achieve their current stature in the video game industry.

12.     If Microsoft's proposed acquisition of Activision Blizzard is allowed to proceed, the video game industry may lose substantial competition, and Microsoft may have far-outsized market power, with the ability to foreclose rivals, limit output, reduce consumer choice, raise prices, and further inhibit competition.

13.     The proposed acquisition is a violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18) in that the effect of the potential consolidation "may be substantially to lessen competition or tend to create a monopoly" in various markets in the video game industry.

14.     This private action is authorized under Section 16 of the Clayton Antitrust Act (15 U.S.C. § 26), which provides in relevant part that "any person…shall be entitled to sue and have injunctive relief …against threatened loss or damage by a violation of the antitrust laws." The remedy afforded to private plaintiffs includes injunctive relief prohibiting any potential unlawful acquisition as well as divestiture.

15.     The Clayton Act codifies Congress' "intent to encourage vigorous private litigation against anticompetitive mergers" that may substantially lessen competition. *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990).

16.     Plaintiffs bring this action under the authority of Section 16 of the Clayton Antitrust Act and allege that the proposed acquisition of Activision Blizzard by Microsoft constitutes a substantial threat of injury to the Plaintiffs and the public because the acquisition

may have the effect of substantially lessening competition and may tend to create a monopoly in various markets in violation of Section 7 of the Clayton Antitrust Act.

17.     Competition rather than combination is the rule of trade in the United States so that these Plaintiffs, and the public at large, may enjoy the benefits and innovations that come from competition, including, among others, improved quality and increased choices at the lowest possible prices.

18.     Vigorous enforcement of the antitrust laws by private persons is an essential part of the congressional plan to ensure that competition rather than monopoly is, and remains, the rule of trade in the United States, including in the video game industry.

## JURISDICTION AND VENUE

19.     The proposed acquisition is in and substantially affects the interstate and foreign commerce of the United States in that video game consoles, personal computers, smartphones, and the video games that are played on those platforms, including cloud-gaming services, are sold throughout the United States.

20.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and Sections 7 and 16 of the Clayton Act (15 U.S.C. §§ 18 and 26).

21.     Jurisdiction and venue are proper in this judicial district pursuant to 15 U.S.C. §§15, 22, 26, and 28 U.S.C. § 1391.

## DIVISIONAL ASSIGNMENT

22.     Pursuant to Civil Local Rule 3-5.(b), assignment of this case to the San Francisco Division is proper because a substantial number of the Plaintiffs reside in and practice gaming in San Francisco.

## PARTIES

### Plaintiffs

23.     The Plaintiffs named below are individual citizens of the cities and states listed. Each Plaintiff is a consumer of video games, all with the express interest and intent in ensuring that the industry remains competitive, with the utmost innovation, output, choice, and price

constraints, now and in the future. The potential acquisition of Activision Blizzard by Microsoft threatens loss and harm to the Plaintiffs, and to the public at large, of the salutary benefits of substantial competition within the video game industry.

24. Dante DeMartini is a video gamer located in San Francisco, California. Mr. DeMartini plays video games on the PlayStation console and on his personal computer using Windows OS. Mr. DeMartini plays or has purchased titles from Activision Blizzard, including multiple versions of *Call of Duty*, *World of Warcraft*, *Overwatch*, *Overwatch 2*, *Starcraft II*, *Diablo III*, and *Hearthstone*.

25. Curtis Burns Jr. is a video gamer located in San Francisco, California. Mr. Burns plays video games on the PlayStation console. Mr. Burns plays or has purchased titles from Activision Blizzard, including *Call of Duty*.

26. Nicholas Elden is a video gamer located in Hoboken, New Jersey. Mr. Elden plays video games on Xbox, PlayStation, Nintendo Switch, and on mobile devices. Mr. Elden plays or has purchased titles from Activision Blizzard, including *Call of Duty*, *Diablo*, *Tony Hawk*, and others.

27. Jessie Galvan is a video gamer located in San Francisco, California. Mr. Galvan plays video games on the PlayStation 5 console. Mr. Galvan plays or has purchased titles from Activision Blizzard, including *Call of Duty*.

28. Christopher Joseph Giddings-LaFaye is a video gamer located in San Rafael, California. Mr. Giddings plays video games on his personal computer using Windows OS. Mr. Giddings plays or has purchased titles from Activision Blizzard, including *Call of Duty* and *Overwatch*.

29. Steve Herrera is a video gamer located in Oakland, California. Mr. Herrera plays video games on PlayStation consoles and the Nintendo Switch. Mr. Herrera plays or has purchased titles from Activision Blizzard, including *Call of Duty* titles, *Overwatch*, *Overwatch 2*, *Crash Bandicoot*, and *Marvel Ultimate Alliance*.

30.     Hunter Joseph Jakupko is a video gamer located in Los Angeles, California. Hunter Joseph Jakupko plays video games on Xbox and PlayStation consoles as well as his personal computer using Apple OS. Mr. Jakupko plays or has purchased titles from Activision Blizzard, including *Call of Duty: Modern Warfare 2*, *Call of Duty: Warzone 2*, *World of Warcraft*, *and Overwatch 2*.

31.     Daniel Dermot Alfred Loftus is a video gamer located in San Rafael, California. Mr. Loftus plays video games on PlayStation consoles. Mr. Loftus plays or has purchased titles from Activision Blizzard, including *Call of Duty* and *Overwatch*.

32.     Beowulf Edward Owen is a video gamer located in Las Cruces, New Mexico. Mr. Owen plays video games on his personal computer using the Windows operating system and Xbox consoles. Mr. Owen plays or has purchased titles from Activision Blizzard including *Call of Duty* and *Overwatch*.

33.     Ivan Calvo-Perez is a video gamer located in San Francisco, California. Mr. Calvo-Perez plays video games on the PlayStation consoles and on his personal computer using Windows OS. Mr. Calvo-Perez plays or has purchased titles from Activision Blizzard, including *Call of Duty*, *Diablo*, *Starcraft*, and *Warcraft 3*.

**Microsoft Corporation**

34.     Defendant Microsoft Corporation is a corporation incorporated under the laws of the State of Washington with its principal place of business in Redmond, Washington. Microsoft is a global technology company.

35.     Microsoft manufactures and sells the Xbox gaming console, a gaming platform capable of processing video games developed for the platform and offers for sale related services.

36.     For the most recent generation of Xbox consoles Microsoft sold 7.47 million units by July 2022, nearly the same number as its closest competitor, the Sony PlayStation.

37.      Microsoft CEO Satya Nadella announced that the company was "the market leader in North America for three quarters in a row among next gen consoles," in a July 26, 2022 earnings call.

38.     Microsoft owns and develops the Windows operating system. Windows is the primary computer operating system for which computer video games are developed.

39.     Microsoft's Windows' market share of computer operating systems is roughly 70–80% worldwide. For computer gaming, that share is roughly 90%.

40.     This market share is also reflected in the number of games developed and available for the Microsoft Windows operating system compared to other operating systems.

41.     Microsoft is a developer, publisher, and distributor of video games for consoles, PCs, and mobile devices.

42.     Microsoft owns 23 different game development studios, including some of the largest. According to Microsoft, Microsoft is "responsible for developing and publishing some of the biggest video game franchises in history," including *Age of Empires*, *Forza*, *Gears of War*, *Halo*, *Minecraft*, *Fallout*, *Microsoft Flight Simulator*, *DOOM*, *The Elder Scrolls*, and many more.

43.     Microsoft is one of the only game developers and publishers that can afford to invest the time, funding, and human resources required to develop and sustain top game franchises like *Minecraft* or *Halo*.

44.     According to a report by the Congressional Research Service, Microsoft is the largest single video game publisher in the United States by market share.

45.     Microsoft distributes games through the Microsoft Store, which sells Xbox and Windows PC games.

46.     Microsoft also distributes games through its Game Pass subscription services that allow consumers to pay a monthly fee to have access to an entire library of games on either Xbox or Windows PC or both.

47.     In March of 2022, Game Pass accounted for about 60% of the video game subscription market already.

48.     Microsoft offers cloud gaming through its Xbox Cloud Gaming service.

49.     Cloud-based gaming is a new model of gaming in which users connect to remote gaming servers through the internet.

50. Microsoft operates cloud-based gaming servers at data centers located throughout the world. Microsoft hosts games on these servers and streams them to a user's devices.

51. The server runs the game and processes gamer inputs in real-time, replicating the experience of playing games natively.

52. Since the video games are processed on the server and not the user's device, cloud-based gaming allows users to play video games on virtually any device, so long as it has a sufficiently fast internet connection.

53. Microsoft also owns and runs its Azure cloud services.

54. Azure is used primarily for enterprise and business server solutions, but it is also used as a backend platform for hosting and supporting live games, called Azure PlayFab, which supports live multiplayer games such as Microsoft's Minecraft. Microsoft also uses its Azure cloud services for cloud-based gaming.

55. PlayFab is a complete server-side platform to create, manage and run real-time games. Microsoft launched this backend development solution in 2014.

## BACKGROUND

56. The video game industry is a fast-evolving, and quickly growing modern industry.

57. Revenue in the video game industry is projected to reach $197 billion this year, with an annual growth rate of 7.67%, reaching $285 billion by 2027.

58. In 2021, there were an estimated 3.24 billion consumers of video games globally (roughly half the world's population), with 226.6 million gamers in the United States alone.

59. That equates to roughly 68% of the U.S. population playing some form of video games, after a 30% increase during the Covid-19 pandemic in 2020.

60. As with many other tech industries, the video game industry changes rapidly with technological advances and creative innovation. The industry has changed dramatically from its humble beginnings roughly 50 years ago, when *Pong* was released in 1972.

61. In recent years, the trend towards concentration of power in the video game industry has increased dramatically.

62. In 2021 alone, there were 1,159 mergers worth a total of $85.4 billion, the highest in history and over three times the deal value of mergers in the video game industry in 2020.

63. That number was quickly surpassed just six months into 2022, which saw $107 billion spent on acquisitions across 651 transactions.

64. The rapid concentration of the video game industry has not escaped notice by industry participants and consumers. Nathan Brown, a game consultant and industry author, suggested that the video game industry is "concentrating power overwhelmingly in the hands of . . . [a] small number of corporations."

65. On January 18, 2022, Microsoft announced plans to acquire Activision Blizzard. Microsoft agreed to pay $68.7 billion ($68,700,000,000.00) in an all-cash transaction. Under the proposed terms of the merger, Microsoft would acquire all the outstanding stock of Activision Blizzard. Upon completion of the deal, Activision Blizzard would be wholly owned by Microsoft.

66. The unlawful acquisition agreement requires Microsoft to pay Activision Blizzard a "reverse termination fee" if the merger is unable to proceed due to challenge under the antitrust laws. The agreement provides that Microsoft will pay Activision Blizzard a reverse termination fee of $2 billion if terminated prior to January 18, 2023, $2.5 billion if terminated after January 18, 2023, or $3 billion if terminated after April 18, 2023.

**Activision Blizzard**

67. Activision Blizzard, Inc. is a corporation incorporated under the laws of the State of Delaware with its headquarters and principal place of business in Santa Monica, California.

68. Activision Blizzard is a video game developer, publisher, and distributor. It creates, publishes, and sells video games across multiple platforms, including Xbox, PlayStation, Windows and Apple PCs, and mobile devices.

69. Activision Blizzard has developed and published some of the most popular game franchises in history, such as *Call of Duty*, *World of Warcraft*, *StarCraft*, *Overwatch*, *Diablo*, and *Candy Crush*, among others.

70. Activision's *Call of Duty* franchise is considered to be one of the most successful and important gaming franchises in the console gaming market.

71. *Call of Duty* is currently one of the largest game franchises by user base and revenue.

72. *Call of Duty* has ranked in the top games available on a console for many years and has a high level of awareness amongst gamers and draws a large and loyal user base to the platforms on which it is played. It has been consistently successful for nearly a decade.

73. There exist very few franchises that can be considered alternatives to *Call of Duty* or match its level of success.

74. Activision Blizzard is one of the few game developers and publishers that can afford to invest the time, funding, and human resources required to develop and sustain a game franchise like *Call of Duty* or *World of Warcraft*.

75. Activision Blizzard is currently considered the second largest video game publisher in the United States, with a market share of 10%, behind only Microsoft.

76. There are only several independent game publishers in the world that are capable of making the highest production quality and most graphics-intensive video games that can be mass marketed and are highly anticipated among gamers (generally referred to as "AAA" or "Triple-A" games), including Activision Blizzard, Electronic Arts, Take-Two, and Ubisoft. Microsoft and Sony are also Triple-A game publishers.

77. Activision Blizzard is also a video game distributor, selling its gaming content through its digital store front, www.battle.net.

**Video Game Platforms**

78.     Video games are developed and published for specific platforms that run the gaming content. Video game platforms are generally any system—a combination of hardware and software—that plays video game programs, or what is often referred to as "gaming content."

79.     Video game platforms process and run the gaming content developed for the platform. Thus, all of the gaming content – the actual video games being played – come from the development of the gaming content, not from the platform. Without video games developed for a platform, a video game platform does not have any gaming content of its own.

80.     Video game platforms are generally divided into four major categories: console systems, personal computers, mobile devices, and cloud-based gaming services.

a)   **Console Gaming**

81.     Console systems are hardware devices that connect directly to a TV or monitor and allow users to play video games. The latest generation of consoles utilizing the latest technology are referred to as "next gen" consoles. Next gen consoles generally cost around $500.

82.     The console itself provides the processing function for game play.

83.     By using a console controller, a user plays games that are displayed typically on a television monitor.

84.     Only games specifically designed and engineered for that console will play on the console.

85.     Some large franchises offer cross-platform interoperability, where the game allows online play between players using different gaming consoles or platforms.

86.     Users must purchase the console system and must also purchase the gaming content designed for that console.

87.     For the past 20 years, there have only been three major manufacturers of gaming consoles. Microsoft makes Xbox consoles, including the most recent Xbox Series X and Series S. Sony Group Corporation ("Sony") makes PlayStation consoles, including the most recent

PlayStation 5. Nintendo Co. Ltd. ("Nintendo"), makes various console systems, including the most recent Nintendo Switch.

88. Console manufacturers produce new generations of their consoles roughly every four to seven years. Each new generation of consoles generally features the latest technological advances in console gaming, and allows users to play ever more graphically and computationally advanced games.

89. Game designers and engineers design games to make use of such increased processing power or new features.

90. New games are ordinarily not backwards compatible with prior versions of consoles.

91. Users must purchase the latest-generation consoles in order to play the newest and best games.

92. Nintendo consoles, like the Nintendo Switch, are far less powerful than the Microsoft Xbox Series X or the Sony PS5. Thus, Microsoft and Sony are the only two producers of the high-performance segment of consoles that includes only the most technologically advanced consoles, which can run the most graphically and computationally complex games at the highest levels.

93. Nintendo consoles and their games tend to cater to a younger and more casual gaming audience.

94. As such, Xbox and PlayStation are much more similar and substitutable for one another, whereas Nintendo has largely carved out a niche that does not compete as heavily with Xbox or PlayStation.

95. Most console games are developed in different versions to be played on different consoles. Individual games will often have both an Xbox version, compatible with an Xbox console, and a PlayStation version, compatible with a PlayStation console. Some games, however, are exclusive titles, only able to be played on an Xbox, PlayStation, PC, or Nintendo console and not the other systems.

**b) PC Gaming**

96.     Games can also be played on personal computers ("PC"),[1] which provide the processing of gaming content.

97.     Most personal computers may be used to play video games. All personal computers can run some video games in addition to their other uses, however, only computers with sufficiently advanced graphical processors and other specifications are able to process and run the most graphically advanced and latest gaming content.

98.     Players utilizing a PC generally use their keyboard and mouse as opposed to a specifically designed controller.

99.     As the computing and graphics processing power of PCs increase, game developers and publishers design games to make use of increased processing power.

100.     Each video game is programmed for a specific computer operating system, and users purchase video games specifically programmed for the operating system of their personal computer.

101.     PC games are generally programmed for either the Windows operating system or Apple's operating system, but gamers play on Windows PC much more than on Apple computers. Windows makes up roughly 90% of the PC gaming market.

102.     Just as with consoles, as PC technologies advance and more advanced video games are developed, users must occasionally upgrade the graphical and computational processing power of their PCs to play the most technologically advanced games.

103.     PCs are primarily used for personal and business functionality rather than playing video games.

104.     PCs are largely produced and marketed to consumers for use irrespective of their video-game-playing potential.

---

[1] Although the term "PC" means personal computer, the term "PC" is often used to mean specifically a Windows or non-Apple computer. This complaint uses the term PC to mean any computer, including Apple computers. However, given that roughly 90% of computer gaming occurs on Windows computers, the two meanings of the term are largely interchangeable with respect to PC-gaming

105. Similarly, the operating systems of PCs are primarily designed for broad functionality, and not solely for gaming.

106. However, because of the popularity of gaming on PCs, the ability of the operating system and the hardware specifications of a PC to be able to run games is an important factor in consumer choice.

107. Another important factor is the quality and quantity of the games programed for that type of device.

108. Most console games are also developed to be played on personal computers.

109. Most popular games can be purchased for use on a console (Microsoft Xbox or Sony PlayStation) and for use on a Windows personal computer. Some games are also made for Apple computers as well.

110. *Call of Duty* for example, made by Activision Blizzard, has been developed for the Xbox, the PlayStation, and for Windows PCs, and can be purchased for all three of those platforms.

111. To play on any of these platforms a user would still need to buy the proper version designed for that platform.

c) **Mobile Gaming**

112. Games can also be played on mobile devices, such as mobile smartphones or tablets. Smartphones allow users to install games through the smartphones' app stores.

113. Mobile gaming, however, is largely targeted at a different user base than console or PC gaming, in part due to the different gaming experience.

114. Players are able to play games directly on their phone, typically with touch-based control systems, without needing to use another device besides their phone or other mobile device.

115. While consoles and PC games can provide very similar (if not identical) gaming experiences due to the similarities between hardware capabilities and complex user controls,

mobile gaming currently lacks the technical capabilities to play the majority of console and PC games.

116. Thus, the majority of mobile gaming consumers use smartphones to play more casual games, such as *Candy Crush*, or *Words with Friends*.

117. As such, mobile gaming is generally not substitutable with console and/or PC gaming and constitutes a separate market.

**d) Cloud-Based Gaming Services**

118. Cloud-based gaming services allow users to play video games on virtually any device, so long as they have a strong internet connection.

119. In cloud-based gaming, the service provider runs the hardware to process the video game on servers and computer systems, and then streams the video game to the user's device remotely through the internet.

120. The fundamental reason for cloud-based gaming is that the user does not need a device with the capabilities to process the intense graphics of many Triple-A games and can instead stream the video game to virtually any device with a fast internet connection, such as a smartphone, tablet, Smart TV, or lower-end PC.

121. Numerous companies have begun to try to develop cloud-based gaming services, such as Google's Stadia, Amazon's Luna, Shadow, Microsoft's Xbox Cloud Gaming, and PlayStation Now.[2]

122. Cloud-based gaming services are reliant on a pre-existing catalog of games, especially high-end titles, as the games are the critical input.

**Gaming Content**

123. Video games (gaming content) are marketed and distributed to consumers through video game developers, publishers, and distributors.

---

[2] Google Stadia will be shutting down in January 2023 with Google now utilizing Nvidia GeForce Now to provide access to Xbox Cloud Gaming, Amazon Luna, and Google Play for new Chromebooks. Shadow has similarly transitioned to focusing on offering a suite of cloud-based computing solutions, with the company being purchased by OVHcloud to develop a European alternative to Office 365.

### a) **Video Game Developers**

124.    Video game developers, also referred to as "game studios," are the entities that create and design video games. Game developers generally are classified as either indie developers, large-scale developers, or third-party developers. Indie developers are small independent developers, usually employing up to 100 employees with generally limited funding, that create smaller and less marketed games.

125.    Large-scale developers are large organizations that work on many games across multiple platforms, have significantly more funding, and generally make larger games that are mass-marketed to a much broader consumer base. Large-scale developers often have control over extremely popular video game franchises, such as *World of Warcraft* and *Call of Duty* (owned by Activision Blizzard), or *Halo* and *Minecraft* (owned by Microsoft).

126.    Third-party developers are entities that contract with video game publishers to create and develop specific video games for their publisher clients.

127.    Indie developers are entities that create smaller games with less funding and marketing for the same video game platforms as other developers.

### b) **Video Game Publishers**

128.    Video game publishers are the entities that market, monetize, and produce video games for mass distribution. Sometimes, publishers fund video game developers to develop specific games for the publishers. Publishers are usually much larger and more heavily resourced than game developers, as publishers need the resources to ensure the finished game is properly placed in the market, compatible with various video game platforms, and adequately marketed to be profitable. Publishers may also ensure that game support and adequate server space is provided.

### c) **Video Game Distributors**

129.    Video game distributors are the entities that distribute gaming content to consumers. In the past, video game distributors sold video games on discs or cartridges in physical brick-and-mortar retail stores. By 2018, 83% of video game sales were in digital format

and sold to consumers through digital stores that allow consumers to download the video games directly to the device on which they will be played (i.e., consoles, PCs, mobile smartphones).

## RELEVANT PRODUCT MARKETS

### Video Games Are a Relevant Product Market

130. Video games are unique entertainment and competitive pursuits, without similar or substitutable products. Video gamers (or just "gamers"—those who play video games) are unlikely to substitute other types of games (e.g., board games, card games, puzzles) for video games in response to a small but significant price increase.

131. The video game industry recognizes this as shown by the different marketing techniques used for video games and the different pricing structures, as opposed to other forms of entertainment and competitive pursuits. Video games require additional hardware to be able to play, and offer players online connectivity, downloadable content, and other benefits that other entertainment products lack. The industry also recognizes this difference in the different manner of producing video games, with specialized manufacturers, the different methods of marketing video games, the distinct prices of video games with strong price sensitivity, and the specialization of video game publishers when compared to other products.

132. Video games constitute a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

133. The video game market is subdivided into smaller relevant product markets, such as video games for console systems, video games for PCs, video games for mobile devices, Triple-A video games, and cloud-based gaming.

### Console Gaming Constitutes a Relevant Product Market

134. Video games for consoles are unlikely to be substituted by gamers for other video game platforms because a gamer would need to purchase an entirely new platform to play video games designed for another platform, along with new video games developed for another platform, and because the network effects associated with console gaming are sufficient to reduce substitutability between console gaming and other types of platforms.

135.    Console gaming also uses a different user input device—the video game controller—from PC gaming, in which the user generally uses a keyboard and mouse.

136.    The user input device on console gaming is also significantly different from mobile gaming, in which the user uses the touchscreen of a phone or tablet to play the video game.

137.    With console gaming, gamers must purchase the console system (hardware device) used solely for the purpose of gaming, whereas PC gaming requires use of a PC, which many gamers already have access to irrespective of whether they play games on the PC or not. PC gaming is similar to mobile gaming, with most gamers already owning a PC and not requiring the purchase of a separate hardware device solely for gaming. However, for the best gaming experience, and to play the latest and most graphically demanding games, gamers generally must purchase either specific gaming computers or update their non-gaming computers with sufficient hardware upgrades.

138.    Console gaming has distinct customers compared to other gaming products, resulting in the term "console gamer" for those players who prefer to play on console as opposed to PC or otherwise.

139.    The industry recognizes console gaming as a unique product market, shown in the way console gaming is marketed to gamers, and through the distinct online communities that support and uphold console gaming as unique to other platforms.

140.    Some developers produce games solely for console systems and no other platforms.

141.    Console games have a distinct pricing structure.

142.    Mobile gaming's lack of the same quality of hardware and software, completely different user controls, as well as differing titles, different marketing techniques, and different gaming communities and types of games played, make mobile gaming also an unlikely substitute, recognized by the industry.

143.    Console gaming constitutes a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**PC Gaming Constitutes a Relevant Product Market**

144. Video games for PCs are also unlikely to be substituted by gamers for video games on different platforms because a gamer would need to purchase an entirely new platform to play video games designed for another platform.

145. Video games for PCs are also unlikely to be substituted by gamers because the network effects associated with PC gaming are sufficient to reduce substitutability between PC gaming and other types of platforms.

146. PC gaming also uses a different user input device—most often the keyboard and mouse—from console gaming, in which the user uses a gaming controller. If PC gamers wish, some games allow for a controller to be connected to the PC to also allow for using a console controller as an input device.

147. The user input device on PC gaming is also very different from mobile gaming, in which the user uses the touchscreen of a phone or tablet to play the video game.

148. With PC gaming, gamers need only the use of a PC with sufficient specifications, which many gamers already have access to irrespective of whether they play games on the PC or not, as opposed to console gaming, in which users must purchase a separate hardware device designed solely for gaming. Similar to mobile gaming, PC gamers often already have the device needed to play games without having to buy an additional device. However, gamers will often have to pay for specific gaming computers, or hardware upgrades, to play the latest and most graphically intensive games.

149. PC gaming has distinct customers compared to other gaming products, resulting in the term "PC gamer" for those players who prefer to play on PC as opposed to console or otherwise.

150. The industry recognizes PC gaming as a unique product market, shown in the way PC gaming is marketed to gamers, and the distinct online communities that support and uphold PC gaming as unique to other platforms.

151.     PC games have a distinct pricing structure compared to console gaming and gaming on other platforms, such as mobile gaming.

152.     PC games must be specifically developed and programmed for PC operating systems and cannot operate on consoles or other platforms.

153.     Mobile gaming's lack of the same quality of hardware and software, completely different user controls, as well as differing titles, different marketing techniques, and different gaming communities and types of games played, makes mobile gaming also an unlikely substitute, recognized by the industry.

154.     PC gaming constitutes a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**Mobile Gaming Constitutes a Relevant Product Market**

155.     Video games for mobile devices such as smartphones and tablets are also unlikely to be substituted by gamers for video games on different platforms because a gamer would need to purchase an entirely new platform to play video games designed for another platform, and because the network effects associated with mobile gaming are sufficient to reduce substitutability between mobile gaming and other types of platforms.

156.     Mobile gaming also uses a different user input device—the touchscreen on a smartphone or tablet—from console gaming and PC gaming.

157.     With mobile gaming, gamers need only the use of a smartphone or tablet, which many gamers already have access to irrespective of whether they play games on it or not.

158.     Mobile gaming has distinct customers compared to other gaming products, resulting in the term "mobile gamer" for those players who prefer to play on mobile as opposed to console, PC, or otherwise.

159.     The industry recognizes mobile gaming as a unique product market, shown in the way mobile gaming is marketed to gamers, and the distinct online communities that support and uphold mobile gaming as unique to other platforms.

160. Mobile games must be specifically developed and programmed for mobile device operating systems and cannot operate on consoles or other platforms.

161. Mobile games have a distinct pricing structure compared to video games on other platforms.

162. Mobile gaming's lack of the same quality of hardware and software, as well as the vastly different user input controls, means that mobile gaming is largely composed of different types of games than console or PC gaming, and the video games are also targeted at a different user base.

163. Mobile gaming is thus an unlikely substitute to other gaming platforms.

164. Mobile gaming constitutes a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**AAA Video Games Constitute a Relevant Product Market**

165. Triple-A video games ("AAA games") are video games with the highest production values, the best graphical and visual experiences, are the most marketed and widely distributed, and are highly anticipated by industry participants.

166. Triple-A video games are considered unique in the industry, with expectations of high unit sales and revenue, are much more heavily marketed, and are unlikely to be substituted for other video games.

167. Triple-A video games have distinct customers due to their widespread appeal and marketing to the general public as opposed to more limited marketing for other non-Triple-A games.

168. Triple-A video games' prominence and uniqueness in the industry is reflected in the ability of only a small number of companies being able to publish Triple-A games, including Microsoft, Sony, Activision Blizzard, Electronic Arts, Take-Two, and Ubisoft.

169. Triple-A video games have a unique pricing structure compared to other games and command the highest prices. They also often offer additional editions of the game that command a higher price with additional cosmetics, physical goods, or other benefits.

170.    Triple-A video games constitute a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**Video Game Subscription Services Constitute a Relevant Product Market**

171.    Video game subscription services, such as Xbox Game Pass are also unlikely to be substituted by gamers for other rental game services due to the specific titles that the subscription offers, strong network effects, and the ease of obtaining a large catalog of games for a major discount.

172.    Video game subscription services typically cater to customers who are willing to pay for monthly access to a large game library as opposed to purchasing individual games that they will own forever.

173.    The industry recognizes video game subscription services as a unique product market as shown in marketing for game subscription services, the placing of titles by developers on game subscription services as opposed to other means of distribution, and the continued sale of games directly without a game subscription.

174.    Video game subscription services have a distinct price model that allow for multiple games to be available for significantly less cost than buying each game individually.

175.    Video game subscription services are thus unlikely to be substituted for other game discount services, like renting games or multigame bundles.

176.    Video game subscription services constitute a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**Game Console Systems Constitutes a Relevant Product Market**

177.    Game console systems are highly differentiated from other gaming platforms, such as PC operating systems or mobile devices, as they are devices made with the primary purpose of playing video games.

178.    The industry recognizes game console systems as a unique relevant product market as shown by how the industry markets games for specific consoles, designs game primarily for the use of console controller inputs, and markets games specifically for use on consoles.

179.    Game console systems constitute a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**High-Performance Console Systems Constitutes a Relevant Product Market**

180.    High-performance consoles systems are highly differentiated from other consoles, such as Nintendo's consoles, which do not incorporate the latest graphical advances and cannot play the most advanced games at the highest level.

181.    High-performance console systems constitute a unique relevant market that does not include Nintendo's most recent console, the Nintendo Switch.

182.    Microsoft's latest Xbox consoles and Sony's latest PlayStation console are both considered in the industry to be "next gen" consoles, but the Nintendo Switch is not.

183.    The Nintendo Switch was released in 2017, the latter half of what is considered the eighth generation of gaming consoles, which had begun in approximately 2013.

184.    The Nintendo Switch has lower computational performance, more in line with Microsoft's and Sony's eighth generation consoles than their current ninth generation consoles.

185.    The Nintendo Switch is instead focused on permitting portable, handheld use, sacrificing computing power which leaves the Nintendo Switch unable to play some of the more advanced games that require the Xbox Series X or PlayStation 5.

186.    The Nintendo Switch offers a different catalog of games, and focuses on casual and family gaming.

187.    The difference in computing power is reflected in a lower price for the Nintendo Switch, which retails at $299.99 as opposed to the Xbox Series X and PlayStation 5, which retail at $499.99.

188.    The industry recognizes high-performance console systems as a unique product market, shown in how the industry markets high-end console gaming and high-end consoles to gamers and the new exclusive gaming titles only available on high-end consoles. It is also reflected in use of the term "next-gen" consoles.

189. High-performance console systems constitute a line of commerce and a unique product market within the meaning of Section 7 of the Clayton Act.

**Computer Operating Systems Constitute a Relevant Product Market**

190. PC operating systems, such as Windows OS, are unlikely to be substituted by video gamers for other video game operating systems, due to the specific titles that the operating system offers, strong network effects, and non-gaming related benefits to an operating system, such as familiarity of use and use outside of gaming for PCs.

191. PC operating systems appeal to a different customer base than those for other video game platforms due to their additional options beyond gaming and unique capabilities from gaming consoles.

192. The industry recognizes the PC operating market as a unique product market as seen in their provision of games to specific operating systems, limitation of titles to only operating systems and not consoles, and individual distribution systems for different operating systems.

193. PC operating systems are priced differently than consoles or other video game platforms due to their additional uses outside gaming and the customization options for heightened performance.

194. PC operating systems are thus unlikely to be substituted for other video game platforms.

195. PC operating systems constitute a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**Cloud-Based Gaming Constitutes a Relevant Product Market**

196. Cloud-based gaming services are unique to all other traditional gaming platforms.

197. Cloud-based gaming is unique in that the user does not need any particular hardware platform, because the video game is instead processed on the service provider's servers remotely and streamed to the user. The gamer can thus play cloud-based gaming on virtually any device so long as it has a screen, sufficient user input controls, and a fast internet connection.

198.    Cloud-based gaming appeals to a different set of consumers by allowing flexibility on which devices are used to play video games.

199.    However, the nature of playing through the "cloud" brings inherent issues unique to this platform of gaming, such as inherent latency, or "lag," between when the user presses input controls and when the video game responds. This latency is a product of internet speeds, as well as the proximity of the service provider's physical servers to the user.

200.     Moreover, a gamer that utilizes cloud-based gaming cannot substitute video games on other platforms because the gamer would need to purchase the alternate gaming platform before playing video games designed for other platforms.

201.    Cloud-based gaming, as it does not require an additional device to play video games, operates in a distinct pricing structure that offers the cloud-based gaming as a standalone product.

202.    The industry recognizes cloud-gaming as a unique product market, shown in the way that new cloud-based gaming services are marketed to gamers, and demonstrated by the fact that cloud-gaming does not have the same video games available to play as other platforms enjoy.

203.    Cloud-based gaming services constitute a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

## **GEOGRAPHIC MARKET**

204.    With respect to the challenged conduct in the above markets, the United States is the relevant geographic antitrust market.

205.    Prices of video games in the United States are generally not constrained by the prices of video games in other countries.

206.    Game publishers and distributors generally price video games at highly differentiated prices by country, and consumers are largely unable to purchase games in other countries to take advantage of lower prices.

207.    Consumers are unable to buy physical copies of games in retail stores in other countries and are prevented by digital game stores from purchasing another countries' version of the same game (a practice known as "region locking").

208.    In addition, regulations and competition dynamics are generally differentiated by country.

209.    Not all nations have access to Microsoft Xbox services or consoles. Other nations have access to all consoles and systems, but have differing market shares based on internal considerations, such as Japan being dominated by Sony's PlayStation despite Microsoft's near equivalent market share in nations like the United States.

210.    Language barriers also prevent consumers from purchasing video games designed for other countries and sold in storefronts designed for other countries.

211.    The United States constitutes a relevant geographic antitrust market in the video game industry.

## COUNT 1

### Violation of Section 7 of the Clayton Act (15 U.S.C. § 18)

212.    Plaintiffs allege and incorporate paragraphs 1–212 as if alleged herein.

213.    On January 18, 2022, Microsoft announced plans to acquire Activision Blizzard. Microsoft agreed to pay $68.7 billion ($68,700,000,000) in an all-cash transaction.

214.    Under the proposed terms of the merger, Microsoft would acquire all the outstanding stock of Activision Blizzard. Upon completion of the deal, Activision Blizzard would be wholly owned by Microsoft.

215.    As Microsoft states, the consolidation would make Microsoft the world's third-largest gaming company by revenue.

216.    Microsoft has stated it expects the acquisition to close sometime in 2023.

217.    The unlawful acquisition agreement further requires Microsoft to pay Activision Blizzard a "reverse termination fee" if the merger is unable to proceed due to challenge under the antitrust laws. The agreement provides that Microsoft will pay Activision Blizzard a reverse

termination fee of $2 billion if terminated prior to January 18, 2023, $2.5 billion if terminated after January 18, 2023, or $3 billion if terminated after April 18, 2023. As a material provision of the unlawful acquisition agreement, the "reverse termination fee" is void and unenforceable.

**The Merger May Substantially Lessen Competition or Tend to Create a Monopoly**

218. The effect of the proposed acquisition may be substantially to lessen competition, or tend to create a monopoly, in interstate trade and commerce in the relevant markets in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

219. The proposed acquisition of Activision Blizzard by Microsoft is part of a dramatic wave of consolidation and stands to further lessen competition and harm consumers. The merger follows a long history of concentration in the markets by both Microsoft and Activision Blizzard and may serve to further consolidate power in the gaming industry.

220. Microsoft has bolstered and cemented its large video game ecosystem through a series of mergers and acquisitions, currently owning 24 different gaming studios, including:

    a. Mojang Studios, acquired on September 15, 2014, and known for games such as *Minecraft* and *Minecraft Dungeons*;

    b. Ninja Theory Ltd., acquired on June 10, 2018, is known for games such as *Devil May Cry* and *Disney Infinity*;

    c. Playground Games Ltd., acquired on June 10, 2018, is known for games such as the *Forza Horizon* and *Forza Motorsport*;

    d. Undead Labs LLC, acquired on June 10, 2018, is known for games such as *State of Decay*;

    e. Compulsion Games Inc., acquired on June 10, 2018, is known for games such as *We Happy Few*;

    f. Obsidian Entertainment Inc., acquired on November 10, 2018, is known for games such as *Pillars of Eternity*, *Knights of the Old Republic*, *Knights of the Old Republic II: The Sith Lords*, *Neverwinter Nights 2*, and *South Park: The Stick of Truth*;

g.     InXile Entertainment, Inc., acquired on November 10, 2018, is known for games such as the *Wasteland* franchise and *Torment: Tides of Numenera*;

h.     Double Fine Productions Inc., acquired on June 9, 2019, is known for games such as *Psychonauts*, *Broken Age*, *Brütal Legend*, and *Grim Fandango Remastered*;

i.     ZeniMax Media Inc., acquired on September 21, 2020, which comprises game studios Bethesda Game Studios, ZeniMax Online Studios, id Software, Arkane Studios, Machine Games, Tango Gamesworks, Alpha Dog Games, and Roundhouse Studios. These studios are known for franchises like *The Elder Scrolls*, *Fallout*, *Wolfenstein*, *Doom*, and *Quake*; and

j.     Rare Ltd., acquired on September 24, 2022, is known for games an franchises such as *GoldenEye 007*, *Perfect Dark*, and *Banjo Kazooie*.

221.     Activision Blizzard owns, among others, *Call of Duty*, *World of Warcraft*, *StarCraft*, *Overwatch*, *Diablo*, and *Candy Crush*.

222.     Activision Blizzard is also the product of many significant mergers and acquisitions, including:

a.     Raven Software Corp., acquired in 1997, and known for its work on *Call of Duty*, *Heretic*, and *Hexen: Beyond Heretic*;

b.     Treyarch Invention LLC, acquired on October 1, 2001, and known for work on the *Call of Duty* series;

c.     Infinity Ward Inc., acquired on October 30, 2003, is known for its work on the *Call of Duty* series;

d.     High Moon Studios Inc., acquired on January 5, 2006 by Vivendi Studios and resultantly Activision Blizzard after acquisition, is known for its work on *Transformers* video games, *Call of Duty*, and *Destiny*;

e.     Vicarious Visions Inc., now known as Blizzard Albany, acquired in January of 2005, is known for work on *Tony Hawk's Pro Skater*;

f.   Radical Entertainment Inc., acquired by Vivendi Games in 2005 and later Activision Blizzard, is known for work on *The Simpsons: Hit & Run*, *Prototype*, *Prototype 2*, and entries in the *Crash Bandicoot* franchise;

g.   Toys for Bob Inc., acquired on May 3, 2005, is known for its work on *Star Control* and *Star Control II*;

h.   Beenox Inc., acquired on May 25, 2005, is known for its work on popular franchises such as *X-Men*, *Spider-Man*, and *Shrek*;

i.   Blizzard Entertainment, Inc., acquired on July 9, 2008 through acquisition of its parent Vivendi Games, which includes games and franchises such as *World of Warcraft*, *Starcraft*, and *Overwatch*;

j.   Sledgehammer Games Inc., acquired in 2009, is known for its work on the *Call of Duty* series; and

k.   King Digital Entertainment PLC, acquired on February 23, 2016, a mobile game conglomerate that has game studios in Stockholm, Malmö, London, Barcelona, Berlin, Singapore, and Seattle with offices in San Francisco, Malta, Seoul, Tokyo, Shanghai, and Bucharest. It is also known for owning the franchise *Candy Crush*, which is the most popular mobile game of all time.

223.   The proposed acquisition of Activision Blizzard by Microsoft poses a substantial threat to the Plaintiffs, and to the public at large, in that the proposed acquisition may substantially lessen competition in each of the relevant product markets, and may cause loss to the Plaintiffs, and the public at large, in the form of higher prices, less innovation, less creativity, less consumer choice, decreased output, and other potential anticompetitive effects, which deprive the Plaintiffs, and the public at large, of the salutary benefits of competition.

224.   The proposed acquisition of Activision Blizzard by Microsoft may also substantially reduce competition in the labor market for video game labor talent.

225. Employees in the video game industry may have substantially less choice among employers, and Microsoft may have outsized market power in hiring and retaining employees in the e video gaming field, which requires specialized talent.

226. This is particularly concerning given that Activision Blizzard is currently engulfed in lawsuits from employees and from the California Department of Fair Employment and Housing, alleging that it engaged in widespread gender discrimination and sexual harassment.

227. Concentration in the market may further limit employees' negotiating power and ability to change employers for improved working environments and compensation.

228. Activision Blizzard is one of Microsoft's primary competitors for top talent in the gaming content industry. The proposed acquisition of Activision Blizzard by Microsoft may reduce the competition for talent in this field.

229. The merger of Microsoft and Activision Blizzard will irreparably harm competition because Microsoft is acquiring, and thereby eliminating one of only a few significant rivals of gaming content creation. The current and future competition between Microsoft and Activision Blizzard will be irretrievably lost.

230. If Microsoft's acquisition of Activision Blizzard is allowed to commence, Microsoft may have far-outsized market power in several key gaming markets, including the labor market, which will allow Microsoft to further inhibit competition.

**The Video Game Industry Is Characterized by Significant Network Effects and Barriers to Entry**

231. The video game industry is characterized by significant network effects and barriers to entry.

232. Gaming consoles or other gaming platforms are only desirable to consumers if the platform offers significant and quality video games for use on that platform.

233. The more innovative and engaging video games a platform offers, the more consumers are willing to purchase or adopt the platform.

234. At the same time, video game developers are more willing to invest in and develop video games for platforms that have a high user base and thus have the potential to sell to a large market of consumers that have adopted the platform.

235. This combination creates a positive feedback loop, where the largest platforms attract the most quality content, which in turn attracts more consumers to the platform, thereby attracting more quality content.

236. This constitutes a substantial barrier to entry, preventing actual or potential competitors from successfully competing or creating new platforms.

237. Microsoft's already substantial gaming ecosystem creates significant network effects that reduce competition and create significant barriers to entry.

238. Video games themselves also have significant network effects. As the Competition and Markets Authority found, "gamers like to be on the same platforms [and games] as their friends to play multiplayer games." Online multiplayer games are more attractive to gamers by the very virtue of their being popular, so that a large online community can sustain quality multiplayer gaming.

239. The most popular online multiplayer games attract even more users through their popularity and the online community that develops, entrenching network effects further.

240. Video games are also critical inputs for gaming platforms to be successful.

241. Gaming platforms allow a user to play video games, and thus, the quantity and quality of the video games that are developed for a given platform are critical to a platform's success, because consumers choose a gaming platform in large part (if not entirely) based on which video games it can play on that platform.

242. Triple-A games play an outsized role for gaming platforms to be successful as they are the most important video games to incentivize players to play on specific platforms.

243. In the video game console market, for example, most video games are currently developed for both Xbox and PlayStation, and thus a consumer who purchases Xbox or PlayStation will have access to play most video games developed for consoles.

244. However, some games are exclusive to the Xbox, PlayStation, PC, or Nintendo systems. If a consumer wishes to play a video game that is exclusive to a given console system, the consumer must purchase the console system on which that game is exclusively developed, in order to play that game.

245. Some video games offer cross-platform interoperability that allows developers to market their games to multiple platforms with the promise that players will be able to play the same game with friends who own different platforms.

246. Video games must also be developed for a particular operating system on PCs.

247. In the PC gaming market, game developers and publishers must choose whether to develop a video game for Windows, Apple, Linux, or other operating systems.

248. For those consumers that wish to play video games on their PC, the quantity and quality of video games programmed for a given operating system is an important factor in deciding which PC and PC operating system to purchase.

249. By making games exclusive to the Windows operating system, competition with respect to operating systems may be reduced.

250. Whether video game developers and publishers choose to develop games for a particular platform or operating system is a critical input for the platform manufacturer.

251. Without substantial and widespread video game development for a particular platform, the platform as a gaming option is unlikely to be successful.

**Microsoft Directly Competes with Activision Blizzard in Game Development for the Console and PC Gaming Markets**

252. As horizontally competitive game developers, Microsoft and Activision Blizzard compete to design, create, promote, and sell the most innovative, enjoyable, and marketable games available to consumers.

253. Microsoft and Activision Blizzard compete to produce games that will sustain gamers' attention and interest and become significantly popular so that they will enjoy the substantial network effects that arise when a critical mass of players plays the game.

254.     Few other game developers have comparable resources and game-development talent to create the most immersive and highly desirable game titles.

255.     Activision Blizzard owns some of the most iconic and popular game franchises in history, including *Call of Duty*, *World of Warcraft*, *StarCraft*, *Overwatch*, *Diablo*, and *Candy Crush*.

256.     Microsoft also owns some of the most iconic and popular game franchises in history, including *Age of Empires*, *Forza*, *Gears of War*, *Halo*, *Minecraft*, *Fallout*, *Microsoft Flight Simulator*, *DOOM*, *The Elder Scrolls*, among others.

257.     If the acquisition of Activision Blizzard by Microsoft were to be completed, Activision Blizzard, an exceptionally strong and important competitor in the game development market, and a significant rival of Microsoft would be eliminated, and competition would be substantially lessened.

**Microsoft Directly Competes with Activision Blizzard in Game Publishing for the Console and PC Gaming Markets**

258.     Microsoft and Activision Blizzard are both video game publishers that compete against each other to publish and market the most popular video games.

259.     Activision Blizzard owns some of the most iconic and popular game franchises in history, including *Call of Duty*, *World of Warcraft*, *StarCraft*, *Overwatch*, *Diablo*, and *Candy Crush*. Activision Blizzard is one of the "Big 4," independent Triple-A video game publishers.

260.     Microsoft also owns some of the most iconic and popular game franchises in history, including *Age of Empires*, *Forza*, *Gears of War*, *Halo*, *Minecraft*, *Fallout*, *Microsoft Flight Simulator*, *DOOM*, *The Elder Scrolls*, and more.

261.     If the acquisition of Activision Blizzard by Microsoft were to be completed, Activision Blizzard, one of only a few Triple-A publishers, and an exceptionally strong and important competitor in the game publishing market, and a significant rival of Microsoft, would be eliminated, and competition would be substantially lessened.

**Microsoft Directly Competes with Activision Blizzard in Game Distribution for the Console and PC Gaming Markets**

262. Microsoft and Activision Blizzard directly compete in the game distribution market.

263. Activision Blizzard owns "www.battle.net," where it sells PC games to consumers.

264. Microsoft owns the Microsoft Store, where it also sells PC games to consumers.

265. Microsoft also provides a game subscription service called Game Pass.

266. If the acquisition of Activision Blizzard by Microsoft were to be completed, Activision Blizzard, an exceptionally strong and important competitor in the game distribution market, and a significant rival of Microsoft, would be eliminated, and competition would be substantially lessened.

**The Proposed Consolidation May Substantially Lessen Current Competition in the Video Game Development, Publishing, and Distribution Markets**

267. Microsoft and Activision Blizzard vigorously compete against one another to develop, create, publish, and sell the most innovative, entertaining, and engaging video games to consumers across multiple genres and platforms.

268. Microsoft is the largest game publisher in the United States, controlling the development, production, and marketing of some of the industry's most popular game franchises.

269. Microsoft has approximately 23.9% of the market share of game publishing in the United States.

270. Activision Blizzard is the second largest video game publisher in the United States, with approximately 10% of the market share.

271. Activision Blizzard is one of only a few independent video game publishers considered capable of reliably publishing Triple-A video games.

272. As the largest publisher in the United States, Microsoft owns numerous video game developers. Microsoft also controls many of the industry's most talented game developers and other key industry personnel.

273. As the second largest publisher in the United States, Activision Blizzard owns numerous immensely popular game titles itself, and also controls a large roster of video game talent working on the next generation of video games.

274. If either company were to fail to deliver adequate quality and experiences in a range of game genres at a competitive price, consumers will choose to purchase other video games that provide better content at a more competitive price.

275. If Microsoft's acquisition of Activision Blizzard were to be completed, one of Microsoft's significant rivals would be eliminated, and competition would be significantly lessened.

**The Proposed Consolidation May Substantially Lessen Competition in the Labor Market**

276. Consolidation may also substantially lessen competition in the market for labor.

277. The talent necessary to develop, design, program, and produce video games is highly technical and specialized. Such employees are highly skilled and sought after. Further, there are only a limited number of large employers like Microsoft and Activision Blizzard in the United States that compete to employ such talent.

278. On information and belief, Microsoft and Activision Blizzard actively compete to recruit talented labor in the video game industry labor market.

279. By consolidating the employment power of these rivals, competition for labor in this industry may substantially lessen.

**The Proposed Consolidation May Give Microsoft Outsized Market Power and the Ability to Further Harm Competition by Foreclosing Inputs to Rivals in the Relevant Markets**

280. The acquisition of Activation Blizzard by Microsoft may result in one of the industry's largest video game companies, with outsized market power and the ability to foreclose key inputs to rivals and further harm competition.

281. Microsoft already controls one of the industry's most popular and largest video game ecosystems. As the largest video game publisher in the United States, Microsoft already has significant market power.

282. Activision Blizzard controls several other of the most important video game franchises, including *Call of Duty*, among others.

283. *Call of Duty* is one of the most important gaming franchises.

284. Between 2010 to 2019, *Call of Duty* titles comprised 10 of the top 15 games sold.

285. The latest installment, Modern *Warfare II*, amassed more than $1 billion in sales within ten days of release.

286. Although *Call of Duty* is currently offered across multiple platforms, including Xbox, PlayStation, and Windows PC, Microsoft's acquisition of Activation Blizzard could change that.

287. Activision Blizzard's games are critical to competition in high-end gaming, having no meaningful substitute.

288. Owning Activision Blizzards' catalog of games would make a material difference in the industry, providing Microsoft's gaming platforms a significant competitive advantage.

289. The proposed acquisition would give Microsoft an unrivalled position in the gaming industry, leaving it with the greatest number of must-have games and iconic franchises.

290. Microsoft would have the ability to foreclose important inputs to rivals of console gaming by making some or all of Activision Blizzard's important catalog of games, including *Call of Duty*, exclusive to Microsoft platforms or partially exclusive.

291. Exclusivity could take the form of "(i) making [Activision Blizzard] content unavailable on rival consoles (i.e. exclusive to Xbox), (ii) making [Activision Blizzard] content available for release on rival console gaming platforms at a later date compared to Xbox (i.e. timed exclusivity), (iii) degrading the quality of [Activision Blizzard] gaming content available to rival console gaming platforms, (iv) making features or upgrades of [Activision Blizzard] games unavailable to other console gaming platforms (i.e. content exclusivity), and/or (v) raising the wholesale price of [Activision Blizzard] content on rival consoles gaming platforms."

292. Currently, Microsoft Xbox and Sony PlayStation systems compete vigorously with one another.

293.    Foreclosing Activision Blizzard titles from appearing on PlayStation would harm competition between Xbox and PlayStation.

294.    Studies show 46% of PlayStation and Nintendo users in the United States would consider subscribing to Microsoft's Game Pass subscription service with the inclusion of Activision Blizzard titles.

295.    Nearly a fifth of this demand is based on the inclusion of the *Call of Duty* Franchise alone.

296.    Given the significant network effects at both the video game and gaming platform levels set forth above, if Microsoft were to make *Call of Duty* and other titles exclusive or partially exclusive to the Xbox or another of Microsoft's gaming platforms or distribution channels, competition could significantly be harmed.

297.    By acquiring Activision Blizzard, Microsoft may have the ability and incentive to engage in strategies to foreclose Sony—Microsoft's closet rival in console gaming platforms— from Activision Blizzard games significantly harming competition.

298.    In addition to console gaming concerns, Microsoft could also foreclose Activision Blizzard's important content on rival PC operating systems, which would substantially harm competition and further cement and maintain Microsoft's monopoly position in the PC operating system gaming market.

299.    For example, Activision Blizzard's *World of Warcraft*, *Diablo*, *Hearthstone*, and *Starcraft,* among others, are currently all developed for Mac in addition to Windows.

300.    Once owned by Microsoft those games, and any other games developed by Microsoft or Activision Blizzard could be developed exclusively for Windows, reducing competition for operating systems.

301.    In fact, Microsoft has engaged in similar practices before, restricting access to games from studios they have acquired.

302.    In 2020, after acquiring ZeniMax Media, which contained the highly popular Bethesda publisher, Microsoft stated it would honor exclusivity commitments made by Bethesda

for one year, and after that determine exclusivity on a case by case basis. Microsoft also assured the European Commission during its regulatory approval of the deal, that Microsoft would not have the incentive to cease or limit making ZeniMax games available for purchase on rival consoles.

303. Bethesda's next title, *Starfield*, will be exclusive to the Xbox consoles and Windows PC, despite prior franchises from that publisher developing games for compatibility with other consoles as well.

304. Microsoft also has made public plans to make other titles from ZeniMax Media, such as the next entry in the popular *Elder Scrolls* franchise, *Elder Scrolls VI*, exclusive.

305. Similar exclusivity decisions were reached after acquiring other studios, such as Obsidian, inXile, and Ninja Theory.

306. Microsoft has currently made public promises to keep Activision Blizzard's game content, including *Call of Duty* available on platforms owned and developed by competitors, like Sony's PlayStation console, but their past history implies these promises are illusory.

307. There is currently intense competition in the nascent market for cloud-based gaming services.

308. Microsoft has launched a cloud-based gaming service, greatly aided, and accelerated by its already existing Azure cloud-server infrastructure, which runs its cloud-gaming services.

309. Just as with any other gaming platform, the video games available on a provider's cloud-gaming service are a critical input, further enhanced by the inherent network effects.

310. For a cloud-gaming service to successfully enter the market, it must have access to a wide range of video games, and in particular must be able to provide users with access to the most popular Triple-A game franchises.

311. Were the combination to proceed, it will provide Microsoft with one of, if not the largest catalog of popular video games.

312. Microsoft would then be able to make those games exclusive to its own cloud-gaming service and foreclose rivals of cloud-based gaming to these critical inputs.

313. Given that cloud gaming is an emerging market that has not gained widespread mainstream adoption yet, and the inherently strong network effects, Microsoft's use of Activision Blizzard's important gaming catalog to foreclose rivals to these important inputs could wipeout competition in these emerging spaces, and create further barriers to entry, thereby further increasing its market power and tending to create a monopoly.

314. Microsoft could also make its gaming catalog, including Activision Blizzard's games, exclusive to its game subscription service, Game Pass, and foreclose rivals of game subscription services to these critical inputs. Game Pass already accounts for roughly 60% of the game subscription market.

315. Microsoft's ability to restrict Activision Blizzard's highly popular game catalog exclusively to Microsoft's cloud-gaming service and game subscription service would impair and foreclose the critical inputs to its competitors and lessen competition.

316. With multi-game subscription services and/or cloud game streaming services by acquiring Activision Blizzard Microsoft may foreclose access to Activision Blizzard games.

317. This would be detrimental to Microsoft's rival distributors of console and PC video games that offer such services, and to its own PC and console video games, which are key for the provision of the nascent services of multi-game subscription and cloud game streaming.

318. Such foreclosure strategies could reduce competition in the markets for the distribution of console and PC video games, leading to higher prices, lower quality, and less innovation for console gaming distributors, which may in turn be passed on to consumers.

319. The proposed acquisition may reduce competition in the market for PC operating systems. Microsoft may reduce the ability of rival providers of PC operating systems to compete with Microsoft's operating system Windows by combining Activision Blizzard's game catalog with Microsoft's cloud-based game streaming to Windows devices.

320. This would discourage video gamers to buy non-Windows PCs.

321.    In addition, Microsoft would receive the ability and incentive to engage in foreclosure strategies using Activision Blizzard's content.

322.    Combined with the rest of Microsoft's multi-product ecosystem, could strengthen network effects, and raise barriers to entry in the supply of cloud gaming services.

323.    Both Microsoft and Activision Blizzard are some of the largest and most influential entities in the video game industry.

324.    In addition to currently competing against one another in video game development, publishing, and distribution, they are both strong, vigorous and viable potential competitors in gaming markets in which they do not currently compete in.

325.    Both competitors have been ready, willing, and able to compete in new gaming markets.

326.    For example, in 2017, Activision Blizzard announced the launch of a new "Consumer Products division," hiring veteran Mattel and Disney executive Tim Kilpin to lead the new division.

327.    Activision Blizzard is thus a massive and vigorous competitor in the industry, already demonstrating its willingness to compete in new markets.

328.    That competition may be irreparably lost if the acquisition is allowed to proceed.

329.    The shape of the gaming industry—and its future—is forged through the competition of these behemoths in the gaming industry.

330.    The competition in the industry brought by Activision Blizzard must be preserved to ensure that the next generation of video game innovation and value are enhanced through competition, not stifled through consolidation.

331.    Unless enjoined, the proposed acquisition may, and most probably would, have the following potential effects in each of the relevant markets, among others:

a.      actual and potential competition between Microsoft and Activision Blizzard would be eliminated;

b. competition within the video game development, publishing and distribution markets would be substantially lessened;

c. competition to hire and retain talent within the specialized video game labor market would be substantially lessened;

d. the merged entity would have outsized market power and the ability and incentive to foreclose critical inputs to rival platform producers, thereby harming rivals' ability to compete effectively;

e. video game quality, innovation, and diversity may decrease;

f. video game output may decrease;

g. video game prices may increase; and

h. Further effects of lessened competition may arise in numerous ways.

332. By reason of this violation, the Plaintiffs are threatened with loss or damage in the form of the ill effects of diminished competition that occurs with the consolidation of power, including but not limited to, reduced quality, innovation and diversity of video games along with increased prices; reduced wages, decreased mobility, and worse working conditions for video game industry employees, the potential further elimination of favored competitors, as well as additional irreparable harm for which damages may be inadequate to compensate Plaintiffs.

333. Plaintiffs are entitled to bring suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief against this proposed acquisition, and to recover their costs of suit, including a reasonable attorney's fee.

## **PRAYER FOR RELIEF**

A. Declaring, finding, adjudging, and decreeing that the agreement to consolidate Microsoft and Activision Blizzard violates Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.

B. Preliminarily enjoining Defendants from consummating the merger, or, if necessary, ordering divestiture, during the pendency of this action.

C.      Permanently enjoining Defendants from consummating the merger or requiring divestiture.

D.      Declaring the contract between the Defendants to be null and void and against the public policy of the United States which declares that competition rather than combination is the rule of trade in the United States;

E.      Declaring the reverse termination fee agreement between Defendants to be null and void and against the public policy of the United States; and

F.      Awarding to Plaintiffs their costs of suit, including a reasonable attorney's fee, as provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

G.      Granting Plaintiffs such other and further relief to which they may be entitled and which the Court finds to be just and proper.

Dated: December 20, 2022

By:         */s/ Joseph M. Alioto*
            Joseph M. Alioto

Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone:   (415) 434-8900
Facsimile:    (415) 434-9200
Email:         jmalioto@aliotolaw.com

Dated: December 20, 2022

By:         */s/ Joseph R. Saveri*
            Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:   (415) 500-6800
Facsimile:    (415) 395-9940
Email:         jsaveri@saverilawfirm.com
             swilliams@saverilawfirm.com
             czirpoli@saverilawfirm.com
             eabuchanan@saverilawfirm.com
             dseidel@saverilawfirm.com

Joseph M. Alioto Jr. (SBN 215544)
**ALIOTO LEGAL**
100 Pine Street, Suite 1250
San Francisco, California 94111
Tel: (415) 398-3800
Email:         joseph@aliotolegal.com

*Counsel for Plaintiffs*

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| See Attachment 1. | MICROSOFT CORPORATION, a Washington corporation |

| **(b)** County of Residence of First Listed Plaintiff    San Francisco<br>*(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant<br>*(IN U.S. PLAINTIFF CASES ONLY)*<br>NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF<br>         THE TRACT OF LAND INVOLVED. |
| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)*<br>See Attachment 2. | Attorneys *(If Known)* |

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1   U.S. Government Plaintiff | ☒ 3   Federal Question<br>      *(U.S. Government Not a Party)* |
| ☐ 2   U.S. Government Defendant | ☐ 4   Diversity<br>      *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*     *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place<br>of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place<br>of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a<br>Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance<br>120 Marine<br>130 Miller Act<br>140 Negotiable Instrument<br>150 Recovery of<br>Overpayment Of<br>Veteran's Benefits<br>151 Medicare Act<br>152 Recovery of Defaulted<br>Student Loans (Excludes<br>Veterans)<br>153 Recovery of<br>Overpayment<br>of Veteran's Benefits<br>160 Stockholders' Suits<br>190 Other Contract<br>195 Contract Product Liability<br>196 Franchise | **PERSONAL INJURY**<br>310 Airplane<br>315 Airplane Product Liability<br>320 Assault, Libel & Slander<br>330 Federal Employers'<br>Liability<br>340 Marine<br>345 Marine Product Liability<br>350 Motor Vehicle<br>355 Motor Vehicle Product<br>Liability<br>360 Other Personal Injury<br>362 Personal Injury -Medical<br>Malpractice | **PERSONAL INJURY**<br>365 Personal Injury – Product<br>Liability<br>367 Health Care/<br>Pharmaceutical<br>Personal Injury Product<br>Liability<br>368 Asbestos Personal Injury<br>Product Liability<br>**PERSONAL PROPERTY**<br>370 Other Fraud<br>371 Truth in Lending<br>380 Other Personal Property<br>Damage<br>385 Property Damage Product<br>Liability | 625 Drug Related Seizure of<br>Property 21 USC § 881<br>690 Other<br><br>**LABOR**<br>710 Fair Labor Standards Act<br>720 Labor/Management<br>Relations<br>740 Railway Labor Act<br>751 Family and Medical<br>Leave Act<br>790 Other Labor Litigation<br>791 Employee Retirement<br>Income Security Act | 422 Appeal 28 USC § 158<br>423 Withdrawal 28 USC<br>§ 157<br><br>**PROPERTY RIGHTS**<br>820 Copyrights<br>830 Patent<br>835 Patent–Abbreviated New<br>Drug Application<br>840 Trademark<br>880 Defend Trade Secrets<br>Act of 2016<br><br>**SOCIAL SECURITY** | 375 False Claims Act<br>376 Qui Tam (31 USC<br>§ 3729(a))<br>400 State Reapportionment<br>☒ 410 Antitrust<br>430 Banks and Banking<br>450 Commerce<br>460 Deportation<br>470 Racketeer Influenced &<br>Corrupt Organizations<br>480 Consumer Credit<br>485 Telephone Consumer<br>Protection Act<br>490 Cable/Sat TV<br>850 Securities/Commodities/<br>Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **IMMIGRATION** | 861 HIA (1395ff)<br>862 Black Lung (923)<br>863 DIWC/DIWW (405(g))<br>864 SSID Title XVI<br>865 RSI (405(g)) | 890 Other Statutory Actions<br>891 Agricultural Acts<br>893 Environmental Matters<br>895 Freedom of Information<br>Act |
| 210 Land Condemnation<br>220 Foreclosure<br>230 Rent Lease & Ejectment<br>240 Torts to Land<br>245 Tort Product Liability<br>290 All Other Real Property | 440 Other Civil Rights<br>441 Voting<br>442 Employment<br>443 Housing/<br>Accommodations<br>445 Amer. w/Disabilities–<br>Employment<br>446 Amer. w/Disabilities–Other<br>448 Education | **HABEAS CORPUS**<br>463 Alien Detainee<br>510 Motions to Vacate<br>Sentence<br>530 General<br>535 Death Penalty<br>**OTHER**<br>540 Mandamus & Other<br>550 Civil Rights<br>555 Prison Condition<br>560 Civil Detainee–<br>Conditions of<br>Confinement | 462 Naturalization<br>Application<br>465 Other Immigration<br>Actions | **FEDERAL TAX SUITS**<br>870 Taxes (U.S. Plaintiff or<br>Defendant)<br>871 IRS–Third Party 26 USC<br>§ 7609 | 896 Arbitration<br>899 Administrative Procedure<br>Act/Review or Appeal of<br>Agency Decision<br>950 Constitutionality of State<br>Statutes |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original<br>Proceeding | ☐ 2 Removed from<br>State Court | ☐ 3 Remanded from<br>Appellate Court | ☐ 4 Reinstated or<br>Reopened | ☐ 5 Transferred from<br>Another District *(specify)* | ☐ 6 Multidistrict<br>Litigation–Transfer | ☐ 8 Multidistrict<br>Litigation–Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Sections 7 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 18, 26)

Brief description of cause:
The acquisition of Activision Blizzard by Microsoft is unlawful under Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18).

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**    ☐ Yes    ☒ No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:

| JUDGE | | DOCKET NUMBER |
|---|---|---|

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

*(Place an "X" in One Box Only)*    ☒ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE    ☐ EUREKA-MCKINLEYVILLE

| DATE   12/20/2022 | SIGNATURE OF ATTORNEY OF RECORD    /s/ Joseph R. Saveri |
|---|---|

## Attachment 1 – Plaintiffs

DANTE DEMARTINI, CURTIS BURNS JR., NICHOLAS ELDEN, JESSIE GALVAN, CHRISTOPHER JOSEPH GIDDINGS-LAFAYE, STEVE HERRERA, HUNTER JOSEPH JAKUPKO, DANIEL DERMOT ALFRED LOFTUS, BEOWULF EDWARD OWEN, and IVAN CALVO-PÉREZ

## <u>Attachment 2 - Plaintiffs' Attorneys</u>

Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email: jmalioto@aliotolaw.com

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
JOSEPH SAVERI LAW FIRM, LLP
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com
swilliams@saverilawfirm.com
czirpoli@saverilawfirm.com
eabuchanan@saverilawfirm.com
dseidel@saverilawfirm.com

Joseph M. Alioto Jr. (SBN 215544)
ALIOTO LEGAL
100 Pine Street, Suite 1250
San Francisco, California 94111
Tel: (415) 398-3800
Email: joseph@aliotolegal.com

# Exhibit 7

1  Rakesh N. Kilaru (*pro hac vice*)
   Anastasia M. Pastan (*pro hac vice*)
2  Jenna Pavelec (*pro hac vice*)
   WILKINSON STEKLOFF LLP
3  2001 M Street NW, 10th Floor
   Washington, DC 20036
4  Telephone: (202) 847-4000
   Facsimile: (202) 847-4005
5  rkilaru@wilkinsonstekloff.com
   apastan@wilkinsonstekloff.com
6  jpavelec@wilkinsonstekloff.com

7  Valarie C. Williams (Bar No. 335347)
   Tania Rice (Bar No. 294387)
8  Alston & Bird LLP
   5600 Mission Street, Suite 2100
9  San Francisco, CA 94105
   Telephone: (415) 243-1000
10 Fax: (415) 243-1001
   valarie.williams@alston.com
11 tania.rice@alston.com

12 *Counsel for Defendant Microsoft Corp.*

13                **UNITED STATES DISTRICT COURT**

14              **NORTHERN DISTRICT OF CALIFORNIA**

15                  **SAN FRANCISCO DIVISION**

| | |
|---|---|
| 16 DANTE DEMARTINI, CURTIS BURNS, JR., NICHOLAS ELDEN, JESSIE GALVAN, | Case No. 3:22-cv-08991-JSC |
| 17 CHRISTOPHER JOSEPH GIDDINGS-LAFAYE, STEVE HERRERA, HUNTER | **DEFENDANT MICROSOFT CORPORATION'S NOTICE OF MOTION** |
| 18 JOSEPH JAKUPKO, DANIEL DERMOT ALFRED LOFTUS, BEOWULF EDWARD | **AND MOTION TO STAY CASE; MEMORANDUM OF POINTS &** |
| 19 OWEN, and IVAN CALVO-PEREZ, | **AUTHORITIES IN SUPPORT THEREOF** |
| 20             Plaintiffs, | Date:     February 16, 2023, or sooner if possible |
| 21          v. | Time:     10:00 a.m. |
| 22 MICROSOFT CORPORATION, a | Location: Courtroom 8 – 19th Floor |
| Washington Corporation, | Judge:    Hon. Jacqueline Scott Corley |
| 23 | |
| 24             Defendant. | |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR RESPECTIVE COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on February 16, 2023 at 10:00 a.m. or as soon thereafter as this Motion may be heard in Courtroom 8 of the United States District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Microsoft Corporation will, and hereby does, move this Court for an order staying all proceedings in this case pending the completion of any regulatory proceedings that would prevent Microsoft and Activision Blizzard King from closing their proposed transaction.

The motion will be made based on this Notice of Motion and Motion, the Memorandum of Points and Authorities herein, the accompanying Declaration of Rakesh Kilaru, all other papers and pleadings on file in this action, and any other written or oral argument or evidence that Microsoft might present to the Court.

### REQUESTED RELIEF

Microsoft requests that the Court exercise its discretion to stay all proceedings in this case.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Microsoft respectfully requests that the Court stay this case.  Plaintiffs' lawsuit has only one purpose:  to enjoin Microsoft's proposed acquisition of Activision Blizzard King.  Though Plaintiffs do not mention it, thirteen days before they filed their complaint, the Federal Trade Commission ("FTC") filed an administrative complaint seeking the same relief.  *See* Ex. C, Docket in *In re Microsoft/Activision Blizzard*, FTC No. 9412; Ex. A, FTC Complaint (Dec. 8, 2022).  Both Plaintiffs and the FTC allege that the proposed acquisition would lessen competition in the video game industry in violation of Section 7 of the Clayton Act.  The only practical distinction between the complaints is Plaintiffs are seeking a preliminary injunction, whereas the FTC presently is not.

There is nothing to preliminarily enjoin.  For almost a year, Microsoft and Activision have been working cooperatively with regulators around the world, including the FTC, to obtain the necessary approvals to close the transaction.  Microsoft and Activision have tried to expedite those processes as much as possible, because the transaction agreement imposes a termination date of July 18, 2023.  *See* Ex. H, Microsoft/Activision Merger Agreement (Jan. 18, 2022), at 84.  But many of those regulatory reviews remain ongoing.  Among them are the European Commission ("EC"), which will review the transaction until at least April 11, 2023, and the United Kingdom's Competition and Markets Authority ("CMA"), which will be examining the transaction until at least April 26, 2023.  The transaction will not close while these and certain other regulatory reviews remain open, and those reviews could result in remedies that would "shape the litigation."  *South Austin Coal. Cmty. Council v. SBC Commc'ns, Inc.*, 191 F.3d 842, 844 (7th Cir. 1999) (Easterbrook, J.).  Further, the FTC has indicated that it may pursue a preliminary injunction to stop the transaction from closing pending the outcome of its lawsuit.

There is accordingly no reason to litigate this case right now.  Microsoft is already litigating the issues presented here in front of the FTC, with the possibility of preliminary injunction proceedings involving the FTC if they become necessary.  And Microsoft is at least several months away from being able to close the transaction.  Judicial economy thus favors staying this action, to avoid needless and duplicative litigation and the risk of inconsistent rulings on identical issues

of fact and law between this case and the FTC proceeding.

Microsoft accordingly requests that the Court stay these proceedings pending the completion of any regulatory proceedings that would prevent Microsoft and Activision from closing their proposed transaction.

## STATEMENT OF ISSUES TO BE DECIDED

Whether to stay all proceedings in this case pending the completion of any regulatory proceedings that would prevent Microsoft and Activision from closing their proposed transaction.

## STATEMENT OF FACTS

This case involves a proposed transaction between the third-place manufacturer of gaming consoles and one of many publishers of popular video games. Defendant Microsoft competes in gaming through its Xbox division. Xbox started behind Nintendo and Sony when it began making consoles 20 years ago, and it remains in third place today. Xbox also has next to no presence in mobile gaming, the fastest-growing segment of gaming and the place where 94% of gamers spend their time today. And Xbox and Activision are just two of hundreds of game publishers, who compete by providing different types of games on different platforms at different prices, ranging all the way down to $0.

On January 18, 2022, Microsoft announced its agreement to acquire Activision Blizzard King ("Activision"). Microsoft's vision for the transaction is simple: Xbox wants to grow its presence in mobile gaming, and three quarters of Activision's gamers and more than a third of its revenues come from mobile offerings. Xbox believes it is good business to make Activision's limited portfolio of popular games more accessible to consumers, by putting them on more platforms and making them more affordable. That includes making *Call of Duty*, one of Activision's most popular games, more broadly available. Microsoft made this public pledge on the day the deal was announced. Since then, Xbox has agreed to provide the game to Nintendo (which does not currently have it) and has offered to continue making the game available to Sony for ten years.

Microsoft and Activision's agreement imposes a termination date of July 18, 2023. *See* Ex. H at 84. Because of that deadline, Microsoft and Activision have been working diligently to

1    ensure that they have regulatory approval to proceed with the acquisition.

2         From the moment the deal was announced, Microsoft and Activision have been working

3    cooperatively with regulators around the world to address any competition-related concerns about

4    the transaction.  Among others, Microsoft has been engaging with the EC and the CMA to obtain

5    their clearance for the transaction.  Both the EC's and CMA's review periods are ongoing and will

6    continue for at least several more months:  the EC's current deadline for completing review is

7    April 11, 2023, and the CMA's deadline is April 26, 2023.  *See* Ex. F, European Commission

8    Docket Notice (Nov. 18, 2022); Ex. G, Competition & Markets Authority Notice of Extension

9    (Jan. 5, 2023).  Microsoft cannot close the transaction while these and certain other foreign

10   regulatory reviews remain open.

11        The FTC also began reviewing the transaction when it was announced.  On December 8,

12   2022, the FTC filed a complaint against Microsoft and Activision before the agency's

13   Administrative Law Judge, alleging that the proposed acquisition violated federal antitrust laws.

14   *See* Ex. A, FTC Complaint (Dec. 8, 2022).  The FTC is seeking to prohibit Microsoft and

15   Activision from combining their businesses (except as approved by the Commission) or any other

16   relief appropriate to remedy the alleged anticompetitive effects of the acquisition.  Trial is currently

17   scheduled for August 2, 2023.  *See* Ex. E, FTC Scheduling Order (Jan. 4, 2023).  Given the time

18   constraints on closing the deal, the parties agreed to an expedited discovery timeline, with fact

19   discovery scheduled to close on April 7, 2023.  *See id.*  The parties agreed to that schedule to

20   accommodate a possible preliminary injunction proceeding by the FTC.  Specifically, if Microsoft

21   obtains the necessary regulatory approvals abroad to close the transaction, expedited discovery

22   will increase the likelihood that any preliminary injunction proceeding can be litigated and

23   resolved by July 18, 2023.

24        Against that regulatory backdrop, and just weeks after the FTC filed its complaint,

25   Plaintiffs, a group of 10 individual gamers, filed this lawsuit and simultaneously moved for a

26   preliminary injunction to block the proposed transaction.  Like the FTC, Plaintiffs allege that the

27   proposed acquisition would lessen competition in various markets within the video game industry

28   in violation of Section 7 of the Clayton Act.  And Plaintiffs seek precisely the same relief—to

-4-

1   block the proposed transaction.

2   **ARGUMENT**

3   **I.      This Court should enter a stay of further proceedings in this case.**

4   This Court has the "discretionary power to stay proceedings." *Lockyer v. Mirant Corp*.,

5   398 F.3d 1098, 1109 (9th Cir. 2005) (citing *Landis v. North American Co*., 299 U.S. 248, 254

6   (1936)).  In determining whether a stay is appropriate, courts consider (i) the "possible damage"

7   that may result if the stay is granted; (ii) the "hardship or inequity" that may result if the stay is

8   denied; and (iii) the "orderly course of justice measured in terms of the simplifying or complicating

9   of issues, proof, and questions of law which could be expected to result from a stay." *Id*. at 1110.

10  Applying those factors, courts in this district "routinely" grant stays "where there are

11  overlapping issues of fact or law" raised in another pending case. *Vance v. Google LLC*, No. 5:20-

12  CV-04696-BLF, 2021 WL 534363, at *3 (N.D. Cal. Feb. 12, 2021); *see, e.g.*, *Noble v. JP Morgan

13  Chase Bank*, No. 22-cv-02879-LB, 2022 WL 4229311, at *9 (N.D. Cal. Sept. 13, 2022) (granting

14  a stay where resolution of related claims in state court would "illuminate similar issues" in the

15  federal lawsuit); *Zurich Am. Ins. Co. v. Omnicell, Inc.*, No. 18-CV-05345-LHK, 2019 WL 570760,

16  at *5–6 (N.D. Cal. Feb 12, 2019) (granting a stay after finding that defendant was "prejudiced" by

17  "having to fight a 'two-front war'") (citation omitted); *McElrath v. Uber Techs., Inc.*, No. 16-CV-

18  07241-JSC, 2017 WL 1175591, at *6 (N.D. Cal. Mar. 30, 2017) (granting a stay where the instant

19  case was "in its early stages" and the outcome of the other case would "have a significant impact

20  on this case").  That is true regardless of "whether the separate proceedings are judicial,

21  administrative, or arbitral in character, and does not require that the issues in such proceedings are

22  necessarily controlling of the action before the court." *Leyva v. Certified Grocers of California,

23  Ltd.*, 593 F.2d 857, 863–64 (9th Cir. 1979).

24  Here, all of the relevant factors weigh in favor of granting a stay of this case.

25  **A.      Plaintiffs will not be harmed by a stay.**

26  Courts are "generally unwilling to presume delay is harmful without specific supporting

27  evidence." *Aliphcom v. Fitbit, Inc.*, 154 F. Supp. 3d 933, 938 (N.D. Cal. 2015).  Here, Plaintiffs

28  cannot provide any evidence of harm from a stay.

-5-

As an initial matter, there is no immediate risk of the transaction closing, because there are several regulatory obstacles to Microsoft completing its proposed acquisition of Activision. The parties cannot close on their deal until they have regulatory approval from foreign regulators including the EC and CMA, and that approval process will take at least several more months. According to their public dockets, the EC's current deadline for completing review is April 11, 2023, and the CMA's deadline is April 26, 2023. *See* Ex. F, EC Docket Notice; Ex. G, CMA Notice of Extension. Given that the parties are meanwhile unable to close the transaction, there is no need to expend court and party resources to temporarily prevent the close of the transaction. *Cf. Cassan Enters., Inc. v. Avis Budget Grp., Inc.*, No. 10-cv-01934-JCC, slip op., at 5 (W.D. Wash. Mar. 11, 2011) ("It is self-evident that Plaintiffs have not suffered any injury from the proposed acquisition: It has not yet taken place.") (emphasis omitted).

Moreover, the FTC's ongoing litigation seeks precisely the same relief that Plaintiffs want—to block Microsoft's proposed acquisition of Activision. *Compare* Ex. A, FTC Complaint, at 23 (seeking a "prohibition against any transaction between Microsoft and Activision that combines their businesses, except as may be approved by the Commission") *with* Plaintiffs' Complaint at 40–41 (seeking to "[p]reliminarily enjoin[] Defendants from consummating the merger" or to "[p]ermanently enjoin[] Defendants from consummating the merger"). Plaintiffs' interests are thus fully represented by the FTC. *Cf. Howard Hess Dental Lab'ys Inc. v. Dentsply* dockfactor into its equitable analysis the effect of another injunction on the plaintiff's showing of injury."). The FTC has statutory authority to seek a preliminary injunction or temporary restraining order to block the acquisition. 15 U.S.C. § 53(a), (b). It has not done so yet because there are other approvals currently preventing the parties from closing. At the January 3, 2023 scheduling conference in the FTC matter, the FTC's trial counsel represented to the ALJ that it would pursue a preliminary injunction in federal court at a later date if it becomes necessary. *See* Ex. D, Transcript of FTC Initial Prehearing Scheduling Conference (Jan. 3, 2023), at 8:7–9.

The EC, the CMA, and the FTC are investigating the same issues raised by the Plaintiffs' claims, the parties cannot close because of ongoing investigations, and the FTC can try to stop the transaction to the extent there is any risk of the parties closing before that case is resolved.

1   Therefore, there is no risk of harm in staying Plaintiffs' case while those regulatory proceedings

2   are ongoing.

3           Under these circumstances, a stay of this case would not harm Plaintiffs.

4       **B.      Microsoft will suffer hardship if a stay is denied.**

5           By contrast, Microsoft will be harmed if a stay is denied. Absent a stay, Microsoft will be

6   forced to simultaneously litigate similar legal and factual issues before two different judges. That

7   two-front litigation would result in unnecessary duplication of litigation efforts and would create

8   a risk of inconsistent rulings. *See Vance*, 2021 WL 534363, at *5.

9           As for duplication, the Plaintiffs' complaint raises many of the same issues as the FTC's

10  complaint, so there is potential for "significant overlap in the discovery in both cases, creating

11  additional expenses" for the parties. *Id.* at *6; *see also Arris Enters. LLC v. Sony Corp.*, No. 17-

12  CV-02669-BLF, 2017 WL 3283937, at *3 (N.D. Cal. Aug. 1, 2017) (noting that without a stay in

13  one action, the parties may "have to conduct multiple depositions of the same witnesses"). For

14  example, both complaints articulate similar theories about the potential anticompetitive effects of

15  the proposed transaction, including that Xbox would allegedly have the incentive to make popular

16  Activision games, like *Call of Duty*, exclusive to Xbox (despite Xbox's public pledge to keep

17  existing Activision games on their existing platforms). Given the considerable overlap between

18  the complaints, there would necessarily be duplicative discovery. That unnecessary expense and

19  inefficiency would be avoided if the Court stays this case while the FTC case is ongoing.

20          As for the risk of inconsistent rulings, both complaints rest on a number of shared threshold

21  questions, the answers to which could lead to different conclusions about the ultimate antitrust

22  claims. For example, both complaints will require a determination of the relevant product markets

23  and of the scope of the relevant geographic market for these claims. If the two tribunals

24  simultaneously consider those questions, there is considerable "potential for inconsistent rulings

25  and resulting confusion." *Vance*, 2021 WL 534363, at *5 (quotation omitted); *see also SST*

26  *Millennium LLC v. Mission St. Dev. LLC*, No. 18-CV-06681-YGR, 2019 WL 2342277, at *5 (N.D.

27  Cal. June 3, 2019) (finding that denying a stay would pose "hardship" to the moving party due to

28  the "possibility of inconsistent and adverse rulings" in the parallel action). And there are many,

many other overlapping questions between the two cases. For example, both complaints make similar allegations about the anticompetitive effects of the transaction:

- Both complaints allege that the acquisition would give Microsoft the ability and incentive to withhold Activision games, like *Call of Duty*, from other platforms;

- Both complaints allege that the acquisition would give Microsoft the ability and incentive to degrade the quality of Activision games, like *Call of Duty*, provided to other platforms; and

- Both complaints allege that the acquisition will allow Microsoft to increase its market power in subscription services and cloud gaming.

Those overlapping questions, and others, further amplify the risk that simultaneous proceedings could "produce a number of factually and legally inconsistent rulings." *Aliphcom*, 154 F. Supp. 3d at 939–40.

There is simply no benefit to litigating the same issues twice—particularly where the resolution of the FTC proceeding, which was first filed, could render the other litigation moot. *See Vance*, 2021 WL 534363, at *5. Indeed, courts regularly dismiss private plaintiffs' antitrust claims when the relief sought by the private plaintiffs has already been secured by a government enforcement action. *See, e.g.*, *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 765 (9th Cir. 2018) (affirming district court's dismissal of private plaintiffs' antitrust claims where "the DOJ reached a settlement to 'prevent increased concentration' in the market"); *Edstrom v. Anheuser-Busch InBev SA/NV*, No. C 13-1309 MMC, 2013 WL 5124149 (N.D. Cal. Sept. 13, 2013) (dismissing private plaintiffs' antitrust claims where the merging parties had revised their agreement to avoid the alleged anticompetitive behavior pursuant to a court order in a DOJ enforcement action); *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. CIV. 13-2664 ADM/SER, 2014 WL 943224, at *9 (D. Minn. Mar. 11, 2014) (dismissing private plaintiffs' request for injunctive relief where the requested relief "duplicates the FTC Order").

The hardship that would result from denying the stay here thus weighs in favor of granting it.

DEFENDANT MSFT'S MOTION TO STAY CASE

C.   **A stay will promote the orderly course of justice.**

Finally, judicial economy strongly favors a stay of this action.  Generally, "[d]uplication of case management tasks by multiple courts is not an economical use of judicial resources." *Vance*, 2021 WL 534363, at *6.  When considering whether to grant a stay, courts thus consider the potential for "simplifying or complicating of issues, proof, and questions of law." *Lockyer*, 398 F.3d at 1110 (quotation omitted).

As discussed above, there is considerable overlap between the legal and factual issues presented in this case and the ongoing FTC litigation.  Staying this case while the FTC litigation is ongoing would thus simplify the issues in this matter. *See SST Millennium*, 2019 WL 2342277, at *5 ("[G]iven the interdependence and identical nature of plaintiffs' claims against each defendant, resolution of plaintiffs' claims against [the defendant in one action] will simplify issues, proof, and questions of law with respect to the claims" at issue in the other.") (citation and quotation omitted).  Although the FTC's rulings are not binding on this court, "the discovery and the rulings can still benefit this case." *Arris Enters. LLC*, 2017 WL 3283937, at *4.  By allowing the FTC to "resolve some of these overlapping issues" in the first instance, this Court can avoid inconsistent rulings and the prospect of wasting judicial resources on duplicative efforts. *Vance*, 2021 WL 534363, at *6.  Indeed, as the Seventh Circuit has explained, "[c]ourts often wait for agencies, even when the agencies' views are not legally conclusive not only because the agencies may have something helpful to say, but also because what the agencies do may shape the litigation." *South Austin*, 191 F.3d at 844.

The orderly course of justice would therefore be served by entering a stay in this case.

II.   **CONCLUSION**

For the foregoing reasons, Microsoft respectfully requests that the Court grant its motion to stay further proceedings in this case.  While the case is stayed, Microsoft will provide the Court with timely updates of any material developments in the ongoing regulatory proceedings.  If a stay is entered, Microsoft would be willing to provide timely updates regarding any material developments in the regulatory proceedings that would affect the timing of closing the transaction.

1    Dated:    January 11, 2023

2

3
                                              By:    /s/ Rakesh N. Kilaru
4                                                    Rakesh N. Kilaru (*pro hac vice*)
                                                     Anastasia M. Pastan (*pro hac vice*)
5                                                    Jenna Pavelec (*pro hac vice*)
                                                     WILKINSON STEKLOFF LLP
6                                                    2001 M Street NW, 10th Floor
                                                     Washington, DC 20036
7                                                    Telephone: (202) 847-4000
                                                     Facsimile: (202) 847-4005
8                                                    rkilaru@wilkinsonstekloff.com
                                                     apastan@wilkinsonstekloff.com
9                                                    jpavelec@wilkinsonstekloff.com

10                                                   Valarie C. Williams (Bar No. 335347)
                                                     Tania Rice (Bar No. 294387)
11                                                   Alston & Bird LLP
                                                     5600 Mission Street, Suite 2100
12                                                   San Francisco, CA 94105
                                                     Telephone: (415) 243-1000
13                                                   Fax: (415) 243-1001
                                                     valarie.williams@alston.com
14                                                   tania.rice@alston.com

15                                                   *Counsel for Defendant Microsoft Corp.*

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:22-cv-08991-JSC                          DEFENDANT MSFT'S MOTION TO STAY CASE

Rakesh N. Kilaru (*pro hac vice*)
Anastasia M. Pastan (*pro hac vice*)
Jenna Pavelec (*pro hac vice*)
WILKINSON STEKLOFF LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
Facsimile: (202) 847-4005
rkilaru@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
jpavelec@wilkinsonstekloff.com

Valarie C. Williams (Bar No. 335347)
Tania Rice (Bar No. 294387)
Alston & Bird LLP
5600 Mission Street, Suite 2100
San Francisco, CA 94105
Telephone: (415) 243-1000
Fax: (415) 243-1001
valarie.williams@alston.com
tania.rice@alston.com

*Counsel for Defendant Microsoft Corp.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DANTE DEMARTINI, CURTIS BURNS, JR., NICHOLAS ELDEN, JESSIE GALVAN, CHRISTOPHER JOSEPH GIDDINGS-LAFAYE, STEVE HERRERA, HUNTER JOSEPH JAKUPKO, DANIEL DERMOT ALFRED LOFTUS, BEOWULF EDWARD OWEN, and IVAN CALVO-PEREZ,<br><br>            Plaintiffs,<br><br>        v.<br><br>MICROSOFT CORPORATION, a Washington Corporation,<br><br>            Defendant. | Case No. 3:22-cv-08991-JSC<br><br>**[PROPOSED] ORDER GRANTING DEFENDANT MICROSOFT CORPORATION'S NOTICE OF MOTION AND MOTION TO STAY CASE; MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:     February 16, 2023, or sooner if possible<br>Time:     10:00 a.m.<br>Location: Courtroom 8 – 19ʰ Floor<br>Judge:    Hon. Jacqueline Scott Corley |

**[PROPOSED] ORDER**

Defendant Microsoft moved to stay all proceedings in this case pending the completion of any regulatory proceedings that would prevent Microsoft and Activision Blizzard King from closing their proposed transaction.

After considering the briefs, the arguments of counsel, and the evidence of record, the Court GRANTS Defendant's Motion to Stay and STAYS the case pending further action from this Court. Defendant SHALL provide timely updates regarding any material developments in the regulatory proceedings that would affect the timing of closing the transaction.

**IT IS SO ORDERED.**

Date: _____, 2023          _____

Hon. Jacqueline Scott Corley

UNITED STATES DISTRICT COURT JUDGE

# Exhibit 8

Valarie C. Williams (Bar No. 335347)
Tania Rice (Bar No. 294387)
Tyler Blake (Bar No. 316623)
Alston & Bird LLP
560 Mission Street, Suite 2100
San Francisco, CA 94105
Telephone: (415) 243-1000
valarie.williams@alston.com
tania.rice@alston.com
tyler.blake@alston.com

B. Parker Miller (*pro hac vice to be filed*)
Alston & Bird LLP
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309
Telephone: (404) 881-7000
parker.miller@alston.com

Rakesh N. Kilaru (*pro hac vice*)
Anastasia M. Pastan (*pro hac vice*)
Jenna Pavelec (*pro hac vice*)
Wilkinson Stekloff LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
rkilaru@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
jpavelec@wilkinsonstekloff.com

*Counsel for Defendant Microsoft Corporation*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

DANTE DEMARTINI, *et al.*,

Plaintiffs,

v.

MICROSOFT CORPORATION,

Defendant.

Case No. 3:22-cv-08991-JSC

**DEFENDANT MICROSOFT CORPORATION'S NOTICE OF MOTION AND MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Hon. Jacqueline Scott Corley

Date: March 9, 2023
Time: 10:00 a.m.
Courtroom: 8 – 19th Floor

i

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on March 9, 2023, at 10:00 a.m., or as soon thereafter as the matter may be heard by the Court, located in Courtroom 8 – 19th Floor, 450 Golden Gate Ave., San Francisco, CA 94102, Defendant Microsoft Corporation will and hereby does move the Court, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), to dismiss this action for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

Microsoft moves to dismiss the action on the ground that the Court lacks subject matter jurisdiction, because Plaintiffs' claims are unripe and they lack standing. Microsoft also moves to dismiss Plaintiffs' Complaint on the ground that it does not allege sufficient facts to state a plausible claim of anticompetitive harm or harm to Plaintiffs.

This motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, all pleadings and papers on file in this action, and upon such other matters that the Court may rely on or as may be presented to the Court at the time of the hearing.


Dated: January 31, 2023                          Respectfully submitted,


                                                 By:   _/s/ Valarie C. Williams_

                                                 Valarie C. Williams
                                                 B. Parker Miller
                                                 Tania Rice
                                                 Tyler Blake
                                                 Alston & Bird LLP

                                                 Rakesh N. Kilaru
                                                 Anastasia M. Pastan
                                                 Jenna Pavelec
                                                 Wilkinson Stekloff LLP

                                                 *Counsel for Defendant Microsoft Corporation*

MICROSOFT'S MOTION TO DISMISS
Case No. 3:22-cv-08991-JSC

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     ISSUES TO BE DECIDED ................................................................................. 1

III.    FACTUAL BACKGROUND ............................................................................... 2

        A.      Plaintiffs' Claims ................................................................................... 2

        B.      Posture of the Underlying Transaction ................................................. 3

IV.     LEGAL STANDARD .......................................................................................... 4

V.      ARGUMENT ....................................................................................................... 4

        A.      Plaintiffs Have Not Plausibly Alleged an Appreciable Danger of
                Anticompetitive Effects ......................................................................... 4

                1.      *Plaintiffs Have Not Alleged Facts Showing that the Proposed
                        Acquisition May Substantially Lessen Competition (Horizontal Theory)*
                        .................................................................................................... 5

                2.      *Plaintiffs Have Not Alleged Facts Showing that Microsoft Is Likely to
                        Exclude Competitors' Platforms (Vertical Theory)* ......................... 9

                3.      *Plaintiffs Have Not Alleged Facts Showing a Viable Claim Based on
                        Lessened Competition in the Labor Market (Labor Market Theory)* ............ 11

        B.      Plaintiffs' Claim Is Not Ripe ............................................................... 11

        C.      Plaintiffs Lack Standing to Bring Their Claim ................................... 15

                1.      *Plaintiffs Lack Standing Because the Transaction Has Not Been
                        Approved* ............................................................................... 15

                2.      *Plaintiffs Lack Standing to Assert a Claim Based on Competition for
                        Labor* ...................................................................................... 16

        D.      Plaintiffs Are Not Entitled to Injunctive Relief ................................. 16

VI.     CONCLUSION ................................................................................................. 17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Addington v. US Airline Pilots Ass'n*,
    606 F.3d 1174 (9th Cir. 2010) ......................................................................12, 13

*Alberta Gas Chems., Ltd. v. E. I. Du Pont de Nemours & Co.*,
    826 F.2d 1235 (3d Cir. 1987)..............................................................................10

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................4, 10

*AT&T Mobility LLC v. Bernardi*,
    No. C 11-03992 CRB, 2011 U.S. Dist. LEXIS 124084 (N.D. Cal. Oct. 26, 2011)...........12, 14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................4, 5, 6, 14

*Bradt v. T-Mobile US, Inc.*,
    No. 19-cv-07752-BLF, 2020 U.S. Dist. LEXIS 44141 (N.D. Cal. Mar. 13, 2020)................13

*California v. Am. Stores Co.*,
    495 U.S. 271 (1990).............................................................................................16

*Camaisa v. Pharm. Rsch. Assocs.*,
    No. 21-cv-00775, 2022 U.S. Dist. LEXIS 50803 (D. Del. Mar. 22, 2022) .........................8

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013).............................................................................................15

*Crouse-Hinds Co. v. Internorth, Inc.*,
    518 F. Supp. 416 (N.D.N.Y. 1980) .....................................................................11

*DeHoog v. Anheuser-Busch InBev SA/NV*,
    899 F.3d 758 (9th Cir. 2018) ......................................................................4, 5, 10, 13

*EuroTec Vertical Flight Sols., LLC. v. Safran Helicopter Engines S.A.S.*,
    No. 3:15-cv-3454, 2019 U.S. Dist. LEXIS 129084 (N.D. Tex. Aug. 1, 2019) .....................8

*FTC v. Facebook, Inc.*,
    560 F. Supp. 3d 1 (D.D.C. 2021) ........................................................................7

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
    No 3:09-cv-03854-MMC, U.S. Dist. LEXIS 133999 (N.D. Cal. Oct. 22, 2009) ...................16

*Korea Kumho Petrochemical v. Flexsys Am. LP*,
    No. C07-01057, 2008 U.S. Dist. LEXIS 68559 (N.D. Cal. Mar. 11, 2008).........................7

iv

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004) .................................................................................................16

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
    634 F.2d 1197 (9th Cir. 1980) ................................................................................16

*Malaney v. UAL Corp.*,
    No. 3:10-CV-02858, 2010 U.S. Dist. LEXIS 106049 (N.D. Cal. Sept. 27, 2010),
    *aff'd*, 434 F. App'x 620 (9th Cir. 2011) ....................................................................6

*Med. Vets, Inc. v. VIP Petcare Holdings, Inc.*,
    811 F. App'x 422 (9th Cir. 2020) .............................................................................7

*Med Vets, Inc. v. Vip Petcare Holdings, Inc.*,
    No. 18-cv-02054-MMC, 2019 U.S. Dist. LEXIS 68099 (N.D. Cal. Apr. 22, 2019),
    *aff'd*, 811 F. App'x 422 (9th Cir. 2020).....................................................................9

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*,
    No. 1:21-cv-00540-AWI-EPG, 2022 U.S. Dist. LEXIS 126239 (E.D. Cal. July 15,
    2022) ..................................................................................................................5, 6, 9

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020).....................................................................13

*Norbert v. City & County of San Francisco*,
    10 F.4th 918 (9th Cir. 2021) ...................................................................................16

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    No. 5:16-cv-06370-EJD, 2017 U.S. Dist. LEXIS 160238 (N.D. Cal. Sept. 28,
    2017) .........................................................................................................................9

*Physician Specialty Pharm., LLC v. Prime Therapeutics, LLC*,
    No. 18-cv-1044, 2019 U.S. Dist. LEXIS 159853 (D. Minn. Aug. 8, 2019) ...........10

*Reazin v. Blue Cross & Blue Shield, Inc.*,
    663 F. Supp. 1360 (D. Kan. 1987)..........................................................................10

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ....................................................................................9

*S. Austin Coal. Cmty. Council v. SBC Commc'ns, Inc.*,
    No. 98 C 3014, 1999 U.S. Dist. LEXIS 949 (N.D. Ill. Jan. 26, 1999), *aff'd*, 191
    F.3d 842 (7th Cir. 1999) .........................................................................................14

*Safe Air For Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004)...................................................................................4

*Sherwin-Williams Co. v. Dynamic Auto Images, Inc.*,
    No. SACV 16-1792, 2017 U.S. Dist. LEXIS 174303 (C.D. Cal. Mar. 10, 2017) ....8

v

*South Austin Coalition Community Council v. SBC Communications, Inc.*,
    191 F.3d 842 (7th Cir. 1999) ............................................................................12, 14

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ...................................................................................................15

*SureShot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*,
    No. H-17-127, 2017 U.S. Dist LEXIS 135796 (S.D. Tex. Aug. 24, 2017), *aff'd in
    part & modified in part by* 754 F. App'x 235 (5th Cir. 2017)................................15

*Taleff v. Sw. Airlines Co.*,
    828 F. Supp. 2d 1118 (N.D. Cal. 2011), *aff'd* 554 F. App'x 598 (9th Cir. 2014) ..................16

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)................................................................................................15

*Trump v. New York*,
    141 S. Ct. 530 (2021) .................................................................................................11

*United States v. AT&T Inc.*,
    310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 ....................................10

*United States v. AT&T, Inc.*,
    916 F.3d 1029 (D.C. Cir. 2019) ..............................................................................9, 10

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) .....................................................................................8, 9

**Statutes**

Clayton Antitrust Act ................................................................................................. *passim*

**Other Authorities**

Rule 12(b)(1)...............................................................................................................3, 4

Rule 12(b)(6)...............................................................................................................3, 4

MICROSOFT'S MOTION TO DISMISS
Case No. 3:22-cv-08991-JSC

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.    INTRODUCTION

Microsoft, the third largest manufacturer of gaming consoles and only one of a multitude of companies producing video game content for various platforms, is attempting to acquire Activision Blizzard, a producer of popular video games.  Ten individual gamers have brought this case to try to stop that prospective transaction—a transaction they readily admit is under antitrust review around the world and accordingly is subject to change before it closes.  Rather than wait for the results of investigations by the Federal Trade Commission, the European Commission, the U.K.'s Competition & Markets Authority, and other worldwide regulators, they contend that they are entitled to access a federal court now, to seek relief for ambiguous, speculative, and theoretical harms.  The gamers also seek to leverage their inadequate claims to justify extensive discovery, including immediate depositions of top executives at Microsoft, Activision Blizzard, and other third parties.  Finally, they contend that this Court should hold a trial and *permanently* enjoin Microsoft from acquiring Activision Blizzard, under the current deal terms, as soon as possible, without waiting for world regulators to finish their work.

As discussed below, this Complaint should be dismissed because Plaintiffs have failed to state any facts that would support a claim for a violation of antitrust law.  Their Complaint is devoid of facts except for a single unsupported "market share" figure that is untethered to any of Plaintiffs' alleged product markets.  Additionally, Plaintiffs' claim is unripe and Plaintiffs lack constitutional standing to assert it.  Finally, Plaintiffs are not legally entitled to seek the equitable remedy of an injunction when, as here, monetary damages would provide an adequate remedy.

## II.    ISSUES TO BE DECIDED

Whether Plaintiffs' claim alleging violation of Section 7 of the Clayton Antitrust Act (15 U.S.C. § 18), seeking to prohibit Microsoft's acquisition of Activision Blizzard, should be dismissed because: (1) Plaintiffs have failed to allege a plausible claim of harm to competition, (2) it is unripe, (3) Plaintiffs lack constitutional standing, and/or (4) Plaintiffs are not legally entitled to injunctive relief when monetary remedies are available.

III.    **FACTUAL BACKGROUND**

    A.    **Plaintiffs' Claims**

Plaintiffs seek to stop a prospective transaction in which Microsoft would acquire Activision Blizzard. (Compl. ¶ 1.) Plaintiffs allege that both Microsoft and Activision Blizzard develop, publish, and distribute competing video games. (*Id.* ¶¶ 5, 124-129.) Microsoft and Activision Blizzard are two of many companies that develop, publish, and/or distribute video games (Plaintiffs do not allege specifically how many competitors there are). (*Id.* ¶¶ 76, 124-129.) Video games can generally be played on a variety of different platforms, including game consoles, personal computers ("PCs"), mobile devices, and cloud-based systems. (*Id.* ¶¶ 78-122, 286.) Microsoft owns and sells one of the three major game consoles (Xbox) and one of the primary operating systems for PCs (Windows). (*Id.* ¶¶ 7, 87.)

Plaintiffs are ten individuals who play video games and have purchased Activision Blizzard titles, which they play on a variety of platforms—Xbox, PlayStation, and Nintendo Switch consoles, PCs, and/or mobile devices. (*Id.* ¶¶ 23-33.) Eight of the ten Plaintiffs play Activision Blizzard games on more than one platform—usually both a console and their PC. (*Id.*) Plaintiffs assert a claim under Section 7 of the Clayton Antitrust Act, which concerns mergers and acquisitions whose effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. They allege three theories of relief:

    (1)    "Horizontal Theory":  Plaintiffs allege that Microsoft and Activision Blizzard are horizontal competitors in developing, publishing, and selling video games and that the proposed acquisition may lessen competition in the video game market. (*Id.* ¶¶ 252-275.) Plaintiffs have alleged ten scattershot product markets that they assert are relevant to their Complaint, but only five in which they allege that Microsoft and Activision Blizzard both compete: video games; console gaming; PC gaming; mobile gaming; and "Triple-A" games. (*Id.* ¶¶ 130-179.) Plaintiffs have not alleged how many competitors develop, publish, and/or distribute video games in each of these supposed "markets." They allege only a single, unsupported (and vastly incorrect) market share statistic, related to one component of one of the product markets (video games): alleging that Microsoft has an approximate 23.9% market share of some undefined market for game *publishing* and Activision

2

Blizzard has an approximate 10% market share of game *publishing*. (*Id.* ¶¶ 269-270.)

(2) "Vertical Theory": Plaintiffs allege that Microsoft's control of one of the popular video game consoles and computer operating systems and its proposed purchase of Activision Blizzard could allow it to make Activision Blizzard's games exclusive or partially exclusive to Microsoft platforms. Plaintiffs' other five product "markets" could only relate to this theory since Activision Blizzard is not a competitor in these markets: video game subscription services; video game console systems; high-performance video game console systems; computer operating systems; and cloud-based gaming services. (*Id.* ¶¶ 171-203.) Plaintiffs allege that Microsoft (Xbox) and Sony (PlayStation) "compete vigorously with one another" in the console space. (*Id.* ¶ 292.) But they allege that the prospective acquisition could give Microsoft "the ability to foreclose important inputs to rivals of console gaming by making some or all of Activision Blizzard's important catalog of games, including *Call of Duty*, exclusive . . . or partially exclusive" to Microsoft platforms. (*Id.* ¶ 290.) Plaintiffs admit, however, that Microsoft has made public promises that it will continue to keep Activision Blizzard's games available on other platforms. (*Id.* ¶ 306.)

(3) "Labor Market Theory": Plaintiffs allege that the proposed acquisition could lessen competition for labor between video game developers, publishers, and distributors. (*Id.* ¶¶ 276-279.) However, Plaintiffs do not allege a legally proper market, they do not allege that they work in this industry, and they do not allege how they would be harmed by any change in the labor market.

### B. Posture of the Underlying Transaction

While Plaintiffs' allegations are taken as true for purposes of Microsoft's motion to dismiss under Rule 12(b)(6), the Court may consider an important additional fact with respect to Microsoft's motion under Rule 12(b)(1): the prospective acquisition has not yet closed and is under review by multiple domestic and foreign regulators. Microsoft is currently working cooperatively with multiple regulators around the world, including the European Commission ("EC") and the United Kingdom's Competition and Markets Authority ("CMA"), to obtain approvals to close the transaction. (*See* Dkt. 26-1 through 26-8.) The FTC has filed a complaint against Microsoft and Activision Blizzard, in which it is has a deadline of April 7 to complete discovery and has a hearing set for August of 2023. (Dkt. 26-6.) The EC and CMA's reviews are currently scheduled to continue through April. (Dkt.

26-7, 26-8.)  Microsoft has stated that it is engaging with the regulators, which could lead to remedies that may alter the transaction, such as a provision requiring Microsoft to continue making Activision Blizzard games available on competitors' consoles (which directly relates to Plaintiffs' Vertical Theory).  (*See* Dkt. 26 at 5, 7.)

## IV.   LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must dismiss the plaintiff's complaint if it fails to state a claim for relief.  To survive a motion to dismiss, the plaintiff must have alleged facts establishing a plausible claim for relief that exceeds a speculative level.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[L]abels and conclusions" or "'naked assertion[s]' devoid of 'further factual enhancement'" do not constitute well-pleaded facts that are entitled to the presumption of truth. *Id.*

Pursuant to Rule 12(b)(1), a court must dismiss an action for lack of subject matter jurisdiction under Article III of the Constitution if the plaintiff's claim is unripe or the plaintiff lacks standing.  "A Rule 12(b)(1) jurisdictional attack may be facial or factual."  *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  "In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment," and the court "need not presume the truthfulness of the plaintiff's allegations." *Id.*

## V.    ARGUMENT

### A.    Plaintiffs Have Not Plausibly Alleged an Appreciable Danger of Anticompetitive Effects

Section 7 of the Clayton Antitrust Act concerns mergers and acquisitions whose effect "may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.  Under the Ninth Circuit's burden-shifting framework for claims under Section 7 of the Clayton Act, Plaintiffs "must first establish a prima facie case that a merger is anticompetitive."  *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 (9th Cir. 2018) (quoting *St. Alphonsus Med. Ctr. - Nampa, Inc. v. St. Luke's Health Sys.*, 778 F.3d 775, 783 (9th Cir. 2015)).  To survive a motion to dismiss, Plaintiffs must also meet the standard of *Twombly* and *Iqbal*: alleging sufficient factual matter to state a plausible

4

claim for relief that exceeds a speculative level and does not rely on naked assertions or conclusions. *Id.* "In practical terms, this means adequately alleging facts that an acquisition creates 'an appreciable danger' or 'a reasonable probability' of anticompetitive effects in the relevant market." *Id.*

"[P]roceeding to antitrust discovery can be expensive" and carry "unusually high" costs; the plausibility requirement is important, "lest a plaintiff with 'a largely groundless claim' be allowed to 'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557-58 (2007). Microsoft and third parties, who are otherwise fully engaged with antitrust regulators around the world, should not be forced to concurrently litigate a parallel case based on the speculative and conclusory allegations in this Complaint. Plaintiffs have not alleged facts establishing the plausibility of an "appreciable danger" or "reasonable probability" of anticompetitive effects. Each of their three theories (Horizonal Theory, Vertical Theory, and Labor Market Theory) fails.

### 1. Plaintiffs Have Not Alleged Facts Showing that the Proposed Acquisition May Substantially Lessen Competition (Horizontal Theory)

To plead their Horizontal Theory, Plaintiffs must plausibly allege facts showing that Microsoft's post-acquisition market power—its singular ability to raise prices and restrict output in the market—may *substantially* lessen competition. *Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*, No. 1:21-cv-00540-AWI-EPG, 2022 U.S. Dist. LEXIS 126239, at *15-16 (E.D. Cal. July 15, 2022). "[A]llegations of market power must be sufficiently detailed 'to raise a right to relief above the speculative level.'" *Id.* at *16 (quoting *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 973 (9th Cir. 2008)). Plaintiffs may meet this hurdle by alleging direct evidence of actual injury (such as restricted output or supracompetitive prices) or circumstantial evidence of market share and barriers to market entry. *Id.* at *15. Here, Plaintiffs do not (and cannot) allege direct evidence because the transaction has not yet occurred. To plead circumstantial evidence, Plaintiffs are required to (1) define the relevant market, (2) plead factual allegations showing that "the defendant owns a dominant share of that market," and (3) plead factual allegations showing that "there are significant barriers to entry *and* that existing competitors lack the capacity to increase their output in the short run." *Id.* at *15 (emphasis added) (citing *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 484 (9th Cir.

2021)).  Plaintiffs have not done so.  To the extent Plaintiffs attempt to rely, as they do in their motion for preliminary injunction, on decades-old cases for the proposition that removing a significant competitor from the relevant market is sufficient to state a Section 7 claim, courts have already rejected those arguments made by these same counsel in other cases.  *See Malaney v. UAL Corp.*, No. 3:10-CV-02858, 2010 U.S. Dist. LEXIS 106049, at *25 (N.D. Cal. Sept. 27, 2010) ("[P]laintiffs' proposed approach that any non-trivial acquisition of a significant rival is per se violative of the Clayton Act is wrong."), *aff'd*, 434 F. App'x 620 (9th Cir. 2011).

Plaintiffs do not allege facts establishing market share in any of the Complaint's identified relevant markets.  Indeed, Plaintiffs' background allegations describe an overall video game market in which there is dispersed competition at multiple levels: there are numerous game developers (Plaintiffs do not specify how many) that create and develop games (Compl. ¶¶ 76, 124-127); there are "several" publishers (Plaintiffs do not allege how many) who produce the games for distribution (*Id.* ¶ 128); there are various distributors who sell the games (again, Plaintiffs do not allege how many) through digital stores and elsewhere (*Id.* ¶ 129); and there are several ways that consumers can access the games, including through three competitors' console systems, consumers' own computers, and cloud and mobile outlets (*Id.* ¶¶ 78-122).

Plaintiffs' allegations are insufficient to plausibly show that the acquisition would give Microsoft a "dominant share" in any relevant market that would allow it to decrease the quality, innovation, diversity, and output of video games or increase video game prices (as asserted in paragraph 331 of the Complaint).  *See Netafim Irrigation*, 2022 U.S. Dist. LEXIS 126239, at *15. Notably, Plaintiffs do not include any factual allegations of the combined market share of Microsoft and Activision Blizzard, the number of competitors remaining post-merger, or any other specific facts to support an ability to increase prices or decrease output in any of the alleged horizontal markets. Rather, Plaintiffs' Complaint is rife with conclusory allegations that Microsoft and Activision Blizzard are two of the "most important" competitors in the video game market with some of the "most iconic and popular" games.  (Compl. ¶¶ 255-256, 282).   Plaintiffs also summarily allege that "the proposed acquisition may substantially lessen competition" in each of the ten relevant markets, but they provide no factual support.  (*Id.* ¶ 223).  Such unsupported allegations should be disregarded.  *See Twombly*,

550 U.S. at 564-65 (failure to plead facts showing an antitrust agreement, beyond descriptions of parallel conduct and conclusions of an agreement, warranted dismissal); *Korea Kumho Petrochemical v. Flexsys Am. LP*, No. C07-01057, 2008 U.S. Dist. LEXIS 68559, at *28-29 (N.D. Cal. Mar. 11, 2008) (dismissing complaint alleging that because of the defendant's market dominance there was a dangerous probability of it achieving monopoly power with its actions, for failure to plead concrete factual allegations).

Two of the very few facts alleged by Plaintiffs are that Microsoft has an approximate 23.9% market share of game *publishing* and Activision Blizzard has an approximate 10% market share of game *publishing*. (Compl. ¶¶ 269-270.) These unsupported (and incorrect) figures are not tied to Plaintiffs' defined product markets: video games as a whole or submarkets of certain types of video games. They speak, at best, to only one component of video game output. Plaintiffs allege no facts showing how this share of publishing activity would give Microsoft market dominance over either the entire video game market or any of the various alleged submarkets. Nor is it plausible that the development and distribution components would not be significant drivers of market output and pricing. In *FTC v. Facebook, Inc.*, 560 F. Supp. 3d 1, 17 (D.D.C. 2021), the court cautioned that evaluating market power requires looking at the "market definition" and "market share" allegations together. The sufficiency of a plaintiff's market share allegations depends on "'how tenuously[]' the market has been defined." *Id.* There, the court dismissed the FTC's claim of monopoly power, finding that the FTC fell "short of its pleading burden" by "merely alleg[ing] that a defendant firm has somewhere over 60%" of a market share but failing to flesh out the contours of the related market or "exactly what [that] figure is even referring to." *Id.* at 18, 20; *see also Med. Vets, Inc. v. VIP Petcare Holdings, Inc.*, 811 F. App'x 422, 423 (9th Cir. 2020) (affirming dismissal where the alleged market share figures did "not show power in the *relevant* market"). This Complaint's claim of market power is much more ill-defined than the complaint in *Facebook*. Not only do Plaintiffs fail to flesh out how their market share allegations relate to dominant market power in any of their defined markets, but the market share allegations are facially disconnected from the defined product markets.

Plaintiffs' Complaint is silent regarding market shares for their defined product markets: video games as a whole, console games, PC games, mobile games, and "Triple-A" games. That fundamental

failure warrants dismissal of Plaintiffs' claim. *See, e.g., Camaisa v. Pharm. Rsch. Assocs.*, No. 21-cv-00775, 2022 U.S. Dist. LEXIS 50803, at *24-25 (D. Del. Mar. 22, 2022) (dismissing Section 7 claim because plaintiff "has not provided any information about alterations in the market share following the merger, increased concentration of firms in the relevant market, elimination of competitors, or increased barriers to entry following the merger"); *EuroTec Vertical Flight Sols., LLC. v. Safran Helicopter Engines S.A.S.*, No. 3:15-cv-3454, 2019 U.S. Dist. LEXIS 129084, at *7 (N.D. Tex. Aug. 1, 2019) (bare allegation of "market share of over 50 percent" was "conclusory"); *Sherwin-Williams Co. v. Dynamic Auto Images, Inc.*, No. SACV 16-1792, 2017 U.S. Dist. LEXIS 174303, at *16-17 (C.D. Cal. Mar. 10, 2017) (finding a failure to allege market power where allegations that firm "owns over 30% of the market" and maintains "a stranglehold" in the industry were too conclusory).

Separately, Plaintiffs must sufficiently allege barriers to market entry and expansion in each of their product markets. *See United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990) ("A high market share, though it may ordinarily raise an inference of monopoly power, will not do so in a market with low entry barriers *or* other evidence of a defendant's inability to control prices or exclude competitors." (emphasis added and citation omitted)). Plaintiffs have not done so. They make conclusory allegations regarding "the largest platforms attract[ing] the most quality content" and consumers being attracted to already-popular gaming ecosystems. (Compl. ¶¶ 231-251.) But these conclusions are belied by the factual allegations. It is implausible that there are few market entrants in the overall video game industry when there were allegedly 1,159 mergers of video game companies in 2021. (*Id.* ¶ 62.) Additionally, Plaintiffs allege no facts establishing barriers to entry in each of their submarkets of console games, PC games, mobile games, and "Triple-A" games. They do not allege how many competitors are in each submarket and why new competitors cannot make games for each market. Further, any assertion of barriers to entry would be illogical because Plaintiffs allege that the video games are available on multiple consoles, users' own PCs, and other platforms. (*See, e.g., Id.* ¶¶ 110, 121.) Indeed, eight of the ten Plaintiffs already play video games on more than one of these platforms. (*Id.* ¶¶ 23-22.) There is no special barrier to making a "console game" or a "PC game" or a "mobile game"—the same games are played on various devices. The "Triple-A" submarket—alleged to be the highest quality and most "anticipated" games—has vaguely-defined

8

parameters and is legally deficient.  Plaintiffs' factually devoid Complaint should be dismissed.  *See Med Vets, Inc. v. Vip Petcare Holdings, Inc.*, No. 18-cv-02054-MMC, 2019 U.S. Dist. LEXIS 68099 (N.D. Cal. Apr. 22, 2019) (dismissing claim where the product market description was too vague to determine which products would be included and the allegations of barriers to entry—the requirement of licensing and relationships with manufacturers and retailers—were too conclusory without factual elaboration), *aff'd*, 811 F. App'x 422 (9th Cir. 2020); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-cv-06370-EJD, 2017 U.S. Dist. LEXIS 160238, at \*25 (N.D. Cal. Sept. 28, 2017) ("Without a better description of the purported entry barriers, the allegations are too conclusory to be entitled to an assumption of truth.").

Finally, Plaintiffs have failed to plead that other competitors in the relevant product markets could not check the alleged anticompetitive consequences (*e.g.*, increased prices or decreased quality) after the merger.  This independently warrants dismissal.  *See Netafim Irrigation, Inc.*, 2022 U.S. Dist. LEXIS 126239, at \*25 (dismissing Section 7 claim because complaint failed to allege "sufficient circumstantial evidence that Defendants possessed market power" because other competitors could increase output in response to a price increase by defendants).  For instance, at least four other competitors operate in the identified product markets for video games generally, console games, PC games, and Triple-A games.  (*See* Compl. ¶ 76 (identifying Electronic Arts, Take-Two, Ubisoft, and Sony).)  The existence of these competitors in the relevant markets means that Microsoft could not "control prices or exclude competitors," and the Complaint contains no facts to suggest otherwise.  *Syufy Enters.*, 903 F.2d at 664; *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995) ("Market power cannot be inferred solely from the existence of entry barriers and a dominant market share.").  Accordingly, Plaintiffs have failed in several ways to adequately allege facts showing market power necessary to support their Section 7 claim.

### 2.  *Plaintiffs Have Not Alleged Facts Showing that Microsoft Is Likely to Exclude Competitors' Platforms (Vertical Theory)*

In challenges to vertical mergers, plaintiffs cannot rely on market share statistics as "a short cut" to show anticompetitive harm "because vertical mergers produce no immediate change in the relevant market share."  *United States v. AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019).  This type

of challenge is rare, difficult, and more complex. *See United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 193-194 (D.D.C. 2018), *aff'd*, 916 F.3d 1029; *Physician Specialty Pharm., LLC v. Prime Therapeutics, LLC*, No. 18-cv-1044, 2019 U.S. Dist. LEXIS 159853, at *31 (D. Minn. Aug. 8, 2019). Vertical mergers are often a "means of creating efficiency," not reduction in competition. *Alberta Gas Chems., Ltd. v. E. I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1244 (3d Cir. 1987) (citations omitted). Plaintiffs must make a fact-specific showing that "the merger will result in a foreclosure of access to sources of supply, a significant increase in concentration in a relevant market, or heightened barriers to entry in either market." *Reazin v. Blue Cross & Blue Shield, Inc.*, 663 F. Supp. 1360, 1489 (D. Kan. 1987); *see also AT&T*, 916 F.3d at 1032.

Plaintiffs have not adequately pled facts to make a plausible showing that the merger would result in a foreclosure of access, significant increase in concentration, or heightened barriers to entry. They offer a highly speculative theory that Microsoft could change the status quo by making Activision Blizzard games exclusive to Microsoft's operating platforms. However, Plaintiffs admit that the games are currently available "across multiple platforms," including competitors' platforms. (Compl. ¶ 286.) Plaintiffs also admit that Microsoft has promised to keep game content available on competitors' platforms. (*Id.* ¶ 306.) Plaintiffs have alleged no facts beyond conclusory and speculative assertions that Microsoft could disrupt current market practices—and go back on its word—to stop games from being available across multiple platforms. This speculation should be disregarded under *Iqbal*, 556 U.S. at 678-79. An allegation that a company *might* foreclose competitors' access to a product is insufficient to plausibly state a claim; if it were, almost any pleading would survive the pleading stage and proceed to expensive discovery.

In *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 765 (9th Cir. 2018), the Ninth Circuit dismissed a Section 7 claim based on a speculative theory of post-transaction business practices. There, the plaintiffs alleged that, post-transaction, the new subsidiary would adopt the distribution practices of ABI and follow its lead in dealings with distributors. *Id.* The court called this a "classic speculative conclusion," even if it were bolstered with allegations regarding past acquisitions. *Id.* Similarly, here, Plaintiffs offer only speculation regarding a post-transaction change

in business practices. Their allegations are controverted by more specific facts regarding the continued availability of the games across platforms. Such classic speculation warrants dismissal.

Additionally, Plaintiffs have failed to allege facts establishing how, even if Microsoft intended to foreclose competitors' access, it would cause competitive harm in the alleged product markets. Plaintiffs contend that Activision Blizzard games are some of the top games with "no meaningful substitute." (*See* Compl. ¶¶ 284-287.) But Plaintiffs fail to allege any facts to show that these games constitute an essential input for any relevant market. As noted above, the only market shares alleged are in game publishing and are wholly unsupported. Moreover, the Complaint does not allege facts showing that other game developers cannot create meaningful substitutes. Even in its self-serving and ill-defined "Triple-A" product market, Plaintiffs concede that there are other competitors. (*See id.* ¶ 168.) Accordingly, Plaintiffs have not alleged facts plausibly tying their speculative theory about Microsoft's future behavior to their allegation of antitrust injury. *See Crouse-Hinds Co. v. Internorth, Inc.*, 518 F. Supp. 416, 431 (N.D.N.Y. 1980) ("a plaintiff must make a greater showing than simply that a vertical merger will result in a significant percentage of market foreclosure" and must demonstrate "some probable anticompetitive effect or impact").

### 3. Plaintiffs Have Not Alleged Facts Showing a Viable Claim Based on Lessened Competition in the Labor Market (Labor Market Theory)

Finally, Plaintiffs append a claim that, because Microsoft and Activision Blizzard both recruit labor, the proposed acquisition would lessen competition in the putative video game labor market. They make only a few brief, conclusory statements in support of this theory. (Compl. ¶¶ 276-279.) They do not allege any factual detail, such as figures or data related to the relevant labor market or the effects that the prospective acquisition would have on it. This conclusory and speculative claim should also be dismissed.

### B. Plaintiffs' Claim Is Not Ripe

Plaintiffs ask this court to enjoin Microsoft and Activision Blizzard from consummating a transaction that currently is subject to multiple regulatory reviews and therefore has multiple contingencies—there is no dispute about that. A "case must be ripe—not dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*,

11

141 S. Ct. 530, 535 (2021) (quoting *Texas v. U.S.*, 523 U.S. 296, 300 (1998)). Otherwise, the Court lacks jurisdiction and the case must be dismissed. *See Addington v. US Airline Pilots Ass'n*, 606 F.3d 1174, 1179 (9th Cir. 2010). This Complaint, which concerns a prospective future transaction that is under review by multiple government regulators (a process during which the transaction might be modified in a way that directly impacts Plaintiffs' claims), is not ripe.

Courts have dismissed similar antitrust claims seeking to enjoin prospective mergers on ripeness grounds. For example, in *South Austin Coalition Community Council v. SBC Communications, Inc.*, 191 F.3d 842 (7th Cir. 1999), the Seventh Circuit upheld the dismissal of an antitrust lawsuit that sought to enjoin a merger that had not yet closed and was still subject to review by the Federal Communications Commission. The court noted that "[c]ourts often wait for agencies, even when the agencies' views are not legally conclusive—not only because the agencies may have something helpful to say, but also because what the agencies *do* may shape the litigation." *Id.* at 844. "Regulatory agencies can raise or lower" the barriers to competition, such as by conditioning their approval on changes that facilitate competitors' entry into the market. *Id.* at 845. Accordingly, it "is impossible to analyze a potential-competition claim" prior to the completion of that approval process and prior to knowing the final terms of the transaction. *Id.* Litigation at that premature stage would be an "expensive challenge to a moving target" and "a waste of everyone's time." *Id.*; *see also AT&T Mobility LLC v. Bernardi*, No. C 11-03992 CRB, 2011 U.S. Dist. LEXIS 124084, at *35 (N.D. Cal. Oct. 26, 2011) (enjoining arbitration proceedings to challenge a merger as premature, and adopting the Seventh Circuit's reasoning that such challenges are unripe "until all required state and federal approvals have been obtained—for the agencies might insist on changes that would substantially alter the merger's competitive effects").

This action is even more premature. The transaction at issue on appeal in *South Austin* was subject to only one remaining approval. Microsoft is currently working cooperatively with numerous regulators around the world to obtain approvals to close the transaction. (*See* Dkt. 26-1 through 26-8; *see also* Compl. ¶ 275 (acknowledging that Plaintiffs' claims are contingent upon "[i]f Microsoft's acquisition of Activision Blizzard were to be completed").) Microsoft has said publicly that it remains open to remedies by the regulators. (Dkt. 26 at 5, 7.) Specifically, this may include terms requiring

12

Microsoft to continue to make Activision Blizzard games available on competitors' platforms, which directly impacts Plaintiffs' Vertical Theory in this case. For instance, Microsoft has already agreed with Nintendo to offer Call of Duty on Nintendo Switch for ten years. *See* Vlad Savov, *Microsoft Agrees to 10-Year Call of Duty Deal with Nintendo*, Bloomberg, Dec. 6, 2022, https://www.bloomberg.com/news/articles/2022-12-07/microsoft-agrees-10-year-call-of-duty-deal-with-nintendo?leadSource=uverify%20wall; *see also* Reuters, *Microsoft to Bring Call of Duty to Nintendo, Sony on the Spot*, Dec. 7, 2022, https://www.reuters.com/technology/microsoft-makes-10-year-commitment-bring-call-duty-nintendo-tweet-2022-12-07/. Plaintiffs' entire vertical merger theory may be mooted if such terms are required by a regulator or voluntarily incorporated. It is impossible to analyze Plaintiffs' claims at this stage, when the regulatory reviews may change the shape of—or even the necessity for—this litigation.[1] Accordingly, this Court lacks subject matter jurisdiction to decide the dispute and should dismiss it.[2]

Generally, courts evaluate ripeness based on (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Addington*, 606 F.3d at 1179.

---

[1] In numerous past mergers, regulatory reviews have resulted in modifications to the transaction that resolved any antitrust concerns. *See, e.g.*, *Bradt v. T-Mobile US, Inc.*, No. 19-cv-07752-BLF, 2020 U.S. Dist. LEXIS 44141, at *6–7 (N.D. Cal. Mar. 13, 2020) (denying plaintiffs' motion to enjoin a merger because the DOJ and FCC "investigated the merger and negotiated divestitures to Dish Network Corporation . . . that will enable DISH to become a major competitor in the nationwide mobile wireless services market and thus preserve the competitive structure of the industry"); *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 233 (S.D.N.Y. 2020) ("[T]he FCC and DOJ remedies, and particularly those designed to ensure that DISH becomes an aggressive fourth national [competitor], significantly reduce the concerns and persuasive force of Plaintiff States' market share statistics."); *Dehoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 760 (9th Cir. 2018) (affirming dismissal of Section 7 claim because the DOJ conditioned approval of the merger on one defendant "divest[ing] entirely its domestic beer business," so the plaintiffs "could not plausibly allege" the merger "would substantially lessen competition in that market").

[2] Microsoft appreciates the Court's prior order, in conjunction with Microsoft's earlier motion to stay and a scheduling discussion, that would postpone the schedule for Plaintiffs' preliminary injunction motion based on Microsoft's stipulation that the acquisition will not close before a future date certain. Microsoft has now informed Plaintiffs that it will stipulate that the transaction will not close any earlier than May 1, 2023. While Microsoft agrees that any preliminary injunction motion should not be heard until closer to the transaction's closing, the prior order does not resolve this motion to dismiss, which concerns the Court's constitutional authority to exercise jurisdiction over this complaint as pled. Accordingly, the complaint should be dismissed, irrespective of the parties' attempts to find commonsense scheduling solutions.

13

These principles warrant dismissal. The issues are not currently fit for judicial decision because it is premature for the Court to evaluate the transaction as pled when it is subject to change and any potential anticompetitive effects cannot yet be determined. Plaintiffs will not face hardship and will have their day in court (if it remains appropriate and necessary). *See S. Austin Coal. Cmty. Council v. SBC Commc'ns, Inc.*, No. 98 C 3014, 1999 U.S. Dist. LEXIS 949, at *4 (N.D. Ill. Jan. 26, 1999) ("[P]laintiffs can always reinstate their action *after* the appropriate agencies have had the opportunity to review the competitive effects of the merger."), *aff'd*, 191 F.3d 842 (7th Cir. 1999); *see also Bernardi*, 2011 U.S. Dist. LEXIS 124084, at *35–36 (delay of challenge to unconsummated merger "cannot cause any hardship" to the consumers).

Allowing the Plaintiffs to proceed with their premature Complaint has real consequences. Plaintiffs have already indicated that they plan to aggressively seek burdensome discovery. *See S. Austin*, 191 F.3d at 845 ("Antitrust litigation can be very costly; an expensive challenge to a moving target is worse than pointless."); *Twombly*, 550 U.S. at 558 (emphasizing that "antitrust discovery can be expensive"). They have told the Court that they intend to take the depositions of executives at the highest levels of Microsoft and Activision Blizzard in February, without waiting for the results of regulatory approvals from abroad or the FTC depositions (which are scheduled to be completed before the deadline of April 7). If the terms of the merger change after the regulatory reviews are complete, Plaintiffs likely will assert the need to re-take depositions to cover the effect of the new terms. Plaintiffs have requested document discovery beyond the 9 million pages provided to the FTC. And they are attempting to set a trial for this case on April 3. Because of the contingencies inherent in the regulatory approval process, no one—including Microsoft—can definitively say by what date the parameters of this transaction will be finalized. These practical issues demonstrate why courts do not exercise jurisdiction over cases that are not ripe for adjudication. Once the final terms of this transaction are known, the Court can give Plaintiffs an opportunity to refile and be heard on a preliminary injunction motion and, if they prevail on that motion, take relevant discovery and litigate the merits at a later trial.

14

## C. Plaintiffs Lack Standing to Bring Their Claim

The threat of injury to Plaintiffs is hypothetical at this stage and thus they lack Article III standing. Plaintiffs bear the burden of proving, at every stage of this litigation, that they meet standing requirements. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("[A]t the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element."). Constitutional standing requires an injury-in-fact that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc.*, 578 U.S. at 339 (citation omitted). Private plaintiffs under the Clayton Antitrust Act must show a threat of injury that is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

### 1. Plaintiffs Lack Standing Because the Transaction Has Not Been Approved

Courts have dismissed antitrust challenges to prospective mergers on standing grounds where, as here, the merger has not closed and is pending regulatory approval. For example, in *Cassan Enterprises, Inc. v. Avis Budget Group, Inc.*, the plaintiff challenged an acquisition in which the companies announced the proposed transaction and their intent to seek regulatory approval, but the approval process had not yet been completed. No. 10-cv-01934-JCC, (W.D. Wash. Mar. 11, 2011), Dkt. 39, at *2-3, 5. The court found that Plaintiffs could not clear the necessary hurdle of alleging an injury that was "certainly impending," because the FTC was "still reviewing the proposed acquisition" and "aspects of the acquisition may change as a result of the Commission's review." *Id.* at *5. The court dismissed the plaintiff's conjectural claims. *Id.* at *5-6.; *see also SureShot Golf Ventures, Inc. v. Topgolf Int'l, Inc.*, No. H-17-127, 2017 U.S. Dist LEXIS 135796, at *10 (S.D. Tex. Aug. 24, 2017) (the plaintiff's "perceived threats of monopolistic behavior are speculative and do not confer standing."), *aff'd in part & modified in part by* 754 F. App'x 235 (5th Cir. 2017).

Here, no one can say with certainty what the final transaction will look like. Plaintiffs rely on a chain of speculative inferences to allege that they will be injured, including conjecture about the transaction's final terms and further conjecture about Microsoft's behavior afterward (such as a baseless allegation that Microsoft will foreclose competitors' access to Activision Blizzard video games). Plaintiffs cannot show that their alleged harm is "certainly impending," and their claims must be dismissed.

15

### 2. *Plaintiffs Lack Standing to Assert a Claim Based on Competition for Labor*

Plaintiffs also allege that the acquisition would threaten to "substantially reduce competition in the labor market for video game labor talent." (Compl. ¶ 224.) But none of the Plaintiffs have alleged how reduced competition for employees in the video game industry would constitute a concrete, particularized, and imminent harm to themselves. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (a party "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties"). None of the Plaintiffs allege that they work in the video game industry or even plan to seek employment in the video game industry.

### D. Plaintiffs Are Not Entitled to Injunctive Relief

Plaintiffs have an adequate remedy at law—monetary damages—and therefore, their claim for injunctive relief must be dismissed. An injunction is "an extraordinary remedy" that "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Norbert v. City & County of San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021). A plaintiff must adequately allege four elements before it can proceed with a claim for injunctive relief: (1) that it has suffered (or will imminently suffer) an irreparable harm; (2) that there is no adequate remedy at law; (3) that the balance of the hardships favors the plaintiff; and (4) that an injunction is in the public interest. *See Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118, 1122 (N.D. Cal. 2011), *aff'd* 554 F. App'x 598 (9th Cir. 2014). These equitable principles apply to Clayton Act claims. *Id.* at 1122; *California v. Am. Stores Co.*, 495 U.S. 271, 281 (1990) ("[T]he statutory language [of Section 16] indicates Congress' intention that traditional principles of equity govern the grant of injunctive relief." (citation omitted)). Plaintiffs have not pled facts sufficient to allege any harm that cannot be remedied by monetary damages. Therefore, their claim should be dismissed.

Plaintiffs' claims are centered on allegations that Microsoft would be able to increase prices post-acquisition, and that is clearly compensable by monetary damages. *See Taleff,* 828 F. Supp. 2d at 1123 n.7; *Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, No 3:09-cv-03854-MMC, U.S. Dist. LEXIS 133999, at *3 (N.D. Cal. Oct. 22, 2009) (holding that "injuries resulting from higher prices would appear to be injuries fully compensable by an award of monetary damages."); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201-02 (9th Cir. 1980) (holding

that "monetary injury is not normally considered irreparable" in Section 16 cases).  At best, Plaintiffs could allege, without any supporting facts and contrary to all public information, that Microsoft would restrict access of popular games to certain platforms or subscriptions.  Even in this Plaintiff-concocted world, Plaintiffs' harm could be remedied through monetary damages designed to repay any costs associated with accessing exclusive content.

Plaintiffs vague and unsupported claims that "video game quality, innovation, and diversity may decrease" if the transaction closes are speculative and not supported by any facts in the Complaint. (Compl. ¶ 331(e).)  And it is implausible that Microsoft is investing almost $70 billion in a video game developer with the intent or incentive to "degrade video game quality, innovation and diversity." Microsoft would have every incentive to maintain and improve the quality and diversity of Activision Blizzard's games even if, as Plaintiffs speculate, they made some of the games exclusive to Microsoft platforms.  In sum, Plaintiffs have not alleged any plausible scenario in which their alleged harm from this transaction would not be compensable by monetary damages.  Therefore, their claim for injunctive relief should be dismissed.

## VI.  CONCLUSION

Microsoft requests that the Court dismiss Plaintiffs' action in its entirety.


Dated: January 31, 2023                      Respectfully submitted,


                                             By:   */s/ Valarie C. Williams*  _____

                                             Valarie C. Williams
                                             B. Parker Miller
                                             Tania Rice
                                             Tyler Blake
                                             Alston & Bird LLP

                                             Rakesh N. Kilaru
                                             Anastasia M. Pastan
                                             Jenna Pavelec
                                             Wilkinson Stekloff LLP

                                             *Counsel for Defendant Microsoft Corporation*

Valarie C. Williams (Bar No. 335347)
Tania Rice (Bar No. 294387)
Tyler Blake (Bar No. 316623)
Alston & Bird LLP
5600 Mission Street, Suite 2100
San Francisco, CA 94105
Telephone: (415) 243-1000
valarie.williams@alston.com
tania.rice@alston.com
tyler.blake@alston.com

B. Parker Miller (*pro hac vice to be filed*)
Alston & Bird LLP
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309
Telephone: (404) 881-7000
parker.miller@alston.com

Rakesh N. Kilaru (*pro hac vice*)
Anastasia M. Pastan (*pro hac vice*)
Jenna Pavelec (*pro hac vice*)
Wilkinson Stekloff LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
rkilaru@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
jpavelec@wilkinsonstekloff.com

*Counsel for Defendant Microsoft Corporation*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DANTE DEMARTINI, *et al.*, | Case No. 3:22-cv-08991-JSC |
| Plaintiffs, | **[PROPOSED] ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| v. | |
| MICROSOFT CORPORATION, | Hon. Jacqueline Scott Corley |
| Defendant. | |

## [PROPOSED] ORDER GRANTING MOTION TO DISMISS

Before the Court is Defendant Microsoft Corporation's Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).  After reviewing the motion and supporting memoranda, Plaintiffs' opposition, and hearing oral argument, the Court finds that Plaintiffs lack subject matter jurisdiction, their claim is unripe, and they have failed to state a claim upon which relief can be granted.

Therefore, it is hereby ORDERED that Defendant Microsoft Corporation's Motion to Dismiss is GRANTED.

Dated: _____

_____

Jacqueline Scott Corley
United States District Judge

[PROPOSED] ORDER GRANTING MOTION TO DISMISS
Case No. 3:22-cv-08991-JSC

# Exhibit 9

```
 1                   UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA
 2                      SAN FRANCISCO DIVISION

 3

 4   DANTE DEMARTINI, et al.,      )  Case No.  22-cv-08991-JSC
                                   )
 5              Plaintiffs,        )  San Francisco, California
                                   )  Thursday, February 2, 2023
 6        v.                       )
                                   )  ZOOM WEBINAR PROCEEDINGS
 7   MICROSOFT CORPORATION, a      )
     Washington corporation,       )
 8                                 )
                Defendant.         )
 9                                 )
     _____)
10

11

12               TRANSCRIPT OF STATUS CONFERENCE
          BEFORE THE HONORABLE JACQUELINE SCOTT CORLEY
13              UNITED STATES DISTRICT COURT JUDGE

14

15   APPEARANCES:  (Via Zoom Webinar)

16   For Plaintiffs:           JOSEPH M. ALIOTO, SR., ESQ.
                               Alioto Law Firm
17                             One Sansome Street, 35th Floor
                               San Francisco, California 94104
18                             (415) 434-8900

19                             JOSEPH R. SAVERI, ESQ.
                               DAVID H. SEIDEL, ESQ.
20                             Joseph Saveri Law Firm, LLP
                               601 California Street, Suite 1000
21                             San Francisco, California 94108
                               (415) 500-6800
22

23   [Additional Counsel Appearances on following page]

24

25   Proceedings recorded by electronic sound recording; transcript
     produced by transcription service.
```

2

```
 1   APPEARANCES:  (Cont'd.)

 2   For Defendant:              VALARIE C. WILLIAMS, ESQ.
                                 Alston & Bird, LLP
 3                               560 Mission Street, Suite 2100
                                 San Francisco, California 94105
 4                               (415) 243-1000

 5                               B. PARKER MILLER, ESQ.
                                 Alston & Bird, LLP
 6                               1201 W. Peachtree Street
                                 Atlanta, Georgia 30309
 7                               (404) 881-4970

 8   Transcription Service:      Peggy Schuerger
                                 Ad Hoc Reporting
 9                               2220 Otay Lakes Road, Suite 502-85
                                 Chula Vista, California 91915
10                               (619) 236-9325

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   SAN FRANCISCO, CALIFORNIA  THURSDAY, FEBRUARY 2, 2023  1:39 P.M.

2                             --oOo--

3            THE CLERK:  Calling Civil Action C-22-8991, DeMartini,

4   et al. v. Microsoft.  Counsel, no need to state your appearance.

5   Thank you.

6            THE COURT:  All right.  Good afternoon, everyone, and

7   thank you for your statement.  To begin with, I understand that

8   Microsoft has agreed to stipulate that it will not close the

9   merger before May 1st, 2023; is that correct?

10           MS. WILLIAMS:  Good afternoon, Your Honor.  That is

11  correct.

12           THE COURT:  Okay.  So pursuant to that stipulation, that

13  will be the order of the Court -- that it will not close the

14  merger before May 1st.  Good.  That gives us all breathing room.

15           So let's talk now about the protective order and the

16  protective order that Plaintiffs filed with their motion, does

17  Microsoft have an objection to that version?  I believe it

18  incorporated something at least that you had requested.

19           MR. MILLER:  Yes, Your Honor.  This is Parker Miller.

20  We do object to the Plaintiffs' order and had proposed an order

21  that we thought more met the needs of this case.

22           THE COURT:  Okay.  All right.  This is what I want you

23  to do because we've got to get the discovery moving.  By tomorrow

24  4:00 p.m., you each -- and I don't know.  Plaintiffs, you already

25  submitted yours, but you can submit additional argument as to why

4

1   you believe -- do you have -- did the Plaintiffs have your last

2   proposal so they know what you're going to submit, Microsoft?

3   Yes.

4           MR. MILLER:  They do.

5           MS. WILLIAMS:  Yes.

6           THE COURT:  Okay.  Four p.m., give me your competing

7   proposals and why, and so I'll put that so we can get the

8   discovery moving.

9           MR. SEIDEL:  Yes, Your Honor.

10          THE COURT:  All right.  We don't need to wait and have

11  a 35-day motion on that.  Let's just get that moving.

12          MS. WILLIAMS:  Understood.

13          THE COURT:  All right.  So we have the motion to dismiss

14  which is scheduled to be heard on March 9.  I need to hear it on

15  March 16th, but still before anything else.  But the briefing

16  schedule remains the same.  That will be March 16th at 10:00 a.m.

17  in person -- in person.

18          MS. WILLIAMS:  We will be there.

19          THE COURT:  All right.  Okay.  The next issue is we need

20  to reschedule the preliminary injunction.  Plaintiff -- Plaintiffs

21  want it to be at trial.  Well, let me tell you why I'm going to

22  leave it as a preliminary injunction.  First is normally combining

23  them helps the defense because -- especially this type of case.

24  It's their witnesses mostly.  They don't have to put them up

25  twice.  On preliminary injunction, Plaintiff has a lower burden

1   than the trial on the merits.  And, finally, there are a lot of

2   moving parts here.  I think it would be a mistake probably for me

3   to enter a permanent injunction -- if I did that.  I have no idea,

4   no opinion -- in April.  Therefore, I don't see that Plaintiffs

5   are  prejudiced  by  moving  forward  with  just  a  preliminary

6   injunction, and that's Microsoft's preference.

7            So I was going to schedule the preliminary injunction

8   hearing for April 12th at 1:00 p.m.  That's specially set.  There

9   are no other matters to be heard at that time.  Then -- to give me

10  enough time to rule thoughtfully before May 1st.

11            Now, again, we can adjust that schedule depending on

12  what Microsoft's willing to stipulate to with respect to the

13  merger but now, as it stands, it's only May 1st.  So it would be

14  April 12th at 1:00 p.m., and I'd like all the briefing complete by

15  March 23rd.  And, again, I'll leave it to you to figure all that

16  out by Monday.  Just file a stip on when the opposition and reply

17  will come in.  The reply must be in at least -- oh, by March 23rd.

18  Right.

19            Anybody want to be heard on any of that?  Oh, you're on

20  mute, Mr. Alioto.  Hopefully that's not a sign.

21            MR. ALIOTO:  I've had plenty of courts try to put me on

22  mute.  Okay.  Your Honor, I heard what the Court said about --

23  about  joining.  Sometimes  under  the  rules,  of  course,  that's

24  allowed and sometimes it's preferred.  I think that the witnesses

25  will be the same.  I think that we'll be able to be finished with

1   the discovery.  And I think that the preliminary injunction is in

2   effect and as a matter of fact, they cannot merge until May 1st

3   anyway, so they are -- and the Court just issued an order -- so

4   they're enjoined from completing this merger.

5           They have certain dates that I think might be relevant

6   to Your Honor.  If they -- if they -- if there's any decision

7   prior to April 18 -- this is in their merger document, which is

8   Exhibit -- I think it's H -- it was H to their -- to their motion

9   to stay.  If the Court enters any orders for a permanent

10  injunction or give up the combination prior to April 18, then they

11  have to pay Activision two and a half billion dollars.  If it's

12  after April 18, then they have to pay Activision -- and it's

13  prohibited -- three billion dollars.

14          So I'm here to argue on behalf of Microsoft to save --

15          THE COURT:  Well, don't bother.

16          (Simultaneous speaking.)

17          MR. ALIOTO:  -- (indiscernible).

18          THE COURT:  Don't bother.  You have no --

19          MR. ALIOTO:  I want to save them money.

20          THE COURT:  You have no standing to do so, Mr. Alioto.

21          MR. ALIOTO:  I'm going to save them money, Your Honor.

22          THE COURT:  No, no.  The only thing I want to hear is

23  why you're somehow prejudiced -- and I don't see how you are given

24  that it's a lower burden on a preliminary injunction.  If I issue

25  the preliminary injunction, the merger's not going forward until

1    I order otherwise.  So I don't see how you're burdened.  I see how

2    Microsoft is burdened, but Microsoft wants it to be a preliminary

3    injunction.

4                 MR. ALIOTO:  Oh, Your Honor, may I ask this?  Then at

5    the preliminary injunction, can we have witnesses?

6                 THE COURT:  Oh, maybe.  Yeah, maybe.

7                 MR. ALIOTO:  Oh -- oh, --

8                 THE COURT:  Yeah -- no.  Preliminary injunction often --

9    sometimes --

10               MR. ALIOTO:  Yeah.

11               THE COURT:  -- involves an evidentiary hearing.

12               MR. ALIOTO:  Oh, okay.  Great.  Okay.  That -- all

13   right.  Then if I said anything, I withdraw it.

14               THE COURT:  About wanting to save Microsoft money.

15               MR. ALIOTO:  I'm going to save money from --

16               THE COURT:  Which that's a good point.  We should

17   probably set -- let's see.  I set the hearing for April 12th.  We

18   should probably set a pre-preliminary injunction hearing for April

19   5th by video.  That's going to be 3:00 p.m.  I'm in trial that

20   week, so 3:00 p.m. -- so we can talk about what the hearing will

21   look like the following week.

22               MR. ALIOTO:  Would the -- would Your Honor want any

23   documents that are going to be used designated by that time?

24               THE COURT:  I'll let you guys -- whatever you want,

25   whatever you think is helpful.

8

1          MR. ALIOTO:  Okay.

2          THE COURT:  That's interesting.  It's not a trial, so

3   I'm not going to issue a trial order.

4          MR. ALIOTO:  Okay.

5          THE COURT:  But obviously whatever is the most useful

6   and helpful to me would be appreciated.  It's a big decision.

7          MR. ALIOTO:  That's what we're trying to do, Your Honor.

8          THE COURT:  Yeah.  And just work together on that so

9   each side can present it in an effective way.

10         Okay.  All right.  So tomorrow by 4:00 p.m., your

11  competing proposals on protective order.  By Monday, stipulation

12  on the opposition.  And the reply will be March 23rd, so I guess

13  the only thing I'll need to know is when you agree the opposition

14  will be filed for the preliminary injunction.  The hearing, April

15  12th and April 5th at 3:00 p.m. a pre-preliminary injunction

16  hearing conference.  We will all be together on March 16th, in any

17  event, and that can be a status as well because we have that here.

18         So now let's talk about discovery.  And as I understand

19  it, Microsoft, you're prepared to turn over everything that's been

20  turned over to the FTC?

21         MS. WILLIAMS:  Yes.  We're prepared to turn over the HSR

22  file that -- that the Plaintiffs have requested, which is the

23  initial HSR filing, the voluntary access letter responses, and

24  then the responses to the second request.

25         THE COURT:  But my question was a little bit different.

1  It was everything that's been turned over to the FTC.

2          MS. WILLIAMS:  I think there may be some additional

3  productions after that.  What we have ready to go is around 9 or

4  10 million pages of documents that were that initial production,

5  and that's what we have ready to go right now and that's what

6  we've agreed to produce.

7          THE COURT:  But why -- what would be the argument as to

8  why you shouldn't produce to the Plaintiffs what you produced to

9  the FTC?

10          MS. WILLIAMS:  I just need to find out what those

11  additional productions are.  I think there may have been some

12  additional documents that -- that have gone in.  And what the

13  Plaintiffs had requested was the HSR file and so that's what we

14  have -- that's what we've copied and gotten ready to produce so

15  far.  I'm not making an argument right now that we won't produce

16  them.

17          THE COURT:  Yeah.  I guess I just don't -- if you're

18  producing them to the FTC, it seems like there's no burden or a

19  relatively small burden to produce that as well to the Plaintiffs.

20  And I understand you've also agreed to produce transcripts of the

21  depositions.

22          MS. WILLIAMS:  That's correct.

23          THE COURT:  Okay.  So, Mr. Alioto, you're not -- you're

24  not -- you have your own case and you get to take your own

25  depositions.

1           MR. ALIOTO:  Thank you, Your Honor.

2           THE COURT:  And, Microsoft, it's their position that

3    they would rather that you take them later which, again, could be

4    burdensome to their -- to their witnesses, but that's the burden

5    they're willing to take on at that point.

6           Given that and given your representation you don't need

7    them for the preliminary injunction, it seems to me the most

8    efficient way to proceed, you get those transcripts, you're going

9    to get all the documents that FTC comes (ph), and then once we

10   resolve the preliminary injunction, the case moves forward, then

11   you get to take your depositions.

12          What's wrong with that approach?

13          MR. ALIOTO:  Your Honor, the law is different and the

14   depositions, therefore, are not seeking the same things that we

15   would be seeking.

16          THE COURT:  No, I understand.  I'm saying you get to

17   take them from scratch.

18          MR. ALIOTO:  Oh, oh.

19          THE COURT:  You get to take them from scratch.

20          MR. ALIOTO:  Okay.

21          THE COURT:  It's just -- you are not bound by them.  You

22   are not bound by how the FTC asked their questions.

23          MR. ALIOTO:  Okay.

24          THE COURT:  You may be going into the same topic area

25   but they're not your -- they're not your clients' lawyer.  You --

1    it's just a matter of timing.

2           MR. ALIOTO:  I think -- I think, Your Honor, that if we

3    were able to be allowed to proceed, we anticipate that the

4    depositions will only be about four hours or so, not very much --

5    currently.  We represented -- we made that representation to the

6    people that we served the subpoenas on as well.  I think that we

7    would be helpful to the FTC, if anything.

8           THE COURT:  Okay.  Well, you are just always trying to

9    help everybody out, but FTC is not here asking.  So what I -- I

10   think -- and we're meeting again on March 16th, so if somebody

11   wants to raise something --

12          MR. ALIOTO:  If there's any --

13          THE COURT:  -- now -- no depositions by the Plaintiffs

14   but Microsoft should turn over everything that's going to the FTC

15   and, as they agreed, the transcripts of all the depositions.

16          MR. SAVERI:  Your Honor, --

17          THE COURT:  Yes.

18          MR. SAVERI:  -- this is Joseph Saveri -- excuse me, Your

19   Honor.  Just with respect to the first kind of bucket of things

20   we're talking about, the materials that were going to be produced,

21   the first thing we did ask for is the HSR materials that were

22   turned over by Microsoft to the FTC and we talked about that.

23          We have asked for some additional materials that relate

24   to that proceeding and I want to be clear about that as long as

25   we're here today.  So first is we asked for unredacted copies of

1  the filings in the FTC proceeding and we are not party to that and

2  I don't think that's within the ambit of the -- the materials that

3  were turned over to the FTC pursuant to the Hart-Scott-Rodino.  So

4  the extent there are materials that were filed in FTC proceedings

5  that were redacted and not in the public docket, we would -- we

6  would want those.

7           THE COURT:  Okay.  What you're looking for are not in

8  the public -- what's under seal.

9           MR. SAVERI:  Correct, Your Honor.

10          THE COURT:  Let me ask --

11          MR. SAVERI:  If I said something different, I misspoke.

12          THE COURT:  No, no, no, no, no.  I'm just -- I don't

13 think so.  I'm just framing it a little bit differently.

14          Ms. Williams, what's your response to that?

15          MS. WILLIAMS:  So we have looked into that and there are

16 some issues with third party protected information, and so we --

17 we can look into going through and taking off the Microsoft-

18 redacted information.  But I don't think there's anything we can

19 do under the confidentiality rules to unredact any other party's

20 information.

21          THE COURT:  Yeah.  I just -- often -- I mean, sometimes

22 you have to go into that court.

23          MR. SAVERI:  But, excuse me, Your Honor.  There isn't

24 like -- because of this, there isn't a Rule 45 third party

25 subpoena practice in this case.  We can -- we can take it up with

1   the third parties that produced it, I suppose, but I just wanted

2   to make sure it was clear with respect to you that our ask was

3   clear and we'll -- to the extent Microsoft can, they should.  And

4   if they can't and they won't, we'll pursue other avenues.  So I

5   just wanted to let --

6           THE COURT:  No.  I think Ms. Williams agreed to look

7   into it to the extent that they can.

8           MR. SAVERI:  And then --

9           MS. WILLIAMS:  I --

10          MS. WILLIAMS:  Excuse me.

11          MS. WILLIAMS:  I wanted to correct something real quick

12  on the -- on the deposition transcripts that -- a mistake that we

13  made  in  the  report  is  we  are  producing  Microsoft  witness

14  transcripts, and I did say Activision in there, and that is not

15  something that we're authorized to do.  So that -- I know they

16  have subpoenas out to Activision, so they'll have to go that route

17  to get Activision transcripts.

18          THE COURT:  Okay.  Or they may -- I'm sure you know --

19  you're in contact with their attorneys -- they may agree.

20          MR. SAVERI:  And, Your Honor, just to -- just to finish

21  this point up about the FTC materials, we -- we understand, but do

22  not know, that frequently in a case of this type that the FTC will

23  conduct interviews which look like depositions perhaps, but those

24  are statements taken by witnesses.  To the extent that those have

25  been taken, they're not depositions per se, but Microsoft likely

1    has transcripts of those.  We would request those as well.

2            MS. WILLIAMS:  That -- this is the first I've heard of

3    this request, so I just don't know if any of those are in

4    existence or what the status is.  I can look into it.

5            THE COURT:  Okay.

6            MR. SAVERI:  Your Honor, those are in the requests for

7    production that we've --

8            THE COURT:  No, I -- okay.  Yeah.  No.  I understand.

9    Just talk to Ms. Williams and -- I don't know if they exist or --

10           MS. WILLIAMS:  I mean, --

11           THE COURT:  -- who takes it down.  I don't know if it's

12   work product.  I have no idea.

13           MS. WILLIAMS:  Yeah.  Exactly.  I -- they've asked us

14   for various items and we've been looking into whether those items

15   are contained in this huge production or not or whether we need to

16   go look elsewhere for them, so we are currently working on that.

17           MR. SAVERI:  And then, Your Honor, we do have additional

18   categories of documents that we've -- that are contained in our

19   requests for production.

20           THE COURT:  Yes.

21           MR. SAVERI:  And we described those in the JSR.

22           THE COURT:  Why do you need them now?

23           MR. SAVERI:  We need them now generally because of the

24   shortness of time, Your Honor.  We're -- we are in a very

25   compressed schedule by any stretch of the imagination.  And so the

1   sooner we --

2           THE COURT:  Less compressed than you wanted.

3           MR. SAVERI: Fair enough, Your Honor, but nonetheless --

4   but I think it's a fair point that by any reasonable estimation,

5   we are in a compressed schedule and these are important things,

6   including documents like whatever the -- whatever the operative

7   version of the agreement is.

8           THE COURT:  I can't imagine hasn't that been produced

9   to the FTC?  I just assumed that the FTC would have it.  I mean,

10  how can they bring an action to --

11          MS. WILLIAMS:  The operative merger agreement is public

12  and they have it, so --

13          MR. SAVERI:  Excuse me, Your Honor.  Maybe I wasn't

14  being -- when we were last in front of you, we wanted to make sure

15  that we had an opportunity to kind of shoot at the right target,

16  so to the extent that that agreement has been modified or changed

17  in any way, that might not necessarily be reflected in the merger

18  document itself.  And so whatever the operative version of the

19  agreement is, I think we would like to have that.

20          Let me address one other thing, though, Your Honor.  You

21  know, we are -- we set the schedule for the preliminary injunction

22  hearing and we've talked about whether it would be -- I mean, it's

23  in the nature of an evidentiary hearing.  And we would certainly

24  want to be on the same footing as Microsoft.  And right now, you

25  know, the discovery is asymmetric.  They have more than we.  And

1   so there are other things that would be key to that which are

2   narrow, carefully tailored to the issues before the Court, and we

3   would like to proceed with obtaining those, and they are described

4   in the JSR.

5            THE COURT:   Okay.   That's different than what was

6   represented to me the last time we were together.  Mr. Alioto said

7   you didn't need the more discovery that it was for.  So what I --

8   so everything the FTC has, you should get, and then maybe

9   certainly the operative agreement.   I think probably Microsoft

10  wants you to have that because it's the anything assigned (ph).

11           The other discovery should be moving forward, right,

12  just so you say, but I'm not saying it has to all be produced in

13  time to be used, you know, in connection with the preliminary

14  injunction hearing, but I'm not staying written discovery.

15  Obviously Microsoft -- it's going to take a little while to gather

16  some of these communications that you asked for --

17           MR. SAVERI:  Yes, Your Honor.

18           THE COURT:   -- and you should be working with them,

19  meeting and conferring and going forward.  I guess the only thing

20  I'm actually staying is the depositions.

21           MR. ALIOTO:  May I ask -- may I ask one thing, if it

22  please, Your Honor?

23           THE COURT:  Yes.

24           MR. ALIOTO:  Okay.  Under the FTC, they're supposed to

25  conclude their discovery by April -- what is it? -- April 7th.

1    They're supposed -- and conclude their fact discovery by April
2    7th.
3            THE COURT:  Yes.
4            MR. ALIOTO:  Okay.  That means that they have taken the
5    depositions, I assume.  We only have five or six depositions --
6            THE COURT:  I'm not going to speculate because you don't
7    know what that schedule is, Mr. Alioto.
8            MR. ALIOTO:  Okay.
9            THE COURT:  So we can have a conversation when you
10   actually know and you've met and conferred with Ms. Williams about
11   that.  Okay?
12           MR. ALIOTO:  About the depositions?
13           THE COURT:  Yes.
14           MS. WILLIAMS:  I can make a representation that those
15   depositions are happening in March.
16           THE COURT:  Okay.  There you go.
17           MR. ALIOTO:  Yeah.
18           THE COURT:  You've got to talk.  You've got to talk to
19   the other side before you bring it up with me.  Okay?
20           MR. ALIOTO:  Sure.
21           THE COURT:  All right.  All right.
22           MS. WILLIAMS:  Can I -- can I say one thing about the
23   depositions, Your Honor?
24           THE COURT:  Yes.
25           MS. WILLIAMS:  And I appreciate your rulings so far.

1   These are -- these are Apex depositions, and you had said that the

2   Plaintiffs could take duplicative -- ask duplicative questions.

3   And I would just like to suggest that for efficiencies and because

4   these are the very top executives at Microsoft, that we would like

5   to submit that the Plaintiffs should not ask duplicative

6   questions.

7           THE COURT:  Well, you can bring a motion if you want on

8   the Apex.  Yeah, you can bring a motion.  I guess what I'm saying

9   is -- I mean, Plaintiffs weren't proposing to do them together,

10  anyway.

11          MS. WILLIAMS:  No.

12          THE COURT:  Right.  So -- but I guess what I was saying

13  to Mr. Alioto, I'm not ruling that they have to rely on what the

14  FTC does at all.

15          MR. ALIOTO:  And, Your Honor, by the way, since you just

16  mentioned it, we'd be happy to take them at the same time that

17  they take them.

18          THE COURT:  Well, I raised that last time about

19  coordinating with the FTC and you said, "Ah, we don't really do

20  that.  I don't know."

21          MR. ALIOTO:  Hey, well, they brought it up.  Hey, I'd

22  be happy --

23          THE COURT:  The FTC may not want to.  I don't know.

24  Anyway, seems a little late now.  They're scheduled and we

25  can't -- we can't get in the way of that.  So --

19

1        MR. ALIOTO:  All right, Your Honor.

2        THE COURT:  So we're not going to get in the way of it.

3        MR. ALIOTO:  Thank you.

4        THE COURT:  All right.  I will write a little order, try

5   to summarize what we decided today.

6        MR. SAVERI:  And, Your Honor --

7        THE COURT:  Okay.  Excuse me, Your Honor.  I apologize.

8   Just to report, we are proceeding with the third party discovery,

9   as we talked about at the last hearing.  The subpoenas are out and

10  we're negotiating those and hopefully we can move those along.  I

11  just wanted to make sure you were aware of that.

12       THE COURT:  Yes.  No.  I'm not -- I'm not staying

13  written discovery.  It's just the depositions.  I think it makes

14  sense  to  let  those  go  forward.   We'll  have  our  preliminary

15  injunction  hearing.   We'll  have  all  your  written  discovery

16  hopefully  by  that  point,  so  then  we  can  move  immediately  to

17  depositions.

18       MR. SAVERI:  And we -- the subpoenas include documents

19  from the third parties.  That's part of it, so --

20       THE COURT:  Yeah, of course.

21       MR. ALIOTO:  But they also include the depositions, so

22  those depositions of --

23       THE COURT:  No.  I don't have them in front of me, so

24  I'm not staying them, right?  I have no idea what they're going to

25  say.

20

```
 1              MR. SAVERI:  Okay.
 2              THE COURT:  I'm not -- I'm not making any ruling on
 3    that.
 4              MR. ALIOTO:  Thank you.  Thank you.
 5              THE COURT:  This is to Microsoft.
 6              MR. ALIOTO:  Yes.  Okay.
 7              THE COURT:  All right.  Anything further?
 8              MR. ALIOTO:  No.
 9              THE COURT:  Okay.
10              MS. WILLIAMS:  No.
11              THE COURT:  Okay.  Yes, Mr. Saveri.
12              MR. SAVERI:  No.  Your Honor, I was going to say I think
13    I've interrupted enough and I did it again, Your Honor.
14              THE COURT:  That's quite all right.  Everyone can speak.
15    We just want to get it right.
16              MR. SAVERI:  Thank you.
17              THE COURT:  I will see you in person then on March 16th.
18              MS. WILLIAMS:  Thank you, Your Honor.
19              THE COURT:  Oh, and maybe, actually, can you give me an
20    updated statement then since we'll do a status as well -- March
21    14th, just two days before so that I get the most up-to-date
22    information of how everything's going.
23              MR. ALIOTO:  All right, Your Honor.  Thank you very
24    much.
25              THE COURT:  Okay.  Thank you.
```

21

1                    ALL:  [Thank you, Your Honor.]

2            (Proceedings adjourned at 2:01 p.m.)

3

4            I, Peggy Schuerger, certify that the foregoing is a

5    correct transcript from the official electronic sound recording

6    provided to me of the proceedings in the above-entitled matter.

7

8            *Peggy Schuerger*                          February 4, 2023
     _____           _____
     Signature of Approved Transcriber          Date

9

     Peggy Schuerger
     _____
10   *Ad Hoc Reporting*
     Approved Transcription Provider
11   for the U.S. District Court,
     Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25