Joseph M. Alioto (State Bar No. 42680)
Tatiana V. Wallace (State Bar No. 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:     (415) 434-8900
Facsimile:      (415) 434-9200
Email:           jmalioto@aliotolaw.com
                      twallace@aliotolaw.com

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone:     (415) 500-6800
Facsimile:      (415) 395-9940
Email:           jsaveri@saverilawfirm.com
                      swilliams@saverilawfirm.com
                      czirpoli@saverilawfirm.com
                      eabuchanan@saverilawfirm.com
                      dseidel@saverilawfirm.com
                      kmcmahon@saverilawfirm.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DANTE DEMARTINI, et al., | Case No. 3:22-cv-08991-JSC |
| Plaintiffs, | |
| v. | **MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE** |
| MICROSOFT CORPORATION, a Washington corporation, | Hon: Jacqueline Scott Corley |
| Defendant. | Date: May 12, 2023<br>Time: 10:00 am<br>Courtroom: 8 - 19th Floor |
| | **FILED UNDER SEAL** |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**:

**PLEASE TAKE NOTICE** that on Friday, May 12, 2023, or as soon thereafter as the Court finds it practical, Plaintiffs will and hereby do move the Court for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), against the proposed acquisition of Activision Blizzard, Inc. by Microsoft Corporation, under Sections 7 and 16 of the Clayton Act, 15 U.S.C. §§ 18 and 26. The motion will be made based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declaration of David H. Seidel in support of this Motion and the exhibits attached thereto, the Declarations of Plaintiffs in support of this Motion, any evidence received on this Motion, and the file in this matter.

**REQUESTED RELIEF**

1. Pursuant to Rule 65(a) and Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs seek an order from the Court preliminarily enjoining Defendant Microsoft Corporation from acquiring Activision Blizzard, Inc., until a trial on the merits may be conducted by the Court to determine whether the combination is unlawful under 15 U.S.C. § 18.

2. Plaintiffs request that the Court order Microsoft to show cause why the merger should not be preliminarily enjoined pending a bench trial on the merits.

Dated: April 23, 2023

By:     /s/ Joseph Saveri
          Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:     (415) 500-6800
Facsimile:     (415) 395-9940
Email:          jsaveri@saverilawfirm.com
                swilliams@saverilawfirm.com
                czirpoli@saverilawfirm.com
                eabuchanan@saverilawfirm.com
                dseidel@saverilawfirm.com
                kmcmahon@saverilawfirm.com

Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:     (415) 434-8900
Facsimile:     (415) 434-9200
Email:          jmalioto@aliotolaw.com

Joseph M. Alioto Jr. (SBN 215544)
**ALIOTO LEGAL**
100 Pine Street, Suite 1250
San Francisco, California 94111
Tel: (415) 398-3800
Email:          joseph@aliotolegal.com

*Plaintiffs' Counsel*

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     THE PROPOSED ACQUISITION ........................................................................5

III.    LEGAL STANDARD .............................................................................................5

IV.     ARGUMENT ...........................................................................................................5

        A.      Plaintiffs are Likely to Succeed on the Merits ............................................5

                1.      Through the Celler-Kefauver Act, Congress Provided a Low Bar to
                        Arrest Concentration Through Mergers ...........................................7

                2.      Plaintiffs Need Only Demonstrate a Reasonable Probability of
                        Lessening Competition in a Single Market....................................9

                3.      The Merger Guidelines Do Not Apply ...........................................10

                4.      The Merger May Substantially Lessen Competition in the Market
                        for Triple-A Video Games..............................................................11

                5.      The Merger May Substantially Lessen Competition in the
                        Platform-Side Markets for High-Performance consoles, Game
                        Library Subscription Services, Cloud-Gaming Services, and
                        Computer Operating Systems .........................................................14

        B.      Plaintiffs Are likely to Suffer Irreparable Harm Without Preliminary Relief
                ........................................................................................................................26

        C.      The Balance of Equities Tips in Plaintiffs' Favor and Preliminary Relief Is
                in the Public Interest ...................................................................................29

        D.      A Bond Should Not be Required ................................................................31

V.      CONCLUSION......................................................................................................31

MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE

# TABLE OF AUTHORITIES

**Federal Cases**

*All. for the Wild Rockies v. Cottrell,*
632 F.3d 1127 (9th Cir. 2011) ......................................................................1, 5, 6

*Barahona-Gomez v. Reno*
167 F.3d 1228 (9th Cir. 1999) ..............................................................................31

*Boardman v. Pac. Seafood Grp.,*
822 F.3d 1011 (9th Cir. 2016) .................................................................... *passim*

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962)..................................................................................... *passim*

*California v. Am. Stores Co.,*
492 U.S. 1301 (1989).............................................................................3, 26, 27, 28

*California v. Am. Stores Co.,*
495 U.S. 271 (1990)............................................................................4, 6, 7, 8

*Cont'l Oil Co. v. Frontier Ref. Co.,*
338 F.2d 780 (10th Cir. 1964) ..............................................................................31

*F.T.C. v. Elders Grain, Inc.,*
868 F.2d 901 (7th Cir. 1989) ..................................................................................8

*Jacobsen & Co., Inc. v. Armstrong Cork Co.,*
548 F.2d 438 (2d Cir. 1977)....................................................................................6

*Moltan Co. v. Eagle-Picher Indus., Inc.,*
55 F.3d 1171 (6th Cir. 1995) ................................................................................31

*N. Am. Soccer League v. Nat'l Football League,*
465 F. Supp. 665 (S.D.N.Y. 1979)........................................................................6

*Olin Corp. v. F.T.C.,*
986 F.2d 1295 (9th Cir. 1993) ..............................................................................10

*ProMedica Health Sys., Inc. v. F.T.C.,*
749 F.3d 559 (6th Cir. 2014) ................................................................................13

*Regents of Univ. of Cal. v. Am. Broad. Cos., Inc.,*
757 F.2d 511 (9th Cir. 1984) ..................................................................................6

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.,*
778 F.3d 775 (9th Cir. 2015) .......................................................................6, 9, 13

*State of Cal. by Van de Kamp v. Am. Stores Co.*,
  697 F. Supp. 1125 (C.D. Cal. 1988) ..............................................26, 30

*State of Cal. v. Am. Stores Co.*,
  872 F.2d 837 (9th Cir. 1989) ...........................................................26

*U.S. v. Falstaff Brewing Corp.*,
  410 U.S. 526 (1973).....................................................................24, 25

*United States v. Aluminum Co. of Am.*,
  377 U.S. 271 (1964).........................................................8, 9, 10, 13

*United States v. BNS Inc.*,
  585 F.2d 456 (9th Cir. 1985) .............................................................6

*United States v. Microsoft Corp.*,
  84 F. Supp. 2d 9 (D.D.C. 1999) ........................................................2

*United States v. Pabst Brewing Co.*,
  384 U.S. 546 (1966)................................................................9, 13, 14

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963)................................................................10, 14

*United States v. Swift & Co.*,
  286 U.S. 106 (1932)..........................................................................18

*United States v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972)..........................................................................30

*United States v. Trib. Publ'g Co.*,
  2016 WL 2989488 (C.D. Cal. Mar. 18, 2016) .................................5

*United States v. Von's Grocery Co.*,
  384 U.S. 270 (1966)................................................................ *passim*

**Federal Statutes**

Clayton Act. § 7 15 U.S.C. § 18 ..................................................... *passim*

Clayton Act § 16, 15 U.S.C. § 26 ................................................... *passim*

**Rules**

Fed. R. of Civ. P. 65......................................................3, 5, 28, 31

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.      INTRODUCTION

Microsoft's acquisition of Activision Blizzard Inc. ("Activision") is the latest step in a long-term strategic plan to acquire and monopolize the most important gaming content producers and starve its platform-side competitors from sufficient Triple-A gaming content. The merger will eliminate the substantial and direct competition between Microsoft and Activision in producing Triple-A games. It will allow Microsoft to significantly further its monopolistic foreclosure strategy and harm competition in the market for High-Performance Consoles, Game Subscription Services, Cloud-Gaming Services, and Operating Systems used in PC gaming. Plaintiffs are likely to succeed in showing that this acquisition might substantially lessen competition or tend to create a monopoly. At minimum, there are "serious questions" going to the merits. *See All. for the Wild Rocki*es v*. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

The limited discovery to date confirms that Microsoft is already utilizing this anticompetitive foreclosure strategy and it has largely admitted as much. Microsoft's strategy is clear: to harm and eliminate rivals through foreclosure of Triple-A gaming content. Integral to this strategy is Microsoft's purchase of rival game developers and publishers and, once acquired, making their games exclusive to Microsoft's platforms. Microsoft's strategic plan is to foreclose its rivals game by game, thereby creating a competitive "moat" that shields it from competition. This anticompetitive strategy has already been utilized by Microsoft in its prior acquisitions where, after acquiring game developers and publishers, Microsoft made its newly acquired content exclusive to Microsoft's platforms and distribution channels. Microsoft has already made acquired games exclusive to its platforms even after telling regulators and the public it had no incentive to, and would not do so. Microsoft's plans for Activision content are no different, nor can Microsoft credibly claim otherwise based on its previous conduct. The proposed acquisition of Activision, however, is remarkable in its potential anticompetitive effects. Activision is without dispute the most successful independent Triple-A game publisher in the world, and *Call of Duty* is the most important Triple-A game for driving platform-side demand.

Even if it were not obvious from Microsoft's business records and prior conduct that Microsoft's foreclosure strategy is to eliminate rivals and competition, it is still clear that the proposed merger would

provide Microsoft the incentives and tools to do so. Microsoft's anticompetitive incentives already manifest in its prior acquisitions and are now confirmed by its confidential records. The same incentive structure applies to its acquisition of Activision Blizzard's content. Economic analysis confirms this as well.

The video game industry is already defined by significant network effects that entrench users and their friends on particular platforms and create barriers to entry into the relevant markets. These dynamics, as documented by expert economists and confirmed by Microsoft's internal business records, establish the ███████████████████████ that Microsoft identifies in its market analysis. Indeed, as Microsoft also admits, this dynamic is ████████████████████████████ ████████████████████████████████████

The dynamics involved mean that Microsoft's acquisition of Activision Blizzard for use in its content foreclosure strategy may do more than simply substantially lessen competition through foreclosure, as was held unlawful in *Brown Shoe*. This merger may be the tipping point at which Microsoft wins by *eliminating* competition, just as it did for example with Netscape Navigator, which was put out of business by Microsoft's similar anticompetitive conduct. *See generally United States v. Microsoft Corp.*, 84 F. Supp. 2d 9 (D.D.C. 1999); see also id. at 112 ("Through its conduct toward Netscape, IBM, Compaq, Intel, and others, Microsoft has demonstrated that it will use its prodigious market power and immense profits to harm any firm that insists on pursuing initiatives that could intensify competition against one of Microsoft's core products. Microsoft's past success in hurting such companies and stifling innovation deters investment in technologies and businesses that exhibit the potential to threaten Microsoft. The ultimate result is that some innovations that would truly benefit consumers never occur for the sole reason that they do not coincide with Microsoft's self-interest.").

Incredibly, Plaintiffs have found evidence that Microsoft believes it can put Sony's PlayStation out of business too, by cornering enough of the Triple-A gaming market and foreclosing PlayStation from that content. In an internal email, Microsoft states the following:

████████████████████████████████████

---

[1] All Exhibits ("Ex.") filed in support of this motion are attached to the declaration of David Seidel, filed concurrently with this memorandum of law .



(emphasis added).

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiffs seek a preliminary injunction to temporarily stop the acquisition of Activision Blizzard by Microsoft Corporation, until the parties can have an accelerated trial on the merits. By enjoining the consummation of the merger until trial, this Court will ensure that the status quo is maintained and prevent irreparable harm to competition and to the Plaintiffs before Plaintiffs can demonstrate that the acquisition is unlawful under Section 7 of the Clayton Act. 15 U.S.C. §18. Because Plaintiffs are likely to establish that the merger is unlawful and that they are threatened with irreparable harm if the merger proceeds, the Court should grant the Motion. As explained by the Supreme Court and as confirmed by the Ninth Circuit , where a threat of lessening of competition exits, the irreparable injury is inherent to the loss of competition. *See California v. Am. Stores Co.*, 492 U.S. 1301, 1304 (1989) ("[L]essening of competition 'is precisely the kind of irreparable injury that injunctive relief under section 16 of the Clayton Act was intended to prevent.'"); *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) ("A lessening of competition constitutes an irreparable injury under our case law."). And these Plaintiffs—ten video game consumers—are precisely the type of individuals the antitrust laws are meant to protect. Plaintiffs would be directly harmed by the anticompetitive effects at issue in this case.

Through Section 7 of the Clayton Act, Congress prohibited all mergers and acquisitions in which the effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. The history of the Supreme Court's Clayton Act jurisprudence, incontrovertibly demonstrates that Congress meant to vigorously clamp down on the trend towards market concentration through mergers and acquisitions. The law in the Ninth Circuit is no different. The Supreme Court has repeatedly affirmed

1  that Congress specifically intended the Act's broad language, requiring that a Plaintiff only show that a

2  merger has a reasonable probability of lessening competition or tending to create a monopoly for it to be

3  unlawful. *See, e.g.*, *Brown Shoe Co. v. United States,* 370 U.S. 294, 317 (1962). Congress meant to stop

4  market concentration in its incipiency, based on a simple but powerful policy judgment: that in the United

5  States, internal expansion through competition is inherently preferred over concentration through mergers

6  and acquisitions, and that concentration must be stopped long before it reaches monopolistic levels.

7     As part of Congress' statutory plan to prevent market concentration in its incipiency, Congress

8  enshrined the individual right of action as part of its antitrust enforcement scheme. Congress authorized

9  private Plaintiffs threatened with loss or harm from the loss of competition, to seek and obtain injunctive

10  relief. As the Supreme Court has explained, "[p]rivate enforcement of the [Clayton] Act was in no sense

11  an afterthought; it was an integral part of the congressional plan for protecting competition." *California v.*

12  *Am. Stores Co.*, 495 U.S. 271, 284 (1990). Section 16 and other provisions of the Clayton Act "manifest a

13  clear intent to encourage vigorous private litigation against anti-competitive mergers," and "subjects

14  mergers to searching scrutiny." *Id.* at 285. Congress did not limit private enforcement to businesses or to

15  those in head-to-head competition or in privity with the parties to the proposed merger.

16     Microsoft's acquisition of Activision Blizzard is precisely the type of merger that Congress meant

17  to enjoin when it enacted the Celler-Kefauver Anti-Merger Act, codified in Section 7 of the Clayton Act.

18  Plaintiffs' attach ample evidence in support of their motion including two separate economic analyses that

19  show that this merger is likely to harm competition. *See* Exs. A, B, C. Also attached is a sworn

20  declaration of ███████████████████████████████████████████████

21  ████████████████████████████████████████████████████████

22  Plaintiffs also submit herewith to the Court internal documents from Microsoft proving, beyond any

23  doubt, that Microsoft is actively pursuing a content foreclosure strategy and will foreclose Activision

24  Blizzard's gaming content from Microsoft's rivals. Plaintiffs also attach their declarations in support.

25  Despite having uncovered numerous documents supporting this motion, Plaintiffs are still far from

26  uncovering the full factual record in this case. Indeed, Activision has substantially delayed producing

27  relevant materials, and Plaintiffs have also been forced to move to compel deposition testimony against

28  Activision. Plaintiffs reserve the right to supplement the record as appropriate.

The Supreme Court has repeatedly struck down mergers with far less risk of harming competition than is the case here. To prevent the irreparable harm to competition and to Plaintiffs that will ensue if the merger is allowed to be consummated but then ultimately found to be unlawful, the Court should preliminarily enjoin the merger from consummating until after an accelerated trial on the merits.

## II.   THE PROPOSED ACQUISITION

On January 18, 2022, Microsoft announced plans to acquire Activision. Microsoft agreed to pay $68.7 billion ($68,700,000,000), in an all-cash transaction to acquire the stock of Activision. Upon consummation of the acquisition, Activision would be wholly owned by Microsoft. The acquisition agreement provides a termination date of July 18, 2023, allowing either party to terminate the agreement after the termination date. Ex. N at 84. The parties may, however, consummate the merger anytime. *Id.* Additional background on the video game industry is described in the Amended Complaint. ECF No. 84.

## III.   LEGAL STANDARD

The Court may grant a preliminary injunction under Federal Rule of Civil Procedure 65(a) and under Section 16 of the Clayton Act, 15 U.S.C. §26. In deciding whether to grant a preliminary injunction, courts must consider four factors: (1) the movant's likelihood of success on the merits; (2) the movant's likelihood of irreparable harm if the preliminary injunction is not issued; (3) a balancing of the equities; and (4) the public interest. *See, e.g.*, *All. for the Wild Rockie*, 632 F.3d at 1135; *United States v. Trib. Publ'g Co.*, 2016 WL 2989488, at *2 (C.D. Cal. Mar. 18, 2016). The Ninth Circuit employs a sliding scale approach, in which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies*, 632 F.3d at 1131. Under this approach, courts recognize that a stronger showing on the balancing of hardships and public interest factors lessens the burden for likelihood of success on the merits. *Id.* Thus, a preliminary injunction is warranted upon a showing of "serious questions going to the merits," so long as the balance of hardships "tips sharply in [plaintiff's] favor." *Id.*

## IV.   ARGUMENT

### A.   Plaintiffs are Likely to Succeed on the Merits

Congress' passage of the Celler-Kefauver Anti-Merger Act meant to ensure that any growing trend towards concentration in markets was stopped in its incipiency, even before it was clear whether a

merger would—or did in fact—lessen competition, reflecting a policy judgment that competition among numerous market participants is preferable to concentrating markets through mergers and acquisitions. *See, e.g.*, *Brown Shoe,* 370 U.S. at 317; *United States v. Von's Grocery Co.*, 384 U.S. 270, 274 (1966); *Am. Stores*, 495 U.S. at 275. Subsequent Ninth Circuit cases are in accord. *See Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (holding that "§ 7 was intended to arrest anticompetitive tendencies in their incipiency") (quoting *Brown Shoe*, 370 U.S. at 323; *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963)). Here, after years of unchecked concentration in the video game industry, Microsoft, one of the largest video game companies, has announced it will acquire yet another independent Triple-A game publisher, Activision. Both companies are among only a handful of companies able to produce Triple-A gaming content. Indeed, Activision is by almost any measure the most successful Triple-A game publisher in the world. And Microsoft's internal strategic documents show that its primary game strategy is to acquire key gaming content and foreclose its rivals from that important content by making it exclusive to Microsoft platforms.

At the preliminary injunction stage, Plaintiffs need only show a likelihood of prevailing on the merits. And given that the balance of hardships tips sharply in Plaintiffs' favor here, *see infra* § IV.C, Plaintiffs need only show that there are "serious questions" as to whether this acquisition might substantially lessen competition or tend to create a monopoly. *See All. For the Wild Rockies*, 632 F.3d at 1131. *United States v. BNS Inc.*, 585 F.2d 456, 464-65 (9th Cir. 1985); *Regents of Univ. of Cal. v. Am. Broad. Cos., Inc.*, 757 F.2d 511, 516-19 (9th Cir. 1984); *see also Jacobsen & Co., Inc. v. Armstrong Cork Co.*, 548 F.2d 438, 443 (2d Cir. 1977); *N. Am. Soccer League v. Nat'l Football League*, 465 F. Supp. 665, 676-77 (S.D.N.Y. 1979). The merger will eliminate the substantial and direct competition between Microsoft and Activision in producing Triple-A games. It will also allow Microsoft to further its foreclosure strategy and harm competition in the markets for High-Performance Consoles, Game Subscription Services, Cloud-Gaming Services, and Operating Systems for use in PC gaming. Moreover, Microsoft concedes that its foreclosure policy is particularly virulent in these markets due to the strong network effects and barriers to entry that exist. Ultimately, Plaintiffs will go far beyond their required burden and show that the merger will substantially lessen competition and will tend to create a monopoly. For now, however, the court should preserve the status quo and issue a preliminary injunction. Plaintiffs

are prepared to have their claims heard on an accelerated basis.

### 1. Through the Celler-Kefauver Act, Congress Intentionally Provided a Low Bar to Arrest Concentration Through Mergers

As part of Congress' statutory scheme to prohibit all mergers and acquisitions that may substantially lessen competition, Congress established a private right of action as an important means to stop anticompetitive mergers that, through incremental combinations and concentrations, slowly but surely destroy competition and tend to lead to monopolies and oligopolies. Section 16 of the Clayton Act provides in relevant part that "[a]ny person . . . shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage" from an unlawful merger or acquisition. 15 U.S.C.A. § 26. As explained in *California v. American Stores*, the Clayton Act's provisions "manifest a clear intent to encourage vigorous private litigation against anti-competitive mergers." 495 U.S. 271, 284 (1990). By encouraging vigorous private litigation to police unlawful mergers, Congress sought to "subjects mergers to searching scrutiny" through private lawsuits such as this. *Id.* at 285 Indeed, "[p]rivate enforcement of the [Clayton] Act was in no sense an afterthought; it was an integral part of the congressional plan for protecting competition." *Id.* at 284.

Congress understood the broad and pervasive harms inherent in economic concentration through mergers and acquisitions. *See Brown Shoe,* 370 U.S. at 317 ("[A] keystone in the erection of a barrier to what Congress saw was the rising tide of economic concentration, was its provision of authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency."). Congress therefore "sought to assure . . . the courts the power to brake this force at its outset and before it gathered momentum." *Id*. at 317–18. Through these provisions, the Clayton Act codifies Congress' intent to arrest the trend of economic concentration by encouraging private litigants to sue for injunctive relief to prevent the merger or acquisition as Plaintiffs seek here. Through an injunction, Congress intended that illegal mergers be stopped before they happen.

To effectuate the Clayton Act's statutory scheme to stop economic concentration through merger and thereby "preserve competition among many small businesses," Congress enshrined an expansive definition of unlawful acquisitions. *Von's Grocery*, 384 U.S. at 277. Section 7 makes unlawful all mergers and acquisitions, the effect of which "may be substantially to lessen competition or tend to create a

monopoly." 15 U.S.C. § 18. Congress' use of the term "may" in Section 7 was meant to ensure that litigants would not need to prove anticompetitive effects but would merely need to show a "reasonable probability" that competition would be lessened. *See Brown Shoe*, 370 U.S. at 325. Outlawing all mergers with merely a reasonable probability of lessening competition was a "necessary element in any statute which seeks to arrest restraints of trade in their incipiency and before they develop into full-fledged restraints violative of the Sherman Act." *Id* at 323 n.39. Indeed, requiring a Clayton Act Plaintiff of showing "certainty and actuality of injury to competition" would be "incompatible" with Section 7's aim to go beyond liability under the Sherman Act "by reaching incipient restraints." *Id.* That is why Section 7 ultimately requires merely a "prediction" as to whether competition may be lessened, and "doubts are to be resolved against the transaction." *F.T.C. v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989).

Congress's expansive definition of unlawful mergers was not made by chance. It was no linguistic accident. Congress meant to "clamp down with vigor on mergers." *Von's Grocery*, 384 U.S. at 276. The very objective of Section 7 of the Clayton Act was to "prevent accretions of power," even those "which 'are individually so minute as to make it difficult to use the Sherman Act test against them.'" *United States v. Aluminum Co. of Am.*, 377 U.S. 271, 280 (1964). That is why the Supreme Court has reiterated that a plaintiff's burden under Section 7 is particularly low. *See Am. Stores*, 495 U.S. at 275. It is also why Supreme Court case after Supreme Court case has prohibited mergers with far less potential harm to competition than here.

In *Brown Shoe*, for example, the Court prohibited a merger between the third and eighth-largest shoe sellers in the United States, where the eighth-largest manufactured less than 0.5% and retailed less than 2% of shoes. 370 U.S. at 298 . The Court held that it could not "avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency." *Id.* at 345. In *United States v. Cont'l Can Co.*, the Court prohibited an acquisition of the sixth-largest competitor by the second largest, where the acquisition would increase the acquiring entity's market share from 21.9% to 25%. 378 U.S. 441, 461 (1964). In *Aluminum Co. of Am.*, 377 U.S. 271, the Court prohibited the acquisition of the ninth-largest producer of aluminum conductor, which held only 1.3% of the market, by the largest producer of aluminum conductor, which held 27.8% of the market. The Court held that "[p]reservation of [the ninth-largest producer], rather than its absorption by one of the giants, will keep it 'as an important

competitive factor,'" and thus, the small aluminum conductor producer with only 1.3% market share "seems to us the prototype of the small independent that Congress aimed to preserve" through Section 7. *Id*. at 280-81. In *Von's Grocery*, 384 U.S. 270, the Court prohibited the merger of two grocery store chains, each with less than 5% of the market. Based solely on the market shares of the merging grocery store chains and the growing trend toward concentration in the market, the Court held that "these facts alone are enough to cause us to conclude . . . that the [merger] did violate §7." *Id.* at 274. And in *United States v. Pabst Brewing Co.*, 384 U.S. 546 (1966), the Court held unlawful the acquisition of the eighteenth largest brewer by the 10th largest brewer, which when combined, became the fifth-largest brewer with a combined market share of only 4.49%. *Id.* at 551-52.

This long line of Supreme Court cases is clear. The Clayton Act enshrined into law a policy that unilateral expansion through competition is inherently preferable to expansion through mergers and acquisitions. The Supreme Court held:

> "A company's history of expansion through mergers presents a different economic picture than a history of expansion through unilateral growth. Internal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output. It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small mergers that added to concentration in an industry." [citing congressional record].

*Brown Shoe*, 370 U.S. at 346 n.72 (1962). The Ninth Circuit is in accord. *See St. Alphonsus Med. Ctr.*, 778 F.3d , at 783 (holding that "§ 7 was intended to arrest anticompetitive tendencies in their incipiency" (quoting *Brown Shoe*, 370 U.S. at 323)).

> ### 2. Plaintiffs Need Only Demonstrate a Reasonable Probability of Lessening Competition in a Single Market.

Section 7 of the Clayton Act requires merely the reasonable probability of lessening of competition "in any line of commerce" or "in any activity affecting commerce" anywhere in the country. 15 U.S.C. § 18. The Supreme Court has recognized that an unlawful merger or acquisition might affect multiple relevant markets. Courts must consider whether the merger might lessen competition **in any one of them;** if so, "the merger is proscribed." *Brown Shoe*, 370 U.S. at 325–28 (assessing whether merger

might lessen competition in men's, women's, and children's shoes) (emphasis added); *Aluminum Co. of Am.*, 377 U.S. at 276 (recognizing submarkets for both aluminum conductor and copper conductor, and finding merger might substantially lessen competition in aluminum conductor market); *Cont'l Can*, 378 U.S. at 457–58 ("That there may be a broader product market made up of metal, glass and other competing containers does not necessarily negative the existence of submarkets of cans, glass, plastic or cans and glass together, for 'within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes.'"); *Olin Corp. v. F.T.C.*, 986 F.2d 1295, 1304 (9th Cir. 1993) ("Even accepting [Defendant's] argument that there is a relevant market comprised of all pool sanitizers, this does not preclude identification of a relevant submarket comprised solely of dry sanitizers.").

Therefore, Microsoft may not defeat a showing that the merger may substantially lessen competition in one market, by showing a potential increase in competition in another market. *See. Phila. Nat'l Bank*, 374 U.S. at 370 (holding that "anticompetitive effects in one market" cannot be justified by "procompetitive consequences in another"). So long as Plaintiffs can identify a single product market in which competition might be substantially lessened, Plaintiffs must prevail. *Id.* "[I]t is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition. If such a probability is found to exist, the merger is proscribed." *Brown Shoe*, 370 U.S. at 325.

### 3.        The Merger Guidelines Do Not Apply

The Department of Justice's and Federal Trade Commission's Merger-Guidelines carry no force of law.[2] They are internal Department of Justice and FTC policy guidelines not binding on any courts. They have never been codified by statute or regulation. Indeed, part of why Plaintiffs' suit is so important, is precisely because the executive branch has strayed so far from enforcing Congress's antitrust policy under the Cellar-Kefauver Anti-Merger Act, codified in Section 7 of the Clayton Act.

---

[2] *See, e.g.*, Timothy Muris, Prepared Remarks, June 10, 2022, available at https://www.ftc.gov/news-events/news/speeches/prepared-remarks-0 ("The Guidelines lack the force of law. They formally bind no one - not the courts, not other countries, not even the Department of Justice.").

A journalist for *ProMarket* recently uncovered a memorandum written by Judge Richard Posner, who was then a law professor at the University of Chicago, and George Stigler, another University of Chicago professor. Posner and Stigler's memorandum was sent to Martin Anderson, an economic advisor on President Reagan's transition team.[3] The memorandum outlines how the newly elected President could "throttle back" the antitrust law enacted by Congress and pursue "deregulation" of mergers without having to change the policy through democratic means. The memorandum declares that private antitrust enforcement, enshrined by Congress, is "a source of considerable resentment (and expensive distraction) among businessmen." Thus, the memorandum proposes appointing "like-minded" people to the Department of Justice and the FTC in order to issue new merger guidelines that would raise "the threshold market share percentages at which the Department will challenge horizontal mergers and abolishing the vertical and conglomerate prohibitions." *Id.* The memorandum goes on to note that despite congressional policy to the contrary, "many courts would probably defer to the announced positions of the Justice Department, viewed as a responsible enforcer of the antitrust laws, on questions of antitrust policy arising in private suits." *Id.*

President Reagan did indeed appoint "like-minded" people, and the merger guidelines were revised in 1982 just as the Chicago-school economists suggested. And despite the merger guidelines having no force of law, they had a tremendous impact on the executive branch and its regulators, which sought their application and self-imposed higher burdens in federal courts. No court, however, has ever held they supplant the Supreme Court case law on point. Plaintiffs' private suit is not governed by the merger guidelines. The democratically enacted antitrust policy of Congress should be enforced. However, the merger here is unlawful under either standard.

### 4. The Merger May Substantially Lessen Competition in the Market for Triple-A Video Games

Microsoft and Activision are significant competitors in the development and publishing of Triple-A video game content. Triple-A games constitute a relevant market. In analyzing a relevant market, the Supreme Court holds that markets and submarkets may be determined by examining the "practical

---

[3] https://www.promarket.org/2022/04/28/a-richard-posner-and-george-stigler-memo-throttling-back-on-antitrust-a-practical-proposal-for-deregulation/

indicia," including "industry or public recognition." *Brown Shoe*, 370 U.S. at 325. The Supreme Court held:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

*Id.* (internal citations omitted). The market for Triple-A games is a relevant market because they are not sufficiently interchangeable with other games *See,* Ex. A [Cabral Report] at §5, §5.1 & n.14 (discussing the use of the hypothetical monopolist test as a measure of interchangeability). Consideration of the practical indicia reaches the same conclusion. Microsoft uses the term ███ games throughout its documents, and recognizes it as a unique market. For example, ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ Indeed, Microsoft's internal documents note the importance and differentiation of Triple-A games, comparing them to ████████ ████████████████████████████████████████████████ ████████████████

The acquisition will immediately eliminate all competition between Microsoft and Activision in the development and publishing of Triple-A games, substantially lessening competition in this market. As shown by Professor Luis Cabral, a Professor of Economics at NYU's Stern School of Business, the elimination of horizontal competition removes price constraints and will likely reduce quality and output. Ex. A at § 6.4 [Cabral Report]. Prices will go up. By internalizing the externality of competition between Microsoft and Activision's Triple-A gaming content, the merger will exert an upward pressure on prices of Triple-A games. *Id.* at §§ 6.4, 6.6.

Numerous internal Microsoft documents show that it acknowledges Activision as one of its top rivals in game development and publishing, if not its chief one. ████████████████████████ And Microsoft is well aware that ████████████████████████████████████████ ████████████

Professor Cabral has identified various objective metrics for calculating the market shares of Triple A game producers. *See* Ex. A at §5.7; §6.4.3. Based on the market shares he establishes, it is likely that the combined Microsoft-Activision will control between 26% to 41% of the Triple-A gaming market, depending on how the market shares are calculated. Professor Cabral has also calculated the Herfindahl–Hirschman Index (HHI) which generally describes market concentration. *See, e.g.*, *St. Alphonsus*, 778 F.3d 775 (applying HHI in FTC case). Even under the heightend standards of the merger guidelins (which do not control this case), a "merger that increases HHI by more than 200 points, to a total number exceeding 2500, is presumptively anticompetitive." *ProMedica Health Sys., Inc. v. F.T.C.*, 749 F.3d 559, 568 (6th Cir. 2014). Here, the HHI figures calculated by Professor Cabral show that the merger will increase the conentration significantly, by much more than 200 points, and the post-merger concentratoin is close to if not exceeding the presumptively anticompttive threshold of 2500. *See* Ex. A [Cabral Report] at 26. These market share statistics alone are sufficient to conclude that the merger is unlawful under Section 7.

In addition, post-acquisition, Microsoft will control roughly 30% of the Triple-A gaming market. This is far in excess of market concentration the Supreme Court has previously held unlawful. *See, e.g.*, *Von's Grocery*, 384 U.S. at 272–74 (holding unlawful the merger of two grocery store chains, with a combined total of 7.5% of the market); *Cont'l Can*, 378 U.S. at 461 (holding unlawful an acquisition that would increase the acquiring entity's market share from 21.9% to 25%.); *Aluminum Co. of Am.*, 377 U.S. at 280–81 (holding unlawful an acquisition of an entity with 1.3% of the market share by a company with 27.8% of the market); *Pabst Brewing Co.*, 384 U.S. at 550 (holding unlawful the acquisition of two brewers with a combined market share of only 4.49%). Significantly, these cases did not turn on complicated econometric or statistical analyses Instead, the conclusion that the mergers may substantially reduce competition were based largely on the market share statistics of the merging entities in combination with a trend towards concentration in the markets. *See, e.g.*, *Von's Grocery*, 384 U.S. at 278 ("It is enought for us that Congress feared that a market marked at the same time by both a continuous decline in the number of small businesses and a large number of mergers would slowly but inevitably gravitate from a market of many small competitors to one dominated by one or a few giants, and competition would thereby be destroyed."). The Ninth Circuit has never held differently.

1    Indeed, in *Philadelphia National Bank*, 374 U.S. at 364, the Court held that any combination

2    which would raise the post-merger entity to at least 30% was a clear *per se* prima facie showing of

3    unlawfulness under Section 7. The Court held that "[w]ithout attempting to specify the smallest market

4    share which would still be considered to threaten undue concentration, we are clear that 30% presents

5    that threat," and therefore established "prima facie unlawfulness." 374 U.S. at 364 & n.41. Here,

6    Microsoft's acquisition of Activision will raise Microsoft's share of Triple-A game production close to or

7    beyond the 30% presumption declared unlawful under *Philadelphia National Bank*.

8    The significant concentration in the game development and publishing markets that may result

9    from this acquisition is particularly pronounced, given the recent and steady trend towards concentration

10   in the industry. As the Supreme Court has held, Section 7 was specifically intended to prevent a lessening

11   of competition **in its incipiency**. Thus, whether a market is trending towards concentration is highly

12   relevant in determining whether a particular merger might lessen competition or tend to create a

13   monopoly. *In Von's Grocery*, the Court held: "Congress sought to preserve competition among many

14   small businesses by **arresting a trend toward concentration in its incipiency** before that trend

15   developed to the point that a market was left in the grip of a few big companies. Thus, where

16   concentration is **gaining momentum** in a market, [courts] must be alert to carry out Congress' intent to

17   **protect competition against ever increasing concentration through mergers**." 384 U.S. at 277

18   (emphasis added); *see also Pabst Brewing Co.*, 384 U.S. at 552–53 ("A **trend toward concentration** in

19   an industry, whatever its causes, is a highly relevant factor in deciding how substantial the anti-

20   competitive effect of a merger may be.") (emphasis added). There is no dispute that Microsoft and

21   Activision became the giants that they are through numerous mergers, in an industry characterized by

22   substantial and increasing concentration. *See, e.g.*, Ex. O [PC Gamer Article]; Ex. P [Mergr Article].

23        **5.**    **The Merger May Substantially Lessen Competition in the Platform-Side
24   Markets for High-Performance consoles, Game Library Subscription
     Services, Cloud-Gaming Services, and Computer Operating Systems**

25   As the Supreme Court explained in *Brown Shoe*, an arrangement, which "forces the customer to

26   take a product or brand he does not necessarily want in order to secure one which he does desire," is

27   "inherently anticompetitive." 370 U.S. at 330. *Brown Shoe* held that foreclosure "by an established

28   company is likely 'substantially to lessen competition" even if "only a relatively small amount of

commerce is affected." *Id.* In *Brown Shoe*, the Court analogized vertical acquisitions for the purpose of making one product exclusive to the other as an inherently anticompetitive tying arrangement. *Id.* at 329–32.

The same applies here. *See* Ex A [Cabral Report] at §6 (Anti-Competitive Effects of the Merger); ███████████████████████. As shown by Professor Cabral, Microsoft's foreclosure of Activision Blizzard games to rival platforms would cause anticompetitive harm and substantially reduce competition. *See* Ex. A [Cabral Report] at §3; §6. For example, Professor Cabral finds that if Microsoft were to make Activision content exclusive or partially exclusive to Xbox, consumers would migrate towards Xbox and away from PlayStation regardless of which platform they inherently preferred. *Id.* at Section 6.1.2. And the same is true of other platform markets. *Id.* §6. █████████████████ ███████████████████████████████████████ ███████████████████████████ The same is true with Microsoft's other platforms, including game subscription and cloud-gaming services. *Id.* at –197.

Moreover, the economic theory is borne out by consumer surveys and Plaintiffs in this case. For example, in a survey conducted by the United Kingdom's Competition and Markets Authority ("CMA"), 89% of respondents mention that the availability of content was important to their decision in purchasing consoles. Ex. H at § 7.183(a). The CMA notes that "content is one of the main reasons for consumers' choice of platform." *Id.* at § 7.133. The Plaintiffs in this case find this to be true as well. *See, e.g.,* DeMartini Decl. at ¶¶ 7-9, 11-13; Galvan Decl. at ¶¶ 7-9, 11-12, 15-18; Jakupko Decl. at ¶¶ 7-9, 11-13, 15, 17; Loftus Decl. at ¶¶ 6-8, 11-13, 15-16; Owen Decl. at ¶¶ 7-12.

Plaintiffs do not need to show that such foreclosure, or other anticompetitive effects, have happened or that they will happen. Here Plaintiffs show that it is likely to happen based on the record in this case and the application of basic economic principles. The evidence identified to date supports this theory of harm because the evidence shows that (1) Microsoft is likely to make Activision's Triple-A games exclusive to Microsoft's platforms; (2) Triple-A gaming content is a crucial input to gaming platforms; (3) Activision content and *Call of Duty* is especially important input to gaming platforms; and (4) Network effects and barriers to entry amplify and compound foreclosure harm.

      **a.**      **Microsoft Is Likely to Make Activision's Games Exclusive to**

**Microsoft's Platforms (Xbox, Game Pass, Cloud, Windows**

Microsoft continues to deny that it has the incentive to make Activision's gaming content exclusive to Microsoft platforms. *See*, *e.g.*, ECF No. 64 at 16 ("Microsoft has no such incentive."). But that is directly contradicted by Microsoft's own internal documents. Microsoft's internal documents, consistent with economic theory, show that not only does Microsoft have an incentive to foreclose competition, but in fact, Microsoft's core gaming strategy is centered ███████████████ ██████

For example, in Microsoft's many "State of the Business" reports, which were provided directly to the Board of Directors, Microsoft states that one of Microsoft's core business strategies for gaming is ███████████████████████████████. This same core gaming strategy was repeated in each of its "State of the Business" reports from at least 2019 through the present. This core gaming strategy, is further explained in a gaming strategy review document, in which Microsoft states that ██ ███████████████████████████████████████████████████████████ ██████ The challenge facing Microsoft, however, is to increase Microsoft's exclusive content ("scale") in order to reap the rewards of significant network effects. ██████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████ Other internal documents show that Microsoft's core gaming strategy centers on gaming content foreclosure through exclusivity. *See, e.g.*, ████████████████████████████ ███████████████████████████████████████████ ██████████

Further, expert analysis shows that Microsoft has the financial incentives to make Activision's content exclusive. ████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████ *See* also Ex A [Cabral Report] at § 6.1.3.

Microsoft knows that, if it made Activision games exclusive to Microsoft platforms it would cause a substantial reduction in competition. Microsoft seeks to avoid the consequences of such a

conclusion simply by denying it harbors any such intent with respect to Activision games. But this claim is demonstrably false.

First, Microsoft has made identical claims that it has no incentive to make games exclusive before, and then turned around and made highly-anticipated games exclusive after acquiring a competitor. For example, in 2021, Microsoft acquired ZeniMax games, and told regulators it had no incentive to make ZeniMax games exclusive (including from the highly popular Triple-A Publisher Bethesda which had been acquired by ZeniMax). *See, e.g.*, Commission decision pursuant to Article 6(1)(b) of Council Regulation No 139/2004 and Article 57 on the Agreement on the European Economic Area, Case M.10001, Microsoft/Zenimax, ¶¶ 102, 106 (2021); *see also* ███████████████ at ¶ 44. Yet after the acquisition, Microsoft announced that several Triple-A games from Bethesda would be exclusive to Microsoft platforms, including *Starfield*, *Redfall*, and *Elder Scrolls IV*. According to an interview with the designer of *Redfall*, development for the PlayStation 5 was ongoing at the time Bethesda was acquired by Microsoft. Immediately after acquisition, Microsoft directed the developers to stop work on the version for the PlayStation 5 and instead to direct all resources to the Xbox version, as well as preparing the game to be launched exclusively on Game Pass. He stated: "We got bought by Microsoft and that was a huge sea change. They said, 'no PlayStation 5. Now we're gonna do Game Pass, Xbox, and PC.'" Ex. V.

Similarly, in Microsoft's acquisition of Playground games in 2018, Microsoft purchased the developer largely to acquire Playground's *Forza*, a Triple-A racing game. Internal documents show that the acquisition would secure ████████████████████████████ ███████████████████████████████████████ The document notes the ██████████████ ███████████████████████████████████████████████ The document describes how *Forza Horizon 3* is ████████████████████████ ██████████████████████████████████████████████████████ ████ Microsoft concluded that it █████████████████████████████████ ████████████████████████████████████████ Microsoft has made many other acquired games exclusive too, including with respect to Obsidian, inXile, and Ninja Theory.

Second, the industry knows that Microsoft has incentive to foreclose its rivals because that is

1   what Microsoft has always done. ████████████████████████████████████

2   ████████████████████████████████████████████████████████████████

3   ████████████████████████████████   Indeed, effectively all of Microsoft's own Triple-A

4   games are developed exclusively for Microsoft platforms. For example, in a Gaming Board Presentation

5   from 2020, Microsoft lists six of its top Triple-A games, each of which has over $1B in revenue. ████████

6   ████████████████████████████████████████████████████████████████

7   ████████   With the exception of *Minecraft*, each is exclusive to Windows and/or Xbox.

8        Moreover, Microsoft's past anticompetitive conduct is relevant to corroborate the likely reduction

9   in competition resulting from the proposed merger. *See United States v. Swift & Co.*, 286 U.S. 106, 116

10  (1932) ("[S]ize carries with it an opportunity for abuse that is not to be ignored when the opportunity is

11  proved to have been utilized in the past.").

12        **b.   Triple-A content is crucial to the success of platforms**

13        In video gaming, content is king. Players play video games, they do not play the platforms.

14  Platforms are used to run and process the video game content. They have differentiated features, but a

15  video game platform is only worthwhile to the extent it allows a consumer to play the video games they

16  want to play. Thus, there is no question that making gaming content exclusive has an effect on consumer

17  purchasing behavior with respect to game platforms.

18        In the industry, Triple-A video games refer to the latest generation and highest production-value

19  games, created by the handful of Triple-A game publishers capable of regularly producing such high

20  production-value games, with significant marketing budgets and commanding the highest prices. Thus,

21  Triple-A games also generate the most demand to play them. Microsoft refers to the importance of access

22  to Triple-A video games in numerous internal documents. *See, e.g.*, Ex. W at 3. And the CMA has noted

23  the same. *See* Ex. H at § 7.136–37; § 7.142. A Microsoft gaming memorandum states that:

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████

26  ██████████████████████████████████████████████████████████

27  ██████████████████████████████████████████████████████████

28  ████████████████████

Microsoft's own artificial intelligence "Bing" chatbot agrees. During the hearing on Microsoft's motion to dismiss, counsel for Microsoft suggested that many answers related to the gaming industry could be found online through Microsoft's new AI search engine and chatbot, "Bing." *See* Hr'g Tr. March 16, 2023 at 38:9–14 ("[A]ll [Plaintiffs] have to do is do a Bing search and they can get a lot of information about, you know, what the actual numbers are, what are the barriers to entry, you know, who is up and coming, how fast games have become successful."). Pursuant to counsel's suggestion, Plaintiffs have asked Microsoft's Bing some important questions about the gaming industry. For example, Plaintiffs asked Bing whether "triple-A video games [are] crucial inputs to gaming platforms." Bing responded that "Triple-A video games are to the gaming world what blockbusters are for the film industry . . . Triple-A games can be considered crucial inputs to gaming platforms as they attract a large audience and can generate significant revenue for the platform." Ex. AA. Further, Plaintiffs' counsel asked Bing "why has Microsoft been buying so many Triple-A game developers and publishers?" Bing responded: "Microsoft has been buying up game developers and publishers in order to acquire more video game brands and make them exclusive to its platforms. With more exclusives, Microsoft may move more consoles. The company's goal is to keep building out the content that it can offer on Xbox and PC through additional internal studios making even more games. By purchasing developers, Microsoft can also expand its library of games and attract a larger audience to its gaming platforms." Ex. BB.

### c. Activision's content and *Call of Duty* franchise and other AAA games are critical to success of platforms.

Activision is the world's most successful independent game developer and the preeminent Triple-A content producer. █████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████

Microsoft has recognized that game availability is a key factor, or determinant, for consumers in choosing to purchase a gaming platform. Microsoft confirms that ████████████████████████ ████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████

4 ███████████████████ In fact, Microsoft acknowledges this dynamic when it confirms █████

5 ██████████████████████████████████████████████████████

6 ████████████████████████████████████████████████

7 ████████████████████████████████

Call of Duty is the most popular franchise in video game history and therefore one the most significant drivers of console purchasers by consumers. 10 of the top 15 games sold between 2010 and 2019 were from the Call of Duty franchise. Call of Duty has been the single largest and most dominant gaming franchise globally for 10 of the last 11 years. Indeed, Activision sold more than $1 billion worth of its latest installment, Modern Warfare II, within the first ten days of its release. █████████

13 ██████████████████████████████████████████████████████

14 ████████████████████████████████████████████

15 ██████████████████████████████████████████████████████

Consumer surveys have demonstrated that significant numbers of consumers would switch consoles if Call of Duty were to become exclusive or partially exclusive. For example, 73% of respondents to the CMA survey responded that their choice of gaming console is and would be impacted by the availability of Call of Duty. Ex. H at §§ 7.182–7.183. Activision has made it crystal clear that the Call of Duty franchise alone drives substantial adoption of subscription services along with gaming platforms and consoles. ███████████████████████████████████████████

████████████████. Meaning that any platform Activision develops Call of Duty for will enjoy significant increased demand.

Call of Duty's ███████████ properties are confirmed by the data from the markets that Microsoft intends to foreclose on through this merger. As Sony represented to the FTC, ███████████

26 ██████████████████████████████████████████████████████

27 ████████████████████████████████████████████

28 ██████████████████████████████████████████

1 ███████████████████████████████████████████████████

2 ██████████████████████████████████████████████

3 █████████████████████████████████████████████████████

4 ████████████████████████████████████████████

5 █████████████████████████████████████████████████

6 ██████████

7 ████████████████████████████████████████████████████

8 █████████████████████████████████████████████████████

9 ███████████████████████████████████████████████

10 ████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████

12 ██████████████████████████████████████████████████

13 █████████████████████████████████████████████████████

14    *Call of Duty's* ██████████ position in the gaming market is further demonstrated by the abject

15 failure of its attempted rivals. For instance, Electronic Arts ("EA") launched *Battlefield 2042* as a direct

16 competitor to *Call of Duty* in the genre of team-based first-person shooter games. *Battlefield 2042*,

17 however, ████████████████████████████████████████████████

18 ████████████████████████████████████████████

19 ██████████████████████████████████

20    Call of Duty is not the only important game Activision sells and markets. Activision owns other

21 game titles which are important drivers of demand as well. ███████████████████

22 █████████████████████████████████████████████████████

23 ████████████████ Activision's entire gaming catalog is a uniquely important driver of demand for

24 gaming platforms.

25    **d.   Network effects and barriers to entry amplify and compound foreclosure harm**

26

27    Network effects and barriers to entry further amplify and compound the foreclosure harm that this

28 merger would inflict on Microsoft's competitors in the relevant markets at issue. If *Call of Duty* is not

equally available on online gaming platforms, gamers will migrate to the Xbox platform. Online multiplayer games have significant network effects, which reinforce demand and serve as barriers to entry to rivals and potential competitors. Microsoft has recognized that ███████████████████ ████████████████████████████████████████████ ██████████████████████████

According to Sony, █████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

The CMA further confirms that "established AAA games benefited from significant network effects, which raised barriers to entry for new games and developers." Ex. H [CMA report]. Gamers mostly play online with their same group of friends, creating "something akin to a social network devoted to specific games," which creates "large switching costs when transitioning to other games[.]" *Id.* The CMA report highlighted "the existence of direct and indirect network effects in gaming, with direct network effects being particularly strong for large multiplayer social franchises," like *Call of Duty*. *Id.*

Microsoft has all but confirmed these network effects and barriers to entry would be significant and desirable to its gaming business. It characterizes its gaming business as providing ████████ ████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████████Microsoft further admits that its strategic thesis with respect to its GamePass subscription service is that ████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ (emphasis added). There is little doubt Microsoft intends to capture these network effects of the Activision merger when it concludes that, with respect to those community and network effects of its online gaming, the ██████████ ██████████████████████████

1

2

**e.**     **Microsoft's foreclosure strategy will harm competition in High-Performance Consoles**

3

High-Performance Consoles constitutes a relevant market. *See* Ex. A [Cabral Report] at §5.3; *see*

4

*also* Am. Compl., ECF 84 at ¶¶ 186–208. As shown in Professor Cabral's report, Nintendo—the only

5

other gaming console in addition to Microsoft's Xbox and Sony's PlayStation—is not a sufficient

economic substitute to be considered within the same market.[4]

6

7

As described above and as shown by the economic analysis, Microsoft's foreclosure strategy will

8

significantly harm competition in the High-Performance Console market by foreclosing Sony's

PlayStation from Activision's critical gaming content, including *Call of Duty*. *See* Ex. A [Cabral Report]

9

at §6.1–6.1.3; ███████████████████████████████████████████████████████████

10

██████████████████

11

12

Indeed, Microsoft's anticompetitive strategy is explicit. Microsoft understands and believes it is

13

███████████████████████████████████████████████████████████████

14

███████████████████████████████████████████████████

**f.**     **Microsoft's foreclosure strategy will harm competition in Game Subscription Services**

15

16

As also shown in Professor Cabral's report, Multi-Game Content Library Subscription Services

17

("Game Subscription services") constitutes a relevant market under basis market principles based on the

18

facts of this case. *See* Ex. A [Cabral Report] at §5.2; *see also* Am. Compl., ECF 84 at ¶¶ 209–220. In

19

particular, Game Subscription services are a distinct market from pay-to-play video games in which each

20

game must be purchased individually.

21

GamePass, Microsoft's game subscription service already controls a dominant position in the

22

market. *See* Ex. C at SIE-DMTI-00000107; *see also* https://www.vgchartz.com/article/453082/xbox-

23

game-pass-accounts-for-60-of-the-gaming-subscription-market/. GamePass is part of Microsoft's core

24

gaming strategy. One of Microsoft's major strategic goals is to use ███████████████ to drive

25

subscriptions to Game Pass, so that Microsoft will have a competitive ███████████████

26

27

[4] Whether the relevant market is consoles (Nintendo, Xbox, and PlayStation) or whether it only includes

28

High-Performance Consoles (Xbox and PlayStation) does not change the fact that Microsoft's foreclosure strategy in connection with the merger will likely have anticompetitive effects.

1 ██████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████

3 █████████████████████████████████████████████████████████

4 ██████████████████████████████████████████████████████████

5 ███████████████████████

As shown in Professor Cabral's report, Microsoft's control of Triple-A content in connection with its foreclosure strategy will significantly harm competition in the Game Subscription services market. Ex. A [Cabral Report] at §6.1–6.2; *see also* Ex. L.

Further, Activision, with its exceptionally strong catalog of games, including ████████ *Call of Duty*, is a potential nascent competitor in the Game Subscription Services market. Microsoft has recognized that if Activision created its own Multi-Game Content Library Subscription Service and put its own highly popular games on it, it would ████████████████████████████████████████ ██████████████████████████████████████████████████████. The proposed merger would eliminate this possibility.

In *U.S. v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973), the Supreme Court reversed a lower court decision on the ground that it "failed to give separate consideration to whether" one of the merging parties "was a potential competitor in the sense that it was so positioned on the edge of the market that it exerted beneficial influence on competitive conditions in that market." *Id.* at 532–33. "The specific question . . . is not what [Defendant's] internal company decisions were but whether, given its financial capabilities and conditions in the [market], it would be reasonable to consider it a potential entrant into that market." *Id.* at 533.

Here, Activision is one of the most successful video game content producers of all time. It owns, and continues to develop and publish, numerous of the most successful and popular games across numerous platforms and gaming genres. In addition to ownership of *Call of Duty*, Activision has the financial capabilities and the incentive to enter new markets, including markets in which it would compete with Microsoft, including multi-game subscription services. By acquiring Activision, Microsoft will forever close the door to any competition from Activision entering new markets in which Microsoft competes. This is yet another basis, sufficient alone under *Falstaff Brewing*, to hold the merger unlawful.

g.  **Microsoft's foreclosure strategy will harm competition in Cloud-Gaming services**

As shown in Professor Cabral's report, Cloud-Gaming services constitute a relevant market under basic economic principles based on the facts of this case.. *See* Ex. A [Cabral Report] at §5.5; *see also* Am. Compl., ECF 84 at ¶¶ 221–231. As with consoles and subscription services, Triple-A content is critical to Cloud-Gaming services. For example, in 2019, Google launched its Cloud-Gaming service "Stadia." However, in 2022, it announced that it was shutting it down as it failed to attract enough consumers. Experts and industry insiders generally credit Google's lack of sufficient Triple-A content as the reason for its demise.[5] *See* Ex. G at ¶¶ 20–22.

Cloud-Gaming services are relatively new. Microsoft's foreclosure strategy will create substantial barriers to entry on nascent competition, since new Cloud-Gaming services will not have access to any of the post-merger Microsoft-Activision gaming content. Here too, Activision is a viable competitor, possess the technology and financial capability to enter new markets, in addition to control over the most important gaming content. It will thus significantly harm competition and will kill innovation in this burgeoning new market. *See* Ex. A [Cabral Report] at §6.1–6.3; Ex. G at ¶ 46; Ex. B at ¶¶ 14, 18–21.

h.  **Microsoft's foreclosure strategy will harm competition among computer operating systems**

There is no dispute that computer operating systems constitute a relevant product market as confirmed by Professor Cabral. *See* Ex. A [Cabral Report] at §5.4; *see also* Am. Compl., ECF 84 at ¶¶ 232–238. And there is no dispute that, based on its control of Windows, Microsoft controls a monopoly position on operating systems for use in computer gaming. *See* Ex. Z [Steam Hardware Survey] (showing that 97.7% of all game downloads from Steam are for Windows, 1.4% are for MacOS, and 0.84% are for Linux). For the same reasons in other platform-side markets, Microsoft's foreclosure strategy with respect to operating systems will also harm competition. *See* Ex. A [Cabral Report] at §6.1–6.3.

For example, Steam recently released the SteamDeck, a handheld gaming device that runs on the Linux operating system. If Activision were to remain independent, *Call of Duty* or other Activision Triple-A games could be developed for SteamDeck and Linux. If so, a significant portion of gamers

---

[5] *See generally* Megan Farokhmanesh, "The End of Google Stadia," Wired, September 29, 2022, available at https://www.wired.com/story/google-stadia-shutting-down-phil-harrison/

1    might switch from Windows to Linux. *See* Decl. of B. Owens. With a sufficient user base, other

2    developers would then begin developing games for Linux in addition to Windows, thereby increasing

3    quality and innovation and likely reducing prices. This merger will foreclose Activision's content from

4    Linux and other operating systems.

**B.    Plaintiffs are Likely to Suffer Irreparable Harm Without Preliminary Relief**

6    Plaintiffs are entitled to injunctive relief to prevent "threatened loss or damage by a violation of

7    the antitrust laws." 15 U.S.C. 26. Both the Supreme Court and the Ninth Circuit hold that the threat of

8    loss or damage required to receive injunctive relief includes the threatened lessening of competition in a

9    relevant market under Section 7. *See California v. Am. Stores Co.*, 492 U.S. 1301, 1304 (1989)

10    ("[L]essening of competition 'is precisely the kind of irreparable injury that injunctive relief under

11    section 16 of the Clayton Act was intended to prevent.'"). The Ninth Circuit is in accord. *See Boardman v.*

12    *Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) ("A lessening of competition constitutes an

13    irreparable injury under our case law."). *California v. American Stores* and *Boardman v. Pacific Seafood*

14    *Group* control this issue and are directly on point. Under those two cases, Plaintiffs meet the likelihood of

15    irreparable injury requirement.

16    In *California v. American Stores*, the state of California, acting in its capacity as *parens patriae* on

17    behalf of its resident consumers, "alleged that Californians will be irreparably harmed if the proposed

18    merger is completed" because the merger would "lessen competition." *See State of Cal. by Van de Kamp*

19    *v. Am. Stores Co.*, 697 F. Supp. 1125, 1134 (C.D. Cal. 1988). The state asserted that California residents

20    faced irreparable injury because the "lessening of competition," "is recognized as precisely the kind of

21    irreparable injury that the interlocutory remedies under the Clayton Act were intended to prevent." *Id.*

22    The Court did not require any further analysis as to whether California residents would be irreparably

23    harmed. The district court concluded that "[i]f the Court is to make a determination as to whether this

24    merger is anticompetitive, the State is correct in its assertion that the egg must be examined before it

25    becomes an omelette. The Court therefore finds that plaintiff has made an adequate showing of irreparable

26    injury." *Id.*

27    The Ninth Circuit affirmed. *See State of Cal. v. Am. Stores Co.,* 872 F.2d 837, 844 (9th Cir. 1989)

28    ("We agree with the district court that this is precisely the kind of irreparable injury that injunctive relief

under section 16 of the Clayton Act was intended to prevent."). The Ninth Circuit held that because the plaintiffs had shown a likelihood of success on the merits, "the district court's determination of irreparable harm follows naturally from its holding," since a likelihood of success on the merits by definition means a likelihood of a lessening of competition. *Id.* Although the Ninth Circuit upheld the district court's analysis and conclusion on irreparable injury, the Ninth Circuit reversed the preliminary injunction on the grounds that the preliminary injunction constituted an indirect divestiture, which the Court held was not an available remedy to private plaintiffs. *Id*. at 844–45.

The plaintiffs appealed to the Supreme Court and asked for a stay of the Ninth Circuit's decision. *See California v. Am. Stores Co.*, 492 U.S. 1301 (1989). The Supreme Court stayed the Ninth Circuit decision, thereby preserving the preliminary injunction pending resolution of the divestiture issue. In its order preserving the preliminary injunction, Justice O'Connor held: "I am persuaded that applicant has set forth sufficient reasons for granting a stay in this case. I agree with both the District Court and the Court of Appeals that applicant has made an adequate showing of irreparable injury." *Id.* at 1304. The Court cited to the district court decision and affirmed that "[the] lessening of competition 'is precisely the kind of irreparable injury that injunctive relief under section 16 of the Clayton Act was intended to prevent." *Id.*

Nor can there be any dispute that these Plaintiffs would be directly harmed by the anticompetitive effects of this merger. For example, if Activision titles are made exclusive to Xbox and Windows, those Plaintiffs that play Activision games on the PlayStation would either no longer have access to those games or would be forced to purchase their less desirable console, or migrate to their less desirable platform to access Activision's games, including *Call of Duty*. *See*, e.g*., See*, *e.g.,* Burns Decl. at ¶¶ 8-9; Galvan Decl. at ¶¶ 13, 15-18; Jakupko Decl. at ¶¶ 15-18; Loftus Decl. at ¶¶ 13, 15-16 . And if prices of Activision Blizzard or other Triple-A games increase, Plaintiffs will be forced to pay inflated prices. *See, e.g.,* Burns Decl. at ¶ 10; Galvan Decl. at ¶ 19; Jakupko Decl. at ¶ 19; Loftus Decl. at ¶ 17.. Indeed, if Microsoft is correct ███████████████████████████████████████████████████████ ██████████ Plaintiffs who use PlayStation will be harmed. But so too will the Xbox players, since PlayStation would no longer competitively constrain Xbox prices and quality. ██████████████████████ ████████████████████████████████████████████████████████████████████

1 ███████████████████████████████████████████████████

2 ███████████████████████████████████████████████████

3 ████████████████████

4      There is thus little question that the threat of irreparable harm "follows naturally" from Plaintiffs'

5 showing a likelihood of success on the merits, which requires Plaintiffs to show a likelihood of

6 substantial lessening of competition. The immediacy of the irreparable injury in *California v. American*

7 *Stores* stemmed directly from the consummation of the merger, which, after consummation, would distort

8 the market and make the market less competitive, in terms of higher prices, lower quality, reduced output

9 and innovation, and other basic economic consequences.

10      Microsoft appears to contend that there can be no showing of irreparable harm until the

11 anticompetitive effects of the merger are realized. That is incorrect. For purposes of the Clayton Act, and

12 Rule 65, irreparable harm results from the harm to competition, through changes in market participants,

13 market conditions, the laws of supply and demand, and market dynamics that the merger will likely

14 cause. Principles of economics, combined with the market conditions, and the business records and sworn

15 testimony all can be brought to bear to show and explain the likely anticompetitive effects of the merger,

16 how they will result, and their consequences. Harm to competition is irreparable because once the market

17 has changed, and competition is impaired, those changes are unlikely to ever be undone. *California v.*

18 *Am. Stores*, 492 U.S. at 1304. ("[The] lessening of competition is precisely the kind of irreparable injury

19 that injunctive relief under section 16 of the Clayton Act was intended to prevent.").

20      The Ninth Circuit affirmed this basic premise of the Clayton Act again in 2016, in its decision in

21 *Boardman v. Pacific Seafood Group*, 822 F.3d 1011, 1023 (9th Cir. 2016) ("A lessening of competition

22 constitutes an irreparable injury under our case law."). In *Boardman*, private fisherman challenged the

23 merger of two fishing companies. The district court granted a preliminary injunction and the defendants

24 appealed. The defendants specifically argued that a preliminary injunction was unwarranted because there

25 was no *immediate* danger of irreparable harm. The Ninth Circuit affirmed the preliminary injunction.

26 First, the Court re-affirmed that "a lessening of competition constitutes an irreparable injury under our

27 case law." *Id.* at 1023. Second, the ninth Circuit held that the requirement of "*immediate*" irreparable

28 harm was satisfied so long as the plaintiff "is likely to suffer irreparable harm before a decision on the

merits can be rendered." *Id.* The Ninth Circuit analyzed whether the merger might occur before plaintiffs could prove their claims on the merits. *Id.* Finding that the merger might consummate before the case could be adjudicated, the Court held the threat of immediate irreparable harm was satisfied. *Id.*

These cases are on all fours with the instant case. Plaintiffs are likely to prevail on their claim that the merger has a reasonable probability of substantially lessening competition. The lessening of competition "constitutes an irreparable injury under our case law." *Boardman*, 822 F.3d at 1023. And for good reason. As shown throughout this memorandum, the lessening of competition is likely to lead to increased prices, lower output and choice, and lower quality in numerous markets. *See* Ex. A [Cabral Report] at §§ 3, 6.6; Ex. B [Cornerstone Report]. Given that the merger is likely to have a reasonable probability of lessening competition, and the merger is likely to consummate on May 22, 2023, before Plaintiffs can have their claims heard on the merits, Plaintiffs have satisfied their burden of demonstrating that they are likely to suffer irreparable harm without preliminary relief.

## C. The Balance of Equities Tips in Plaintiffs' Favor and Preliminary Relief Is in the Public Interest

The balance of equities tips sharply in Plaintiffs' favor because if a preliminary injunction is denied and the merger were allowed to proceed, yet Plaintiffs ultimately prevail at trial and divestiture must then be attempted, Plaintiffs will be irreparably harmed during the pendency of this case and competition within these important markets across the United States will be irretrievably lost. Indeed, given Microsoft's demonstrated prior conduct, and admitted core strategy of acquiring important gaming developers and publisher and then making their gaming content exclusive to Microsoft's own gaming platforms, the damage done to competition will likely be extensive, immediate, and irreversible. Similarly, the loss in competition that currently exists between Microsoft and Activision Blizzard in the production of gaming content will necessarily be lost.

A preliminary injunction merely preserves the status quo. If the Court issues a preliminary injunction, plaintiffs are prepared to try their case on an accelerated time line so that the case can be heard before July 18, 2023, the deadline for Microsoft to close its merger under the agreement. In that scenario, even if the Court ultimately denies Plaintiffs' motion for a permanent injunction, Microsoft will not be harmed at all, because Microsoft would still be able to consummate the merger prior to July 18, 2023.

Further, even if the merits of this case are heard beyond July 18, 2023, Microsoft will only face possible delay of its acquisition. It is much less disruptive of the industry and less harmful to competition to maintain the status quo and delay an acquisition, than to allow a merger to proceed only to later seek divestiture to undue the unlawful merger. *See, e.g.*, *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016). Breaking up a consummated merger is difficult if not impossible. Among other things, civil litigation seeking divestiture and damages from a consummated merger can take years to resolve, which makes efforts to "unscramble" the "eggs" impractical. [6] *See also State of Cal. by Van de Kamp v. Am. Stores Co.*, 697 F. Supp. 1125, 1134 (C.D. Cal. 1988) ("If the Court is to make a determination as to whether this merger is anticompetitive, the State is correct in its assertion that the egg must be examined before it becomes an omlette.").

Further, given Plaintiffs demonstration of likely success on the merits, a preliminary injunction is in the public interest. As the Ninth Circuit has held, "the central purpose of the antitrust laws, state and federal, is to preserve competition," which is "vital to the public interest." *Id.* at 1024. Indeed, the antitrust laws were established in part to ensure that no economic forces grew so large and so powerful that they could grossly tilt the economic playing field further in their favor, and recognized that allowing economic power to concentrate in the hands of too few corrupted all facets of society. Justice Thurgood Marshall captured this fundamental premise succinctly: "Antitrust laws . . . are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972). Plaintiffs will show that Microsoft's $69 Billion acquisition of the most successful independent Triple-A game publisher and content creator in the United States will lessen competition in numerous markets. It will give Microsoft the ability and incentive to foreclose rivals, and raise further barriers to entry. Prohibiting this merger from proceeding and maintaining the status quo until Plaintiffs can prevail on the merits is in the public interest.

---

[6] *See generally*, William J. Baer, *Reflections on 20 Years of Merger Enforcemtn Under the HartScott-Rodina Act*, October 31, 1996, available at https://www.ftc.gov/news-events/news/speeches/reflections-20-years-merger-enforcement-under-hart-scott-rodino-act (discussing how mergers cannot be "unscrambled" after they are consummated).

### D.       A Bond Should Not be Required

A bond is discretionary. Under either Section 16 of the Clayton Act, or Federal Rule of Civil Procedure 65, requiring a bond is within the sound discretion of the district court. *See Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782–83 (10th Cir. 1964) ("15 U.S.C.A. § 26 . . . is not a mandate to require a bond in every anti-trust case in which an injunction is issued."); *Barahona-Gomez v. Reno* 167 F.3d 1228 (9th Cir. 1999); *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). In holding that no bond was required in *Reno*, the Court recognized the importance of the public interests underlying the suit and "the unremarkable financial means of the [Plaintiffs] as a whole." *Id*. at 1237. The Sixth Circuit, cited to with approval in *Reno*, is in accord. In *Moltan v. Eagle-Picher*, the court held that the posting of security under Rule 65(c) was not required due to (1) the strength of the plaintiffs' case and (2) the strong public interests involved. 55 F.3d at 1176.

Just as in *Reno* and *Moltan*, this Court should waive the requirement of a bond in this case. Plaintiffs do not have the financial means to post security, and thus the requirement of a bond might avert meritorious appropriate relief if it were to the prevent a preliminary injunction that would otherwise be issued. Moreover, Plaintiffs are likely to succeed in showing that this merger will substantially lessen competition, thus protecting both the Plaintiffs and the public interest in robust economic competition and preventing a trend towards concentration of economic power. All these factors weigh in favor of not requiring a bond here.

## V.       CONCLUSION

For all the foregoing reasons, the Court should issue a preliminary injunction to ensure the unlawful merger does not commence before Plaintiffs can prove the merits of their case at trial. Plaintiffs are likely to prevail on the merits, will suffer irreparable injury if the merger is allowed to commence during the pendency of Plaintiffs' claims, and the balance of hardships tips sharply in Plaintiffs'—and the public interest's—favor.

1

Dated: April 23, 2023

2

By: _____ */s/ Joseph Saveri* _____
Joseph R. Saveri

3

4

5

6

7

8

9

10

11

12

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:     (415) 500-6800
Facsimile:     (415) 395-9940
Email:         jsaveri@saverilawfirm.com
               swilliams@saverilawfirm.com
               czirpoli@saverilawfirm.com
               eabuchanan@saverilawfirm.com
               dseidel@saverilawfirm.com
               kmcmahon@saverilawfirm.com

13

14

15

16

17

Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:     (415) 434-8900
Facsimile:     (415) 434-9200
Email:         jmalioto@aliotolaw.com

18

19

20

21

Joseph M. Alioto Jr. (SBN 215544)
**ALIOTO LEGAL**
100 Pine Street, Suite 1250
San Francisco, California 94111
Tel: (415) 398-3800
Email:         joseph@aliotolegal.com

22

23

24

*Plaintiffs' Counsel*

25

26

27

28

MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE