Joseph M. Alioto (State Bar No. 42680)
Tatiana V. Wallace (State Bar No. 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:      (415) 434-8900
Facsimile:      (415) 434-9200
Email:          jmalioto@aliotolaw.com
                twallace@aliotolaw.com

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone:      (415) 500-6800
Facsimile:      (415) 395-9940
Email:          jsaveri@saverilawfirm.com
                swilliams@saverilawfirm.com
                czirpoli@saverilawfirm.com
                eabuchanan@saverilawfirm.com
                dseidel@saverilawfirm.com
                kmcmahon@saverilawfirm.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| DANTE DEMARTINI, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION, a Washington corporation,<br><br>Defendant. | Case No. 3:22-cv-08991-JSC<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Hon: Jacqueline Scott Corley<br><br>Date: May 12, 2023<br>Time: 10:00 am<br>Courtroom: 8 - 19th Floor |

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ............................................................................................1

II.     STANDARD OF REVIEW..............................................................................2

III.    ARGUMENT ..................................................................................................3

        A.      Plaintiffs Have Standing .................................................................3

        B.      Plaintiffs Are Entitled to Pursue Injunctive Relief..................................9

        C.      Plaintiffs Have Plausibly Alleged That the Merger Has a Reasonable Probability
                of Reducing Competition in Each of the Alleged Markets .................................12

                1.      The Elimination of Competition Among Triple-A Game Publishers.......12

                2.      Microsoft's Foreclosure Strategy ............................................14

IV.     CONCLUSION ..............................................................................................18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Altes v. Bulletproof 360, Inc.*, No. 2:19-cv-04409-ODW, 2020 U.S. Dist. LEXIS 32716 (C.D. Cal. Feb. 25, 2020) ........................................................................................ 8

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,* 190 F.3d 1051 (9th Cir. 1999) .............................. 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................................ 2

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc.,* 241 F.3d 696 (9th Cir. 2001) .............. 17

*Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011 (9th Cir. 2016) ............................................... 5, 6

*Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860 (W.D.N.Y. 1994) ..................... 6

*Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2022) ....................................................................... 2

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ......................................................... 13, 17

*California v. Am. Stores Co.*, 492 U.S. 1301 (1989) .................................................................... 10

*California v. Am. Stores Co.*, 495 U.S. 271 (1990) ........................................................................ 9

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ...................................................................... 6, 7

*City of Rohnert Park v. Harris*, 601 F.2d 1040 (9th Cir. 1979) .................................................... 6

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................................................... 4, 6

*Clemens v. ExecuPharm Inc.*, 48 F.4th 146 (3d Cir. 2022) ........................................................... 8

*Cmty. Publishers, Inc. v. DR Partners*, 139 F.3d 1180 (8th Cir. 1998) ......................................... 6

*Coca-Cola Prods. Mktg. & Sales Practices Litig. (No. II)*, No. 20-15742, 2021 U.S. App. LEXIS 26239 (9th Cir. Aug. 31, 2021) .............................................................. 8

*Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956 (9th Cir. 2018) ............................................. 4, 6

*Elias v. Connett*, 908 F.2d 521 (9th Cir. 1990) ............................................................................ 8

*Epic Games, Inc. v. Apple, Inc.*, No. 21-16506, 2023 WL 3050076 (9th Cir. Apr. 24, 2023) ...................................................................................................................... 13

*Foster v. Essex Prop., Inc.*, No. 5:14-cv-05531-EJD, 2017 U.S. Dist. LEXIS 8373 (N.D. Cal. Jan. 20, 2017) ................................................................................................. 8

*Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315 (4th Cir. 2002) ................................. 4

*High Technology Careers v. San Jose Mercury News*, 996 F.2d 987 (9th Cir.1993)................... 12

*Image Tech. Servs. v. Eastman Kodak Co.*, 125 F3d 1195 (9th Cir. 1997) ................................. 12

*Liberty Univ., Inc. v. Lew*, 733 F.3d 72 (4th Cir. 2013)................................................................. 4

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)............................................................................ 4

*Malaney v. UAL* Corp., No. 3:10-CV-02858-RS, 2010 WL 3790296 (N.D. Cal. Sept. 27, 2010) ....................................................................................................................................... 10

*Med. Diagnostic Labs., LLC v. Independence Blue Cross*, No. 16-5855, 2017 U.S. Dist. LEXIS 140256 (E.D. Pa. Aug. 30, 2017) ..................................................................... 8

*Mid-W. Paper Prod. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573 (3d Cir. 1979) ................................. 7

*Monsanto Co. v. Gerston Seed Farms*, 561 U.S. 139 (2010)........................................................ 4

*Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038 (9th Cir. 2008) ........................................ 12

*Olin Corp. v. FTC*, 986 F.2d 1295 (9th Cir. 1993) ..................................................................... 13

*Oregon Laborers-Employers Health & Welfare Tr. Fund v. Philip Morris, Inc.,* 185 F.3d 957 (9th Cir. 1999)........................................................................................................... 17

*R.C. Bigelow, Inc., v. Unilever N.V.,* 867 F.2d 102 (2d Cir. 1989) ................................................ 7

*Safe Air For Everyone v. Meyer*, 373 F.3d 1035 (9th Cir. 2004) ................................................. 8

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775 (9th Cir. 2015) ....................................................................................................................... 3, 18

*Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*, No. C 93-20613 RMW (EAI), 1995 WL 150089 (N.D. Cal. Mar. 28, 1995)........................................................................ 5

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)............................................................ 6

*Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118 (N.D. Cal. 2011) ............................................. 8

*Tamboura v. Singer*, No. 5:19-cv-03411-EJD, 2020 U.S. Dist. LEXIS 94566 (N.D. Cal. May 29, 2020).................................................................................................................. 8

*Tasty Baking Co. v. Ralston Purina, Inc.* 653 F. Supp. 1250 (E.D. Pa. 1987) ............................ 7

*Warth v. Seldin,* 422 U.S. 490 (1975) ......................................................................................... 4

*Wolfe v. Strankman*, 392 F.3d 358 (9th Cir. 2004) ..................................................................... 8

*Zenith Radio Corp, v. Hazeltine Rsch., Inc.*, 395 U.S. 100 (1969)........................................ 7, 8, 9

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) .................................................... 8

PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT

**Federal Statutes**

15 U.S.C. § 18 ................................................................................................. *passim*

15 U.S.C. § 26 ................................................................................................. *passim*

**Rules**

Fed. R. Civ. P. 12 ............................................................................................ 2, 3, 15

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law An Analysis of Antitrust
    Principles and Their Application* (4th ed. 2016) ...................................................... 3

## I.     INTRODUCTION

The Court should deny Defendant Microsoft's Motion to Dismiss Plaintiffs' First Amended Complaint, ECF No. 120 ("Def's Mot."). Microsoft's intent behind its $68.7 billion acquisition of Activision Blizzard Inc. ("Activision") is admitted and clear. Microsoft aims to eliminate Activision as a competitor in the Triple-A game market and gain exclusive access to its Triple-A content, including the immensely popular *Call of Duty* franchise, to drive demand for Microsoft's various video game platforms, create a competitive moat around its already dominant positions, increase barriers to entry, and foreclose competitors.

Plaintiffs are all avid *Call of Duty* gamers. They are passionate video game consumers who regularly purchase Activision's Triple-A gaming content and regularly play Triple-A games across various platforms. In short, they are Microsoft and Activision's core customers. They are the exact type of consumers that are protected by Section 7, and they will be directly harmed if this merger is allowed to go through. Plaintiffs have standing and have adequately alleged a cause of action under Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, because Microsoft's acquisition of Activision will cause the very type of anticompetitive harm that Section 7 was designed to prevent. Each Plaintiff plays *Call of Duty* regularly and each Plaintiff has and will continue to purchase Activision games. They thus all have Article III and antitrust standing and are all entitled to seek injunctive relief because the irreparable harm to competition in the markets in which they regularly participate would directly harm them.

The FAC contains new allegations adduced through discovery that demonstrate Microsoft's anticompetitive intent to harm competition both horizontally in the Triple-A game market in which it competes with Activision, FAC ¶¶ 247–260, and vertically in the platform-side markets, FAC ¶¶ 261–377. There is nothing speculative about Microsoft's well-pleaded size and market shares, its well-pleaded ***admitted*** and well-established anticompetitive intent to make games exclusive to Microsoft platforms, or its well-pleaded ability to follow through on its ongoing foreclosure strategy. Microsoft's intent, after just recently acquiring another massive independent Triple-A publisher in Bethesda, is to now acquire the most successful of the last few major independent Triple-A game publishers and its content portfolio, to become the largest Triple-A game publisher, so that it can foreclose its platform-

side rivals—as well as entrench its own dominant position against nascent competition—from critically important Triple-A content. Indeed, Plaintiffs have uncovered internal Microsoft emails that establish that Microsoft intends to corner enough of the Triple-A market not just to foreclose competition, but to *eliminate* Sony from the gaming industry. *See* ECF No. 133-7 (Ex. K to Pls' Mot. for Prelim. Inj.).

Recently, the United Kingdom's Competition and Markets Authority ("CMA") issued a decision holding that the merger was anticompetitive and should not be allowed to consummate on certain of the very grounds Plaintiffs allege in their complaint.[1] (FAC ¶¶ 221–231, 261–341, 363–377.) Plaintiffs' Complaint is more than sufficient to plausibly state a claim without regard to the factual record. And the factual record to date shows that the anticompetitive harm from this merger is everything that Plaintiffs have alleged and more.

In evaluating Microsoft's Motion, the Court must take Plaintiffs' factual allegations as true, and make all reasonable inferences in favor of the Plaintiffs. Doing so leads to only one conclusion: the Court should deny Microsoft's Motion and allow Plaintiffs to proceed to the merits of their claims to stop this anticompetitive merger.

## II.    STANDARD OF REVIEW

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Id*.

"Determining whether a complaint states a plausible claim for relief will . . .  be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Boquist v. Courtney*, 32 F.4th 764, 773–74 (9th Cir. 2022) (internal citations omitted). Ultimately, dismissal is only proper under Rule 12(b)(6) if it appears beyond doubt that the Plaintiffs here can

---

[1] Microsoft / Activision deal prevented to protect innovation and choice in cloud gaming - GOV.UK (www.gov.uk)

prove **no** set of facts to support their claims. *Id.* The facts alleged in the FAC are more than sufficient to support Plaintiffs' §7 claim here.

## III.   ARGUMENT

The Court should deny Microsoft's Motion to Dismiss. Microsoft argues for the second time that Plaintiffs lack standing. Microsoft already argued Plaintiffs had no standing in their prior motion to dismiss, and, other than the labor market which Plaintiffs no longer plead, the Court denied Microsoft's prior standing arguments. *See* ECF No. 74. Microsoft's second attempt fares not better.

### A.   Plaintiffs Have Standing

Microsoft first challenges Plaintiffs' standing to assert claims under Article III. Microsoft lumps Article III and antitrust standing inquiries together in a hodgepodge attempt to paint Plaintiffs as uninjured or too remote to have standing to seek to block this merger. The Court should reject these arguments. The proposed merger itself presents an immediate competitive harm to Plaintiffs, who are direct participants in the relevant markets, purchasers of the products to be affected by the merger. Microsoft first argues Plaintiffs do not have Article III standing because they have not yet been injured. Def's Mot. at 6:15–9:23.

But Microsoft's argument misconceives the nature of this case. Future injuries have yet to occur because the merger has not yet been consummated. Section 7 specifically provides that anyone "threatened" with loss or damage from an unlawful merger may sue for injunctive relief. 15 U.S.C. § 26. Indeed, if Microsoft were correct, no individual would ever have standing to prevent a merger before it occurs. But Congress intended to provide a right of action to prevent concentration in its "incipiency," and before the merger has occurred.[2] *See Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) ("'Because § 7 of the Clayton Act bars mergers whose effect "may be substantially to lessen competition, or to tend to create a monopoly,"' 15

---

[2] "Of all the forms of equitable relief, a simple injunction prior to consummation of the merger transaction is the least disruptive to all concerned. Any competitive injuries that might result from the merger have not yet occurred. Once the merger transaction has been completed, both the re-allocation of ownership and the reorganization of the post-merger firm can produce significant problems of 'unscrambling the egg,' as it is sometimes put. For this reason, the antitrust system encourages challenges to mergers before they occur." Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law An Analysis of Antitrust Principles and Their Application* ¶ 990c (4th ed. 2016).

U.S.C. § 18, judicial analysis necessarily focuses on 'probabilities, not certainties.'") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962)); *see also id.* ("[Section] 7 was intended to **arrest anticompetitive tendencies in their incipiency**.") (emphasis added) (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963)).

"The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). To establish Article III standing, a plaintiff must show (1) an injury in fact (2) a sufficient causal connection between the injury and the conduct complained of and (3) a likelihood will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). *Monsanto Co. v. Gerston Seed Farms*, 561 U.S. 139, 149 (2010); *see Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018). The injury-in-fact requirement ensures that the plaintiff has a personal stake in the outcome of the controversy. *Warth v. Seldin,* 422 U.S. 490, 498 (1975).[3] A plaintiff "need only plausibly allege" injury at this stage. *Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 89–90 (4th Cir. 2013).

Microsoft asserts that Plaintiffs do not allege a sufficient injury to satisfy Article III. Microsoft asserts that Plaintiffs have failed to (1) plead concrete injury and (2) imminent harm. Def's Mot. at 7–8. Both arguments fail. Plaintiffs bring a claim for injunctive relief under Section 7 of the Clayton Act. Generally, injunctive relief is a prospective remedy to address prospective harm. In the case of a claim for injunctive relief to stop prospective harm, a plaintiff must establish a threat of injury that is "actual and imminent, not conjectural or hypothetical." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (quoting *Summers v. Earth Island, Inst.* 555 U.S. 488, 493 (2009)).

Plaintiffs allege in detail concrete injury resulting from the consummation of the merger. Plaintiffs allege that they have purchased—and will purchase in the future—products which would be

---

[3] At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, because courts presume that general allegations embrace those specific facts that are necessary to support the claim. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The causation prong of the standing test sets a lower bar than "a requirement of tort causation." *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 324 (4th Cir. 2002) (citing *Nat. Res. Def. Council, Inc. v. Watkins*, 954 F.2d 974, 980 n. 7 (4th Cir.1992)).

directly affected economically by the merger, including video games, video game consoles, video game subscription services, and cloud gaming services. FAC ¶¶ 112–128, 259–260, 315, 319–320, 350–351, 361–362, 373–377. Plaintiffs specify the nature of the economic harm, namely increases in prices, decreases in output, innovation, and quality with respect to those products in particular and the markets more generally. FAC ¶¶ 125–128. Indeed, harms of this type are the basic harm resulting from a reduction in competition as confirmed by the laws of supply and demand and the basic principles of economics and antitrust law. The economic and market harms plaintiffs identify are concrete. They are not conjectural, speculative or ephemeral. They have been confirmed by the leading economics and antitrust scholars from Adam Smith to George Stigler, Phillip Areeda, and Herbert Hovenkamp.

In fact, they are the types of economic harms which are the bedrock of the antitrust laws for which antitrust plaintiffs have obtained redress for generations. Further, far from simply "reciting the elements of a cause of action," Def's Mot. at 7, Plaintiffs describe the mechanism for such harm. Plaintiffs' allege in detail the relevant economic markets, FAC ¶¶ 165–238; Microsoft's market share in each market, FAC ¶¶ 167–168, 206–207, 218, 219, 230, 237; how the industry is already characterized by significant network effects and barriers to entry, FAC ¶¶ 104–111; how Microsoft and Activision Blizzard currently compete in the production of Triple-A content, FAC ¶¶ 247–260; why Triple-A content is crucial to platform success, FAC ¶¶ 273–281; Microsoft's demonstrated and admitted incentive to make Activision's Triple-A gaming content exclusive to Microsoft's platforms, FAC ¶¶ 282–300; how Microsoft has already pursued this exact foreclosure strategy before, FAC ¶¶ 289–297; why Activision's Triple-A content is particularly important, FAC ¶¶ 301–320; why Microsoft's alleged 10-year deals do not prohibit Microsoft's foreclosure strategy, FAC ¶¶ 321–341, and how the merger may harm competition and these Plaintiffs, FAC ¶¶ 253–260, 342–392.

Numerous courts hold that consumers, as private litigants, have sufficiently concrete standing to challenge anticompetitive mergers that would affect the markets in which they participate. *See, e.g.*, *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016); *Santa Cruz Med. Clinic v. Dominican Santa Cruz Hosp.*, No. C 93-20613 RMW (EAI), 1995 WL 150089, at *4 (N.D. Cal. Mar. 28, 1995) ("Plaintiffs must demonstrate that they are "either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market" (quoting *Eagle v. Star–Kist*

1   *Foods, Inc.*, 812 F.2d 538, 540 (9th Cir.1987))); *Cmty. Publishers, Inc. v. DR Partners*, 139 F.3d 1180,

2   1183 (8th Cir. 1998) (holding consumer had standing to challenge newspaper merger because they had

3   "status as a purchaser of advertising" in one of the newspapers); *see also In Bon-Ton Stores, Inc. v. May*

4   *Dep't Stores Co.*, 881 F. Supp. 860, 866 (W.D.N.Y. 1994) (holding that competitors in the relevant

5   market have standing to enjoin mergers under §7). Because Section 16 provides for relief from future

6   harms, the "concrete injury" is satisfied where there is a sufficient threat of harm to competition. Thus,

7   "the standing requirements under [Section] 16 of the Clayton Act are broader than those under

8   [Section] 4 of the Act[.] . . . To have standing under [Section] 16, a plaintiff must show (1) a threatened

9   loss or injury cognizable in equity (2) proximately resulting from the alleged antitrust violation." *City*

10  *of Rohnert Park v. Harris*, 601 F.2d 1040, 1044 (9th Cir. 1979).

11          Microsoft's claim that Plaintiffs do not specify the exact point in time when the anticompetitive

12  harms would certainly materialize should be rejected. Defendants' interpretation of the proper legal

13  standard is wrong in two ways. First, Microsoft suggests that "[a]llegations of *possible* future injury are

14  not sufficient." Def's Mot. at 6:22 (quoting *Clapper,* 568 U.S. at 409). This relies on a selective

15  quotation of *Clapper* and ignores the Supreme Court's clarification the next year that "[a]n allegation of

16  future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk'

17  that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Thus, a

18  plaintiff need not show it is "literally certain that the harms they identify will come about." *Clapper*,

19  568 U.S. at 414 n.5. There is no requirement that a plaintiff seeking to prevent conduct in the future set

20  forth the date and time when that harm will certainly occur. Moreover, in a Section 7 case seeking to

21  stop an unlawful merger which may lessen competition, the harm to competition occurs when the

22  merger is consummated. *See Boardman*, 822 F.3d at 1023.

23          Second, plaintiffs' allegations of future harm are "actual and imminent, not conjectural or

24  hypothetical." *Kimberly-Clark*, (quoting *Summers v. Earth Island, Inst*. 555 US 488, 493 (2009)).

25  Plaintiffs allege that they have purchased the products bought and sold in the markets effected by the

26  merger and would sustain economic injuries as a result of the specifically alleged anticompetitive harm

27  resulting from the merger. Certainly, Microsoft's prior acquisitions of Triple-A content producers are

28  substantial "evidence bearing on whether there is a real and immediate threat of repeated injury" *City of*

1    *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotation marks omitted). Far from the mere

2    "possibility of future injury", Plaintiffs allege facts showing that because of Plaintiffs' continued use

3    and purchase of these products, there is a high likelihood, if not certainty, that they will be "wronged in

4    a similar way." *City of Los Angeles, v. Lyons*, 461 U.S. at 111, 124.

5          Moreover, the statutes providing for injunctive relief in addition to federal court equity powers

6    under Article III provide additional support for the conclusion that plaintiffs' allegations of harm from

7    violations of Section 7 is sufficiently concrete. Congress has enacted statutes of wide application

8    providing for injunctive relief to thwart anticompetitive harm across the economy before it happens. In

9    particular, Sections 7 and 16 of the Clayton Act provide for injunctive relief to stop mergers that may

10   lessen competition or tend to create a monopoly. Indeed, in the Section 7 context a plaintiff "is entitled

11   to the benefit of all reasonable inferences that follow from the alleged deliberate acquisition by merger

12   of substantial monopoly power in the [relevant] market and to a presumption that following the merger

13   [defendant] would be likely to eliminate that competition in that market by, *inter alia*, reducing

14   [Plaintiff's] access to" the product at issue. *R.C. Bigelow, Inc., v. Unilever N.V.*, 867 F.2d 102, 111 (2d

15   Cir. 1989). Microsoft's attempt to require Plaintiffs here to plead a past injury in order to be entitled to

16   sue to prevent future harm has been summarily rejected in this context. "[A]s a matter of law, the

17   requirement of direct injury does not apply to claims for injunctive relief." *Tasty Baking Co. v. Ralston

18   Purina, Inc.* 653 F. Supp. 1250, 1255 (E.D. Pa. 1987). This is because in "contradistinction to §4

19   [authorizing treble damages], §16 does not ground injunctive relief upon a showing that 'injury' has

20   already been sustained but instead makes it available 'against Threatened [sic] loss or damage.'" *Mid-

21   W. Paper Prod. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 591 (3d Cir. 1979).

22         The Supreme Court directly addressed the question of whether threatened economic harm is

23   sufficient with respect to claims for injunctive relief under the antitrust laws in *Zenith Radio Corp, v.

24   Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969). In *Zenith*, Plaintiffs asserted claims involving

25   agreements among holders of patent pools using those patent pools to exclude competition. Plaintiffs

26   sought injunctive relief under Section 16. The court held that with respect to the injunctive relief claim,

27   a Section 16 plaintiff "need only demonstrate a significant threat of injury from an impending violation

28   of the antitrust laws." *Id.* ("§16 of the Clayton Act, 15 U.S.C. §26, which was enacted by the Congress

to make available equitable remedies previously denied private parties, invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of 'threatened injury . . . . That remedy is characteristically available even though the plaintiff has not yet suffered actual injury, he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws.") (citations omitted); *see also Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 153 (3d Cir. 2022) (rejecting a rule that "would require plaintiffs to wait until they had sustained an actual injury to bring suit" as "[t]his would directly contravene the Supreme Court's holding *in Susan B. Anthony List,* which authorizes suits based on a 'substantial risk' that the harm will occur.") (quoting *Susan B. Anthony*, 573 U.S. at 158). As alleged in the Complaint, Microsoft's soon-to-be-consummated acquisition of Activision is an "impending violation of the antitrust laws." *Zenith Radio*, 395 U.S. at 130.

Indeed, every single one of Defendant's cited cases on standing concerns antitrust injury that already occurred. None of Defendant's cited cases deal with prospective injury. None concerned a prospective merger challenge under Section 7 and 16. All are inapposite.[4] Defendant's citation to *United States v. Borden* supports Plaintiffs' position too. Def's Mot. at 8 (citing *Borden*, 347 U.S. 514, 518 (1954) ("The private plaintiff, though his remedy is made available pursuant to public policy as determined by Congress, may be expected to exercise it only when his personal interest will be served.")). Here Plaintiffs' personal interests as gamers are being served in seeking to enforce §7 to

---

[4] *See Coca-Cola Prods. Mktg. & Sales Practices Litig. (No. II)*, No. 20-15742, 2021 U.S. App. LEXIS 26239, at *5 (9th Cir. Aug. 31, 2021) (false advertising); *Tamboura v. Singer*, No. 5:19-cv-03411-EJD, 2020 U.S. Dist. LEXIS 94566, at *11 (N.D. Cal. May 29, 2020) (university's fraudulent admissions scheme); *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (whether grass residue remaining after a Kentucky bluegrass harvest is "solid waste" within the meaning of the Resource Conservation and Recovery Act); *Foster v. Essex Prop., Inc.*, No. 5:14-cv-05531-EJD, 2017 U.S. Dist. LEXIS 8373, at *4 (N.D. Cal. Jan. 20, 2017) (data breach); *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004) (civil rights action); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 , 302 (3d Cir. 2012) (Sherman Act claims regarding propriety of long term exclusive contracts); *Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118, 1122 (N.D. Cal. 2011) (merger case seeking divestiture of already consummated merger); *Elias v. Connett*, 908 F.2d 521, 526 (9th Cir. 1990) (Taxpayer sued United States for compensatory and punitive damages, and for injunctive relief to restrain IRS from further attempting to collect tax deficiencies assessed against him); *Altes v. Bulletproof 360, Inc.*, No. 2:19-cv-04409-ODW (SKx), 2020 U.S. Dist. LEXIS 32716, at *7 (C.D. Cal. Feb. 25, 2020) (deceptive labeling); *Med. Diagnostic Labs., LLC v. Independence Blue Cross*, No. 16-5855, 2017 U.S. Dist. LEXIS 140256, at *11-12 (E.D. Pa. Aug. 30, 2017) (Sherman Act exclusive dealings).

1  stop this merger and prevent its anticompetitive effects on the markets in which Plaintiffs regularly

2  participate.

3  **B.      Plaintiffs Are Entitled to Pursue Injunctive Relief**

4  Microsoft seeks to deny Plaintiffs the relief afforded them by Section 7 by arguing that the

5  availability of monetary relief precludes injunctive relief. This should be rejected. Def's Mot. at 11:13-

6  18. The assertion is at odds with Section 7 and 16. No court has so held. Section 7 allows plaintiffs to

7  prevent mergers that may tend to lessen competition in the future. And Section 16 specifically permits

8  and allows for injunctive relief. See 15 U.S.C. § 26; *see also California v. Am. Stores Co.*, 495 U.S.

9  271, 283 (1990) ("the literal text of § 16 is plainly sufficient to authorize injunctive relief, including an

10  order of divestiture, that will prohibit that conduct from causing that harm.").

11  Microsoft falls back on the proposition that Plaintiffs cannot pursue injunctive relief because

12  seeking "monetary damages," is a sufficient remedy. Def's Mot. at 11. This is not well taken. It is well

13  established that an injunction may issue even though the plaintiff has not yet suffered an injury for

14  which damages can be awarded. Section 7 and Section 16 do not limit the statutory remedies only to

15  situations where monetary relief is unavailable. Indeed, to the contrary, one of the purposes was to

16  make relief available to prevent injuries in the future. *See* 15 U.S.C. § 26; *Zenith Radio Corp. v.*

17  *Hazeltine Research, Inc*., 395 U.S. 100, 130 (1969) ("[Section 16] was enacted by the Congress to

18  make available equitable remedies previously denied private parties, [and] invokes traditional

19  principles of equity and authorizes injunctive relief upon the demonstration of 'threatened' injury. That

20  remedy is characteristically available even though the plaintiff has not yet suffered actual injury.").

21  Indeed, the Clayton Act was designed to allow for both damages and injunctive relief to further the

22  enforcement of the antitrust laws. *Id*. ("the purpose of giving private parties treble-damage and

23  injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose

24  of enforcing the antitrust laws.") (citing *Borden*, 347 U.S. at 518).

25  Further, any argument that monetary damages are a substitute is undercut by the fact Plaintiffs

26  are not seeking damages under Section 4 of the Clayton Act. Nor could monetary damages possibly

27  remedy future harms stemming from harm to competition, which by its nature perpetuates harm in

28  perpetuity. *See*. Areeda & Hovenkamp, ¶326a ("[O]ne receives damages for the consequence of

previous violations and an injunction for threatened future violations, which are never recompensed by the damages award to the extent that the latter covers only the past."). Moreover, even if damages were an adequate remedy (they are not) there are strong reasons to prefer injunctive relief to damages or other post-merger relief. *See* Areeda & Hovenkamp, ¶ 990c & n.3.  There is no substitute remedy here. *California v. Am. Stores Co.*, 492 U.S. 1301, 1304 (1989) ("lessening of competition 'is precisely the kind of irreparable injury that injunctive relief under section 16 of the Clayton Act was intended to prevent'").

Defendant's citation to *Mulaney v. UAL* is distinguishable. Def's Mot. at 11:9. In *Mulaney*, the Plaintiffs were suing to stop an airline merger, but the court held that plaintiffs' "unformed hope of future air travel" was insufficient to allege that the effects of the merger would be "personal" to them. *Malaney v. UAL* Corp., No. 3:10-CV-02858-RS, 2010 WL 3790296, at *14 (N.D. Cal. Sept. 27, 2010), aff'd, 434 F. Ap'x 620 (9th Cir. 2011). Here, not only is there evidence submitted that Plaintiffs are extremely loyal *Call of Duty* gamers, due in part to the well-pleaded network effects of social gaming and would be injured if this merger were allowed to go through, there is market evidence presented that shows just how loyal *Call of Duty* gamers are to new releases from the franchise. *See* FAC ¶¶ 306–312. There is no doubt that this merger personally affects serious gamers of Activision and other Triple-A franchises in significant ways. As but one example, the merger is likely to render Plaintiffs' existing PlayStation 5 consoles useless to play the next *Call of Duty* iteration or other Activision Triple-A release, as alleged in the complaint. FAC ¶¶ 342–351. The same is true with multi-game subscription services, FAC ¶¶ 352–362, cloud-gaming services, FAC ¶¶ 363–377, and computer operating systems. FAC ¶¶ 378–392. Moreover, there is no dispute that if Microsoft succeeds in putting PlayStation out of business, or irreparably harming PlayStation's competitive standing, these Plaintiffs will be harmed.

Here Plaintiffs allege foreclosure of competition, a loss of innovation and artificially increased prices due to this potential merger. And in alleging the foreclosure on competition, Plaintiffs set forth in detail market shares of Activision, Microsoft and their competitors, and anticompetitive results of this proposed merger. Plaintiffs' likely injuries are foreseeably caused by the harm alleged. Who else other than video game consumers stand to lose more as a proximate consequence of this anticompetitive merger? Far from conjecture or hypothesis, Plaintiffs are not random individuals claiming without any

reasonable basis that they might be harmed by this merger, as Defendants would have this Court believe, Def's Mot. at 7:18-8:14. The Plaintiffs, as alleged and declared, spend much of their free time playing *Call of Duty* online with their friends and are loyal to the franchise. FAC ¶¶ 112–128. They also play other Triple-A games from Activision. *Id.*

Plaintiffs do not make "conclusory allegation[s] that they are 'likely' to purchase…unspecified products at so some unspecified time," as Microsoft suggests. Def's Mot. at 8:4–5. Rather the facts pled and the reasonable inferences to be drawn from them demonstrate that Plaintiffs, as loyal and social *Call of Duty* gamers, intend to and will purchase the next iteration of the *Call of Duty* franchise when it comes out. FAC ¶¶ 113–123, 125, 128, 306, 312, 316. And Microsoft is simply misleading when it tries to argue the lack of imminence of the injury complained of, by asserting that *Call of Duty* games "take six to ten years" to develop. Def's Mot. at 11:6–7. Putting aside that the antitrust laws do not rise and fall on an antitrust violator's product release schedule, it is at odds with the facts. Activision has released a new *Call of Duty* game every year since 2005 and has released two new *Call of Duty* games in 2022. Defendant even acknowledges that the decision PlayStation 5 owners will have to make whether to change High Performance Consoles to the Xbox to play new *Call of Duty* titles will be forced on Plaintiffs as soon as next year. Def's Mot. at 5:15; Kilaru Decl. Ex. B.

As alleged, Plaintiffs all: (1) purchase and play *Call of Duty* or other Activision Triple-A games, a video game market in which Microsoft, as a Triple-A game developer itself, directly competes with Activision and in which post-merger, it will be only one of five substantial competitors, FAC ¶¶165–185; and/or (2) they purchase and play *Call of Duty* in the market for High Performance Consoles, where Microsoft's Xbox platform has just a single competitor in Sony's PlayStation 5 console (FAC ¶¶186–208); and/or (3) they purchase multi-game library subscription services in which Xbox Game Pass already dominates the market, FAC ¶¶209–220, and/or (4) they purchase in the market for Cloud Gaming Subscription Services in which Microsoft is also the dominant market leader, FAC ¶¶ 221–231; and/or (5) they participate in the market for personal consumer operating systems that play those Triple-A games locally or on the cloud, in which Microsoft's Windows enjoys extraordinary, dominant and well-documented monopoly power, and where it has only *de minimis* competition from Apple and Linux operating systems, FAC ¶¶ 232–238.

1   There is nothing speculative about the immediate threatened loss of competition this merger

2   presents to Plaintiffs, as gamers, who seek equitable relief here, or their direct proximity, as gamers, to

3   that harm. These Plaintiffs are the very market participants who, as alleged if this Merger goes through,

4   will pay more to Microsoft in monopoly profits, and for less quality, choice and/or innovation in those

5   markets. FAC ¶¶ 258–260, 267–271.

### C. Plaintiffs Have Plausibly Alleged That the Merger Has a Reasonable Probability of Reducing Competition in Each of the Alleged Markets

Plaintiffs' Complaint is more than sufficient at this juncture. The Complaint plausibly alleges

that the merger has a reasonable probability of harming competition in five relevant markets. These

well pleaded facts, taken as true as the Court must, and giving plaintiffs the benefit of reasonable

inferences, readily establish a reasonable probability of lessened competition.

### 1. The Elimination of Competition Among Triple-A Game Publishers

Defendants first argue that Plaintiffs' complaint should be dismissed because they have not

"plausibly alleged" a relevant market for Triple-A games. But at the motion to dismiss stage, a plaintiff

need only "allege any legally cognizable 'relevant market.'" *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513

F.3d 1038, 1044 (9th Cir. 2008). There is no requirement that the relevant market "be pled with

specificity." *Id.* The Ninth Circuit holds:

> There is no requirement that [the relevant market] of the antitrust claim be pled with specificity. An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect. And since the validity of the "relevant market" is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial.

*Id.* (citations omitted). Other Ninth Circuit cases are in accord. *See High Technology Careers v. San

Jose Mercury News*, 996 F.2d 987, 990 (9th Cir.1993) (holding that the market definition depends on "a

factual inquiry into the 'commercial realities' faced by consumers") (quotations omitted); *Image Tech.

Servs. v. Eastman Kodak Co.*, 125 F3d 1195, 1203 (9th Cir. 1997) ("[W]hat constitutes a relevant

market is a factual determination for the jury.").

The allegations of Plaintiffs' Complaint are more than sufficient. Plaintiffs have alleged that

Triple-A games constitute a relevant sub-market. FAC ¶¶ 165–185. The well pleaded allegations define

the relevant market and allege facts sufficient to show that Triple-A games constitute a relevant market. Markets and submarkets may be determined by examining the "practical indicia," including "industry or public recognition." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). In *Brown Shoe*, which remains the primary case on determining relevant markets,[5] the Supreme Court held:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

The complaint alleges at minimum that (1) Triple-A games have a unique pricing structure compared to other games, commanding the highest prices; (2) they are published by industry-recognized Triple-A publishers who are able to market the games nationally or even globally; (3) they are considered unique in the industry, with expectations of high unit sales and revenue and much higher marketing budgets; and (4) their prominence and uniqueness in the industry is reflected in the ability of only a small number of companies being able to publish Triple-A games; (5) the gaming industry recognizes a limited top tier of independent game publishers, sometimes referred to as the "Big Four" or the Triple-A publishers: Activision Blizzard, Electronic Arts ("EA"), Take-Two, and Ubisoft; and (6) they are unlikely to be substituted for other "indie" video games. FAC ¶¶ 165–185. Based on these practical indicia, the Complaint has adequately pled a relevant market of Triple-A games. Indeed, that Triple-A games are priced higher is sufficient to show that consumers do not consider Triple-A games and non-Triple-A games substitutable.

In publicly available documents, Satya Nadella, Microsoft's Chairman and Chief Executive Officer, shows that Microsoft understands that Triple-A games constitute a relevant market ("we are energized by our upcoming lineup of AAA game launches, including exciting new titles from ZeniMax

---

[5] *See, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, No. 21-16506, 2023 WL 3050076, at *11 (9th Cir. Apr. 24, 2023) ("Courts also consider several "practical indicia" that the Supreme Court highlighted in *Brown Shoe*"); *Olin Corp. v. FTC*, 986 F.2d 1295, 1299 (9th Cir. 1993) (invoking *Brown Shoe* indicia).

and Xbox Game Studios")[6]; ("This holiday season will bring our biggest lineup of content and exclusive games ever, with 3 new AAA titles, including Halo Infinitive available via Game Pass subscription service").[7] Plaintiffs request the Court take judicial notice that these statements were made.

Second, Defendants argue that Plaintiffs' complaint must be dismissed because "Plaintiffs' market share figures are not tethered to their market." Def's Mot. at 15. But Defendants merely cite to *St. Alphonsus*, which held simply that a plaintiff may meet its prima facie case by showing sufficient market concentration, post-merger. Putting aside that market concentration is not the only way a plaintiff can support such a claim, Plaintiffs' complaint more than sufficiently alleges precisely what *St. Alphonsus* describes.

Here, Plaintiffs allege that post-merger, Microsoft will control roughly 30% of the Triple-A games market by the number of games sold. FAC ¶¶ 167, 168, 249. Although the data alleged comes from North America, the reasonable inference to be drawn is that the United States' market for Triple-A games is going to be roughly equivalent to market shares including the United States, Canada, and Mexico. There is already very limited horizontal competition for Triple-A game development. FAC ¶ 249. And barriers to entry are exceptionally high in this market. FAC ¶¶ 104–111.

## 2. Microsoft's Foreclosure Strategy

Microsoft does not dispute—and apparently concedes—that the four platform-side relevant markets Plaintiffs allege are sufficient. FAC ¶¶ 186–238. Nor does Microsoft dispute the market shares Plaintiffs allege showing Microsoft's dominance. FAC ¶ 206 (Microsoft controls roughly 50% of the High-Performance Console market), ¶ 2018–19 (Microsoft controls roughly 60–68% of the Game Library Subscriptions), ¶ 230 (Microsoft controls roughly 40% of the Cloud-Gaming market); and ¶ 237 (Microsoft controls roughly 98% of the computer Operating Systems market for gaming). Instead, Microsoft asks the Court to dismiss Plaintiffs' claims with respect to each on the grounds that

---

[6] https://www.fool.com/earnings/call-transcripts/2023/01/24/microsoft-msft-q2-2023-earnings-call-transcript/

[7] https://seekingalpha.com/article/4462243-microsoft-corporation-msft-ceo-satya-nadella-on-q1-fiscal-2022-results-earnings-call

the alleged anticompetitive foreclosure strategy "is not plausible." Def's Mot. at 16:12. Microsoft's assertion of implausibility should be denied for numerous reasons. First, the well-pleaded factual allegations, together with all reasonable inferences to be made from them, are more than sufficient. Second, in its attempt to make its case for "implausibility" on the pleadings, Microsoft makes numerous unsupported factual assertions, at odds with those Plaintiffs set forth. But Microsoft is wrong on the facts.[8] Microsoft even attaches deposition testimony in order to support its inaccurate factual statements. In doing so, Microsoft concedes that its Rule 12 motion rises and falls on factual issues that must be addressed at summary judgment or at trial.

Plaintiffs allege harm resulting from foreclosure and exclusivity in each platform-side market. FAC ¶¶ 261-392. Plaintiffs allege facts showing that Microsoft will foreclose Activision's current and future Triple-A games from rival platforms. Plaintiffs' allegations include numerous facts that show that Triple-A content is crucial to the success of gaming platforms, *see* FAC ¶ 273 (Platforms are designed specifically to run video games and have no value without having gaming content programmed for the platform); FAC ¶ 274 (CMA study showing that gamers consider availability of content key factor in which platform to purchase); FAC ¶ 275, ¶ 280 (Microsoft's internal documents show that gaming content is critical to success of platforms); FAC ¶ 276–279 (several CMA findings showing the same).

In response, Microsoft merely alleges that, because *Call of Duty* and other Activision games are not currently on any game library subscription or cloud-gaming service, that Activision games are "by definition, not critical inputs." Def's Mot. at 18. This argument is fatally flawed. And these facts are found nowhere in the complaint. Microsoft does not dispute that Game Library Subscriptions and Cloud-Gaming Services currently provide gamers with Triple-A content, and that they require Triple-A games to be competitive. *See, e.g.*, FAC ¶¶ 96–99. Plaintiffs allege that Triple-A content is a critical input to gaming platforms, and that *Call of Duty* and Activision games are the most important Triple-A games, with numerous factual allegations in support. FAC ¶¶ 273–281, 301–320. Even assuming no Game Library Subscriptions and Cloud-Gaming Services currently have access to Activision games

---

[8] For example, Microsoft states that *Call of Duty* has never been developed for Apples' operating system, MacOS. Def's Mot. at 6:2, 9:12–14. But *Call of Duty* has developed several games for the MacOS, including as recently as *Block Ops 3*. *See* https://www.gamerevolution.com/guides/675468-call-of-duty-list-of-mac-games.

(because Activision games are so highly in demand that Activision can sell its games individually at a higher price for a specific platform), that says nothing about what would happen if only Microsoft's Game Library Subscription or Cloud-Gaming Service received access and its competitors were foreclosed.

In addition, Plaintiffs also allege numerous facts that show that Microsoft has the incentive to make Triple-A games exclusive to Microsoft's platforms, including Activision's. FAC ¶¶ 282–300. For example, the Complaint alleges that one of Microsoft's core gaming strategies is to make Triple-A gaming content exclusive to its own platforms. FAC ¶¶ 282–286. Plaintiffs allege that Microsoft has done the exact same thing before with another large Triple-A publisher, Bethesda. FAC ¶¶ 289–296. Further, as Plaintiffs allege, Microsoft's purchase of Playground games shows that Microsoft's core gaming strategy is to lock-up Triple-A games on its own platforms and to foreclose its rivals from that content. FAC ¶ 288. The Complaint also sets forth and describes two separate economic analyses showing that Microsoft possesses both short-term and long-term incentives to make Activision's games exclusive. FAC ¶¶ 298–300.

Microsoft does not dispute that these factual allegations support Plaintiffs' allegation that Microsoft has the incentive to make Triple-A content exclusive. Instead, Microsoft asserts that provisions of its 10-year deals with certain platform manufacturers prove that Microsoft has no incentive or ability to make Activision content exclusive. Putting aside that Microsoft's assertion of these alleged contracts is a factual issue that is not before the Court, Plaintiffs allege sufficient facts to show that the 10-year deals are either illusory or inadequate to prevent Microsoft's admitted foreclosure strategy. FAC ¶¶ 321–341. And further, Plaintiffs allege that Microsoft has made similar assurances in the past and then reneged on them. FAC ¶¶ 291–295.

Third, Plaintiffs allege numerous facts that show that Activision's gaming content is some of the most, if not the most important Triple-A gaming content for driving platform demand. FAC ¶¶ 301–320. Microsoft does not contest these allegations. Instead, Microsoft argues that making Activision's highly important games exclusive to Microsoft will somehow *promote* competition, because it will make Sony "compete harder." *Id.* at 18:26. The idea that the economy will benefit from a monopoly or concentration of an industry because those excluded or damaged will need to "compete harder" is

1    preposterous and not supported by antitrust law or economics. Basic antitrust principles teach that the

2    economy benefits when numerous competitors compete on the merits, not by distorting the market by

3    foreclosing rivals through monopoly power or anticompetitive practices. *See Brown Shoe Co. v. United*

4    *States,* 370 U.S. 294, 323–24, 82 S. Ct. 1502, 1523, 8 L. Ed. 2d 510 (1962) ("The primary vice of a

5    vertical merger or other arrangement tying a customer to a supplier is . . . foreclosing the competitors of

6    either party from a segment of the market otherwise open to them"). Microsoft might as well try to

7    argue that erecting a competitive "moat" is procompetitive because its competitors must "compete

8    harder" to overcome the moat. Or that erecting barriers to entry is procompetitive because competitors

9    must "work harder" to overcome the barriers.

10        Microsoft lastly argues that there is no plausible "antitrust harm," and therefore Plaintiffs do not

11    have "antitrust standing." Def's Mot. at 19:23–20:6. For many of the same reasons discussed above in

12    Sections III.A and III.B, Microsoft's argument on antitrust standing also fails. Defendants essentially

13    repeat their Article III standing arguments asserting that Plaintiffs have failed to allege antitrust harm.

14    These arguments fair no better in this guise. An antitrust injury contains four elements: "(1) unlawful

15    conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct

16    unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v.*

17    *Gen. Tel. Co. of Cal.,* 190 F.3d 1051, 1055 (9th Cir. 1999). Plaintiffs here certainly meet these

18    requirements as players and direct purchasers in the relevant markets that will suffer competitive harm

19    due to this merger. "The requirement that the alleged injury be related to anti-competitive behavior

20    requires, as a corollary, that the injured party be a participant in the same market as the alleged

21    malefactors." *Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris, Inc.,* 241 F.3d 696, 704 (9th Cir. 2001)

22    (*citing Bhan v. NME Hosps., Inc*., 772 F.2d 1467, 1470 (9th Cir. 1985)). "In other words, the party

23    alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor

24    of the alleged violator in the restrained market." *Oregon Laborers-Employers Health & Welfare Tr.*

25    *Fund v. Philip Morris, Inc.,* 185 F.3d 957, 966 (9th Cir. 1999) (citing *Eagle v. Star-Kist Foods, Inc.*, 812

26    F.2d 538, 540 (9th Cir. 1987)). These Plaintiffs are gamers, loyal purchasers of Triple-A content,

27    including Activision's Triple-A content, and passionate consumers of the platform markets alleged in

28    the complaint.

Plaintiffs are threatened with loss or damage under §7 as they are the very gamers that directly bear the harm of Microsoft's monopolistic consolidation in this merger and its intent to make Activision games exclusive to Microsoft's platforms. It is these gamers who may lose choice if Microsoft is allowed to foreclose Sony and others. It is these gamers who may have to buy new consoles and change subscriptions to Microsoft products just to play their favorite games with their friends. "Because §7 of the Clayton Act bars mergers whose effect 'may be substantially to lessen competition, or to tend to create a monopoly,' 15 U.S.C. § 18, judicial analysis necessarily focuses on 'probabilities, not certainties.'" *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962)). "This requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended § 7 was intended to arrest anticompetitive tendencies in their incipiency." *Id*. (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963) (internal quotation marks omitted). Here we do not even need to rely on prediction: Microsoft's *modus operandi* is well documented. They're seeking to destroy Sony and foreclose rivals, which would directly harm these gamers.

## IV.   CONCLUSION

For the foregoing reasons, the Court should deny Microsoft's Motion to Dismiss.

1    Dated: April 28, 2023                    By:      /s/ Joseph R. Saveri
2                                                     Joseph R. Saveri

3                                             Joseph R. Saveri (State Bar No. 130064)
     Steven N. Williams (State Bar No. 175489)
4                                             Cadio Zirpoli (State Bar No. 179108)
     Elissa Buchanan (State Bar No. 249996)
5                                             David H. Seidel (State Bar No. 307135)
     Kathleen J. McMahon (State Bar No. 340007)
6                                             **JOSEPH SAVERI LAW FIRM, LLP**
7                                             601 California Street, Suite 1000
     San Francisco, California 94108
8                                             Telephone:    (415) 500-6800
     Facsimile:    (415) 395-9940
9                                             Email:        jsaveri@saverilawfirm.com
10                                                          swilliams@saverilawfirm.com
                                                            czirpoli@saverilawfirm.com
11                                                          eabuchanan@saverilawfirm.com
                                                            dseidel@saverilawfirm.com
12                                                          kmcmahon@saverilawfirm.com

13                                            Joseph M. Alioto (SBN 42680)
     Tatiana V. Wallace (SBN 233939)
14                                            **ALIOTO LAW FIRM**
15                                            One Sansome Street, 35th Floor
     San Francisco, CA 94104
16                                            Telephone:    (415) 434-8900
     Facsimile:    (415) 434-9200
17                                            Email:        jmalioto@aliotolaw.com

18                                            Joseph M. Alioto Jr. (SBN 215544)
19                                            **ALIOTO LEGAL**
     100 Pine Street, Suite 1250
20                                            San Francisco, California 94111
     Tel: (415) 398-3800
21                                            Email:        joseph@aliotolegal.com

22                                            *Plaintiffs' Counsel*

23

24

25

26

27

28