Valarie C. Williams (Bar No. 335347)
Tania Rice (Bar No. 294387)
Alston & Bird LLP
560 Mission Street, Suite 2100
San Francisco, CA 94105
Telephone: (415) 243-1000
valarie.williams@alston.com
tania.rice@alston.com

B. Parker Miller (*pro hac vice*)
Alston & Bird LLP
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309
Telephone: (404) 881-7000
parker.miller@alston.com

Beth A. Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
Kieran G. Gostin (*pro hac vice*)
Anastasia M. Pastan (*pro hac vice*)
Jenna Pavelec (*pro hac vice*)
Wilkinson Stekloff LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
kgostin@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
jpavelec@wilkinsonstekloff.com

*Counsel for Defendant Microsoft Corporation*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANTE DEMARTINI, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | Case No. 3:22-cv-08991-JSC<br><br>**DEFENDANT MICROSOFT CORPORATION'S REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Hon. Jacqueline Scott Corley<br><br>Date: May 12, 2023<br>Time: 10:00 a.m.<br>Courtroom: 8 – 19th Floor |

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................................. 1

II.  PLAINTIFFS LACK ARTICLE III STANDING ............................................................... 2

    A.   Plaintiffs are Wrong that a "Threat of Harm to Competition" Grants Consumers Automatic Standing ................................................................................................. 2

    B.   Plaintiffs have not Alleged Personal, Concrete, or Imminent Injury ....................... 4

III. PLAINTIFFS HAVE NOT, AND CANNOT, ALLEGE IRREPARABLE HARM ............... 6

IV.  PLAINTIFFS HAVE NOT PLAUSIBLY PLED A HORIZONTAL CLAIM ...................... 8

V.   PLAINTIFFS HAVE NOT PLAUSIBLY PLED THEIR VERTICAL CLAIMS ................ 10

VII. CONCLUSION .................................................................................................................. 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*,
   190 F.3d 1051 (9th Cir. 1999) ...........................................................................................11

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
   750 F.2d 1470 (9th Cir. 1985) .............................................................................................7

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).......................................................................................................5, 11

*Boardman v. Pac. Seafood Grp.*,
   822 F.3d 1011 (9th Cir. 2016) .............................................................................................3

*Bon-Ton Stores v. May Dep't Stores Co.*,
   881 F. Supp. 860 (W.D.N.Y. 1994) ....................................................................................3

*Brown Shoe Co. v. United States*,
   370 U.S. 294 (1962)........................................................................................................9, 10

*Camaisa v. Pharm. Rsch. Assocs., Inc.*,
   No. 21-cv-00775, 2022 U.S. Dist. LEXIS 50803 (D. Del. Mar. 22, 2022) ........................8

*City of Oakland v. Oakland Raiders*,
   20 F.4th 441 (9th Cir. 2021) ..............................................................................................12

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013)...................................................................................................4, 5, 6

*In re Coca-Cola Prods. Mktg. & Sales Practices Litig. (No. II)*,
   No. 20-15742, 2021 U.S. App. LEXIS 26239 (9th Cir. Aug. 31, 2021) ............................5

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)............................................................................................................6

*Epic Games, Inc. v. Apple, Inc.*,
   Nos. 21-16506, 21-16695, 2023 U.S. App. LEXIS 9775 (9th Cir. Apr. 24, 2023) ...........9

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) .............................................................................................10

*Golden Gate Pharm. Servs. v. Pfizer, Inc.*,
   No. C-09-3854, 2009 U.S. Dist. LEXIS 133999 (N.D. Cal. Oct. 22, 2009) .....................7

*IT&T v. Gen. Tel. & Elecs. Corp.*,
   518 F.2d 913 (9th Cir. 1975) ..............................................................................................9

*Lanovaz v. Twinings N. Am., Inc.*,
 726 F. App'x 590 (9th Cir. 2018) ..................................................................................................3

*In re Live Concert Antitrust Litig.*,
 863 F. Supp. 2d 966 (C.D. Cal. 2012) ...........................................................................................9

*Med. Diagnostic Labs., LLC v. Independence Blue Cross*,
 No. 16-5855, 2017 U.S. Dist. LEXIS 140256 (E.D. Pa. Aug. 30, 2017) .....................................8

*Med. Vets, Inc. v. VIP Petcare Holdings, Inc.*,
 811 F. App'x 422 (9th Cir. 2020) ................................................................................................10

*Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*,
 596 F.2d 573 (3d Cir. 1979)...........................................................................................................3

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
 513 F.3d 1038 (9th Cir. 2008) .......................................................................................................8

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
 No. 5:16-cv-06370-EJD, 2020 U.S. Dist. LEXIS 62795 (N.D. Cal. Apr. 9, 2020)...................7

*R.C. Bigelow, Inc. v. Unilever N.V.*,
 867 F.2d 102 (2d Cir. 1989)...........................................................................................................2

*Rohnert Park v. Harris*,
 601 F.2d 1040 (9th Cir. 1979) .......................................................................................................3

*Santa Cruz Medical Clinic v. Dominican Santa Cruz Hospital*,
 No. C 93-20631, 1995 WL 150089 (N.D. Cal. Mar. 28, 1995)..................................................3

*Spokeo, Inc. v. Robins*,
 578 U.S. 330 (2016)..................................................................................................................4, 5

*Susan B. Anthony List v. Driehaus*,
 573 U.S. 149 (2014).......................................................................................................................4

*Taleff v. Sw. Airlines Co.*,
 828 F. Supp. 2d 1118 (N.D. Cal. 2011) ........................................................................................7

*Tasty Baking Co. v. Ralston Purina, Inc.*,
 653 F. Supp. 1250 (E.D. Pa. 1987) ...............................................................................................3

*TransUnion LLC v. Ramirez*,
 141 S. Ct. 2190 (2021)...............................................................................................................2, 4

*United States v. AT&T Inc.*,
 310 F. Supp. 3d 161 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019)...........................11

**Statutes**

15 U.S.C. § 26...........................................................................................................................................6

**Other Authorities**

Fed. R. Evid. 201 ................................................................................................................9

## I. INTRODUCTION

Plaintiffs' arguments in opposition to Microsoft's Motion to Dismiss the Amended Complaint are built upon a fundamental legal error: that because Section 16 of the Clayton Act provides for an injunction as a potential form of relief, these Plaintiffs are entitled to pursue it, and need not comply with the ordinary, black letter requirements for seeking injunctive relief. But that is wrong. Indeed, the relief these ten gamers seek is unprecedented. That would not be the case if Plaintiffs were right about their sprawling view of the law.

Plaintiffs' Opposition does nothing to cure the three glaring deficiencies with their Amended Complaint. *First*, Plaintiffs lack standing. Nothing in the Clayton Act trumps the baseline Article III requirement that Plaintiffs plead a concrete, personal, and imminent injury. Plaintiffs do not come close to meeting that test; all they have offered is speculation about what Microsoft might do at some unspecified point after the merger closes, devoid of any factual allegations showing how that speculation will turn into an imminent injury to *these plaintiffs*.

*Second*, Plaintiffs failed to plead irreparable harm. The Clayton Act incorporates the well-established requirement that a plaintiff seeking injunctive relief must plausibly allege an irreparable harm with no adequate remedy at law (such as monetary damages). Plaintiffs have not plausibly pleaded that *they* will suffer any harm if the transaction is allowed to close, much less irreparable harm. The only types of harm that Plaintiffs point to with any specificity—the chance that they might need to buy a new console or pay more for games—are compensable with monetary damages and thus not irreparable. Plaintiffs' conclusory reference to the potential for reduced innovation and quality is speculative, not concrete, and not imminent, so it cannot support a finding of irreparable harm or standing.

*Third*, Plaintiffs have not alleged a plausible claim for relief. Plaintiffs' horizontal claim is premised on an alleged market for "Triple-A" games, but they continue to resist even specifying what games meet their definition. Their vertical claims of foreclosure of Activision content are belied by their own allegations several times over. The Amended Complaint should be dismissed.

## II. PLAINTIFFS LACK ARTICLE III STANDING

In its motion, Microsoft laid out why Plaintiffs cannot plausibly allege that they will suffer a concrete and imminent injury, as required by Article III. Each Plaintiff will have the same or greater access to Activision games as he did pre-merger. Microsoft's competitors (principally Sony in Plaintiffs' eyes), will continue to compete and Plaintiffs point to nothing that plausibly suggests that they will depart the market. And, as a result, the alleged price increases and innovation decreases that Plaintiffs hypothesize, which hinge on the theory of competition foreclosure, will not occur. And in any event, they are not imminent and concrete. Plaintiffs offer no real response.

### A. Plaintiffs are Wrong that a "Threat of Harm to Competition" Grants Consumers Automatic Standing

Initially, Plaintiffs are simply incorrect that the Clayton Act allows a private plaintiff to establish Article III standing merely by showing "a sufficient threat of harm to competition." (Opp. at 4:22-6:10, 7:5-10.) Plaintiffs' argument seems to be that any statutory violation (threatened harm to competition) is automatically enough to confer Article III standing (concrete, imminent harm to themselves). This runs afoul of black letter law that a statute cannot provide an end run around Article III standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021) ("Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III."). Plaintiffs' version of standing in a Sections 7 and 16 case is vast in scope: any consumer could sue to enjoin any merger by alleging a generic harm to competition. That is not the law.

Plaintiffs attempt to wave away ten cases, each of which sets forth important and applicable standing principles, by labeling them "inapposite" because none specifically involved a plaintiff seeking to enjoin a prospective merger under Sections 7 and 16. (Opp. at 8:11-13 & n.4.) But almost all involved claims for prospective injunctive relief, and others examined standing in analogous antitrust contexts. Plaintiffs' argument that the rules of constitutional standing are discarded in cases brought under Sections 7 and 16, or applied with less rigor, is simply wrong.

In support of their position, Plaintiffs quote three decades-old, non-controlling cases in misleading ways. (*See* Opp. at 7:5-21.) They manipulate a quote from *R.C. Bigelow, Inc. v. Unilever*

*N.V.*, 867 F.2d 102, 111 (2d Cir. 1989), which concerned competitors, not consumers, and referred to making "reasonable inferences" on behalf of the plaintiff at a summary judgment stage. They cite to *Tasty Baking Co. v. Ralston Purina, Inc.*, 653 F. Supp. 1250, 1255 (E.D. Pa. 1987), for an out-of-context assertion that "the requirement of direct injury does not apply to claims for injunctive relief," where the court was discussing antitrust standing requirements for direct and indirect purchasers under *Illinois Brick*. That is unrelated to whether plaintiffs are required to establish personal, imminent harm to have constitutional standing under Article III. *Mid-West Paper Prods. Co. v. Cont'l Grp., Inc.*, 596 F.2d 573, 590 (3d Cir. 1979), concerned that same, irrelevant issue.

Relatedly, Plaintiffs provide no authority for their position that every consumer has standing to enjoin a merger simply by asserting that at some point it had purchased products of a merging party. Two of the cases that Plaintiffs cite for this position were not brought by consumers. *See Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022-23 (9th Cir. 2016) (fishermen alleged imminent impacts regarding their ability to sell fish into the market); *Bon-Ton Stores v. May Dep't Stores Co.*, 881 F. Supp. 860, 865 (W.D.N.Y. 1994) (competitor alleged that its entry into the market was obstructed). The relevant question in *Santa Cruz Medical Clinic v. Dominican Santa Cruz Hospital*, No. C 93-20631, 1995 WL 150089, at *4 (N.D. Cal. Mar. 28, 1995), was whether antitrust law applied to competition for hospital services, which has no bearing on the Article III objection raised here. *See id.* In *Rohnert Park v. Harris*, 601 F.2d 1040, 1043-45 (9th Cir. 1979), the court found that the plaintiff—a city that claimed harm from the building of a regional shopping center in a nearby city, which would discourage a similar development in its own city—*lacked standing*. Plaintiffs' effort to cherry-pick a quote from this case fails, because the court's bottom line was that "the applicable standing rules in suits to enjoin antitrust violations are the general rules of standing." 601 F.2d at 1044 n.4. In *Community Publishers v. DR Partners*, the Western District of Arkansas found antitrust standing (the court did not examine constitutional standing) where one plaintiff "regularly" advertised in a newspaper and would face increased advertisement costs. 892 F. Supp. 1146, 1150 (W.D. Ark. 1995), *aff'd*, 139 F.3d 1180, 1183 (8th Cir. 1998). There are no similar allegations here from Plaintiffs. These cases only reinforce that consumers, like every plaintiff, must meet the constitutional requirements of standing. *See, e.g.*, *Lanovaz v. Twinings N. Am., Inc.*, 726 F. App'x 590, 591 (9th Cir.

2018). Plaintiffs have not done so here.

Plaintiffs make several additional errors or mischaracterizations of Microsoft's arguments. They imply that Microsoft's standing argument has been previously rejected, which is false—its prior standing argument related to the uncertain shape of the merger's terms. (Opp. at 3:4-7; see Dkt. 42 at 15:11-28.) Plaintiffs similarly miss the mark in arguing that they were not required to plead a "past injury." (Opp. at 3:14-15; 7:15-16.) This point is a red herring; Microsoft has never argued that. The relevant point is whether Plaintiffs have plausibly alleged personalized, concrete, and imminent future harm. They have not. Plaintiffs fail each aspect of the Article III test.

### B.     Plaintiffs have not Alleged Personal, Concrete, or Imminent Injury

To have standing, Plaintiffs must have an injury-in-fact that is particularized, concrete, and imminent. *See TransUnion*, 141 S. Ct. at 2203-05; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). To be particularized, the alleged injury "must affect the plaintiff in a personal and individual way." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). To be concrete, Plaintiffs' alleged injury must be "real, and not abstract." *TransUnion*, 141 S. Ct. at 2204 (citation omitted). To be imminent, the alleged future injury must be "certainly impending" or there must be a "substantial risk" that the harm will occur. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Plaintiffs' allegations fail all three requirements.

*First*, none of Plaintiffs' alleged injuries are *particularized and personal*. Plaintiffs do not dispute that there is no possible harm associated with the games they have already purchased; their claims relate only to future purchases of new game titles and platforms. Yet they do not plausibly plead what harms they will personally suffer. Plaintiffs' allegations are vague about any details of their past purchases—for example, they do not allege which specific *Call of Duty* titles they purchased and whether they purchased every year's new release. They could perhaps have lent credence to a claim that they are likely to purchase future versions of *Call of Duty*, for example, by alleging that each of them have bought every *Call of Duty* title each year upon release, or at least that they will each buy the next one expected to be released in November of 2023. Plaintiffs have not made any such statements at any point in this case. As to other future planned purchases, Plaintiffs allegations are even more vague—that they "are likely" to make future purchases of Activision and "Triple-A" games

and relevant platforms—and they do not expound on this in their opposition. (Am. Compl. ¶¶ 124-128; Opp. at 4:23-5:3.). The pleading rules are designed to stop parties from proceeding to expensive litigation based on abstract allegations that may obscure why a claim is not viable. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (enforcing pleading requirements is necessary to avoid proceeding to "expensive" antitrust discovery based on largely groundless claims). Plaintiffs should not be allowed to proceed here.

*Second*, none of Plaintiffs' alleged injuries are *concrete*. They originally claimed that the harm they would suffer is their claim that Microsoft will withhold certain games from PlayStation and other platforms, causing them to potentially buy an Xbox console. But they now conclude that the closing of the merger itself will produce vague harms to competition in general (a potential for future increased prices and reduced future innovation and quality), referring to no fewer than 212 paragraphs from their Amended Complaint that allegedly embed the "mechanisms" for the alleged harm to competition. (Opp. at 4:22-5:22.) Replacing a general claim with an even more generalized claim does not suffice to describe an injury that is "*de facto*" and "actually exist[s]." *Spokeo*, 578 U.S. at 340. Nowhere do they explain how the Plaintiffs who already use Microsoft gaming platforms (and therefore will continue to be able to access Activision content even by their own exclusivity allegations) will suffer concrete harm from a foreclosure of rivals' strategy. They do not explain how any Plaintiff could suffer any harm associated with their alleged "cloud gaming" and "multi-game content library subscription" markets—considering that *Call of Duty* is not currently available on those platforms and Plaintiffs do not allege that they use them or how they would be harmed. They do not plausibly allege that the Sony PlayStation users will be harmed, when contracts ensure that *Call of Duty* remains on PlayStation through 2024 and Microsoft has offered to extend that with a 10-year contract, and there is no plausible claim in the complaint that PlayStation will be forced to exit any market.

Third, none of Plaintiffs' alleged injuries are *imminent*, which in the case of a prospective injury, means "certainly impending."[1] *In re Coca-Cola Prods. Mktg. & Sales Practices Litig. (No. II)*,

---

[1] This does not always mean that the harm must be "literally certain," and Microsoft has not so contended. *See Clapper*, 568 U.S. at 414 n.5. Nor did Microsoft argue that Plaintiffs must specify the exact "date and time when that harm will certainly occur." (Opp. at 6:11-22.) But, as discussed in

No. 20-15742, 2021 U.S. App. LEXIS 26239, at *5 (9th Cir. Aug. 31, 2021) (quoting *Clapper*, 568 U.S. at 409). Again, Plaintiffs focus on general harms to competition that might perhaps result from the merger and assume that the merger's closing date makes them "imminent." But any alleged changes to price and quality of future games or platforms are attenuated and improperly "rest on speculation about the decisions of independent actors." *Clapper*, 568 U.S. at 414. Plaintiffs do not plausibly explain how or *when* the merger would foreclose competitors in the market from competing (either using Activision games, which they will have a contractual right to use, or using numerous other available games), in turn immediately allowing Microsoft to suddenly lower quality and increase price. They conspicuously do not allege *when* the next *Call of Duty* title will be released, never mind how the next releases will be impacted. Plaintiffs' own allegations make clear that these vague harms are not imminent. Plaintiffs allege that games can take six to ten years to develop. (*See* Opp. at 11:9-14.) The significance of the development cycle is that game studios have been working on developing the next years' *Call of Duty* titles for a long time, making it implausible that near term releases could exhibit a sudden drop in innovation and quality impacting Plaintiffs or any other consumers. Plaintiffs' allegations indicate that development for the next *Call of Duty* title is already well underway—making rapid change in quality unlikely. (*See* Am. Compl. ¶¶ 50, 78.)

### III.   PLAINTIFFS HAVE NOT, AND CANNOT, ALLEGE IRREPARABLE HARM

Instead of providing a substantive response to Microsoft's arguments that Plaintiffs fail to allege irreparable harm, Plaintiffs maintain, as they do in their Motion for Preliminary Injunction, that they did not need to. But Section 16 explicitly limits the circumstances under which a plaintiff can seek injunctive relief. It is only available "when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity." 15 U.S.C. § 26.

Under those principles, Plaintiffs' claim fails. It is black letter law that to assert a claim for injunctive relief, Plaintiffs must plausibly allege an irreparable harm with no adequate remedy at law (such as monetary damages). *See, e.g.*, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006);

---

Microsoft's Motion to Dismiss, Plaintiffs' reliance on speculation or possibilities, with no showing of a near-term harm, fails to clear Article III's bar. *See Clapper*, 568 U.S. at 414 n.5.

*Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118, 1122 (N.D. Cal. 2011) (quoting *N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 843 (9th Cir. 2007)), *aff'd on other grounds*, 554 F. App'x 598 (9th Cir. 2014); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473-74 (9th Cir. 1985) (no irreparable harm where there was insufficient showing that antitrust violation threatened Plaintiffs existence because "any loss in revenue due to an antitrust violation is compensable in damages"). These "elements apply when considering relief under Section 16 of the Clayton Act." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-cv-06370-EJD, 2020 U.S. Dist. LEXIS 62795, at *5 (N.D. Cal. Apr. 9, 2020). The relevant question is not whether Plaintiffs are seeking damages, (*see* Opp. at 9:25-26), but whether monetary relief could adequately resolve their harm.

Plaintiffs cite no authority that holds otherwise. They assert that no court has held that the availability of monetary remedies precludes injunctive relief under Sections 7 and 16, but that is false. (Opp. at 9:6.) In *Taleff*, the plaintiffs challenged a merger under Sections 7 and 16, alleging that they were threatened with higher ticket prices and paying more for less service. 828 F. Supp. 2d at 1123 n.7. They sought divestiture, which is a form of injunctive relief under the Clayton Act. *Id.* at 1122. The court dismissed their claim because they had "not demonstrated that the remedies available at law, such as monetary damages, would be inadequate." *Id.* at 1123; *see also, e.g.*, *Golden Gate Pharm. Servs. v. Pfizer, Inc.*, No. C-09-3854, 2009 U.S. Dist. LEXIS 133999, at *4 (N.D. Cal. Oct. 22, 2009) (denying injunctive relief under Section 16 because "injuries resulting from higher prices would appear to be injuries fully compensable by an award of monetary damages").

As in *Taleff,* Plaintiffs' claimed harms are compensable with monetary damages. They assert that some of them may need to *buy* an Xbox to continue playing *Call of Duty* and may need to *purchase* future games and platforms at higher prices. (*See* Opp. at 10:16-21, 11:14-16; Am. Compl. ¶¶ 125, 128, 184, 202, 217, 229, 350, 351.) These alleged harms are not irreparable.

Conclusory assertions about future diminished product quality or reduced incentives to innovate do not convert Plaintiffs' compensable damages to irreparable harm. Plaintiffs hypothesize that Microsoft could "put PlayStation out of business" or "irreparably harm PlayStation's competitive standing," (Opp. at 10:21-24), underscoring that these amorphous harms are attenuated, remote, and speculative. Plaintiffs make no factual allegations as to how Microsoft could do that (as their

allegations make clear that PlayStation can compete using other games), or how the alleged competition between Microsoft and Activision or Microsoft and Sony impacts innovation or quality. Plaintiffs' allegations regarding the game development cycle make clear that any alleged harms are in the remote future. Such conclusory allegations do not provide a basis for finding irreparable harm. *See Med. Diagnostic Labs., LLC v. Independence Blue Cross*, No. 16-5855, 2017 U.S. Dist. LEXIS 140256, at *11-12 (E.D. Pa. Aug. 30, 2017) (a complaint cannot "offer a bare conclusion that quality has fallen"; it "must allege facts to support a reduction in quality across the relevant market").

The law is clear that Plaintiffs were required to plead the fundamental requirements of standing and irreparable harm. These Plaintiffs have not and cannot do so, and their claims should be dismissed.

## IV.   PLAINTIFFS HAVE NOT PLAUSIBLY PLED A HORIZONTAL CLAIM

Plaintiffs' "Triple-A games" market is wholly implausible. It is not clearly defined; it does not specify which games are included; it fails to address whether there are economic substitutes for the included games; its criteria are subjective and a game could meet some but not all of the criteria (*e.g.*, "blockbusters," "high development costs," "superior graphical quality," "expectations of high unit sales," "extensive marketing and promotion"); it arbitrarily excludes certain games that would seem to meet those criteria; and it arbitrarily and self-servingly selects the top handful of overall video game competitors instead of examining each included product.

Plaintiffs primarily argue that these defects do not matter at this stage, because market definition is often a factual inquiry. But the very case they cite for this proposition notes an important caveat: it is appropriate to dismiss claims based on market definitions that are defective on the face of the complaint. *See Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1044-45 (9th Cir. 2008). Here, Plaintiffs' market is facially defective. Plaintiffs fail to address the multiple cases cited in Microsoft's motion to dismiss—cases where courts dismissed claims based on similar facially defective relevant market allegations. *See, e.g.*, *Camaisa v. Pharm. Rsch. Assocs., Inc.*, No. 21-cv-00775, 2022 U.S. Dist. LEXIS 50803, at *20 (D. Del. Mar. 22, 2022) (plaintiff failed to plead a relevant market in Section 7 case because the proposed market definition of "cloud-based, bring-your-own-device ('BYOD') clinical trial software solutions for CROs" "lack[ed] the detail required to plausibly construct the outer boundaries of a relevant market" such as reasonable interchangeability).

Plaintiffs' effort to fall back on the *Brown Shoe* "practical indicia" does not save their relevant market. First, those "practical indicia" are not enough. They do not excuse Plaintiffs' failure to clearly define their market and adequately allege its proper outer bounds of all reasonably interchangeable substitutes. *See Epic Games, Inc. v. Apple, Inc.*, Nos. 21-16506, 21-16695, 2023 U.S. App. LEXIS 9775, at *34 (9th Cir. Apr. 24, 2023) (courts "*also* consider several 'practical indicia," in addition to the other requirements) (emphasis added). Second, Plaintiffs' Amended Complaint did not allege facts relevant to most of the "practical indicia"—industry recognition as a *separate economic entity* (as opposed to merely the highest performers)[2], unique production facilities, distinct customers (even the Plaintiffs indicate that they play a variety of games), sensitivity to price changes, and specialized vendors (they do not claim that every game by a "Triple-A publisher" meets "Triple-A" status or that other publishers are incapable of producing "Triple-A" games). *IT&T v. Gen. Tel. & Elecs. Corp.*, 518 F.2d 913, 932 (9th Cir. 1975) (it was "clearly erroneous" for "the district court [to] segregate[] the independent telephone operating company 'submarket' for telephone equipment from the industrial, governmental, and new common carrier 'submarket' for the same equipment because two of the *Brown Shoe* criteria were present: industry recognition . . . and distinct customers"); *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 993 (C.D. Cal. 2012) ("[I]n the absence of additional economic analysis, the relevant product market cannot be defined solely by reference to a single *Brown Shoe* factor."). Third, with respect to the "practical indicia" that Plaintiffs did try to address, they only make vague and subjective conclusions that are deficient. For example, for "distinct prices"—which would require factual detail and numbers—Plaintiffs merely conclude that the games "command[] the highest prices" and are "unlikely to be substituted." (Opp. at 13:9-21.) Plaintiffs' assertions only establish that the games were the most successful in hindsight, not that they are a unique economic product. And garnering the "highest prices" is not informative without knowing whether those products are sensitive to price competition from other games. In *Brown Shoe*, the Court held that

---

[2] Cherry-picked statements from one industry executive, colloquially and generally referencing "AAA" titles, is not enough to establish a legally proper market. Microsoft also opposes Plaintiffs' request for judicial notice. They have not shown why the fool.com and seekingalpha.com webpages are sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201. More importantly, it is an improper attempt to add factual matter that was not alleged in the Amended Complaint.

men's, women's, and children's shoes were distinct submarkets because "each has characteristics peculiar to itself rendering it generally noncompetitive with the others." *Brown Shoe Co. v. United States*, 370 U.S. 294, 326 (1962). Here, Plaintiffs have not shown, under any of the "practical indicia," that "Triple-A" games are noncompetitive with other video games.

Critically, Plaintiffs also raise no legitimate dispute that they were required to set forth market shares that are tied to their alleged market. *See FTC v. Qualcomm Inc.*, 969 F.3d 974, 992-93 (9th Cir. 2020); *Med. Vets, Inc. v. VIP Petcare Holdings, Inc.*, 811 F. App'x 422, 423 (9th Cir. 2020). They address (but do not resolve) their use of North American figures as a proxy for United States market shares, by arguing what they failed to factually allege (that those geographies are comparable). But they do not even address the biggest issue: a mismatch of their alleged market and their market shares. Plaintiffs took all games produced by selected game publishers and provided their purported market shares out of an overall market for all video games, in relation to one another. They did not provide market share figures for a "Triple-A" games market. And it remains a mystery whether or not all "Triple-A" games are counted within Plaintiffs' market share figures and, conversely, whether all of the games that were counted meet Plaintiffs' definition of "Triple-A." Plaintiffs' failure to allege market shares for their alleged relevant market is a fatal flaw. Their horizontal theory should be dismissed.

## V. PLAINTIFFS HAVE NOT PLAUSIBLY PLED THEIR VERTICAL CLAIMS

Plaintiffs' opposition reiterates their position that "Triple-A" games are important. But that is not the test—the relevant questions are whether there will be a foreclosure of competition, and whether such harm will accrue to these Plaintiffs, as a result of the transaction. Plaintiffs' Amended Complaint relies on a thinly alleged chain of events that do not cumulate to a reasonable probability of substantially lessened competition and harm to Plaintiffs.

First, Plaintiffs did not plausibly allege that Microsoft is reasonably likely to make Activision's games exclusive to its own platform. Plaintiffs' own pleadings indicate that Microsoft is contractually obligated to keep the games available on other platforms.[3] (Am. Compl., ¶ 329.) Plaintiffs' claim that

---

[3] Plaintiffs mischaracterize Microsoft's argument as relying on unsupported factual assertions, when

these agreements are "illusory or inadequate" is unsupported and implausible. (Opp. at 16:18-21.) Nor can Plaintiffs elide this failure with their contention that Microsoft has "reneged" on similar assurances. That argument is unsupported by the Amended Complaint, which does not allege that Microsoft disregarded any *contractual obligation*, because it cannot. (Opp. at 16:21-22); *see Twombly*, 550 U.S. at 570 (dismissing complaint where the plaintiffs "have not nudged their claims across the line from conceivable to plausible").

Second, Plaintiffs were required to allege how, *assuming* Microsoft made the games exclusive, they are such a critical input that rivals would not be able to effectively compete. *See United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 202-04 (D.D.C. 2018), *aff'd*, 916 F.3d 1029 (D.C. Cir. 2019). Plaintiffs' allegations concerning the importance and popularity of *Call of Duty*—and other "Triple-A" games—are not enough. They acknowledge that rivals are currently competing with other, non-Activision "Triple-A" games, and do not allege why that would not continue. (Am. Compl. ¶¶ 167-168.) Plaintiffs' assertion that any increased market concentration is harmful is not sufficient to establish a vertical claim. (*See* Opp. at 16:27-17:9); *AT&T Inc.*, 916 F.3d at 1032 (plaintiffs cannot rely on market share statistics as "a short cut" to show anticompetitive harm "because vertical mergers produce no immediate change in the relevant market share"). Further, if mere theoretical foreclosure were sufficient to constitute antitrust harm, nearly every vertical merger would be stopped. That is not the law.

Third, as to harm to themselves, and concomitant antitrust standing, Plaintiffs fail to address the law that a general status as a consumer does not automatically confer antitrust standing. *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1058 (9th Cir. 1999). Even if there were harm to competition, that does not necessarily translate to harm to Plaintiffs themselves. Here, Plaintiffs' allegations of harm to themselves are attenuated and speculative—relying on a chain of events that

---

that is not the case. (*See* Opp. at 15:4-8.) It relies on Plaintiffs' own admission in their Amended Complaint: "Microsoft has signed several 10-year deals that purport to guarantee *Call of Duty* access to rival platforms on parity with development and release on Microsoft's platforms." (Am. Compl., ¶ 329.) While the Court likely does not need to review any of the actual contracts to grant Microsoft's Motion to Dismiss, Microsoft noted that the Court may consider those agreements under the incorporation by reference doctrine. Plaintiffs' assertion that Microsoft relies on deposition testimony is incorrect—the deposition excerpts were only used in support of the Rule 12(b)(1) factual challenge to standing, to which Plaintiffs did not respond.

might lead to the need to switch platforms at some point in the future.  This is within an industry that they allege is "still growing and developing with new innovations emerging"—it is uncertain what games and platforms will be popular in the coming years.  (Am. Compl. ¶ 6.)  Additionally, these consumer choices, like deciding in the future to buy certain platform products over others because of a personal preference in games, is not a sufficiently direct antitrust harm caused by anticompetitive conduct, as long as the firms in the market are still effectively competing.  *See City of Oakland v. Oakland Raiders*, 20 F.4th 441, 460 (9th Cir. 2021) (finding "too many speculative links in the chain of causation between Defendants' alleged [antitrust violations] . . . and the City's alleged injuries" where there was no way of knowing "what would have occurred in a more competitive marketplace").

Finally, Plaintiffs have alleged a case primarily around the Xbox and PlayStation consoles, and then assumed that the same theories would apply to other platforms.  That is not the case.  Nowhere have they alleged that Activision games are currently available on cloud gaming and multi-game subscription services (they are not).  It is not plausible to infer that Activision games are a "critical input" to companies' ability to compete in the cloud gaming and multi-game subscription services markets when they are not yet available in those markets and companies are currently competitive with other gaming content.  Plaintiffs certainly have not alleged how the possibility of harm to nascent subscription and cloud gaming platform markets would cause harm to these Plaintiffs, where no Plaintiff alleges that he currently plays Activision games on those platforms.  Plaintiffs also have not alleged how the computer operating systems market will be impacted at all.

## VII. CONCLUSION

Plaintiffs' Amended Complaint did not fix the deficiencies that were fatal to their original complaint. Plaintiffs have not plausibly alleged irreparable harm to themselves, nor even harm to competition in general. They also (both facially and factually) lack an imminent, concrete, personal injury that would confer standing. Microsoft's Motion to Dismiss should be granted.

Dated: May 3, 2023                                      Respectfully submitted,

                                                        By:  /s/ *Valarie C. Williams*

                                                        Valarie C. Williams
                                                        B. Parker Miller
                                                        Tania Rice
                                                        Alston & Bird LLP

                                                        Beth A. Wilkinson
                                                        Rakesh N. Kilaru
                                                        Kieran G. Gostin
                                                        Anastasia M. Pastan
                                                        Jenna Pavelec
                                                        Wilkinson Stekloff LLP

                                                        *Counsel for Defendant Microsoft Corporation*