Valarie C. Williams (Bar No. 335347)
Tania Rice (Bar No. 294387)
Alston & Bird LLP
560 Mission Street, Suite 2100
San Francisco, CA 94105
Telephone: (415) 243-1000
valarie.williams@alston.com
tania.rice@alston.com

B. Parker Miller (*pro hac vice*)
Alston & Bird LLP
1201 West Peachtree Street, Suite 4900
Atlanta, GA 30309
Telephone: (404) 881-7000
parker.miller@alston.com

Beth A. Wilkinson (*pro hac vice*)
Rakesh N. Kilaru (*pro hac vice*)
Kieran G. Gostin (*pro hac vice*)
Anastasia M. Pastan (*pro hac vice*)
Jenna Pavelec (*pro hac vice*)
Wilkinson Stekloff LLP
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4000
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
kgostin@wilkinsonstekloff.com
apastan@wilkinsonstekloff.com
jpavelec@wilkinsonstekloff.com

*Counsel for Defendant Microsoft Corporation*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANTE DEMARTINI, *et al.*,<br><br>                Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>                Defendant. | Case No. 3:22-cv-08991-JSC<br><br>**MICROSOFT CORPORATION'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION (IRREPARABLE HARM AND BOND)**<br><br><br>Hon. Jacqueline Scott Corley<br>Date: May 12, 2023<br>Time: 10:00 a.m.<br>Courtroom: 8 – 19th Floor |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     ISSUES TO BE DECIDED ................................................................................ 2

III.    FACTUAL BACKGROUND ............................................................................ 2

IV.     PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM ........... 3

        A.      Plaintiffs Must Show Immediate, Irreparable Harm that is Personal to Them ............ 3

        B.      Plaintiffs' Declarations Do Not Show Irreparable Harm ............................................. 7

                1.      *Plaintiffs' Allegations of Harm are Compensable by Monetary Damages* ................................................................................................ 7

                2.      *Plaintiffs Have Made No Showing of Immediate, Irreparable Harm* .............. 8

        C.      Plaintiffs' Allegations of Loss of Innovation and Quality Are Even More Speculative ................................................................................................... 11

V.      PLAINTIFFS MUST POST A BOND ........................................................... 13

VI.     CONCLUSION ................................................................................................ 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Recs., Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001), *as amended* (Apr. 3, 2001)....................................................14

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...................................................................................................3

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985) .........................................................................................4, 6, 8

*Hawaii ex rel. Anzai v. Gannett Pac. Corp.*,
99 F. Supp. 2d 1241 (D. Haw.), *aff'd*, 203 F.3d 832 (9th Cir. 1999) ......................................13

*Apple, Inc. v. Samsung Elecs. Co.*,
877 F. Supp. 2d 838 (N.D. Cal.), *rev'd on other grounds*, 695 F.3d 1370 (Fed.
Cir. 2012) ..................................................................................................................................14

*Auto Driveaway Franchise Sys., LLC v. Auto Driveaway Richmond, LLC*,
928 F.3d 670 (7th Cir. 2019) ....................................................................................................14

*Barahona-Gomez v. Reno*,
167 F.3d 1228 (9th Cir. 1999) ..................................................................................................16

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007)......................................................................................................13

*Caribbean Marine Servs. Co. v. Baldridge*,
844 F.2d 668 (9th Cir. 1988) ...............................................................................................4, 12

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983).................................................................................................................4, 8

*Dehoog v. Anheuser-Busch InBev SA/NV*,
899 F.3d 758 (9th Cir. 2018) ......................................................................................................4

*Earth Island Inst. v. Carlton*,
626 F.3d 462 (9th Cir. 2010) ......................................................................................................3

*Ginsberg v. INBEV SA/NV*,
No. 4:08-cv-1375JCH, 2008 WL 4965859 (E.D. Mo. Nov. 18, 2008) ..............................14, 16

*Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*,
No. C 09-03854 MMC, 2009 U.S. Dist. LEXIS 133999 (N.D. Cal. Oct. 22, 2009)...........8, 11

*Immigrant Legal Res. Ctr. v. City of McFarland*,
827 F. App'x 749 (9th Cir. 2020) ..............................................................................................3

*Malaney v. UAL Corp.*,
   No. 3:10-CV-02858-RS, 2010 U.S. Dist. LEXIS 106049 (N.D. Cal. Sep. 27,
   2010), *aff'd*, 434 F. App'x 620 (9th Cir. 2011) ..........................................................4, 10, 13

*McCarthy v. Intercontinental Exch., Inc.*,
   No. 20-cv-05832-JD, 2021 U.S. Dist. LEXIS 245093 (N.D. Cal. Dec. 23, 2021)...................8

*Metromedia Broad. Corp. v. MGM/UA Entm't Co.*,
   611 F. Supp. 415 (C.D. Cal. 1985) ......................................................................................12

*Moltan Co. v. Eagle-Picher Industries, Inc.*,
   55 F.3d 1171 (6th Cir. 1995) ..............................................................................................16

*Momenta Pharms., Inc. v. Amphastar Pharms., Inc.*,
   834 F. Supp. 2d 29 (D. Mass. 2011) ...................................................................................14

*Newspaper & Periodical Drivers' & Helpers' Union, Loc. 921 v. S.F. Newspaper
   Agency*,
   89 F.3d 629 (9th Cir. 1996) ................................................................................................13

*Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*,
   16 F.3d 1032 (9th Cir. 1994) ..............................................................................................14

*Nokia Corp. v. InterDigital, Inc.*,
   645 F.3d 553 (2d Cir. 2011)................................................................................................14

*Norbert v. City & County of San Francisco*,
   10 F.4th 918 (9th Cir. 2021) ................................................................................................7

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
   No. 5:16-cv-06370-EJD, 2020 U.S. Dist. LEXIS 62795 (N.D. Cal. Apr. 9, 2020)...................4

*OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*,
   842 F. App'x 16 (9th Cir. 2021) ....................................................................................14, 16

*Pfizer, Inc. v. Teva Pharms., USA, Inc.*,
   429 F.3d 1364 (Fed. Cir. 2005)...........................................................................................14

*Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc.*,
   351 F. Supp. 462 (E.D. Pa. 1972) .......................................................................................13

*Reilly v. Medianews Grp., Inc.*,
   No. C 06-04332 SI, 2006 U.S. Dist. LEXIS 61696 (N.D. Cal. July 28, 2006) ..................8, 11

*Saint Alphonsus Med. Ctr. - Nampa, Inc. v. Saint Luke's Health Sys.*,
   No. 1:12-CV-560-BLW, 2012 U.S. Dist. LEXIS 181363 (D. Idaho Dec. 20, 2012)..............11

*Sanofi-Synthelabo v. Apotex, Inc.*,
   470 F.3d 1368 (Fed. Cir. 2006)...........................................................................................14

*State v. Valero Energy Corp.*,
   No. C 17-03786 WHA, 2017 U.S. Dist. LEXIS 138095 (N.D. Cal. Aug. 23, 2017) .............11

*Taleff v. Sw. Airlines Co.*,
   828 F. Supp. 2d 1118 (N.D. Cal. 2011), *aff'd on other grounds*, 554 F. App'x 598
   (9th Cir. 2014)........................................................................................................................4, 8

*United States v. Borden Co.*,
   347 U.S. 514 (1954)...............................................................................................................3, 5

*California ex rel. Van de Kamp v. Am. Stores Co.*,
   697 F. Supp. 1125 (C.D. Cal. 1988), *aff'd in part*, 872 F.2d 837 (9th Cir. 1989),
   *stay granted*, 492 U.S. 1301 (1989), *rev'd*, 495 U.S. 271 (1990)........................................5, 6

*Villegas Lopez v. Brewer*,
   680 F.3d 1068 (9th Cir. 2012) ...................................................................................................3

*Von Grabe v. Ziff Davis Pub. Co.*,
   No. 91 CIV. 6275 (DLC), 1994 WL 719697 (S.D.N.Y. Dec. 29, 1994)....................................14

*Where Do We Go Berkeley v. Cal. Dep't of Transp.*,
   32 F.4th 852 (9th Cir. 2022) ......................................................................................................3

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)........................................................................................................3, 5, 7, 12

**Statutes**

15 U.S.C. § 26........................................................................................................... *passim*

**Other Authorities**

Erik Kain, *'Call of Duty' 2023 Release Date And Beta Dates Leak Online*, Forbes,
   Feb. 13, 2023, https://www.forbes.com/sites/erikkain/2023/02/13/call-of-duty-
   2023-release-date-and-beta-dates-leak-online/?sh=6dfb20a8328d ......................................2, 9

Fed. R. Civ. P. 65(c) ......................................................................................13, 14, 15

GamesHub, Nov. 24, 2022, https://www.gameshub.com/news/news/playstation-xbox-
   activision-blizzard-new-console-generation-2028-34524/ .......................................................3

https://support.activision.com/modern-warfare-ii/articles/crossplay-and-cross-
   progression-in-modern-warfare-ii ..............................................................................................2

https://www.callofduty.com/modernwarfare ..................................................................................2

https://www.playstation.com/en-us/ps-plus/games/ ...................................................................2, 10

Leah Williams, *Playstation and Xbox Won't Launch New Consoles Until at Least
   2028*................................................................................................................................................3

Tech Guided, Feb. 1, 2023, https://techguided.com/call-of-duty-games-in-order/ ........................9

MICROSOFT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:22-cv-08991-JSC

## I.   INTRODUCTION

This is not a preliminary injunction case.  A preliminary injunction is an extraordinary and drastic remedy, reserved to prevent identifiable and immediate harms that cannot be fixed later with monetary compensation.  Six private plaintiffs, gamers, declare to this Court that the merger of Microsoft and Activision may cause them harm, such as the *potential* that they will not be able to play new releases of their favorite game on their favorite platform.  Or, they say, they *may* have to pay higher prices for those games.  They also speculate that the merger *perhaps* will lead to less innovation and lower quality games one day.  Even if true, these are not the personal, concrete, irreparable and immediate harms that could justify this drastic remedy.

The day after the Microsoft/Activision transaction closes, nothing will change for the worse for these Plaintiffs.  They can still play the current version of their favorite game, *Call of Duty*, just as they did the day before the transaction.  Should they choose to purchase new releases of *Call of Duty* in the future*,* they will still be able to do so after closing.  And, if they decide to try cloud gaming, they will find that *Call of Duty* will be coming to cloud gaming, for the first time, through Microsoft's cloud gaming agreements.  The very fact that the parties can have a reasonable discussion about whether Plaintiffs will be better off—able to play their favorite game on more devices, not fewer—demonstrates that this is not a preliminary injunction case.

And none of the harm claimed by Plaintiffs is irreparable.  Almost all of it is monetary—alleged higher prices and the need to purchase an additional console.  Plaintiffs' vague claims of future declines in innovation and quality are too speculative and unsupported to support injunctive relief.  Plaintiffs tacitly acknowledge this fatal problem, by arguing, erroneously, that putative harm to competition is enough to satisfy the irreparable harm requirement of 15 U.S.C. § 26.  Whether or not Plaintiffs can show harm to competition (they cannot), that simply is not the law.

Finally, Plaintiffs must bear the risk of their request for a preliminary injunction by posting a bond adequate to cover the substantial damages that Microsoft will incur if it is prevented, erroneously, from completing this transaction.

What Plaintiffs ask this court to do is unprecedented.  They have not cited a single case where a court has enjoined a merger based on alleged harms claimed by a few individual consumers.

## II.   ISSUES TO BE DECIDED

Whether Plaintiffs have met their burden of proof to establish irreparable harm to preliminarily enjoin Microsoft's acquisition of Activision Blizzard, and whether Plaintiffs are required to post a bond to cover damages to Microsoft in the event that a preliminary injunction is improvidently granted.

## III.   FACTUAL BACKGROUND

*Call of Duty* can be played as a multi-player, cross-platform game.[1]  That means that gamers can play by themselves or with their friends across the platforms that it is currently offered on—Microsoft Xbox, Sony PlayStation, and personal computers.[2]  Activision and Sony are operating under a contract (which Microsoft will inherit upon closing its acquisition of Activision) that makes *Call of Duty* available on PlayStation until at least the end of 2024.  (Kilaru Decl., Ex. B at 188:2-9, Ex. G; Stuart Decl., Ex. A at § 2.4.)  Microsoft has made a ten-year offer to extend that access.  (Am. Compl. ¶¶ 329, 335.)  *Call of Duty* is not currently available on any cloud service or multi-game subscription service.[3]  (Kilaru Decl., Ex. F at 78:4-11.)  But Microsoft has entered into multiple contracts to make *Call of Duty* and other Activision content available on competing platforms, including cloud gaming services, for the next 10 years.  (Am. Compl. ¶ 329; Kilaru Decl., Ex. C, Ex. D, Ex. E.)  Accordingly, the merger will bring Activision games to more platforms than ever before.

Even if Activision games were to become exclusive to certain platforms, how that would impact the video game industry, which is "growing and developing with new innovations emerging," is unpredictable.  (Am. Compl. ¶ 6.)  There are several competitors who publish games in Plaintiffs' alleged "Triple-A" games market—and some of those games become exclusive to a platform.  (*Id.* at ¶¶ 167-168.)  And any possible impacts would not be felt for some time.  The next title in the *Call of Duty* franchise is not expected until November of 2023.[4]  Additionally, there is a years-long development cycle for games, (Am. Compl. ¶ 257), so the development of the next titles in the *Call of*

---

[1]  *See*  https://support.activision.com/modern-warfare-ii/articles/crossplay-and-cross-progression-in-modern-warfare-ii.
[2] *See* https://www.callofduty.com/modernwarfare.
[3] *See also* https://www.playstation.com/en-us/ps-plus/games/.
[4] *See* Erik Kain, *'Call of Duty' 2023 Release Date And Beta Dates Leak Online*, Forbes, Feb. 13, 2023, https://www.forbes.com/sites/erikkain/2023/02/13/call-of-duty-2023-release-date-and-beta-dates-leak-online/?sh=6dfb20a8328d.

*Duty* franchise is already well underway.[5]  New generations of consoles are only released every five to ten years, (Am. Compl. ¶ 50); the next version of the Xbox is not expected until 2028.[6]

## IV.   PLAINTIFFS HAVE NOT SHOWN A LIKELIHOOD OF IRREPARABLE HARM

"A preliminary injunction is 'an extraordinary and drastic remedy.'" *Villegas Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citation omitted).  It is never "awarded as of right."  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Plaintiffs bear the burden of making a "clear showing" of all elements for a preliminary injunction: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 852, 859 (9th Cir. 2022); *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). Section 16 of the Clayton Act incorporates these general requirements, allowing injunctive relief only "under the same conditions and principles as injunctive relief . . . is granted by courts of equity" and specifically requiring "a showing that the danger of irreparable loss or damage is immediate."  15 U.S.C. § 26. The Court need not assess every element in this case.  Plaintiffs cannot meet the requirement of proving that they will suffer immediate, irreparable harm if the Court does not preliminarily enjoin the merger.

### A.  Plaintiffs Must Show Immediate, Irreparable Harm that is Personal to Them

To establish irreparable harm, a plaintiff must show an injury that is: (1) personal to them; (2) immediate; (3) incapable of being remedied through monetary damages; (4) nonspeculative; and (5) substantial.  *United States v. Borden Co.*, 347 U.S. 514, 518 (1954) ("Under [Section 16], a private plaintiff may obtain injunctive relief against [antitrust] violations only on a showing of 'threatened loss or damage'; and *this must be of a sort personal to the plaintiff*") (emphasis added); *Immigrant Legal Res. Ctr. v. City of McFarland*, 827 F. App'x 749, 751-52 (9th Cir. 2020) ("The standard for preliminary injunctions, however, requires irreparable harm to the plaintiffs themselves.") (citing *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018)); *Caribbean Marine*

---

[5] *See* Kain, *supra* n.4.

[6] *See* Leah Williams, *Playstation and Xbox Won't Launch New Consoles Until at Least 2028*, GamesHub, Nov. 24, 2022, https://www.gameshub.com/news/news/playstation-xbox-activision-blizzard-new-console-generation-2028-34524/.

*Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."); *City of Los Angeles v. Lyons*, 461 U.S. 95, 103, 111 (1983) (injunctive relief can only be issued to prevent a "substantial and immediate irreparable injury"); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473-74 (9th Cir. 1985) (forecasted lost revenue due to antitrust violation was not irreparable harm because monetary damages are not irreparable).

Plaintiffs maintain that the normal requirements for a preliminary injunction do not apply to cases brought under Sections 7 and 16 of the Clayton Act. Not so. The "four elements [for a preliminary injunction, including irreparable harm] apply when considering relief under Section 16 of the Clayton Act." *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 5:16-cv-06370-EJD, 2020 U.S. Dist. LEXIS 62795, at *5 (N.D. Cal. Apr. 9, 2020). Indeed, Section 16 explicitly requires that "the standard equitable principles for injunctive relief are met." *Dehoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 762 (9th Cir. 2018); *see also* 15 U.S.C. § 26; *Am. Passage Media Corp.*, 750 F.2d at 1472 ("The Clayton Act provides injunctive relief under the same principles as generally applied by courts of equity."). This includes proof of irreparable harm that is personal, immediate, not remedied by monetary damages, nonspeculative, and substantial. *See Malaney v. UAL Corp.*, No. 3:10-CV-02858-RS, 2010 U.S. Dist. LEXIS 106049, at *46 (N.D. Cal. Sep. 27, 2010) (denying preliminary injunction motion in merger challenge brought under Sections 7 and 16, because "[i]n evaluating plaintiffs' purported irreparable harm as well as the balance of equities, the Court must only consider those injuries plaintiffs advance that are personal to them were defendants to merge, and cannot consider any injuries that plaintiffs allege would be suffered by the general public as a whole"), *aff'd*, 434 F. App'x 620 (9th Cir. 2011); *Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118, 1122-23 (N.D. Cal. 2011) (dismissing merger challenge brought under Sections 7 and 16 because the plaintiffs had "not demonstrated that the remedies available at law, such as monetary damages, would be inadequate"), *aff'd on other grounds*, 554 F. App'x 598 (9th Cir. 2014).

Contrary to Plaintiffs' assertions, likelihood of success on the merits in showing that the merger will harm competition does not automatically translate to irreparable harm to these private Plaintiffs. As the Supreme Court has explained, "[a]n injunction is a matter of equitable discretion; *it does not*

4

*follow from success on the merits as a matter of course*." *Winter*, 555 U.S. at 22, 32 (emphasis added) (reversing a preliminary injunction upon a lesser showing of *possible* irreparable harm to marine mammals; plaintiffs must "demonstrate that irreparable injury is *likely* in the absence of an injunction"); *see also United States v. Borden Co.*, 347 U.S. 514, 518 (1954) (private plaintiffs may seek injunctive relief against violations of federal antitrust law, but "only on a showing of 'threatened loss or damage'; and this must be of a sort personal to the plaintiff").

Applying that principle, the Ninth Circuit recently rejected an identical argument in an analogous context. In *Hooks v. Nexstar Broadcasting, Inc.*, an NLRB Regional Director requested a preliminary injunction ordering the defendant to cease its unfair labor practices, to reinstate its recognition of a union, and to bargain in good faith. 54 F.4th 1101, 1109 (9th Cir. 2022). The district court granted the preliminary injunction, reasoning that "when there is a likelihood of success on the merits there is an inference of irreparable harm to union representation from the continuation of the unfair labor practice." *Id.* at 1110-11. The Ninth Circuit reversed, explaining that the Supreme Court had consistently rejected decisions that "adopted a presumption of irreparable harm" based on a finding of likelihood of success on the merits. *Id.* at 1115.

Plaintiffs rely on two cases, neither of which support their position. In both cases, the courts found irreparable harm independently from a finding on the merits of a threat to competition in general. In both cases, the courts stated the black letter law that private plaintiffs must prove irreparable harm to themselves personally.

In *California v. American Stores*, the Supreme Court noted that a private litigant must "prove 'threatened loss or damage' to his own interests in order to obtain [injunctive] relief." 495 U.S. 271, 295-96 (1990). The trial court found personal, irreparable harm to the plaintiffs, and the Ninth Circuit and Supreme Court upheld that finding on an abuse of discretion standard. *California ex rel. Van de Kamp v. Am. Stores Co.*, 697 F. Supp. 1125, 1135 (C.D. Cal. 1988), *aff'd in part*, 872 F.2d 837, 844 (9th Cir. 1989), *stay granted*, 492 U.S. 1301, 1304 (1989), *rev'd*, 495 U.S. 271 (1990). That case is easily distinguishable from this one. It was brought on behalf of all California residents, rather than ten individuals, challenging the merger of two of the largest supermarket chains. *Id.* at 1134. The harm from the merger would have been immediate, as the "defendants will rapidly restructure the

1    newly-acquired company and its assets and disable the acquired chain from operating independently

2    of the parent." *Id.* at 1133-34.  And the harm would have affected California residents by permanently

3    and irrevocably impacting the grocery supply.  The merger would lead to hundreds of millions of

4    dollars in increased grocery prices to California families—which although monetary in nature, would

5    be "extremely difficult, if at all possible," to remedy.  *See id.* at 1134, *aff'd in part*, 872 F.2d at 844.

6           In *Boardman v. Pacific Seafood Group*, the plaintiffs were not consumers; they were fishermen

7    who sold fish in the market at issue, which they claimed was being monopolized.  822 F.3d 1011,

8    1016-17, 1023 (9th Cir. 2016).  The court recited the law that "a plaintiff must show that she 'is likely

9    to suffer irreparable harm in the absence of preliminary relief.'"  *Id.* at 1022 (quoting *Winter*, 555 U.S.

10   at 20).  The plaintiffs provided a declaration stating that the "single greatest concern" to West Coast

11   fisherman operating in the relevant market was the defendant's monopoly power; because the

12   defendant could unilaterally set fish prices below competitive market levels, fishermen "struggled

13   financially" and could not maintain their fishing vessels.  (Kilaru Decl., Ex. A at ¶¶ 5, 7.)  In light of

14   this, and other detailed declarations, the court found that the plaintiffs established an irreparable injury

15   to themselves—a monopsony that would threaten their livelihood, which depended on the ability to

16   compete in the market to sell fish.  822 F.3d at 1022-23.

17          Plaintiffs' own authorities confirm that they have the burden of proof of establishing

18   irreparable harm.  Yet Plaintiffs do little to try to meet it.  They devote a single, conclusory paragraph

19   to the harms claimed by the individual Plaintiffs.  (Mot. at 27:18-28:4.)  They assert that they might

20   someday lose access to certain games unless they migrate to a different console; could potentially face

21   higher prices; and, if Microsoft were to eventually put Sony out of business and was no longer

22   competitively constrained, they could experience lower quality gaming in the future.  But Plaintiffs'

23   own cases illustrate why these speculative and vague harms are not the kind that courts have found to

24   be irreparable and immediate.  These harms differ markedly from immediate, irrevocable food supply

25   disruption statewide and threatened failure of a business.  *See also, e.g., Am. Passage Media Corp.*,

26   750 F.2d at 1473-74 (finding "[t]he threat of being driven out of business [] sufficient to establish

27   irreparable harm," but lost revenue a harm reparable through monetary damages).  Indeed, courts

28   consistently deny requests for preliminary relief, even where the plaintiff was threatened with far more

6

serious harm than Plaintiffs attempt to show here.  *See Winter*, 555 U.S. at 21-23 (reversing preliminary injunction on Naval sonar training exercises because the lower courts did not find a *likelihood* of irreparable harm to marine mammals); *Norbert v. City & County of San Francisco*, 10 F.4th 918, 935-36 (9th Cir. 2021) (affirming denial of injunctive relief because the plaintiff inmates "had not demonstrated a risk of material harm to human health arising from" lack of extended access to direct sunlight).

### B.  Plaintiffs' Declarations Do Not Show Irreparable Harm

Only six of ten Plaintiffs submitted declarations to support the Motion for Preliminary Injunction.  The declarations that were submitted are wholly insufficient.  They demonstrate that the claimed harms are compensable by monetary damages, speculative, and not immediate.

#### 1.  *Plaintiffs' Allegations of Harm are Compensable by Monetary Damages*

Plaintiffs' purported harms fall into two categories of concerns regarding future purchases of new releases of *Call of Duty*.  First, Plaintiffs assert that they may pay higher prices for future games. Each declaration ends with the same boilerplate assertion: "If the prices of important gaming content such as Activision Blizzard titles were to increase, I would be harmed as I would need to purchase titles at inflated prices."  (*See* DeMartini Decl. ¶ 15; Owen Decl. ¶ 13; Jakupko Decl. ¶ 19; Galvin Decl. ¶ 19; Burns Decl. ¶ 10; Loftus Decl. ¶17.)  Second, Plaintiffs Gavin and Loftus claim they will be forced to buy a new platform to maintain access to *Call of Duty* if Microsoft made Activision titles exclusive to its platforms at some unknown point in the future (*See* Galvin Decl. ¶¶ 15, 16; Loftus Decl. ¶ 15), and Plaintiff Burns makes the vaguer claim that he could be harmed by losing access to Activision games on his "favorite videogame platform" (Burns Decl. ¶ 9).  Plaintiffs DeMartini, Jakupko, and Owen would not experience this second alleged harm, as they will continue to be able to play *Call of Duty* on their Microsoft platform.  (DeMartini Decl. ¶¶ 3, 10; Jakupko Decl. ¶¶ 3, 14; Owen Decl. ¶ 4.)

Neither of these purported harms is sufficient.  Where a plaintiff's injury is compensable with monetary damages, there is no irreparable harm and no claim to injunctive relief.  *See Am. Passage Media Corp.*, 750 F.2d at 1473; *Reilly v. Medianews Grp., Inc.*, No. C 06-04332 SI, 2006 U.S. Dist. LEXIS 61696, at *18 (N.D. Cal. July 28, 2006) (assertions of higher prices and reduced quality that

7

1  would result from a merger were compensable with monetary damages and not irreparable harm); *see*

2  *also McCarthy v. Intercontinental Exch., Inc.*, No. 20-cv-05832-JD, 2021 U.S. Dist. LEXIS 245093,

3  at *18 (N.D. Cal. Dec. 23, 2021) (finding no "imminent threat of irreparable harm" in a Section 1 case

4  where the claimed injury was monetary in nature).   That black letter principle applies to Plaintiffs'

5  claim brought under Sections 7 and 16 of the Clayton Act.   *See, e.g.*, *Taleff*, 828 F. Supp. 2d at 1122-

6  23 (dismissing merger challenge brought under Sections 7 and 16, because allegations that the

7  plaintiffs were threatened with higher ticket prices and paying more for less service could be remedied

8  with monetary damages); *Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*, No. C 09-03854 MMC, 2009

9  U.S. Dist. LEXIS 133999, at *3-5 (N.D. Cal. Oct. 22, 2009) (assertions of higher prices that would

10  result from a merger did not constitute irreparable harm).

11        Buying a new console and paying increased prices for games are indisputably monetary harms

12  that could be repaired by monetary damages.   If Plaintiffs' claimed harms occur, they could be

13  remedied with the cost of two Xbox consoles (one for Galvin and one for Loftus) and the amount of

14  any price increase for the next *Call of Duty* titles (per unit, multiplied by ten—one for each Plaintiff).

15              ### 2.       *Plaintiffs Have Made No Showing of Immediate, Irreparable Harm*

16        Plaintiffs also fail to show the *immediate,* irreparable harm necessary to obtain a preliminary

17  injunction.   *See* 15 U.S.C. § 26 (requiring "a showing that the danger of irreparable loss or damage is

18  immediate"); *Lyons*, 461 U.S. at 103, 111 (injunctive relief can only be issued to prevent a "substantial

19  and immediate irreparable injury").   Plaintiffs' claims of harm rely on a chain of causation, no

20  component of which could happen immediately.   Accordingly, for several independent reasons, there

21  is no likelihood that the alleged harm would be experienced by Plaintiffs immediately.

22        The main concern expressed by Plaintiffs is that Microsoft will make *Call of Duty* exclusive

23  to its platforms—a decision that *cannot* be effected before a trial on the merits would occur in this

24  case.   Activision and Sony are operating under a contract (which Microsoft will inherit upon closing)

25  that makes *Call of Duty* available on PlayStation until at least ███████████████████

26  ███████.   (Kilaru Decl., Ex. B at 188:2-9, Ex. C at 195:21-196:10, Ex. G; Stuart Decl., Ex. A at §

27  2.4.)   Microsoft has also offered to make the games available to Sony for much longer.   Microsoft has

28  entered into multiple contracts to make Call of Duty and other Activision content available on

competing platforms for the next 10 years, even where it is not currently available.  (Am. Compl. ¶ 329; Kilaru Decl., Ex. C, Ex. D, Ex. E, Ex. F at 78:4-11.)

Next, the video game and platform development cycle would not allow the purported harms to be felt in the market immediately.  The next title in the *Call of Duty* franchise is not expected to be released until November of 2023.[7]  This alone precludes a finding of immediacy.  *See Boardman*, 822 F.3d at 1023 ("A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff is likely to suffer irreparable harm before a decision on the merits can be rendered.").  Further, Plaintiffs allege a years-long development cycle for games and consoles.  (Am. Compl. ¶¶ 50, 257.)  The next titles in the *Call of Duty* series are already in development by game studios (for compatibility with Xbox and PlayStation), so it is unlikely that any alleged diminution in quality or innovation would be felt for upcoming releases.[8]  Nor is the next generation of the Xbox expected until approximately 2028.  (Am. Compl. ¶ 50.)[9]  Accordingly, no changes could occur immediately after the merger and prior to a decision on the merits in this case.

Nor does Plaintiffs' expert report show any immediate harm.  Dr. Cabral admits that, while Microsoft may have an incentive to raise prices that begins at the time of the merger, "[t]his does not necessarily mean that prices will be raised on day one."  (Cabral Report § 6.6.)  This, again, describes a monetary harm that is not irreparable.  But it also casts the harm to occur in a speculative, remote future.  Plaintiffs have not shown how Microsoft could immediately raise prices to anticompetitive levels or diminish quality, when it would continue to face market pressures from competitors.

Finally, Plaintiffs have not shown when any purported harm in the market would reach them personally.  None of the six declarations submitted in support of Plaintiffs Motion state that they will buy the next title in the *Call of Duty* franchise, nor that they habitually purchase every single *Call of*

---

[7] *See* Erik Kain, *'Call of Duty' 2023 Release Date And Beta Dates Leak Online*, Forbes, Feb. 13, 2023, https://www.forbes.com/sites/erikkain/2023/02/13/call-of-duty-2023-release-date-and-beta-dates-leak-online/?sh=6dfb20a8328d.

[8] *See* Kain, *supra* n.4.  The next title is being developed by game studio Sledgehammer Games (a subsidiary of Activision).  *Id.*  The lead gaming studios to develop each year's version of *Call of Duty* have rotated each year.  *See* Brent Hale, *All Call of Duty Games in Order [2023 Update]*, Tech Guided, Feb. 1, 2023, https://techguided.com/call-of-duty-games-in-order/.

[9] *See* Williams, *supra* n.6.

1    *Duty* title.  To the contrary, the declarations are vague about which *Call of Duty* titles the Plaintiffs

2    have purchased and when those purchases occurred.  They also indicate that these Plaintiffs have

3    purchased "numerous" different video games on different platforms, of which Activision games are

4    only part of their purchasing habits or "one of" their favorite games.  (*See* Burns Decl. ¶ 7; DeMartini

5    Decl. ¶ 4; Galvan Decl. ¶ 3; Jakupko Decl. ¶ 6; Loftus Decl. ¶ 5; Owen Decl. ¶ 3.)

6          Plaintiffs' claims of irreparable harm based on foreclosure in cloud gaming and multi-game

7    subscription services are even more remote.  Only Plaintiff Galvan states that he uses a cloud-based

8    gaming service.  (Galvan Decl. ¶ 4.)  The rest of the Plaintiffs merely claim they *anticipate* using cloud

9    gaming in the future.  (*See* DeMartini Decl. ¶ 3; Burns Decl. ¶ 5; Jakupko Decl. ¶ 3; Loftus Decl. ¶ 4.)

10   These "someday" cloud gamers cannot establish immediate, irreparable harm from this merger when

11   they do not show how their ability to play the games at issue would be impacted or when.  *See Malaney*

12   *v. UAL Corporation* 2010 U.S. Dist. LEXIS 106049, at \*45-48 (failure to show irreparable harm where

13   plaintiffs did not currently have set plans to travel on the routes at issue).  In any event, *Call of Duty*

14   is not currently available on *any* cloud service or multi-game subscription service.  (Kilaru Decl., Ex.

15   F at 78:4-11.)[10]  The merger will likely *benefit* certain Plaintiffs.  Microsoft has entered into binding

16   commitments with NVIDIA and others, to make several Activision games available on cloud gaming

17   services, such as NVIDIA's GeForce Now.  (Kilaru Decl., Ex. C, Ex. E.)  Plaintiffs would gain more

18   access than ever to Activision games and could choose between competing services.  Any supposed

19   injury related to cloud-based or multi-game subscription service gaming is thus highly speculative and

20   far from the immediate and irreparable harm required to justify injunctive relief.

21         Courts have denied motions for preliminary injunctions under similar circumstances where the

22   purported harm was not immediate.  In *Reilly v. Medianews Group, Inc.*, the plaintiffs sought to enjoin

23   a merger between newspapers, asserting that it would result in increased prices, decreased quality, and

24   harm to competition and consumers.  No. C 06-04332 SI, 2006 U.S. Dist. LEXIS 61696, at \*18-19

25   (N.D. Cal. July 28, 2006).  Among other problems with the plaintiffs' theory, the court found that it

26   lacked the immediacy required for an irreparable injury, because other competitors remained in the

27

28   _____

[10] *See also* https://www.playstation.com/en-us/ps-plus/games/.

1   market so any "effects [were] unlikely to be felt for a substantial period of time."  *Id.* at \*20-21.

2   Further, the two newspapers would continue to exist as separate entities post-merger, so divestiture

3   remained a potential remedy and there would be no permanent injury.  *Id.* at \*21-22.[11]  In *State v.*

4   *Valero Energy Corp.*, the court found that there was no likelihood of irreparable harm, because the

5   parties had contracts and assurances preventing them from taking the complained-of action before a

6   trial on the merits.  No. C 17-03786 WHA, 2017 U.S. Dist. LEXIS 138095, at \*15-18 (N.D. Cal.

7   2017); *see also Saint Alphonsus Med. Ctr. - Nampa, Inc. v. Saint Luke's Health Sys.*, No. 1:12-CV-

8   560-BLW, 2012 U.S. Dist. LEXIS 181363, at \*8-9 (D. Idaho Dec. 20, 2012) (hospital's assurances

9   made it unlikely that employee layoffs as a result of a merger would occur prior to trial).  In *Golden*

10  *Gate Pharmacy Services v. Pfizer, Inc.*, the court found that there was no irreparable harm where the

11  plaintiffs asserted that prices would increase and that a merger would "result in a 'diminution of

12  innovation and services' and a 'lower quality of drugs.'"  No. C-09-3854 MMC, 2009 U.S. Dist.

13  LEXIS 133999, at \*3-5 (N.D. Cal. Oct. 22, 2009).  Increased prices were compensable with an award

14  of monetary damages, and "there [was] no showing, let alone any evidence" that any of the other

15  effects would occur before trial.  *Id.*

16      **C.  Plaintiffs' Allegations of Loss of Innovation and Quality Are Even More Speculative**

17      To the extent Plaintiffs' attempt to fall back on vague notions of harm to innovation and quality

18  that they argue may occur at some point in the future, those purported harms rely on the same

19  speculative, non-immediate chain of suppositions discussed above.   But they are even more

20  speculative and insufficient.  Plaintiffs speculate that these impacts would occur in a hypothetical and

21  distant future where Microsoft puts Sony out of business and somehow no longer faces competition.

22  [11] Even under Plaintiffs' erroneous view that harm to competition equals irreparable harm, they have

23  made no showing of a harm to competition that could not be remedied.  They have not proven that the
    merger would scramble eggs that could not be unscrambled.  *See State v. Valero Energy Corp.*, No. C

24  17-03786 WHA, 2017 U.S. Dist. LEXIS 138095, at \*17-18 (N.D. Cal. Aug. 23, 2017) (denying
    preliminary injunction where there was no showing that the merging assets would "become too

25  intertwined . . . to disentangle").   To the contrary, Microsoft and Activision will remain separate
    entities post-merger, in a parent-subsidiary relationship.  (*See* Stuart Decl., Ex. A.)  The studios that

26  make *Call of Duty* and other games are a further step removed, as they too are separate entities.  *See*
    Kain, *supra* n.4.  And even if Microsoft does as Plaintiffs allege—make Activision games exclusive,

27  allowing it to raise prices—those actions could be easily undone with an order requiring Microsoft to

28  make the games available to competitors.

(Mot. at 27:25-28.)  Dr. Cabral similarly engages in pure speculation.  He focuses on general concepts that *may* apply to "dominant firms," but does nothing to establish that Microsoft is a dominant firm now (it is not) or will be at some specific point in the future.  (*See* Cabral Report § 6.5.1.)  He speaks only in possibilities, not probabilities.  He also fails to explain how those possibilities would result in direct harm to the Plaintiffs.

These hypothetical impacts are even more speculative within the context of what Plaintiffs acknowledge is a growing, dynamic industry, (Am. Compl. ¶ 6), where Microsoft would continue to face strong competitors even in Plaintiffs flawed "Triple-A" games relevant market.  (*Id.* at ¶¶ 167-168.)  While these Plaintiffs have purchased at least one *Call of Duty* title in the past, they cannot predict which games will be the most popular in the future.  *See Metromedia Broad. Corp. v. MGM/UA Entm't Co.,* 611 F. Supp. 415, 427 (C.D. Cal. 1985) ("taste . . . is fleeting" and therefore claiming loss of a preferred product is "theoretical and not properly the basis for preliminary relief").

Certain of the Plaintiffs make references to their ability to play video games with their friends.  To the extent they attempt to fall back on that as a harm, their argument fails.  It relies on the same speculative, non-immediate, unlikely chain of causation discussed above, but it adds another speculative link: Plaintiffs' friends would need to choose not to purchase future *Call of Duty* titles and to stop playing.  Under any circumstance, they can all continue to play the titles they currently own, and Plaintiffs have not set forth any facts to establish their hypothetical world of future consumer choices and harm.  Indeed, Plaintiffs' ability to play with their friends is unlikely to be impacted.  *Call of Duty* is a cross-platform game and Microsoft has entered into multiple agreements to make sure friends can play with each other on more platforms than ever before.

A mere possibility of irreparable harm is insufficient.  *See Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."); *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) (holding that speculative assertions are insufficient to establish irreparable harm).  Plaintiffs' claims of possible future harm to innovation and quality do not satisfy their burden of showing irreparable harm.  *See Malaney*, 2010 U.S. Dist. LEXIS 106049, at *48

1  (assertion of higher prices and lower quality for future air travel, when the plaintiffs did not establish

2  set plans for such future travel, constituted a "speculative and *de minimus* injury . . . insufficient to

3  establish irreparable harm"); *Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 321 (3d Cir. 2007)

4  ("The prospective harm to competition must not, however, be speculative" in a Section 7 action).

5  **V.   PLAINTIFFS MUST POST A BOND**

6        Before any preliminary injunction may issue, Plaintiffs must post security capable of

7  remedying the harms that Microsoft will sustain if wrongfully enjoined. Section 16 of the Clayton Act

8  allows preliminary injunctions only "upon the execution of proper bond against damages for an

9  injunction improvidently granted."  15 U.S.C. § 26.  The same requirement is found in Rule 65(c) of

10 the Federal Rules of Civil Procedure:

11            The court may issue a preliminary injunction or a temporary restraining order *only if*
12            the movant gives security in an amount that the court considers proper to pay the costs
              and damages sustained by any party found to have been wrongfully enjoined or
13            restrained.

14 Fed. R. Civ. P. 65(c) (emphasis added). Courts apply Rule 65(c) in Clayton Act cases. *See, e.g.,*

15 *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1255 (D. Haw.) (requiring plaintiff

16 to post bond pursuant to Rule 65(c) after granting motion for preliminary injunction under Section 16

17 of the Clayton Act), *aff'd*, 203 F.3d 832 (9th Cir. 1999); *Phila. World Hockey Club, Inc. v. Phila.*

18 *Hockey Club, Inc.*, 351 F. Supp. 462, 513 n.45 (E.D. Pa. 1972) ("[T]he procedure under [15 U.S.C.]

19 § 26 is governed by Rule 65 of the Federal Rules of Civil Procedure," including "Rule 65(c) which

20 requires the posting of security by the applicant").

21       As the Ninth Circuit has explained, the bond requirement serves: "(1) to discourage parties

22 from requesting injunctions based on tenuous legal grounds; and (2) to assure judges that defendants

23 will be compensated for their damages if it later emerges that the defendant was wrongfully enjoined."

24 *Newspaper & Periodical Drivers' & Helpers' Union, Loc. 921 v. S.F. Newspaper Agency*, 89 F.3d

25 629, 631 (9th Cir. 1996).  "[T]he 'bond, in effect, is the moving party's warranty that the law will

26 uphold the issuance of the injunction.'"  *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 842 F.

27 App'x 16, 17 n.2 (9th Cir. 2021) (citation omitted).

28       The amount of the required bond should be sufficient to cover Microsoft's anticipated costs

1   and damages of complying with the injunction. *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 560

2   (2d Cir. 2011) ("[T]he purpose of an injunction bond . . . [is] to cover the costs and damages incurred

3   as a result of complying with a wrongful injunction."). If the injunction is overturned, Microsoft is

4   entitled to recover damages arising from compliance with the injunction, but that recovery is limited

5   to the amount of the security posted. *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032,

6   1036 (9th Cir. 1994).

7       Accordingly, appellate courts have "instructed district courts to 'err on the high side'" in setting

8   the amount of the bond to ensure there are adequate funds to cover the enjoined party's harms in the

9   event the injunction is subsequently overturned. *Auto Driveaway Franchise Sys., LLC v. Auto

10   Driveaway Richmond, LLC*, 928 F.3d 670, 679 (7th Cir. 2019); *see also Apple, Inc. v. Samsung Elecs.

11   Co.*, 877 F. Supp. 2d 838, 918 (N.D. Cal.), *rev'd on other grounds*, 695 F.3d 1370 (Fed. Cir. 2012)

12   ("Because the amount of the bond is an upper limit on an injured party's redress for a wrongful

13   injunction, courts have held that 'district courts should err on the high side.'" (citation omitted)).

14       Indeed, district courts in the Ninth Circuit and around the country routinely order bonds in the

15   millions—and even hundreds of millions—of dollars before issuing a preliminary injunction. *See,

16   e.g.*, *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1385 (Fed. Cir. 2006) ($400 million bond);

17   *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1372 (Fed. Cir. 2005) ($200 million bond);

18   *Momenta Pharms., Inc. v. Amphastar Pharms., Inc.*, 834 F. Supp. 2d 29, 31 (D. Mass. 2011) ($100

19   million bond); *Apple*, 877 F. Supp. 2d at 918 ($95 million bond); *Nintendo*, 16 F.3d at 1036 ($15

20   million bond); *A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1028 (9th Cir. 2001) ($5 million

21   bond), *as amended* (Apr. 3, 2001); *see also Ginsberg v. INBEV SA/NV*, No. 4:08-cv-1375JCH, 2008

22   WL 4965859, at *5 (E.D. Mo. Nov. 18, 2008) (denying motion to preliminary enjoin $52 billion

23   merger under Section 7 of the Clayton Act while considering claimed lost value of $18 billion in Rule

24   65(c) bond analysis); *Von Grabe v. Ziff Davis Pub. Co.*, No. 91 CIV. 6275 (DLC), 1994 WL 719697,

25   at *4 (S.D.N.Y. Dec. 29, 1994) (denying motion to restrain a $1.4 billion transaction when it was

26   "doubtful" plaintiff would be able to post the necessary bond pursuant to Rule 65(c), "which would

27   likely be in the millions of dollars").

28       Applying this standard, Plaintiffs should be required to post a bond to cover the substantial

losses Microsoft would incur if it were wrongfully enjoined from acquiring Activision Blizzard.  As evidenced by the declaration of Tim Stuart, Xbox's Chief Financial Officer, the total quantifiable harm would be ▮▮▮▮▮▮▮.  That figure is based on two components.

First, under the Merger Agreement, after July 18, 2023, Activision has the right to terminate the Merger Agreement if the transaction has not closed.  (*See* Stuart Decl. ¶ 9.)  Upon Activision exercising that right, the Merger Agreement requires Microsoft to pay a "Breakup Fee" of $3 billion (*See id.* ¶ 11.)  If a wrongful preliminary injunction were to prevent the transaction from closing in a timely manner, and if Activision exercised its right to terminate, Microsoft would be harmed by having to pay the Breakup Fee.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Second, if Activision terminates the Merger Agreement or the deal is otherwise not consummated, Microsoft would also lose the value of the transaction over the purchase price.  Prior to entering into the Merger Agreement, based on an internal financial model created in the ordinary course of business, Microsoft valued the deal at ▮▮▮▮▮▮.  (Stuart Decl. ¶ 19.)  Subtracting the purchase price of $68.7 billion, this leaves a surplus value of ▮▮▮▮▮▮ that Microsoft's shareholders would stand to lose if the deal is not completed.  (*See id.* ¶ 20.)

Plaintiffs offer little to counterbalance this clear evidence of harm to Microsoft, arguing only that Microsoft can avoid the harm because this case can be completely resolved in a few months, before the transaction could close anyway.  But the bond—Plaintiffs' legally required "warranty that the law will uphold the issuance of the injunction"—is not calculated based on the most ideal scenario Plaintiffs can game out.  *See OTR Wheel Eng'g, Inc.*, 842 F. App'x at 17 n.2.  Instead, the bond must

---

[12] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1   operate to provide Microsoft with protection against the risk of a wrongfully issued injunction

2   preventing the deal from closing.

3       Unable to demonstrate that Microsoft will not suffer any harm from a wrongful preliminary

4   injunction, Plaintiffs argue that the Court should simply ignore the bond requirement because of

5   Plaintiffs' financial means. But the only controlling authority Plaintiffs cite for that proposition—

6   *Barahona-Gomez v. Reno*, 167 F.3d 1228 (9th Cir. 1999)—did not hold that the bond requirement can

7   be ignored based on the financial circumstances of the plaintiffs.  In *Reno*, plaintiffs challenged the

8   lawfulness of an Amendment to an Immigration and Naturalization Act that capped the number of

9   suspensions of deportation that the Attorney General could grant each fiscal year.  In that case, the

10  district court "noted the public interest underlying the litigation and the unremarkable financial means

11  of the class as a whole." *Id.* at 1237.  But the Ninth Circuit did not hold that a plaintiff's lack of

12  financial means or the public interest were a sufficient basis for denial of a bond.  The Circuit Court

13  approved the district court's decision to require a "nominal" bond because any cost to the government

14  defendant "would be minimal" and defendant "did not tender any evidence" to support its alleged

15  costs.  *Id.*; *see also id.* ("*Absent any showing by defendants of cost*, we cannot say the district court

16  clearly abused its discretion in determining the bond amount." (emphasis added)).[13]

17      Here, in contrast, Microsoft has provided competent evidence of the significant harm (████

18  ████) that Microsoft would risk incurring if a preliminary injunction was wrongfully entered, and

19  Plaintiffs have adduced no evidence that they are independently able to pay those wrongful damages

20  without a bond.  To proceed with their request for a preliminary injunction, Plaintiffs should be

21  required to put up a bond equal to that amount.  *See, e.g.*, *Ginsberg*, 2008 WL 4965859, at *5 (denying

22  motion to preliminary enjoin the $52 billion acquisition of Anheuser-Busch by InBev because, in part,

23  "Anheuser-Busch shareholders could lose $18 billion if the transaction d[id] not proceed" and

24  plaintiffs had "neither posted, nor offered to post, any type of bond to support their claims.").

25

26  _____

    [13] Plaintiffs also cite *Moltan Co. v. Eagle-Picher Industries, Inc.*, 55 F.3d 1171 (6th Cir. 1995), for the
27  proposition that a bond can be denied based on (1) the strength of the plaintiffs' case and (2) the
    strength of the public interest.  But that decision is not binding on this Court.  Nor have Plaintiffs
28  shown that their case or the public interest are comparable to *Moltan* or *Reno*.

MICROSOFT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
Case No. 3:22-cv-08991-JSC

## VI.   CONCLUSION

Plaintiffs' Motion for a Preliminary Injunction should be denied, because Plaintiffs have not proven that they will suffer an immediate, irreparable harm unless the merger is preliminarily enjoined. The Court need not reach the other elements of a request for a preliminary injunction.  Even if they could meet their burden of proving irreparable harm and all of the other elements, Plaintiffs would not be entitled to a preliminary injunction unless they post a bond sufficient to cover the costs and damages that Microsoft could incur as a result of complying with a wrongful injunction.

Dated: May 5, 2023                                      Respectfully submitted,


                                                        By:   */s/ Valarie C. Williams*

                                                        Valarie C. Williams
                                                        B. Parker Miller
                                                        Tania Rice
                                                        Alston & Bird LLP

                                                        Beth A. Wilkinson
                                                        Rakesh N. Kilaru
                                                        Kieran G. Gostin
                                                        Anastasia M. Pastan
                                                        Jenna Pavelec
                                                        Wilkinson Stekloff LLP

                                                        *Counsel for Defendant Microsoft Corporation*