# ATTACHMENT A

Joseph M. Alioto (State Bar No. 42680)
Tatiana V. Wallace (State Bar No. 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:    (415) 434-8900
Facsimile:     (415) 434-9200
Email:          jmalioto@aliotolaw.com
                   twallace@aliotolaw.com

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone:    (415) 500-6800
Facsimile:     (415) 395-9940
Email:          jsaveri@saverilawfirm.com
                   swilliams@saverilawfirm.com
                   czirpoli@saverilawfirm.com
                   eabuchanan@saverilawfirm.com
                   dseidel@saverilawfirm.com
                   kmcmahon@saverilawfirm.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| DANTE DEMARTINI, et al., | Case No. 3:22-cv-08991-JSC |
| Plaintiffs, | |
| v. | **CORRECTED REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE** |
| MICROSOFT CORPORATION, a Washington corporation, | |
| Defendant. | Hon: Jacqueline Scott Corley |
| | Date: May 12, 2023<br>Time: 10:00 am<br>Courtroom: 8 - 19th Floor |

## **TABLE OF CONTENTS**

I.     INTRODUCTION ..................................................................................................... 1

II.    PLAINTIFFS MEET THE IRREPARABLE HARM ELEMENT ............................... 1

       A.     Microsoft Misrepresents the Law ................................................................ 1

       B.     Even under Microsoft's Standard, Plaintiffs Meet the Irreparable Harm Inquiry ............. 5

III.   THE COURT SHOULD NOT REQUIRE A BOND ................................................ 10

       A.     The Equitable Factors Do Not Warrant a Bond ............................................. 10

       B.     Microsoft is Using its Own Delay to Try to Fatally Prejudice Plaintiffs ........................ 12

IV.    THE CMA DECISION SUPPORTS PLAINTIFFS' MOTION .................................. 13

V.     CONCLUSION ...................................................................................................... 15

CORRECTED REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW
CAUSE

# TABLE OF AUTHORITIES

**Cases**

*Am. Passage Media Corp. v. Cass Comm'ns, Inc.*,
  750 F.2d 1470 (9th Cir. 1985) ............................................................................................... 2

*Barahona-Gomez v. Reno*,
  167 F.3d 1228 (9th Cir. 1999) ............................................................................................. 10

*Boardman v. Pac. Seafood Grp.*,
  822 F.3d 1011 (9th Cir. 2016) ..................................................................................... 2, 3, 4, 8

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962) .............................................................................................................. 1

*California v. Am. Stores Co.*,
  492 U.S. 1301 (1989) ................................................................................................. 2, 3, 4, 5

*California v. Am. Stores Co.*,
  495 U.S. 271 (1990) ............................................................................................................. 4

*Cont'l Oil Co. v. Frontier Ref. Co.*,
  338 F.2d 780 (10th Cir. 1964) ............................................................................................. 10

*Governing Council of Pinoleville Indian Cmty. v. Mendocino Cnty.*,
  684 F. Supp. 1042 (N.D. Cal. 1988) ................................................................................... 11

*Johnson v. Couturier*,
  572 F.3d 1067 (9th Cir. 2009) ............................................................................................. 10

*Minpeco, S.A. v. Conticommodity Servs., Inc.*,
  116 F.R.D. 517 (S.D.N.Y. 1987) ......................................................................................... 11

*Moltan Co. v. Eagle-Picher Indus., Inc.*,
  55 F.3d 1171 (6th Cir. 1995) ............................................................................................... 10

*OakPAC, Oakland Metro. Chamber of Com. v. City of Oakland*,
  No. C 06-6366, 2006 WL 8459567 (N.D. Cal. Oct. 19, 2006) ............................................ 10

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015) ............................................................................................... 15

*Save Our Sonoran, Inc. v. Flowers*,
  408 F.3d 1113 (9th Cir. 2005) ............................................................................................. 10

*Taleff v. Sw. Airlines Co.*,
  828 F. Supp. 2d 1118 (N.D. Cal. 2011) ................................................................................ 3

*United States v. Borden Co.*,
  347 U.S. 514 (1954) ............................................................................................................. 5

*Yack v. Wash. Mut., Inc.*,
　389 B.R. 91 (N.D. Cal. 2008) ........................................................................ 12

**Statutes**

Clayton Act
　§ 7
　§ 16 .......................................................................................................... *passim*

**Other Authorities**

Fed. R. Civ. P. 65 ............................................................................... 2, 5, 10

Phillip E. Areeda & Herbert Hovenkamp, *An Analysis of Antitrust Principles and Their
Application* ¶ 325b (3d ed. 2007) ...................................................................... 3

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust
Principles and Their Application* ¶ 326a (2d ed. 2000) ....................................... 2

CORRECTED REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW
CAUSE

## I.      INTRODUCTION

Plaintiffs are threatened with irreparable harm if the largest tech merger of all time is allowed to proceed. The loss to competition in the relevant video game markets directly and personally impacts these Plaintiffs, who rely on video games, including *Call of Duty* and other Activision games, for recreation, social connection, and enjoyment. Allowing the merger to consummate before a trial on the merits will cause immediate irreparable harm to competition. The loss of competition cannot be reclaimed. Unwinding the merger after consummation is highly problematic and disfavored, making divestiture post-consummation significantly more difficult. Nor is there any guarantee that an action for divestiture can resurrect the competition that is lost. The record evidence and economic theory shows that this merger will immediately harm competition, and directly impact these Plaintiffs. It was for precisely these reasons that Congress provided "authority for arresting mergers at a time when the trend to a lessening of competition . . . was still in its incipiency," and "sought to assure . . . the courts the power to brake this force at its outset and before it gathered momentum." *Brown Shoe Co. v. United States*, 370 U.S. 294, 317–18 (1962).

## II.     PLAINTIFFS MEET THE IRREPARABLE HARM ELEMENT

### A.      Microsoft Misrepresents the Law

In its attempt to inoculate itself from preliminary relief preserving the status quo, Microsoft argues that even if the merger is found to have a reasonable probability of substantially harming competition in the relevant markets, these Plaintiffs cannot show enough immediate harm to themselves to warrant protection before Microsoft consummates the merger. In its brief, Microsoft mischaracterizes the irreparable harm element and asks the Court to improperly apply it. Microsoft's opposition is a clear invitation to error.

Microsoft mischaracterizes Plaintiffs' arguments, saying that "Plaintiffs maintain that the normal requirements for a preliminary injunction do not apply to cases brought under Sections 7 and 16 of the Clayton Act." Def's Opp. at 4. Not so. It is Microsoft that asks the court to apply a novel theory of irreparable harm that would make it virtually impossible for private plaintiffs to enjoin a merger. Microsoft's novel theory is at odds with the case law of the Supreme Court and the Ninth Circuit.

First, Microsoft asserts that even proof that a merger will cause prices to increase cannot form

CORRECTED REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE

the basis for injunctive relief because such claims are "compensable by monetary damages." Def's Opp. at 7 (citing *Am. Passage Media Corp. v. Cass Comm'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985)). Such an assertion is wildly incompatible with black-letter antitrust law. Antitrust plaintiffs are entitled to recover damages for past economic injuries they have sustained (such as increased prices from anti-competitive conduct), *as well* as seeking injunctive relief to prevent economic injury in the future. *See, e.g.*, Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 326a (2d ed. 2000) ("Areeda & Hovenkamp 2d ed.") ("[O]ne receives damages for the consequence of previous violations and an injunction for threatened future violations, which are never recompensed by the damages award to the extent that the latter covers only the past."). Nothing in Section 16, or the case law applying it,  supports Microsoft's position.

Microsoft also argues that Plaintiffs must prove that they themselves would be irreparably harmed "immediately" upon consummation of the merger. *See* Def's Opp. at 8 ("Plaintiffs' claims of harm rely on a chain of causation, no component of which could happen immediately.") This is wrong for at least two reasons. First, Microsoft's argument is at odds with the record evidence. As shown by economic theory, competitive harms to the markets and to these Plaintiffs will be immediate upon consummation of the merger. *See* Ex. A to Pls' Mot. [Cabral Report] at § 6.6. And Microsoft's own records and prior conduct show that Microsoft will pursue its foreclosure strategy immediately. *See* Pls' Mot., ECF No. 135, at 17–18.

Second, for purposes of showing irreparable harm under Fed. R. Civ. P. 65, the "immediacy" element is met where the harm is likely to occur before a plaintiff can prove their claims on the merits. In the antitrust context, the harm occurs when the anticompetitive conduct harms competition. Thus, in the merger context, immediacy is analyzed with respect to when the merger will consummate. Microsoft's argument that Plaintiffs must prove that the consequences of the merger, in the form of higher prices, lower quality, decreased innovation, and decreased choice will materialize immediately into irreparable harm against these Plaintiffs is not correct. *See California v. Am. Stores Co.*, 492 U.S. 1301, 1304 (1989); *Boardman v. Pac. Seafood Grp.,* 822 F.3d 1011, 1023 (9th Cir. 2016).

In both *Boardman* and *California v. American Stores Co.*, the courts analyzed whether the merger would likely go forward before the plaintiffs could prove their claims. In *Boardman*, the Ninth

CORRECTED REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE

Circuit held that the plaintiffs had "adequately demonstrated a threatened irreparable injury" because they showed that the merger would decrease competition in a market that affected the plaintiffs personally, just as is the case here. *Boardman*, 822 F.3d at 1023. This was sufficient because a "lessening of competition constitutes an irreparable injury under our case law." *Id*. The Ninth Circuit rejected the same "immediacy" claim Microsoft makes here. The court focused on the timing of the merger. Finding that the merger was reasonably likely to be consummated before plaintiffs could prove their claims, the immediacy element was satisfied. The same was true in *California v. American Stores Co*. There, the immediate irreparable harm was measured from when the merger was likely to occur. There was no requirement that plaintiffs prove with precision when grocery prices were likely to increase or other competitive harms were likely to materialize against consumers. *See* 492 U.S. at 1307.

Further, irreparable harm exists here because once Microsoft acquires Activision, competition is permanently and irrevocably harmed, and the lost competition becomes impossible to regain. And, as Microsoft's cited cases show, seeking divestiture after consummation poses unique and substantial problems, making it a strongly disfavored remedy. *See Taleff v. Sw. Airlines Co.,* 828 F. Supp. 2d 1118, 1122-23 (N.D. Cal. 2011). In *Taleff*, private plaintiffs brought suit after Southwest and another low-cost carrier had already merged and sought divestiture. *Id.* at 1120-21. On a motion to dismiss, the court held that divestiture was barred as a matter of law because the hardship in breaking up an ongoing business post-merger far outweighed the anticompetitive harm. *Id.* at 1122-23. The court held that plaintiffs should have sued for injunctive relief to prevent the merger *before consummation*. *Id.*

*California v. American Stores* and *Boardman v. Pacific Seafood Group* are controlling authority. Microsoft's attempts to distinguish them fail. First, Microsoft argues that *California v. American Stores* is distinguishable because it was brought by the California Attorney General on behalf of California consumers. Def's Opp. at 5–6. But that is a distinction without a difference. When states bring *parens patriae* actions on behalf of consumers, such actions are treated as actions brought by private litigants and must meet the same requirements. "When the states acting as *parens patriae* bring suit, . . . they act as private parties and must therefore meet the irreparable harm requirement." Phillip E. Areeda & Herbert Hovenkamp, *An Analysis of Antitrust Principles and Their Application* ¶ 325b (3d ed. 2007) (Areeda & Hovenkamp 3d ed.) (citing *New York v. Kraft Gen. Foods, Inc.*, 862 F. Supp. 1030

CORRECTED REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE

(S.D.N.Y.), *aff'd*, 14 F.3d 590 (2d Cir. 1993)). Indeed, in *California v. American Stores* itself, the Supreme Court treated the state as a private litigant and applied the same standard applicable here. *See California v. Am. Stores Co.*, 495 U.S. 271, 295-96 (1990) ("A private litigant, however, must have standing—in the words of § 16, he must prove "threatened loss or damage" to his own interests in order to obtain relief."). Applying the same standard, the Supreme Court held: "[i]f we assume that the merger violated the antitrust laws, and if we agree with the District Court's finding that the conduct of the merged enterprise **threatens economic harm to California consumers**, the literal text of § 16 is plainly sufficient to authorize injunctive relief, including an order of divestiture, that will prohibit that conduct from causing that harm." *Id.* at 283. The Court upheld a preliminary injunction based on the state's theory that if the merger was consummated, "[c]ompetition and potential competition 'in many relevant geographic markets will be eliminated," and "the prices of food and non-food products might be increased." *Id*. at 276.

Microsoft's attempts to distinguish *Boardman* also fail. Microsoft asserts the *Boardman* plaintiffs were "not consumers; they were fisherman." Def's Opp. at 6. Microsoft implies that different legal principles apply to sellers' monetary injuries than to buyers' (consumers). Microsoft provides no support for this novel argument. An anticompetitive overcharge on the consumer-side and an anticompetitive reduction-in-price on the supplier side are both injuries for which the antitrust law provides redress. Moreover, Microsoft's attachment of the plaintiff declaration from *Boardman* further supports Plaintiffs here. The declaration submitted in *Boardman* indicates possible economic harms from anticompetitive pricing, based entirely on lost competition through the merger. For example, Paragraph 10 of the declaration discusses the impact of the merger, stating that if the merger were to consummate, "our markets would suffer yet another loss of a potential competitor," and that "it would be far better for our industry and the competitiveness that is critical to fair ex vessel pricing if Ocean Gold Seafoods were to become completely independent of Pacific Seafood Group." *See* ECF No. 163-2 at ¶ 10. Plaintiffs' declarations here also indicate the proximate monetary harm they would suffer as a result of anticompetitive prices. In addition, as demonstrated by Plaintiffs' declarations, economic expert testimony, and Microsoft's own records, Plaintiffs here are also threatened with additional significant non-economic harm, including reduced quality, reduced choice, and reduced output.

Moreover, Microsoft felt it necessary to attach the declaration precisely because the Ninth Circuit's opinion did not turn on it.

Here, Plaintiffs satisfy their Rule 65 burden with respect to irreparable harm in many ways. First, they are all passionate video game players who have a significant personal stake in ensuring that the video game markets identified in the complaint remain competitive, with as much competition on price, innovation, quality, and output as possible. Second, they regularly purchase and play video games and video game platforms in the relevant markets alleged. Third, Microsoft currently remains set to consummate the merger on May 22, 2023. Fourth, the harm to competition that this merger has a reasonable probability of causing is irreparable under Supreme Court and Ninth Circuit case law because "lessening of competition is precisely the kind of irreparable injury that injunctive relief under section 16 of the Clayton Act was intended to prevent." *Am. Stores*, 492 U.S. at 1304. And fifth, the competitive loss directly harms these Plaintiffs.

## B.   Even under Microsoft's Standard, Plaintiffs Meet the Irreparable Harm Inquiry

Microsoft asks the Court to apply a novel legal standard that would preclude virtually all consumers from ever challenging anticompetitive mergers. Microsoft supports its novel theory by citing to a handful of largely non-antitrust cases without context. Microsoft asserts that Plaintiffs "must show [a threatened] injury that is (1) personal to them; (2) immediate; (3) incapable of being remedied through monetary damages; (4) nonspeculative; and (5) substantial." Def's Opp. at 3. As shown above, Microsoft asks the Court to misapply the standard in a way no court ever has. It is at odds with settled precedent. Nonetheless, Plaintiffs satisfy Microsoft's novel theory too.

**The threatened harm to competition is of a sort personal to these Plaintiffs.** Plaintiffs do not dispute that the threatened harm "must be of a sort personal to the plaintiff." *United States v. Borden Co.*, 347 U.S. 514, 518 (1954). There is no one for whom harm to competition in the video game industry is more personal than Plaintiffs here. Plaintiffs are all passionate video game players who play video games not only as a form of recreation but also as a way to stay connected with friends. They rely on *Call of Duty* and other Activision games as one of their primary means for recreation and socializing with friends. All of them regularly purchase video games, including many if not most of the *Call of Duty* games. And all of them regularly purchase and adopt various platforms as the latest video

CORRECTED REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE

game platform technologies become available. In short, these plaintiffs are Microsoft and Activision's core customers. They are the targets of the exclusionary conduct and foreclosure which would result were the merger to go forward. These are the gamers that will be directly harmed by the lessening of competition the merger will likely cause.

Microsoft tries to discredit Plaintiffs' declarations because they did not "state that they will buy the next title in the *Call of Duty* franchise, or that they habitually purchase every single *Call of Duty* game." Def's Opp. at 9. Although that is not a requirement, many of these Plaintiffs do. For example, Dante DeMartini has played at least 21 different unique titles from the *Call of Duty* franchise, including all of the most recent *Call of Duty* games since 2019. *See* Supp. Decl. D. DeMartini at ¶¶ 3, 5. He estimates that he has played *Call of Duty* titles for well over 5,000 hours in total. *Id.* ¶ 4. He has purchased every single *Call of Duty* title released since 2019 (*Call of Duty: Modern Warfare II* (2022); *Call of Duty: Warzone 2.0* (2022); *Call of Duty: Vanguard* (2021); *Call of Duty: Black Ops Cold War* (2020); *Call of Duty: Modern Warfare* (2019)). *Id.* ¶ 5. He has also owned over 18 different video game platforms, including both Xbox and PlayStation consoles. *Id.* ¶ 6. He will be purchasing the next *Call of Duty* title that is released. *Id.* ¶ 7. He purchases approximately 4–5 new video games every year. *Id.* ¶ 8. He plays video games with friends approximately 1,000 hours per year. *Id.* ¶ 9. Video games enhance the quality of his life, including through social gaming. *Id.* ¶ 10.

As another example, Beowulf Owen has played numerous *Call of Duty* titles as well, including all but one since 2011, and has logged at least 2,000 hours on *Call of Duty* games. *See* Supp. Decl. of B. Owen at ¶¶ 3–5. He has owned over 9 different video game platforms, and plays video games with friends on average roughly 12 hours a week. *Id.* ¶ 9. He plans on buying the next *Call of Duty* game. *Id.*

**The Threatened Harm Is Imminently Pending.** Microsoft remains set to consummate the merger on May 22, 2023. Even under Microsoft's incorrect application of its "immediacy" requirement, Plaintiffs meet the standard because they are threatened with the numerous economic and non-economic impacts that will arise upon consummation of the merger, and because once the merger consummates, the lost competition cannot be regained.

First, once the merger closes, there will be an immediate loss of competition in the Triple-A games market by the elimination of Activision as a significant competitor. The merger will immediately

reduce the already dwindling number of independent Triple-A game publishers from five (Activision, Ubisoft, Electronic Arts, Take Two, and Epic) to four. As shown by Professor Cabral, that loss on competition will have an immediate upward pressure on price and downward pressure on quality and innovation by immediately eliminating the externality of competition between Microsoft and Activision. *See* Ex. A to Pls' Mot. [Cabral Report] at §§ 6.4–6.6. For example, Professor Cabral explains that "[t]he day the merger is consummated, the upward pressure on the price of AAA games will begin to be felt" due to the internalization of the externality of competition. *Id.* § 6.6. For example, it has been shown that "under certain assumptions, the gap between prices and costs (the price cost margin) can be exactly determined by the Herfindahl-Hirschman index of market concentration." *Id.* § 6.4.1. Upon consummation, the HHI will increase significantly. *See id.* § 6.4.3.

Similarly, as soon as the merger is consummated, Microsoft's incentives to innovate and produce new content will diminish. *See id* § 6.5. Plaintiffs do not claim that Microsoft will completely stop innovating or will entirely stop producing new games the day the merger is consummated. But economic principles show that Microsoft's incentive to do so would significantly and durably decrease as soon as they merge with Activision. For example, Professor Cabral also explains that economic principles show that "one of the incentives for product improvement is to capture demand from rival offerings. To the extent that rival offerings are now part of the same entity"—which would be the case as soon as Microsoft and Activision combine—"such incentive disappears the day the merger is consummated. Lower investment levels will be observed soon after the merger, whereas the effects of this lower investment will be felt over time." *Id.* § 6.6. Indeed, in the 1980's when Nintendo was the dominant firm, Nintendo "purposely slowed down the release of better products because, by their own admission, innovation would cannibalize their own leading products." *Id.* § 6.5.1 & n.78.

Moreover, the day the merger is consummated, Microsoft will have the incentive and ability to foreclose rivals from Activision's content, just as Microsoft did with the many other game publishers and producers it has already acquired. For example, when Microsoft acquired ZeniMax and Bethesda, Bethesda was then developing a version of *Redfall* for the PlayStation. *See* Pls' Mot. at 17. But as soon as Microsoft acquired Bethesda, Microsoft pulled the plug. The director of *Redfall* stated: "We got bought by Microsoft and that was a huge sea change. They said, "no PlayStation 5. Now we're gonna

do Game Pass, Xbox, and PC." *See* Pls' Mot at Ex. V, ECF No. 142-22. Microsoft has no answer.

Activision is currently incentivized to devote equal resources to develop games for all platforms (even those that compete with Microsoft). But the second the merger consummates, those incentives change. Microsoft is likely to immediately divert resources to prioritize Activision's game development for Microsoft's platforms, including canceling Activision games that are currently in development for non-Microsoft platforms. Plaintiffs will suffer the harm from Microsoft's vertical foreclosure strategy by losing the ability to play games that Microsoft cancels or makes exclusive, as well as the harm to competition on the platform-side markets through Microsoft's foreclosure strategy. They will further suffer harm by paying increased prices for Microsoft platforms in order to gain full access to Activision's gaming content. Microsoft's factual arguments to the contrary go directly to the merits.

**The harms to competition cannot be remedied through damages actions**. Microsoft claims that the entirety of Plaintiffs' injuries are suitable to be remedied through damages actions after consummation of the merger. Not so. Microsoft argues that "[i]f Plaintiffs' claimed harms occur, they could be remedied with the cost of two Xbox consoles . . . and the amount of any price increase for the next *Call of Duty* titles." Def's Opp. at 8. This is wrong. Even with respect to anticompetitive overcharges on games and platforms, the harm is still irreparable because once the anticompetitive merger consummates and prices increase, Plaintiffs would be forced to sue Microsoft for damages for every game and every platform they purchase for the rest of their lives. Under Microsoft's theory, no injunctive relief can ever be issued to prevent anticompetitive price increases because plaintiffs can simply sue for damages over, and over, and over again with every purchase they make. The irreparable nature of the increased pricing that this anticompetitive merger may bring, is not that Plaintiffs' next purchase of *Call of Duty*, *Halo*, or the Xbox Game Pass (for example) will be overpriced, it is that they will be forced to participate in a market in which the prices for Microsoft's video games and video game platforms will be set at supracompetitive levels, higher than they would be but for the merger. The same issue was present in *Boardman*, 822 F.3d at 1023.

Moreover, supracompetitive pricing is not the only injury that this unlawful merger may produce. Plaintiffs will also personally sustain additional harm in other irreparable ways, including:

- Plaintiffs will lose the ability to play games on a PlayStation if Sony goes out of business and

will lose substantial choice in video game platforms.

- Plaintiffs will lose the ability to play *Call of Duty* and other Activision games if Microsoft makes Activision games exclusive or partially exclusive to Microsoft.

- Plaintiffs will be forced to migrate to (or stay with) Microsoft's ecosystem solely to gain access to Activision's gaming content.

- Plaintiffs will lose the ability to play games that are canceled or not created because of the loss of competition of this merger.

- Plaintiffs will lose the ability to play *Call of Duty* with their friends when Microsoft makes Activision games exclusive to Microsoft because some gamers will not migrate to Microsoft's ecosystem.

- Microsoft would become the dominant firm in cloud-gaming and Plaintiffs will lose meaningful choice in cloud-gaming platforms, along with lessened innovation and lower quality.

- Microsoft would become the dominant firm in multi-game library subscription services and Plaintiffs will lose meaningful choice in multi-game library subscription services, and quality will decline.

- Plaintiffs will lose meaningful choice in computer operating systems because the barriers to challenge Microsoft's monopoly position in PC gaming will significantly increase.

**The record shows that the harms to Plaintiffs are imminent and concrete, not hypothetical or speculative**. Microsoft argues that the harm that will come to Plaintiffs is "too remote." Def's Opp. at 10. But that factor is addressed in the analysis on the likelihood of success on the merits. So long as the Court is satisfied that the Plaintiffs have a reasonable likelihood of prevailing on the merits, or that there are serious questions going to the merits, the harms are not overly speculative or remote.

Moreover, the record shows that there is nothing speculative about Microsoft's foreclosure strategy. Microsoft has done the same thing numerous times before. *See* Pls' Mot., ECF No. 135 at 17–18. Microsoft's own core gaming strategy is based on making content exclusive. *Id.* at 16. Numerous Microsoft documents admit that Microsoft's strategy in gaming centers on cornering Triple-A gaming content and making it exclusive to Microsoft's platform ecosystem. *Id.* Plaintiffs are not relying only on a possibility that this will occur—the harm is demonstrated by Microsoft's internal business records, the testimony of Sony, and the expert economic testimony. *See, e.g.*, Ex. F to Pls' Mot [Sony Declaration]; Ex. A to Pls' Mot. [Cabral Report].

Nor is there anything remote about Microsoft's stated motive and opportunity to put Sony's PlayStation out of business. As shown in Plaintiffs' Motion, Microsoft believes it can corner enough

Triple-A gaming content to put PlayStation out of business. *See* Ex. K to Pls' Mot., ECF No. 133-7.

Sony is also concerned with this very real possibility. *See* Ex. F to Pls' Mot, ECF No. 134-9 at ¶¶ 33–44. Plaintiffs are threatened with real harm that is not overly speculative.

**Plaintiffs are threatened with substantial harm.** Microsoft does not even argue that the threatened harm is not substantial. These Plaintiffs are serious video game players who get tremendous joy out of playing games, including *Call of Duty* and other Activision games. They purchase numerous *Call of Duty* and other video game titles, and they have logged thousands of hours playing with their friends. There is no dispute that the threatened harm here is substantial to the markets and to Plaintiffs.

## III.    THE COURT SHOULD NOT REQUIRE A BOND

### A.    The Equitable Factors Do Not Warrant a Bond

Microsoft argues the Court is compelled to require Plaintiffs to post a bond against damages for an injunction improvidently granted. Def's Opp. at 13. That is not the law. "Despite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quotation marks omitted). It is well within the Court's sound discretion to require no bond or only a nominal bond, given the equities. *See Cont'l Oil Co. v. Frontier Ref. Co.,* 338 F.2d 780, 782–83 (10th Cir. 1964) (Section 16 "is not a mandate to require a bond in every antitrust case in which an injunction is issued."); *Barahona-Gomez v. Reno*, 167 F.3d 1228 (9th Cir. 1999); *Moltan Co. v. Eagle-Picher Indus., Inc*., 55 F.3d 1171, 1176 (6th Cir. 1995). "In noncommercial cases . . . courts should consider the hardship a bond requirement would impose on the party seeking the injunction." *OakPAC, Oakland Metro. Chamber of Com. v. City of Oakland*, No. C 06-6366, 2006 WL 8459567, at *2 (N.D. Cal. Oct. 19, 2006). Courts "may waive the bond requirement altogether when 'the balance of equities weighs overwhelmingly in favor of the party seeking the injunction.'" *Id.* at *2.

In *Barahona-Gomez*, the Ninth Circuit upheld the district court's decision to require only a nominal bond under Rule 65, citing in part the "public interest underlying the litigation and the unremarkable financial means of the class as a whole." *Barahona-Gomez*, 167 F.3d at 1237; *see also Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) (affirming "long-standing precedent that requiring nominal bonds is perfectly proper in public interest litigation."). Those

equitable reasons are even more relevant here, where Congress wrote Section 16 into the Clayton Act specifically to empower private plaintiffs just like these gamers to bring suit in the public interest to enjoin monopolistic acquisitions just like this one. *See, e.g., Minpeco, S.A. v. Conticommodity Servs., Inc.,* 116 F.R.D. 517, 523–24 (S.D.N.Y. 1987) (Section 16 of the Clayton Act and other provisions allowing private party law enforcement as "private attorney generals" are "infused with the public interest."). The Court should therefore consider the following factors in determining the bond: (1) the likelihood of success on the merits; (2) Plaintiffs' financial means; (3) the balance of the equities between Microsoft's alleged harm in possible delay of the merger versus the harm to the public interest in preserving competition if the bond would preclude a preliminary injunction that would otherwise issue.

First, the Court should take judicial notice of the CMA's recent decision in the UK blocking ***this merger*** for the ***identical antitrust concerns*** about vertical monopolization in ***the same cloud-computing market*** alleged here. Microsoft's argument that Plaintiffs are requesting an injunction "based on tenuous legal grounds" (Def's Opp. at 13) is not well taken.

Second, Plaintiffs are all consumers without extraordinary financial means. Thus, the requirement of posting a ███████ bond would preclude the appropriate relief here. *See Governing Council of Pinoleville Indian Cmty. v. Mendocino Cnty.*, 684 F. Supp. 1042, 1047 (N.D. Cal. 1988) ("Notwithstanding this literal language, courts have discretion to excuse the bond requirement under appropriate circumstances, such as where requiring security would deny access to judicial review.").

As to the third issue, the equities greatly favor Plaintiffs here for numerous reasons. First, because Plaintiffs are likely to prevail in stopping an anticompetitive merger that will harm competition and these Plaintiffs, the equities greatly favor Plaintiffs and the public interest in preserving free and fair competition. Second, Microsoft's proposed ███████ bond relies on the wrong measure of harm. Microsoft's proposed bond requirement is based on the potential that a preliminary injunction could delay the merger beyond July 18, 2023 and cause the merging parties to decide to terminate the agreement. Microsoft only provides a single lump sum cost based solely on "if Activision [or Microsoft] terminates the Merger Agreement . . . Microsoft would also lose the value of the transaction over the purchase price." Def's Opp. at 15. But a preliminary injunction merely preserves the status quo

until a trial on the merits. Thus, the proper question is not how much Microsoft believes the merger is worth in future monopoly profits, but how much a *delay* to the merger would cost. Microsoft fails to put forward any evidence that Microsoft will be harmed by a delay to the merger.

## B. Microsoft is Using its Own Delay to Try to Fatally Prejudice Plaintiffs

Microsoft's position with respect to timing and its effect on the merger has been situational, strategic and contradictory. Microsoft should be judicially estopped from making such clearly contradictory arguments in an attempt to game this Court and preclude Plaintiffs from equitable relief. *See Yack v. Wash. Mut., Inc.,* 389 B.R. 91, 96 (N.D. Cal. 2008) ("Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later taking to their benefit a clearly inconsistent position.").

**First, Microsoft argues that it would be prejudiced if the case were *not* delayed indefinitely.** On January 11, 2023, Microsoft filed a motion to stay this case. ECF No. 26. Microsoft argued that Microsoft would be prejudiced if Plaintiffs' case were not stayed until after the FTC case, which was scheduled for trial in August 2023. ECF No. 26 at 7. Microsoft also claimed that "Plaintiffs will not be harmed by a stay." *Id.* at 5–6. Microsoft specifically argued that Plaintiffs could always bring their motion for preliminary injunction after Microsoft's requested stay. Counsel for Microsoft stated: "Your Honor, if you were concerned that the Plaintiffs would lose that opportunity [to get a preliminary injunction], we would recommend that you shape the relief to require Microsoft to inform the Court that closing was imminent and provide the Plaintiffs with the opportunity to move for preliminary injunction and prevent the closing." Jan. 19, 2023 Hr'g Tr. at 5:17-22.

Then, on January 31, 2023, Microsoft filed a motion to dismiss, arguing that Plaintiffs' complaint should be dismissed because they brought their case **too soon**. ECF No. 42 at 15. They argued the case was not ripe, and that Plaintiffs should be required to file their suit **after** all regulatory agencies had approved the transaction.

**Now, Microsoft argues that it will be prejudiced in excess of ███████ if this case is delayed beyond July 18, 2023.** Microsoft now argues that Plaintiffs should be denied preliminary relief precisely because of Microsoft's own delay**,** arguing that Plaintiffs' motion for preliminary injunction preserving the status quo might delay the merger beyond July 18, 2023. Microsoft argues

CORRECTED REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE

that delaying the merger past the July 18, 2023 deadline risks multi-billions of dollars in damages to Microsoft.

Plaintiffs have argued since day one that they were prepared to resolve this suit through an accelerated trial on the merits prior to July 18, 2023 to prevent the prejudice to Microsoft that Microsoft now claims precludes Plaintiffs' relief. Plaintiffs have recognized from the very beginning that there could be prejudice to both parties if this case was delayed beyond the July 18, 2023 merger deadline. In the event of a false positive—where the Court issues a preliminary injunction but ultimately denies a permanent injunction on the merits—Microsoft would be delayed in merging. In the event of a false negative—where the Court denies a preliminary injunction but ultimately finds the merger unlawful after the merger has already consummated—Plaintiffs and the public at large would be greatly and irreparably prejudiced. Although Plaintiffs are of course prejudiced by having to prove their claims (on which Plaintiffs have the burden of proof) on an accelerated basis in a setting in which Microsoft and Activision control all the relevant documents, Plaintiffs are prepared to do so because that is the only equitable way to proceed in this setting. It is Microsoft that has sought to delay this case well beyond July 18, 2023, and now uses its own delay to try to preclude Plaintiffs' relief.

So long as a trial on the merits is conducted before July 18, 2023, Microsoft cannot claim any prejudice from delay. And it is Microsoft that has sought to delay this case repeatedly. Plaintiffs ask that the Court set a trial on the merits prior to July 18, 2023. If Plaintiffs lose, Microsoft will face none of the prejudice of which they now complain. And it will allow Plaintiffs' critically important antitrust claims to proceed to the merits without risk of prejudice to either party.

## IV.    THE CMA DECISION SUPPORTS PLAINTIFFS' MOTION

During the last case management conference on April 27, Microsoft informed the Court that it would be appealing the CMA's decision to block the merger. Microsoft stated that it would consider stipulating to a new preliminary injunction in this case, but has not done so. Microsoft remains set to consummate the merger on May 22, 2023.

The CMA decision supports Plaintiffs' claims that this merger will substantially lessen

CORRECTED REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE

competition.[1] The CMA blocked the acquisition in the UK because it would result in "substantial lessening of competition" in the Cloud Gaming Services market. *See* CMA Final Report ¶ 1. The CMA found that in relation to cloud gaming services, Microsoft "already has [a] strong position," with "an estimated 60-70% market share". *Id.* ¶ 3. The CMA found that Microsoft's ownership of the "popular gaming platform," Xbox with its "large portfolio of games;" the "leading PC operating system" in Windows; and a "global cloud computing infrastructure," including Azure and Xbox Cloud Gaming, gave it "important advantages in running a cloud gaming service." *Id*. The CMA found:

> [A]fter the Merger, Microsoft would find it commercially beneficial to make Activision's titles exclusive to its own cloud gaming service. Given its already strong position, even a moderate increment to Microsoft's strength may be expected to substantially reduce competition in this developing market, to the detriment of current and future cloud gaming users.

*Id.* ¶ 4. The CMA found that "the Merger would make Microsoft even stronger and substantially reduce competition in this market," because Activision's AAA titles, "including [*Call of Duty*], *World of Warcraft*, and *Overwatch* will be important for the competitive offering of cloud gaming services as the market continues to grow and develop." *Id*. The CMA further rejected Microsoft's proposed 10-year licensing remedy as insufficient to prevent the antitrust harm. *See id.* ¶¶ 73–79. "Based on this evidence, we found that the only effective remedy to the [substantial lessening of competition] and its adverse effects was to prohibit the Merger." *Id.* ¶ 79.

Immediately after the CMA decision was announced, Microsoft and Activision Blizzard began a coordinated campaign to threaten the United Kingdom and its citizens with economic harm if the United Kingdom did not overrule the CMA and approve the merger. Brad Smith, Microsoft's President and former general counsel, has publicly attacked the UK, and threatened its citizens with economic hardship unless the UK accedes to Microsoft's demands to approve the merger. In a thinly veiled threat, Mr. Smith stated in a BBC interview that the CMA's decision "will discourage innovation and investment in the United Kingdom," and that the CMA should have approved the deal because Microsoft is so large and powerful that it supports the UK's economy. *See* Declaration of David Seidel

---

[1] The Final CMA report ("CMA Final Report") can be found here:
https://assets.publishing.service.gov.uk/media/644939aa529eda000c3b0525/Microsoft_Activision_Final_Report_.pdf

CORRECTED REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND ORDER TO SHOW CAUSE

("Seidel Decl."), Ex. A at 2. Mr. Smith stated: "Microsoft has been in the United Kingdom for 40 years and we play a vital role, not just supporting businesses and non-profits but even defending the nation from cyber-security threats. But this decision, I have to say, is probably the darkest day in our four decades in Britain. It does more than shake our confidence in the future of the opportunity to grow a technology business in Britain than we've ever confronted before." *Id.*

Microsoft and Activision pre-coordinated their threats. One of Activision's VP's who is popular on Twitter, also immediately began to threaten the UK with economic harm if it did not overrule the CMA decision on appeal. *See* Seidel Decl., Ex. B. She tweeted that the CMA's "report is also a disservice to UK citizens, who face increasingly dire economic prospects, and we will need to reassess our growth strategy in the UK." *Id.* She stated: "[t]he CMA's report today is a major setback for the UK's ambitions to be a tech hub, and we will work with Microsoft to reverse it on appeal." *Id.*

In light of Microsoft and Activision's coordinated attack and threats against the UK and its citizens, it appears reasonably likely that the UK government or the Competition Appeal Tribunal will overturn the CMA decision to appease these tech giants and prevent the economic harm that Microsoft and Activision are now threatening. Microsoft's outrage and threats over the CMA's decision to block their anticompetitive merger and prevent them from rolling up the game industry and its nascent game-subscription and cloud-gaming markets shows precisely why Congress sought to prevent concentration in its "incipiency." *See Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015) (holding that "§ 7 was intended to arrest anticompetitive tendencies in their incipiency") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962); *United States v. Phila. Nat. Bank*, 374 U.S. 321, 362 (1963)). Microsoft's size and power has grown to the point where it now rivals sovereign nations. Its threats to the UK are real. This merger will further entrench Microsoft's power and create further substantial barriers to new challengers. The antitrust policies established by Congress must be followed.

## V.   CONCLUSION

The Court should issue a preliminary injunction to preserve the status quo pending a trial on the merits.

Dated: May 9, 2023                    By:  ___*/s/ Joseph R. Saveri*___
                                               Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Steven N. Williams (State Bar No. 175489)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:    (415) 500-6800
Facsimile:    (415) 395-9940
Email:        jsaveri@saverilawfirm.com
              swilliams@saverilawfirm.com
              czirpoli@saverilawfirm.com
              eabuchanan@saverilawfirm.com
              dseidel@saverilawfirm.com
              kmcmahon@saverilawfirm.com

Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone:    (415) 434-8900
Facsimile:    (415) 434-9200
Email:        jmalioto@aliotolaw.com

Joseph M. Alioto Jr. (SBN 215544)
**ALIOTO LEGAL**
100 Pine Street, Suite 1250
San Francisco, California 94111
Tel: (415) 398-3800
Email:        joseph@aliotolegal.com

*Plaintiffs' Counsel*