1  Joseph M. Alioto (State Bar No. 42680)
Tatiana V. Wallace (State Bar No. 233939)
2  **ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
3  San Francisco, CA  94104
Telephone:     (415) 434-8900
4  Facsimile:     (415) 434-9200
Email:          jmalioto@aliotolaw.com
5                  twallace@aliotolaw.com

6  Joseph R. Saveri (State Bar No. 130064)
Cadio Zirpoli (State Bar No. 179108)
7  Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
8  Kathleen J. McMahon (State Bar No. 340007)
Aaron Cera (State Bar No. 351163)
9  **JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
10  San Francisco, California 94108
Telephone:     (415) 500-6800
11  Facsimile:     (415) 395-9940
Email:         jsaveri@saverilawfirm.com
12                czirpoli@saverilawfirm.com
                 eabuchanan@saverilawfirm.com
13                dseidel@saverilawfirm.com
                 kmcmahon@saverilawfirm.com
14                acera@saverilawfirm.com

15  (Additional Counsel on Signature Page)

16                     **UNITED STATES DISTRICT COURT**

17                     **NORTHERN DISTRICT OF CALIFORNIA**

18                     **SAN FRANCISCO DIVISION**

19

20

21  DANTE DEMARTINI, et al.,              Case No. 3:22-cv-08991-JSC

                 Plaintiffs,              **JOINT STATUS CONFERENCE
22                                         STATEMENT**

23        v.
                                          Status Conference Date: February 8, 2024
24  MICROSOFT CORPORATION, a Washington   Time: 1:30 p.m.
corporation,                              Location: Zoom
25                                         Judge: Hon. Jacqueline Scott Corley
                 Defendant.
26                                         **REDACTED**

27

28

The parties through their undersigned counsel submit the following joint status report.

## I.   <u>Case Status</u>

**Plaintiffs' Position:**

On December 20, 2022, Plaintiffs brought this action to prevent the unlawful combination of the largest and most successful independent AAA video game publisher in the world (Activision Blizzard) with one of the worlds' largest gaming ecosystems and the world's largest technology company (Microsoft). The $70 billion acquisition of Activision is not only the largest acquisition in Microsoft's history (and one of the largest technology mergers of all time), but it is also the largest video game acquisition ever. In fact, the acquisition is so large that only a handful of the biggest technology companies in the world were even capable of paying $70 billion. Bobby Kotick, Activision's CEO, testified at his deposition that when Microsoft offered to buy Activision for $70 billion, ██████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ █████████████████████████  *See* Ex. 1 [Kotick Dep.] at 30:6–18 ███████████████ ███████████  ; *id.* at 31:7–15 ████████████████████████████████████  .

Plaintiffs sought a preliminary injunction to preserve competition in the industry until the Court could address this super-merger on the merits. *See* ECF No. 135. In moving for a preliminary injunction, Plaintiffs offered an expert report that relied on economic theory to predict what would occur post-merger. For example, the report opined that "when a firm merges with a competitor that previously provided a competitive constraint, the merged entity can now profitably raise prices or degrade non-price aspects of its competitive offering (such as quality, range, service and innovation) on its own." Cabral Rep., ECF No. 134-4 at 22. Microsoft offered no expert report or evidence to rebut Plaintiffs' expert. Instead, Microsoft simply asserted repeatedly that Plaintiffs' economic theory, report, and evidence, was only "speculation." *See, e.g.*, ECF No. 163 at 18. But now that the merger has consummated the predicted harms from this merger have already begun to occur.

For example, Plaintiffs said that prices of games would increase as a result of the merger. *See* Pls' Prelim. Inj. Mot. ECF No. 135 at 35; *see also* Cabral Rep., ECF No. 134-4 at 17. Microsoft told the Court that would not happen, and that it was mere "speculation," despite it being based on economic

theory. *See* Def.'s Opp'n to Prelim. Inj., ECF No. 163 at 18. But, Microsoft has now raised the prices of Game Pass. On June 21, 2023, Microsoft announced that it was increasing its Xbox and PC Game Pass Subscription by $1 per month (a 10% increase) and increased its Ultimate Game Pass Subscription by $2 a month (a 13% increase). *See* Ex. 2 [Verge Article re Game Pass Increase in Prices].

Plaintiffs also asserted—based on economic principles—that the merger would cause Microsoft to produce less AAA content than was being produced by an independent Microsoft and independent Activision, since those two companies vigorously competed in the development and production of AAA games. *See* Cabral Rep., ECF No. 134-4 at 29 ("over time, gamers are less likely to enjoy the benefits of newly developed content that they would absent the merger"). And that is exactly what is now happening. Just as Plaintiffs' economist predicted, Microsoft has now cancelled a AAA game that Activision had been developing for years. On January 25, 2024, Microsoft announced that it was firing a significant portion of its gaming workforce across Microsoft and Activision. *See* Ex. 3 [Article on layoffs]. And at the same time, Microsoft also cancelled a large AAA game that was in development at Activision. *See id.* The cancelled game was called Project Odyssey, in which Activision had already invested significant development costs over many years. *Id.*

Moreover, Microsoft's firing of a significant percentage of Activision's workforce ensures that if divestiture is required—and Activision is required to be spun off as an independent company once again—Activision will be unable to effectively compete against Microsoft and others. On January 25, 2024, Microsoft fired 1,900 people across Microsoft's gaming division. *See id.* The majority of the layoffs were from Activision. *Id.* The layoffs amounted to around 8% of Microsoft's total gaming workforce, including Activision and Bethesda. Then, on January 30, Microsoft fired another round of Activision personnel, firing a large portion of Activision's e-sports division. *See* Ex. 4 [Esports Illustrated Article].

Microsoft's Activision layoffs are substantially weakening Activision, ensuring that divestiture will be less effective at restoring competition. As Bobby Kotick testified during his deposition, Microsoft and Activision directly competed over the development and production of AAA games. *See* Ex. 1 [Kotick Dep.] at 38:10–16.]. Moreover, Activision's ability to enter the game subscription or cloud streaming market acted as a competitive restraint against Microsoft's potential to monopolize those

1  markets; but no longer.

2  Indeed, the Supreme Court in *Brown Shoe* aptly held that "expansion through merger is more

3  likely to reduce available consumer choice while providing no increase in industry capacity, jobs or

4  output." 370 U.S. 294, 344–45 (1962). The Supreme Court held:

5  A company's history of expansion through mergers presents a different economic picture than a
6  history of expansion through unilateral growth. Internal expansion is more likely to be the
   result of increased demand for the company's products and is more likely to provide increased
7  investment in plants, more jobs and greater output. Conversely, expansion through merger is
   more likely to reduce available consumer choice while providing no increase in industry
8  capacity, jobs or output. It was for these reasons, among others, Congress expressed its
   disapproval of successive acquisitions. **Section 7 was enacted to prevent even small mergers**
9  **that added to concentration in an industry**.

10 *Id.* (emphasis added). Microsoft's firing of roughly 10% of its gaming division quickly after the merger

11 and cancelling AAA projects is a perfect example of the Supreme Court's holding that "expansion

12 through merger is more likely to reduce available consumer choice while providing no increase in

13 industry capacity, jobs or output."

14 Plaintiffs are preparing a Temporary Restraining Order to stop Microsoft from firing the

15 remainder of Activision employees. The TRO is needed to prevent irreparable harm to competition. If

16 divestiture is ultimately ordered, Activision must be able to be spun off and continue to compete in the

17 market as the most successful and largest independent AAA game publisher. Microsoft argues that the

18 Court already addressed this issue previously. But that is incorrect. Plaintiffs are drafting a new TRO

19 that is based on entirely new facts, to stop the destruction of Activision through layoffs. Microsoft does

20 not dispute that the massive layoffs to its gaming division and Activision just occurred recently.

21 **Microsoft's Position:**

22 Plaintiffs first provided their draft of this Case Management Statement to Microsoft at 12:24 pm

23 on the day it was due to be filed.[1]  Their portions of the statement address a host of issues about which

24 the parties have not yet fully met and conferred, including their potential request for a TRO (*see supra*)

26 ___

27 [1] Plaintiffs explained that they tried to send it at approximately 10:00 p.m. the night before, but their
   email bounced back due to a technical glitch.  Given the time constraint, Microsoft is unable to respond
28 fully to Plaintiffs' substantive arguments.  Regardless, Microsoft believes that most of that
   argumentative material is irrelevant to the upcoming case management conference.

and their complaint about inadvertent and inconsequential document production issues (*see* Part III, *infra*).  Their statement is also misleading in the extreme.  Here are just a few examples.  Plaintiffs assert that they have provided uncontroverted economic evidence from their expert, Luis Cabral.  That is false: Microsoft has submitted a report from Dr. Liz Bailey that thoroughly debunks the few remaining *vertical* theories Plaintiffs are advancing.  Plaintiffs claim that "after the merger has consummated, Microsoft has raised the prices of Game Pass."  That too is false: The evidence they cite of a price increase occurred *before the merger*—and indeed before the trial in the FTC action and before Plaintiffs' earlier motion to hold separate that the Court denied.  Plaintiffs claim, below, that Game Pass's subscriber base has dramatically increased "since the FTC trial."  That is misleading: Their citations compare statistics from January 2022, over two years ago, to numbers from late 2023, *and* they neglect to mention that ███████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████  And Plaintiffs make allegations about reduced production of AAA games and reductions in the Xbox workforce.  But in addition to being misleading, those claims are off-point, given that the Court already dismissed their labor-market and horizontal theories.

But these examples, while useful in evaluating the credibility of Plaintiffs' submission, have little to do with the case management issues currently before the Court.  While Microsoft can fully brief the issue if it becomes necessary, a TRO is unwarranted in this case.  Plaintiffs have already lost bids for a preliminary injunction and a hold separate order, in large part because they were unable to show any immediate, irreparable harm *to themselves*.  Nothing in Plaintiffs' submission changes that fundamental failing, or relates to Microsoft's ability or incentive to make *Call of Duty* exclusive on its platforms.  Their misguided, misleading, and erroneous complaints do not justify another reconsideration of the issues already decided.

## II.   <u>Trial Date</u>

Plaintiffs respectfully request that a trial date be set promptly after the Ninth Circuit issues its opinion. In addition to the massive layoffs and cancelling of Activision's Project Odyssey, Microsoft's Game Pass Subscription continues to subsume a larger and larger share of the market. During the FTC's motion for preliminary injunction hearing in June, 2023, the FTC and Microsoft testified and established

that Microsoft's Game Pass had roughly 25–26 million subscribers by January 2022, which even then was substantially more than Sony's subscription service or any other console/pc subscription service. *See, e.g.*, Ex. 5 FTC Trial Hr'g, June 22, 2023 at 196:20–197:16; Ex. 6 FTC Trial Hr'g, June 28, 2023 at 149:2–8. As Microsoft's own documents state, with respect to game library subscriptions, ████████ ████████ *See* Ex. 7 [Ex. I to Preliminary injunction motion] at p. 8; *see also* Ex. 8 FTC Trial Hr'g, June 23, 2023 at 92:5–92:24 ("[H]aving scale and subscribers is *imperative*" in Microsoft's view "to success in gaming subscriptions."). ████████████████████████ ████████████████████████████████ *See* Ex. 9 Dep. of P. Spencer, Nov. 15, 2023 at 53:11-25. A prompt trial is needed before competition is destroyed beyond repair, and before Microsoft monopolizes the game library subscription market. Plaintiffs respectfully request that a trial date be set promptly after the Ninth Circuit issues its opinion.

**Microsoft's Position:**

As noted above, Plaintiffs' claims about Game Pass, and their allegations about the need for a prompt trial in this matter, are simply incorrect.  Microsoft continues to agree with the Court's prior comments that a trial in this action should occur after the trial in the FTC matter, which was filed first.

### III.   Discovery

**Plaintiffs' Position:**

As ordered by the Court, fact discovery was to have closed on November 20, 2023. Yet on February 2, 2024, long after the depositions of Microsoft executives, and just before Plaintiffs' expert's rebuttal report was due, Activision produced over 60 gigabytes of documents to Plaintiffs, containing over 10,000 emails of key Activision witnesses, including Mr. Kotick and others. Activision conceded that these documents were "inadvertently omitted," and that they should have produced these documents in April of 2023, prior to Plaintiffs' motion for preliminary injunction. Activision's failure to timely produce evidence denied Plaintiffs the opportunity to use it and denied Plaintiffs a fair process.

This is not the first time Microsoft and Activision have failed to comply with discovery obligations. Microsoft previously failed to timely produce documents, making a voluminous data production on November 20, 2023, just before Plaintiffs' expert's report was due. Plaintiffs detailed Microsoft's previous failure to timely produce documents in the parties' December 15, 2023, case

management statement. *See* ECF No. 305. To resolve Microsoft's previous failure to timely produce data, the parties agreed to allow Plaintiffs more time to file their rebuttal report, so that the data could be analyzed. The parties stipulated to that extension. *See* ECF No. 322.

Microsoft and Activision again represented to Plaintiffs and to the Court that they had completed their document productions. They made those representations numerous times. Each time it was false. Despite their assurances, on January 31, 2024, Plaintiffs learned that Microsoft and Activision for a second time had failed to produce voluminous documents that had previously been produced to the FTC. Plaintiffs became aware of these missing documents because Microsoft's expert relied on and cited to these documents, even though they were never produced. When Plaintiffs inquired into the location of the documents, counsel for Activision informed Plaintiffs that voluminous documents had been "inadvertently omitted" from the April 2023 production. Thus, Plaintiffs have been deprived the ability to use these documents as evidence since April 2023, which includes Plaintiffs' motion for preliminary injunction and all of the depositions in this case.

Activision produced the missing 60 gigabytes of documents to Plaintiffs on February 2, at 11:56 a.m. Pacific time. Notably, Activision produced the documents long after the close of fact discovery, long after the Court had already denied the motion for preliminary injunction and long after all the Microsoft executives (other than Satya Nadella) had already been deposed. The production also came long after Plaintiffs' expert report was due, and only 10 days before Plaintiffs' rebuttal report is due. Plaintiffs have been severely prejudiced by Activision's failure to timely produce its documents. Activision is trifling with the Court's orders and its own discovery obligations.

To mitigate the prejudice, Plaintiffs ask the Court to order the following relief:[2]

1.   Plaintiffs request that the Court order Microsoft and Activision to submit declarations from the relevant individuals, certifying under oath that all documents required to be produced to Plaintiffs have been produced. If any documents have still not been produced, Plaintiffs ask that they be produced

---

[2] The document production was so large that Plaintiffs are still getting a handle on the documents produced, which appears to consist of over 10,000 relevant emails, and thousands of documents, PDFs, slide presentations, and spreadsheets. It took days just to download and days more to upload to Plaintiffs' database for review. And Plaintiffs' rebuttal report is currently due on February 12, necessitating prompt relief.

1   within one week.

2       2.   Plaintiffs request that the Court modify the deadline for Plaintiffs' rebuttal report from February

3   12, 2024, to March 4, 2024. A three-week extension will allow Plaintiffs' experts some limited time to

4   review the documents and incorporate them into their rebuttal report. This is particularly necessary

5   given that Microsoft's own expert *cited to and relied on some of the late-produced documents* in her

6   opposition report. Plaintiffs should be allowed time to adequately review and incorporate the documents.

7       3.   Plaintiffs request leave to file a motion to reopen the depositions of any deponents whose

8   documents were not timely produced prior to their depositions. For example, if the late-produced

9   documents from Activision contain emails or documents from Bobby Kotick that Plaintiffs could not use

10  during Mr. Kotick's deposition, Plaintiffs request leave to file a motion to reopen the deposition to

11  inquire about those documents. Plaintiffs have not yet been able to review the roughly 10,000 emails,

12  and thousands of documents, PDFs, slide presentations, and spreadsheets that were produced on

13  February 2, 2024. Thus, Plaintiffs do not yet know what the production contains.

14      Plaintiffs also reserve the right to seek sanctions and attorneys' fees if appropriate.

15  **Microsoft's Position:**

16      Plaintiffs have been aware of the inadvertent technical error which led to inadvertent gaps in

17  Activision's production since January 29, but never sought to meet and confer on the issue.  Instead,

18  Plaintiffs raised the issue for the first time in this case management statement.  Microsoft requests that

19  the Court direct Plaintiffs to meet and confer with Microsoft and Activision on any concerns they may

20  have about Activision's recent production.

21      It is important to note, however, that Plaintiffs' statement omits important context.  To be clear:

22  Activision made its document production in April 2023.  Due to a vendor error that neither side noticed,

23  a small subset of the more than 1 million documents that Activision produced to the FTC had not

24  transmitted when Activision reproduced its production to Plaintiffs.  Plaintiffs did not alert Activision

25  regarding the gaps in the Bates numbers within the production until over 9 months later, when they

26  realized that they did not have three of the documents cited in Microsoft's expert report.  Activision

27  promptly produced the documents to Plaintiffs within five days (and nine days before their expert's

28  rebuttal report is due).  Notably, Plaintiffs' expert did not cite any documents from Activision's

1    production other than exhibits from the FTC hearing.  Plaintiffs have already negotiated an additional

2    nineteen days for their expert's rebuttal report, and additional time is not warranted.  If Plaintiffs do

3    receive more time, then Microsoft respectfully submits that it should get a reciprocal extension of time

4    to review Dr. Cabral's report before deposing him.

5                              **IV.    Satya Nadella Deposition Date**

6    **Plaintiffs' Position:**

7            On January 8, 2024, The Court granted Plaintiffs' motion to compel the deposition of Satya

8    Nadella, Microsoft's CEO. ECF No. 318. Mr. Nadella negotiated the merger agreement and was the

9    ultimate decisionmaker for the "largest transaction Microsoft has ever made." *Id.* at 2. The Court

10   ordered that the deposition be "limited to three hours," and occur "at a time and place convenient to Mr.

11   Nadella and the parties." ECF No. 318 at 2.

12           Plaintiffs promptly requested that Microsoft's counsel provide a date convenient to Mr. Nadella.

13   However, Microsoft ignored Plaintiffs' request for weeks, requiring several letters to Microsoft's

14   counsel asking for a deposition date. On January 23, 2024, Microsoft informed Plaintiffs that Mr.

15   Nadella was only available in three months' time, on either April 23 at 9:00 a.m. or April 30, at 11:00

16   a.m. Microsoft has asserted that Mr. Nadella is not available for any three-hour window before April 23.

17           Plaintiffs respectfully request that Mr. Nadella's deposition occur sooner than April 23. Plaintiffs

18   request that the Court order that the deposition occur anytime convenient for Mr. Nadella between

19   February 26 and the end of March, 2024.

20   **Microsoft's Position:**

21           On January 8, this Court granted Plaintiffs' request, ordering Satya Nadella to sit for a 3-hour

22   deposition "at a time and place convenient to Mr. Nadella and the parties."  (Dkt. 318, Order at

23   2.)  Leaving the timing to the parties made sense, since the Court had also vacated the trial date, (*see id.*

24   at 2), and previously stated that trial in this matter would follow not only the outstanding Ninth Circuit

25   appellate decision, but also any FTC trial, (Tr. of 12/21/2023 Status Conf. at 5:14–21).  On January 11,

26   Plaintiffs requested "convenient" dates for the deposition.  Microsoft replied offering two dates—April

27   23, 2024 and April 30, 2024—that work for Mr. Nadella's schedule.  Until the time of this statement,

28   Plaintiffs demanded that Mr. Nadella's deposition proceed in February.

1    The Court should not set an earlier deadline to complete this deposition.  As an initial matter, and

2    as Microsoft's counsel have made clear to Plaintiffs, Mr. Nadella is not available earlier.  He has a full

3    calendar and, given his job responsibilities, is often booked out for months in advance.  Consistent with

4    the Court's guidance, Microsoft has offered two dates that are "convenient to Mr. Nadella" and his

5    counsel.  And Plaintiffs have provided no explanation for why those dates do not work for

6    them.  Plaintiffs do not contend that they have any conflicts that would prevent them from deposing Mr.

7    Nadella on the offered dates.

8    Nor have Plaintiffs provided any reason why Mr. Nadella's deposition needs to occur prior to

9    April.  There is currently no trial date in this case, and as the Court has explained, the trial would follow

10   not only the Ninth Circuit's ruling in this and the related FTC appeal, but also any hearing in the FTC's

11   related administrative case (which is set to begin 21 days after the Ninth Circuit rules).  Moreover,

12   Microsoft has made clear that in the event an earlier deposition becomes necessary because the Court

13   sets a trial date before April 23 or 30, it would work with Plaintiffs' counsel to try to clear other

14   important events on Mr. Nadella's calendar to permit the deposition to proceed.

15   Plaintiffs have set forth no reason for the Court to manage this deposition date.  They will not be

16   prejudiced by an April deposition.  Under these circumstances, there is no reason to require Mr. Nadella

17   to upend his schedule to accommodate Plaintiffs' preference for an earlier deposition, rather than going

18   forward on a date convenient to him and the parties.

19

20   Dated: February 6, 2024                              By:      */s/ Cadio Zirpoli*
                                                                         Cadio Zirpoli
21

22                                                         Joseph R. Saveri (State Bar No. 130064)
                                                          Cadio Zirpoli (State Bar No. 179108)
23                                                         Elissa Buchanan (State Bar No. 249996)
                                                          David H. Seidel (State Bar No. 307135)
24                                                         Kathleen J. McMahon (State Bar No. 340007)
                                                          Aaron Cera (State Bar No. 351163)
25                                                         **JOSEPH SAVERI LAW FIRM, LLP**
                                                          601 California Street, Suite 1000
26                                                         San Francisco, California 94108
                                                          Telephone:      (415) 500-6800
27                                                         Facsimile:      (415) 395-9940
                                                          Email:          jsaveri@saverilawfirm.com
28                                                                         czirpoli@saverilawfirm.com

eabuchanan@saverilawfirm.com
dseidel@saverilawfirm.com
kmcmahon@saverilawfirm.com
acera@saverilawfirm.com

*Plaintiffs' Counsel*

Dated: February 6, 2024                  By:  _/s/ Tania Rice_

Valarie C. Williams
B. Parker Miller
Tania Rice
Robert Poole
Alston & Bird LLP

Rakesh N. Kilaru
Anastasia M. Pastan
Jenna Pavelec
Wilkinson Stekloff LLP

*Counsel for Defendant Microsoft Corporation*

### Filer's Attestation

Each of the other Signatories have concurred in the filing of the document, which shall serve in lieu of their signatures on the document.

Dated: February 6, 2024                  By:    _/s/ Cadio Zirpoli_
                                                  Cadio Zirpoli

# EXHIBIT 1

## EXCERPT

## FILED UNDER SEAL

# **EXHIBIT 2**

2/5/24, 10:13 AM
Case 3:22-cv-08991-JSC Document 383 Filed 02/06/24 Page 14 of 50
Microsoft is hiking the price of Xbox Series X and Xbox Game Pass - The Verge



Menu 

**MICROSOFT** / **TECH** / **XBOX**

## Microsoft is hiking the price of Xbox Series X and Xbox Game Pass / Xbox Series X pricing will remain the same in the US and match PS5 pricing in most other markets. Xbox Game Pass prices are going up in most markets.

By Tom Warren, a senior editor covering Microsoft, PC gaming, console, and tech. He founded WinRumors, a site dedicated to Microsoft news, before joining The Verge in 2012.

Jun 21, 2023, 10:00 AM PDT |  50 Comments / 50 New

 

*If you buy something from a Verge link, Vox Media may earn a commission. See our ethics statement.*



Photo by Vjeran Pavic / The Verge

Microsoft is increasing its Xbox Series X prices in most countries in August apart from the US, Japan, Chile, Brazil, and Colombia. The Xbox maker is also increasing the monthly prices of its Xbox Game Pass and Xbox Game Pass Ultimate subscriptions for the first time next month, which will see the base Game Pass subscription for console move up to $10.99 a month from $9.99.

"We've held on our prices for consoles for many years and have adjusted the prices to reflect the competitive conditions in each market," says Kari Perez, head of communications for Xbox, in a statement to *The Verge*.

Xbox Series X console pricing will largely match the price hike Sony announced for the PS5 last year, with the Xbox Series X moving to £479.99 in the UK, €549.99 across most European markets, CAD $649.99 in Canada, and AUD $799.99 in Australia starting August 1st. The Xbox Series S pricing will not be adjusted in any markets, remaining at $299.99.

While Xbox Series X pricing adjustments had been expected after Sony's move last year, Xbox chief Phil Spencer also hinted in October that pricing for subscriptions wouldn't hold forever.



Image: Microsoft

Xbox Game Pass Ultimate and Game Pass for Console pricing will increase starting July 6th. Xbox Game Pass Ultimate will move from $14.99 per month to $16.99 (€14.99 / £12.99). The base Xbox Game Pass for Console pricing will also move from $9.99 a month up to $10.99 (€10.99 / £8.99). Microsoft is not changing PC Game Pass pricing, though.



Switch and get the new Samsung Galaxy S24+ on us.

With select trade-in and Business Unlimited plan. For new Verizon Business customers on initial online purchase only.

**verizon**✓
business

Up to $1,200 value. New device pymt purchase also req'd. Credit varies by smartphone trade-in, applied to acct over agmt term (up to 36 mos.). Offer & trade-in terms apply. Limited-time offer.

If you're an existing Game Pass monthly subscriber, then these new recurring prices won't take effect until August 13th, or September 13th in Germany. New Xbox Game Pass members will see the new prices immediately on July 6th. If you're subscribed to Xbox Game Pass through a yearly code, the new pricing won't take effect until you go to renew your subscription.

Most markets will be affected by the Xbox Game Pass price increases, with the exception of some Game Pass console pricing which will remain the same in Norway, Chile, Denmark, Switzerland, and Saudi Arabia.

## New Xbox Game Pass pricing

| Country | Currency | Xbox Game Pass Ultimate current | Xbox Game Pass Ultimate new | Game Pass for Console current | Game Pass for Console new |
|---------|----------|--------------------------------|------------------------------|-------------------------------|----------------------------|
| Argentina | ARS | 899 | 1449 | 599 | 1199 |
| Australia | AUD | 15.95 | 18.95 | 10.95 | 11.95 |
| Austria | EUR | 12.99 | 14.99 | 9.99 | 10.99 |
| Belgium | EUR | 12.99 | 14.99 | 9.99 | 10.99 |

| Country | Currency | Xbox Game Pass Ultimate current | Xbox Game Pass Ultimate new | Game Pass for Console current | Game Pass for Console new |
|---|---|---|---|---|---|
| Brazil | BRL | 44.99 | 49.99 | 29.99 | 32.99 |
| Canada | CAD | 16.99 | 18.99 | 11.99 | 12.99 |
| Chile | CLP | 7990 | 8990 | 5990 | 5990 |
| Colombia | COP | 29900 | 33900 | 19900 | 21900 |
| Czech Republic | CZK | 339 | 389 | 259 | 269 |
| Denmark | DKK | 99 | 109 | 79 | 79 |
| Finland | EUR | 12.99 | 14.99 | 9.99 | 10.99 |
| France | EUR | 12.99 | 14.99 | 9.99 | 10.99 |
| Germany | EUR | 12.99 | 14.99 | 9.99 | 10.99 |
| Greece | EUR | 12.99 | 14.99 | 9.99 | 10.99 |
| Hong Kong SAR | HKD | 79 | 85 | 59 | 65 |
| Hungary | HUF | 4190 | 4790 | 3000 | 3190 |
| India | INR | 499 | 549 | 349 | 379 |
| Ireland | EUR | 12.99 | 14.99 | 9.99 | 10.99 |
| Israel | ILS | 39.99 | 44.99 | 27.99 | 30.99 |
| Italy | EUR | 12.99 | 14.99 | 9.99 | 10.99 |
| Japan | JPY | 1100 | 1210 | 850 | 935 |
| Korea | KRW | 11900 | 13500 | 7900 | 8500 |
| Mexico | MXN | 229 | 249 | 149 | 159 |
| The Netherlands | EUR | 12.99 | 14.99 | 9.99 | 10.99 |
| New Zealand | NZD | 19.95 | 21.95 | 12.95 | 13.95 |
| Norway | NOK | 125 | 139 | 99 | 99 |
| Poland | PLN | 54.99 | 62.99 | 40 | 42.99 |
| Portugal | EEUR | 12.99 | 14.99 | 9.99 | 10.99 |
| Saudi Arabia | SAR | 39.99 | 44.99 | 29.99 | 29.99 |

2/5/24, 10:13 AM

Case 3:22-cv-08999-JSC  Microsoft is hiking prices of Xbox Series X and Xbox Game Pass - The Verge
Document 333  Filed 02/06/24  Page 18 of 50

| Country | Currency | Xbox Game Pass Ultimate current | Xbox Game Pass Ultimate new | Game Pass for Console current | Game Pass for Console new |
|---|---|---|---|---|---|
| Singapore | SGD | 13.99 | 15.9 | 9.99 | 10.9 |
| Slovakia | EUR | 12.99 | 14.99 | 9.99 | 10.99 |
| South Africa | ZAR | 119 | 129 | 79 | 85 |
| Spain | EUR | 12.99 | 14.99 | 9.99 | 10.99 |
| Sweden | SEK | 135 | 155 | 99 | 105 |
| Switzerland | CHF | 14.99 | 16.99 | 12 | 12 |
| Taiwan | TWD | 299 | 338 | 199 | 219 |
| Turkey | TRY | 44.99 | 120.99 | 29.99 | 79.99 |
| UAE | USD | 9.99 | 11.99 | 6.99 | 7.99 |
| UK | GBP | 10.99 | 12.99 | 7.99 | 8.99 |

Microsoft hasn't changed its Xbox Game Pass pricing since launching the subscription in 2017, and the company is keen to stress this isn't related to its proposed acquisition of Activision Blizzard. "These Game Pass price adjustments are not related to the Activision Blizzard deal, and are intended to match local market conditions," says Perez.

Microsoft's Xbox subscription changes follow a general trend in price hikes over the past couple of years for entertainment subscriptions. Netflix raised prices again last year following gradual price hikes in recent years, and Disney Plus and Hulu saw steep price hikes last year, too. Apple Music and Spotify have both increased in price in most markets in recent years.

Nintendo has not yet adjusted its Switch Online subscription service since launching it in 2018, and Sony only just updated its own PlayStation Plus subscriptions last year with new PlayStation Plus Essential, Plus Extra, and Plus Premium subscriptions for PlayStation owners.

💬 50 COMMENTS (50 NEW)

Microsoft is bumping the price of Xbox Series X and Xbox Game Pass - The Verge

FEATURED VIDEOS FROM THE VERGE

## Tesla Master Plan 3 in 4 minutes

00:00                                                        00:00

More from **Microsoft**

## Microsoft's new OneDrive design starts rolling out for consumers

## JBL's retro-inspired Authentics speakers are on sale for nearly 25 percent off

## Microsoft Teams, Word, Excel, and more are coming to Apple's Vision Pro at launch

## Microsoft's gaming revenues overtake Windows thanks to Activision Blizzard

## SPONSORED CONTENT

Keep your cafe moving with Square.

Square

Get Started

Small Business Bonus

Comcast Business

GET IT NOW



Prime is Now $179, But Few Know this Fre...

Online Shopping To...



Brain Scan Uncovers The Real Root...

Healthy Guru



Most Affordable Camper Vans

SearchTopics | Searc...

Learn More

If You Have Toenail Fungus Try This...

WellnessGuide101.co...

Watch More

2/5/24, 10:13 AM
Case 3:22-cv-08991-JSC    Document 183    Filed 02/06/24    Page 21 of 50
Microsoft is bumping the price of Xbox Series X and Xbox Game Pass - The Verge

TERMS OF USE / PRIVACY NOTICE / COOKIE POLICY / DO NOT SELL OR SHARE MY PERSONAL INFO / LICENSING FAQ
/ ACCESSIBILITY / PLATFORM STATUS / HOW WE RATE AND REVIEW PRODUCTS

CONTACT / TIP US / COMMUNITY GUIDELINES / ABOUT / ETHICS STATEMENT

THE VERGE IS A VOX MEDIA NETWORK

ADVERTISE WITH US / JOBS @ VOX MEDIA

© 2024 VOX MEDIA, LLC. ALL RIGHTS RESERVED

# **EXHIBIT 3**



☰                                    GAME**RANT**                                    Log in

Home  ›  Games

# Microsoft Announces Major Layoffs

Microsoft confirms it has laid off 1,900 staff in another round of cutbacks, with staff at Activision Blizzard particularly affected.

BY **DANIEL MORRIS**    PUBLISHED JAN 25, 2024



≣  **HIGHLIGHTS**

- **1,900 staff laid off from Microsoft's gaming division, including Activision Blizzard, Xbox, and ZeniMax.**

- President of Blizzard, Mike Ybarra, and Blizzard cofounder and chief design officer, Allen Adham


DEAD & COMPANY  DEAD FOREVER
✕

**Ad**

Microsoft's acquisition of Activision Blizzard was one of the biggest stories of 2023, with a drawn-out case that reached its conclusion in October. The move was worth a gargantuan $68.7 billion, putting Microsoft at the helm of huge franchises such as *Call of Duty* and *Warcraft*, among others. While it was undoubtedly great news for Xbox gamers, there was plenty of concern that the aggressive move would leave PlayStation users without their favorite franchises. Xbox's purchase of Bethesda has already seen multiple titles, including *Redfall* and *Starfield*, skip PlayStation platforms, so the concerns had merit.

RELATED



**Rumor: Microsoft in Talks to Bring Big PlayStation Console Exclusive to Xbox**

First reported by The Verge, it has been confirmed that Microsoft is laying off 1,900 employees primarily across Activision Blizzard, with some Xbox and ZeniMax affected too. With the gaming division at Microsoft previously sitting at around 22,000 employees, it's a massive cut of 8 percent of the workforce. As part of the move, president of Blizzard Mike Ybarra confirmed that he too would be leaving alongside company cofounder and chief design officer Allen Adham. According to The Verge, Blizzard's unnamed survival game, which was first announced in early 2022, has been canceled alongside these layoffs.



- 1,900 staff laid off in total laid off

- President of Blizzard since February 2022 Mike Ybarra leaving

- Blizzard cofounder and chief design officer Allen Adham leaving

- Blizzard's unnamed survival game codenamed *Project Odyssey* canceled

Microsoft is no stranger to layoffs, after cutting 10,000 jobs back in January 2023, as well as a smaller set in July. The company has undergone plenty of restructuring of late, particularly in the Xbox division. Back in October, Sarah Bond was announced as the new President of Xbox in a huge leadership shake-up. Around the same time, the company announced that the Xbox gaming division had achieved a 9 percent year-on-year uptick in revenue for Q1 2024 (spanning July 1 to September 30,



The latest layoffs at Microsoft are a reflection of the industry as a whole at the moment. Layoffs are coming thick and fast at many of the biggest studios the industry has to offer. Just a couple of days back, Riot Games announced massive layoffs, showing no company is safe from the need to cut back from current levels of spending. These moves certainly raise questions about the ongoing sustainability of the games industry in its current state, with no end in sight for the extremely sad series of layoffs.



## Subscribe To Our Newsletters!

Email Address

SUBSCRIBE

By subscribing, you agree to our **Privacy Policy** and may receive occasional deal communications; you can unsubscribe anytime.

## Related Topics

GAMES    MICROSOFT    BLIZZARD    ACTIVISION    XBOX

## RECOMMENDED ARTICLES



**PALWORLD**

**Palworld: The Best Pal Of Each Type, Ranked**



**SILENT HILL**

**New Silent Hill Game Is Getting Bad Reviews**



**TWITCH**

**The Streamer Awards Controversy Explained**



**POKEMON**

**February 27 is Going to Be a Big Day for Pokemon Fans**



**SUICIDE SQUAD: KILL THE JUSTICE LEAGUE**

**Suicide Squad: Kill The Justice League Dialogue Accidentally Spoils DLC Character**

**Ad**

## POLL

**Which of these indie survival games is your favorite?**

- ◯ Don't Starve Together
- ◯ Valheim
- ◯ Sons of the Forest
- ◯ Subnautica

Join Our Content Team    Home    Contact Us    Terms    Privacy    Copyright    About Us    Advertise with us    Press Kit

Fact Checking Policy    Corrections Policy    Ethics Policy    Ownership Policy    Odyssey Group    Owned & Operated by Valnet Inc.

Copyright © 2024 gamerant.com

# EXHIBIT 4

2/5/24, 12:27 PM
Activision Blizzard Reportedly Let Go of 83% of Esports Staff - Sports Illustrated
Case 3:22-cv-08991-JSC Document 300 Filed 02/06/24 Page 31 of 50



Hudson Valley battered by flash flooding

# Activision Blizzard Reportedly let go of 83% of Esports Staff

Just a skeleton crew is left to oversee Call of Duty and Overwatch esports operations

CHARLIE CATER • JAN 30, 2024 2:50 PM EST

On Sunday, January 28, the Call of Duty League Boston Breach Major I tournament concluded. It was an incredible event, with Toronto Ultra coming out victorious in a 4-1 victory over Atlanta FaZe. **However, just two days later, Activision Blizzard have reportedly let go of 60 out of the 72 staff in their esports division, leaving just 12 employees. This is a cut of 83%, and sees some of the most talented members of the esports community without work.**

On January 25, 2024, Microsoft revealed that 1,900 Activision Blizzard and Xbox employees had been laid off. However, the staff working at the Call of Duty League Major in Boston were not informed until today. Scott Parkin, Senior Manager of Esports Operations at Activision Blizzard described how they were given "zero reassurances [they] will have a job when [they] get back home".

Unfortunately, Scott was one of the 60 individuals let go today.

Along with Scott, all of the full-time observing staff at the Call of Duty League were also let go. The observing staff were the backbone of the Call of Duty League, highlighting every single play, and ensuring a smooth running of the broadcast. The Call of Duty League even made a mini-documentary about their observers just two years ago, commending their incredible work.

The community has expressed their disappointment at Activision Blizzard and support for all those let go today on X. With former professional Call of Duty player, Samuel "Octane" Larew saying, "Scott's one of the most incredible people I've met through COD. Saddened to see him not working on Call of Duty anymore."

With the Call of Duty Challengers scene and Overwatch esports now being controlled by ESL FaceIt Group, it appears that the Call of Duty League will now be operated by them too. With just a skeleton group of 12 employees left in Activision Blizzard's esports department left to oversee things, it's looking more and more likely that this is the final year of the Call of Duty League.

# **EXHIBIT 5**

## EXCERPT

Volume 1

Pages 1 - 211

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

FEDERAL TRADE COMMISSION,          )
                                   )
            Plaintiff,             )
                                   )
  VS.                              )     **NO. C 23-02880 JSC**
                                   )     **SEALED PAGES 5-14**
MICROSOFT CORPORATION, et al.,     )
                                   )
            Defendants.            )
_____   )


                          San Francisco, California
                          Thursday, June 22, 2023

            TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS

APPEARANCES:

For Plaintiff:
                    FEDERAL TRADE COMMISSION
                    600 Pennsylvania Avenue, NW
                    Washington, D.C.  20580
              BY:   JAMES H. WEINGARTEN, ATTORNEY AT LAW
                    JENNIFER FLEURY, ATTORNEY AT LAW
                    PEGGY FEMENELLA, ATTORNEY AT LAW



For Defendant Microsoft:

                    WILKINSON STEKLOFF LLP
                    2001 M Street, NW - 10th Floor
                    Washington, D.C.  20036
              BY:   BETH WILKINSON, ATTORNEY AT LAW
                    RAKESH N. KILARU, ATTORNEY AT LAW
                    KIERAN GOSTIN, ATTORNEY AT LAW
                    GRACE HILL, ATTORNEY AT LAW
                    SARAH NEUMAN, ATTORNEY AT LAW

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

```
 1   APPEARANCES:   (cont'd)

 2   For Plaintiff DeMartini in related case 22-08991:

 3                         JOSEPH SAVERI LAW FIRM, INC.
                           601 California Street - Suite 1000
 4                         San Francisco, California  94108
                    BY:   DAVID H. SEIDEL, ATTORNEY AT LAW
 5                         CADIO R. ZIRPOLI, ATTORNEY AT LAW

 6   For Defendant Activision Blizzard, Inc.:

 7                         SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                           1440 New York Avenue, N.W.
 8                         Washington, D.C.  20005
                    BY:   STEVEN C. SUNSHINE, ATTORNEY AT LAW
 9                         JULIA K. YORK, ATTORNEY AT LAW

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**BOND - CROSS / FLEURY**

1    Q.   For the PlayStation offerings that have content libraries

2    as compared to the Xbox offerings that have content libraries,

3    how many subscribers, roughly, what is the comparison between

4    PlayStation and Xbox?

5    A.   I don't have access to PlayStation's confidential

6    information.

7    Q.   Would you agree that Game Pass is the market leader when

8    it comes to subscriptions with content libraries?

9    A.   I don't know what PlayStation's latest numbers are, and

10   they did recently launch.

11   Q.   Do you agree that Game Pass has significantly more

12   subscribers for content libraries with content libraries than

13   PlayStation?

14   A.   I can't know for sure without seeing their data.

15   Q.   I'd like you to turn to your deposition, page -- that's

16   tab 1, page 219.

17   A.   Yeah.

18   Q.   Tab 1.  Okay.

19   A.   (Witness examines document.)  Okay.

20   Q.   Line 11 -- sorry -- line 14 you were asked (as read):

21       "**QUESTION:**  That bar graph shows that Microsoft has

22       26 million content subscribers; correct?"

23       Your answer (as read):

24       "**ANSWER:**  It does.

25       "**QUESTION:**  And Sony has 3 million content subscribers;

**BOND - CROSS / FLEURY**

```
1          correct?
2          "ANSWER:  That's what the bar graph says."
3                    (Pause in proceedings.)
4              THE WITNESS:  Yes, but I don't know what that bar
5     graph was of, um, and what it was dated.  So I just want to be
6     careful in how I'm answering because things change over time,
7     which is why I don't know what this data was showing or what is
8     happening with Sony today.
9     BY MS. FLEURY:
10    Q.   Understood.
11         Fair to say that at the time you gave this testimony and
12    the document you were reviewing, Microsoft had significantly
13    more subscribers for content than PlayStation?
14    A.   Yes, but I wonder what the comparison was.  Like, of the
15    SKUs, what was being compared to what?  That's what I'm not
16    sure on actually.
17    Q.   I want to switch gears and ask you about the agreements
18    that Ms. Wilkinson, Microsoft's counsel, asked you about.  I
19    want to start with the Ubitus agreement?
20    A.   Okay.
21    Q.   Ubitus is located outside of the U.S.; correct?
22    A.   Yes.
23    Q.   It has a small presence in the United States?
24    A.   I don't know the details of Ubitus' footprint.
25    Q.   You don't know whether they have any footprint in the
```

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Thursday, June 22, 2023

8

9

10

11    _____

12          Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
           United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

# **EXHIBIT 6**

# **EXCERPT**

Volume 4

Pages 689 - 917

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

FEDERAL TRADE COMMISSION,      )
                               )
          Plaintiff,           )
                               )
   VS.                         )   NO. C 23-02880 JSC
                               )   SEALED PAGES 693-707 and
MICROSOFT CORPORATION, et al., )        902-916
                               )
          Defendants.          )
_____)


                         San Francisco, California
                         Wednesday, June 28, 2023


          TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS


APPEARANCES:

For Plaintiff:
                    FEDERAL TRADE COMMISSION
                    600 Pennsylvania Avenue, NW
                    Washington, D.C.  20580
               BY:  JAMES H. WEINGARTEN, ATTORNEY AT LAW
                    JAMES ABELL, ATTORNEY AT LAW
                    JENNIFER FLEURY, ATTORNEY AT LAW
                    PEGGY FEMENELLA, ATTORNEY AT LAW
                    CEM AKLEMAN, ATTORNEY AT LAW
                    NICOLE CALLAN, ATTORNEY AT LAW
                    MARIA CIRINCIONE, ATTORNEY AT LAW
                    ALEX ANSALDO, ATTORNEY AT LAW


REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

**APPEARANCES:**   (continued)

For Defendant Microsoft:

                     WILKINSON STEKLOFF LLP
                     2001 M Street, NW - 10th Floor
                     Washington, D.C.  20036
          BY:  **BETH WILKINSON, ATTORNEY AT LAW**
               **RAKESH N. KILARU, ATTORNEY AT LAW**
               **KIERAN GOSTIN, ATTORNEY AT LAW**
               **GRACE HILL, ATTORNEY AT LAW**
               **SARAH NEUMAN, ATTORNEY AT LAW**
               **ANASTASIA PASTAN, ATTORNEY AT LAW**

For Defendant Activision Blizzard, Inc.:

                     SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                     1440 New York Avenue, N.W.
                     Washington, D.C.  20005
          BY:  **STEVEN C. SUNSHINE, ATTORNEY AT LAW**

                     SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                     525 University Avenue
                     Palo Alto, California  94301
          BY:  **CAROLINE VAN NESS, ATTORNEY AT LAW**

                     SKADDEN ARPS SLATE MEAGHER & FLOM LLP
                     1 Manhattan West
                     New York, New York  10001
          BY:  **EVAN R. KREINER, ATTORNEY AT LAW**

For Nintendo of America, Inc.:

                     VENABLE LLP
                     151 West 42nd Street - 49th Floor
                     New York, New York  10036
          BY:  **BENJAMIN P. ARGYLE, ATTORNEY AT LAW**

For Sony Interactive Entertainment:

                     CLEARY GOTTLIEB STEEN & HAMILTON, LLP
                     2122 Pennsylvania Avenue, NW-Suite 1000
                     Washington, D.C.  20037
          BY:  **ELSBETH BENNETT, ATTORNEY AT LAW**

1    A.    That's correct.

2    Q.    And right below that, Mr. Nadella, you also highlight that

3    Microsoft's Game Pass had achieved more than 25 million

4    subscribers across PC and console; correct?

5    A.    That's correct.

6    Q.    And that was a true and accurate statement when you made

7    it to the Microsoft investment community?

8    A.    That's correct.

9    Q.    And at the very bottom of that paragraph, Mr. Nadella, do

10   you see where you highlight "and more than 20 million have

11   played Halo Infinite making it the biggest Halo launch in

12   history"?  Do you see that?

13   A.    I do.

14   Q.    And that was a true and accurate statement when you made

15   it to Microsoft's investment community?

16   A.    Yes.

17   Q.    You represented to investors that Microsoft continues to

18   lead the fast-growing cloud gaming market in an investor call;

19   correct?

20   A.    I may have, but are you referring to that particular --

21   Q.    I'll go ahead and direct your attention, Mr. Nadella, to

22   page -- to PX9012 again.

23   A.    9012?

24   Q.    Yes.

25   A.    (Witness examines document.)

SEALED PROCEEDINGS

1      (Proceedings adjourned at 3:52 p.m.)

2           ---oOo---

3

4      **CERTIFICATE OF REPORTER**

5      I certify that the foregoing is a correct transcript

6  from the record of proceedings in the above-entitled matter.

7

8  DATE:   Wednesday, June 28, 2023

9

10

11

12  _____

13      Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
            United States District Court - Official Reporter

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 7

## EXCERPT

## FILED UNDER SEAL

# EXHIBIT 8

## EXCERPT

Volume 2

Pages 212 - 490

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

FEDERAL TRADE COMMISSION,          )
                                   )
            Plaintiff,             )
                                   )
    VS.                            )    NO. C 23-02880 JSC
                                   )    SEALED PAGES 216-225, 228-266
MICROSOFT CORPORATION, et al.      )    and 369-389
                                   )
            Defendants.            )
_____)
                                   San Francisco, California
                                   Friday, June 23, 2023

TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS

APPEARANCES:

For Plaintiff:
                    FEDERAL TRADE COMMISSION
                    600 Pennsylvania Avenue, NW
                    Washington, D.C.  20580
            BY:  JAMES H. WEINGARTEN, ATTORNEY AT LAW
                 JAMES ABELL, ATTORNEY AT LAW
                 JENNIFER FLEURY, ATTORNEY AT LAW
                 PEGGY FEMENELLA, ATTORNEY AT LAW
                 CEM AKLEMAN, ATTORNEY AT LAW
                 ETHAN GURWITZ, ATTORNEY AT LAW

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

```
1   APPEARANCES:   (cont'd)

2   For Defendant Microsoft:

3                       WILKINSON STEKLOFF LLP
                        2001 M Street, NW - 10th Floor
4                       Washington, D.C.  20036
                BY:  BETH WILKINSON, ATTORNEY AT LAW
5                    RAKESH N. KILARU, ATTORNEY AT LAW
                     KIERAN GOSTIN, ATTORNEY AT LAW
6                    GRACE HILL, ATTORNEY AT LAW
                     ANASTASIA PASTAN, ATTORNEY AT LAW
7
    For Defendant Activision Blizzard, Inc.:
8
                        SKADDEN ARPS SLATE MEAGHER & FLOM LLP
9                       1440 New York Avenue, N.W.
                        Washington, D.C.  20005
10              BY:  STEVEN C. SUNSHINE, ATTORNEY AT LAW
                     JULIA K. YORK, ATTORNEY AT LAW
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**SPENCER - DIRECT / WEINGARTEN**

1   A.   That's our goal.

2   Q.   And subscriber scale, meaning the number of subscribers,

3   is imperative for a successful subscription service in gaming;

4   right?

5   A.   Having a large number of subscribers is important to our

6   subscription success, yes.

7   Q.   In fact, having scale and subscribers is imperative, in

8   your view, to success in gaming subscription; right?

9   A.   Yes.

10  Q.   Have you ever expressed the view that you want to make it

11  clear to Google, Amazon, and others that they will not catch up

12  to Microsoft in gaming at all, not just in subscriber numbers?

13  A.   For us gaming is a capability that Microsoft has where we

14  want to continue to extend our capability and show leadership

15  relative to potential competitors or today's competitors.

16  Q.   And I appreciate that, but my question was:  Have you ever

17  said that you want to make it clear to Google and Amazon that

18  they will not catch up to Microsoft in gaming all in, not just

19  in terms of subscribers even?

20  A.   Yeah, I believe I've said that.

21  Q.   Okay.  And have you also -- do you also believe that

22  content is part of the differentiator for Microsoft versus

23  Google and Amazon in subscription?

24  A.   Gaming content is today, yes.

25  Q.   So I'll make it more clear.  I thank you for the

1

2

3                    **CERTIFICATE OF REPORTER**

4        I certify that the foregoing is a correct transcript

5  from the record of proceedings in the above-entitled matter.

6

7  DATE:   Friday, June 23, 2023

8

9

10

11       _Marla Knox_____

12       Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
         United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 9

## EXCERPT

## FILED UNDER SEAL