Joseph M. Alioto (State Bar No. 42680)
Tatiana V. Wallace (State Bar No. 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA  94104
Telephone:      (415) 434-8900
Facsimile:       (415) 434-9200
Email:      jmalioto@aliotolaw.com
                   twallace@aliotolaw.com

Joseph R. Saveri (State Bar No. 130064)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone:      (415) 500-6800
Facsimile:       (415) 395-9940
Email:      jsaveri@saverilawfirm.com
                   czirpoli@saverilawfirm.com
                   eabuchanan@saverilawfirm.com
                   dseidel@saverilawfirm.com
                   kmcmahon@saverilawfirm.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| DANTE DEMARTINI, et al., <br><br> Plaintiffs, <br><br> v. <br><br> MICROSOFT CORPORATION, a Washington corporation, <br><br> Defendant. | Case No. 3:22-cv-08991-JSC <br><br> *Hearing: As soon as the matter may be heard.* <br><br> **PLAINTIFFS' NOTICE OF MOTION AND EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION** <br><br> <u>**REDACTED**</u> <br><br> Hon: Jacqueline Scott Corley <br><br> Date: April 18, 2024 <br> Time: 10:00 am <br> Courtroom: 8 - 19th Floor |

Case No. 3:22-cv-08991-JSC

PLAINTIFFS' NOTICE OF MOTION AND EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD**:

**PLEASE TAKE NOTICE** that on April 18, 2024 at 10:00 am in Courtroom 8, 450 Golden Gate Ave., San Francisco, California, or as soon as the matter may be heard, Plaintiffs shall move and hereby do move the Court for entry of a preliminary injunction, under Federal Rule of Civil Procedure 65(a), to preserve the status quo and prevent Microsoft from further dismantling Activision Blizzard until the Plaintiffs can be heard on the merits at trial.

**PLEASE TAKE FURTHER NOTICE** that as soon as the matter may be heard, Plaintiffs shall move and hereby do move the Court to issue an emergency temporary restraining order ("TRO"), under Federal Rule of Civil Procedure 65(b), to prevent Microsoft from further dismantling Activision Blizzard until the Court can rule on Plaintiffs' motion for preliminary injunction.

Plaintiffs brought this action under Section 7 of the Clayton Act, 15 U.S.C. § 18, to stop Defendant Microsoft Corporation ("Microsoft") from completing its proposed acquisition of Activision Blizzard, Inc. ("Activision Blizzard"). To prevent the irreparable harm to Plaintiffs—and to competition generally—that Plaintiffs anticipated would result if Microsoft consummated the deal, Plaintiffs moved for a preliminary injunction to delay the merger's progress until the Court could consider Plaintiffs' claims in an accelerated trial on the merits. *See* ECF No. 135. The Court denied Plaintiffs' Motion. ECF No. 189. Relying on Microsoft's representations that Activision Blizzard would remain an independent subsidiary after the merger, the Court held that Plaintiffs could not be irreparably harmed because they could seek divestiture of the merger after it was consummated, an "important" antitrust remedy that "is simple, relatively easy to administer, and sure." *Id.* at 8 (quoting *California v. American Stores Co.*, 495 U.S. 271, 281 (1990)). Plaintiffs appealed the Court's Order to the Ninth Circuit on June 2, 2023. ECF No. 207.

Much has transpired since. Microsoft completed its acquisition of Activision Blizzard in October 2023. It has now begun integrating Activision Blizzard into its business operations, *much* to Activision Blizzard's individual detriment. Specifically, contrary to its representations to the Court that Activision Blizzard would remain an independent subsidiary after the merger, Microsoft has: (1) removed Bobby Kotick as CEO and removed Mike Ybarra as president, installing Microsoft's own

Matt Booty and Phil Spencer as the new heads of Activision Blizzard; (2) terminated 1,900 gaming-division employees, a move that heavily impacted Activision Blizzard and diminished its ability to compete independently in the video game market; (3) fired 83% of Activision Blizzard's esports staff; (4) cancelled at least one eagerly-anticipated Activision Blizzard AAA game that had been in development for years; and (5) severed ties with two Activision Blizzard game studios instrumental to the development of Activision Blizzard's tentpole franchise, *Call of Duty*.

Given the nature of the damage already inflicted on Activision Blizzard's business, Microsoft's actions have irreparably harmed Activision Blizzard, and through it, the players of its games, including Plaintiffs. The outcome that Plaintiffs feared, and which they sought to delay by moving for a preliminary injunction, is now becoming a reality. With the merger now consummated, Microsoft is wielding its newfound power to act with impunity towards Activision Blizzard, disregarding its prior representations to the Court that Activision Blizzard would remain an independent entity and viable market participant post-merger and ignoring the anticompetitive impact of its decisions on the video game industry at large. All indications are that Microsoft will continue its dismantling of Activision Blizzard—thereby rendering divestiture an impotent remedy—unless and until it is ordered to stop. Plaintiffs therefore have no choice but to file the instant Emergency Motion for Temporary Restraining Order and Order to Show Cause and Motion for Preliminary Injunction to maintain the status quo and prevent Microsoft from further dismantling Activision Blizzard pending Plaintiffs' trial on the merits.

Accordingly, Plaintiffs respectfully request that this Court enter a TRO prior to 8:59 p.m. Pacific Time on March 18, 2024, or as soon thereafter as the Court deems proper, requiring Microsoft to preserve the status quo by maintaining Activision Blizzard as an independent subsidiary, without taking any further actions that would irreparably harm Activision Blizzard's ability to compete as an independent company, until the Court can rule on Plaintiffs' motion for preliminary injunction.[1]

---

[1] This Court has jurisdiction to issue a TRO because "the district court retains jurisdiction during the pendency of an appeal to act to preserve the status quo." *Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001); *see* ECF No. 290, at 2 ("On an appeal from a preliminary injunction order, the district court . . . retains jurisdiction during the pendency of an appeal to act to preserve the status quo." (internal quotation marks and citation omitted)).

## ISSUES TO BE DECIDED

Whether, under Federal Rules of Civil Procedure 65(a) and (b), the Court should enter a TRO and/or a preliminary injunction requiring Microsoft to maintain Activision Blizzard as an independent subsidiary, without: (1) terminating more Activision Blizzard employees; (2) further interfering with the development of new Activision Blizzard game content; (3) severing relationships with or closing more Activision Blizzard game studios; or (4) taking any other action that would further irreparably harm Activision Blizzard's ability to compete as an independent company until Plaintiffs can be heard on the merits.

Dated: March 13, 2024

By: ___/s/ Joseph R. Saveri___
Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:    (415) 500-6800
Facsimile:    (415) 395-9940
Email:        jsaveri@saverilawfirm.com
              czirpoli@saverilawfirm.com
              eabuchanan@saverilawfirm.com
              dseidel@saverilawfirm.com
              kmcmahon@saverilawfirm.com

Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone:    (415) 434-8900
Facsimile:    (415) 434-9200
Email:        jmalioto@aliotolaw.com
              twallace@aliotolaw.com

Joseph M. Alioto Jr. (SBN 215544)
**ALIOTO LEGAL**
100 Pine Street, Suite 1250
San Francisco, California 94111
Tel: (415) 398-3800
Email:        joseph@aliotolegal.com
              twallace@aliotolaw.com

*Plaintiffs' Counsel*

PLAINTIFFS' NOTICE OF MOTION AND EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................................1

II.     PROCEDURAL HISTORY ....................................................................................7

III.    RELEVANT FACTS ..............................................................................................8

        A.      Microsoft Ousted Bobby Kotick and Installed Xbox's Matt Booty to Run
                Activision Blizzard ...................................................................................8

        B.      Microsoft Terminated 1,900 Gaming Employees, Most of Whom Were Activision
                Blizzard Employees ..................................................................................8

        C.      Microsoft Cancelled a AAA Game in Development at Activision Blizzard that
                Would Have Competed with *Minecraft*, a Popular Microsoft Game......................9

        D.      Microsoft Gutted Activision Blizzard's Esports Staff............................................10

        E.      Microsoft Severed Ties with Two Activision Blizzard Game Studios...................11

IV.     LEGAL STANDARD ..........................................................................................11

V.      ARGUMENT .......................................................................................................12

        A.      Plaintiffs are Likely to Succeed on the Merits .......................................................12

        B.      Plaintiffs Will Suffer Irreparable Harm without a TRO.........................................14

        C.      The Balance of Equities and the Public Interest Weigh in Plaintiffs' Favor..........16

VI.     CONCLUSION....................................................................................................18

## **TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ............................................. 12

*Boardman v. Pac. Seafood Grp.,* 822 F.3d 1011 (9th Cir. 2016) .................................................. 11

*California v. American Stores Co.*, 495 U.S. 271 (1990) ............................................................ 17

*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668 (9th Cir. 1988)..................................... 11

*Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163 (9th Cir. 2001) ........................... 2

*Saint Alphonsus Med. Ctr.—Nampa, Inc. v. St. Luke's Health Sys., Ltd.*,
      No. 1:12-CV-560-BLW, 2012 WL 6651167 (D. Idaho Dec. 20, 2012) .......................... 14, 18

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832 (9th Cir. 2001)............... 11

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .......................................................... 11

**Federal Statutes**

15 U.S.C. § 18 ...................................................................................................................... 7, 14

PLAINTIFFS' NOTICE OF MOTION AND EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs brought this action on December 20, 2022, to prevent the unlawful combination of the largest and most successful independent producer of AAA video game content in the world (Activision Blizzard) with another of the world's largest gaming companies (Microsoft). The $70 billion acquisition of Activision Blizzard is not only by far the largest video game acquisition ever, it is also the largest acquisition in Microsoft's history (and arguably the largest technology merger ever). In fact, the acquisition is so large that only a handful of the largest technology companies in the world were even capable of paying the $70 billion all-cash purchase price. Bobby Kotick, Activision Blizzard's former CEO, testified at his deposition that when Microsoft offered to buy Activision Blizzard for $70 billion in cash, ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████. *See* Ex. A, Deposition Testimony of Bobby Kotick, dated Dec. 1, 2023 ("Kotick Dep."), at 30:6–18 ████████████████████ ██████████████; *id.* at 31:7–15 ████████████████████████████████.[2]

Plaintiffs sought a preliminary injunction to delay the merger and preserve competition in the industry until the Court could address this mega-merger on the merits. *See* ECF No. 135. In support of their motion, Plaintiffs offered an expert report, relying on textbook economic analysis, which predicted the harms that would occur post-merger. *See* Ex. B, Expert Report of Professor Luís Cabral, Ph.D., dated April 20, 2023 ("Cabral Rep."); *see also* Ex. C, Expert Report of Professor Luís Cabral, Ph.D., dated December 12, 2023 ("Cabral Rep. 2") (likewise predicting economic harms that would occur post-merger). Microsoft offered no expert report, economic theory, or evidence to rebut Plaintiffs' expert. Instead, Microsoft simply asserted repeatedly that Plaintiffs' economic theory, report, and evidence were only "speculation." *See, e.g.*, ECF No. 163 at 18. In the related FTC action, Microsoft assured the Court that the merger would not lead to increased Game Pass prices. *See FTC v. Microsoft*, 23-cv-02880, Def's Mem. Of Law In Opp. to Mot. For Prel. Injunction, ECF No. 109-3, at 20 █████

---

[2] Unless noted otherwise, all Exhibits ("Exs.") filed in support of this Motion are attached to the Declaration ("Decl.") of David H. Seidel, dated March 12, 2024, filed concurrently herewith.

████████████████████████████████████████████████████████

████████████████████████████████████████████████

(emphasis added).[3]

But now that the merger is complete, the harms that Plaintiffs' expert predicted can no longer be written off as "speculation." They have already begun to occur. Perhaps most significantly, on January 25, 2024, Microsoft fired 1,900 people across its gaming division. *See* Tom Warren, *Microsoft Lays off 1,900 Activision Blizzard and Xbox employees*, The Verge (Jan. 25, 2024).[4] The layoffs amounted to roughly 8% of Microsoft's total gaming workforce and heavily impacted Activision Blizzard, which lost both its president, Mike Ybarra, and its chief design officer, Allen Adham, among hundreds of other key employees. *See id.* Then, on January 30, 2024, Microsoft fired another round of Activision Blizzard personnel, including 60 out of the 72 staff in Activision Blizzard's esports division. *See* Charlie Cater, *Activision Blizzard Reportedly let go of 83% of Esports Staff* (Jan. 30, 2024).[5] And more recently, in mid-February, Microsoft continued its layoffs, "making over 130 people redundant from [Activision Blizzard's] office in the Republic of Ireland." *See* Alex Calvin, *Report: Activision Blizzard cutting 136 jobs in Ireland*, PC Games Insider (Feb. 19, 2024).[6]

Microsoft's termination of a significant percentage of Activision Blizzard's workforce has harmed competition beyond what harm the merger itself inflicted, because if divestiture is required—and the Court requires Microsoft to spin off Activision Blizzard as an independent company—Activision Blizzard will be less able, or possibly even unable, to compete against Microsoft. As then CEO Bobby Kotick testified during his deposition, ████████████████████████████████████ ███████████████████████████████████████████████████. *See* Ex. A, Kotick Dep., at 38:10-16.

Further, Activision Blizzard's ability to enter the game subscription or cloud streaming market

---

[3] Microsoft increased the prices of Game Pass by more than 10% in September, 2023. *See* Decl. of Beowulf Owen, dated March 12, 2024 ("Owen Decl.) at ¶¶ 8–9.

[4] Available at https://www.theverge.com/2024/1/25/24049050/microsoft-activision-blizzard-layoffs.

[5] Available at https://esi.si.com/news/activision-blizzard-esports-layoffs.

[6] Available at https://www.pcgamesinsider.biz/news/74310/report-activision-blizzard-cutting-136-jobs-in-ireland.

acted as a competitive restraint against Microsoft's potential to monopolize those markets. In fact, Plaintiffs have now uncovered numerous documents showing that Activision Blizzard ███████████ ████████████████████████████████████████████████████████████████████ ████████████████████. *See, e.g.*, Ex. D, ABK-2R-01410604 [Platform Strategy & Partnerships: Team Overview, dated December 5, 2019] at 12; Ex. E, ABK-2R-01499757 [Battle.Net Growth, dated March 2021] at 4; Ex. N [Cabral Rebuttal Report] at 26–27 & n.119–20. But after these mass terminations, it may no longer be possible for Activision Blizzard to play the spoiler to Microsoft's monopolistic ambitions. Indeed, as evidenced in emails written by Phil Spencer, CEO of Microsoft Gaming and the top executive overseeing gaming at Microsoft throughout the relevant period, Microsoft knew that ██████████████████████████████████████████████ ██████████████████████████. *See* Ex. F, MSFT-2R-04729484, Emails from Phil Spencer to Sarah Bond, dated February 5-6, 2020.

Plaintiffs also asserted—based on economic principles—that the merger would cause Microsoft to produce less AAA content than would be produced by an independent Microsoft and an independent Activision Blizzard, because those two companies vigorously competed in the development and production of AAA games. *See* Ex. B, Cabral Rep. at 29 ("[O]ver time, gamers are less likely to enjoy the benefits of newly developed content that they would absent the merger."). That is exactly what is happening now. Just as Plaintiffs' economist predicted, Microsoft cancelled an eagerly-anticipated AAA game, referred to internally at Activision Blizzard as "Project Odyssey," that had been in development for years, wasting thousands of developer-hours and significant company resources.[7]

A slowdown in the cadence of new AAA content harms gamers generally, but specifically harms Plaintiffs and other gamers who play Activision Blizzard games, because many Activision Blizzard

---

[7] Activision Blizzard began work on Project Odyssey in 2017 and first teased it to the public in 2022. *See* Graham Smith, *Blizzard's survival game has already been in development for nearly five years— Games take a long time*, Rock Paper Shotgun (Jan. 30, 2022), available at https://www.rockpapershotgun.com/blizzards-survival-game-has-already-been-in-development-for-nearly-five-years.

games, including AAA titles *Call of Duty: Warzone* and *Overwatch 2* , are "live-service" games.[8] A "live-service" game is a type of video game with a long-term strategy of ongoing content creation meant to engage players indefinitely. *See* Kerry Halladay, *The Never-Ending Story*, Built In (Jan. 31, 2022).[9] To carry out that strategy, game developers design a game that they can continuously update, possibly for years.[10] *See* Sergio Velasquez, *What Are Live-Service Games and How Do They Work?*, Make Use Of (Mar. 10, 2022).[11] Unlike traditional games, live-service games are online multiplayer experiences that gamers can play with or against friends or strangers. *See* Halladay, *supra* note 9 and accompanying text. "Game companies just keep adding content to keep current players 'hooked' and entice other players to pick up the game." *See* Velasquez, *supra* note 11 and accompanying text.

One technique that developers use to entice new players to live-service games is to release the games "free-to-play." *See id.* Rather than charging gamers to play, developers create a revenue stream through "microtransactions" and in-game purchases by releasing new types of content in the form of character "skins," weapons, and maps on a seasonal basis. *See id.* The most popular AAA free-to-play live-service games, including Activision Blizzard's *Call of Duty: Warzone* and *Overwatch 2*, have different themes for each season. *See id.* It is common each season for live-service game developers to give new content to players for free while also providing premium themed content to players who decide to buy the game's season pass. *See id.*

---

[8] Plaintiffs have played multiple Activision Blizzard live-service titles affected by the merger, including games from the *Call of Duty* franchise (e.g., Plaintiffs Jakupko, Galvan, and Owen), games from the *Diablo* franchise (e.g., Plaintiffs Jakupko, Calvo-Pérez, and DeMartini), *World of Warcraft* (e.g., Plaintiff DeMartini), *Overwatch 2* (e.g., Plaintiffs Owen, Loftus, and DeMartini), and *Hearthstone* (e.g., Plaintiffs Owen and DeMartini). *See* Decl. of Hunter Jakupko, dated March 11, 2024, ¶¶ 6-7; Owen Decl. ¶¶ 5-7; Decl. of Ivan Calvo-Pérez, dated March 12, 2024, ¶¶ 2-4; Decl. of Jesse Galvan, dated March 11, 2024, ¶¶ 2-3; Ex. G, Plaintiff Daniel Loftus Supplemental Responses to Defendant Microsoft Corporation's First Set of Interrogatories, dated December 8, 2023, at 3-9; Ex. H, Plaintiff Dante DeMartini's Supplemental Responses to Defendant Microsoft Corporations's First Set of Interrogatories, dated December 8, 2023, at 3-9.

[9] Available at https://builtin.com/gaming/games-as-a-service.

[10] Live-service games are sometimes referred to as games-as-a-service, or "GaaS." *See* Halladay, *supra* note 9 and accompanying text. GaaS is a business model that applies the software-as-a-service model to video games. *See id.* Developers maintain and update the game for technical needs through patches, hotfixes and security updates like any software-as-a-service. *See id.*

[11] Available at https://www.makeuseof.com/live-service-games-what-how-work.

While the "free-to-play" model is common in live-service games, it is not ubiquitous. For example, *Sea of Thieves*, a live-service game developed by Rare and published by Xbox Game Studios, requires players either to purchase the game directly or indirectly through an Xbox Game Pass subscription. *See* Sea of Thieves Store, https://www.seaofthieves.com/buy (last visited Mar. 7, 2024); *see also* Rahul Bhushan, *GTA 5: How to play GTA Online*, Sportskeeda (Jan. 1, 2023) (explaining that gamers must purchase *GTA Online*, the live-service component of the *Grand Theft Auto V* video game, to play it).[12] Regardless of whether a live-service game is free to play, it still requires significant developer support to maintain the game's content cadence. *See* Jeffrey Rousseau, *Report: 95% of studios are working on or aim to release a live service game*, GamesIndustry.biz (Feb. 2, 2024).[13]

Live-service games have fundamentally changed video game creation. *See id.* (reporting that 95% of 537 video game development studios surveyed "are developing or maintaining a live-service game"). "Rather than the linear production process of a traditional game, with its discrete stages—design and prototype, pre-production, production, testing, distribution and retail—that end at game launch, live-service games emphasize post-launch activities." *See* Halladay, *supra* note 9 and accompanying text. "Releasing a game to market is no longer the end but rather the beginning of ongoing service operations in which regular content updates, game optimization, support and community management are key to enduring success." Louis-Etienne Dubois & Johanna Weststar, *Games-as-a-service: Conflicted identities on the new front-line of video game development*, 24 New Media & Society 10, at 2332-2353 (Oct. 2022);[14] *see* Rousseau, *supra* note 13 and accompanying text (reporting that 66% of video game development studios surveyed "agreed that live services are necessary for long-term title success").

Thus, live-service games require a never-ending development cycle, as there are usually two or more concurrent tracks to support a game; one working to support the current available release, and others that are working on the future content that will be added to the game. *See id.* Consumer

---

[12] Available at https://www.sportskeeda.com/gta/gta-5-how-play-online-now.

[13] Available at https://www.gamesindustry.biz/report-95-of-studios-are-working-on-or-aim-to-release-a-live-service-game.

[14] Available at https://journals.sagepub.com/doi/pdf/10.1177/1461444821995815.

expectations for ongoing content updates are high,[15] and AAA game companies are engaged in an

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████. *See* Ex. I, MSFT-2R-02056992, Email from Matt Booty to Phil Spencer, et al. (May 19,

2021, 8:32 AM PT) ███████████████████████████████████████████

████████████████████████████████████████████████. 

Microsoft's massive layoffs of Activision Blizzard personnel therefore diminished Activision Blizzard's

ability to compete in the AAA game market by reducing its ability to continue to service and create

content for its live-service AAA titles.

   To make matters worse, Microsoft has begun chipping away support for Activision Blizzard's

tentpole game franchise, *Call of Duty*. At one point during the pandemic, when the wildly popular

game, *Call of Duty: Warzone,* came out, all nine game studios directly owned by Activision (part of the

larger mega-company Activision Blizzard) supported the *Call of Duty* franchise.[16] *See* Zack Zwiezen,

*Now Every Single Activision Studio Works On Call Of Duty*, Kotaku (April 30, 2021).[17] But in the time

since the merger, two of those studios, Toys for Bob and Sledgehammer Games, both of which were

ravaged by Microsoft's layoffs, have been severed from Activision Blizzard. *See* Roland Li, *Microsoft-

Owned Gaming Giant's Layoffs Hit 162 Bay Area Workers, Offices Closing*, San Francisco Chronicle

(Feb. 6, 2024).[18]

---

[15] *See "Players have no patience", says Blizzard president – "they want new stuff every day, every hour"*, Rock Paper Shotgun (Nov. 7, 2023), available at https://www.rockpapershotgun. com/players-have-no-patience-says-blizzard-ceo-they-want-new-stuff-every-day-every-hour ("People who play videogames want 'new content literally almost every single day', according to Blizzard president Mike Ybarra - indeed, 'they want new stuff every day, every hour.'").

[16] *Call of Duty: Warzone* remains immensely popular in 2024. An estimated 350,000 players are online playing the game at any given time, with around 60 million players logging into the game each month. *See Warzone Player Count in 2024: How Many People Play Warzone?*, Esports.net (Dec. 28, 2023), available at https://www.esports.net/news/cod/warzone-player-count.

[17] Available at https://kotaku.com/now-every-single-activision-studio-works-on-call-of-dut-1846798677.

[18] Available at https://www.sfchronicle.com/tech/article/tech-layoffs-microsoft-activision-blizzard-18651552.php.

If the Court allows Microsoft to continue gutting Activision Blizzard by firing its employees, cancelling or slowing the release of AAA content, and cutting ties with its studios, Plaintiffs will be irreparably harmed in numerous ways. Plaintiffs will be irreparably harmed first because Microsoft's destruction of Activision Blizzard as a vigorous competitor makes Plaintiffs' remedy of divestiture less effective at restoring competition. This Court previously held that because Activision Blizzard could be divested and competition restored, Plaintiffs could not establish irreparable harm. But now Microsoft is irreparably harming the effectiveness of Plaintiffs' remaining remedy, divestiture. Plaintiffs are also harmed because Microsoft is cancelling Activision's games and harming its ability produce and update new content.

Accordingly, Plaintiffs ask the Court to enter a TRO and a preliminary injunction requiring Microsoft to maintain Activision Blizzard as an independent subsidiary, without: (1) terminating more Activision Blizzard employees; (2) further interfering with the development of new Activision Blizzard game content; (3) severing relationships with or closing more Activision Blizzard game studios; or (4) taking any other action that would further irreparably harm Activision Blizzard's ability to compete as an independent company, until Plaintiffs can be heard on the merits at trial.

## II.   PROCEDURAL HISTORY

On May 19, 2023, the Court denied Plaintiffs' motion for a preliminary injunction to temporarily prevent the merger between Microsoft and Activision Blizzard. ECF No. 189. Plaintiffs' motion for preliminary injunction asked the Court to temporarily delay the merger until the Court could hold a trial on the merits to assess the lawfulness of one of the largest mergers of all time. The Court assumed without deciding that the merger was unlawful under Section 7 of the Clayton Act. ECF No. 189 at 1, 5 ("[T]he Court will assume Plaintiffs have met their burden of showing a likelihood of success on the merits."). But the Court still denied the motion on the grounds that Plaintiffs could not show any immediate irreparable harm. *Id.* at 8.

In holding that Plaintiffs failed to show any immediate irreparable harm, the Court stated that "Plaintiffs' injury could be immediate only if the merger, or particularly aspects of the merger, could not be undone." *Id.* at 8. Thus, the Court held that even assuming the merger was unlawful and would harm competition, the Court would still not delay its consummation until the Court could assess the

merits because the Court could simply issue divestiture of the merger later. *See id.* (citing divestiture cases).

Importantly, the Court held that should the facts change, and "Microsoft were to suddenly announce" that it intended to engage in conduct that would irreparably harm Plaintiffs—e.g., by making *Call of Duty* exclusive to Microsoft platforms—Plaintiffs could then seek a new preliminary injunction to prevent the sudden change in conduct. *Id.* at 6. The Court thus held that any sudden reversal in Microsoft's conduct prior to a trial on the merits that would irreparably harm Plaintiffs would be grounds for a new preliminary injunction motion to prevent the sudden change in conduct and preserve the status quo. *Id.*

## III.   RELEVANT FACTS

Microsoft and Activision Blizzard consummated their merger in October 2023. Soon after the merger was complete, new facts began to emerge showing that Microsoft is taking actions to weaken and cripple Activision Blizzard irredeemably as a vigorous competitor.

### A.   Microsoft Ousted Bobby Kotick and Installed Xbox's Matt Booty to Run Activision Blizzard

On December 29, 2023, Bobby Kotick, the longtime CEO, exited Activision Blizzard. *See* Todd Spangler, *Microsoft Sets New Activision Blizzard Management Structure as Bobby Kotick Confirms Exit Date*, Variety (Dec. 20, 2023).[19] Microsoft installed Matt Booty, the current head of Microsoft's Xbox first-party studios, to run Activision Blizzard. *Id.* Microsoft top executives Phil Spencer and Matt Booty now oversee and manage Activision Blizzard.

### B.   Microsoft Terminated 1,900 Gaming Employees, Most of Whom Were Activision Blizzard Employees

On January 25, 2024, Microsoft suddenly announced through a memo from its Gaming CEO, Phil Spencer, that Microsoft was terminating 1,900 of its gaming employees. *See* Warren, *supra*, note 4. The layoffs came just three months after Microsoft assumed legal control over Activision Blizzard. *Id.* The memo Spencer circulated establishes that the layoffs were related to the merger, stating that it was

---

[19] Available at https://variety.com/2023/digital/news/bobby-kotick-exits-activision-blizzard-microsoft-management-1235847653/.

a joint decision from Microsoft and Activision Blizzard, that it was needed to establish a "sustainable

cost structure" across all of Microsoft's gaming divisions, and that it was needed after identifying

"areas of overlap" from the merger. *Id.* The memo stated:

> It's been a little over three months since the Activision, Blizzard, and King teams joined
> Microsoft. As we move forward in 2024, the leadership of Microsoft Gaming and
> Activision Blizzard is committed to aligning on a strategy and an execution plan with a
> sustainable cost structure that will support the whole of our growing business. Together,
> we've set priorities, identified areas of overlap, and ensured that we're all aligned on the
> best opportunities for growth.

*Id.* The firing of 1,900 gaming employees constituted roughly 8% of Microsoft's entire gaming

division, including Xbox, Activision Blizzard, and Bethesda. *Id.* The majority of the employees laid off

were Activision Blizzard employees. *See* Daniel Morris, *Microsoft Announces Major Layoffs*,

GameRant (Jan. 25, 2024).[20]

### C. Microsoft Cancelled a AAA Game in Development at Activision Blizzard that Would Have Competed with *Minecraft*, a Popular Microsoft Game

At the same time as the layoffs, soon after Microsoft took control over Activision Blizzard,

Microsoft cancelled an eagerly-anticipated AAA game in development at Activision Blizzard internally

referred to as "Project Odyssey." *See* TheMajor, *New details have emerged about Blizzard's cancelled

"Project Odyssey" survival game*, GamesEnquirer (Jan. 26, 2024).[21] Project Odyssey was set to be a

new AAA survival and crafting game, similar to *Minecraft* but with superior graphics. *See id. Minecraft*

is one of Microsoft's most successful games, and Project Odyssey would have competed with

*Minecraft*. Project Odyssey had been in the works for years; Activision Blizzard had committed

substantial resources and a development team numbering in the hundreds to the project. *See id.* But on

or around January 25, 2024, Microsoft stopped all development for the new AAA game, *see id.*, and

fired virtually the entire development team. *See* Brendan Lowry, *Microsoft cancels Blizzard's survival

game amid layoffs, shifts developers to "one of several promising new projects*," Windows Central (Jan.

---

[20] Available at https://gamerant.com/microsoft-layoffs-2024-activision-blizzard. More recently, in mid-
February, Microsoft continued its layoffs, "making over 130 people redundant from [Activision
Blizzard's] office in the Republic of Ireland." *See* Calvin, *supra* note 6 and accompanying text.

[21] Available at https://www.gamesenquirer.com/news/new-details-have-emerged-about-blizzards-
cancelled-project-odyssey-survival-game.

25, 2024) (noting that "[o]ne of the visual effects artists that worked on [Project Odyssey] said that 'the entire Survival Team just got laid off'").[22]

Project Odyssey's cancellation came as a surprise. Reports at the time indicated that the game was already in a playable state and that Activision Blizzard had "confidence in the project's direction." *See* Smith, *supra* note 7. Blizzard Entertainment president Mike Ybarra even tweeted, "I've played many hours of this project with the team and I'm incredibly excited about the team's vision and the brand-new world it presents for players to immerse themselves in together." *See* Mike Ybarra (@Qwik), Twitter (Jan. 25, 2022, 10:11 AM).[23] Microsoft claimed that it cancelled the game because of technical issues with the game engine Activision Blizzard was using for the project, and that it would shift some of the project's developers to other projects. *See* Jason Schreier, *Microsoft Cancels New Blizzard Video Game After Six Years of Development*, Bloomberg (Jan. 25, 2024).[24] Many members of the Project Odyssey team were later informed that they were being let go. *See id.; see also* Lowry, *supra* note 22 (stating that the claim of "[o]ne of the visual effects artists that worked on [Project Odyssey] that 'the entire Survival Team just got laid off,' . . . seemingly contradicts Microsoft's stated plan to transfer some of its developers to other projects").

**D.  Microsoft Gutted Activision Blizzard's Esports Staff**

On or around January 30, 2024, Microsoft also terminated around 83% of Activision Blizzard's gaming employees who oversee its esports programming. *See* Cater, *supra* note 5 and accompanying text. The layoffs affected every esports brand under Microsoft, including the Call of Duty League, a professional esports league for the *Call of Duty* franchise, and the Overwatch League, a professional esports league for the video game *Overwatch 2*, both developed and produced by Activision Blizzard.

---

[22] Available at https://www.windowscentral.com/gaming/microsoft-cancels-blizzards-survival-game-amid-layoffs.

[23] Available at https://twitter.com/Qwik/status/1486038936057044993.

[24] Available at https://www.bloomberg.com/news/articles/2024-01-25/microsoft-cancels-big-new-blizzard-game-after-six-years-of-development?leadSource=uverify%20wall.

*See* Will Borger, *Blizzard's Esports Division Among Those Hit by Microsoft Layoffs*, IGN (Jan. 30, 2024).[25]

### E.  Microsoft Severed Ties with Two Activision Blizzard Game Studios

Further, since the merger, two Activision Blizzard game studios, both instrumental to the development of Activision Blizzard's *Call of Duty* franchise, were severed from the company. *See* Li, *supra* note 18 and accompanying text. In Foster City, California, Activision Blizzard's Sledgehammer Games facility, a *Call of Duty* support studio, lost nearly a third of its staff in Microsoft's layoffs and is closing its main offices. *See* Andrej Barovic, *Sledgehammer Games loses 30 percent of staff, main office as Microsoft layoffs hit MW3 dev*, Dot Esports (Jan. 25, 2024).[26] And in Novato, California, the Toys for Bob game studio—which also supported *Call of Duty* and lost 86 employees during Microsoft's layoffs—is shutting down its physical offices and leaving Activision Blizzard to return to its roots as an independent developer. *See* Matt Wales, *Activision's Skylanders, Crash Bandicoot studio Toys for Bob going independent*, Eurogamer (Feb. 29. 2024).[27]

### IV.    LEGAL STANDARD

In the Ninth Circuit, the standards for a TRO and preliminary injunction are the same. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A movant must demonstrate (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm that would result if an injunction were not issued, (3) the balance of equities tips in favor of the plaintiff, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The irreparable injury must be both likely and immediate. *Id.* at 20-22. "[A] plaintiff must demonstrate immediate threatened injury as a prerequisite to [a TRO]." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Boardman v. Pac. Seafood Grp.,* 822 F.3d 1011, 1022–23 (9th Cir. 2016).

---

[25] Available at https://www.ign.com/articles/blizzards-esports-division-among-those-hit-by-microsoft-layoffs.

[26] Available at https://dotesports.com/call-of-duty/news/sledgehammer-games-loses-30-percent-of-staff-main-office-as-microsoft-layoffs-hit-mw3-dev.

[27] Available at https://www.eurogamer.net/activisions-skylanders-crash-bandicoot-studio-toys-for-bob-going-independent.

The Ninth Circuit employs a sliding scale approach, in which "the elements of the [TRO] test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *All for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this approach, courts recognize that a stronger showing on the balancing of hardships and public interest factors lessens the burden for likelihood of success on the merits. *Id.* Thus, a TRO is warranted upon a showing of "serious questions going to the merits," so long as the balance of hardships "tips sharply in [plaintiff's] favor." *Id.*

## V.   ARGUMENT

The Court should issue a temporary restraining order and preliminary injunction requiring Microsoft to preserve the status quo by maintaining Activision Blizzard as an independent subsidiary, without: (1) terminating more Activision Blizzard employees; (2) further interfering with the development of new Activision Blizzard game content; (3) severing relationships with or closing more Activision Blizzard game studios; or (4) taking any other action that would further irreparably harm Activision Blizzard's ability to compete as an independent company until Plaintiffs can be heard on the merits at trial.

### A.   Plaintiffs are Likely to Succeed on the Merits

In the Court's prior order allowing Microsoft and Activision Blizzard to merge before a trial on the merits, the Court did not address the merits and instead "assumed" for purposes of the motion that the merger was unlawful and would substantially lessen competition. *See* ECF No. 189 at 8. Plaintiffs' briefing on that motion establishes that Plaintiffs will likely prevail on the merits. *See* ECF No. 135. Plaintiffs incorporate their previous motion by reference.

Further, Plaintiffs have recently obtained documents through discovery illuminating additional anticompetitive effects of the merger. Activision Blizzard maintains a free online gaming platform, Battle.net, that provides a variety of services including digital game distribution, digital rights management, social networking, and multiplayer online gaming. Plaintiffs' newly uncovered documents show that Activision Blizzard planned as early as 2019 to ███████████████████████████████████████████████████████████████████████████████████████████████. *See, e.g.*, Ex. D, ABK-2R-01410604 at 12 ███████████████████

1 ███████████████████; Ex. E, ABK-2R-01499757 at 4 ████████████████

2 ██████████████████████████████████████████████████████

3 ███████████████████████████████████████; Ex. N [Cabral Rebuttal

4 Report] at 26–27 & n.119–20.

5     The merger therefore killed Activision Blizzard's entry as a new competitor in the content

6 subscription market, further widening Microsoft's competitive moat in that market. *See Xbox Making*

7 *Billion-Dollar Game Pass Bet as Competition Heats Up*, PYMNTS (Dec. 4, 2023) ("Xbox is seeing its

8 massive investment in video game content pay off.").[28] Microsoft was well-aware of Activision

9 Blizzard's competitive threat to ██████████████████████████████████

10 ████████. *See* Ex. F, MSFT-2R-04729484 [Emails from Microsoft Gaming CEO Phil Spencer to

11 Sarah Bond, dated February 5-6, 2020] (Spencer writing that if he worked at Activision Blizzard, he

12 would turn ████████████████████████████████████████

13 ██████████████████████████████████████████████

14 ███████████████████████████████████████

15 ███████████ (p. -9484)).

16     Microsoft pursued a similar strategy with another competitor it acquired, Bethesda Softworks.

17 Documents show that Phil Spencer confirmed that the ████████████████████████

18 ████████████████████████████████████████████████████

19 █████████████████████████████████████████████████

20 ████████████.[29] *See* Ex. J, ABK-2R-01397652 [Microsoft Executive Briefing] at 1 (Apr. 22,

21

22 ───────────────

23 [28] Available at https://www.pymnts.com/subscriptions/2023/xbox-making-billion-dollar-game-pass-bet-as-competition-heats-up.

24 [29] Plaintiffs' expert commented on the anticompetitive effects of Microsoft's strategy for dominating the subscription gaming service market:

25     Excluding rival subscription plans from key content (such as Call of Duty and other AAA

26     Activision games) likely has the effect of partially or totally foreclosing competition in the subscription market. While Microsoft has ostensibly committed to offering Activision's content

27     to Sony's subscription plan, the terms that it offers are effectively equivalent to excluding such content from Sony's subscription. For this reason, it is my belief as an economist that

28     Microsoft's acquisition of Activision will likely substantially lessen competition in this market.

2021). This conduct is particularly virulent given that numerous Microsoft documents disclose that

AAA games—which are necessary for gaming platforms to be successful— ████████████████

████. *See* Ex. K, MSFT-2R-05727022 at 17 ███████████████████████████████████

███████████████; Ex. L, MSFT-2R-13379285 at -9287 ████████████████████████████

████████████ Ex. M, MSFT-2R-05721672 at -1672 (noting ████████████████████████

████████████████████████████████).

    Dr. Luís Cabral, an economist at New York University, has reviewed the discovery material in

this case and has concluded that the merger is likely to substantially lessen competition across the

gaming industry, most pronouncedly in the content subscription market of Xbox's Game Pass. *See* Ex.

B [Cabral Rep.]; Ex. C, [Cabral Rep. 2]; Ex. N, [Cabral Rebuttal Rep.].

    Plaintiffs are thus likely to prevail on the merits at trial and show that this merger may

substantially lessen competition in numerous markets. *See* 15 U.S.C. § 18. At minimum, given that the

equities tip sharply in Plaintiffs' favor, *see infra* Part V.C., the Court need only find that there are

serious questions going to the merits to warrant preserving the status quo until the Court can address the

legality of this merger on the merits.

### B. Plaintiffs Will Suffer Irreparable Harm without a TRO

    If the Court declines to issue a TRO, Plaintiffs will be irreparably harmed because the

divestiture remedy will be less effective, if effective at all. In its Order denying Plaintiffs motion for a

preliminary injunction, the Court noted that if Microsoft began taking actions that would harm plaintiffs

or competition, the Court could enter a preliminary injunction at that time. *See* ECF No. 189 at 6; *see

also Saint Alphonsus Med. Ctr.—Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, No. 1:12-CV-560-BLW,

2012 WL 6651167, at *3 (D. Idaho Dec. 20, 2012)) ("If the representations of St. Luke's counsel prove

not to be true, and St. Al's experiences a measurable reduction in referrals, it can bring that fact to the

Court's attention at trial. And, if referrals are reduced, St. Al's may seek a preliminary injunction to bar

any further steps towards integration of Saltzer into St. Luke's until after a final decision has been

Ex. N, Rebuttal Expert Report of Professor Luís Cabral, Ph.D., dated March 4, 2024 ("Cabral Rebuttal
Rep."). As noted below, Microsoft's market dominance allows it to raise Game Pass subscription prices
at will.

issued."). As described above, Microsoft is taking action that is irreparably harming Activision Blizzard's ability to compete independently in the video game market, including: (1) terminating hundreds of Activision Blizzard employees; (2) firing 83% of Activision Blizzard's esports staff; (3) cancelling at least one eagerly-anticipated Activision Blizzard game that had been in development for years; and (4) severing ties with two Activision Blizzard game studios instrumental to the development of Activision Blizzard's tentpole franchise, *Call of Duty*. If the Court does not stop Microsoft's dismantling of Activision Blizzard now, there may be nothing left to divest when Plaintiffs ultimately win on the merits.

Additionally, Plaintiffs are currently being irreparably harmed, and risk further irreparable harm if the Court declines to take action, because Microsoft is now cancelling AAA content and slowing the development cycle for new content in AAA live-service games. Plaintiffs will therefore have no opportunity to enjoy the content that is cancelled and will receive less new content for live-service games that they play or plan to play once the content is released. Indeed, Plaintiffs were eagerly anticipating playing Project Odyssey before it was cancelled. *See, e.g.*, Jakupko Decl. ¶¶ 2-5; Owen Decl. ¶¶ 2-4; *see also* Declaration of Dante DeMartini, dated March 12, 2024, ¶¶ 2-5 (stating that he is an "open-world survival…game lover," that he has played over 1,000 hours of the crafting and survival game, *Rust*, that he has played hundreds of hours of the crafting and survival game, *Minecraft*, and that he likely would have wanted to play Project Odyssey had it been released). Plaintiffs also had high expectations for ongoing content updates to the live-service Activision Blizzard games they were playing. *See supra* note 8 and documents cited therein.

Microsoft cannot reasonably argue that the significant structural changes it has made to Activision Blizzard's business flowed naturally from increased efficiencies resulting from the merger. Microsoft CFO Amy Hood testified that prior to the acquisition of Activision Blizzard, "cost savings opportunities" were not a "meaningful component" of the merger. Ex. O, Deposition of Amy Hood, dated September 27, 2023 ("Hood Dep."), at 112:12–19. Moreover, it is reasonable to assume that any "cost savings opportunities" realized by the merger would be reflected in a reduced price for Microsoft and/or Activision Blizzard gaming products. But in September 2023, Microsoft actually *raised* the prices of its Game Pass by more than 10%. *See* Rory Young, *Another Xbox Game Pass Price Increase*

1   *is 'Inevitable'*, GameRant (Sept. 25, 2023). Game Pass for console and PC increased by $1 per month

2   (a 10% increase), and Game Pass Ultimate increased by $2 per month (a 13% increase).[30] *See id.*

3   Plaintiff Beowulf Owen began paying the increased Game Pass prices in September 2023. *See* Owen

4   Decl. ¶ 8 and Ex. 1 (screenshot of Beowulf Owen's payments from June 2023 through October 2023 for

5   his Xbox Game Pass subscription). Notably, Microsoft told this Court that Game Pass prices would not

6   increase as a result of the merger. *See FTC v. Microsoft,* 23-cv-02880, Def's Mem. Of Law In Opp. to

7   Mot. For Prel. Injunction, ECF No. 109-3, at 20 ██████████████████████████████

8   ████████████████████████████████████████████████████████████████

9   ████████████████████████████ (emphasis added).

10   ### C.   The Balance of Equities and the Public Interest Weigh in Plaintiffs' Favor

11   The balance of equities and the public interest tip sharply in Plaintiffs' favor. Now that the

12   merger is complete, Microsoft has exercised its power to do as it pleases with Activision Blizzard,

13   regardless of the resulting impact on Activision Blizzard's ability to compete as an independent entity,

14   or on competition in the video game industry generally. Microsoft has eliminated parts of Activision

15   Blizzard's business, actions which, if allowed to continue, may ensure Activision Blizzard's inability to

16   function as a viable competitor if the Court ultimately orders divestiture. Thus, failing to issue a TRO

17   and preliminary injunction requiring Microsoft to maintain Activision Blizzard as a wholly independent

18   subsidiary, and allowing Microsoft to continue eliminating parts of Activision Blizzard's business,

19   would directly cut against the Court's Order denying Plaintiffs' motion for preliminary injunction. *See*

20   ECF No. 189.

21   In its opposition to Plaintiffs' motion for a preliminary injunction, Microsoft argued that the

22   preliminary injunction should be denied because Plaintiffs had "not proven that the merger would

23   scramble eggs that could not be unscrambled." ECF No. 162- 2, at 11 & n.11. Microsoft then asserted

24   that "Microsoft and Activision will remain separate entities post-merger, in a parent-subsidiary

25   relationship," citing to the declaration of Tim Stuart. *Id.* Similarly, Microsoft CFO Amy Hood testified

---

[30] Microsoft's increases in Game Pass pricing are just what Plaintiffs' expert predicted: "when a firm merges with a competitor that previously provided a competitive constraint, the merged entity can now profitably raise prices or degrade non-price aspects of its competitive offering (such as quality, range, service and innovation) on its own." Ex. B, Cabral Rep., at 22.

that the acquisition was not based on any cost-savings that could be accomplished by eliminating any parts of Activision that are redundant to Microsoft. *See* Ex. O, Hood Dep., at 115:8-20 ("Cost savings [through elimination of redundancy] I would expect to be a very small fraction of [the deal value]. And when I say 'very small,' very, very small."); *id.* at 112:15–19 ("Yes, I do run a process to see if there are cost savings opportunities, although that wasn't, in our board of directors' deck, a meaningful component."). According to Hood, Microsoft's purchase of Activision Blizzard was not based on eliminating any redundancies, and the rationale for the deal was to keep Activision Blizzard intact to continue creating, publishing, and selling games in the ways it has always done, as an independent subsidiary of Microsoft. *See id.* Thus, issuing a TRO and preliminary injunction requiring Microsoft to maintain Activision Blizzard as an independent subsidiary of Microsoft, and not to take any action that would harm Activision Blizzard's ability to compete, would not prejudice Microsoft: indeed, it would simply require Microsoft to act consistently with its representations to this Court.

The Court credited Microsoft's representations and based its decision in part on the assumption that Microsoft and Activision Blizzard would be maintained as wholly separate entities that could be easily divested. *See* ECF No. 189 at 8. This assumption was critical to the Court's holding that Plaintiffs could not show irreparable harm, because the Court also assumed that if Plaintiffs prevailed on the merits after the acquisition was completed, divesture would follow. *Id.* The Court stated that "the plaintiff's injury could be immediate only if the merger, or particular aspects of the merger, could not be undone." *Id.* Further, "Plaintiffs have not demonstrated that fact, especially given that following the merger Activision will continue to exist as a subsidiary of Microsoft." *Id.* Thus, the Court's reliance on Microsoft's representations that it would hold Activision Blizzard separate as an independent subsidiary—representations that were hollow in hindsight—was central to the Court's holding that divestiture would be readily achievable. *Id.* (quoting *American Stores*, 495 U.S. at 281). It would therefore be inequitable to deny Plaintiffs' motion for a preliminary injunction on the ground that divesture could be issued, yet subsequently greenlight Microsoft's gutting of Activision Blizzard and altering the factual circumstances on which the Court premised its denial. *See Saint Alphonsus Med. Ctr.—Nampa, Inc.*, 2012 WL 6651167 at *3; *see also* ECF No. 189 at 6 ("Further, if Microsoft were to

suddenly announce it is going to [take actions that would irreparably harm Plaintiffs] . . . a preliminary injunction could be entered at that time.").

Failing to issue a TRO would allow Microsoft to continue doing what it unambiguously assured the Court it would not do. *See* ECF No. 162-2, at 11 & n.11. ("To the contrary, Microsoft and Activision will remain separate entities post-merger, in a parent-subsidiary relationship."). Indeed, given that the Court denied Plaintiffs' motion for a preliminary injunction precisely because Plaintiffs would be able to get divestiture, which would be "simple, relatively easy to administer, and sure," ECF No. 189 at 8, it would be unjust and highly prejudicial to allow Microsoft to gut Activision Blizzard, making Plaintiffs' remedy of divestiture incapable of fully restoring competition. Allowing Microsoft to continue laying off Activision employees and cancel Activision games would not only irreparably harm Activision Blizzard, but it would also irreparably harm the players of its games, including Plaintiffs, and competition generally in the video game industry. Moreover, Plaintiffs motion only seeks to maintain the status quo for a short time until the Court can address the legality of this mega-merger on the merits.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter a TRO prior to 8:59 p.m. Pacific Time on March 18, 2024, or as soon thereafter as the Court deems proper, and issue a preliminary injunction requiring Microsoft to preserve the status quo by maintaining Activision Blizzard as an independent subsidiary, without: (1) terminating more Activision Blizzard employees; (2) further interfering with the development of new Activision Blizzard game content; (3) severing relationships with or closing more Activision Blizzard game studios; or (4) taking any other action that would further irreparably harm Activision Blizzard's ability to compete as an independent company, until Plaintiffs can be heard on the merits at trial.

Dated: March 13, 2024

By: _____/s/ Joseph R. Saveri_____
Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone:    (415) 500-6800
Facsimile:    (415) 395-9940
Email:       jsaveri@saverilawfirm.com
            czirpoli@saverilawfirm.com
            eabuchanan@saverilawfirm.com
            dseidel@saverilawfirm.com
            kmcmahon@saverilawfirm.com

Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone:    (415) 434-8900
Facsimile:    (415) 434-9200
Email:       jmalioto@aliotolaw.com
            twallace@aliotolaw.com

Joseph M. Alioto Jr. (SBN 215544)
**ALIOTO LEGAL**
100 Pine Street, Suite 1250
San Francisco, California 94111
Tel: (415) 398-3800
Email:       joseph@aliotolegal.com
            twallace@aliotolaw.com

*Plaintiffs' Counsel*