Joseph M. Alioto (State Bar No. 42680)
Tatiana V. Wallace (State Bar No. 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email: jmalioto@aliotolaw.com
twallace@aliotolaw.com

Joseph R. Saveri (State Bar No. 130064)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, CA 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
eabuchanan@saverilawfirm.com
dseidel@saverilawfirm.com
kmcmahon@saverilawfirm.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

DANTE DEMARTINI, et al.,

Plaintiffs,

v.

MICROSOFT CORPORATION, a Washington corporation,

Defendant.

Case No. 3:22-cv-08991-JSC

**PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION**

**REDACTED**

Hon: Jacqueline Scott Corley

Case No. 3:22-cv-08991-JSC
PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 3

A. Plaintiffs Will Be Irreparably Harmed if the Court Blesses Microsoft's Continued Dismantling of Activision Blizzard. ..... 4

B. Microsoft Hardly Disputes That Plaintiffs Are Likely to Succeed on the Merits ..... 7

C. The Balance of Equities Tip in Plaintiffs' Favor and Are in the Public Interest. ..... 8

D. This Court Has Jurisdiction To Impose Plaintiffs' Requested Relief and Preserve the Status Quo ..... 9

E. Microsoft's Argument That This is Merely a Motion for Reconsideration Ignores Microsoft's Intervening Conduct ..... 11

F. Microsoft's Delay Arguments Are Inapposite ..... 13

III. CONCLUSION ..... 15

Case No. 3:22-cv-08991-JSC i

PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Arc of Cal. v. Douglas*, 757 F.3d 975 (9th Cir. 2014) ........ 13, 14

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........ 1

*Coastal Transfer Co. v. Toyota Motor Sales*, 833 F.2d 208 (9th Cir. 1987) ........ 11

*F.T.C. v. Whole Foods Market, Inc.*, 548 F.3d 1028 (D.C. Cir. 2008) ........ 3

*Ford Motor Co. v. United States*, 405 U.S. 563 (1972) ........ 8

*Hurry v. Fin. Indus. Regul. Auth., Inc.*, 782 F. App'x 600 (9th Cir. 2019) ........ 7

*Lansdown v. Bayview Loan Servicing, LLC*, No. 22-CV-00763-TSH, 2023 WL 2934932 (N.D. Cal. Apr. 12, 2023) ........ 5

*Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211 (9th Cir. 1984) ........ 13

*Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163 (9th Cir. 2001) ........ 9, 10

*Qureshi v. Countrywide Home Loans, Inc.*, No. 09–4198, 2010 WL 841669 (N.D. Cal. Mar. 10, 2010) ........ 7

*Sch. Dist. No. 1J Multnomah County, Oregon v. ACandS, Inc.,* 5 F.3d 1255 (9th Cir. 1993) ........ 11

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125 (C.D. Cal. 2011) ........ 7

*United States v. Coca-Cola Bottling Co. of Los Angeles*, 575 F.2d 222 (9th Cir. 1978) ........ 5

*Unites States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111 (E.D. Cal. 2001) ........ 11

**Federal Statutes**

Clayton Act § 7 ........ 1, 3, 8

Case No. 3:22-cv-08991-JSC ii

PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION

## I.   INTRODUCTION

Plaintiffs' Motion shows that everything that Plaintiffs predicted would happen as a result of the merger is now, in fact, happening. Prices have increased on Game Pass. Already scarce AAA content is now being eliminated by Microsoft. Quality and output of live-service content is being reduced. And Microsoft has instituted mass layoffs that threaten further quality and content reductions. Indeed, Plaintiffs and their economist predicted that these were the likely consequences of this merger based on basic economic principles. And the Supreme Court affirmed the same principles as far back as 1972, in its famous *Brown Shoe* decision:

> A company's history of expansion through mergers presents a different economic picture than a history of expansion through unilateral growth. Internal expansion is more likely to be the result of increased demand for the company's products and is more likely to provide increased investment in plants, more jobs and greater output. Conversely, expansion through merger is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output. It was for these reasons, among others, Congress expressed its disapproval of successive acquisitions. Section 7 was enacted to prevent even small mergers that added to concentration in an industry.

*Brown Shoe Co. v. United States*, 370 U.S. 294, 346 (1962).

Microsoft concedes virtually all of the facts set forth in Plaintiffs' Motion. Microsoft fails to rebut Plaintiffs' arguments head on, wholly ignoring many arguments and declining to put forth evidence in opposition. Microsoft also fails to put forward any declarations under oath about its own current or future conduct. And Microsoft fails to put forward any expert opposition to the Cabral reports, which Plaintiffs submitted in support of their Motion. Microsoft has, in effect, abandoned any real opposition to Plaintiffs' Motion, instead asking the Court to deny the motion on erroneous procedural objections. But its procedural arguments lack merit. Thus, given that Microsoft has failed to meaningfully and adequately respond to Plaintiffs' arguments, the Court should grant Plaintiffs' Motion and fashion an appropriate equitable relief to preserve the status quo and prevent irreparable harm.

For example, Microsoft wholly fails to respond to arguments in Plaintiffs' Motion concerning Microsoft's reduction and destruction of Activision's live-service gaming content. Indeed, that was a focal point of Plaintiff's Motion, showing that Microsoft's post-merger conduct is irreparably harming Plaintiffs' access to AAA content in live-service games. Plaintiffs noted the irreparable harm Microsoft is causing to live-service gaming content, which Plaintiffs rely on and enjoy. Yet Microsoft ignores this

issue completely. Microsoft's failure to respond concedes that the damage Microsoft has done to Activision Blizzard's live-service games constitutes irreparable harm. And with respect to Microsoft's cancellation of Project Odyssey—a game that was years in the making and would have competed with *Minecraft*—Microsoft's sole opposition is that these Plaintiffs did not *really* want to play it, while failing to even address Mr. DeMartini's declarations about it.

Further, Plaintiffs submitted expert reports from an economist at New York University, Dr. Luís Cabral. Those reports opine that the merger is likely to substantially lessen competition in the markets for AAA games, content subscriptions, cloud-gaming, and consoles. Yet Microsoft fails to put forward any shred of evidence rebutting the reports. Microsoft did not submit any expert report in opposition. Microsoft could have at least tried to rebut Plaintiffs' evidence, but it chose not to.

Instead, Microsoft asks this Court to greenlight its dismantling of Activision Blizzard on several procedural grounds. But Microsoft's procedural arguments are baseless and ignore the intervening conduct in which Microsoft has engaged. For example, much of Microsoft's Opposition focuses on alleged "delay." But Microsoft cites the same case law Plaintiffs cite that authorizes the Court to maintain the status quo during pendency of an appeal. Moreover, the facts show that Plaintiffs acted promptly once they determined that Microsoft's incremental dismantling of Activision Blizzard threatened the viability of divestiture as a remedy in this case, a remedy the Court assumed would be easy to carry out and effective at restoring competition upon a judgment for Plaintiffs.

Indeed, Microsoft offers no real evidence of "delay," because Microsoft fails to address that Microsoft's post-merger diminishment of Activision came gradually through various news reports, that Plaintiffs had to piece together and decide when "enough was enough" to warrant emergency relief. And the only exhibits Microsoft puts forward in support of its Opposition are two deposition excerpts addressing what former Activision Blizzard CEO Bobby Kotick planned to do after the merger. But that is a non-sequitur. Plaintiffs' Motion is not based solely on the fact that Microsoft removed Mr. Kotick. It is based on Microsoft's conduct in the aggregate, occurring over time, which Plaintiffs could only uncover through news reports. Plaintiffs do not know what Microsoft internally plans for Activision Blizzard; only Microsoft knows what will happen to Activision Blizzard next. Aside from filing this Motion, Plaintiffs have no recourse and are left to read news report after news report detailing

Microsoft's diminishment of Activision Blizzard as a viable competitor in phases, an ongoing process that will continue without this Court's intervention.

Microsoft has previously argued to this Court that the merger would not increase prices. But that is now proven untrue. *See* ECF No. 350 at 22 (detailing Microsoft's September 2023 price hike for the Xbox Game Pass). Microsoft also asserted that the merger was output expanding in that Activision's games would not go into the subscription market absent the merger. But the newly disclosed documents discredit that claim: [REDACTED] [REDACTED]. Microsoft has repeatedly asserted that Plaintiffs' irreparable harm was "too speculative and unsupported to support injunctive relief." ECF No. 163 at 7; *see id.* at 12–13, 15–19 (repeatedly labelling Plaintiffs' irreparable harm "speculative"). Indeed, Microsoft tries the same ploy again here, labeling Plaintiffs undisputed evidence as mere "speculation" eight different times in its opposition. Well, now that the merger is complete and the harms predicted have been realized, Microsoft cannot reasonably still claim that Plaintiffs are "speculating." Each of the harms is now coming true, just as basic economic theory predicted. Injunctive relief is therefore urgently needed.

## II. ARGUMENT

Microsoft is trifling with the Court's prior order when it says that in denying a preliminary injunction to delay the merger, the Court effectively blessed and approved of Microsoft's diminishment and reduction in Activision Blizzard content, making divestiture a potentially impotent remedy to restore competition. In fact, the Court's prior order said the opposite. The Court's prior order denied the preliminary injunction *specifically because* it held that Plaintiffs could get effective relief post-merger through divestiture. It would therefore be highly inequitable for the Court to now allow Microsoft to continue taking actions that are gradually cutting back Activision's ability to make AAA content and harming this Court's ability to issue effective post-merger remedies.

Microsoft is also trifling with Section 7 of the Clayton Act and the United States antitrust laws when it says this Court does not have the power to issue equitable relief to preserve the status quo. *See F.T.C. v. Whole Foods Market, Inc.*, 548 F.3d 1028, 1033 (D.C. Cir. 2008) (holding district courts retain "large discretion" post-merger to create remedies "effective to redress [antitrust] violations").

Considering the conduct Microsoft has taken and continues to take, this Court should issue appropriate equitable remedies to ensure that divestiture remains an effective remedy at restoring competition.

**A. Plaintiffs Will Be Irreparably Harmed if the Court Blesses Microsoft's Continued Dismantling of Activision Blizzard.**

In Plaintiffs' motion, Plaintiffs asserted two types of irreparable harm. First, allowing Microsoft to continue to dismantle Activision Blizzard irreparably harms Plaintiffs' ability to seek effective relief and restore competition to the pre-merger status quo. ECF No. 350 at 14–15. And second, the continued diminishment of Activision Blizzard's AAA content is irreparably harming plaintiffs through the cancellation and reduction in gaming content that Plaintiffs rely on and enjoy. *Id.* at 15–16.

Microsoft's opposition fails to address these harms. *See* ECF No. 367 at 9–10. Instead, Microsoft invites this Court to err by asserting that the Court may deny the motion simply on the ground that it previously denied Plaintiffs' motion for preliminary injunction to delay the closing of the merger. *Id.* at 9. But that argument fails to account for Microsoft's conduct post-merger that has now changed the facts in ways that irreparably harm and threaten further irreparable harm to Plaintiffs. And it contravenes the Court's Order that if Microsoft began taking actions that would irreparably harm plaintiffs or competition, Plaintiffs could then seek relief from the Court (just as it is doing now), and the Court could enter a preliminary injunction upon a showing of such post-merger conduct. *See* ECF No. 189 at 6. Now is that time.

Moreover, Microsoft baselessly assumes that the only conceivable irreparable harm that could warrant equitable relief to preserve the status quo is if Microsoft directly prevents Plaintiffs from playing *Call of Duty* and only *Call of Duty*. *See* ECF No. 367 at 9 (arguing that Plaintiffs cannot show that Microsoft "will undermine their access to *Call of Duty*."). Microsoft also wrongly asserts without any citation that Plaintiffs' complaint is solely about whether "Microsoft will make *Call of Duty* exclusive to its own platforms." *Id.* That is not what Plaintiffs allege and that is not the only thing this case is about. Microsoft may wish it so, but that is unquestionably false. *See* Pls' Compl. (ECF No. 84).

With respect to Plaintiffs' argument that allowing Microsoft to continue to dismantle Activision Blizzard will irreparably harm Plaintiffs' ability to get effective relief when they prevail on the merits at trial, Microsoft fails even to respond. *See id.* at 9–10. But that is precisely what preliminary relief is

Case No. 3:22-cv-08991-JSC 4

PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION

for—to preserve the status quo so that effective relief can be issued when and if Plaintiffs prevail on the merits. Indeed, this Court denied Plaintiffs' previous motion to delay the merger until a trial on the merits specifically because it held that Plaintiffs could get effective relief post-merger. *See* ECF No. 350 at 9, 14–15. Yet Microsoft is now taking action that if continued, threatens effective post-merger relief and threatens any hope of restoring competition back to the status quo. *See, e.g.*, *United States v. Coca-Cola Bottling Co. of Los Angeles*, 575 F.2d 222, 232 (9th Cir. 1978) (district court had discretion to order a preliminary injunction maintaining the status quo "to preserve the possibility of a decree of rescission at the conclusion of trial," notwithstanding fact that sale had been consummated and seller had distributed more than $2 million of consideration). Microsoft ignores this entirely and thus concedes it. *See, e.g., Lansdown v. Bayview Loan Servicing, LLC*, No. 22-CV-00763-TSH, 2023 WL 2934932, at *4 (N.D. Cal. Apr. 12, 2023) ("[A] failure to respond in an opposition to an argument constitutes waiver or abandonment, and thus 'concedes the argument.'").

Microsoft's only rejoinder is in its relevant background section, in which Microsoft asserts only that the "reduction in force" does not undermine Microsoft's prior commitments that it has "structured and is operating the post-merger company in a way that will readily enable it to divest any or all of the Activision businesses as robust market participants." ECF No. 367 at 5. But this ipse dixit statement, which contains no citation to any declaration or shred of evidence, is directly contradicted by the facts put forward in Plaintiffs' motion. For example, when divestiture is ordered, Activision Blizzard will no longer have *Project Odyssey* to compete with Microsoft's *Minecraft*, and will no longer have the team that was working on it, since virtually the entire *Project Odyssey* team was fired. *See* ECF No. 350 at 17. If this Court greenlights Microsoft's ability to cancel more AAA games, fire more Activision teams, and sever and weaken ties to more Activision studios, Activision will be even less of a "robust competitor" and both competition and AAA content will be irreparably lost. Microsoft's actions have already harmed Activision's ability to compete as an independent entity and Microsoft does not dispute that *Project Odyssey* is now gone forever. The irreparable harm will increase if Microsoft is allowed to continue down this path.

Further, Microsoft argues that the cancellation of *Project Odyssey*—and the threat that Microsoft will continue cancelling, diminishing, and reducing Activision's AAA content output—is

"not tied to any immediate harm to [Plaintiffs]." ECF No. 367 at 10. But Microsoft's bald assertion is incompatible with Plaintiffs' declarations, as well as the obvious link between gaming content and the gamers (these Plaintiffs) who rely on them. In fact, Microsoft concedes that these Plaintiffs wished to play *Project Odyssey* had it been released, *id.* at 10 (citing to Jakupko and Owen Declarations), but then misleads the Court on what those declarations say. *Compare id.* ("the most they could say was that it 'looked interesting' or 'looked fun'"), *with* ECF No. 350-20 [Jakupko Decl.] at ¶ 5 ("Had Activision Blizzard completed and released Project Odyssey, I would have wanted to play it.") *and* ECF No. 350-21 [Owen Decl.] at ¶ 4 (same). Microsoft then inexplicably ignores the declaration of Dante DeMartini, who stated that *Project Odyssey* was within his favorite genre of games: open-world survival and crafting games. *See* ECF No. 350-18 [DeMartini Decl.] at ¶¶ 2–4. He has played over 1,000 hours of other similar open-world survival and crafting games, including *Rust* and *Minecraft*, and he wanted to play *Project Odyssey*. *Id.* Indeed, it appears that Microsoft did not even bother to read the declaration of Dante DeMartini, as Microsoft wrongly states that "only two" Plaintiffs expressed interest in playing *Project Odyssey*, citing only the Jakupko and Owen declarations. ECF No. 367 at 10.

In the same vein, Plaintiffs explained in their Motion how "[a] slowdown in the cadence of new AAA content harms gamers generally, but specifically harms Plaintiffs and other gamers who play Activision Blizzard games, because many Activision Blizzard games, including AAA titles *Call of Duty: Warzone* and *Overwatch 2*, are 'live-service' games."[1] ECF No. 350 at 3–4. Live service games seek to engage existing players and attract new players indefinitely through a steady stream of content updates. *Id*. at 4. "Releasing a game to market is no longer the end but rather the beginning of ongoing service operations in which regular content updates, game optimization, support and community management are key to enduring success." *Id.* at 5. Live-service games therefore require significant development support post-release. *Id.* at 4.

[1] Plaintiffs have played multiple Activision Blizzard live-service titles affected by the merger, including games from the *Call of Duty* franchise, games from the *Diablo* franchise, *World of Warcraft*, *Overwatch 2*, and *Hearthstone*. *See* ECF No. 350 at 11 n.8 (citing various Plaintiffs' declarations and interrogatory responses).

Case No. 3:22-cv-08991-JSC 6
PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION

Consumer expectations for ongoing content updates in live-service games are high,[2] and AAA game companies are engaged in an [REDACTED]. *See* ECF No. 347-8, Ex. I, MSFT-2R-02056992, Email from Matt Booty to Phil Spencer, et al. (May 19, 2021, 8:32 AM PT) [REDACTED]. These facts establish that Microsoft's massive layoffs diminished Activision Blizzard's ability to compete as an independent company by reducing its ability to continue to service and create content for its live-service AAA titles. Nonetheless, Microsoft *completely ignores* these facts and fails to discuss the arguments Plaintiffs draw from them. In fact, incredibly, although Plaintiffs' discussion of live-service games features prominently in their Motion, *see* ECF No. 350 at 10-13, Microsoft's Opposition *does not even mention* the words, "live-service," once. Defendants' "failure to respond to that argument constitutes waiver." *Hurry v. Fin. Indus. Regul. Auth., Inc.*, 782 F. App'x 600, 602 (9th Cir. 2019).[3]

### B. Microsoft Hardly Disputes That Plaintiffs Are Likely to Succeed on the Merits

Microsoft barley attempts to dispute that Plaintiffs are likely to succeed on the merits. Instead, Microsoft states that the Court "need not address the likelihood of success on the merits." ECF No. 367 at 10. Microsoft further pushes the conclusory nonsense that "none of the arguments in Plaintiffs' motion itself relate to any of their live claims before the Court." *Id.* Not so. Plaintiffs attached the expert reports of Dr. Cabral, an economist at New York University, who explained and opined that the merger would likely substantially lessen competition in the markets for AAA games, consoles, cloud gaming providers, and content subscription services such as Game Pass. *See* ECF No 347-5; ECF No. 347-6 at 30. Microsoft failed to put forward even a shred of evidence to controvert Dr.

---

[2] *See "Players have no patience", says Blizzard president – "they want new stuff every day, every hour"*, Rock Paper Shotgun (Nov. 7, 2023), available at https://www.rockpapershotgun. com/players-have-no-patience-says-blizzard-ceo-they-want-new-stuff-every-day-every-hour.

[3] *See, e.g.*, *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("[I]n most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue."); *Qureshi v. Countrywide Home Loans, Inc.*, No. 09–4198, 2010 WL 841669, at *6 n.2 (N.D. Cal. Mar. 10, 2010) (deeming plaintiff's failure to address in opposition brief claims challenged in a motion to dismiss, an "abandonment of those claims").

Case No. 3:22-cv-08991-JSC 7

PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION

Cabral's opinions. Dr. Cabral's reports are thus entirely unrebutted here. Dr. Cabral's unrebutted reports are alone sufficient to establish that Plaintiffs are likely to prevail at trial.

Moreover, Plaintiffs have put forward recently uncovered documents showing that Activision was considering turning [REDACTED] [REDACTED]. Microsoft does not dispute this at all, merely saying that some similar documents "on this topic" were produced in April 2023, and that they are entirely irrelevant because "they relate only to a horizontal claim about Activision as a competitor" to Game Pass. ECF No. 367 at 11. But the uncontroverted evidence showing that this merger precludes Activision's entry into the subscription market is highly relevant to Plaintiffs' Section 7 claim in two ways: First, it shows that the merger may substantially lessen competition in the subscription market by precluding Activision from ever entering the market and competing with Game Pass. *See Ford Motor Co. v. United States*, 405 U.S. 563 (1972) (holding that elimination of a potential nascent competitor who may have entered the market was sufficient grounds to find the merger unlawful under Section 7). Second, it shows that the merger may substantially lessen competition in the subscription market because had Activision turned [REDACTED] [REDACTED] [REDACTED] not exclusively into Game Pass. But by acquiring Activision Blizzard, Microsoft can now capture Activision's AAA content and put it exclusively into Game Pass, withholding it from other rival subscriptions. *See* Pls' Mot. (ECF No. 350) at 12–14. This evidence also contradicts Microsoft's assertions that Activision's content would not have come into the subscription market but for the merger. Indeed, this evidence is sufficient by itself to find this merger unlawful. Asking this Court to ignore this glaring evidence as somehow irrelevant invites this court to commit error.

**C. The Balance of Equities Tip in Plaintiffs' Favor and Are in the Public Interest.**

Microsoft's response to the balancing of the equities is hardly a response at all. Microsoft asserts that any injunctive relief that is unduly "vague" or would "restrict Microsoft" would be "extreme and untenable." But Plaintiffs requested relief is tailored to three specific areas: (1) preserving AAA games being developed at Activision Blizzard; (2) preserving Activision' gaming development talent; and (3) preserving the relationships with game development studios that Activision had for years

Case No. 3:22-cv-08991-JSC 8
PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION

before the merger. These specific requests are necessary to ensure that Activision Blizzard may be divested in the same form as it existed before: the preeminent independent AAA game publisher.

Moreover, Microsoft cannot complain of undue hardship when it took the risk in merging, and when it alone chose to engage in the conduct complained of. That is doubly true because it was Microsoft that assured the Court that it would maintain Activision as a separate subsidiary. *See* Def's Opp. to Mot. for Prelim. Inj., ECF No. 162-2, at 11 & n.11. The Court denied Plaintiffs' motion for a preliminary injunction previously on the specific ground that divestiture remained an adequate remedy because Activision would be maintained as a separate entity.

Preserving the competitive status quo is also in the public interest. As the Ninth Circuit has held, "the central purpose of the antitrust laws, state and federal, is to preserve competition," which is "vital to the public interest." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016). As Justice Thurgood Marshall aptly stated: "Antitrust laws . . . are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms." *United States v. Topco Assocs., Inc*., 405 U.S. 596, 610 (1972).

This Court has ample discretion to fashion an appropriate remedy. For example, in the alternative, this Court could order that Microsoft provide advanced notice to Plaintiffs and/or the Court before (1) cancelling any more AAA games currently in development; (2) firing Activision employees; or (3) severing any ties to game development studios. Such a requirement notice would provide Plaintiffs and the Court with advanced notice such that the issues could be adequately assessed to preserve the status quo and ensure that competition can be restored to as close to the pre-merger state as possible. As it stands now, Plaintiffs and the Court are likely only seeing the very tip of the iceberg through public reports, which hampers Plaintiffs ability to raise issues with the Court.

### D. This Court Has Jurisdiction To Impose Plaintiffs' Requested Relief and Preserve the Status Quo

The parties agree that the Court "retains jurisdiction during the pendency of an appeal to act to preserve the status quo." *Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d 1163, 1166 (9th Cir. 2001) (cited in Microsoft's brief for the same proposition, ECF No. 367 at 6). Microsoft argues,

Case No. 3:22-cv-08991-JSC 9
PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION

however, that the Court already declined to order Microsoft to maintain the status quo when it denied Plaintiffs' Motion to Hold Separate (ECF. No. 290), a motion that sought similar relief to what Plaintiffs seek now. But Microsoft ignores the fact that Plaintiffs filed their Motion to Hold Separate *before* the merger was complete and, thus, *before* Microsoft began diminishing and dismantling Activision Blizzard and its AAA content production pipeline, a process that is now ongoing. The factual predicate of that motion is therefore distinct from the one presently before the Court; it was a different "status quo." Here, Plaintiffs base their Motion on actual post-merger actions that Microsoft took and *continues to take* that inarguably render divestiture an increasingly impotent remedy by diminishing Activision Blizzard's ability to compete as an independent company. If the Court permits Microsoft to continue down this path, divestiture may become an impotent remedy, because when Plaintiffs ultimately prevail, there could be little left of Activision Blizzard for the Court to divest.

Microsoft asserts that in Plaintiffs' Motion to Hold Separate, "Plaintiffs did not merely seek to maintain the status quo," because the Court, relying on Microsoft's representations that it would maintain Activision Blizzard as an independent subsidiary, "did not order Microsoft to do so" when it denied Plaintiffs' Motion for Preliminary Injunction.[4] ECF No. 367 at 7 (citing ECF No. 290 at 2:16–20). In other words, Microsoft argues that its representations to the Court were non-binding because the Court did not enter an order requiring Microsoft to follow through with them, an argument that turns the professional duty of candor on its head. When the Court decided the Motion to Hold Separate, there was no reason to think Microsoft would renege on its representations. But now, it is apparent that those representations functioned as a smokescreen that allowed Microsoft to press forward with dismantling Activision Blizzard immediately after the merger, notwithstanding the fact that the Court had blessed divestiture as a remedy in this action, noting that it is "simple, relatively easy to administer, and sure." ECF No. 189 at 8 (quoting *California v. American Stores Co.*, 495 U.S. 271, 281 (1990)). Thus, where once the Court found no legal basis to act, there now exists ample justification for judicial intervention.

---

[4] Presumably, this language reflects the Court's holding that it did not have jurisdiction over Plaintiffs' motion based on Microsoft violating a court order. Here, Plaintiffs do not argue that the Court has jurisdiction over the Motion because Microsoft violated a court order. Rather, Plaintiffs argue that the Court has jurisdiction to order Microsoft to maintain the status quo, *see Nat. Res. Def. Council, Inc. v. Sw. Marine Inc.*, 242 F.3d at 1166, which Microsoft has conclusively demonstrated it will not do absent a court order.

Case No. 3:22-cv-08991-JSC 10
PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION

Moreover, Plaintiffs' requested relief is narrow, highly targeted, and reasonable: they ask the Court to order only that Microsoft preserve Activision Blizzard as an independent subsidiary until Plaintiffs' claims are decided on the merits. Given the arguments set forth here and in Plaintiffs' Memorandum of Points and Authorities in support of the Motion—and especially given Microsoft's representations to the Court—such an order is warranted.

**E.  Microsoft's Argument That This is Merely a Motion for Reconsideration Ignores Microsoft's Intervening Conduct**

Seemingly liberated from the constraints of formal logic, Microsoft asserts that Plaintiffs' Motion is "effectively" a motion for reconsideration of the Court's denial of Plaintiffs' Motion for Preliminary Injunction and Motion to Hold Separate (together, the "Prior Motions"). ECF No. 367 at 7. Generally stated, reconsideration is appropriate where there has been an intervening change in controlling law, new evidence has become available, or it is necessary to correct clear error or prevent manifest injustice. *See Sch. Dist. No. 1J Multnomah County, Oregon v. ACandS, Inc.,* 5 F.3d 1255, 1263 (9th Cir. 1993). To seek reconsideration based on allegations of newly-discovered evidence, the moving party must show that the evidence: "(1) is truly newly-discovered; (2) could not have been discovered through due diligence; and (3) is of such material and controlling nature that it demands a probable change in the outcome." *Unites States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1131 (E.D. Cal. 2001). For purposes of a motion for reconsideration, evidence is not "new" if it was in the moving party's possession or could have been discovered prior to the court's ruling. *See Coastal Transfer Co. v. Toyota Motor Sales*, 833 F.2d 208, 212 (9th Cir. 1987).

Here, Microsoft argues that Plaintiffs' Motion is flawed because "[t]he facts Plaintiffs rely on are neither new nor material." ECF No. 367 at 8. Microsoft's characterization of the facts in question not only misrepresents the substance of Plaintiffs' argument but also fundamentally misunderstands the evidentiary basis upon which it is premised. Plaintiffs chose not to fashion their motion as one for reconsideration *precisely because* there are no "truly newly-discovered" facts that existed but were not discovered when the Court ruled on Plaintiffs' Prior Motions. Rather, Plaintiffs' instant Motion arose from facts that did not yet exist when the Court denied Plaintiffs' Prior Motions. Specifically, Plaintiffs base this Motion on the facts that, after the merger closed, Microsoft: (1) removed Bobby Kotick as

CEO and removed Mike Ybarra as president, installing Microsoft's own Matt Booty and Phil Spencer as the new heads of Activision Blizzard; (2) terminated 1,900 gaming-division employees, a move that heavily impacted Activision Blizzard and diminished its ability to compete independently in the video game market; (3) fired 83% of Activision Blizzard's esports staff; (4) cancelled at least one eagerly-anticipated Activision Blizzard AAA game that had been in development for years; and (5) severed and weakened ties with two Activision Blizzard game studios instrumental to the development of Activision Blizzard's tentpole franchise, *Call of Duty*. Because these facts came to be *after* the Court's Prior Orders, there is nothing for the Court to reconsider.

Citing excerpts from Mr. Kotick's deposition, Microsoft claims that "Plaintiffs already knew before their earlier motions that Mr. Kotick planned to depart Activision." ECF No. 367 at 8. That claim is not accurate. According to the transcript of Mr. Kotick's March 17, 2023 deposition, Mr. Kotick: (1) told Microsoft President and CEO Satya Nadella that he would honor his employment contract and "stay[] as long as they need me for the integration process"; (2) predicted he would leave Activision Blizzard "[u]nless they come with another thing for me to do" besides running the games business; and (3) testified that he did not have a specific end date for his employment in mind. ECF No. 367-2 at 8. None of these statements put Plaintiffs on notice that Mr. Kotick's possible departure was certain before Plaintiffs filed the Prior Motions. Microsoft's citation to Mr. Kotick's December 1, 2023, deposition transcript (ECF No. 367-3) does nothing to change that fact, because that deposition took place *after* Plaintiffs filed their Motion for Preliminary Injunction on April 24, 2023, and Motion to Hold Separate on October 9, 2023.

Microsoft also wrongly asserts that Plaintiffs "omit that Toys for Bob . . . remains in existence, going back to its roots as a 'small and nimble' independent studio.'" ECF No. 367 at 5. In fact, Plaintiffs' Motion explains exactly that: "[I]n Novato, California, the Toys for Bob game studio—which also supported *Call of Duty* and lost 86 employees during Microsoft's layoffs—is shutting down its physical offices and leaving Activision Blizzard *to return to its roots as an independent developer*." ECF No. 350 at 11 (emphasis added). Moreover, this development was not "pro-competitive," as Microsoft disingenuously claims. ECF No. 367 at 5. Especially after the merger and Microsoft's subsequent layoffs, "small and nimble" Toys for Bob cannot reasonably be considered a direct

competitor against the behemoth that is Microsoft Gaming, and Microsoft offers no evidence that suggests otherwise.[5]

In sum, Microsoft's attempt to frame Plaintiffs' Motion as a flawed motion for reconsideration is baseless and should not be countenanced by the Court.

**F. Microsoft's Delay Arguments Are Inapposite**

Microsoft makes much of the fact that, during a January 26, 2024, meet-and-confer call, Plaintiffs' counsel indicated that Plaintiffs were considering filing a motion for a TRO. *See* ECF No. 350 & 367-1 ¶ 4. Microsoft claims that Plaintiffs' "delay" in filing the Motion renders their showing of irreparable harm meaningless. ECF No. 367 at 8-9. But, "[a]lthough a plaintiff's failure to seek judicial protection can imply the lack of need for speedy action, such tardiness is not particularly probative in the context of ongoing, worsening injuries." *Arc of Cal. v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014) (internal quotation marks and citations omitted). In such circumstances, "the magnitude of the potential harm becomes apparent gradually, undermining any inference that the plaintiff was sleeping on its rights." *Id.* at 990-91 (internal quotation marks and citation omitted). Moreover, "[u]sually, delay is but a single factor to consider in evaluating irreparable injury; courts are loath to withhold relief solely on that ground." *Id.* (internal quotation marks omitted); *see Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984) ("We would be loath to withhold relief solely [because plaintiff slept on his rights], but we do give that fact consideration in measuring the claim of urgency.").

Here, the irreparable harm to Plaintiffs is compounding. Once Microsoft and Activision Blizzard completed the merger, the ground began to shift, and it has not stopped shifting since. As noted, incrementally, Microsoft has: (1) removed Bobby Kotick as CEO and removed Mike Ybarra as president; (2) terminated 1,900 gaming-division employees; (3) fired 83% of Activision Blizzard's

[5] As for Sledgehammer Games, which lost a third of its staff and closed its main offices because of Microsoft's layoffs, Microsoft's claim that the studio is "fully functional" is laughable given that Microsoft fired its environment artist, system designer, and "basically [its] entire [quality assurance] team," among dozens of other vital employees. Levi Winslow, *Not Even Call of Duty Devs Are Safe from Layoffs*, Kotaku (Jan. 25, 2024), available at https://kotaku.com/call-of-duty-layoffs-infinity-ward-raven-sledgehammer-1851198666; *see* Shubhankar Parijat, *Call of Duty Developer Sledgehammer Games Reportedly Lays off Over 70 People*, Gaming Bolt (Feb. 8, 2024), available at https://gamingbolt.com/call-of-duty-developer-sledgehammer-games-reportedly-lays-off-over-70-people.

esports staff; (4) cancelled at least one Activision Blizzard AAA game; and (5) severed and weakened ties with two Activision Blizzard game studios.[6] Cumulatively, over time, these actions have inflicted enormous irreparable harm on Activision Blizzard, and through it, the players of its games, including Plaintiffs. Given that "the magnitude of the potential harm [to Plaintiffs became] apparent gradually," Microsoft is wrong to imply that Plaintiffs slept on their rights and therefore cannot be harmed by the continuing conduct shown. *Arc of Cal.*, 757 F.3d at 990.

Moreover, the very idea that Plaintiffs have been ready to file their Motion for weeks but have simply been biding their time to obtain a litigation advantage is absurd. Plaintiffs are no better situated than the general public to know Microsoft's plans for Activision Blizzard and are wholly dependent on reporting from news media to learn when Microsoft has taken an action that harms Activision Blizzard's ability to compete as an independent company, or harms the content that Activision produces. Plaintiffs are likely only able to present to the Court a small fraction of what is actually happening. Plaintiffs do not have discovery providing insight into Microsoft's current conduct. Plaintiffs are not provided any prior notice from Microsoft before Microsoft fires employees or eliminates some of Activision's AAA projects. And Microsoft has not submitted declarations or other assurances that it will not continue destroying Activision Blizzard as a competitor. Rather, Plaintiffs can only rely on reports of Microsoft's actions as they dripped out over the months following the merger. Plaintiffs—mindful that any single action by Microsoft (e.g., the removal of Mike Ybarra and Bobby Kotick) was not enough to warrant injunctive relief—were forced to determine when "enough was enough." Plaintiffs had to determine when the threat of further irreparable harm had reached a point to require emergency relief. Plaintiffs finally decided that Microsoft had crossed that line only after Plaintiffs had pieced together the various media reports throughout February.[7] Microsoft's position that Plaintiffs' Motion is untimely is meritless and no ground to deny relief.

---

[6] These facts represent only what has been publicly reported—who knows what other activities Microsoft is taking behind their "walled garden."

[7] This included reports in February showing what a boon the Activision Blizzard merger has been to Microsoft's gaming business in 2023, at the same time Microsoft increases prices, lowers output, cancels games, and diminishes quality. *See, e.g.*, Zachs Equity Research, *Microsoft (MSFT) Up 2.6% Since Last Earnings Report: Can It Continue?*, Yahoo Finance (Feb. 29, 2024) (noting that Microsoft's gaming revenues grew 49% year over year, "with 44 points of net impact from the Activision acquisition"), available at https://finance.yahoo.com/news/microsoft-msft-2-6-since-163043085.html.

Case No. 3:22-cv-08991-JSC 14

PLAINTIFFS' REPLY IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE AND MOTION FOR PRELIMINARY INJUNCTION

## III. CONCLUSION

For all the above reasons, the Court should issue appropriate injunctive relief to preserve the status quo, preserve divestiture as an effective remedy that will return competition to its pre-merger levels, and prevent irreparable harm.

Dated: March 29, 2024

By: */s/ Joseph R. Saveri*
Joseph R. Saveri

Joseph R. Saveri (State Bar No. 130064)
Cadio Zirpoli (State Bar No. 179108)
Elissa Buchanan (State Bar No. 249996)
David H. Seidel (State Bar No. 307135)
Kathleen J. McMahon (State Bar No. 340007)
**JOSEPH SAVERI LAW FIRM, LLP**
601 California Street, Suite 1000
San Francisco, California 94108
Telephone: (415) 500-6800
Facsimile: (415) 395-9940
Email: jsaveri@saverilawfirm.com
czirpoli@saverilawfirm.com
eabuchanan@saverilawfirm.com
dseidel@saverilawfirm.com
kmcmahon@saverilawfirm.com

Joseph M. Alioto (SBN 42680)
Tatiana V. Wallace (SBN 233939)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email: jmalioto@aliotolaw.com
twallace@aliotolaw.com

*Plaintiffs' Counsel*